UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: FCA US LLC MONOSTABLE ELECTRONIC GEARSHIFT LITIGATION <br><br> MDL No. 2744 <br><br> This Document Relates to: PERSONAL INURY TRACK CASES | Master File No.16-md-02744 <br> Honorable David M. Lawson <br> Magistrate Judge David R. Grand |
| DEBRA MANEOTIS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FCA US LLC, a Delaware Corporation, <br><br> Defendant. | |

**CONSOLIDATED MASTER COMPLAINT FOR PERSONAL INJURY
ACTIONS AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..................................................................................1

II.  PURPOSE AND FUNCTION OF THIS COMPLAINT ...............................4

III.  JURISDICTION AND VENUE ...............................................................6

IV.  PARTIES ..........................................................................................7

    A.  Personal Injury Plaintiffs.........................................................7

    B.  Defendant ..............................................................................8

V.  FACTUAL ALLEGATIONS ...................................................................9

    A.  FCA and the ZF Electronic Gear Shifter...................................9

        1.  The National Highway Transportation Safety Administration Has Determined the ZF Shifter Is Poorly Designed ................12

        2.  Reports to NHTSA Recount Horrifying Incidents of Vehicle Rollaway ................................................................16

        3.  FCA and ZF Maintain That There Is Nothing Wrong With the Defective Shifter Vehicles .......................................................18

        4.  FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury. ..........................................................19

        5.  FCA Finally Provides a Purported Remedy for Certain Defective Shifter Vehicles: One that is Ineffective and Diminishes the Functionality of the Defective Shifter Vehicles.20

        6.  FCA Knew or Should Have Known of the Serious Defect in the Defective Shifter Vehicles and That the Defect Could Lead to Serious Injury and Death. ..........................................................27

    B.  Allegations Relating to the Underlying Actions ..................................28

        1.  Dedra Maneotis .......................................................................29

2. Philip and Isabel ("Liz") Rivera ...............................................30

3. John J., Christine Pia, and Timothy D. Malone .......................31

4. Rebecca Peoples ...........................................................................33

5. Daneen Holcomb ..........................................................................34

6. Judy and Mark Borlin ..................................................................35

7. Gary A. Massey ............................................................................37

8. Wilbert Norton J.R. ......................................................................39

C. Damages .................................................................................................40

VI. TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL......41

A. Equitable Tolling ..................................................................................41

B. Estoppel .................................................................................................43

VII. VIOLATIONS ALLEGED...................................................................................43

A. Dedra Maneotis .....................................................................................43

COUNT I  NEGLIGENCE ...............................................................................43

COUNT II  NEGLIGENCE PER SE................................................................47

COUNT III  STRICT PRODUCT LIABILITY ...............................................48

B. Philip and Liz Rivera............................................................................51

COUNT I  NEGLIGENCE ...............................................................................51

COUNT II STRICT LIABILITY: PRODUCT LIABILITY..............................54

COUNT III STRICT LIABILITY: PRODUCT LIABILITY .............................59

C. John J., Christine Pia, and Timothy Malone .......................................60

COUNT I NEGLIGENCE ..................................................................................61

COUNT II NEGLIGENCE PER SE...................................................................63

- ii -

COUNT III FAILURE TO WARN ........................................................................65

COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY 66

COUNT V LOSS OF SPOUSAL CONSORTIUM..................................................70

COUNT VI LOSS OF PARENTAL CONSORTIUM .............................................71

    D.    Becky Peoples ...................................................................................71

COUNT I NEGLIGENCE .................................................................................72

COUNT II STRICT LIABILITY: PRODUCT LIABILITY ...................................76

COUNT III BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY 79

COUNT IV BREACH OF EXPRESS WARRANTY ............................................80

COUNT V CONSUMER PROTECTION ACT.....................................................81

COUNT VI UNJUST ENRICHMENT ...............................................................82

    E.    Daneen Holcomb ................................................................................83

COUNT I NEGLIGENCE RESULTING IN PERSONAL INJURY ....................83

COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY .87

COUNT III BREACH OF EXPRESS WARRANTY ............................................88

COUNT IV VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)...........................................88

COUNT V UNJUST ENRICHMENT...................................................................90

COUNT VI PUNITIVE DAMAGES ..................................................................91

    F.    Judy and Mark Borlin ........................................................................92

COUNT I STATUTORY DEFECTIVE DESIGN/FORMULATION (O.R.C. § 2307.75)............................................................................................92

COUNT II STATUTORY INADAQUATE WARNING/INSTRUCTION  (O.R.C. § 2307.76) ............................................................................................94

COUNT III VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT (OHIO REV. CODE § 1345.01, *ET SEQ.*)......................................................96

COUNT IV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (OHIO REV. CODE § 1302.27, *ET SEQ.*)(U.C.C. § 2-314) ........................99

COUNT V LOSS OF CONSORTIUM ................................................................100

    G.    Gary Massey........................................................................................101

COUNT I NEGLIGENCE .................................................................................101

COUNT II STRICT LIABILITY: PRODUCT LIABILITY................................104

COUNT III PUNITIVE DAMAGES ..................................................................110

    H.    Wilbert Norton J.R. ............................................................................111

COUNT I CAUSE OF ACTION FOR PRODUCTS LIABILITY .......................111

REQUEST FOR RELIEF ..................................................................................112

DEMAND FOR JURY TRIAL .........................................................................112

The Personal Injury Plaintiffs, pursuant to the Court's Pretrial Order No. 6: Miscellaneous Procedural Directives [Dkt. No. 56]("Pretrial Order No. 6"), file this Master Consolidated Complaint. The cases included in the Personal Injury Track as of the date of the filing of this Master Consolidated Complaint are listed in the attached Exhibit K. The Personal Injury Plaintiffs, based on personal knowledge and upon information and belief as to all other matters based on an investigation by counsel, allege as follows:

## I.  INTRODUCTION

1.      Car makers must design and manufacturer their cars to be safe to operate. One of the most basic safety features in every car is the gear shifter that causes a stationary car to remain stationary unless and until the driver wants the car to move. The design of a gear shifter must be such that drivers know when a car is safe to exit because it is in the "park" mode, and if a car maker decides to use a monostable shifter that does not change positions, it must include a safety override that automatically puts the car in park or engages the parking brake when the driver gets out of the car.

2.      FCA US LLC ("FCA") broke this basic rule when it designed and manufactured cars with monostable shifters that did not provide a reliable method of determining gear placement and did not include any safety-override to prevent rollaway accidents. In its 2012-14 Dodge Chargers and Chrysler 300s, and 2014-15

Jeep Grand Cherokees ("Defective Shifter Vehicles"), FCA installed gear shifters, designed and manufactured by ZF Friedrichshafen AG ("ZF"). Departing from the long established "PRND" gear selector that provided a distinct position of the shifter for each gear, ZF shifters were electronic and never actually "shifted" into any gear, instead returning to a central location after being engaged (the "ZF Shifter"). The ZF Shifter design is dangerously defective because there is not any tactile or position feedback to the operator as to whether the car has actually been placed into the safe-to-exit "park" gear, nor is there a safety override that automatically puts the car in "park" or applies the parking brake if the driver gets out of the car.

3.      The safety issue is real. As of February 2016, the National Highway Transportation Safety Administration ("NHTSA") and the Office of Defects Investigation ("ODI") (collectively, "NHTSA-ODI") had identified over 300 incidents of vehicle rollaway and/or accidents following intended shifts to Park due to the Defective Shifter, including 121 incidents that resulted in crashes and 30 that involved injuries.  Injuries included fractured pelvises, a ruptured bladder, a fractured kneecap, broken ribs, broken noses, facial lacerations requiring stitches, sprained knees, severe bruising and trauma to legs.   There were 325 additional complaints regarding Defective Shifter Vehicles drivers' difficulty shifting into Park.

4.      The design defect was avoidable. FCA competitors, including BMW, have for several years used similar electronic gear shifters that return to center after being engaged. But on the BMW, if the car is not in "park," and the driver opens the door and unbuckles the seat belt, the car automatically shifts into "park," preventing roll-away incidents and accidents.

5.      The Audi A8 luxury sedan used the identical ZF Shifter, but Audi did not introduce a single A8 into the market before designing and implementing a safety override that automatically engaged the electronic parking brake if the driver's door was opened and the seatbelt unbuckled. FCA could have provided a similar safety override, but it chose not to.

6.      Though complaints and accident reports have been ongoing since soon after FCA began selling Defective Shifter Vehicles, FCA has only recently initiated a voluntary recall of the over 811,000 Defective Shifter Vehicles in the United States. Initially, FCA only sent a letter to owners describing the design defect of the ZF Shifter, even though it knew a viable fix existed and could solve the problem. After years of blaming roll-away accidents on its customers and telling them the cars were not defective, the widely publicized death of Anton Yelchin, a popular young actor, and the filing of a class action complaint, caused FCA to finally change its tune and issue a recall to purportedly add an "Autopark" feature to the defective shifter mechanism.

7.      FCA's unreasonable delay in fixing the defect and its warning letter was too little, too late. Nearly a million Defective Shifter Vehicles remain in unsuspecting owners' driveways and garages. As a result of this dangerous defect, the Defective Shifter Vehicles are a hazard to their owners and the public and directly caused injuries to Personal Injury Plaintiffs

8.      Personal Injury Plaintiffs seek damages for FCA's tortious conduct related to the defectively designed gear selector as alleged in this Master Consolidated Complaint. Specifically, Personal Injury Plaintiffs seek: compensation for rehabilitation, medical bills, pain & suffering, property damage, overpayment for a defective vehicle, consequential damages, and punitive damages for FCA's knowing disregard for its customers' safety in designing and selling the Defective Shifter Vehicles.

## II.      PURPOSE AND FUNCTION OF THIS COMPLAINT

9.      The purpose of this Consolidated Master Complaint, as directed by the Court's Order Setting Schedule, is to include all plaintiffs who have made claims of personal injury. This Consolidated Master Complaint includes a section identifying each Personal Injury Plaintiff, a section containing common factual allegations, a description of the underlying incident involving a Defective Shifter Vehicle for each Personal Injury Plaintiffs, and a compendium of the causes of

action that the Personal Injury Plaintiffs have asserted in their respective complaints.

10.     This Consolidated Master Complaint is intended to be an administrative convenience to the Court and the parties and to be a consolidation for purposes of this MDL proceeding only and for the duration of this MDL proceeding only. It does not constitute a "*Lexecon* waiver" and does not waive the right of the Personal Injury Plaintiffs in the underlying actions to have their cases tried in the District in which they were originally filed. *See* Pretrial Order No. 6 at ¶ I. ("This consolidation does not constitute a determination that the actions should be consolidated for trial, nor does it have the effect of making any entity a party to any action in which he, she or it has not been named, served or added in accordance with the Federal Rules of Civil Procedure.").

11.     This Consolidated Master Complaint neither waives nor dismisses any claims for relief against Defendant not included in this pleading that are asserted by Personal Injury Plaintiffs in actions that have been or will be made part of this MDL proceeding. Certain claims for certain parties may, consistent with 28 U.S.C. § 1407 and the case law thereunder, be matters for determination on remand by transferor courts.

12.    This Consolidated Master Complaint is not intended to alter the choice of law rules that apply to the underlying individual actions, which have been filed in several different states.

13.    In the event that a material number of additional individual actions are filed and transferred to this MDL Proceeding, Plaintiffs' Lead Counsel anticipate that they will propose a procedure to allow additional plaintiffs to "adopt" this Consolidated Master Complaint or portions of it.

## III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over the underlying Personal Injury Plaintiffs' claims based on diversity of citizenship under 28 U.S.C. § 1332(a)(1), because the state of citizenship of each of the plaintiffs is different from the state of citizenship of each of the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.[1]

15.    Venue is appropriate in this District pursuant to the Transfer Order entered by the Judicial Panel on Multidistrict Litigation on February 2, 2017.  [dkt. No. 43].  Venue lies in this District pursuant to 28 U.S.C. § 1391 because FCA maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Personal Injury Plaintiffs' claims occurred in this District, and because Defendant conducts a substantial amount of business

---

[1] The following action was originally filed in state court and removed to federal court: *Wilbert Norton, J.R. v. FCA US LLC*, (Case No. 4:16-cv-03640).

in this District. Accordingly, Defendant has sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.

## IV.    PARTIES

### A.    Personal Injury Plaintiffs

16.    The following are the Personal Injury Plaintiffs as of the date of the filing of this Master Amended Consolidated Complaint.

| Plaintiff(s) | Citizenship | Vehicle |
|---|---|---|
| Dedra Maneotis | Citizen of the State of Colorado residing in Craig, Colorado | 2014 Jeep Grand Cherokee |
| Philip and Isabel Rivera | Citizens of the State of Georgia residing in , Woodstock, Georgia | 2014 Jeep Grand Cherokee |
| John J. Malone, Christine Pia Malone, and Timothy D. Malone | Citizens of the State of Massachusetts residing in Beverly, Massachusetts (John J. and Christine Pia Malone) and Jamaica Plain, Massachusetts (Timothy D. Malone) | 2015 Jeep Grand Cherokee |
| Becky Peoples | Citizen of the State of New Hampshire residing in Atkinson, New Hampshire | 2014 Jeep Grand Cherokee |
| Daneen Holcomb | Citizen of the State of Virginia residing in Bumpass, Virginia | 2014 Jeep Grand Cherokee |
| Judy and Mark Borlin | Citizen of the State of Ohio residing in Solon, Ohio | 2014 Jeep Grand Cherokee |
| Gary A. Massey | Citizen of the State of Georgia residing in Jefferson, Georgia | 2012 Dodge Charger |
| Wilbert Norton, J.R. | Citizen of the State of Texas residing in Harris | 2013 Chrysler 300 |

| | County, Texas | |
|---|---|---|

**B.     Defendant**

17.     Defendant FCA is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan.  FCA is a member of the Fiat Chrysler Automobiles N.V. ("Fiat Chrysler") family of companies.  Fiat Chrysler is a Dutch corporation with its headquarters in London, England.  As of 2015, FCA is the seventh largest automaker in the world by unit production.

18.     FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, Fiat and Maserati brands in this District and throughout the United States. FCA manufactures, distributes, and sells motor vehicles and parts through its network of authorized motor vehicle dealers.  FCA engages in interstate commerce by selling vehicles through this its authorized dealers located in every state of the United States, including within this District.

19.     At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States.  Defendant and/or its agents designed, manufactured, and/or installed the Defective Shifter in the Class Vehicles.  Defendant and/or its agents also developed and disseminated the owner's manuals and warranty

booklets, advertisements and other promotional materials relating to the Class

Vehicles.

## V.     FACTUAL ALLEGATIONS

### A.     FCA and the ZF Electronic Gear Shifter

20.     The Defective Shifter Vehicles were equipped with the ZF shifter,

which is an 8-speed transmission with an electronic gear selector.

21.     On its website announcing a "voluntary recall" of these vehicles, FCA

describes the ZF Shifter as follows:

> The vehicles affected by this recall are equipped with
> electronic shift levers that return to the same position
> after each manipulation. Gear selection is conveyed to
> the driver by multiple sets of indicator lights, not gear-
> selector position, and unless due care is taken, drivers
> may draw erroneous conclusions about the status of their
> vehicles.[2]

22.     The ZF Shifter does not have positions for each gear setting, *i.e.*, Park,

Reverse, Neutral, Drive ("PRND"). Rather, it always rests in the same position

after having been pushed up or down from that position. The following is a picture

of the ZF Shifter in a Jeep Grand Cherokee:

---

[2] *See* Exhibit A,
http://media.fcanorthamerica.com/newsrelease.do?id=17455&amp;mid=1 (last
viewed on October 17, 2016).



23.     Importantly, the ZF Shifter does not include a safety override that prevents the driver from getting out of the car when it is not in "park." Other manufacturers, including BMW, use monostable electronic gear shifters like the ZF Shifter, but *the BMW gear shifter has a safety override*. If the BMW is not in "park" and the driver's door is opened while the seatbelt is unbuckled, the car *automatically shifts into "park."* This safety override eliminates the possibility of the roll-away incidents that plague the Defective Shifter Vehicles.

24.     Likewise, the Audi A8 luxury sedan uses the same ZF Shifter that FCA used in the Defective Shifter Vehicles. But Audi did not sell a single A8 equipped with the ZF Shifter until it had developed a safety override that

automatically engaged the electronic parking brake on the car if the driver's door is opened while the seatbelt is unbuckled.

25.    It is indisputable that from the time FCA first sold a Defective Shifter Vehicle, it had the ability and technological capability to install a safety override that would have prevented the roll-away incidents that have plagued the Defective Shifter Vehicles and caused hundreds of accidents, dozens of injuries, and at least one death. It simply chose not do so.

26.    FCA has already recognized that the ZF Shifter has a problem. As noted on its website, "To address customer satisfaction issues, the Company began equipping the Charger and 300 with a new shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was updated in model year 2016."[3]

27.    In FCA's own recall chronology it states that as of April 12, 2016, "FCA has identified approximately 700 field reports potentially related to this issue which includes 212 crashes, 308 claims of property damage and 41 injuries."[4]

---

[3] *See id.*

[4] *See* Exhibit B, FCA US LLC Chronology, Monostable Gear Selector (Submitted on April 22, 2016), available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514516/RMISC-16V240-7112.pdf (last visited Dec. 16, 2016).

1.    **The National Highway Transportation Safety Administration Has Determined the ZF Shifter Is Poorly Designed**

28.    The National Highway Transportation Safety Administration ("NHTSA") Office of Defects Investigation ("ODI") opened Preliminary Evaluation PE15-030 on August 20, 2015, to investigate 14 reports of rollaway 2014-15 Jeep Grand Cherokee vehicles.[5]

29.    In early February, 2016, amid continuing reports of roll-away vehicles, NHTSA upgraded its investigation to an engineering analysis, after determining the issue is one of design rather than defect.[6]

30.    NHTSA described the defect as follows:

Monostable electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift system operates electronically and the gear requested by the driver is transmitted from the shifter via the CAN Bus to the Transmission Control Module which makes the requested shift. The Monostable gearshift does not move into a detent but springs back to a centered/neutral position after the driver selects a gear and releases the shifter. A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or Park.

The gear selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds

---

[5] *See* Exhibit C, http://www-odi.nhtsa.dot.gov/owners/SearchResultsByUrlCode.action?referenceSearch.requestId=48801&referenceSearch.urlCode=RGRCHIUC3ZXFGZZ (last accessed October 17, 2016).

[6] *See* Exhibit B.

and a message is displayed on the EVIC to warn the driver.  In addition, the engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.***[7]

31.     NHTSA testing during PE15-030 indicated that the operation of the monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection.[8]

32.     ODI's analysis of the PE15-030 complaint and field report data identified 306 incidents of vehicle rollaway following intended shifts to "park" in the 2014-2015 Grand Cherokee.[9] These resulted in 117 alleged crashes and caused the following injuries:

> Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg). Other injuries include reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs.[10]

---

[7] *Id.* (emphasis added).

[8] *See* Exhibit B.

[9] *See* Exhibit C.

[10] *Id.*

33.     MY 2012-2014 Chrysler 300 and Dodge Charger vehicles (L-cars) equipped with 3.6L engines use the same Defective ZF Shifter found in the Jeep Grand Cherokee. [11] ODI received 8 complaints, including 4 crashes and 2 injuries on the L-cars.[12]

34.     On April 22, 2016, FCA submitted a Defect Information Report, informing NHTSA that "[t]he existing strategies built into these vehicles to deter drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so."[13]  FCA admitted that "[d]rivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."[14]

35.     NHTSA continued to investigate the Defective Shifter and perform its Engineering Analysis through June 24, 2016.  As a result of this analysis, NHTSA found the Defective Shifter "appears to violate several basic design guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function

---

[11] *Id.*

[12] *Id.*

[13] *See* Exhibit D, Part 573 Safety Recall Report (Submitted on April 22, 2016), available at http:// http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-3644.PDF (last visited Jan. 5, 2017).

[14] *Id*.

the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[15]

36.    NHTSA concluded that the "[a]udible chimes" and "visual warning[s]" provided to alert drivers that the vehicle is not in Park when the engine is running and the driver's door is opened are ineffective.   NHTSA stated:

> Based on ODI's interviews with complainants, in some incidents the driver believed they had left the vehicle idling in Park when they exited, but the vehicle was not in Park.  In other incidents the drivers believed they had turned the engine Off after shifting to Park, but failed to recognize that the engine did not shutoff and the vehicle was not in Park.  The engine noise at idle is not obvious to many drivers who may not recognize that the engine continues to run after attempted shutoff.

37.    Lastly, NHTSA identified one fatal crash potentially related to one of the Defective Shift Vehicles, a 2015 Jeep Grand Cherokee, stating:

> In addition to the crashes and injuries documented in this closing resume, ODI is aware of a fatal incident involving a recalled 2015 Jeep Grand Cherokee that occurred over the weekend of June 18-19, 2016 in Studio City, California that may be related to the alleged defect. The incident is being investigated by the Los Angeles Police Department and FCA.[16]

---

[15] *See* Exhibit E ("NHTSA-ODI Resume 2" announcing the findings of the Engineering Analysis announced in NHTSA-ODI Resume 1).

[16] *Id.*

2.      **Reports to NHTSA Recount Horrifying Incidents of Vehicle Rollaway**

38.      NHTSA has received hundreds of reports of rollaway incidents involving the Defective Shifter Vehicles, including the reports copied verbatim below:

> MY WIFE PULLED THE CAR INTO A COMMUNITY PARK AND PUT THE JEEP IN PARK AND OPENED THE DOOR TO GRAB HER SONS LOST DOG. NEXT THING SHE KNOWS THE JEEP IS ROLLING, AND PROCEEDS TO RUN HER OVER AND CONTINUES DOWN A SMALL HILL INTO SOME TREES. SHE WAS TAKEN TO THE HOSPITAL VIA A 911 CALL AND WE ARE NOW WAITING FOR RESULTS FROM AN MRI. THIS PROBLEM COULD HAVE KILLED HER IF SHE DIDN'T GET HER HEAD OUT OF THE WAY.

> ON AUGUST 19, 2014, I STEPPED OUT OF MY STATIONARY 2014 JEEP GRAND CHEROKEE OVERLAND BELIEVING I HAD PUT THE VEHICLE IN PARK ON A GENTLE CITYSTREET SLOPE WHEN IT SUDDENLY MOVED BACKWARD, ROLLING OVER MY LEFT LEG AND SEVERELY DAMAGING MY KNEE, SKIN, ARTERY, AND QUAD MUSCLES. MY WIFE IMMEDIATELY CALLED AN AMBULANCE, WHICH TRANSPORTED ME TO A LOCAL HOSPITAL, WHERE DOCTORS SURGICALLY ATTACHED AN "EXTERNAL FIXATOR" IN THREE PLACES, STABILIZING AND COMPLETELY IMMOBILIZING MY LEG (FOR THE NEXT FIVE WEEKS). AFTER A SECOND SURGERY AND OVER A YEAR OF PAINFUL AND ARDUOUS THERAPY LATER, I CAN NOW WALK WITH A KNEEBRACE, HALTINGLY AND WITH A NOTICEABLE LIMP. . . ALL DUE TO THE JEEP GRAND CHEROKEE'S

TRANSMISSION THAT DOES NOT ACCURATELY INDICATE WHAT GEAR IT IS IN! UNLESS ONE IS CONCENTRATING 100+% OF THE TIME ON THE CONSOLE SHIFTER AND CONSTANTLY GLANCING AT THE INDICATOR LIGHTS ON THE VEHICLE DASHBOARD THE DRIVER NEVER KNOWS WHAT POSITION THE JEEP'S TRANSMISSION IS IN! THE SHIFTER ON THE CONSOLE ALWAYS LOOKS EXACTLY THE SAME, NO MATTER WHAT GEAR HAS SUPPOSEDLY BEEN SELECTED. WE HAD NO ABSOLUTELY FOREWARNING OF THE POTENTIAL LIFE THREATENING PROBLEM INHERENT IN THIS VEHICLE'S DESIGN, AND I CAN ONLY THANK GOD THAT I'M STILL ALIVE TODAY. LAST WEEK WE WERE SURPRISED TO RECEIVE WRITTEN NOTIFICATION FROM FIAT CHRYSLER AUTOMOBILES THAT THE COMPANY AND NHTSA HAD RECALLED 2014 JEEP GRAND CHEROKEES FOR THE SPECIFIC DEFECT DESCRIBED IN MY INCIDENT ABOVE! (FINALLY! VINDICATION!) THE RECALL NUMBER IS SHOW BELOW, I BELIEVE. FCA VEHICLE RECALL NUMBER: S27 / NHTSA 16V240

ON FEBRUARY 25TH, I SHIFTED MY CAR INTO PARK AND WAS GETTING OUT TO LOOK AT BACK WIPER WHICH SEEMED TO BE STUCK. I HAD LEFT THE CAR RUNNING. THE CAR TOOK OFF IN GEAR AND CAUSED ME TO FALL AND BREAK MY ANKLE IN AN OPEN COMPOUND FRACTURE THAT REQUIRED HOSPITALIZATION AND SURGERY. MY JEEP ENDED UP HITTING A PARKED GARBAGE TRUCK AND SUSTAINED ABOUT $5000 DAMAGE. WHO KNOWS WHAT MY MEDICAL BILLS WILL END UP BEING. PLUS MY ANKLE MAY NEVER BE RIGHT. I WILL INCLUDE A PHOTO OF MY CAR AND XRAY. IT HAPPENED ON PRIVATE PROPERTY (TACO BELL PARKING LOT). A POLICE OFFICER CAME AND PARKED

> MY CAR AND CALLED AN AMBULANCE BUT DID
> NOT MAKE A REPORT SINCE ON PRIVATE
> PROPERTY. WE HAVE NOT HEARD FROM
> GARBAGE TRUCK AND DOUBT IT DID
> ANYTHING TO IT. THE CAR WAS IN PARK AND
> NOT SURE HOW FAST WAS GOING WHEN HIT
> THE GARBAGE TRUCK

**3.  FCA and ZF Maintain That There Is Nothing Wrong With the Defective Shifter Vehicles**

39.  While FCA has acknowledged it knows of 41 injuries that may be related to what it describes as a "confusing" shifter, it has stated: "the vehicles involved in these events were inspected and no evidence of equipment failure was found."[17]

40.  ZF issued a press release stating:

> ZF supplies gearshift systems to automotive
> manufacturers according to their technical and design
> specifications. The manufacturer designs the integration
> of the gearshift system into the vehicle operating concept
> and develops the respective safeguard mechanisms. ZF
> delivered a fully functional state-of-the-art product,
> which was integrated into the vehicle architecture by the
> manufacturer. As such, ZF is unaware of any indications
> that claims could be made against ZF in the context of
> the current NHTSA investigations of the FCA vehicle
> models "2014-15 Grand Cherokee; 2012-14 Charger &
> 300 w/3.6 l engine".[18]

---

[17] *See* Exhibit F, http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed on October 17, 2016).

[18] *See id.*

41.     The Defective Shifter Vehicles have been under investigation by NHTSA since August 20, 2015, yet FCA concealed detailed information on the defect by marking as confidential all but two pages from its owner's manual in the presentation it provided to NHTSA in response to its investigation. FCA has purposefully kept consumers and its customers in the dark about the ZF Shifter defect. This shroud of secrecy has unquestionably increased the risk of accidents, injury and death to consumers because it has delayed consumer awareness to take extreme care to ensure that the "park" position is engaged before getting out of a Defective Shifter Vehicle.

### 4.     FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury.

42.     FCA's foot-dragging on notifying its customers and drivers of the dangerous ZF Shifter defect and taking steps to correct it is, unfortunately, business as usual for FCA. As reported in the *New York Times* on June 21, 2016, Center for Auto Safety Executive Director Clarence Ditlow said, "There was no sense of urgency on Chrysler's part or NHTSA's part given the potential for death or injury."[19] The *Times* pointed out that NHTSA "had publicly chastised the company, which acknowledged delaying recalls in almost two dozen cases going

---

[19] Christopher Jensen, Exhibit G, *Anton Yelchin's Death Highlights a Known Issue With Jeeps*, THE NEW YORK TIMES, June 21, 2016, http://www.nytimes.com/2016/06/22/business/anton-yelchins-death-highlights-a-known-issue-with-jeeps.html?_r=0.

back to 2013 and affecting millions of vehicles."[20] NHTSA Head Mark Rosekind had said at the time, "[t]his represents a significant failure to meet a manufacturer's safety responsibilities."[21]

43.     FCA promised to speed up its recalls and agreed to pay close to $105 million in penalties. But this case evidences the fact that little has changed. FCA's corporate culture is still putting profits ahead of safety and FCA customers and drivers are being maimed, even killed, as a result.

**5.     FCA Finally Provides a Purported Remedy for Certain Defective Shifter Vehicles: One that is Ineffective and Diminishes the Functionality of the Defective Shifter Vehicles.**

44.     After its prolonged and unreasonable delay, FCA responded to the Defective Shifter maelstrom by providing a purported remedy that: (1) is ineffective and/or causes roll-aways of Defective Shifter Vehicles; (2) leads to other mechanical failures in the Defective Shifter Vehicles; and/or (3) diminishes the functionality of the Defective Shifter Vehicles.

45.     Moreover, numerous Defective Shifter Vehicle owners have reported that they never received a recall notice from FCA, and have yet to be contacted by

---

[20] *Id.*

[21] Exhibit H, http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-pubic-hearing/27531875/ (last visited November 25, 2016).

the Company or offered the purported remedy for the Defective Shifter in their Defective Shifter Vehicles.

46.     On information and belief, dealerships have reported that the first recall remedy was ineffective, many of the Defective Shifter Vehicles have had to be fixed more than once, and they are unsure whether the second recall remedy will, in fact, effectively fix the ZF Shifter.

47.     FCA already has admitted that at least 13,000 Defective Shifter Vehicles in the United States have not been properly fixed even though they were recalled and repaired by the Company.[22]  According to a November 16, 2016 *Associated Press* article: "The new software was supposed to make the cars and SUVs automatically shift into park when the driver's door is opened while the engine is running.  But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[23]

48.     FCA spokesman Eric Mayne stated: "The software didn't work in a small number of vehicles with certain engine, transmission and two- or four-wheel-drive combinations . . . In most cases we initiated the installation of that software without the customer having to show up with the recall notice in hand. It just

---

[22] *See* Exhibit I, Tom Krishner, *Software Fix Didn't Work on Some Fiat Chrysler Gearshifts*, ASSOCIATED PRESS, Nov. 16, 2016.

[23] *Id.*

wasn't the right software for their particular vehicles."[24]   Thus, certain consumers

have experienced dangerous rollaway incidents after their Defective Shifter

Vehicles were repaired.

49.   FCA sent certain Defective Shifter Vehicle owners a second recall

notice, informing them of the need to take their Defective Shifter Vehicle to the

dealership for additional repairs.   The second recall notice states:

> Our records indicate that the recall repairs were
> attempted on your vehicle at a FCA US dealer.   Further
> investigation by FCA US has determined, however, that
> **your vehicle <u>did not</u> receive the complete and proper
> recall repair.   Your vehicle's software requires
> additional updating**. . . . **Until the complete recall
> repair is performed on your vehicle, your vehicle may
> roll away striking and injuring you, your passengers,
> or bystanders, if the vehicle's engine is left running,
> the parking brake is not engaged and the vehicle is
> not in the "PARK" position before exiting the
> vehicle**."[25]

50.   Consumers also report that FCA's purported remedy led to other

mechanical failures in their Defective Shifter Vehicles.   These mechanical failures

occurred shortly after the software update was performed on the Defective Shifter

Vehicles.

51.   Below is a sample of complaints lodged with NHTSA as a results of

FCA's purported remedy:

---

[24] *Id.*

[25] *See* Exhibit J ("Notice of Need For Additional Repairs").

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/14/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN, UNKNOWN OR OTHER
**NHTSA ID Number:** 10895811
MY JEEP WAS SERVICED TWICE FOR THE RECENT SHIFTER PROBLEM
THAT CHRYSLER IDENTIFIES AS DRIVER INATTENTION OR
CONFUSION. THE SOFTWARE PATCH THAT IS INTENDED TO "AUTO
PARK" THE VEHICLE, HAS FAILED ON TWO OCCASIONS. THE ENGINE
IS STARTED, I APPLY THE BRAKE AND PLACE THE SHIFTER INTO
REVERSE OR A FORWARD GEAR. I THE DESIRED GEAR IS
ILLUMINATED AND I EASE OF THE BRAKE, HOWEVER, WHEN APPLY
GAS THE ENGINE SIMPLY RACES AS IF THE TRANSMISSION IS STILL
IN PARK OR NEUTRAL. JEEPS ATTEMPT TO FIX A PROBLEM HAS NOW
LED TO ANOTHER PROBLEM. THIS VEHICLE IS UNRELIABLE AND A
DEATH MACHINE. I HAVE NO CONFIDENCE IN IT'S OPERATION AND I
CAN'T IN GOOD CONSCIENCE SELL THIS VEHICLE TO ANYONE. JEEP
CORPORATE SHOULD BE IN JAIL.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/15/2016
**Date of Incident:** 08/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895959
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT
STATED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA
CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE
VEHICLE WAS STILL EXPERIENCING THE SAME FAILURE. THE
CONTACT STATED THAT THE VEHICLE SLIPPED OUT OF PARK
SEVERAL TIMES AFTER BEING REPAIRED. THE CONTACT NOTIFIED
THE DEALER, BUT HAD NOT RECEIVED AN ALTERNATIVE REPAIR
SOLUTION. THE FAILURE MILEAGE WAS 10,000. UPDATED 10/04/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898220
I DRIVE THE 2014 GR CHEROKEE WITH THE ELECTRONIC GEAR
SHIFTER THAT HAS BEEN RECALLED FOR THE SHIFTER NOT

ENGAGING ALL OF THE WAY INTO PARK. I HAD THE RECALL 'FIX' DONE A COUPLE OF MONTHS AGO, BUT THEN FOUND OUT FROM THE DEALER THAT THE EMERGENCY BRAKE ONLY ENGAGES IF YOU ATTEMPT TO OPEN ONE OF THE DOORS. ABOUT A WEEK AGO, AFTER PARALLEL PARKING ON A BUSY CITY STREET, I PUT THE CAR IN PARK AND REMAINED IN THE CAR FOR ABOUT ANOTHER MINUTE WHILE FISHING QUARTERS OUT OF MY CUPHOLDER (FOR THE PARKING METER). I ALL OF A SUDDEN FELT LIKE SOMETHING HIT MY CAR, LOOKED UP ONLY TO FIND MY CAR HAD ROLLED BACKWARD INTO THE PARKED CAR BEHIND ME. I HAVE A HUGE BIKE RACK ON THE BACK OF MY JEEP THAT BLOCKS THE REVERSE CAMERA, SO THE AUDIBLE SECURITY ALERT IS ALWAYS ON WHEN THE CAR IS IN REVERSE - THIS ALERT DID NOT COME ON WHILE THE CAR WAS ROLLING BACKWARD, THEREFORE, THE CAR WAS NOT IN REVERSE, BUT RATHER NOT IN PARK ALL OF THE WAY. THANKFULLY THERE WERE NO PEDESTRIANS BEHIND MY CAR, NOR ANY DAMAGE TO EITHER VEHICLE, HOWEVER, IF A PERSON WOULD HAVE HAD THEIR BACK TO ME, I WOULD HAVE CRUSHED THEM BETWEEN THE TWO CARS. MY CAR HAS NOW BEEN AT THE DEALERSHIP FOR 6 DAYS (SECOND TIME FOR SAME ISSUE) AND I'M DEALING WITH CUSTOMER SERVICE DEPARTMENTS WITHIN CHRYSLER/JEEP TO RECTIFY THIS ISSUE SOMEHOW. I WANT EITHER A NEW GEAR SHIFTER THAT IS NOT ELECTRONIC, OR TO GET OUT OF THIS VEHICLE. THIS GEAR SHIFTER IS AN ENORMOUS SAFETY HAZARD. I FEEL LIKE I'M GETTING THE RUN-AROUND, TO SAY THE LEAST, ABOUT A MAJOR RECALL THAT IS THE AUTO MAKERS FAULT, NOT THE CONSUMER. FOR THE RECORD, I HAVE BEEN DRIVING APPROXIMATELY 30 YEARS AND TYPICALLY AVERAGE 20-30K MILES/YEAR. I AM CONSULTING A LAWYER AT THIS POINT.

**2013 Chrysler 300**
**Date Complaint Filed:** 09/08/2016
**Date of Incident:** 08/25/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10904633
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE FAILED TO SHIFT OUT OF PARK. THE VEHICLE WAS SERVICED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE FAILURE OCCURRED ON THE

SAME DAY SHORTLY AFTER THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/04/2016
**Date of Incident:** 10/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10913784
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER ATTEMPTING TO PLACE THE VEHICLE IN PARK AND EXIT, THE CONTACT DISCOVERED THAT THE GEAR SHIFT FAILED TO MOVE INTO THE PARK POSITION AND THE ACCESSORY WARNING INDICATOR ILLUMINATED. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE VEHICLE WAS DIAGNOSED A SECOND TIME AND THE TECHNICIAN STATED THAT THE RECEIVING CODE FOR THE TRANSMISSION WAS NOT UPDATED TO THE COMPUTER. THE VEHICLE WAS NOT REPAIRED DUE TO THE PART BEING ON BACK ORDER. THE CONTACT MENTIONED THAT THE ACCESSORY INDICATOR REMAINED ILLUMINATED AFTER THE RECALL REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 57,000.

**2012 Dodge Charger**
**Date Complaint Filed:** 08/23/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10897869
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. THE CONTACT STATED THAT THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS REMEDIED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). ATER LEAVING THE DEALER, THE CHECK ENGINE AND TRANSMISSION WARNING INDICATORS ILLUMINATED. THE VEHICLE COULD NOT BE DRIVEN OVER 20 MPH. THE VEHICLE WAS TAKEN BACK TO THE DEALER, BUT THE DIAGNOSIS WAS UNKNOWN. THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE FAILURE MILEAGE WAS APPROXIMATELY 30,000.

**2013 Dodge Charger**
**Date Complaint Filed:** 09/20/2016
**Date of Incident:** 08/12/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10908275
TL* THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT RECEIVED A RECALL NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT TOOK THE VEHICLE TO THE DEALER. WHEN THE DEALER TRIED TO REPLACE THE PART, THE TRANSMISSION CONTROL MODULE CRASHED AND THE ENGINE STALLED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 17,000.

**2012 Dodge Charger**
**Date Complaint Filed:** 10/03/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10911109
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. AFTER THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), THE CONTACT BEGAN TO EXPERIENCE A FAILURE. THE CONTACT STATED THAT THE SHIFTER FAILED TO LOCK INTO THE DESIRED POSITION. THE CONTACT HEARD A LOUD CLONKING NOISE COMING FROM THE TRANSMISSION. THE DEALER DIAGNOSED THAT THE REPAIR CAUSED THE TRANSMISSION TO FAIL. THE CONTACT WAS UNSURE OF THE DETAILS OF THE REPAIR. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

52.     Moreover, when effective, the remedy diminishes the functionality of the Defective Shifter Vehicles.  When a driver of a Defective Shifter Vehicle opens the driver-side door but the car is not in Park, the software fix abruptly places the vehicle in Park even if the driver is not exiting the vehicle.

    **6.**    **FCA Knew or Should Have Known of the Serious Defect in the Defective Shifter Vehicles and That the Defect Could Lead to Serious Injury and Death.**

53.    FCA's knowledge as described in this Complaint is reflected in internal communications, including memoranda and e-mail and in reports of other incidents—including those compiled in the NHTSA database, which FCA regularly reviews—involving FCA's vehicles.

54.    On information and belief, FCA's knowledge as described in this Complaint is reflected in its compilations and analyses of crash data.

55.    On information and belief, FCA's knowledge as described in this Complaint is reflected in the results of tests conducted by Defendant and others, including but not limited to failure mode and effects analyses (FMEA), human factors simulations, pre-release vehicle evaluation tests, computer simulations, and cost/benefit analyses.

56.    Upon reasonable inspection and testing of the Defective Shifter Vehicles and each of such vehicles' components, Defendant knew or should have known the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, were defective and unreasonably susceptible to failure.

57.    Defendant knew or should have known of the defective design and manufacture of the Defective Shifter Vehicles, including the Personal Injury

Plaintiffs' vehicles, and failed to take reasonable corrective steps in curing the defects.

58.    Defendant had sufficient knowledge, expertise, availability, and resources to inspect the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, for defects before sale.

59.    Defendant failed to properly inspect and confirm the safety of the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' vehicles, before its entry into the stream of commerce and sale.

60.    Defendant failed to complete a reasonable inspection of the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' vehicles, which inspection would have revealed the unreasonably high potential for the failure of the Defective ZF Shifter.

61.    The Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, were manufactured without adequate quality control measures and without using appropriate manufacturing procedures.

**B.     Allegations Relating to the Underlying Actions**

62.    The following are the underlying accidents that transpired involving each of the Personal Injury Plaintiffs as of the date of the filing of this Master Consolidated Complaint.

63.     Each of the following injuries occurred during a rollaway incident that happened during the ordinary use and reasonably forseeable use of the vehicle at issue.

64.     In each incident, upon information and belief, the ZF Shifter in the Defective Shifter Vehicle at issue was in the same essential condition as it was at the time that it left the vehicle manufacturer's control.

### 1.     Dedra Maneotis

65.     On December 20, 2013, Dedra Maneotis was attempting to exit her 2014 Jeep Grand Cherokee through the driver's side door in her driveway when the vehicle started to roll backward. With her left leg out, she tried to hop along with her left foot while holding on to the door and the steering wheel.

66.     But the car door clipped a half-height decorative wall and bent backward, causing Dedra to lose her grip on the door handle. She struggled to stay upright as the car gained speed down the hill.

67.     Dedra grew tired and had to let go of her hold on the vehicle. She fell, and her leg got wrapped up in the front driver-side wheel. The Jeep rolled up onto the half-height decorative wall and over Dedra's leg. It then rolled over, and then spun out on, Dedra's leg causing the injury. While the vehicle moved backward to the street, the leg that remained in the car caused her to flip around in the street, preventing a dangerous head injury.

68.     Today, Dedra has nerve damage and is numb from the knee to the toes. Her legs get tight quickly and she cannot walk more than 50 yards without difficulty. Since the crash, she has relied on pain medication for near constant pain – she cannot even sit down without pain. Her knee is permanently damaged and she has scarring on her leg.

69.     After Dedra's rollaway incident, Dedra's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

**2.      Philip and Isabel ("Liz") Rivera**

70.     On October 13, 2014, Philip Rivera was driving separately behind his wife Liz who was driving the couple's 2014 Jeep Grand Cherokee. Liz pulled into their garage, exited the vehicle, and left the driver's side door open with the engine running.

71.     Philip saw that Liz left the engine running in their 2014 Jeep Grand Cherokee so he exited his vehicle, walked to the open door of the 2014 Jeep Grand Cherokee, reached across the steering wheel to push the start/stop button to shut off the engine. But the engine would not shut off and Philip thought it was strange that the engine would continue to run after he pushed the start/stop button.

72.     The 2014 Jeep Grand Cherokee then began to roll backwards by itself down the incline of the driveway. Philip tried to stop it by pushing with his hands on the door frame. However, the driver side door knocked Phil down onto the

driveway forcing his right leg under the car. The driver side front wheel ran over Philip's right leg pinning him under the vehicle. The vehicle stopped and Philip's right leg and upper thigh. Philip was pinned for at least 10 minutes.

73.     Philip was hospitalized for over two weeks where he was treated for severe trauma to his right leg and thigh. He then required home care for an additional 30 days.

74.     Philip has had two skin grafts. Nonetheless, his leg is permanently swollen and disfigured.  Philip continues to live with constant pain. He cannot walk, sit, or stand for extended periods due to the resulting pain. He also suffers from nerve damage and numbness from his knees to his toes.

75.     After Philip's rollaway incident, Philip and Liz's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

**3.     John J., Christine Pia, and Timothy D. Malone**

76.     On June 2, 2016, John J. Malone went to Sudbay Jeep in Gloucester, Massachusetts for the required brake pad service for his 2015 Jeep Grand Cherokee. When the service was complete, he drove to a nearby store to pick up a newspaper. He parked a few feet away from a concrete wall, put his Grand Cherokee in "park," pushed the ignition button to turn the car off, and got out of the car. But something was wrong. Usually, when John turned off his car and opened the door, the radio stopped. This time, as he stepped onto the ground, he

heard the radio still playing. With his left foot on the ground, he noticed the car was in gear and was moving. He tried to hit the brake, but it was too late. The car kept moving, hit the concrete wall, bounced back, and pinned his left leg between the open door and the doorframe.

77.     John suffered grave injuries including but not limited to a torn ACL and fractures and severe bruising to the bones of his knee.

78.     After his release from Beverly Hospital, he began physical therapy. He wore a leg brace and walked with a cane. He needed fluid drained from his knee three times. But the pain continued to increase. X-rays confirmed that, due to the damage from the accident, his knee bones were deteriorating.

79.     John's injuries require a total knee replacement. However, John has previously been diagnosed with cancer and the knee replacement surgery will affect his cancer treatment.

80.     John's injuries require a total knee replacement. However, John has previously been diagnosed with cancer and the knee replacement surgery will affect his cancer treatment.

81.     John's injuries have precluded from working and forced him to cancel a paid-for trip with his son to Ireland.

82.     Prior to John's rollaway incident, the Malone 2015 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

### 4. Rebecca Peoples

83.    On November 8, 2015, at approximately 6pm, Becky drove her 14 year-old daughter to her father's house to get her gear bag for basketball practice. It was dark out, and no one was home at her father's house, so her daughter asked if Becky would walk her up to the front door and wait there for her while she retrieved her bag. Becky put her 2014 Jeep Grand Cherokee in "park," but left it running because it was a very cold evening. She and her daughter then got of the car and walked up to the porch of the house, where Becky waited while her daughter went inside to get her bag.

84.    As Becky was waiting, Becky suddenly noticed it was rolling away in reverse.  Becky thought the car was being stolen so she ran to the car to try and see who was in it.  When she saw that no one was in the car she chased after it to try to gain control of it before it injured someone or caused an accident.  Becky was able to reach the handle of the drivers' door and pulled it open, but then Becky was being dragged and saw that the car was going to hit the neighbors' mail box so she let it go and dropped down to avoid being caught between the car and the mailbox post.

85.    Becky was still trying to get in the car when it reversed direction and began proceeding down the driveway it just went up. The sudden change in direction knocked Becky out of the driver's door well and onto the ground face

down.  The car then rolled over both of Becky's legs. Apparently as a result of adrenaline, Becky was able to stand up and get control of the car after it rolled through the street again and into a neighbor's fence. Becky and her daughter went to her brother's house which was directly around the corner from the accident scene and from there was taken to the hospital.

86.     Becky suffered nerve damage and numbness in both of her legs. She is in constant pain and experiences difficulty and pain while walking, sitting, or standing for prolonged periods of time. She also suffered to damage to her knees and scarring.

87.     After Becky's rollaway incident, Becky's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

**5.     Daneen Holcomb**

88.     On January 16, 2015, Daneen Holcomb left her house to go to a scheduled doctor's appointment. Daneen stopped at the end of her driveway to place outgoing mail in her mailbox.  Daneen put the car in "park," then opened the door and stepped out.  The 2014 Jeep Grand Cherokee immediately began to roll and the open door pushed Daneen to the ground where her head and back struck the gravel drive.  The left front wheel of the Jeep then rolled over Daneen's feet and ankles.

89.     Daneen was transported by ambulance to the hospital. Daneen's injuries included severe ankle sprains, soft tissue injury, contusions and deep lacerations to her heels and feet. She endured tremendous swelling of her feet and ankles and intense pain.  Daneen was unable to work for several weeks following the accident and was required to lay prone with her legs elevated and iced.

90.     Since returning to work, Daneen has had to work with her legs elevated on a garbage can with a pillow strapped to the can.  If Daneen sits for any period of time without elevating her legs, she suffers from shooting pains through her ankles and her heels to her arches.

91.     Daneen has undergone physical therapy for months, yet the prognosis is that she may never fully recover or be pain free. Her heals and the bottom of her feet are in constant pain and she experiences severe leg cramps. Daneen is unable to sit for any extended period of time without elevating her legs. To this day, Daneen experiences severe anxiety each time she drives her Jeep, especially with her husband, children or grandchildren.

92.     After Daneen's rollaway incident, Daneen's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

**6.     Judy and Mark Borlin**

93.     On May 20, 2016, Judy Borlin was looking for her son's dogs in a park. As Judy turned on the ignition, Judy looked up to see her son's dogs outside

2014 Jeep Grand Cherokee. She shifted the vehicle into "park" and opened the door to retrieve the dogs.

94.     After loading the first dog into her vehicle, she turned to load the second dog and noticed that her vehicle began to roll backwards towards her. Judy attempted to hit the brakes with her hand but the vehicle did not stop.

95.     The open door knocked Judy down and the front left tire ran over both of her legs. She got up and hobbled to the vehicle which stopped sixty feet away. She called her husband who called an ambulance.

96.     Judy suffered extensive trauma to her right leg and knee. She was on crutches for approximately one month following the accident and continued to suffer swelling and hematomas for several weeks. The pain was so severe that Judy returned to the ER twice to ensure that the pain was not the result of blood clots. Six weeks after the accident, a large crush wound was discovered which has since persisted for several months. Judy also suffered bruising on her left knee.

97.     Judy has bi-weekly visits to the doctor to deal with her crush wound. She also wears a negative pressure wound therapy system to help close her wound. It is unclear at this juncture whether the nerve damage is permanent. Her doctors have recommended hyperbaric oxygen therapy to promote wound healing. She has scarring, pain while walking standing, sitting, and walking, numbness, and a severe rash around the wound area. Because her injuries preclude her from exercising,

Judy has gained weight and suffered emotional and psychological distress as a result.

98.    After Judy's rollaway incident, Judy's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the ZF Shifter.

### 7.    Gary A. Massey

99.    On November 5, 2016, Gary Massey was in the driveway of a home he rents in Gainesville, Georgia. He uses the home to help the homeless and addicts who are in recovery.  Gary believed his 2012 Dodge Charger was in "park" when he exited the vehicle with the motor still running. Gary left the driver's side door open and entered the apartment for a period of about five minutes. He reentered the vehicle and then, remembering he had something else to do in the home, attempted to exit the vehicle again. While attempting to re-exit the vehicle, and without warning, the vehicle started rolling backwards. Gary attempted to control the vehicle by holding onto the steering wheel. The open door knocked Gary to the ground with enough force that he rolled backwards and his right foot and leg became lodged in the rear driver's side wheel well.

100.    Unable to pull his foot out, Gary was dragged 25 feet the asphalt as the Massey Dodge Charger continued to roll down the driveway and onto the street. The Massey Dodge Charger only came to a halt when it hit a telephone pole next to the street. Despite intense pain throughout his entire body, he was able to

pull his foot out of the wheel well, get back into the Massey Dodge Charger and drive himself to the hospital.

101.   Gary's foot turned purple almost immediately. He had multiple abrasions, commonly known as road rash, on his right rear shoulder blade and waist; this was caused by Gary's skin rubbing against the road surface as he was forcefully dragged by the vehicle. He also suffered severe bruising on his shoulder blade, waist, legs, and buttocks, as well as several puncture wounds spread throughout the same affected areas. Gary also suffered a twisted right ankle and whip lash in his neck.

102.   Three days later, Gary returned to the hospital and learned that he also had a fracture in his leg just below the knee cap.

103.   Gary has lived with constant pain ever since the rollaway incident. When clothing touches his abrasions, it causes Gary terrible pain. The abrasions also stain his clothing. Because of his broken leg, his mobility is severely impaired. He also suffers anxiety whenever he enters the vehicle.

104.   Gary has lived with constant pain ever since the rollaway incident. When clothing touches his abrasions, it causes Gary terrible pain throughout his body. Use of painkillers leaves Gary drowsy and confused and he is constantly fatigued. The abrasions also stain his clothing. Because of his broken leg, his

mobility is severely impaired and he experiences pain while sitting. He also suffers anxiety whenever he enters the Dodge Charger.

105.   Gary's 2012 Dodge Charger was recalled by FCA as a result of defects in the ZF Shifter. Although Gary's 2012 Dodge Charger was recalled before the above rollaway incident, it was not until December, 2016, <u>weeks after the rollaway incident</u>, that Gary received recall notice from FCA.

### 8.   **Wilbert Norton J.R.**

106.   On December 20, 2014, while driving home in his Chrysler 300, Wilbert Norton J.R. stopped his vehicle on the side of the road. He placed the vehicle in "park" and attempted to exit the vehicle. As he was exiting, without warning, the vehicle started moving backward. The vehicle knocked Wilbert down with his right leg going underneath the vehicle. The vehicle continued to roll backward over his right leg.

107.   Wilbert was taken by ambulance to the hospital. Wilbert's right leg was fractured 6-8 inches above his right foot. Subsequently, he had three surgeries on his leg including a skin graft. As a result, he was unable to work for over a year and a half.

108.   After Wilbert's rollaway incident, Wilbert's 2013 Chrysler 300 was recalled by FCA as a result of defects in the ZF Shifter.

## C. Damages

109.   Personal Injury Plaintiffs continue to undergo extensive rehabilitation

and medical treatment.

110.   As a result of FCA's Defective Shifter vehicles which failed to keep

Personal Injury Plaintiffs' vehicles in "park," Personal Injury Plaintiffs have

suffered numerous medical issues, including, but not limited to:

      a.  broken bones;
      b.  skin abrasions;
      c.  puncture wounds;
      d.  constant pain throughout body;
      e.  bruising throughout back and shoulders;
      f.  twisted ankle;
      g.  scarring;
      h.  pain while sitting;
      i.  pain while standing
      j.  anxiety;
      k.  whiplash
      l.  difficulty walking;
      m.  inability to perform basic chores and/or engage family;
      n.  severe rash;
      o.  nerve damage;
      p.  crush wounds;
      q.  numbness;
      r.  knee damage
      s.  tightness in leg; and
      t.  permanent swelling.

111.   The acts and omissions of FCA were the direct and proximate cause

of Personal Injury Plaintiffs' injuries and damages.

112.   Personal Injury Plaintiffs' injuries and damages were the direct result of the defective ZF Shifter installed in the Personal Injury Plaintiffs' vehicles, and their failure to keep the vehicles in park.

113.   As a direct and proximate result of the Personal Injury Plaintiffs' Defective Shifter Vehicles' defect and resulting failure, Personal Injury Plaintiffs suffered—and will continue to suffer—non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress, and impairment of quality of life.

114.   As a direct and proximate result of the Personal Injury Plaintiffs' Defective Shifter Vehicles' defect and resulting failure, Personal Injury Plaintiffs suffered—and will continue to suffer—temporary and permanent impairment, physical impairment, and disfigurement.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

### A.   Equitable Tolling

115.   The Personal Injury Plaintiffs had no way of knowing about FCA's Defective Shifters in their Class Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers.  This is the quintessential case for equitable tolling.

116.   Within the period of any applicable statutes of limitation, Personal Injury Plaintiffs could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein and misrepresenting the company's true position with respect to the safety qualities of its vehicles. Personal Injury Plaintiffs reasonably relied upon FCA's knowing and affirmative misrepresentations and/or active concealment of these facts.

117.   Within the period of any applicable statutes of limitation, Personal Injury Plaintiffs could not have discovered through the exercise of reasonable diligence that FCA was concealing the defective shifter. The causes of action alleged herein did not accrue until Personal Injury Plaintiffs discovered that their vehicles had the defective ZF Shifter. Personal Injury Plaintiffs, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – their vehicles were recalled. Even then, Personal Injury Plaintiffs had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

118.   For these reasons, all applicable statutes of limitation have been equitably tolled by operation of the discovery rule with respect to claims as to all Defective Shifter Vehicles.

**B.**     **Estoppel**

119.   FCA was under a continuous duty to disclose to Personal Injury

Plaintiffs the true character, quality, and nature of the Defective Shifter Vehicles at

issue.

120.   FCA knowingly, affirmatively, and actively concealed the true nature,

quality, and character of the Defective Shifter Vehicles at issue. Personal Injury

Plaintiffs reasonably relied upon Defendants' knowing and affirmative

misrepresentations and/or active concealment of these facts.

121.   Based on the foregoing, FCA is estopped from relying on any statutes

of limitations in defense of this action.

## VII.   VIOLATIONS ALLEGED

**A.**     **Dedra Maneotis**

122.   The following causes of action apply to Dedra Maneotis:

## COUNT I

## NEGLIGENCE

123.   Plaintiff realleges and incorporates by reference all paragraphs as

though fully set forth herein.

124.   FCA, as a designer, manufacturer, and seller of the Grand Cherokee

under C.R.S. § 13-21-401, owed Plaintiff a duty to exercise reasonable care to

prevent the Grand Cherokee from creating an unreasonable risk of harm to

Plaintiff, a person reasonably expected to use the Grand Cherokee by FCA and who did so in a manner which FCA might have reasonably expected.

125. The Grand Cherokee failed because FCA failed to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm. FCA's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, prepared for distribution, and/or sold the Grand Cherokee.

126. FCA's negligent acts include but are not limited to:

a. negligently designing the Grand Cherokee;

b. negligently designing and incorporating, among other components, a defective electronic shifter;

c. failing to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Grand Cherokee in a foreseeable manner;

d. failing to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

e. failing to incorporate safer alternative designs and formulations during the design and manufacture of the Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Grand Cherokee without impairing its usefulness;

f. failing to adequately inspect and test the Grand Cherokee before sale or distribution; and

g.    failing to recall and remove the Grand Cherokee from the stream of commerce before it malfunctioned during Plaintiff's use.

127.   Dedra Maneotis was a person who FCA reasonably expected, or should have reasonably expected, to use or be affected by the Grand Cherokee.

128.   FCA knew, or should have known in the exercise of reasonable care, of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

129.   The risk of rollaway was known or knowable to FCA in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

130.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

131.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Grand Cherokee on December 20, 2013, when Dedra Maneotis was attempting to park it and it failed catastrophically.

132.   The risk of serious injury or death resulting from a rollaway incident was not obvious to Plaintiff or to the general public.

133.   FCA had a duty to warn Dedra Maneotis and the general public given the high likelihood of accident and the seriousness of consequences, such as death or serious injury.

134.   A reasonably prudent manufacturer would warn drivers that the monostable shifter fails to shift the vehicle into park and that the vehicle is therefore susceptible to rollaway, which can cause serious injury or death.

135.   FCA was obligated to warn, and should have warned, users of the danger involved in using the vehicle.

136.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm – not apparent to an ordinary user – involved in any intended or reasonably expected use.

137.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm – not apparent to an ordinary user – involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

138.   As a direct and proximate result of Defendant's breach of its duties, Dedra Maneotis sustained injuries, damages, and losses that were caused by FCA's

negligence while the Grand Cherokee was being used in a manner FCA should reasonably have expected.

## COUNT II

### NEGLIGENCE PER SE

139.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

140.   FCA was negligent *per se*.

141.   Under 49 U.S.C. § 30101, *et seq*., the purpose of which was to reduce traffic accidents and death and injuries from traffic accidents, and 49 C.F.R. § 573.6 promulgated thereunder, FCA was required to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

142.   This statute was enacted for public safety and designed to protect Plaintiff and other drivers and passengers of vehicles from defective conditions in their vehicles that may cause death or physical injury.

143.   The ignition switch defect in Plaintiff's vehicle was a defect that related to motor vehicle safety because it resulted in a failure of a vehicle to remain stationary when the occupant intended it to do so.  FCA was therefore required to furnish a defect report to the NHTSA.  FCA failed to furnish the required report for years after knowing about the rollaway safety defect and therefore violated the statute and regulations promulgated thereunder.

144.   Plaintiff suffered serious personal injury as a direct and proximate result of FCA's failure to furnish the required defect reports to the NHTSA.

145.   FCA's statutory violation for failing to file the required defect reports was a proximate cause of Plaintiff's injuries. Had the requisite defect reports been furnished to the NHTSA, Plaintiff's vehicle would have been recalled and the defect corrected or, alternatively, Plaintiff would have been on notice of the defective condition in her vehicle and could have avoided driving the vehicle while the defective condition persisted.

## COUNT III

## STRICT PRODUCT LIABILITY

146.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

147.   Defendant is a "manufacturer" and seller under C.R.S. § 13-21-401, as it designed, assembled, fabricated, produced, constructed, and prepared the Grand Cherokee before it was sold. Defendant is a "seller" under the same statute because it was a manufacturer, wholesaler, and distributor engaged in the business of selling a product for resale or use, with actual knowledge of the defects in the Grand Cherokee.

148.   Defendant sold the Grand Cherokee to a business affiliated with Dedra Maneotis.

149.   FCA placed the Grand Cherokee in the stream of commerce and expected it to reach the user or consumer without substantial change in the condition in which it was sold. Indeed, it reached Dedra Maneotis – someone who would reasonably be expected to use, consume, or be affected by the Grand Cherokee – without substantial change in the condition in which it was sold.

150.   The Grand Cherokee was defective, and its defects are outlined throughout this Complaint.  Generally, they comprise the design and provision of a dangerous, defective shifter and, despite knowledge of the defects, the failure to warn consumers about the shifter's defects.

151.   In situations such as Dedra's – where the driver used the vehicle as intended and in a foreseeable and reasonable manner – the vehicle should not fail.

152.   Nevertheless, the Grand Cherokee failed, and it did so because of design defects in the Grand Cherokee existing when it left the manufacturer's control.

153.   Defendant knew or should have known of the defective design of the Grand Cherokee and that, as a result, it was unreasonably dangerous.

154.   While history has shown the ZF Shifter causes serious injury and death to operators, it adds no additional utility beyond that offered by traditional automatic shifters, which were readily available, inexpensive, and devoid of the unsafe aspect of the ZF shifter.  Had a traditional shifter been used, the risk of

injury or death from an inadvertent vehicle rollaway would have been eliminated or rendered insignificant.

155.   But, beyond this, FCA could still have kept its drivers safe from the ZF shifter by incorporating a safety override (as it did for other cars) that automatically engaged the electronic parking brake when the driver's door was opened and the seatbelt was unbuckled.  This override would cure the unsafe aspect of the ZF Shifter without impairing any purported usefulness or imposing unreasonable costs.   This sensible, cost-effective feature would have prevented Dedra's and many others' injuries and harm.

156.   The Jeep Grand Cherokee and ZF Shifter performed exactly as intended by FCA, and yet the vehicle was unreasonably dangerous. The danger inherent in the ZF shifter was not obvious to Dedra Maneotis or the general public, nor could they have avoided danger with additional care in the use of the shifter.

95.    The defects in design and inspection made the Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

96.    Defendant did not warn or alert purchasers or users of the foregoing dangers, despite knowledge of them.

157.   As a direct and proximate result of the defects in the Grand Cherokee's design and manufacture and FCA's failures to warn, Dedra Maneotis has sustained injuries, damages, and loss.

158.   Defendant is strictly liable to Dedra Maneotis for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Grand Cherokee.

**B.   Philip and Liz Rivera**

159.   The following causes of action apply to Philip and Liz Rivera:

## COUNT I

## NEGLIGENCE

160.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

161.   FCA, as a designer, manufacturer, and seller of the Rivera Jeep Grand Cherokee, under C.R.S. § 13-21-401, owed Plaintiff a duty to exercise reasonable care to prevent the Rivera Jeep Grand Cherokee from creating and unreasonable risk of harm to Plaintiff, who was a person reasonably expected to use the Rivera Jeep Grand Cherokee by FCA and who did so in a manner which FCA might have reasonably expected.

162.   The Rivera Jeep Grand Cherokee failed because FCA failed to exercise reasonable care to prevent the Rivera Jeep Grand Cherokee from creating

an unreasonable risk of harm.  FCA's failures occurred when it manufactured,

designed, engineered, developed, tested, approved, inspected, repaired, labeled,

advertised, promoted, marketed, distributed, wholesaled, and/or sold the Rivera

Jeep Grand Cherokee.

163.   FCA negligent acts include but are not limited to:

a.   negligently designing the Rivera Jeep Grand Cherokee;

b.   negligently designing and incorporating, among other
components, a defective electronic shifter;

c.   failing to exercise reasonable care to prevent the Rivera
Jeep Grand Cherokee from creating an unreasonable risk
of harm to the person or property of one who might
reasonably be expected to use the Rivera Jeep Grand
Cherokee in a foreseeable manner;

d.   manufacturing an unsafe product, the Rivera Jeep Grand
Cherokee;

e.   failing to warn the consumer of the risk of harm or injury
where a reasonably careful person would have done so
under the circumstances;

f.   failing to incorporate safer alternative designs and
formulations during the design and manufacture of the
Rivera Jeep Grand Cherokee that were practicable and
would have eliminated the unsafe nature of the Rivera
Jeep Grand Cherokee without impairing its usefulness;

g.   failing to adequately test the Rivera Jeep Grand Cherokee
before retail sale;

h.   failing to adequately inspect, during the manufacture and
fabrication, the Jeep Grand Cherokee; and

      i.     failing to recall and remove the Rivera Jeep Grand Cherokee from the stream of commerce before it malfunctioned during Plaintiff's use.

164.   Phil was a person, or should have been a person, FCA reasonably expected to use or be affected by the Rivera Jeep Grand Cherokee.

165.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

166.   The risk of roll-away was known or knowable to FCA in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

167.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Rivera Jeep Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

168.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Rivera Jeep Grand Cherokee on October 13, 2014, when Phil Rivera was attempting to shut off the Rivera Jeep Grand Cherokee and the vehicle failed catastrophically.

169.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm—not apparent to an ordinary user—involved in any intended or reasonably expected use;

170.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm—not apparent to an ordinary user—involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

171.   As a direct and proximate result of Defendant's breach of its duties, Phil Rivera sustained injuries, damages, and losses that were caused by FCA's negligence while the Rivera Jeep Grand Cherokee was being used in a manner FCA should reasonably have expected.

**COUNT II**
**STRICT LIABILITY: PRODUCT LIABILITY**

172.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

173.   Defendant is a "manufacturer" and seller under GA. CODE ANN. § 51-1-11 *et seq.* and is engaged in the business of manufacturing and selling vehicles, including the Rivera Jeep Grand Cherokee.

174.   Defendant is a "manufacturer" of the Rivera Jeep Grand Cherokee under GA. CODE ANN. § 51-1-11 *et seq.*,, as it is an entity that designed, assembled,

fabricated, produced, constructed, prepared and sold the Rivera Jeep Grand Cherokee.

175.   Defendant is a "manufacturer" of the Rivera Jeep Grand Cherokee under GA. CODE ANN. § 51-1-11 *et seq.*, as it is a seller who had actual knowledge of a defect in the Rivera Jeep Grand Cherokee.

176.   Defendant is a "seller" of the Rivera Jeep Grand Cherokee under GA. CODE ANN. § 51-1-11 *et seq.*, as it is an entity and manufacturer engaged in the business of selling or leasing any product, including the Rivera Jeep Grand Cherokee, for resale, use, or consumption.

177.   Defendant sold the Rivera Jeep Grand Cherokee to Liz Rivera's employer for use by Liz Rivera.

178.   The Rivera Jeep Grand Cherokee was expected to reach the user or consumer without substantial change in the condition in which it was sold.

179.   The Rivera Jeep Grand Cherokee was placed in the stream of commerce and reached Phil Rivera without substantial change in the condition in which it was sold reached.  Phil was a person who would reasonably be expected to use, consumer or be affected by the Rivera Jeep Grand Cherokee.

180.   The Rivera Jeep Grand Cherokee was defective. These defects are outlined throughout this Complaint, but include the design and provision of a dangerous, defective shifter.

181.   Under entirely foreseeable and predictable operating conditions, such as those of Phil Rivera's at the time of the Rivera Jeep Grand Cherokee's failure, the Rivera Jeep Grand Cherokee should not fail.

182.   When the Rivera Jeep Grand Cherokee unexpectedly failed, it did so as a result of the design defects that existed within the Rivera Jeep Grand Cherokee at the time it was manufactured.

183.   Defendant knew or should have known of the defective design of the Rivera Jeep Grand Cherokee and that the Rivera Jeep Grand Cherokee was unreasonably dangerous.

184.   Because of the Rivera Jeep Grand Cherokee's defects, the Rivera Jeep Grand Cherokee was unreasonably dangerous to Phil Rivera, a person reasonably expected to use or be affected by the Rivera Jeep Grand Cherokee.

185.   The Rivera Jeep Grand Cherokee was unreasonably dangerous and created an unreasonable risk of harm to persons or property that would not ordinarily be expected.

186.   The Rivera Jeep Grand Cherokee was unreasonably dangerous because of, among other things, a defect in its design that created an unreasonable risk of harm to persons or property not outweighed by the benefits to be achieved by such design.

187.   Even when the Rivera Jeep Grand Cherokee and ZF Shifter perform exactly as intended by FCA, the vehicle is unreasonably dangerous.

188.   The Rivera Jeep Grand Cherokee was defective at the time Defendant sold it or when it left Defendant's control.

189.   The defects in design and inspection made the Rivera Jeep Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the Rivera Jeep Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

190.   Phil Rivera was a person who would reasonably be expected to use or be affected by the Rivera Jeep Grand Cherokee.

191.   The Rivera Jeep Grand Cherokee was not assembled properly and reached Phil Rivera in a condition unreasonably susceptible to failure.

192.   As a direct and proximate result of the defect in the Rivera Jeep Grand Cherokee's design and manufacture, Phil Rivera has sustained injuries, damages, and loss.

193.   Defendant is strictly liable to Phil Rivera for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Rivera Jeep Grand Cherokee.

194.   In the alternative, Defendant is a "manufacturer" of the Rivera Jeep Grand Cherokee under Colorado law because it is the apparent manufacturer of the Rivera Jeep Grand Cherokee.

195.   When it placed the Rivera Jeep Grand Cherokee into the stream of commerce through advertising, distribution, and sale of the Rivera Jeep Grand Cherokee, Defendant conveyed to the public, including Phil Rivera, that it had designed, manufactured, marketed, and sold the Rivera Jeep Grand Cherokee as its own.

196.   Phil Rivera relied upon Defendant's care in designing and manufacturing the Rivera Jeep Grand Cherokee.

197.   Phil Rivera relied upon Defendant's assurance to her that the Rivera Jeep Grand Cherokee was designed and manufactured without defect.

198.   Defendant placed its private label on the Rivera Jeep Grand Cherokee with the intent of its private label carrying some weight of quality assurance.

199.   Defendant placed its private label on the Rivera Jeep Grand Cherokee to capitalize upon and preserve Defendant's goodwill with the public, including Plaintiff.

200.   Defendant's placement of the private label was made for Defendant's benefit.

201.   Defendant's placement of the private label left Plaintiff ignorant of who manufactured the Rivera Jeep Grand Cherokee.

202.   The Rivera Jeep Grand Cherokee entered into the stream of commerce under Defendant's name. Defendant did not place any other name on the Rivera Jeep Grand Cherokee indicating that any other person, firm, or entity was the designer or manufacturer of the Rivera Jeep Grand Cherokee. Defendant's placement of its private label on the Rivera Jeep Grand Cherokee is sufficient to impose strict liability upon Defendant.

203.   As a direct and proximate result of Defendant placing its private label on the Rivera Jeep Grand Cherokee without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Rivera Jeep Grand Cherokee, Phil Rivera has sustained injuries, damages, and loss.

204.   Defendant is strictly liable to Phil Rivera for the injuries and damages caused by Defendant's placement of its private label on the Rivera Jeep Grand Cherokee without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Rivera Jeep Grand Cherokee.

## COUNT III
## STRICT LIABILITY: PRODUCT LIABILITY

205.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

206.   Defendant, through its conduct in designing, manufacturing, inspecting, testing, and selling the Rivera Jeep Grand Cherokee and its component parts, demonstrated gross neglect and an entire want of care evidencing a reckless indifference and conscious disregard to the consequences of their actions, which included an extreme degree of risk. Phil is entitled to an award of punitive damages to deter Defendant from such conduct in the future.

207.   Despite Defendant's knowledge of the dangerous defects in its Rivera Jeep Grand Cherokee, Defendant did nothing to remedy or mitigate the problem so that innocent victims like Phil would not be injured, maimed, or killed.

208.   There is clear and convincing evidence that Defendant acted with such willful, wanton, conscious, and reckless indifference, which demonstrated an entire wanton of care for the safety and well-being of victims like those involved in the Incident and others so as to evidence a conscious indifference to the consequences of its acts, which included an extreme degree of risk. These actions demand and warrant an award of punitive damages against Defendant that will punish it for the harm they have caused and that will deter it from similar future misconduct.

## C.   John J., Christine Pia, and Timothy Malone

209.   The following causes of action apply to John J., Christine Pia, and Timothy Malone:

## COUNT I
## NEGLIGENCE

210.   Mr. Malone realleges and incorporates by reference all paragraphs as though fully set forth herein.

211.   Jeep was the designer, manufacturer, distributor, marketer, and seller of the Grand Cherokee.

212.   Specifically, but without limitation:

> a.   Jeep owed Mr. Malone a duty to comply with existing standards of care, and to exercise due care, in providing a Grand Cherokee which was free of defects and safe for its intended use.

> b.   Jeep owed Mr. Malone a duty to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to Mr. Malone.

213.   Jeep breached those duties and was otherwise negligent in its design, manufacturing, distribution, marketing, and sale of the Grand Cherokee, which was sold to Mr. Malone.

214.   The Grand Cherokee failed because Jeep failed to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm. Jeep's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, prepared for distribution, and/or sold the Grand Cherokee.

215.   Jeep failed to exercise due care in accordance with the standard of care and skill required of, and ordinarily exercised by, a designer, manufacturer, distributor, marketer, and seller of automotive vehicles.

216.   Jeep's negligent acts include but are not limited to:

    a.    negligently designing the Grand Cherokee;

    b.    negligently designing and incorporating, among other components, a defective electronic shifter;

    c.    failing to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Grand Cherokee in a foreseeable manner;

    d.    failing to incorporate safer alternative designs and formulations during the design and manufacture of the Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Grand Cherokee without impairing its usefulness;

    e.    failing to adequately inspect and test the Grand Cherokee before sale or distribution; and

    f.    failing to recall and remove the Grand Cherokee from the stream of commerce before it malfunctioned during Mr. Malone's use.

217.   Mr. Malone was a person who Jeep reasonably expected, or reasonably should have expected, to use or be affected by the Grand Cherokee.

218.   Jeep knew, or should have known in the exercise of reasonable care, of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured

defects described above, but Jeep chose not to incorporate these alternative designs.

219.   The risk of rollaway was known or knowable to Jeep in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

220.   The risk of serious injury or death resulting from a rollaway incident was not obvious to Mr. Malone or the general public.

221.   Jeep knew or should have known in the exercise of reasonable care that (1) the use of the Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

222.   Jeep's negligent actions, including its lax quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Grand Cherokee on June 2, 2016 when John Malone was attempting to park his vehicle, and it failed catastrophically.

223.   As a result of the June 2, 2016 rollaway accident, John Malone was injured by Jeep's negligence.

## COUNT II
## NEGLIGENCE PER SE

224.   Mr. Malone realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

225.   Jeep was negligent *per se*.

226.   Under 49 U.S.C. § 30101, *et seq.*, the purpose of which was to reduce traffic accidents and death and injuries from traffic accidents, and 49 C.F.R. § 573.6 promulgated thereunder, Jeep was required to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

227.   This statute was enacted for public safety and designed to protect Mr. Malone and other drivers and passengers of vehicles from defective conditions in their vehicles that may cause death or physical injury.

228.   The ZF Shifter defect in Mr. Malone's vehicle was a defect that related to motor vehicle safety because it resulted in a failure of a vehicle to remain stationary when the occupant intended it to do so.  Jeep was therefore required to furnish a defect report to the NHTSA.  Jeep failed to furnish the required report for years after knowing about the rollaway safety defect and therefore violated the statute and regulations promulgated thereunder.

229.   Mr. Malone suffered serious personal injury as a direct and proximate result of Jeep's failure to furnish the required defect reports to the NHTSA.

230.   Jeep's statutory violation for failing to file the required defect reports was a proximate cause of Mr. Malone's injuries.  Had the requisite defect reports been furnished to the NHTSA, Mr. Malone's vehicle would have been recalled and the defect corrected or, alternatively, Mr. Malone would have been on notice of the

defective condition in his vehicle and could have avoided driving the vehicle while the defective condition persisted.

**COUNT III**
**FAILURE TO WARN**

231.   Mr. Malone realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

232.   Jeep, as the designer, manufacturer, distributor, marketer, and seller of the Grand Cherokee, owed Mr. Malone a duty to warn the Mr. Malone of any dangers, defects, or risk of harm or injury that were not obvious to Mr. Malone or the general public.

233.   The Grand Cherokee designed, manufactured, distributed, marketed, and sold by Jeep was defective, and as such posed a substantial health and safety risk to Mr. Malone and other members of the public.

234.   Jeep knew or reasonably should have known that the Grand Cherokee was defective.  Jeep knew or reasonably should have known of the substantial health and safety risk the Grand Cherokee posed to Mr. Malone and other members of the public.

235.   The risk that Mr. Malone's Grand Cherokee would be involved in a rollaway accident was not obvious to Mr. Malone or the general public.

236.    Mr. Malone was reasonably unaware of the substantial health and safety risk posed by the Grand Cherokee designed, manufactured, distributed, marketed, and sold by Jeep.

237.    A reasonable designer, manufacturer, distributor, marketer, and seller of automotive vehicles would have known that the risk of harm or injury from a rollaway accident was not obvious to Mr. Malone or other members of the public and would have warned Mr. Malone that his Grand Cherokee posed a serious risk of harm or injury due to a rollaway accident.

238.    Jeep breached its duty to Mr. Malone by failing to warn Mr. Malone of the risk of harm or injury where a reasonably careful person would have done so under the circumstances.

239.    As a result of Jeep's failure to warn Mr. Malone of the non-obvious risk of a rollaway accident, Mr. Malone was injured by his Grand Cherokee on June 2, 2016.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

240.    Mr. Malone realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

241.    Jeep is a manufacturer and seller, as it designed, assembled, fabricated, produced, constructed, and prepared the Grand Cherokee before it was sold.  Jeep is a seller because it was a manufacturer, wholesaler, and distributor

engaged in the business of selling a product for resale or use with actual knowledge of the defects in the Grand Cherokee.

242.   The Grand Cherokee that Mr. Malone purchased from Jeep is a good subject to an implied warranty of merchantability pursuant to M.G.L.A. c. 106, § 2-314, under which Jeep impliedly warranted that the goods it provided to Mr. Malone and other consumers were safe, merchantable, and reasonably suited for the ordinary purposes for which they were sold.

243.   Jeep did not effectively disclaim said warranty.

244.   The Grand Cherokee sold by Jeep was defective.  Jeep breached its implied warranty of merchantability, in that, among other things, the Grand Cherokee was not safe, merchantable, and reasonably suited for the ordinary purposes for which it was sold.

245.   Jeep sold the Grand Cherokee to a business affiliated with Mr. Malone.

246.   Mr. Malone was a person whom Jeep reasonably might have expected to purchase and the use Grand Cherokee.

247.   Mr. Malone relied upon the warranty of Jeep that the Grand Cherokee he purchased was of merchantable quality, but it was defective in that the ZF Shifter rendered it unreasonably dangerous and, as a result, caused the Grand Cherokee to roll into Mr. Malone and cause severe injury to his person.

248.   As a result of the breach of warranty, Mr. Malone sustained personal injuries and suffered great pain of body and mind.

249.   Jeep placed the Grand Cherokee in the stream of commerce and expected it to reach the user or consumer without substantial change in the condition in which it was sold.  Indeed, it reached Mr. Malone – someone who would reasonably be expected to use, consume, or be affected by the Grand Cherokee – without substantial change in the condition in which it was sold.

250.   The Grand Cherokee was defective, and its defects are outlined throughout this complaint.  Generally, they comprise the design and provision of a dangerous, defective shifter and, despite knowledge of the defects, the failure to warn consumers about the shifter's defects.

251.   In situations such as Mr. Malone's – where the driver used the vehicle as intended and in a foreseeable and reasonable manner – the vehicle should not fail.

252.   Nevertheless, the Grand Cherokee failed, and it did so because of design defects in the Grand Cherokee existing when it left the manufacturer's control.

253.   Jeep knew or should have known of the defective design of the Grand Cherokee and that, as a result, it was unreasonably dangerous.

254.   While history has shown the ZF Shifter causes serious injury and death to operators, it adds no additional utility beyond that offered by traditional automatic shifters, which were readily available, inexpensive, and devoid of the unsafe aspect of the ZF Shifter.  Had a traditional shifter been used, the risk of injury or death from an inadvertent vehicle rollaway would have been eliminated or rendered insignificant.

255.   But, beyond this, Jeep could still have kept its drivers safe from the ZF Shifter by incorporating a safety override (as it did for other cars) that automatically engaged the electronic parking brake when the driver side door was opened and the seatbelt was unbuckled.  This override would cure the unsafe aspect of the ZF Shifter without impairing any purported usefulness or imposing unreasonable costs.  This sensible, cost-effective feature would have prevented Mr. Malone's and many others' injuries and harm.

256.   The Jeep Grand Cherokee and ZF Shifter performed exactly as intended by Jeep, and yet the vehicle was unreasonably dangerous.  The danger inherent in the ZF Shifter was not obvious to Mr. Malone or the general public, nor could they have avoided danger with additional care in the use of the shifter.

257.   The defects in design and inspection made the Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the

Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

258.   Jeep did not warn or alert purchasers or users of the foregoing dangers, despite knowledge of them.

259.   As a direct and proximate result of the defects in the Grand Cherokee's design and manufacture and Jeep's failures to warn, Mr. Malone has sustained injuries, damages, and loss.

260.   Jeep is liable to Mr. Malone for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Grand Cherokee.

## COUNT V
## LOSS OF SPOUSAL CONSORTIUM

261.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

262.   At all times material to the present complaint, Plaintiff Christine Pia Malone ("Mrs. Malone") was the legal spouse of Plaintiff John J. Malone.

263.   As a further direct and proximate result of Jeep's negligence and gross negligence, negligence *per se*, failure to warn, breach of implied warranty of merchantability, and all other culpable acts, omissions, and activities set forth above, Mrs. Malone has suffered the loss of her spouse's services, companionship,

society, and consortium.  She has suffered emotional distress and mental anguish. She will continue to suffer such losses and damages in the foreseeable future.

264.   Mrs. Malone has also incurred and will incur expenses related to obtaining medical treatment and care for her spouse's injury.

## COUNT VI
## LOSS OF PARENTAL CONSORTIUM

265.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

266.   At all times material to the present complaint, Plaintiff Timothy D. Malone was the natural child of Plaintiff John J. Malone.

267.   As a further direct and proximate result of Jeep's negligence and gross negligence, negligence *per se*, failure to warn, breach of implied warranty of merchantability, and all other culpable acts, omissions, and activities set forth above, Plaintiffs John J. Malone and Timothy D. Malone were forced to cancel a planned and paid-for trip to Ireland, causing Plaintiff Timothy D. Malone financial loss.  Plaintiff Timothy D. Malone's claims are limited to loss of consortium during this this trip-of-a-lifetime.

**D.   Becky Peoples**

268.   The following causes of action apply to Becky Peoples:

## COUNT I
## NEGLIGENCE

269.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

270.   FCA, as a designer, manufacturer and seller of the Grand Cherokee, owed Becky a general duty to design, manufacture, and sell the Grand Cherokee as reasonably safe for its foreseeable uses by Plaintiff, who used the Grand Cherokee in the manner which FCA might have reasonably expected.

271.   When the Grand Cherokee unexpectedly failed, it did so as a result of the negligent manner in which FCA designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, sold, and placed the vehicle into the stream of commerce.

272.   In the course of designing and manufacturing the Grand Cherokee, FCA negligently breached acceptable manufacturing standards, including, but not limited to:

    a.   negligently design the Grand Cherokee;

    b.   negligently designing and incorporating, among other components, a defective electronic shifter;

    c.   failing to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Grand Cherokee in a foreseeable manner;

     d.     manufacturing an unsafe product, the Grand Cherokee;

     e.     failing to take reasonable care to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

     f.     failing to incorporate safer alternative designs and formulations during the design and manufacture of the Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Grand Cherokee without impairing its usefulness;

     g.     failing to adequately test the Grand Cherokee before retail sale;

     h.     inadequately inspecting the vehicle during the manufacture and fabrication of the Jeep Grand Cherokee; and

     i.     failing to recall and remove the Grand Cherokee from the stream of commerce before it malfunctioned during Plaintiff's use.

273.   Becky was a person who FCA should have reasonably expected to use and be affected by a defect in the Grand Cherokee.

274.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

275.   The risk of roll-away was known to FCA in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture, so FCA was aware that its actions would cause a great risk of harm to those who purchased the Grand Cherokee.

276.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

277.   On information and belief, FCA's knowledge as described in this Complaint is reflected in its internal communications, including memoranda and e-mail.

278.   FCA's knowledge as described in this Complaint is reflected in reports of other incidents—including those compiled in the NHTSA database, which FCA regularly reviews—involving FCA's vehicles.

279.   On information and belief, FCA's knowledge as described in this Complaint is reflected in Defendant's compilations and analyses of crash data;

280.   On information and belief, FCA's knowledge as described in this Complaint is reflected in the results of tests conducted by Defendant and others, including but not limited to failure mode and effects analyses (FMEA), human factors simulations, pre-release vehicle evaluation tests, computer simulations, and cost/benefit analyses.

281.   Upon reasonable inspection and testing of the Grand Cherokee and each of its components, Defendant knew or should have known the Grand Cherokee was defective and unreasonably susceptible to failure.

282.   Defendant knew or should have known of the defective design and manufacture of the Grand Cherokee and failed to take reasonable corrective steps in curing the defects.

283.   Defendant had sufficient knowledge, expertise, availability, and resources to inspect the Grand Cherokee for defects before its sale.

284.   Defendant failed to properly inspect and confirm the safety of the Grand Cherokee before placing it into the stream of commerce and sale.

285.   Defendant failed to complete a reasonable inspection of the Grand Cherokee, which inspection would have revealed the unreasonably high potential for the failure of the Grand Cherokee.

286.   The Grand Cherokee was manufactured without adequate quality control measures and using inappropriate manufacturing procedures.

287.   Such inappropriate quality control measures and inappropriate manufacturing practices and procedures contributed to the in-use failure of the Grand Cherokee on November 8, 2015, as Becky was using the Grand Cherokee, when the defect in design and manufacture caused it to fail catastrophically.

288.   As a direct and proximate result of Defendant's breach of the aforementioned duty, Becky has sustained injuries, damages, and losses that were caused by FCA's negligence while the Grand Cherokee was being used in a reasonably foreseeable manner.

## COUNT II
## STRICT LIABILITY: PRODUCT LIABILITY

289.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

290.   FCA is a manufacturer, seller, and provider of motor vehicles engaged in the business of doing so, including the Grand Cherokee. FCA installed the ZF Shifter as part of its manufacturing design and placed the finished product, with its private label, into the stream of commerce through advertisement, distribution, and sale to the public, including Becky.

291.   FCA owes Becky, who purchased the Grand Cherokee, a general duty to manufacture and sell the product that is reasonably safe for its foreseeable uses, including a duty to warn of dangers not obvious and reasonably known to Plaintiff.

292.   FCA manufactured, sold, and supplied the Grand Cherokee in conformity with the intended design, but the design itself poses unreasonable dangers to consumers, like Becky. Even when the Jeep Grand Cherokee and ZF Shifter perform exactly as intended by FCA, the vehicle is unreasonably dangerous.

293.   FCA had actual knowledge of a defect in the Grand Cherokee.

294.   FCA expected the Grand Cherokee to reach the user or consumer, including Becky, without substantial change in the condition in which it was sold.

295.   As a direct result of FCA's design and manufacturing, the Grand Cherokee was defective, including but not limited to, the design and incorporation of a defective shifter.

296.   Under entirely foreseeable and predictable operating conditions, such as those of Becky's at the time of the Grand Cherokee's failure, the Grand Cherokee should not fail.

297.   When the Grand Cherokee unexpectedly failed, it did so as a result of the design defect that existed within the Grand Cherokee at the time FCA manufactured and placed it into the stream of commerce and at the time Plaintiff purchased it.

298.   FCA knew or should have known of the defective design of the Grand Cherokee and that the Grand Cherokee was unreasonably dangerous, whereas Becky could not have reasonably known about the defect since it was concealed and not disclosed to her.

299.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm—not apparent to an ordinary user—involved in any intended or reasonably expected use.

300.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm—not apparent to an ordinary user—involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

301.   FCA's design of its Grand Cherokee was unreasonably dangerous because any social utility and desirability to the public of such a design is outweighed by the unexpected and unreasonable risk of harm the design and manufacture created, which could have been reduced without significantly affecting its effectiveness or cost, and due to the lack of adequate warnings.

302.   FCA could have eliminated the unreasonably dangerous condition in the Grand Cherokee without excessive cost or loss of product efficiency.

303.   The defects in design and inspection made the Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

304.   Becky was a person who would reasonably be expected to use or be affected by the Grand Cherokee.

305.   The Grand Cherokee was not assembled properly and reached Becky in a condition unreasonably susceptible to failure.

306.   As a direct and proximate result of the defect in the Grand Cherokee's design and manufacture, Becky has sustained injuries, damages, and loss by operating it in a foreseeable manner.

307.   Defendant is strictly liable to Becky for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Grand Cherokee.

308.   When it placed the Grand Cherokee into the stream of commerce, Becky relied upon Defendant's care in designing and manufacturing the Grand Cherokee.

309.   Becky relied upon Defendant's assurance to her that the Grand Cherokee was designed and manufactured without defect.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

310.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

311.   FCA is and was at all relevant times a "merchant" with respect to vehicles of the kind under RSA 382-A:2-104(1) and RSA 382-A:2-314(1), including the Grand Cherokee that Becky purchased.

312.   FCA sold the Grand Cherokee that Becky purchased, and FCA impliedly warranted to her that the vehicle was fit for the ordinary purposes for which it was used, including driving and parking. RSA-382-A:2-314(2)(c).

313.   FCA knew or should have known that the Grand Cherokee at the time of sale was intended to be purchased for driving and parking but that it contained a dangerous defect, and that Becky was a person reasonably expected to use and be affected by the good.

314.   Becky reasonably relied on FCA's judgment, indications and statements that the Grand Cherokee was fit for ordinary use as a motor vehicle, including driving and parking.

315.   When FCA sold and placed the Grand Cherokee into the stream of commerce, it was unsafe for its ordinary use and was not of merchantable quality, as impliedly warranted by FCA, in that it had dangerous propensities that could cause serious injury or death to the user.

316.   Becky suffered injuries and damages as a result of FCA's conduct and actions.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**

317.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

318.   FCA made express representations to Becky that her Grand Cherokee was safe and functioned properly through owner's manuals and warranty booklets, advertisements, other promotional materials, and directly in person.

319.   FCA's representations about its vehicles, including the Grand

Cherokee, were included in the basis of the bargain.

## COUNT V
## CONSUMER PROTECTION ACT

320.   Plaintiff realleges and incorporates by reference all paragraphs as

though fully set forth herein.

321.   FCA is a "person" who engaged in "trade and commerce" by

advertising, selling, and distributing vehicles, including Becky's Grand Cherokee

under RSA 358-A:1(I), (II).

322.   By the misconduct complained of, FCA engaged in unfair and

deceptive acts and practices in violation of RSA 358-A:2. As a result, Becky has

been damaged in an amount to be determined at trial.

323.   FCA's unfair and deceptive practices include, without limitation:

    a.    representing that its vehicles, including the Grand
Cherokee, have approval, characteristics, uses, and
benefits they do not have because they are not safe, free
from a dangerous defect, and function properly, in
violation of RSA 358-A:2(V);

    b.    representing that its vehicles, including the Grand
Cherokee, are of a particular standard, quality, or grade,
when they are of a much lower standard and quality
because of the dangerous defect, in violation of RSA
358-A:2(VII);

    c.    advertising its vehicles, including the Grand Cherokee,
with the intent not to sell them as advertised because they

are not safe and do not function properly, in violation of RSA 358-A:2(IX); and

d.  generally committing objectionable conduct that attains a level of rascality that raises an eyebrow to someone inured to the rough and tumble of the world of commerce by: designing, manufacturing, and selling a defective product with a high propensity of causing serious injury to its consumers, failing to provide adequate warnings, and denying a defect existed in Becky's car, all despite the fact it knew or should have known about the dangerous defect. *See State v. Moran*, 151 N.H. 450, 452–53 (2004).

## COUNT VI
## UNJUST ENRICHMENT

324.  Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

325.  By paying $42,703.00 for a vehicle that was in fact worth much less because it had a dangerous defect that FCA knew or should have known existed, Becky unwittingly conferred an economic benefit upon FCA.

326.  The following causes of action apply to Becky Peoples: FCA priced the Grand Cherokee based on its misrepresentations that the vehicle was safe and functional, and Plaintiff paid this amount, completely unaware that the vehicle contained a dangerous defect.

327.  FCA's acceptance and retention of the full price of the Grand Cherokee would be unconscionable and contrary to equity and good conscience.

328.   Unjust enrichment is available because FCA breached its contact and because the benefit received falls outside the scope of the contract.

**E.   Daneen Holcomb**

329.   The following causes of action apply to Daneen Holcomb:

## COUNT I
## NEGLIGENCE RESULTING IN PERSONAL INJURY

330.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

331.   FCA, as a designer, manufacturer, and seller of the Grand Cherokee, owed Plaintiff a duty to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to Plaintiff, who used the Grand Cherokee in the manner in which FCA might have reasonably expected.

332.   FCA, as a designer, manufacturer, and seller of the Grand Cherokee, owed Plaintiff a duty to exercise reasonable care to warn Grand Cherokee purchasers of its unreasonably dangerous and defective condition.

When the Grand Cherokee unexpectedly failed, it did so as a result of the negligent manner in which FCA designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, and sold its vehicle.

333.   In the course of designing and manufacturing the Grand Cherokee, FCA negligently breached the acceptable standards of manufacture for goods, by its actions including, but not limited to:

   a.   Negligently designing the Grand Cherokee;

   b.   negligently designing and incorporating, among other components, a defective electronic shifter;

   c.   failing to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Grand Cherokee in a foreseeable manner;

   d.   manufacturing an unsafe product, the Grand Cherokee;

   e.   failing to take reasonable care to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

   f.   failing to incorporate safer alternative designs and formulations during the design and manufacture of the Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Grand Cherokee without impairing its usefulness;

   g.   failing to adequately test the Grand Cherokee before retail sale;

   h.   inadequately inspecting the vehicle during the manufacture and fabrication of the Jeep Grand Cherokee; and

   i.   failing to recall and remove the Grand Cherokee from the stream of commerce before it malfunctioned during Plaintiff's use.

334.   Daneen was a person who FCA should have reasonably expected to use and be affected by a defect in the Grand Cherokee.

335.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

336.   The risk of roll-away was known or knowable to FCA in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture, so FCA was or should have been aware that its actions caused a great risk of harm to people who purchased the Grand Cherokee.

337.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

338.   On information and belief, FCA's knowledge as described in this Complaint is reflected in its internal communications, including memoranda and e-mail.

339.   FCA's knowledge as described in this Complaint is reflected in reports of other incidents—including those compiled in the NHTSA database, which FCA regularly reviews—involving FCA's vehicles.

340.   On information and belief, FCA's knowledge as described in this Complaint is reflected in Defendant's compilations and analyses of crash data.

341.   On information and belief, FCA's   knowledge as described in this Complaint is reflected in the results of tests conducted by Defendant and others, including but not limited to failure mode and effects analyses (FMEA), human factors simulations, pre-release vehicle evaluation tests, computer simulations, and cost/benefit analyses.

342.   Upon reasonable inspection and testing of the Grand Cherokee and each of its components, Defendant knew or should have known the Grand Cherokee was defective and unreasonably susceptible to failure.

343.   Defendant knew or should have known of the defective design and manufacture of the Grand Cherokee and failed to take reasonable corrective steps in curing the defects.

344.   Defendant had sufficient knowledge, expertise, availability, and resources to inspect the Grand Cherokee for defects before its sale.

345.   Defendant failed to properly inspect and confirm the safety of the Grand Cherokee before its entry into the stream of commerce and sale.

346.   Defendant failed to complete a reasonable inspection of the Grand Cherokee, which inspection would have revealed the unreasonably high potential for the failure of the Grand Cherokee.

347.   The Grand Cherokee was manufactured without adequate quality control measures and using inappropriate manufacturing procedures.

348.   Such inappropriate quality control measures and inappropriate manufacturing practices and procedures contributed to the in-use failure of the Grand Cherokee on November 8, 2015, as Daneen was using the Grand Cherokee, when the defect in design and manufacture caused it to fail catastrophically.

349.   As a direct and proximate result of Defendant's breach of the aforementioned duty, Daneen has sustained injuries, damages, and losses that were caused by FCA's negligence while the Grand Cherokee was being used in a reasonably foreseeable manner.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

350.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

351.   FCA is and was at all relevant times a "merchant" as defined by VA. CODE ANN. § 8.2-314.

352.   At all times relevant to the Complaint, Daneen Holcomb had a right to expect that the 2014 Jeep Grand Cherokee was "merchantable" as provided by VA. CODE ANN. § 8.2-314.

353.   As such, Plaintiff's purchase of the 2014 Jeep Grand Cherokee was made subject to an Implied Warranty of Merchantability.

354.   FCA breached the implied warranty of merchantability by designing, marketing, and distributing the 2014 Jeep Grand Cherokee when the product was not reasonably safe for its intended use as a passenger vehicle.

355.   As a direct and proximate result of Defendant's breach of the impled warranty of merchantability, Daneen Holcomb sustained injuries, damages, and all of which were reasonably foreseeable, and a direct consequence of Defendant's breach.

## COUNT III
## BREACH OF EXPRESS WARRANTY

356.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

357.   FCA made express representations to Plaintiff that her Grand Cherokee was safe and functioned properly through owner's manuals and warranty booklets, advertisements, other promotional materials, and directly in person.

358.   FCA's representations about its vehicles, including the Grand Cherokee, were included in the basis of the bargain.

## COUNT IV
## VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)

359.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

360.   The Virginia Consumer Protection Act prohibits "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; … (8) advertising goods or services with intent not to sell them as advertised …; [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]" VA. CODE ANN. § 59.1-200(A).

361.   FCA is a "person" as defined by VA. CODE ANN. § 59.1-198.  The transaction between FCA and Plaintiff was a "consumer transaction" as defined by VA. CODE ANN § 59.1-198, because the vehicle was purchased primarily for personal, family or household purposes.

362.   In the course of FCA's business, it willfully failed to disclose and actively concealed the defects inherent in the design of the ZF Shifter as described above.  Accordingly, FCA engaged in acts and practices violating VA. CODE ANN. § 59.1-200(A), including representing that the vehicle had characteristics, uses, benefits, and qualities which it did not have; representing that the vehicle was of a particular standard and quality when it was not; advertising the vehicle with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

363.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

364.   FCA's conduct proximately caused injuries to the Plaintiff.

365.   FCA's conduct proximately resulted in ascertainable harm to the Plaintiff including, serious and permanent physical injury, in addition to the fact that Plaintiff overpaid for the vehicle and did not receive the benefit of her bargain for the vehicle.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

366.   FCA actively and willfully concealed and/or suppressed the material facts regarding the defective and unsafe condition of the vehicle, in whole or in part, with the intent to deceive and mislead the Plaintiff and to induce the Plaintiff to purchase the vehicle at a higher price than the 2014 Jeep Grand Cherokee's true value.  Plaintiff is thus entitled to treble damages.

## COUNT V
## UNJUST ENRICHMENT

367.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

368.   By paying $53,017.42 for a vehicle that was in fact worth much less because it had a dangerous defect that FCA knew or should have known existed, Plaintiff unwittingly conferred an economic benefit upon FCA.

369.   FCA priced the Grand Cherokee based on its misrepresentations that the vehicle was safe and functional, and Plaintiff paid this amount, completely unaware that the vehicle contained a dangerous defect.

370.   FCA's acceptance and retention of the full price of the Grand Cherokee would be unconscionable and contrary to equity and good conscience.

371.   Unjust enrichment is available because FCA breached its contract and because the benefit received falls outside the scope of the contract.

## COUNT VI
## PUNITIVE DAMAGES

372.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

373.   FCA knew or should have known that the 2014 Jeep Grand Cherokee was defective as designed and manufactured, such that it presented an unreasonable risk of harm to consumers operating the vehicle in its normal use.

374.   FCA disregarded such knowledge and placed the 2014 Jeep Grand Cherokee into the stream of commerce despite the highly dangerous and defective nature of the ZF Shifter.

375.   FCA's conduct in designing, manufacturing, marketing and distributing the 2014 Jeep Grand Cherokee was wanton, willful, malicious, and/or done with conscious disregard for the rights and safety of its consumers.

376.   Plaintiff's damages were a proximate result of such misconduct by FCA.

377.   Plaintiff should be awarded punitive damages in an amount sufficient to deter FCA from such misconduct in the future.

**F.      Judy and Mark Borlin**

378.   The following causes of action apply to Judy and Mark Borlin:

**COUNT I**
**STATUTORY DEFECTIVE DESIGN/FORMULATION (O.R.C. § 2307.75)**

379.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

380.   The Defendant designed, created and assembled the Borlin Jeep Grand Cherokee. The Defendant is a "manufacturer" as defined by O.R.C. § 2307.71(A)(9).

381.   At the time the Borlin Jeep Grand Cherokee left the Defendant's control, it was defectively designed as outlined above because the foreseeable risks associated with its design or formulation exceeded the benefits associated with that design or formulation.

382.    At the time the Borlin Jeep Grand Cherokee left the Defendant's control, it was defectively designed as outlined above because the harm for which the Plaintiffs seek to recover compensatory damages was not caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be

eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.

383. At the time the Borlin Jeep Grand Cherokee left the Defendant's control, it was defectively designed as outlined above because a practical and technically feasible alternative design or formulation was available that would have prevented the harm for which Plaintiffs seek to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product.

384. As a result of the defective design of the Borlin Jeep Grand Cherokee, Plaintiffs have suffered physical injury, mental anguish, loss of consortium, and economic loss, including at least the loss of value of the Borlin Jeep Grand Cherokee at trade-in. Such damage constitutes "harm" as defined by O.R.C. 2307.71(A)(7).

385. FCA is strictly liable for the harm caused by the defect as set forth above pursuant to O.R.C. § 2307.77. FCA is also strictly liable for additional compensatory and economic loss pursuant to O.R.C. § 2307.79.

386. FCA is also liable to Plaintiffs for punitive and/or exemplary damages pursuant to O.R.C. § 2307.80 because, as detailed above, FCA's misconduct

manifested a flagrant disregard of the safety of persons who might be harmed by the product in question.

## COUNT II
## STATUTORY INADAQUATE WARNING/INSTRUCTION
## (O.R.C. § 2307.76)

387.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

388.   The Defendant designed, created and assembled the Borlin Jeep Grand Cherokee. The Defendant is a "manufacturer" as defined by O.R.C. § 2307.71(A)(9).

389.   The Borlin Jeep Grand Cherokee was defective due to inadequate warning or instruction at the time of marketing because, when it left the Defendant's control, Defendant knew or, in the exercise of reasonable care, should have known about the defect but failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which Plaintiffs seek to recover compensatory damages and in light of the likely seriousness of that harm.

390.   The Borlin Jeep Grand Cherokee was defective due to inadequate post-marketing warning or instruction because, at a relevant time after it left Defendant's control, FCA knew or, in the exercise of reasonable care, should have

known about the defect but failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which Plaintiffs seek to recover compensatory damages and in light of the likely seriousness of that harm.

391.    At the time that Plaintiffs were injured by the Borlin Jeep Grand Cherokee, the defect was not open and obvious or a matter of common knowledge.

392.    As a result the failure of the Defendant's failure to warn or instruct, Plaintiffs have suffered physical injury, mental anguish, loss of consortium, and economic loss, including at least the loss of value of the Borlin Jeep Grand Cherokee at trade-in. Such damage constitutes "harm" as defined by O.R.C. 2307.71(A)(7).

393.    FCA is strictly liable for the harm caused by its failure to warn or instruct, as set forth above pursuant to O.R.C. § 2307.77.  FCA is also strictly liable for additional compensatory and economic loss pursuant to O.R.C. § 2307.79.

394.    FCA is also liable to Plaintiffs for punitive and/or exemplary damages pursuant to O.R.C. § 2307.80 because, as detailed above, FCA's misconduct manifested a flagrant disregard of the safety of persons who might be harmed by the product in question.

## COUNT III
## VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE § 1345.01, *ET SEQ.*)

395.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

396.   Plaintiffs are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 ("OCSPA"). FCA is a "supplier" as defined by the OCSPA. Plaintiffs' purchase of the Borlin Jeep Grand Cherokee was a "consumer transaction" as defined by the OCSPA.

397.   By  willfully failing to disclose and actively concealing the defective ZF Shifter, FCA engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the Defective Shifter Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Defective Shifter Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Defective Shifter Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

398.   In the course of FCA's business, FCA willfully failed to disclose and actively concealed the defective ZF Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive.

399.   FCA knew it had installed a defective ZF Shifter and knew that the ZF Shifter did not operate safely, as advertised. FCA knew this for almost two years before Judy's injury, but concealed all of that information.

400.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

401.   By failing to disclose that the defective ZF Shifter did not operate safely and did not include a safety override to prevent roll-away incidents, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the OCSPA.

402.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true performance of the Defective Shifter Vehicle with ZF Shifter, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Defective Shifter Vehicles including the Borlin Jeep Grand Cherokee.

403.   By concealing detailed information on the defect by marking as confidential all but two pages from its owner's manual in the presentation it

provided to NHTSA in response to its investigation, FCA intentionally and knowingly omitted material facts regarding the Defective Shifter Vehicles with an intent to mislead Plaintiffs.

404.   FCA knew or should have known that its conduct violated the OCSPA.

405.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Defective Shifter Vehicles, and the devaluing of safety and performance at FCA, because FCA:

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and performance of the Defective Shifter Vehicles generally, and the defective ZF Shifter in particular, when FCA concluded that no evidence of equipment failure was found in the Defective Shifter Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

406.   Because FCA fraudulently concealed the defective ZF Shifter and the true performance of the Defective Shifter Vehicles with the ZF Shifter, a raft of negative publicity resulted once the defects finally began to be disclosed and the value of the Borlin Jeep Grand Cherokee was greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, the Borlin Jeep Grand Cherokee was worth significantly less than it otherwise would have been worth at trade-in.

407.   As a result of its violations of the OCSPA, as detailed above, FCA caused Plaintiffs to suffer economic loss.

408.   Plaintiffs sustained economic loss as a result of FCA's unlawful acts and are therefore entitled to economic loss and other relief as provided under the OCSPA.

409.   Plaintiffs also seek court costs and attorneys' fees as a result of FCA's violations of the OCSPA, as provided in OHIO REV. CODE § 1345.09.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OHIO REV. CODE § 1302.27, *ET SEQ.*)(U.C.C. § 2-314)

410.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

411.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles.

412.   A warranty that the Borlin Jeep Grand Cherokee was in merchantable condition is implied by law. The Borlin Jeep Grand Cherokee, when sold and at all times thereafter, was not in merchantable condition and was not fit for the ordinary purpose for which cars are used. Specifically, the Borlin Jeep Grand Cherokee was inherently defective in that the ZF Shifter system was not adequately designed, manufactured, and tested and does not include a safety override to prevent roll-away incidents.

413.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

414.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Judy Borlin sustained economic loss which was reasonably foreseeable and a direct consequence of Defendant's breach.

## COUNT V
## LOSS OF CONSORTIUM

415.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein

416.   Plaintiff Mark Borlin brings this claim for spousal consortium as husband of Judy Borlin.

417.    As a direct and proximate result of Defendant's wrongful conduct as

described above, Plaintiff Mark Borlin suffered a loss of spousal consortium

including:

    A.     Loss of services;

    B.     Loss of assistance;

    C.     Loss of aid;

    D.     Loss of society; and

    E.     Loss of companionship and conjugal relationship.

418.    Furthermore, as stated above, Defendant acted in a willful, wanton, reckless,

and grossly negligent manner and Plaintiff is entitled to recover punitive

damages in addition to the compensatory damages previously set forth.

**G.    Gary Massey**

419.   The following causes of action apply to Gary Massey:

**COUNT I**
**NEGLIGENCE**

420.   Plaintiff incorporates and adopts by reference all facts and allegations

contained in the preceding paragraphs as though specifically pled herein.

421.   FCA, as a designer, manufacturer, and seller of the Massey Dodge

Charger, under GA. CODE ANN. § 51-1-2, owed Plaintiff a duty to exercise

reasonable care to prevent the Massey Dodge Charger from creating and

unreasonable risk of harm to Plaintiff, a person reasonably expected to use the

Massey Dodge Charger by FCA and who did so in a manner which FCA might have reasonably expected.

422.   The Massey Dodge Charger was defective because FCA failed to exercise reasonable care in order to prevent the Massey Dodge Charger from creating an unreasonable risk of harm. FCA's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, and/or sold the Massey Dodge Charger.

423.   FCA's negligent acts include but are not limited to:

    a.    negligently designing the Massey Dodge Charger;

    b.    negligently designing and incorporating, among other components, a defective electronic shifter;

    c.    failing to exercise reasonable care to prevent the Massey Dodge Charger from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Massey Dodge Charger in a foreseeable manner;

    d.    manufacturing an unsafe product, the Massey Dodge Charger;

    e.    failing to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

    f.    failing to incorporate safer alternative designs and formulations during the design and manufacture of the Massey Dodge Charger that were practicable and would have eliminated the unsafe nature of the Massey Dodge Charger without impairing its usefulness;

      g.     failing to adequately test the Massey Dodge Charger before retail sale; and

      h.     failing to adequately inspect, during the manufacture and fabrication, the Jeep Grand Cherokee.

424.   Plaintiff is a person that FCA reasonably expects to use or be affected by the Massey Dodge Charger.

425.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, which would have better protected occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

426.   The risk of roll-away was known or knowable to FCA in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

427.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Massey Dodge Charger may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

428.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Massey Dodge Charger on November 5, 2016, when Gary Massey

was attempting to enter the Massey Dodge Charger and the vehicle failed catastrophically.

429.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific risk of harm and unapparent risk of harm involved in any intended or reasonably expected use.

430.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific and unapparent risk of harm involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

431.   As a direct and proximate result of Defendant's breach of its duties, Gary Massey sustained injuries, damages, and losses that were caused by FCA's negligence while the Massey Dodge Charger was being used in a manner FCA should reasonably have expected.

## COUNT II
## STRICT LIABILITY: PRODUCT LIABILITY

432.   Plaintiff incorporates and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

433.   Defendant is a "manufacturer" and seller under GA. CODE ANN. § 51-1-11 *et seq.* and is engaged in the business of manufacturing and selling vehicles, including the Massey Dodge Charger.

434.   Defendant is a "manufacturer" of the Massey Dodge Charger under GA. CODE ANN. § 51-1-11 *et seq.*, as it is an entity that designed, assembled, fabricated, produced, constructed, prepared and sold the Massey Dodge Charger.

435.   Defendant is a "manufacturer" of the Massey Dodge Charger under GA. CODE ANN. § 51-1-11 *et seq.*, as it is a seller who had actual knowledge of a defect in the Massey Dodge Charger.

436.   Defendant is a "seller" of the Massey Dodge Charger under GA. CODE ANN. § 51-1-11 *et seq.*, as it is an entity and manufacturer engaged in the business of selling or leasing any product, including the Massey Dodge Charger, for resale, use, or consumption.

437.   Defendant sold the Massey Dodge Charger to Gary Massey for his personal use.

438.   The Massey Dodge Charger was expected to reach the user or consumer without substantial change in the condition in which it was sold.

439.   The Massey Dodge Charger was placed in the stream of commerce and reached Gary Massey without substantial change in the condition in which it was manufactured. Gary Massey is a person who reasonably would be expected to use or be affected by the Massey Dodge Charger.

440.   The Massey Dodge Charger was defective. These defects are outlined throughout this Complaint, but include the design and provision of a dangerous, defective shifter.

441.   Under entirely foreseeable and predictable operating conditions, such as those of Gary Massey's at the time of the Massey Dodge Charger's failure, the Massey Dodge Charger should not fail.

442.   When the Massey Dodge Charger unexpectedly failed, it did so as a result of the design defects that existed within the Massey Dodge Charger at the time it was manufactured.

443.   Defendant knew or should have known of the defective design of the Massey Dodge Charger and that the Massey Dodge Charger was unreasonably dangerous.

444.   Because of the Massey Dodge Charger's defects, the Massey Dodge Charger was unreasonably dangerous to Gary Massey, a person reasonably expected to use or be affected by the Massey Dodge Charger.

445.   The Massey Dodge Charger was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property that would not ordinarily be expected.

446.   The Massey Dodge Charger was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property not outweighed by the benefits to be achieved by such design.

447.   Even when the Massey Dodge Charger and ZF Shifter perform exactly as intended by FCA, the vehicle is unreasonably dangerous.

448.   The Massey Dodge Charger was defective at the time Defendant sold it or when it left Defendant's control.

449.   The defects in design and inspection made the Massey Dodge Charger unreasonably dangerous, unfit, and unsafe for its intended use and caused the Massey Dodge Charger to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

450.   Gary Massey was a person who would reasonably be expected to use or be affected by the Massey Dodge Charger.

451.   The Massey Dodge Charger was not assembled properly and reached Gary Massey in a condition unreasonably susceptible to failure.

452.   As a direct and proximate result of the defect in the Massey Dodge Charger's design and manufacture, Gary Massey has sustained injuries, damages, and loss.

453.    Defendant is strictly liable to Gary Massey for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Massey Dodge Charger.

454.    In the alternative, Defendant is a "manufacturer" of the Massey Dodge Charger under Michigan law because it is the apparent manufacturer of the Massey Dodge Charger.

455.    When it placed the Massey Dodge Charger into the stream of commerce through advertising, distribution, and sale of the Massey Dodge Charger, Defendant conveyed to the public, including Gary Massey, that it had designed, manufactured, marketed, and sold the Massey Dodge Charger as its own.

456.    Gary Massey reasonably relied upon Defendant's care in designing and manufacturing the Massey Dodge Charger.

457.    Gary Massey reasonably relied upon Defendant's assurance to him that the Massey Dodge Charger was designed and manufactured without defect.

458.    Defendant placed its private label on the Massey Dodge Charger with the intent of its private label carrying some weight of quality assurance.

459.    Defendant placed its private label on the Massey Dodge Charger to capitalize upon and preserve Defendant's goodwill with the public, including Plaintiff.

460.   Defendant's placement of the private label was made for Defendant's benefit.

461.   Defendant's placement of the private label left Plaintiff ignorant of who manufactured the Massey Dodge Charger.

462.   The Massey Dodge Charger entered into the stream of commerce under Defendant's name. Defendant did not place any other name on the Massey Dodge Charger indicating that any other person, firm, or entity was the designer or manufacturer of the Massey Dodge Charger. Defendant's placement of its private label on the Massey Dodge Charger is sufficient to impose strict liability upon Defendant.

463.   As a direct and proximate result of Defendant placing its private label on the Massey Dodge Charger without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Massey Dodge Charger, Gary Massey has sustained injuries, damages, and loss.

464.   Defendant is strictly liable to Gary Massey for the injuries and damages caused by Defendant's placement of its private label on the Massey Dodge Charger without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Massey Dodge Charger.

## COUNT III
## PUNITIVE DAMAGES

465.   Plaintiff incorporates and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

466.   Defendant, through its conduct in designing, manufacturing, inspecting, testing, and selling the Massey Dodge Charger and its component parts, demonstrated gross neglect and an entire want of care evidencing a reckless indifference and conscious disregard to the consequences of their actions, which included an extreme degree of risk. Gary Massey is entitled to an award of punitive damages to deter Defendant from such conduct in the future.

467.   Despite Defendant's knowledge of the dangerous defects in its Massey Dodge Charger, Defendant did nothing to remedy or mitigate the problem so that innocent victims like Gary Massey would not be injured, maimed, or killed.

468.   There is clear and convincing evidence that Defendant acted with such willful, wanton, conscious, and reckless indifference, which demonstrated an entire wanton of care for the safety and well-being of victims like those involved in the Incident and others so as to evidence a conscious indifference to the consequences of its acts, which included an extreme degree of risk. These actions demand and warrant an award of punitive damages against Defendant that will punish it for the harm they have caused and that will deter it from similar future misconduct.

**H.** **Wilbert Norton J.R.**

469. The following causes of action apply to Wilbert Norton J.R.:

## COUNT I
## CAUSE OF ACTION FOR PRODUCTS LIABILITY

470. Plaintiff would show that there have been numerous injuries caused by malfunction of the transmissions in Chrysler vehicles. On July 18, 2016, Mr. Norton received a "SAFETY RECALL NOTICE" in regard to the transmission in his vehicle. The Notice advised that the transmissions in 2012 through 2014 models of the Chrysler 300s were defective. Mr. Norton returned his Chrysler 300 automobile to Gulfgate Chrysler where the electronic shifter had to be adjusted. The Plaintiff therefore sues the Defendant under strict Products Liability. Plaintiff would show that his transmission was defective and that this defect proximately caused the incident and the injuries and damages described above. He here now sues for his damages caused by this defect.

471. Plaintiff further sues for design defect. The Defendant breached their duty to design a reasonably safe product. Such a failure on their part was a proximate cause of the incident in question and the Plaintiff's injuries and damages.

472. Plaintiff further sues for breach of express and implied warranties which breach approximately caused the incident described above and his resultant damages.

## REQUEST FOR RELIEF

WEREFORE, Personal Injury Plaintiffs respectfully prays for judgment against Defendant FCA in an amount to be determined by the trier of fact for her losses, damages and harm, economic and nonecomonic, for puntive and statutuory damages, and for all costs, attorneys fees, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court may deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Personal Injury Plaintiffs demand a jury trial for all claims so triable.

DATED: March 15, 2017              Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
Miller Building,
950 West University Drive, Suite 300
Rochester, MI  48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@miller.law

***Plaintiffs' Lead Counsel and Chair of Plaintiffs' Steering Committee***

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
Thomas E. Loeser

- 112 -

1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

**HAGENS BERMAN SOBOL
SHAPIRO LLP**
Christopher R. Pitoun
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Tel:  (213) 330-7150
christopherp@hbsslaw.com

*Attorneys for the Personal Injury
Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC
MONOSTABLE ELECTRONIC
GEARSHIFT LITIGATION

    MDL No. 2744

This Document Relates to:
PERSONAL INURY TRACK
CASES

DEBRA MANEOTIS, *et al.*,

               Plaintiffs,

       v.

FCA US LLC, a Delaware
Corporation,

              Defendant.

Master File No.16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*_____
E. Powell Miller (P39487)
950 W. University Dr., Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com