UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

**OPINION AND ORDER DENYING MOTION TO DISMISS
FOR LACK OF SUBJECT MATER JURISDICTION**

The plaintiffs have filed a first amended consolidated master class action complaint (FACMC) in this multidistrict litigation proceeding, which addresses the claims of all the named plaintiffs and absent putative class members who allege economic loss, but do not allege a personal physical injury. The defendant has filed a motion under Federal Rule of Civil Procedure 12(b)(1) arguing that the plaintiffs have not alleged facts establishing the injury-in-fact component of standing under Article III, and therefore the Court does not have subject matter jurisdiction. The defendants also argue that the Court lacks subject matter jurisdiction over the claims for equitable relief because they are preempted by the Motor Vehicle Safety Act. The Court heard oral argument on April 12, 2017. The motion will be denied, because the FACMC pleads adequate facts to establish an injury in fact, and preemption will not deprive the Court of subject matter jurisdiction.

I.

The FACMC consolidates several civil actions filed in various districts alleging defects in vehicles manufactured by defendant FCA US LLC (commonly referred to as Fiat Chrysler Automotive, Chrysler, or FCA) that are equipped with "monostable electronic gearshifts." The plaintiffs contend generally that the vehicles are defective because they do not shift into "Park" properly, and rollaway incidents can and have resulted as a consequence. The FACMC targets the

2012-2014 Chrysler 300, 2012-2014 Dodge Charger, and 2014-2015 Jeep Grand Cherokee equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG (these will be designated as "the class vehicles"). The parties generally agree that the shifter design does not use a lever that moves physically to different positions, but instead is pushed in a direction by the driver, and then springs back to its original position after a gear is selected. The only indication that the car has changed gears or is in a particular gear is a lighted indicator that changes to display letters such as "D" for "Drive" or "P" for "Park." The class vehicles, when sold to the plaintiffs, also did not have any mechanism to automatically shift the car to "Park" when the driver exits the car while it is in another gear.

In its motion, the defendant characterizes the FACMC as alleging that the class vehicles are defective because they have no "auto park" feature. Chrysler reads the complaint as translating that "defect" into "allegations of harms suffered by unidentified putative class members and anonymous persons who submitted unsubstantiated incident reports to the National Highway Transportation Safety Administration ('NHTSA')." It believes that the pleading is bereft of facts that support the five categories of harm the plaintiffs allege, which Chrysler understands to be (a) loss of the benefit of the bargain for class vehicle purchasers, (b) incidental and consequential damages incurred when obtaining recall repairs, (c) suffering a rollaway incident, (d) diminished functionality as a result of the recall, and (e) increased rates of vehicle depreciation (mostly for the Grand Cherokee models).

The FACMC, of course, pleads much more than that. According to the plaintiffs, it is the lack of a physical indication of the gear selected, *together with* the absence of an "auto park" feature, that has caused numerous incidents in which a driver got out of his or her car, thinking that it was safely in "Park" when it was not, leading to accidents where cars rolled away down sloped streets

or driveways, sometimes over the driver or others, resulting, in some cases, in serious personal injuries or property damage. (However, the plaintiffs named in the FACMC are those who allege economic losses only as a result of the defect; the claims of plaintiffs who suffered personal injuries from "rollaway" accidents involving the class vehicles are comprised in a separate complaint.) As of February 2016, NHTSA had identified more than 300 rollaway incidents involving class vehicles, with 121 of those involving crashes, and 30 resulting in personal injuries. FACMC ¶ 6. Also, NHTSA has logged more than 325 additional complaints from drivers whose cars had problems shifting into "Park." The NHTSA investigated the defect and concluded that "[d]rivers may exit the vehicle when the engine is running and the transmission is not in Park, resulting in unattended vehicle rollaway," and "[r]ollaway incidents may result in serious injuries to the driver or passengers as they exit the vehicle or to other pedestrians in the path of the rolling vehicle." *Id.* ¶ 7. NHTSA determined that the design of the defective shifter violated several basic guidelines for motor vehicle control and operation, and that it provided poor feedback to drivers about the currently selected gear and whether the vehicle was safely parked.

The plaintiffs allege that FCA knew about the defects in the shifter since at least 2011, when the affected vehicles first went to market, but it took no steps to address the defect until it issued a voluntary recall in April 2016. In May 2016, FCA sent affected owners a letter explaining the problems and risks with the shifter design, but stated only that it was working on a solution to be released near the end of 2016. The NHTSA report of the voluntary recall stated that FCA had assessed the cause and risks that led to the recall as follows:

> Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged. FCA US has therefore determined that the absence of an additional mechanism to mitigate the

> effects of driver error in failing to shift the monostable gear selector into PARK prior
> to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety.

FACMC, Ex. F, Recall Report dated May 24, 2016 (Pg ID 2971). The plaintiffs assert that in the meantime, because there was no remedy immediately available to fix the defect, they were left with the alternatives of either driving a dangerous vehicle, or not driving their cars at all. The recall notice ultimately affected more than 800,000 vehicles in the United States. FCA also later phased out the problematic shifter design starting with the 2016 model year.

On June 20, 2016, the problems with the shifter design became a subject of widespread public attention when news sources "reported that a young Hollywood actor, Anton Yelchin, was crushed to death when his 2015 Jeep Grand Cherokee rolled backward down his driveway and pinned him against his mailbox after he exited the vehicle." FACMC ¶ 17.

On June 24, 2016, FCA notified owners of certain affected vehicles that they could bring their cars into an FCA dealer for a software update that would add an "auto park" feature, intended to "eliminate[] the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle." FACMC ¶ 19. However, the plaintiffs contend that the software fix was ineffective, and there have been numerous reports logged by NHTSA of vehicles having rollaway accidents after the fix was applied. Some owners have had to return to their dealers for a second purported fix, which also has not fully remedied the defect. According to published news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000 affected vehicles in the United States, and it has sent a second recall notice to affected owners directing them to return their vehicles to a dealer for further repairs. *Id.* ¶ 22. The plaintiffs allege that they have suffered losses in several ways as a result of the defect, the widespread reports of accidents caused by it, and the defendant's bungled attempts to fix it. In particular, they contend that

they overpaid for cars they thought were safe, which were not; had to take time off from work and other obligations to accommodate the defendant's repeated failed attempts to fix their cars; and now own vehicles that have dropped in value much faster than previous similar models or competitor vehicles, due to the public perception that the cars are dangerous to own or drive. The plaintiffs allege in particular that, before new reports about the defective shifter surfaced, "2014 and 2015 Jeep Grand Cherokees held their value *better* than other cars in their class," but "after the defect stories became known, the monthly depreciation of these cars increased drastically, causing them to hold value worse than other cars in their class." *Id.* ¶ 12.

This multidistrict litigation was initiated on October 5, 2016 by an order of the Judicial Panel on Multidistrict Litigation (JPML) transferring to this Court for pretrial proceedings six civil actions pending in various districts. Subsequent orders by the JPML transferred more cases raising substantially the same claims, which all together comprise 11 putative class actions and 52 named plaintiffs who have pleaded, cumulatively, more than 140 counts under the laws of 28 states. Later transfer orders added eight cases raising claims by plaintiffs who assert that they suffered personal injuries as a result of the rollaway accidents; but, as noted above, those cases are not the subject of the FACMC or this motion.

As part of the case management, the Court directed the plaintiffs to file a consolidated master complaint by December 23, 2016. They did so, but the Court struck that pleading and directed the plaintiffs to re-file it, after the defendant filed a motion challenging the naming of 17 new individuals who were not parties to any underlying transferred action. On March 24, 2017, the plaintiffs filed the present FACMC, raising claims under federal law and the law of 18 states for fraud, negligent misrepresentation, violation of The Magnuson-Moss Warranty Act, 15 U.S.C. §

2301, *et seq.*, unjust enrichment, breach of express and implied contractual duties, breach of express and implied warranties, and violations of state consumer protection laws. The defendant responded with a first round of Rule 12 motions, as permitted by this Court. The motion now before the Court is based on Federal Rule of Civil Procedure 12(b)(1), challenging subject matter jurisdiction.

II.

The defendant argues that (1) the FACMC should be dismissed for want of subject matter jurisdiction, because it fails to plead any facts sufficient to show that the plaintiffs have suffered any actual injury that gives them standing under Article III of the Constitution to pursue their claims; and (2) the plaintiffs' demands for injunctive relief are "preempted" because NHTSA has "exclusive authority to order and supervise motor vehicle recalls, it has already approved an auto-park remedy to address all concerns with the monostable shifter, and the recall process providing that remedy is ongoing."

A case may be dismissed under Federal Rule of Civil Procedure 12(b)(1), among other reasons, if it does not sufficiently allege subject matter jurisdiction. A challenge to the sufficiency of the pleading, as here, is known as a "facial attack," and "the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). As the party invoking the Court's jurisdiction, the "[p]laintiff[s] bear[] the burden of establishing that subject matter jurisdiction exists." *Id.* at 760 (citing *DLX, Inc. v. Commonwealth of Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)); *see also Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1064 (6th Cir. 2014).

A.

To establish standing to sue under Article III, the plaintiffs must plead facts that show *at least* that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The defendant insists that the complaint is wanting as to the first element.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Ibid.* "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Ibid.* "Concreteness, therefore, is quite different from particularization." *Ibid.* "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.* at 1549. "[T]he risk of real harm [can] satisfy the requirement of concreteness." *Ibid.* "For example, the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure." *Ibid.* (citing Restatement (First) of Torts §§ 569 (libel), 570 (slander *per se*) (1938)). The pertinent inquiry is "whether the [circumstances] alleged in [such a] case entail a degree of risk sufficient to meet the concreteness requirement." *Id.* at 1550.

The defendant argues that the plaintiffs fail to allege any sufficiently concrete injury, because they have pleaded, at most, that they own vehicles that lack a specific safety feature, which the

defendant never advertised, and they never bargained for. The defendant contends that its cars only are "unsafe" when bizarrely misused, and that so-called "rollaway" accidents only can occur as a result of an "attenuated chain of possibilities," which the Supreme Court held in *Clapper v. Amnesty International USA*, --- U.S. ---, 133 S. Ct. 1138 (2013), will not be enough to show that an injury is sufficiently "imminent" for Article III standing.

The problems with these arguments are that (1) they are a frontal assault on the merits of the claims, not the power of the Court to hear them; and (2) they rely on facts that are explicitly contrary to those alleged in the amended FACMC.

Contrary to the defendant's self-favoring construction of the pleadings, the plaintiffs do not allege some imaginary harm that only could occur as a result of a series of strange and unfortunate events. They specifically assert that the shifter, as designed, (1) does not engage or stay in "Park" when a driver attempts to place a vehicle in that gear; (2) does not provide adequate information about what gear the car is in after a driver tries to place the car in "Park"; and (3) can shift unexpectedly out of "Park" and into a selection that allows the vehicle to roll away unrestrained by the "Park" mechanism. They contend that, as a result of those defects, hundreds of crashes have occurred involving the subject vehicles, which now have gained a reputation for being dangerous to own or drive, resulting in diminished market value compared with preceding models of the same cars, or similar competitors, that do not share the defect. These allegations are not conclusory. The plaintiffs specifically allege that, before news reports about the defect widely were published, at least one model involved had held its market value better than competitors, but after news about the accidents broke, that model began losing its resale value faster than other vehicles in its class. They also contend that the defendant's purported "fix" for the defect has not worked, at least on a

significant number of the affected vehicles (more than 13,000 by the defendant's own account), and that those vehicles continue to experience rollaway accidents, and drivers continue to complain of problems with vehicles being difficult to put in "Park" or not remaining in the "Park" setting once placed there.

The injury here is particularized: each of the individual plaintiffs asserts that he or she bought and still owns one of the vehicles in the class that, it is apparently undisputed, have the type of allegedly defective gearshift. The injury also is concrete; the plaintiffs allege that they have lost the value of their time indulging the defendant's unsuccessful attempts to repair their vehicles, and the vehicles remain broken, and have not yet been fixed. They also specifically allege that their cars have lost market value faster than they otherwise would have absent the defect, particularly when compared to unaffected preceding or competing models.

The allegations — that the defendant sold the plaintiffs cars that do not stay in "Park" when placed in "Park," or that misinform drivers to think the cars are in "Park" when they are not, leaving unsecured vehicles to roll away when the driver exits, with sometimes disastrous consequences — plainly are sufficient to make out an "injury" under Article III. The plaintiffs thought that they were buying cars that were safe. If the allegations of the complaint are to be believed — as, at this point, they must be — what they bought were cars that decidedly were not safe. And when that defect becomes widely known, the value of the cars can suffer. *See In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1163 (C.D. Cal. 2011).

In the Toyota Camrey sudden acceleration cases, the court found Article III standing amidst a challenge that mirrored Chrysler's argument here. In that case, the cars also seemed to have a "mind of their own" concerning where they would go, and when. The plaintiffs alleged that the

vehicles were defective because they "accelerate suddenly and dangerously out of the driver's control and lack a fail-safe mechanism to overcome this." 790 F. Supp. 2d at 1163. All of the plaintiffs said that had they known, they would not have purchased the vehicles, or at least would not have paid as much. The court held that, "[t]aking these allegations as true, as the Court must at the pleading stage, they establish an economic loss." *Ibid.* The court reasoned that "[a] vehicle with a defect is worth less than one without a defect." *Ibid.* Therefore, the court held, "[t]he overpayment for the defective, unsafe vehicle constitutes the economic-loss injury that is sufficient to confer standing." *Ibid.* That reasoning applies equally here.

When a manufacturer sells a product that is defective, which causes consumers to be misled at the point of sale into paying more and getting less than they believed they were purchasing, the consumers suffer an injury in fact, even if that defect does not manifest itself in every individual unit. *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("Because all Duet [front-loading clothes washer] owners were injured at the point of sale upon paying a premium price for the Duets as designed, even those owners who have not experienced a mold problem are properly included within the certified class. Moreover, under the negligent failure-to-warn theory of liability, the plaintiffs need not prove that mold manifested in every Duet owned by class members because the injury to all Duet owners occurred when Whirlpool failed to disclose the Duets' propensity to develop biofilm and mold growth."); *see also In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1162 (C.D. Cal. 2011) ("Just as the California Supreme Court in *Kwikset* held that locks that were falsely advertised as being made in the United States were worth less to a consumer even if the locks were fully functional, so too have Plaintiffs alleged here that the alleged safety defects make Plaintiffs' vehicles worth less even if [the improper acceleration] has

not yet occurred."). That is why the defendant's argument that plaintiffs who have not been injured personally, or who have not yet sold their vehicles for a nominal loss, is a non-starter. As the district court aptly observed in *Toyota*, "this argument succeeds only if one assumes that a plaintiff who has not *experienced* a safety defect *does not have* a safety defect. . . . [A]ll Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle. . . . The economic loss was present from the beginning." *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1165.

The defendant attempts to read into the complaint an attenuated chain of uncertainty in the plaintiffs' allegations, based on its own self-serving — and, as to the facts actually alleged in the complaint, entirely counter-factual — hypothetical scenario. The defendant contends that its cars stay in "Park" when placed in "Park"; the plaintiffs, however, assert that they do not. The defendant contends that only intentional misuse of its cars can produce a "rollaway" accident; the plaintiffs assert that rollaway accidents have occurred even when, by all indications available to them, drivers believed that the transmissions of their vehicles were safely set to "Park," but they either were not, or they shifted out of "Park" after being set in that gear. Those facts are readily distinguishable from the "attenuated chain of possibilities" that the plaintiffs proposed in *Clapper v. Amnesty International USA*, where the Court found that the specter of illegal electronic surveillance was only a distant possibility. 133 S. Ct. at 1148 (holding that the "injury" was based only on the plaintiffs' "highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are

consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.").

Here, unlike in *Clapper*, no elaborate Rube Goldberg-style series of connections, and no mental gymnastics, are required to see how a car that seems to be stopped and parked when it is not, or that, after being "parked" refuses to stay that way, poses a direct and immediate threat to the safety of the driver and anyone else who happens to be around if the vehicle decides to go its own way in the world. And it is but a small and easily navigable next step to see how models of cars that have a reputation for doing so with regularity would be viewed by the car-buying public as risky and undesirable, with a market value well below that which comparable but safer vehicles may command.

The FACMC contains enough facts to plead an injury in fact suffered by the named plaintiffs. The defendant does not challenge any of the other elements of standing. The plaintiffs have described an "active case[] or controvers[y], as required by Article III, section 2 of the federal constitution." *Barry v. Lyon*, 834 F.3d 706, 714 (6th Cir. 2016) (citing *Lujan*, 504 U.S. at 560).

B.

The defendant also argues that the plaintiffs' demand for injunctive relief is "preempted" because the NHTSA is the only federal entity authorized to initiate or supervise a motor vehicle safety recall, and any meddling by the Court only would complicate and frustrate the administrative process. That is a curious argument in the context of Rule 12(b)(1). It does not address the Court's subject matter jurisdiction, because it is, in substance, an argument that the complaint fails to state

a claim on which relief can be granted, not a properly phrased challenge to the power of the Court to hear the case and order relief. The court of appeals has explained:

> Preemption . . . does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion. Rather, the doctrine generally concerns the merits of the claim itself — namely, whether it is viable and which sovereign's law will govern its resolution. That is why litigants typically invoke preemption as a defense to state-law claims asserted in state or federal court, not as a jurisdictional defect.

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir. 2004); *see also Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) ("[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case. It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." (quotation marks and citations omitted)); *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1249 (6th Cir. 1996) ("As the Supreme Court has held, a non-frivolous claim 'confers power to decide that it has no merit, as well as to decide that it has.'") (quoting *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 249 (1951)).

But even as a merits argument, the defendant cannot prevail on this theory. Ordering the defendant properly and fully to repair or replace defective units would not lead to an irreconcilable conflict between the direction of the Court ordering relief on one or more of the plaintiffs' state law claims, and any extant motor vehicle safety standard promulgated by the NHTSA.

The Motor Vehicle Safety Act expressly prohibits state and local governments from enacting any "standards" governing the "performance of a motor vehicle," where those standards are not "identical to the standard[s] prescribed under this chapter." 49 U.S.C. § 30103(b). However, the Act also contains a "saving clause," which provides that "[c]ompliance with a motor vehicle safety

-13-

standard prescribed under this chapter does not exempt a person from liability at common law." The Supreme Court has held that these two provisions, read in harmony, stand for the proposition that the Act does not expressly preempt all common law tort suits premised on motor vehicle safety defects. "The saving clause assumes that there are some significant number of common-law liability cases to save," and "a reading of the express pre-emption provision that excludes common-law tort actions gives actual meaning to the saving clause's literal language, while leaving adequate room for state tort law to operate — for example, where federal law creates only a floor, i.e., a minimum safety standard." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000).

Following *Geier*, the courts of appeals have concluded that "Congress in the Safety Act plainly did not intend to occupy the field of motor vehicle safety, so the implied preemption question turns on whether [the plaintiff's] common law claim conflicts with or would frustrate the purpose of [a federal motor vehicle safety standard]." *Harris v. Great Dane Trailers, Inc.*, 234 F.3d 398, 400 (8th Cir. 2000). "[*Geier* strongly suggests] that a minimum federal safety standard will rarely, if ever, impliedly preempt more rigorous common law safety obligations, particularly when, as here, the governing federal statute contains a common law remedial savings clause." *Id.* at 401.

The defendant has not pointed to any motor vehicle safety standard that it contends would be implicated if this Court were to order the defendant to repair the allegedly defective transmissions, which, so it claims, it already has attempted to do. The defendant, in fact, asserts that it voluntarily has undertaken to make such repairs; but the plaintiffs allege that the repair did not achieve its objective. The retrofit allegedly either was ineffective on some vehicles, or, when applied, it does not prevent the defective and dangerous behavior. The defendant asserts that the NHTSA has "exclusive authority" under federal law to order and supervise motor vehicle recalls.

However, unlike in the cases cited by the defendant, the plaintiffs do not make any demand in their complaint for an order of the Court directing the NHTSA to perform a recall, or to take any action at all. Instead, they merely seek unspecified "appropriate injunctive relief," an order enjoining the defendant from continuing its "deceptive practices," and "[e]quitable relief in the form of buyback of the Class Vehicles." If anything, the plaintiffs' most insistent desire for relief is simply an order compelling the defendant to satisfy the goals of a voluntary recall that they already have initiated — i.e., to actually fix the defect which they have acknowledged, but, so far at least, have not managed actually to remedy in a significant number of vehicles among those subject to the recall.

The defendant correctly points out that section 30162 permits "[a]ny interested person [to] file a petition with the Secretary of Transportation requesting the Secretary to begin a proceeding . . . to decide whether to issue [a recall] order under section 30118(b) of this title." 49 U.S.C. § 30162. But, as contemporary district court decisions rebuffing the same arguments have observed, the Act itself provides that the "recall" process does not exclude or override other remedies that may be available to consumers seeking to have vehicle defects effectively remediated. *See Chamberlan v. Ford Motor Co.*, 314 F. Supp. 2d 953, 964 (N.D. Cal. 2004) (noting that nothing in the statute "contains mandatory language to the effect that a petition to the Secretary is a consumer's only means to seek remedies for defective equipment," and that "prior to enactment of the 1974 recall amendments to the MVSA, courts enforced State-law-based injunctive remedies similar to recalls in the field of vehicle safety").

Moreover, as the plaintiffs point out, in a NHTSA position statement filed in a similar litigation, which the defendant included as an exhibit to its motion, the agency expressed its view that the pending litigation and even court supervision of a prospective remedy for the alleged defects

would not interfere with, and could well aid, the progress and resolution of its recall investigation and any subsequent technical determination of the most appropriate remedy. Def.'s Mot. [36], Ex. B, United States' Statement of Interest re: Motion to Stay Based on Primary Jurisdiction of the NHTSA dated Sept. 11, 2015 at 3-4 (Pg ID 1115-16).

However one views this argument, it in no way calls into question the Court's subject matter jurisdiction over the claims set out in the FACMC.

### III.

The plaintiffs have set forth facts to establish an injury in fact sufficient to satisfy the "'irreducible constitutional minimum,'" *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan*, 504 U.S., at 560), for standing as required by Article III. The MVSA does not "preempt" the Court's subject matter jurisdiction.

Accordingly, it is **ORDERED** that the defendant's motion to dismiss based on Federal Rule of Civil Procedure 12(b)(1) [dkt. #36] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: April 18, 2017

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 18, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI

---