## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**IN RE: FCA US LLC MONOSTABLE**      Case Number 16-md-02744
**ELECTRONIC GEARSHIFT**      Honorable David M. Lawson
**LITIGATION**      Magistrate Judge David R. Grand

      MDL No. 2744

**This Document Relates to:**
**ECONOMIC LOSS CLAIMS**

_____ /


## SECOND AMENDED CONSOLIDATED MASTER
## CLASS ACTION COMPLAINT AND
## <u>DEMAND FOR JURY TRIAL</u>

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................5

II.    JURISDICTION AND VENUE ..............................................................18

III.   PARTIES ...............................................................................................19

     A.     Arizona Plaintiffs ...................................................................19

     B.     California Plaintiffs ................................................................22

     C.     Colorado Plaintiffs .................................................................23

     D.     Florida Plaintiffs ....................................................................24

     E.     Georgia Plaintiffs ...................................................................25

     F.     Illinois Plaintiffs ....................................................................26

     G.     Iowa Plaintiffs ........................................................................28

     H.     Louisiana Plaintiffs ................................................................29

     I.     Maryland Plaintiffs .................................................................30

     J.     Massachusetts Plaintiffs .........................................................31

     K.     Michigan Plaintiffs .................................................................33

     L.     Minnesota Plaintiffs ...............................................................34

     M.     Missouri Plaintiffs .................................................................35

     N.     Nevada Plaintiffs ....................................................................37

     O.     New Jersey Plaintiffs ..............................................................38

     P.     New York Plaintiffs ................................................................39

     Q.     North Carolina Plaintiffs ........................................................42

     R.     Ohio Plaintiffs ........................................................................43

     S.     Oklahoma Plaintiffs ................................................................44

     T.     Oregon Plaintiffs ....................................................................45

     U.     Pennsylvania Plaintiffs ...........................................................46

     V.     Texas Plaintiffs ......................................................................49

     W.     Utah Plaintiffs .......................................................................55

     X.     Washington Plaintiffs .............................................................56

Y.    Wisconsin Plaintiffs ................................................................57

Z.    Wyoming Plaintiffs ...............................................................58

AA.  Defendant ..............................................................................60

IV.   FACTUAL ALLEGATIONS ...........................................................61

A.    Shift-by-Wire Transmission Systems ...................................61

B.    The Defective Shifter ............................................................64

C.    The Defective Shifter Does Not Adequately Alert Drivers to the Class Vehicles' Gear Position...................................67

D.    FCA Touted Safety in Its Marketing and Advertising......................71

E.    FCA Knew About the Defective Shifter and Associated Safety Risks.............................................................................77

      1.    NHTSA Complaints..................................................78

F.    FCA Stopped Installing the Defective Shifter in its Vehicles .................................................................................92

G.    NHTSA Confirms a Design Defect in the Defective Shifter ...................................................................................93

H.    Despite NHTSA's Findings and FCA's Voluntary Recall, FCA Blames Drivers and Fails to Provide a Remedy within a Reasonable Time ...................................................97

      1.    The Class Vehicles Are Recalled.............................98

      2.    FCA Failed to Provide a Remedy Within a Reasonable Time....................................................100

      3.    FCA Wrongly Blamed Drivers for Rollaway Incidents While it Delayed its Response ................103

I.    FCA Finally Provides a Purported Remedy for Certain Class Vehicles: One that is Ineffective and Diminishes the Functionality of the Class Vehicles............................108

      1.    FCA's Purported Remedy Is Ineffective ................108

      2.    FCA's Purported Remedy Has Led to Other Mechanical Failures in Class Vehicles ..................111

      3.    FCA's Purported Remedy Diminishes the Functionality of the Class Vehicles .......................120

        4.      Plaintiffs and Class Members Were Harmed by the Recall While Defendant Benefited ..........................................121

    J.     FCA's Delayed and Inadequate Response to the Defective Shifter Deprived Class Members of the Benefit of their Bargain and Has Led to a Decrease in Value of the Class Vehicles .................................................................122

V.    TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL ..................................................................................128

    A.    Discovery Rule Tolling ......................................................128

    B.    Estoppel ..............................................................................128

VI.   CLASS ALLEGATIONS ................................................................129

VII.  VIOLATIONS ALLEGED.............................................................135

    A.    Claims Brought on Behalf of the Nationwide Class .........135

    B.    Claims Brought on Behalf of the Arizona Subclass ..........138

    C.    Claims Brought on Behalf of the California Subclass .......150

    D.    Claims Brought on Behalf of the Colorado Subclass ........166

    E.    Claims Brought on Behalf of the Florida Subclass............176

    F.    Claims Brought on Behalf of the Georgia Subclass ..........187

    G.    Claims Brought on Behalf of the Illinois Subclass ...........204

    H.    Claims Brought on Behalf of the Iowa Subclass ...............214

    I.     Claims Brought on Behalf of the Louisiana Subclass.......226

    J.     Claims Brought on Behalf of the Maryland Subclass........227

    K.    Claims Brought on Behalf of the Massachusetts Subclass ..............239

    L.    Claims Brought on Behalf of the Michigan Subclass .......246

    M.   Claims Brought on Behalf of the Minnesota Subclass .....260

    N.    Claims Brought on Behalf of the Missouri Subclass .........278

    O.    Claims Brought on Behalf of the Nevada Subclass ..........283

    P.    Claims Brought on Behalf of the New Jersey Subclass....297

    Q.    Claims Brought on Behalf of the New York Subclass......310

    R.    Claims Brought on Behalf of the North Carolina Subclass ..............320

S.     Claims Brought on Behalf of the Ohio Subclass .............................330

T.     Claims Brought on Behalf of the Oklahoma Subclass......................343

U.     Claims Brought on Behalf of the Oregon Subclass ..........................356

V.     Claims Brought on Behalf of the Pennsylvania Class ......................368

W.    Claims Brought on Behalf of the Texas Subclass............................381

X.     Claims Brought on Behalf of the Utah Subclass..............................394

Y.     Claims Brought on Behalf of the Washington Subclass ..................406

Z.     Claims Brought on Behalf of the Wisconsin Subclass ....................418

AA.   Claims Brought on Behalf of the Wyoming Subclass .....................430

VIII.  REQUEST FOR RELIEF.........................................................................443

IX.    DEMAND FOR JURY TRIAL .................................................................443

The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to all other matters based on an investigation by counsel.[1]

## I.   INTRODUCTION

1.     Car makers must design and manufacture their cars to be safe to operate.  One of the most basic safety features in every car is the gear shifter that causes a stationary car to remain stationary unless and until the driver wants the car to move. The design of a gear shifter must be such that drivers know when a car is safe to exit because it is in the "Park" mode, and if a car maker decides to use a "monostable" shifter that does not change positions, it must include a safety override that automatically puts the car in Park or engages the parking brake when the driver gets out of the car.

2.     FCA US LLC ("FCA," "Company," or "Defendant") broke this basic rule when it designed and manufactured cars with monostable shifters that did not provide a reliable method of determining gear placement and did not include any safety-override to prevent rollaway accidents. From 2012-2015, FCA sold or

---

[1] Counsel's investigation includes an analysis of publicly available information, including consumer complaints, the investigation by the National Highway Transportation Safety Administration, information provided by Defendant relating to the recall of Class Vehicles, and additional analysis.  Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

leased hundreds of thousands of vehicles throughout the United States that contained a concealed and dangerous gearshift design defect that places drivers and occupants of the vehicles as well as the public at risk for serious injury or death, meaning that all purchasers and lessees of these vehicles paid more than the vehicle was actually worth.

3.      Plaintiffs Jeffrey Guy, Casey E. Perkins, Wisam Yacoub, David Goldsmith, Michael Vincent Nathan Jr., Debra Felker, Justine Andollo, Erica Willis, Kean McDonald, Lindsey Wells, Pamela Havnen, Dustin Stewart, Charles Frank Schultz, Bernadine Hartt, Scott Michael Youngstrom Jr., Todd Machtley, Melvin Scott, Corinn Berken, Taylor Brooks, Eliam M. Marrero Bernal, Clare Colrick, John Lynd, Janella Mack, Jacob Gunnells, Danielle and Joby Hackett, Carol Clark, Todd Fisher, Timothy Weber, Bruce Vosburgh, John and Mary Metzger, Robert F. Hyatt IV, Cameron Phelps, Cris-Ann Craig, Kelli Foreman, Krystal Dial, Ashley Gillipsie, Jay Waggoner, Trevor Marble, Karen Stedman, Cameron Webster, Marc Hughes, and Ann Magnuson  ("Plaintiffs") bring this class action against FCA, individually and on behalf of all persons in the United States who purchased, leased or own a 2012-2014 Chrysler 300, 2012-2014 Dodge Charger, or 2014-2015 Jeep Grand Cherokee equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG (the "Class Vehicles"), for

Defendant's fraud, negligent misrepresentation and concealment of the known gearshift defect in the Class Vehicles.

4.     FCA installed gear shifters in the Class Vehicles that departed from the long established "PRND" gear selector that provided a distinct position of the shifter for each gear.  Unlike traditional automatic transmission shifters, the Class Vehicles are equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG ("ZF"), which returns to a central predetermined position after a driver switches gears (the "Defective Shifter").  The Defective Shifter does not move into a physical gear position like a traditional shifter but rather springs back to its original position after a driver selects a gear.  Thus, the only indication that a specific gear has been selected is that a light changes, *i.e.*, when shifting from Drive to Park, the light changes from D to P.  There is no physical Park, Reverse, Neutral or Drive gear level, and there is no safety override function that puts the Class Vehicles into Park if a driver attempts to exit the vehicle while it is in another gear.

5.     The design of the Defective Shifter is dangerously defective because of the lack of a physical gear position that would clearly notify drivers regarding which gear their vehicle is in, *and* the lack of a safety override function that would automatically put the vehicle in Park or engage a parking brake when a driver attempts to exit the vehicle when it is not in Park.  This dangerous defect has

resulted in hundreds of accidents and vehicle rollaways as a result of drivers not knowing which gear their transmission is in and/or exiting their vehicle without the vehicle in Park.

6.      The safety issue is real.  As of February 2016, the National Highway Transportation Safety Administration ("NHTSA") and the Office of Defects Investigation ("ODI") (collectively, "NHTSA-ODI") had identified over 300 incidents of vehicle rollaway and/or accidents following intended shifts to Park due to the Defective Shifter, including 121 incidents that resulted in crashes and 30 that involved injuries.[2]  Injuries included fractured pelvises, a ruptured bladder, a fractured kneecap, broken ribs, broken noses, facial lacerations requiring stitches, sprained knees, severe bruising and trauma to legs.[3]  There were 325 additional complaints regarding Class Vehicle drivers' difficulty shifting into Park.[4]

7.      As a result of the consumer complaints, NHTSA-ODI investigated the Defective Shifter and described the defect as follows: "***Drivers may exit the vehicle when the engine is running and the transmission is not in Park, resulting in unattended vehicle rollaway.   Rollaway incidents may result in serious***

---

[2]  *See*  Exhibit A ("NHTSA-ODI Resume 1", reporting the results of an investigation launched in August 2015 and announcing the opening of an Engineering Analysis).

[3] *See id.*

[4] *See id.*

8

*injuries to the driver or passengers as they exit the vehicle or to other pedestrians in the path of the rolling vehicle*."[5]

8.      NHTSA-ODI's testing indicated that operation of the Defective Shifter "is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection."[6]  NHTSA-ODI also found that the functions related to the Defective Shifter in Class Vehicles "*[do] not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off*."[7]

9.      NHTSA also concluded that the Defective Shifter "*appears to violate several basic design guidelines for vehicle controls*, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[8]

10.      Although FCA has known of the Defective Shifter and associated safety risks since shortly after certain of the Class Vehicles were placed on the market in 2011, it has failed to act within a reasonable time to notify Plaintiffs and

---

[5] *See id*. (emphasis added).

[6] *See id.* (emphasis added).

[7] *See id*. (emphasis added).

[8] *See* Exhibit B ("NHTSA-ODI Resume 2" announcing the findings of the Engineering Analysis announced in NHTSA-ODI Resume 1) (emphasis added).

members of the Classes (defined below) of the defect and/or provide a remedy to protect them from the associated safety risks.  Rather, FCA waited until April 22, 2016 to issue a recall for certain of the Class Vehicles and took months after the recall to offer the Company's purported remedy for its defective design of the Defective Shifter.[9]  Additionally, the recall and purported remedy do not fully compensate Plaintiffs and members of the Classes for either the decrease in value of their vehicle since the defect came to light or for their time dedicated to fixing the defect.

11.    On or around May 14, 2016, FCA sent owners and lessees of the Class Vehicles a notification letter informing them about the Defective Shifter and associated safety risks, but offered no remedy or repair.[10]  Rather, FCA told consumers that "a permanent remedy for this condition is currently under development" and it "is working to finalize a remedy by the 4th quarter of 2016."[11] Thus, as of May 2016, FCA left owners and lessees of Class Vehicles with two undesirable options: (1) have no transportation while FCA implements a remedy;

_____

[9] *See* Exhibit C, Press Release, *Statement: Shift Strategy*, FCA North America, Apr. 22, 2016, http://media.fcanorthamerica.com/newsrelease.do?id=17455&mid= (last visited Dec. 16, 2016) ("Recall Press Release").

[10] *See* Exhibit D ("May 2016 FCA Recall Letter").

[11] *See id.*

or (2) drive a dangerously defective vehicle that puts drivers, occupants and the public at risk for injury or death.

12.     FCA has long known of the safety risks associated with the defect in the Defective Shifter.  In FCA's own recall chronology it states that as of April 12, 2016, "FCA has identified approximately 700 field reports potentially related to this issue which includes 212 crashes, 308 claims of property damage and 41 injuries."[12]

13.     Moreover, FCA recognized that the Class Vehicles contained a defect and stopped installing the Defective Shifter in certain 2015 and 2016 vehicles. As noted on its website: "To address customer-satisfaction issues, the Company began equipping the Charger and 300 with a new shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was updated in model year 2016."[13]

14.     In fact, the design defect was avoidable.  For example, FCA competitors, including BMW, have for several years used similar monostable electronic shift levers that return to center after being engaged.  But on the BMW, if the car is not in "Park," and the driver's door is opened and the foot brake

---

[12] *See* FCA US LLC Chronology, Monostable Gear Selector (Submitted on April 22, 2016), available at http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514516/RMISC-16V240-7112.pdf (last visited Dec. 16, 2016) ("FCA Chronology"), Exhibit E.

[13] *See* Exhibit C (Recall Press Release).

11

released, the car automatically shifts into "Park."  Likewise, the Audi A8 luxury sedan uses the same Defective Shifter that FCA used in the Class Vehicles.  But Audi did not sell a single A8 equipped with the Defective Shifter until it had developed a safety override that automatically engaged the electronic parking brake on the car if the driver's door is opened while the seatbelt is unbuckled.

15.    It is indisputable that from the time FCA first sold a Class Vehicle, it had the ability and technological capability to install a safety override that would have prevented the rollaway incidents that have plagued the Class Vehicles and caused hundreds of accidents, dozens of injuries, and at least one death.  It simply chose not to do so.

16.    On May 24, 2016, NHTSA submitted a safety recall report explaining FCA's acknowledgement of the defect as follows:

> Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged. ***FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety***.[14]

17.    On June 20, 2016, the public became aware of the significant safety risks associated with the Defective Shifter when it was reported that a young

---

[14] *See* Exhibit F ("NHTSA Safety Recall Report 1") (emphasis added).

Hollywood actor, Anton Yelchin, was crushed to death when his 2015 Jeep Grand Cherokee rolled backward down his driveway and pinned him against his mailbox after he exited the vehicle.

18.    On June 21, 2016, NHTSA submitted an updated safety recall report explaining that FCA is recalling over 800,000 vehicles in the United States equipped with the Defective Shifter in order to remedy its design defect.[15]

19.    On June 24, 2016, FCA issued a follow-up recall notice to owners and lessees of certain models of Jeep Grand Cherokees.[16]   According to FCA, the Company's purported remedy would involve taking the vehicle to an FCA dealer, who would "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle."[17]   The letter also stated that the dealer would provide additional information and guidance regarding the new feature, stating:

> You will receive an "Auto Park" addendum card explaining the vehicle's new "Auto Park" feature.  After your vehicle receives the software update, please review the addendum card with all of the drivers of your vehicle and then store the addendum card in the owner's manual for future reference.

---

[15] *See* Exhibit G ("NHTSA Safety Recall Report 2").

[16] *See* Exhibit H ("June 2016 FCA Second Recall Notice").

[17] *See id*.

> Your dealer will also review/demonstrate this new "Auto
> Park" feature and answer any questions or concerns.[18]

20.     To date, FCA's purported remedy has been ineffective, has led to

additional rollaway incidents and other mechanical failures in the Class Vehicles,

and has diminished the functionality of the Class Vehicles.  Numerous complaints

have been made to NHTSA describing incidents where Class Vehicles have

experienced rollaway incidents after the software update was performed on the

vehicles, and incidents where the software update led to other mechanical failures

in the vehicles.[19]

21.     On information and belief, dealerships have reported that the first

recall remedy was ineffective, many of the Class Vehicles have had to be fixed

more than once, and even FCA's own dealers are unsure whether the second recall

remedy will effectively fix the Defective Shifter, thus requiring Plaintiffs and

members of the Classes to devote even more time to remedying this defect.

22.     FCA already has admitted that at least 13,000 Class Vehicles in the

United States have not been properly fixed even though they were recalled and

repaired by the Company.  According to a November 16, 2016 *Associated Press*

article: "The new software was supposed to make the cars and SUVs automatically

---

[18] *Id.*

[19] *See infra*, Section IV. I.

14

shift into park when the driver's door is opened while the engine is running. But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[20]  In addition, FCA sent certain Class members a second recall notice, informing them of the need to take their Class Vehicle to the dealership for additional repairs.[21]

23.    Plaintiffs and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they, *inter alia*: (1) did not receive the benefit of the bargain of the purchase or lease of the Class Vehicles which were sold and leased as safe and reliable vehicles at premium prices even though they contained a known but concealed defect; (2) were forced to take time off from work and/or their daily activities in order to have the repair implemented (in some cases more than once); (3) own or lease a repaired vehicle which suffers from continued rollaways or other mechanical failures; (4) own or lease a repaired vehicle with diminished functionality due to the remedy instituted by FCA; and/or (5) own a vehicle that has substantially diminished in value and is diminishing in

---

[20] *See* Exhibit I, Tom Krishner, *New software doesn't fix Fiat Chrysler gearshifts*, The Columbus Dispatch (Nov. 16, 2016), http://www.dispatch.com/content/ stories/business/2016/11/16/software-fix-fiat-chrysler_.html# ("November 2016 Associated Press Article").

[21] *See* Exhibit J ("Notice of Need For Additional Repairs").

value at an increased rate each month and thus cannot be sold without incurring substantial losses.

24.     As a specific example of the increased diminution in value, 2014 and 2015 Jeep Grand Cherokees held their value *better* than other cars in their class before knowledge of the shifter defect became widespread, but after the defect became known, the monthly depreciation of these cars increased drastically, causing them to hold value *worse* than other cars in their class.

25.     While Plaintiffs and Class members were harmed by the recall, FCA benefited from and has been unjustly enriched by the recall which has forced hundreds of thousands of Class members to visit FCA dealerships nationwide in order to have their Class Vehicles repaired—without the need for FCA to spend millions in advertising and marketing to drive customers to its dealerships.

26.     Defendant misrepresented the standard, quality or grade of the Class Vehicles and knowingly, actively, and affirmatively omitted and/or concealed the existence of the Defective Shifter to increase profits by selling additional Class Vehicles.   Knowledge and information regarding the Defective Shifter and associated safety risks were in the exclusive and superior possession of Defendant and its dealers, and was not provided to Plaintiffs and members of the Classes, who could not reasonably discover the defect through due diligence.   Based on pre-production testing, design failure mode analysis, and consumer complaints to

16

dealers and NHTSA, *inter alia*, Defendant was aware of the design defect in the Defective Shifter and fraudulently concealed the defect from Plaintiffs and members of the Classes.

27.     Plaintiffs and members of the Classes (defined below) assert claims against Defendant for fraud, negligent misrepresentation, violation of The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., unjust enrichment, breach of express and implied contractual duties, breach of express and implied warranties, and violations of state consumer protection laws.

28.     As a direct result of FCA's wrongful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.  Specifically, Plaintiffs seek: immediate installation of an effective safety override system that does not diminish the functionality of the Class Vehicles or replacement of the Defective  Shifter altogether; provision of a temporary replacement vehicle while repair of the defect is pending, and/or buyback of the Class Vehicles; compensation for any additional sums spent on any repairs to the Defective Shifter and/or any "fix" performed on the Class Vehicles; restitution for purchase of extended warranties that will go unused; compensation for the increased loss in value and depreciation of the Class

Vehicles due to widespread knowledge of the shifter defect, and punitive damages for FCA's knowing fraud that put drivers and members of the public nationwide at risk.

## II.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Classes, members of the Classes (as defined below) are citizens of states different from Defendant, and greater than two-thirds of the members of the Classes reside in states other than the state in which Defendant is a citizen.  This Court has jurisdiction over supplemental state law claims pursuant to 20 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

30.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Defendant maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendant conducts a substantial amount of business in this District.  Accordingly, Defendant has

sufficient contacts with this District to subject Defendant to personal jurisdiction in the District and venue is proper.

## III.   PARTIES

### A.   Arizona Plaintiffs

**Plaintiff Jeffrey Guy**

31.   Plaintiff Jeffrey Guy is a resident of Arizona domiciled in Mesa, Arizona.   On January 31, 2015, Plaintiff Guy bought a new 2015 Jeep Grand Cherokee at Larry Miller Jeep Chrysler in Avondale, Arizona.   He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.   Plaintiff Guy believed his Grand Cherokee would be a good value because of its utility and reputation for safety.   Plaintiff Guy traded in his vehicle in or around January 2017.

32.   Unbeknownst to Plaintiff Guy at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Guy of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Guy experienced roughly twenty rollaway incidents in his Jeep Grand Cherokee and did not feel safe driving the vehicle.

19

**Plaintiff Casey E. Perkins**

33.   Plaintiff Casey E. Perkins is a resident of Arizona domiciled in Fort Mohave, Arizona.   On October 8, 2014, Plaintiff Perkins bought a new 2014 Chrysler 300 at Swanty's Chrysler Dodge Jeep Ram in Bullhead City, Arizona.   He purchased the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability. Plaintiff Perkins believed his Chrysler 300 would be a good value because of its utility and reputation for safety.   Plaintiff Perkins still owns his Chrysler 300.

34.   Unbeknownst to Plaintiff Perkins at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Perkins of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Perkins experienced at least three rollaway incidents in his Chrysler 300.

**Plaintiff Wisam Yacoub**

35.   Plaintiff Wisam Yacoub is a resident of Arizona domiciled in San Tan Valley, Arizona. Plaintiff Yacoub owned a 2014 Chrysler 300, which he purchased new from Bill Luke Chrysler Jeep Dodge Ram in Phoenix, Arizona. He purchased

the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability. Plaintiff Yacoub believed his Chrysler 300 would be a good value because of its utility and reputation for safety. Plaintiff Yacoub returned his Chrysler 300 to the bank that financed the purchase on October 16, 2017. As a result of the Defective Shifter and the long history of repairs on the Chrysler 300, Plaintiff Yacoub was unable to sell the Vehicle.  Because Plaintiff Yacoub had to return it to the bank, his credit score suffered a decrease.

36.    Unbeknownst to Plaintiff Yacoub at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Yacoub of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Yacoub experienced an incident in which his Chrysler 300 should have been in park, but instead rolled back and hit his son.

## B.      California Plaintiffs

**Plaintiff David Goldsmith**

37.    Plaintiff David Goldsmith is a resident of California domiciled in Hanford, California.  On August 15, 2015, Plaintiff Goldsmith purchased a new 2015 Jeep Grand Cherokee at Clovis Chrysler Dodge Jeep RAM in Clovis, California.  He purchased the car because of its reputation for safety and utility consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Goldsmith believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Goldsmith still owns his Jeep Grand Cherokee.

38.    Unbeknownst to Plaintiff Goldsmith at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Goldsmith of the Defective Shifter and corresponding safety risk associated with his vehicle.   Given the Defective Shifter, Plaintiff Goldsmith experienced a rollaway incident in his Jeep Grand Cherokee.

**Plaintiff Michael Vincent Nathan, Jr.**

39.    Plaintiff Michael Vincent Nathan, Jr is a resident of California domiciled in Acton, California.  On or about September 10, 2013, Plaintiff Nathan

bought a new 2014 Jeep Grand Cherokee at AutoNation Chrysler Dodge Jeep Ram in Valencia, California. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Nathan believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns the vehicle.

40.    Unbeknownst to Plaintiff Nathan at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Nathan of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Nathan has experienced  several rollaway incidents in his Jeep Grand Cherokee and no longer feels safe driving the vehicle.

### C.    Colorado Plaintiffs

**Plaintiff Debra Felker**

41.    Plaintiff Debra Felker is a resident of Colorado domiciled in Grand Junction, Colorado. On November 17, 2015, Plaintiff Felker purchased a new 2015 Jeep Grand Cherokee at Grand Junction Chrysler Dodge Jeep Ram in Grand Junction, Colorado. She purchased the car because of its reputation for safety and

utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Felker believed her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff no longer owns the vehicle.

42.     Unbeknownst to Plaintiff Felker at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Felker of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Felker's vehicle rolled away on at least five occasions and Plaintiff no longer felt safe driving her vehicle.

**D.     Florida Plaintiffs**

**<u>Plaintiff Justine Andollo</u>**

43.     Plaintiff Justine Andollo is a resident of Florida domiciled in Naples, Florida.  Plaintiff Andollo bought a 2015 Jeep Grand Cherokee at Naples Dodge Chrysler Jeep in Naples, Florida, in 2015.  She purchased the car because of its reputation for safety and utility, consistent with her exposure to Jeep's advertising messaging.  Plaintiff Andollo believed her Grand Cherokee would be a good value

because of its utility and reputation for safety.  Plaintiff Andollo still owns her Jeep Grand Cherokee.

44.    Unbeknownst to Plaintiff Andollo at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Andollo of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the Defective Shifter, Plaintiff Andollo has had five separate incidents where her vehicle has rolled away.  At least one rollaway occurred after the recall was performed.  Plaintiff Andollo no longer feels safe operating her Defective Shifter vehicle but, because of the Defective Shifter, she is not able to trade or sell her car absent a substantial financial loss as the value of her car has substantially declined.

### E.    Georgia Plaintiffs

### Plaintiff Erica Willis

45.    Plaintiff Erica Willis is a resident of Georgia domiciled in Atlanta, Georgia. Plaintiff Willis bought a used 2012 Dodge Charger at a Ford Dealership in Conyers, Georgia. She purchased the car because of its reputation for safety and utility, consistent with her exposure to Chrysler's advertising messaging. Plaintiff

Willis believed her Dodge Charger would be a good value because of its utility and reputation for safety. At all times relevant to Plaintiff Willis's allegations in the complaint, Plaintiff Willis owned her Dodge Charger.

46.    Unbeknownst to Plaintiff Willis at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Willis of the Defective Shifter and corresponding safety risk associated with her vehicle.

## F.    Illinois Plaintiffs

**Plaintiff Kean McDonald**

47.    Plaintiff Kean McDonald is a resident of Illinois domiciled in Western Springs, Illinois.  On July 8, 2013, he bought a new 2014 Jeep Grand Cherokee at Zeigler Chrysler Dodge Jeep RAM in Downers Grove, Illinois.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff McDonald believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff McDonald still owns his Jeep Grand Cherokee.

48.    Unbeknownst to Plaintiff McDonald at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert

drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff McDonald of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff McDonald has experienced three separate rollaways.

**Plaintiff Lindsey Wells**

49. Plaintiff Lindsey Wells is a resident of Illinois domiciled in Highland Park, Illinois. On April 30, 2015, Plaintiff Wells bought a new 2015 Jeep Grand Cherokee at Fields Jeep in Glenview, Illinois. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Wells believed that her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Wells traded in her Jeep Grand Cherokee on or around September 2017.

50. Unbeknownst to Plaintiff Wells at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Wells of the Defective Shifter and corresponding safety risk associated with her vehicle.

27

Given the defect, Plaintiff's vehicle rolled away on at least three occasions and Plaintiff no longer felt safe driving the vehicle. Because of the Defective Shifter's continued problems, she believed she had no choice but to sell the vehicle.

### G.    Iowa Plaintiffs

**Plaintiff Pamela Havnen**

51.    Plaintiff Pamela Havnen is a resident of Iowa domiciled in Ankeny, Iowa. Plaintiff Havnen bought a new 2015 Jeep Grand Cherokee at Duey Ford in Iowa. She purchased the car because of its reputation for safety and utility, consistent with her exposure to Jeep's advertising messaging. Plaintiff Havnen believed her Jeep Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Havnen still owns her Jeep Grand Cherokee.

52.    Unbeknownst to Plaintiff Havnen at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Havnen of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the Defective Shifter, Plaintiff Havnen has experienced rollaway incidents in her Jeep Grand Cherokee. Although Defendant provided a repair through the recall, Plaintiff Havnen still experiences an unusual shift aspect in her

Jeep Grand Cherokee, and is constantly double-checking the position of the gearshift.

### H.    Louisiana Plaintiffs

**Plaintiff Dustin Stewart**

53.    Plaintiff Dustin Stewart is a resident of Louisiana domiciled in Walker, Louisiana. On May 13, 2015, Plaintiff bought a used 2014 Jeep Grand Cherokee at Brian Harris Jeep (now Salisbury's Chrysler Dodge Jeep Ram) in Baton Rouge, Louisiana. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Stewart believed his Grand Cherokee would be a good value because of its utility and reputation for safety.

54.    Unbeknownst to Plaintiff Stewart at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Stewart of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff's vehicle has rolled away on at least two occasions and Plaintiff no longer feels safe driving the vehicle.

## I.    Maryland Plaintiffs

### Plaintiff Charles Frank Schultz

55.    Plaintiff Charles Frank Schultz is a resident of Maryland domiciled in Linthicum, Maryland. On September 29, 2015, he bought a used 2014 Jeep Grand Cherokee at Don White's Timonium Chrysler Dodge Jeep RAM in Cockeysville, Maryland. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Schultz believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Schultz still owns his Jeep Grand Cherokee.

56.    Unbeknownst to Plaintiff Schultz at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Schultz of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Schultz's vehicle has rolled away on at least one occasion. Plaintiff Schultz no longer feels safe driving the vehicle.

## J.    Massachusetts Plaintiffs

### Plaintiff Bernadine Hartt

57.    Plaintiff Bernadine Hartt is a resident and citizen of Saugus, Massachusetts.  Plaintiff Hartt owns a 2014 Jeep Grand Cherokee Limited 4x4 that is registered in Massachusetts.  She purchased the car from Lawless Chrysler Jeep Dodge in Woburn, Massachusetts.  She purchased the car because of its reputation for safety, security, and reliability, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Hartt believed her Grand Cherokee would be a good value because of its reputation safety, security, and reliability.  Plaintiff Hartt still owns her Jeep Grand Cherokee.

58.    Unbeknownst to Plaintiff Hartt at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Hartt of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the design defect, Plaintiff Hartt has experienced issues with properly shifting her car into reverse.  Although Plaintiff Hartt's vehicle has been repaired, she still does not trust the repair and has to take extra precaution to ensure she shifts her vehicle into the correct gear.

31

**Plaintiff Scott Michael Youngstrom Jr.**

59.    Plaintiff Scott Michael Youngstrom Jr. is a resident of Massachusetts domiciled in Quincy, Massachusetts.    On December 10, 2011, Plaintiff Youngstrom bought a new 2012 Dodge Charger at Planet Jeep Chrysler Dodge in Franklin, Massachusetts.  He purchased the car because of its reputation for safety and utility, consistent with his review of Fiat Chrysler's advertising messaging regarding safety and reliability.  Plaintiff Youngstrom believed his Dodge Charger would be a good value because of its utility and reputation for safety.  Plaintiff Youngstrom still owns his Dodge Charger.

60.    Unbeknownst to Plaintiff Youngstrom at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Youngstrom of the Defective Shifter and corresponding safety risk associated with his vehicle.  Because of the continued risk of a rollaway, Plaintiff Youngstrom does not feel safe parking and exiting the vehicle.

**Plaintiff Todd Machtley**

61.    Plaintiff Todd Machtley is a resident of Massachusetts domiciled in Middleboro, Massachusetts.  On or about December 20, 2014, Plaintiff Machtley

bought a new 2015 Jeep Grand Cherokee Altitude 4x4 at Somerset Chrysler Jeep Dodge in Somerset, Massachusetts.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Machtley believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Machtley still owns his Jeep Grand Cherokee.

62.    Unbeknownst to Plaintiff Machtley at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.    Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Machtley of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defect, Plaintiff Machtley's vehicle has rolled away on at least two occasions and Plaintiff no longer feels safe driving the vehicle.

### K.    Michigan Plaintiffs

**Plaintiff Melvin Scott**

63.    Plaintiff Melvin Scott is a resident of Michigan domiciled in Kentwood, Michigan.  On April 30, 2013, Plaintiff Scott bought a new 2014 Jeep Grand Cherokee at Courtesy Jeep Chrysler Dodge in Grand Rapids, Michigan.  He

purchased the car because of its reputation for safety and utility, consistent with his review of Fiat Chrysler's advertising messaging regarding safety and reliability. Plaintiff Scott believed his Jeep Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Scott traded in his Jeep Grand Cherokee in or around September 2017.

64.    Unbeknownst to Plaintiff Scott at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Scott of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff's vehicle has rolled away on at least two occasions and Plaintiff no longer feels safe driving the vehicle.  On October 27, 2016, Plaintiff took his vehicle in to have the recall work performed. However, approximately one week later, Plaintiff was subsequently informed by the service department that the recall work may not be complete and that he may receive an additional notice from FCA that the repair work performed by FCA failed to cure the defect.

L.    **Minnesota Plaintiffs**

**Plaintiff Corinn Berken**

65.    Plaintiff Corinn Berken is a resident of and is domiciled in Eagan, Minnesota. Plaintiff Berken purchased a used 2014 Jeep Grand Cherokee from Delacy Automotive in Minnesota. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Berken believed her Jeep Grand Cherokee would be a good value because of its utility and reputation for safety.

66.    Unbeknownst to Plaintiff Berken at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Berken of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Berken has experienced a rollaway incident with her Jeep which resulted in property damage.

**M.    Missouri Plaintiffs**

**Plaintiff Taylor Brooks**

67.    Plaintiff Taylor Brooks is a resident and citizen of Kansas City, located in Clay County in the State of Missouri.  He owns a 2015 Jeep Grand Cherokee.  On May 28, 2016, Plaintiff Brooks purchased a certified pre-owned 2015 Jeep Grand Cherokee Laredo from Gladstone Dodge Chrysler Jeep RAM, a

certified Chrysler Group car dealership located in Gladsville, Missouri.  Neither FCA, the dealership, nor any of its agents relayed any information about a recall involving the rollaway safety issue.

68.    After Plaintiff Brooks independently learned of the recall, he called his dealership to inquire into the safety of his defective vehicle.  The dealership informed Plaintiff Brooks that the recall on his specific vehicle had been fixed. Despite the dealership's representations, on July 11, 2016, Plaintiff Brooks attempted to place his vehicle in Park while at a gas station.  Because of the Defective Shifter, the vehicle was not properly shifted into Park and began to rollaway, crossing four lanes of traffic and ultimately crashing into a fence pole. At the time of the accident, Plaintiff Brooks' Jeep Grand Cherokee was under a 10-year, 100,000 mile warranty from the dealership.

69.    After this incident, Plaintiff Brooks double-checked his vehicle's VIN number and learned that his vehicle had not, in fact, been fixed; rather, the recall was simply "educational."   When Plaintiff Brooks took his vehicle to the dealership, it informed him that he would need to go through his insurance to account for the resulting damage to his vehicle.  Additionally, the dealership told Plaintiff Brooks that it did not have to inform him of the recall at the time of purchase.

70.   As a result of the rollaway, Plaintiff Brooks' defective vehicle has been damaged, which will cause him to incur out of pocket costs to repair his defective vehicle.  To date, his vehicle is not repaired.

71.   Unbeknownst to Plaintiff Brooks at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Brooks of the Defective Shifter and corresponding safety risk associated with his vehicle.

**N.    Nevada Plaintiffs**

**Plaintiff Eliam M. Marrero Bernal**

72.   Plaintiff Eliam M. Marrero Bernal is a resident of Nevada domiciled in Las Vegas, Nevada.  On or about May 30, 2015 Plaintiff Bernal bought a new 2015 Jeep Grand Cherokee at Prestige Chrysler Jeep Dodge in Las Vegas, Nevada. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Bernal believed his Grand Cherokee would be a good value because of its utility and reputation for safety.   Plaintiff Bernal traded in his Jeep Grand Cherokee on or around January 2017.

73.     Unbeknownst to Plaintiff Bernal at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Bernal of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defect, Plaintiff Bernal's vehicle has rolled away on at least two occasions and Plaintiff no longer felt safe driving the vehicle.

O.     **New Jersey Plaintiffs**

**Plaintiff Clare Colrick**

74.     Plaintiff Clare Colrick is a resident of New Jersey domiciled in Short Hills, New Jersey.  On August 27, 2013 Plaintiff Colrick bought a new 2014 Jeep Grand Cherokee at Salerno Duane in Summit, New Jersey.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Colrick believed her Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Colrick still owns her Jeep Grand Cherokee.

75.     Unbeknownst to Plaintiff Colrick at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the

engine running.  Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Colrick of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Colrick's vehicle has rolled away on at least five occasions and Plaintiff Colrick no longer feels safe driving the vehicle.

### P.    New York Plaintiffs

**Plaintiff John Lynd**

76.    Plaintiff John Lynd is an individual and citizen of New York State residing in Albany, New York.  On or about November 30, 2014, Plaintiff Lynd leased a new 2015 Jeep Grand Cherokee Overland 4x4 from Goldstein Chrysler Jeep Dodge Ram in Latham, New York.

77.    Plaintiff Lynd leased the vehicle because of its reputation for safety and reliability, consistent with his exposure to marketing materials for the vehicle. Plaintiff Lynd has a family and wanted a car that was safe to drive and did not present a risk of breaking down or getting in accidents.  Prior to leasing the vehicle, Plaintiff Lynd test drove it and reviewed specific features and options available.  Based on FCA's representations regarding the vehicle, Plaintiff Lynd believed that the vehicle was safe and reliable and, therefore, a good value. Plaintiff Lynd's lease has not expired.

78.     Unbeknownst to Plaintiff Lynd at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on May 14, 2016 and subsequent recall letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Lynd of the Defective Shifter and corresponding safety risk associated with his vehicle.  As a result of the Defective Shifter, Plaintiff Lynd has experienced multiple instances where he was about to exit or had exited the vehicle, assuming the transmission had been placed in Park, only to discover that the transmission was actually in Drive or Reverse.

79.     On or about June 20, 2016, Plaintiff Lynd learned that actor Anton Yelchin had been crushed to death by a rollaway 2015 Jeep Grand Cherokee, apparently as a result of the same Defective Shifter.  Shortly thereafter, Plaintiff Lynd contacted the FCA dealer from whom he had leased his vehicle to inquire as to the availability of a fix for the problem.

80.     Upon contacting the dealer, Plaintiff Lynd was informed that FCA had provided dealers with a supposed fix for the safety issue presented by the Defective Shifter installed in Plaintiff Lynd's Jeep Grand Cherokee in the form of a software patch.  Later that week, Plaintiff Lynd took his vehicle to the dealer, who installed the software patch provided by FCA.

81.     The software patch has proven ineffective.   On more than one occasion, Plaintiff Lynd has used the presumably fixed Defective Shifter to place the vehicle into Park, only to watch the transmission shift instead to a different gear.

82.     After receiving the software patch and continuing to suffer safety risks due to the Defective Shifter, Plaintiff Lynd notified the dealer that the software patch has not remedied all the safety issues caused by the Defective Shifter.  The dealer informed Plaintiff Lynd that FCA did not offer any additional remedial measures to resolve the safety issues associated with the Defective Shifter.

83.     Plaintiff Lynd no longer feels safe driving the vehicle and will not allow other members of his family to operate it.

**Plaintiff Janella Mack**

84.     Plaintiff Janella Mack is a resident and citizen of the state of New York and owns a 2015 Jeep Grand Cherokee. Plaintiff Mack purchased her 2015 Jeep Grand Cherokee from Garden City Jeep dealership located in New York.

85.     Unbeknownst to Plaintiff Mack at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016 and subsequent recall letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff

Mack of the Defective Shifter and corresponding safety risk associated with her vehicle. As a result of the Defective Shifter, Plaintiff Mack experienced a rollaway incident outside of her grandmother's resident. Upon placing her vehicle in Park, and as she was removing items from the vehicle, Plaintiff Mack's 2015 Grand Cherokee began to rollaway and ultimately collided with another vehicle.

86.    Plaintiff Mack reported the rollaway incident to the dealership where she purchased her 2015 Grand Cherokee. Her vehicle was inspected and then later released to her. One week later, she received the recall notice in the mail.

87.    As a result of the rollaway, Plaintiff Mack's Class Vehicle has been damaged, and she has incurred out of pocket costs related to the rollaway incident.

### Q.    North Carolina Plaintiffs

**Plaintiff Jacob Gunnells**

88.    Plaintiff Jacob Gunnells is a resident of North Carolina domiciled in Raleigh, North Carolina. In July 2015, he bought a used 2014 Jeep Grand Cherokee at Mark Jacobson Toyota in Durham, North Carolina. Before purchasing the car, he took it for a used-car inspection at Westgate Chrysler Jeep Dodge Ram in Raleigh, North Carolina. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. He also purchased a lifetime service contract on this vehicle from Jeep. Plaintiff Gunnells believed his Grand Cherokee would be a

good value because of its utility and reputation for safety. Plaintiff Gunnells still owns his Jeep Grand Cherokee.

89. Unbeknownst to Plaintiff Gunnells at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Gunnells of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Gunnells' vehicle has rolled away on at least one occasion.

### R.    Ohio Plaintiffs

**Plaintiffs Danielle and Joby Hackett**

90. Plaintiffs Danielle and Joby Hackett are residents of Ohio domiciled in Masury, Ohio. Plaintiffs Hackett bought a new 2015 Jeep Grand Cherokee at Eddy Chrysler Dodge Jeep in Youngstown, Ohio. They purchased the car because of its reputation for safety and utility, consistent with their exposure to Jeep's advertising messaging. Plaintiffs Hackett believed their Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiffs Hackett still own their Jeep Grand Cherokee.

91.    Unbeknownst to Plaintiffs Hackett at the time of purchase, their vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.    Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiffs Hackett of the Defective Shifter and corresponding safety risk associated with their vehicle.    Given the Defective Shifter, Plaintiff Hackett's vehicle has rolled away on numerous occasions and Plaintiff Hackett no longer feels safe driving the vehicle.

## S.    Oklahoma Plaintiffs

### Plaintiff Carol Clark

92.    Plaintiff Carol Clark is a resident of Oklahoma, domiciled in Chocktaw, Oklahoma. On September 13, 2014, Plaintiff Clark bought a new 2014 Jeep Grand Cherokee at David Stanley Chrysler Dodge Jeep Ram in Norman, Oklahoma. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Clark believed her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Clark still owns her Jeep Grand Cherokee.

93.    Unbeknownst to Plaintiff Clark at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent recall letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Clark of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Clark's vehicle has rolled away on more than one occasion due to the defect and Plaintiff Clark no longer feels safe driving the vehicle.

**T.    Oregon Plaintiffs**

**Plaintiff Todd Fisher**

94.    Plaintiff Todd Fisher is a resident of Oregon domiciled in Gresham, Oregon.  On December 9, 2014, Plaintiff Fisher bought a new 2015 Jeep Grand Cherokee at Gresham Dodge Jeep in Gresham, Oregon.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Fisher believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Fisher still owns his Jeep Grand Cherokee.

95.    Unbeknownst to Plaintiff Fisher at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of

the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Fisher of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff's vehicle has rolled away on three occasions and Plaintiff Fisher no longer feels safe driving the vehicle. Approximately three months after FCA allegedly performed the recall work on Plaintiff Fisher's vehicle, Plaintiff Fisher received a second notice from FCA that his vehicle did not receive the complete and proper recall repair and that his vehicle's software required additional updating. All the while, Plaintiff Fisher had been driving the vehicle trusting that FCA had addressed the design defect when, in fact, they had not. Even though Plaintiff Fisher has had two rounds of recall work performed on his vehicle, he continues to experience rollaways.

### U.    Pennsylvania Plaintiffs

**Plaintiff Timothy Weber**

96.    Plaintiff Timothy Weber is a citizen of the state of Pennsylvania and resides in Conneaut Lake, Pennsylvania. On or around September 9, 2013, Plaintiff Weber purchased a new 2014 Jeep Grand Cherokee from Griffin Motors in Meadville, Pennsylvania for personal, family or household use. Plaintiff Weber continues to own the 2014 Jeep Grand Cherokee.

97.    Unbeknownst to Plaintiff Weber at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Weber of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the Defective Shifter, Plaintiff Weber has experienced incidents where he has exited the vehicle when it was in Reverse gear but Plaintiff Weber thought he put the vehicle in Park gear.

**Plaintiff Bruce Vosburgh**

98.    Plaintiff Bruce Vosburgh is a citizen of the State of Pennsylvania and resides in Kennett Square, Pennsylvania.  Plaintiff Vosburgh owned a 2014 Jeep Grand Cherokee, which he purchased new from David-Dodge Jeep in Glen Mils, Pennsylvania.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Vosburgh believed his Grand Cherokee would be a good value because of its utility and reputation for safety.

99.    Unbeknownst to Plaintiff Vosburgh at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle

with the engine running.   Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Vosburgh of the Defective Shifter and corresponding safety risk associated with his vehicle.   Given the defect, Plaintiff Vosburgh has experienced issues with the gear shift not clicking into the appropriate gear. Plaintiff Vosburgh traded in his Jeep Grand Cherokee in or around November 2017.

**Plaintiffs John and Mary Metzger**

100.   Plaintiffs John and Mary Metzger are residents of Pennsylvania domiciled in Lancaster, Pennsylvania.   On April 7, 2014, Plaintiffs Metzger bought a used 2014 Jeep Grand Cherokee at Keller Bros. Dodge Inc.   They purchased the car because of its reputation for safety and utility, consistent with their review of Jeep's advertising messaging regarding safety and reliability.   Plaintiffs Metzger still own their Jeep Grand Cherokee.

101.   Unbeknownst to Plaintiffs Metzger at the time of purchase, their vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.   Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiffs Metzger of the Defective Shifter and corresponding safety risk associated with their vehicle.   Given the defect, in December, 2015, Plaintiffs

48

Metzger's vehicle rolled away and Plaintiffs Metzger no longer feel completely safe driving the vehicle.

## V.     Texas Plaintiffs

## Plaintiff Robert F. Hyatt IV

102.   Plaintiff Robert F. Hyatt IV is a resident of Texas domiciled in Houston, Texas.  In December 2014, he bought a new 2014 Jeep Grand Cherokee at Helfman Dodge Chrysler Jeep RAM in Houston, Texas.   Plaintiff Hyatt purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Hyatt believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Hyatt still owns his Jeep Grand Cherokee.

103.   Unbeknownst to Plaintiff Hyatt at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Hyatt of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Hyatt's vehicle has rolled away on two occasions due to the defect and Plaintiff no longer feels safe driving the vehicle. However, due to

financial considerations, Plaintiff is unable to trade in or sell the vehicle and must continue to own and drive a vehicle Plaintiff Hyatt knows is unsafe.

**Plaintiff Cameron Phelps**

104.   Plaintiff Cameron Phelps is a resident of Texas domiciled in Austin, Texas.   On April 26, 2016, Plaintiff Phelps bought a used 2014 Jeep Grand Cherokee at Austin Subaru in Austin, Texas.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Phelps believed his Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff still owns his vehicle.

105.   Unbeknownst to Plaintiff Phelps at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Phelps of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Phelps' vehicle has rolled away on at least one occasion and Plaintiff no longer feels safe driving the vehicle.

**Plaintiff Cris-Ann Craig**

106.   Plaintiff Cris-Ann Craig is a resident of Texas domiciled in Corpus Christie, Texas. Plaintiff Craig bought a 2014 Jeep Grand Cherokee at Bluebonnet Dodge Jeep in New Braunfels, Texas. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Craig believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

107.   Unbeknownst to Plaintiff Craig at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Craig of the Defective Shifter and corresponding safety risk associated with her vehicle. Plaintiff Craig still owns her Jeep Grand Cherokee.

**Plaintiff Kelli Foreman**

108.   Plaintiff Kelli Foreman is a resident of Texas domiciled in Humble, Texas. Plaintiff Foreman bought a new 2014 Jeep Grand Cherokee at Texan Chrysler Jeep Dodge Ram in Humble, Texas. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Foreman believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

109.    Unbeknownst to Plaintiff Foreman at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Foreman of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Foreman experienced a situation in which her vehicle did not properly shift into gear, and rolled away from her. Plaintiff Foreman still owns her Jeep Grand Cherokee.

**Plaintiff Krystal Dial**

110.    Plaintiff Krystal Dial is a resident of Texas domiciled in Tyler, Texas. Plaintiff Dial bought a new 2014 Jeep Grand Cherokee at Randall Noe Chrysler Dodge Jeep Ram in Terrell, Texas. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Dial believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

111.    Unbeknownst to Plaintiff Dial at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters

52

sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Dial of the Defective Shifter and corresponding safety risk associated with her vehicle. Plaintiff Dial still owns her Jeep Grand Cherokee.

## Plaintiff Ashley Gillipsie

112.   Plaintiff Ashley Gillipsie is a resident of Texas domiciled in Omaha, Texas. Plaintiff Gillipsie bought a new 2015 Jeep Grand Cherokee at Dow Jeep Chrysler in Pittsburgh, Texas. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Gillipsie believed her Grand Cherokee would be a good value because of its utility and reputation for safety.

113.   Unbeknownst to Plaintiff Gillipsie at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Gillipsie of the Defective Shifter and corresponding safety risk associated with her vehicle.

114.   Given the defect, Plaintiff Gillipsie experienced an incident in which her Jeep was parked outside of her parents' house and her father saw the Jeep begin to roll away. Additionally, in or around November 2017, Plaintiff Gillipsie's

vehicle spontaneously shifted from drive to neutral, and started to roll backwards, as she was attempting to drive up a slight incline at a low speed. Plaintiff Gillipsie still owns her Jeep Grand Cherokee.

### Plaintiff Jay Waggoner

115.   Plaintiff Jay Waggoner is a resident of Texas domiciled in Portland, Texas. Plaintiff Waggoner bought a 2014 Chrysler 300 from Allen Samuels Chrysler-Dodge in Aranas Pass, Texas. He purchased the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability. Plaintiff Waggoner believed his Chrysler 300 would be a good value because of its utility and reputation for safety.

116.   Unbeknownst to Plaintiff Waggoner at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Waggoner of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Waggoner experienced rollaway incidents with his Chrysler, both before and after Defendant performed

the purported repair on Plaintiff Waggoner's vehicle. Plaintiff Waggoner turned in his car to the bank in 2017.

## W.    Utah Plaintiffs

### Plaintiff Trevor Marble

117.    Plaintiff Trevor Marble is a resident of Utah domiciled in Salt Lake City, Utah. On January 7, 2014, Plaintiff purchased a used 2014 Jeep Grand Cherokee at Layton Hills Chrysler Dodge Jeep Ram in Layton, Utah. He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Marble believed his Jeep would be a good value because of its utility and reputation for safety. Plaintiff Marble still owns his Jeep Grand Cherokee.

118.    Unbeknownst to Plaintiff Marble at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Marble of the Defective Shifter and corresponding safety risk associated with his vehicle. Given the defect, Plaintiff Marble's vehicle has rolled away on two occasions. One of these rollaways occurred after Plaintiff Marble had the recall work performed on his Jeep Grand Cherokee. Plaintiff does not feel safe driving the vehicle.

## X.    Washington Plaintiffs

**Plaintiff Karen Stedman**

119.    Plaintiff Karen Stedman is a resident of Washington domiciled in Mill Creek, Washington.  On March 8, 2015, Plaintiff Stedman bought a new 2015 Jeep Grand Cherokee at Dwayne Lane's Chrysler Dodge Jeep and Ram in Everett, Washington.  She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Stedman believed her Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Stedman still owns her vehicle.

120.    Unbeknownst to Plaintiff Stedman at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Stedman of the Defective Shifter and corresponding safety risk associated with her vehicle.  Given the defect, Plaintiff Stedman's vehicle has rolled away on two occasions and Plaintiff no longer feels safe driving the vehicle.

**Plaintiff Cameron Webster**

121.    Plaintiff Cameron Webster is a resident of Washington domiciled in North Bend, Washington.  In April 2013, he bought a new 2014 Jeep Grand

Cherokee at Rairdon Chrysler Dodge Jeep in Kirkland, Washington.  He purchased the car because of its reputation for safety and utility, consistent with his review of Jeep's advertising messaging regarding safety and reliability.  Plaintiff Webster believed his Grand Cherokee would be a good value because of its utility and reputation for safety.  Plaintiff Webster still owns the vehicle.

122.   Unbeknownst to Plaintiff Webster at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Webster of the Defective Shifter and corresponding safety risk associated with his vehicle.  Given the defect, Plaintiff Webster's vehicle has rolled away on at least two occasions and Plaintiff is concerned that he may experience another roll away incident caused by the defect.  Plaintiff Webster feels less safe driving the vehicle with the defective shifter.

Y.   **Wisconsin Plaintiffs**

**Plaintiff Marc Hughes**

123.   Plaintiff Marc Hughes is a resident of, and is domiciled in, Holmen, Wisconsin.   Plaintiff Hughes owns a used 2014 Chrysler 300C, which he purchased at Rudy Luther's in Hopkins, Minnesota.  He purchased the car because

of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability.  Plaintiff Hughes believed his 2014 Chrysler 300 would be a good value because of its utility and reputation for safety.

124.   Unbeknownst to Plaintiff Hughes at the time of purchase, his vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running.  Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Hughes of the Defective Shifter and corresponding safety risk associated with his vehicle.  Plaintiff Hughes still owns his 2014 Chrysler 300.

Z.     **Wyoming Plaintiffs**

### Plaintiff Ann Magnuson

125.   Plaintiff Ann Magnuson is a resident of Wyoming domiciled in Wilson, Wyoming. In or around June 3, 2015, she bought a new 2015 Jeep Grand Cherokee at Castle Rock Jackson in Jackson, Wyoming. She purchased the car because of its reputation for safety and utility, consistent with her review of Jeep's advertising messaging regarding safety and reliability. Plaintiff Magnuson believed her Grand Cherokee would be a good value because of its utility and reputation for safety. Plaintiff Magnuson still owns her vehicle.

126.   Unbeknownst to Plaintiff Magnuson at the time of purchase, her vehicle was equipped with the Defective Shifter, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's recall on April 22, 2016, and subsequent letters sent to Class Vehicle owners and lessees, Defendant never warned Plaintiff Magnuson of the Defective Shifter and corresponding safety risk associated with her vehicle. Given the defect, Plaintiff Magnuson's vehicle has rolled away on one occasion and Plaintiff no longer feels safe driving the vehicle. During the roll away, Plaintiff Magnusson had to jump, tuck and roll out of the vehicle as the vehicle careened into the street. While she was able to avoid injury, there was substantial damage to her vehicle.

127.   None of the advertisements reviewed or representations received by Plaintiffs and members of the Classes contained any disclosure relating to the Defective Shifter and associated safety risk.  Had Defendant disclosed that the Class Vehicles contained a Defective Shifter and corresponding safety risk, Plaintiffs and members of the Classes would have not purchased or leased their vehicles, or would have paid less for their vehicles.

128.   When Plaintiffs and members of the Classes purchased or leased their Class Vehicles, they reasonably relied on the reasonable expectation that the Class Vehicles would be equipped with a gear shifting system that was free from defects

and safe to operate.  Had Defendant disclosed that the Defective Shifter in the Class Vehicles could lead to dangerous rollaway incidents, Plaintiffs and members of the Classes would have not purchased or leased their vehicles, or would have paid substantially less for their vehicles.

129.   The Class Vehicles were operated in a reasonably foreseeable manner and as the vehicles were intended to be used.  Plaintiffs and members of the Classes have suffered an ascertainable loss as a result of Defendant's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Defective Shifter and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of their respective vehicles.

130. Neither Defendant nor any of its agents, dealers or other representatives informed Plaintiffs and members of the Classes of the Defective Shifter and associated safety risk prior to the purchase or lease of the Class Vehicles.

## AA.   Defendant

131.  Defendant FCA is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan.  FCA is a member of the Fiat Chrysler Automobiles N.V. ("Fiat Chrysler") family of companies.  Fiat Chrysler is a Dutch corporation with its headquarters in London,

England.  As of 2015, FCA is the seventh largest automaker in the world by unit production.

132.  FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, and Fiat brands in this District and throughout the United States. FCA manufactures, distributes, and sells motor vehicles and parts through its network of authorized motor vehicle dealers.  FCA engages in interstate commerce by selling vehicles through this its authorized dealers located in every state of the United States, including within this District.

133.  At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Class Vehicles throughout the United States.  Defendant and/or its agents designed, manufactured, and/or installed the Defective Shifter in the Class Vehicles.  Defendant and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements and other promotional materials relating to the Class Vehicles.

## IV.   FACTUAL ALLEGATIONS

### A.   Shift-by-Wire Transmission Systems

134.   Shift-by-wire transmission systems, like the one installed in the Class Vehicles, manipulate gear changes without the use of a mechanical linkage between the gear shifting lever and the transmission; thus, saving materials and

manufacturing costs, and saving valuable design space in the center console area where the mechanical link to the transmission would be installed.

135.   Shift-by-wire transmissions use electronic signals and electronic control modules to manipulate transmission gear changes.   Drivers engage control mechanisms such as levers and/or buttons that send electronic signals to manipulate the electronic control module, which shifts the transmission into the desired gear.   Control mechanisms currently in use include: (1) a monostable electronic gear shift ("Monostable Shifter"); (2) a rotary electronic gear shift ("Rotary Shifter"); or (3) a polystable electronic gear shift ("Polystable Shifter").

136.   Monostable Shifters are characterized as "monostable" because their shifter levers always return to a single predetermined location after the desired gear is selected.   Drivers push or pull a Monostable Shifter lever backward or forward one or more times and release the lever at their desired gear.   The shift-by-wire system then relies on electronic signals and an electronic control module to shift the transmission into the selected gear.   Monostable Shifter levers do not physically move and rest in separate physical positions, or "detents," for Park, Reverse, Neutral and Drive ("PRND") in order to change transmission gears.

137.   Below is an image of Monostable Shifter in a 2015 Jeep Grand Cherokee, a Class Vehicle:



138.    Some shift-by-wire transmissions do not even use a shift lever.  For example, the Rotary Shifter uses a rotary wheel to cycle through PRND and then sends the electronic signal that corresponds with the selected gear.[22]

139.    A Polystable Shifter incorporates the shift-by-wire electronic gear changes and the tactile feedback of a traditional mechanical gear shifter.  The Polystable Shifter mimics the tactile feedback of a traditional mechanical gear shifter because it requires drivers to push or pull the shifter into predetermined physical slots for P, R, N or D.  The benefit of a Polystable Shifter is that drivers

---

[22] As discussed herein, on December 20, 2016, it was reported that NHTSA was launching an investigation into FCA's Rotary Shifters installed in 2013-16 Dodge Ram pickup trucks and 2014-16 Dodge Durango SUVs.  The investigation follows reports that certain of the vehicles rolled away after having been placed in Park. *See* Exhibit K, David Shepardson, *U.S. probes 1 million Fiat Chrysler vehicles for roll-away crashes*, Reuters (Dec. 20, 2016), http://www.reuters.com/article/us-usa-fiat-chrysler-idUSKBN149171 ("December 2016 Reuters Article").

receive the familiar tactile feedback associated with traditional mechanical fgear shifters, thereby eliminating instances in which a driver thinks the vehicle is in P when it is actually in R, N or D.

140.    Below is an image of Polystable Shifter that FCA began using in 2016 Jeep Grand Cherokees:



141.    As the above image demonstrates, the Polystable Shifter slides back and forth and rests in predetermined physical slots for P, R, N or D.

### B.    The Defective Shifter

142.    The Class Vehicles are equipped with the Defective Shifter, which was manufactured and supplied by ZF.  Unlike a traditional gear shifter, and unlike

a polystable electronic shifter, the Defective Shifter in the Class Vehicles does not have individual physical positions into which the gear shifter lever moves and rests for PRND.  The Defective Shifter requires drivers to cycle through PRND by pressing a button on the shifter-lever knob and either pushing the shifter lever forward or pulling backward to cycle through PRND.  After drivers push or pull the shifter lever to select their desired gear, the shifter lever returns to its predetermined central location.

143.  Once drivers have selected their desired gear, the Defective Shifter uses illuminated PRND letters on the shifter-lever knob and illuminated PRND letters on the driver's informational display to indicate whether the vehicle is in Park, Reverse, Neutral or Drive.  Thus, there is no physical gear level associated with Park, Reverse, Neutral or Drive as there is in a traditional automatic transmission shifter.

144.  Among other things, the lack of a physical gear level for PRND and the Defective Shifter's return to its predetermined location has led to hundreds of reports of Class Vehicles rolling away when drivers thought their vehicles were in Park.

145.  FCA has recognized that its Defective Shifter does not adequately convey gear position to drivers of Class Vehicles, stating: "[g]ear-selection is conveyed to the driver by multiple sets of indicator lights, not gear-selector

position, and unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles."[23]

146.   Unlike other automobile manufacturers, FCA did not implement a safety override feature that would prevent Class Vehicles from moving when the vehicles are not in Park and a driver opens the driver door and disengages pressure on the gas or brake pedals to exit the vehicle.

147.   Unlike the Defective Shifter, traditional automatic gear shifter systems such as those found in most vehicles have grooves and separate physical resting places for PRND into which drivers can cause the shifter lever to rest.  This type of gear shifting system gives drivers a visual cue as to the current gear the vehicle is in because the shifter lever physically rests on Park, Reverse, Neutral or Drive.   Additionally, such systems use tactile feedback to alert drivers to the vehicle's gear position because they require drivers to cause the shifter lever to rest on the desired gear position by either physically pushing or pulling the shifter lever to that position.  Thus, traditional gear shifting systems provide more information to the driver by using both tactile and visual cues to inform drivers of their vehicle's gear position.

---

[23] *See* Exhibit C (Recall Press Release).

148.   Below is an image of a traditional mechanical gear shift design from a 2010 Chevrolet Aveo:



### C.   The Defective Shifter Does Not Adequately Alert Drivers to the Class Vehicles' Gear Position

149.   The Defective Shifter's use of solely visual cues to alert drivers to the Class Vehicles' gear position is ineffective because drivers may not realize that they have not pushed the gear lever forward or backward enough to engage their desired gear.   The Defective Shifter's use of solely visual cues (without tactile feedback) to alert drivers to the Class Vehicles' gear position is especially problematic when drivers leave their car while the engine is running.   Because there is no tactile feedback informing a driver whether the shifter lever has

physically moved and is resting in P, R, N or D, drivers may think have pushed the shifter lever forward enough to engage the Park gear and may exit the vehicle when it is not actually in Park.

150.   The Defective Shifter's sole reliance on visual feedback to convey gear selection has been dangerously ineffective.   Indeed, consumer complaints beginning at least as early as 2013 reproduced verbatim below document Class Vehicle owners' and lessees' inability to determine whether their vehicle is in the desired gear resulting in hundreds of rollaways, accidents and injuries.   Further, numerous complaints to NHTSA allege that once a driver puts a Class Vehicle into Park, the vehicle can move into another gear on its own.

151.   In addition to the defective design of the Defective Shifter, FCA has failed to implement any safety override or fail-safe features that would cause the Class Vehicles to automatically shift into Park or engage the parking brake when the engine is running and the driver-side door is open and the driver is exiting the vehicle.   The lack of a fail-safe feature is especially problematic because the engine stop button in the Class Vehicles is programmed to not function when drivers attempt to shut off the engine while the vehicle is not in Park.   Class Vehicles are also programmed to shift into Neutral gear by default if drivers attempt to shift into Park while the vehicle is moving faster than 1.2 mph.

152.   Safety override features are common in other car companies' vehicles that use a Monostable Shifter and, if FCA had employed a safety override, it may have prevented the collisions, injuries and death associated with the Defective Shifter.   For example, Mercedes-Benz USA, LLC ("Mercedes-Benz") sells vehicles with Monostable Shifters like those in the Class Vehicles; but, Mercedes-Benz vehicles include a safety feature that automatically shifts the gear to Park when the engine is running and the driver releases his foot off of the brake pedal and the driver-side door is opened.   This safety override eliminates the potential for the dangerous vehicle rollaways associated with the Defective Shifter.   Such a fail-safe feature likely could have prevented the approximately "212 crashes, 308 claims of property damage and 41 injuries" FCA identified from "700 field reports" related to the Defective Shifter.[24]

153.   NHTSA has reported that the Defective Shifter "***appears to violate several basic design guidelines for vehicle controls***, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[25]

---

[24] Exhibit E (FCA Chronology).

[25] Exhibit B (NHTSA-ODI Resume 2).

154. No reasonable consumer expects to purchase a vehicle with a Defective Shifter and associated safety risk that could expose her/him to collisions, vehicle rollaways and potential injury and death. Further, Plaintiffs and members of the Classes do not reasonably expect Defendant to omit or conceal a defect in the Class Vehicles or omit or conceal a known safety risk that puts drivers, passengers and the public at risk. Plaintiffs and members of the Classes had no reasonable way to know that Class Vehicles contained Defective Shifters which were defective in materials, workmanship, design and/or manufacture and posed a significant safety risk.

155. As alleged herein, Plaintiffs and members of the Classes unknowingly purchased or leased vehicles that "violate several basic design guidelines" and suffered diminished market value and other damages related to their purchase or lease of the Class Vehicles as a direct result of Defendant's material misrepresentations and omissions regarding the standard, quality or grade of the Class Vehicles and/or the existence of the Defective Shifter and safety risk. The fact that the Class Vehicles contain the Defective Shifter is material to Plaintiffs and members of the Classes because it diminishes the value of the Class Vehicles and presents a risk of injury and/or death to drivers and passengers of the Class Vehicles.

156.   As a result of Defendant's material misrepresentations and omissions, including its failure to disclose that the Class Vehicles incorporate the Defective Shifter, Defendant has caused Plaintiffs and members of the Classes to suffer actual damages, including but not limited to diminished value of their vehicles, and have recklessly placed Plaintiff and members of the Classes, the occupants of the Class Vehicles and the public at risk.

### D.   FCA Touted Safety in Its Marketing and Advertising

157.   Maintaining that safety is purportedly one of the company's primary goals, specifically, FCA has touted its "commitment" and "dedication" to "transportation safety includ[ing] engineering active and passive features for diverse drivers and vehicle segments."[26]   Amid worsening reliability ratings and recall investigations from NHTSA,[27] FCA's head of vehicle safety and regulatory

---

[26]   Exhibit L, 2015 Sustainability Report, Vehicle Safety, FCA GROUP, http://reports.fcagroup.com/sustainability/2015/products-and-processes/product-innovation-and-responsible-mobility/vehicle-safety#start (last visited on Dec. 16, 2016) ("2015 Sustainability Report").

[27]   Exhibit M, Michael Wayland, *Quality Chief Leaves FCA Amid Recalls, Poor Reliability*, THE DETROIT NEWS (Oct. 29, 2014), http://www.detroitnews.com/story/business/autos/chrysler/2014/10/28/fiat-chrysler-replaces-longtime-quality-chief/18052121/ ("2014 Detroit News Article").

compliance assured the market in 2014 that "safety considerations are baked into every component of every product we make."[28]

158.   On its website, FCA represents that its "objective is to ensure vehicle quality and safety."[29]   Defendant informs consumers that FCA "vehicles meet the highest standard in terms of safety, ecological profile, driving performance and quality."[30]   Specifically, FCA's website focuses on Defendant's purported rigorous testing and quality control:

> To ensure that FCA vehicles deliver maximum safety and quality to customers over their entire life, every mechanical and electronic component, body part and trim element is rigorously tested.   The designers work with a team of researchers during the testing phase to ensure vehicles meet the highest standards in terms of safety, ecological profile, driving performance and quality.[31]

159.   With regard to the Dodge Charger, FCA's Dodge brand website states "safety and security is a priority."[32]   Adding, that "[a] modern, powerful ride

---

[28] Exhibit N, Sandy Smith, *Sandy Says: Are You a Safety Advocate?*, EHS TODAY, (Feb. 4, 2016), http://ehstoday.com/safety-leadership/sandy-says-are-you-safety-advocate ("February 2016 EHS Today Article").

[29]   Exhibit   O,   The   Group,   Brand   Stories,   FCA   GROUP, http://www.fcagroup.com/en-US/group/brand_stories/Pages/quality_lifecycle.aspx (last visited Dec. 20, 2016) ("FCA Group Brand Stories").

[30] *Id*.

[31] *Id.*

[32]  Exhibit P, Vehicles, Charger, Dodge, http://www.dodge.com/en/charger/ (last visited Dec. 20, 2016) ("Dodge Charger Safety and Security Screenshot 1").

should first and foremost protect."[33]   The Dodge Charger website also states "safety and security are built in," the "Dodge Charger is helping keep you and your passengers safe and secure."[34]   Advertisements for the Dodge Charger include that the vehicle is "always on guard" and "the Dodge Charger packs more than 80 standard and available safety and security features to help keep drivers and passengers protected":[35]



---

[33] Exhibit Q, Vehicles, Charger, Safety & Security, Dodge, http://www.dodge.com/ en/charger/safety_security/ (last visited Dec. 16 2016) ("Dodge Charger Safety and Security Screenshot 2").

[34] *Id.*

[35] *Id.*



160. FCA touts the same safety messages for the Chrysler 300, stating "[t]he Chrysler 300 Offers Over 80 Standard and Available Safety and Security Features."[36]



161. Defendant claims that "[s]ince 1941, when the first Jeep was built, the brand has continued to produce unique, versatile and capable vehicles. Jeep delivers customers an experience that no other automotive brand can offer."[37]

---

[36] Exhibit R, http://mydigimag.rrd.com/publication/?i=278297 (last visited Dec. 16, 2016) ("Chrysler 300 Safety and Screen Screenshot").

162.   FCA describes the Jeep Grand Cherokee as having "[o]ver 70 available safety and security features" and "protection when and where you need it."[38]   Its website conveys to consumers that the Jeep Grand Cherokee is "[a]t the forefront of the latest safety and security systems."[39]   Advertisements also claim that the vehicle is "[s]afe, secure, and in control."[40]



163.   FCA made these repeated claims and advertisements touting its dedication to safety to boost Class Vehicle sales while knowing that it was selling hundreds of thousands of Class Vehicles equipped with the Defective Shifter, which had a known defect that violated basic design guidelines and an associated

---

[37] Exhibit S, FCA Group, https://www.fcagroup.com/en-US/group/brands/Pages/jeep.aspx (last visited Dec. 21, 2016) ("Jeep Brands Screenshot").

[38] Exhibit T, Vehicles, Grand Cherokee, Jeep, http://www.jeep.com/en/2016/grand-cherokee/safety-security/ (last visited Dec. 16, 2016) ("Jeep Safety and Security Screenshot").

[39] *Id.*

[40] *Id.*

safety risk and which incorporated no safety override function to ensure Class Vehicles were in the proper gear and would not unexpectedly rollaway or shift into unintended gears.

### E. FCA Knew About the Defective Shifter and Associated Safety Risks

164. Defendant fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Classes the defect in the Class Vehicles even though Defendant knew or should have known of design and manufacturing defects in Class Vehicles and that the vehicles' design violated basic guidelines.

165. Knowledge and information regarding the Defective Shifter were in the exclusive and superior possession of Defendant and its dealers, and that information was not provided to Plaintiffs and members of the Classes. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's network of exclusive dealers and NHTSA, basic design guidelines, and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the defect in the Defective Shifter and fraudulently concealed the defect and safety risk from Plaintiffs and members of the Classes.

166. Defendant knew, or should have known, that the defect in the Defective Shifter and associated safety risk were material to owners and lessees of

the Class Vehicles and were not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles.

167.   Notwithstanding Defendant's exclusive and superior knowledge of the Defective Shifter, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the defect through the 2015 model year.  Until April 2016, Defendant intentionally concealed that the Defective Shifter violated basic design guidelines and presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

### 1.   NHTSA Complaints

168.   Soon after Class Vehicles entered the market in early 2011, FCA became aware of the design defect associated with the Defective Shifter that potentially leads to dangerous rollaway incidents.  According to NHTSA-ODI, "FCA received negative consumer feedback for the Monostable shifters shortly after the subject vehicles [Class Vehicles] entered the market."[41]  Further, "[f]ield data indicate that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents."[42]

---

[41] Exhibit B (NHTSA-ODI Resume 2).

[42] *Id.*

169.  Consumers who purchased or leased Class Vehicles have filed hundreds of complaints with NHTSA reporting dangerous rollaway incidents, collisions and injuries and detailing the defect in the Class Vehicles equipped with the Defective Shifter.

170.   Federal law requires FCA to monitor defects which can cause a safety issue and report them within five (5) days.   FCA regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the Defective Shifter through these complaints, *inter alia*.

171.   Below is a sample of consumer complaints made to NHTSA regarding Class Vehicle rollaway incidents and/or incidents where Class Vehicles did not remain in the desired gear:

**2012 to 2014 Chrysler 300**

- **Date Complaint Filed: 02/26/2014**

  **Date of Incident:** 12/16/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10566108
  **Consumer Location:** LENAPAH, OK
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2013
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAAG6DH...

**SUMMARY:**

TL- THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE'S TRANSMISSION WAS IN THE PARK POSITION WITH THE ENGINE TURNED ON BEFORE SHE EXITED THE VEHICLE. APPROXIMATELY 4 MINUTES LATER THE VEHICLE SUDDENLY BEGAN TO DRIVE BACKWARDS AND CRASHED INTO A SECOND VEHICLE. THE CONTACT INDICATED THAT THE PASSENGER IN THE FRONT PASSENGER SEAT WAS ABLE TO MOVE INTO THE DRIVERS SEAT AND STOP THE VEHICLE BY PRESSING THE BRAKES. THE CONTACT INDICATED THAT THE PARKING BREAK WAS NOT ENGAGED DURING THE INCIDENT. NO INJURIES WERE REPORTED AND NO POLICE REPORT WAS TAKEN. THE VEHICLE WAS DIAGNOSED AT THE DEALER AND THE CONTACT WAS INFORMED THAT THE DEFECT WAS DUE TO A SOFTWARE MALFUNCTION. NO ADDITIONAL INFORMATION WAS AVAILABLE. NO REPAIRS WERE PERFORMED. THE FAILURE MILEAGE WAS 39,000. JFT

- **Date Complaint Filed: 01/14/2015**

  **Date of Incident:** 01/14/2015
  **Component(s):** ENGINE AND ENGINE COOLING , POWER TRAIN
  **NHTSA ID Number:** 10672445
  **Consumer Location:** HUNTINGTON WOODS, MI
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAGG1EH...

**SUMMARY:**
WHEN I PUT THE CAR INTO PARK, IT POPS INTO REVERSE. THEN I HIT THE ENGINE OFF BUTTON, BUT SINCE IT IS IN REVERSE, THE ENGINE STAYS ON. THEN I OPEN THE DOOR TO GET OUT, THINKING THE ENGINE IS OFF AND THE CAR IS IN PARK, AND IT STARTS ROLLING BACKWARD. THIS HAS HAPPENED 6 TIMES. THE CAR IS IN THE SHOP NOW. *TR

- **Date Complaint Filed: 02/08/2016**

  **Date of Incident:** 02/01/2016
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824981
  **Consumer Location:** ENGLEWOOD, FL
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2013
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAKG5DH...

**SUMMARY:**
VEHICLE SHIFTER WILL NOT OPERATE PROPERLY, THERE ARE TIMES I THOUGHT CAR WAS IN PARK AND IT WAS IN REVERSE. I MOVE SHIFTER FROM PARK TO DRIVE AND IT IS STILL IN PARK. GO TO PUT IT IN REVERSE AND IT BYPASSES THE GEAR. TIMES I PUT IT IN DRIVE AND IT IS IN NEUTRAL. TAKEN CAR BACK TO DEALER FOR PROBLEM AND WAS TOLD TO LIVE WITH IT, NOTHING CAN BE DONE. ONE TIME I GOT OUT THINKING CAR WAS IN PARK AND IT WAS IN REVERSE AND STARTED TO MOVE, LUCKILY I WAS IN A FLAT PARKING AREA AT THE TIME.

- **Date Complaint Filed: 02/09/2016**

  **Date of Incident:** 01/01/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10825219
  **Consumer Location:** TUCSON, AZ
  **Vehicle MakeModelModel Year(s)**
  CHRYSLER 300 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CCAAG5EH...

**SUMMARY:**

I FEEL THE GEAR SELECTOR ON MY 2014 CHRYSLER 300 IS VAGUE, CONFUSING, AND DANGEROUS. IT IS ELECTRONIC AND PIVOTS INSTEAD OF MOVING ONE SPOT FOR EACH GEAR SELECTION. IF YOU PARK AND ATTEMPT TO SHIFT FROM DRIVE TO PARK SOMETIMES IT MAKES IT AND SOMETIMES IT ENDS UP IN REVERSE. WHEN THIS HAPPENS THE ENGINE DOES NOT TURN OFF WHEN YOU PUSH THE STOP BUTTON AND AS YOU STEP OUT THE CAR TAKES OFF BACKWARDS. ALSO WHEN SHIFTING FROM PARK TO DRIVE SOMETIMES IT GOES PAST DRIVE AND INTO LOW, SO I ENDED UP DRIVING FOR A TIME STUCK IN LOW GEAR AND NOT KNOWING UNTIL YOU GO TO SLOW OR STOP AND IT FEELS LIKE THE BRAKES ARE STUCK ON SO YOU START LOOKING FOR THE REASON. I HAVE HATED THIS CAR ALMOST SINCE I LEASED IT IN DECEMBER OF 2014. I FEEL WITH THE LACK OF A SWITCH KEY TO TURN THE ENGINE ON AND OFF, AND THIS VAGUE GEAR SELECTOR THIS GROUP OF VEHICLES IS AN ACCIDENT WAITING TO HAPPEN. I HAVE TRIED TO TRADE IT IN BUT I STILL HAVE 13 MONTHS LEFT AND CAN DO NOTHING. PLEASE LOOK INTO THIS...THANK YOU *TR

- **Date Complaint Filed: 05/09/2016**

   **Date of Incident:** 02/07/2016
   **Component(s):** POWER TRAIN
   **NHTSA ID Number:** 10863977
   **Consumer Location:** GLASTONBURY, CT
   **Vehicle MakeModelModel Year(s)**
   CHRYSLER 300 2014
   Crash: Yes
   Fire: No
   Number of Injuries: 0
   Number of Deaths: 0
   **Manufacturer:** Chrysler (FCA US LLC)
   **Vehicle Identification No. (VIN):** 2C3CCAAGXEH...

**SUMMARY:**

ON FEBRUARY 7, 2016, MY HUSBAND PARKED HIS 2014 CHRYSLER 300 IN A PARKING SPOT IN A PARKING LOT AND EXITED THE VEHICLE WITH THE ENGINE RUNNING. I WAS SEATED IN THE FRONT PASSENGER SEAT WITH OUR 11 YEAR-OLD CHILD BEHIND ME AND 9

YEAR-OLD CHILD SEATED BEHIND THE DRIVER'S SEAT. ALL 3 OF US WERE WEARING SEAT BELTS. MY HUSBAND WALKED ACROSS THE PARKING LOT AND DOWN THE BLOCK. I WAS TEXTING SOMEONE ON MY CELLPHONE WHEN MY 11 YEAR-OLD EXCLAIMED THAT THE CAR WAS MOVING. WITHOUT LOOKING UP FROM MY PHONE, I EXPLAINED TO HER THAT IT WAS PROBABLY THE ILLUSION OF A CAR PULLING INTO OR OUT OF THE PARKING SPOT BESIDE US. SHE SCREAMED, "NO THE CAR IS DEFINITELY MOVING!" THE CAR WAS ACCELERATING BACKWARDS. I MADE EVERY EFFORT TO MOVE THE GEARSHIFT, GRAB THE STEERING WHEEL AND HIT THE BRAKES BUT DUE TO THE SIZE OF THE LARGE CONSOLE I COULD NOT SWING MY LEG OVER TO REACH THE BRAKE. THE CAR MOVED IN REVERSE ACROSS THE PARKING LOT AND STRUCK AN UNOCCUPIED VEHICLE THAT WAS PARKED ON THE OPPOSITE SIDE OF THE LOT. THANKFULLY, THE CAR DID NOT STRIKE ANY PEDESTRIANS OR OCCUPIED VEHICLES, AS THIS WAS A BUSY PARKING LOT. OUR CHRYSLER ENDURED SIGNIFICANT DAMAGE WHILE THE DAMAGE TO THE OTHER VEHICLE WAS MINOR. MY CHILDREN AND I WERE EXTREMELY UPSET. WE ARE VERY GRATEFUL THAT NO ONE WAS PHYSICALLY INJURED BUT WE WERE ALL QUITE SHAKEN BY THE OUT OF CONTROL CAR. THE IMPACT WAS SUCH THAT IT MAKE A LOUD "THUD" SOUND WHEN IT COLLIDED WITH THE OTHER VEHICLE AND JOLTED US A BIT. WE WERE COMPLETELY SHOCKED THAT THE CAR SEEMINGLY ON IT'S OWN WENT FROM "PARK" INTO "REVERSE". MY HUSBAND HAD TIME TO WALK ACROSS THE PARKING LOT AND DOWN THE BLOCK BEFORE THE VEHICLE STARTED TO MOVE. THE VEHICLE WAS LONG OUT OF HIS SIGHT BEFORE IT STARTED TO MOVE. THIS CAR IS DANGEROUSLY DEFECTIVE. WE REPORTED THIS INCIDENT TO OUR INSURANCE CARRIER THE NEXT DAY.

**2012 to 2014 Dodge Charger**

- **Date Complaint Filed: 04/13/2013**

  **Date of Incident:** 01/01/2013
  **Component(s):** POWER TRAIN, VISIBILITY/WIPER
  **NHTSA ID Number:** 10508134
  **Consumer Location:** VERNON, CT
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012

Crash: No
Fire: No
Number of Injuries: 0
Number of Deaths: 0
**Manufacturer:** Chrysler (FCA US LLC)
**Vehicle Identification No. (VIN):** 2C3CDXHG0CH...

**SUMMARY:**
CAR ROLLED EVENTHOUGH VEHICLE WAS IN PARK AND VEHICLE
WAS NOT RUNNING. 1ST INCIDENT HAPPENED WITHIN 10 MIN OF
WALKING AWAY FROM CAR, ROLLED INTO ANOTHER CAR. 2ND
INCIDENT HAPPENED NEARLY 2 HOURS AFTER BEING PARKED, AND
3RD INCIDENT HAPPENED WITHIN 1 HOUR OF BEING PARKED ON
SLIGHT INCLINE. DEALER UNABLE TO RECREATE INCIDENT. FACTOR
REP CALLED DODGE, DODGE CALLED TRANSMISSION MFG AND HAD
VALVE COM REPLACED. NO FURTHER INCIDENT 2ND PROBLEM,
WINDSHIELD HAS WAVE IN GLASS, WIPERS LEAVING LARGE
STREAKS CAUSING DRIVER TO HAVE SAFETY ISSUE. DEALER
POLISHED WINDSHIELD 3X TO NO AVAIL. CONTACTED DODGE
WAITING FOR FACTORY REP TO AUTHORIZE REPLACEMENT OF
WINDSHIELD ON GOING FOR ALMOST 10 MONTHS. *TR

- **Date Complaint Filed: 06/03/2014**

  **Date of Incident:** 05/03/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10595813
  **Consumer Location:** LAUREL, MD
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012
  Crash: Yes
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CDXHG5CH...

**SUMMARY:**
PARKED AUTO ON GRAVEL PARKING LOT. THE DRIVE SELECT DID GO
INTO THE PARK POSITION UPON SHUT-DOWN AND THE ENGINE DID

NOT TURN OFF WHEN THE IGNITION BUTTON WAS DEPRESSED. NO ENGINE SOUND APPARENT DUE LOW RPM AND GOOD SOUND SUPPRESSION MATERIAL. EXCITED THE VEHICLE AND LOCKED CAR DOOR.THE CAR DID NOT MOVE AS I LEFT THE AREA.SUBSEQUENT TO MY DEPARTURE,THE TORQUE BUILT UP ENOUGH TO PROPEL THE CAR ACROSS THE PARKING LOT AND INTO A TREE IN FRONT OF A PRIVATE RESIDENT ADJACENT TO THE FAIR GROUNDS. *TR

- **Date Complaint Filed: 02/08/2016**

  **Date of Incident:** 09/19/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824970
  **Consumer Location:** ALIQUIPPA, PA
  **Vehicle MakeModelModel Year(s)**
  DODGE CHARGER 2012
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 2C3CDXJG5CH...

**SUMMARY:**
VEHICLE ROLLAWAY, ENGINE ON. RE: ODI PE15-30 AND EA 16-002. I EXITED MY VEHICLE WITH THE ENGINE RUNNING AND THE TRANSMISSION WAS NOT IN PARK. THE VEHICLE HILL START ASSIST GAVE ME ENOUGH TIME TO EXIT THE VEHICLE AND THEN IT BEGAN TO ROLL BACKWARD. THE OPEN DRIVER'S SIDE DOOR KNOCKED ME DOWN AND DRAGGED ME 50 FEET. MY RIGHT LEG AND FOOT WENT UNDER THE LEFT FRONT WHEEL WHICH PULLED ME OUT FROM UNDER THE OPEN DOOR. THE VEHICLE CONTINUED ROLLING BACKWARD OVER AN EMBANKMENT AND CRASHED ON THE ROAD BELOW. THE VEHICLE WAS A TOTAL LOSS AND I SUSTAINED A SEVERE SPRAIN TO MY RIGHT FOOT. I HAVE PICTURES AND AN INSURANCE CLAIM REPORT TO PROVIDE PROOF OF THIS INCIDENT.

## 2014-2015 Jeep Grand Cherokee

- **Date Complaint Filed: 12/12/2013**

  **Date of Incident:** 12/12/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10824970
  **Consumer Location:** MAHWAH, NJ
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: Yes
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFBG1EC...

**SUMMARY:**
FROM A STOPPED POSITION IN PARK, CAR SPONTANEOUSLY SHIFTED
INTO NEUTRAL. *TR

- **Date Complaint Filed: 03/06/2014**

  **Date of Incident:** 11/01/2013
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10567538
  **Consumer Location:** Unknown
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFCG0EC...

**SUMMARY:**
PARKING VEHICLE AND PUTTING INTO PARK. EXITED THE VEHICLE
AND CAR STARTED MOVING. SHIFTER WAS NOT IN PARK. VERY
FUSSY SHIFTER. YOU CAN NOT TELL IT'S IN PARK UNLESS YOU LOOK
EACH TIME. EVEN THOUGH YOU PUSH IT ALL THE WAY UP

SOMETIMES IT IS NOT IN PARK. I HAD THE CAR START ROLLING SEVERAL TIMES AFTER EXITING THE CAR. *TR

- **Date Complaint Filed: 04/17/2014**

  **Date of Incident:** 04/07/2014
  **Component(s):** POWER TRAIN , STRUCTURE
  **NHTSA ID Number:** 10583366
  **Consumer Location:** FORT COLLINS, CO
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFCT2EC...

**SUMMARY:**
HAVE A LONG NARROW DRIVEWAY WITH A BIT OF A SLOPE TOWARD THE HOUSE. WHEN GOING OUT THE DRIVEWAY I SEEN A TRASH CONTAINER TIPPED OVER. I PUT THE VEHICLE IN PARK, LETTING IT IDLE, WHILE I EXITED THE VEHICLE TO REMOVE THE CONTAINER. LOOKING BACK I SEEN THE JEEP BACKING DOWN THE DRIVEWAY TOWARD THE HOUSE UNDER IT'S OWN POWER. I TRIED CATCH IT,BUT IT HIT THE SIDE OF THE HOME ON A GARAGE WALL. TOTAL DAMAGE TO THE VEHICLE IS AROUND $9400 I'VE YET TO GET THE HOUSE DAMAGE ESTIMATE BACK. I DIDN'T SEE IF THE VEHICLE WAS IN PARK OR REVERSE WHEN I EXITED. I PUSHED THE SHIFTER CLEAR FORWARD TILL IT STOPPED, THEN EXITED. THE SHIFTER HAS TO GO THRU REVERSE BEFORE IT GETS TO PARK. IN THE PAST I'VE NOTICED THAT IT DID NOT ALWAYS GO INTO PARK WHEN I HAD PUT IT THERE. I DRIVE LIKE NORMAL PEOPLE DRIVE. I HAVE 55+ YEARS OF DRIVING EXPERIENCE. WE SHIFT BY FEEL AND NOT ALWAYS LOOKING DOWN AT THE SHIFTER. WHEN A SHIFT LEVER GOES THRU THE MOTION FORWARD AND STOPS, WE EXPECT IT TO BE IN PARK, NOT REVERSE. THIS IS A MAJOR FLAW IN THE VEHICLE. I LOVE THE NEW 8 SPEED TRANSMISSION, BUT DON'T TRUST THE SHIFTING MECHANISM. MY WIFE IS VERY RELUCTANT TO DRIVE IT BECAUSE OF THIS ISSUE. I'VE CONTACTED CHRYSLER ABOUT THE ISSUE. THEY SEEM CONCERNED AND ARE WANTING TO LOOK AT THE VEHICLE WHEN REPAIRED.

HOWEVER, I'M NOT CERTAIN, HEARING ABOUT OTHER ISSUES WITH VEHICLES, WHETHER THEY ARE JUST TRYING TO BLOW SMOKE UNTIL I QUITE DOWN. I DID OBTAIN A LEG INJURY WHEN ATTEMPTING TO STOP THE VEHICLE. NOT SERIOUS, BUT SURELY COULD HAVE BEEN. HAD THERE BEEN A CHILD, PET OR OTHER PERSON BEHIND THE VEHICLE, IT COULD HAVE BEEN DISASTROUS. THERE NEEDS TO BE A FIX TO THIS PROBLEM. I HAVE A FAMILY MEMBER THAT WORKS FOR STATE FARM INSURANCE. THEY'VE ALSO HAD SIMILAR COMPLAINTS. THERE'S NOT DETENT IN THE SHIFTING, IT JUST GOES FORWARD AND STOPS. ALL ELECTRONIC, NOT MECHANICAL AS THEY USED TO BE.

- **Date Complaint Filed: 12/05/2014**

  **Date of Incident:** 12/05/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10567538
  **Consumer Location:** VALLEY COTTAGE, NY
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2014
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFBG4EC...

**SUMMARY:**

ON 3 SEPARATE OCCASIONS IN THE LAST TWO WEEKS MY 2014 JEEP GRAND CHEROKEE HAS ROLLED UNEXPECTEDLY ONCE THE TRANSMISSION HAS BEEN PUT INTO PARK AND THE ENGINE TURNED OFF. THE FIRST TIME IT HAPPENED, I DROVE INTO A SLOPED DRIVEWAY. I PUT THE CAR INTO PARK, TURNED OFF THE CAR, AND SAT IN THE DRIVER'S SEAT TO COMPOSE AN E-MAIL. MY FOOT CONTINUED TO BE ON THE BRAKE. A MINUTE OR SO LATER, WHEN I COMPLETED MY TASK, I OPENED THE DOOR AND BEGAN TO GET OUT, HAVING NOT PUT ON THE EMERGENCY BRAKE. AS IT WAS A GENTLE SLOPE, I DID NOT NOTICE THE CAR BEGINNING TO ROLL IMMEDIATELY, BUT ONCE OUTSIDE THE CAR I REALIZED IT WAS ROLLING BACKWARDS. I TURNED AND GOT BACK INTO THE CAR

AND APPLIED THE EMERGENCY BRAKE, ALMOST FALLING IN THE PROCESS. AT THE TIME I THOUGHT THAT I MIGHT HAVE PUT THE CAR INTO NEUTRAL RATHER THAN PARK, AS THE GEAR SHIFT IS ELECTRONIC, AND IS SLIGHTLY DIFFERENT IN FEEL FROM OLDER TRANSMISSIONS. BELIEVING THAT IT WAS MY ERROR, I DID NOTHING ABOUT THIS. THEN, OVER THIS PAST WEEKEND IT HAPPENED AGAIN, AND I WROTE TO JEEP VIA THEIR OWNER PORTAL, TO ENSURE THAT IT WAS REPORTED. ON DECEMBER 3RD, I SCHEDULED A SERVICE FOR FRIDAY DECEMBER 5TH. YESTERDAY, DECEMBER 4TH, I TOOK THE CAR TO A CAR WASH. THE ATTENDANT WAS DOING DETAIL WORK, AND AFTER TAKING IT THROUGH THE WASH, HE PARKED IT. I WALKED TOWARD THE CAR, AND HE GOT OUT OF THE CAR ONCE HE HAD PUT IT INTO PARK AND TURNED IT OFF. HE EXITED JUST AS I GOT TO THE FRONT DRIVER'S SIDE CORNER. THE CAR BEGAN TO ROLL AGAIN, AND WAS ON A SLOPE. HAD THE ATTENDANT NOT JUMPED BACK INTO THE CAR AND APPLIED THE BRAKE, BOTH OF US WOULD HAVE BEEN PINNED IN PLACE, ME BETWEEN THE DOOR AND A LARGE CEMENT PLANTER, AND HE BETWEEN THE DOOR AND THE INTERIOR. I QUICKLY VIDEOTAPED THE ATTENDANT BRIEFLY RECOUNTING THE STORY, AND OBTAINED HIS CONTACT INFORMATION, AS WELL. THE JEEP IS NOW AT THE DEALERSHIP. *TR

- **Date Complaint Filed: 04/21/2015**

  **Date of Incident:** 09/08/2014
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10711893
  **Consumer Location:** METHUEN, MA
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: No
  Fire: No
  Number of Injuries: 0
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** Not Available

**SUMMARY:**

WHEN MOVING THE GEAR SHIFT ALL THE UP FROM DRIVE TO PARK THE CAR IS NOT ALWAYS IN PARK BUT REVERSE. THIS HAS HAPPENED MULTIPLE TIMES AND THE CAR WILL BEGIN MOVING BACKWARD WHEN I TAKE MY FOOT OF THE BRAKE. IT SEEMS LIKE THE COMPUTER IS NOT QUICK ENOUGH TO RECOGNIZE THE MOVEMENT OF THE SHIFTER. VERY DANGEROUS BUT NOW I AM AWARE OF IT.

- **Date Complaint Filed: 06/29/2015**

  **Date of Incident:** 06/28/2015
  **Component(s):** POWER TRAIN
  **NHTSA ID Number:** 10730952
  **Consumer Location:** LIVONIA, MI
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** 1C4RJFAG3FC...

**SUMMARY:**
VEHICLE WAS PUT INTO PARK WHILE RUNNING. THE VEHICLE THEN STARTED TO ROLL BACKWARDS WHILE STILL IN PARK AND THEN COLLIDED INTO ANOTHER PARKED VEHICLE. WHILE THE VEHICLE WAS ROLLING BACKWARDS 3 OTHER OCCUPANTS PROCEEDED TO EVACUATE THE VEHICLE BEFORE IT COLLIDED WITH THE OTHER PARKED CAR. THE EVACUATION OF THE VEHICLE LEFT THE DOORS OPEN WHICH, WHEN THE VEHICLES COLLIDED, LEFT THE DOORS OF THE ROLLING VEHICLE (THE JEEP) UNABLE TO BE CLOSED.*UPDATED* THE DRIVER LEFT THE VEHICLE TO GO INTO A GAS STATION, THE SHIFT INDICATOR SHOWED THE VEHICLE TO BE IN PARK. THE VEHICLE STARTED TO ROLLAWAY, THE TWO CHILDREN AND THE ADULT PASSENGER EVACUATED THE VEHICLE AS THEY THOUGHT IT MIGHT ROLL INTO STREET TRAFFIC AND BE STRUCK. A CHILD WAS INJURED EXITING THE VEHICLE AS THE VEHICLE COLLIDED WITH ANOTHER PARKED VEHICLE, AND THEN CONTINUED ON ROLLING INTO A DITCH. A BYSTANDER JUMPED IN THE VEHICLE

TO TRY TO STOP THE ROLLING AND NOTICED THAT THE SHIFT INDICATOR WAS SHOWING THE VEHICLE WAS IN PARK.*SMCH....UPDATED 04/25/16 *BF

- **Date Complaint Filed: 09/04/2015**

  **Date of Incident:** 12/12/2014
  **Component(s):** ELECTRICAL SYSTEM , POWER TRAIN
  **NHTSA ID Number:** 10761498
  **Consumer Location:** LITCHFIELD, MN
  **Vehicle MakeModelModel Year(s)**
  JEEP GRAND CHEROKEE 2015
  Crash: Yes
  Fire: No
  Number of Injuries: 1
  Number of Deaths: 0
  **Manufacturer:** Chrysler (FCA US LLC)
  **Vehicle Identification No. (VIN):** Not Available

**SUMMARY:**

ON DECEMBER 5, 2014, I ACCEPTED DELIVERY OF A NEW 2015 MODEL YEAR JEEP GRAND CHEROKEE OVERLAND 4X4, EQUIPPED WITH AN 8-SPEED PADDLE-SHIFT AUTOMATIC TRANSMISSION AND ?KEYLESS ENTER ?N GO.? ON DECEMBER 12, 2014, I WAS TRAVELLING WITH A FRIEND. WHEN WE REACHED OUR DESTINATION, I PULLED TO THE SIDE OF THE PAVED STREET, PLACED THE VEHICLE IN ?PARK,? PRESSED THE ?ON OFF? BUTTON TO SHUTOFF THE ENGINE, AND EXITED THE VEHICLE THROUGH THE DRIVER?S DOOR. THE PASSENGER HAD EXITED THE FRONT PASSENGER DOOR, AND WAS COMING AROUND THE REAR OF THE VEHICLE. (IT SHOULD BE NOTED THAT NEITHER I NOR MY PASSENGER HAD TO ?UNLOCK? OUR DOORS TO EXIT THE VEHICLE, CONFIRMING I HAD PLACED THE VEHICLE IN ?PARK.?) AS SHE APPROACHED THE LEFT REAR OF THE VEHICLE, SHE REMARKED THAT I HAD NOT SHUT THE VEHICLE OFF. AS I REPLIED, ?YES, I DID,? I NOTICED EXHAUST COMING FROM THE VEHICLE?S TAILPIPE. I RETURNED TO THE DRIVER?S DOOR, OPENED THE DOOR, REACHED IN AND PRESSED THE ?ON OFF? BUTTON 2-3 TIMES; THE VEHICLE WOULD NOT SHUT OFF. AS I WAS PRESSING THE ?ON OFF? BUTTON I BELIEVE I HEARD THE ENGINE ?REV? AND THE VEHICLE BEGAN TRAVELLING IN REVERSE. I WAS CAUGHT BETWEEN THE

OPEN DRIVER?S DOOR AND THE VEHICLE AND DRUG ALONG. I REACHED IN AND GRABBED THE STEERING WHEEL IN AN ATTEMPT TO PULL MYSELF IN AND GAIN CONTROL OF THE VEHICLE. I WAS UNABLE, AND FINALLY LET GO OF THE WHEEL AND DROPPED INTO THE MIDDLE OF AN INTERSECTION. AS THE VEHICLE PROCEEDED ACROSS THE INTERSECTION IT BACKED INTO A WOODEN FENCE WHERE IT CAME TO REST, IDLING. A RESPONDING SHERIFF?S DEPUTY ARRIVED ON THE SCENE, AND HE TOLD ME HE WAS UNABLE TO PLACE THE VEHICLE INTO ?PARK.? I SUSTAINED SOFT TISSUE INJURIES TO MY LEG(S).....UPDATED 04/25/16 *BF

### F. FCA Stopped Installing the Defective Shifter in its Vehicles

172. Beginning in or before 2014, FCA stopped installing the Defective Shifter in its vehicles and began equipping its 2015 Dodge Charger and 2015 Chrysler 300 with a Polystable Shifter. But it kept the Defective Shifter in the Jeep Grand Cherokee until the 2016 model year. According to FCA, in order "[t]o address customer-satisfaction issues, [FCA] began equipping the [Dodge] Charger and [Chrysler] 300 with a new shift-lever design in model-year 2015" and the "[Jeep] Grand Cherokee's shift-lever was updated in model-year 2016."[43]

173. NHTSA has found that Polystable Shifters reduce the safety risks associated with the Defective Shifter, stating that "Polystable gearshift assemblies stay in the position of the selected gear, similar to a standard mechanical shifter,

---

[43] Exhibit C (Recall Press Release).

providing drivers with the expected tactile and visual feedback (i.e., works as expected and does not require additional thought or attention)."[44]

### G.     NHTSA Confirms a Design Defect in the Defective Shifter

174.   Between August 2015 and February 2016, NHTSA investigated the Defective Shifter, and informed FCA that "it is concerned that the design of the shifters is confusing for drivers."[45]

175.   On August 20, 2015, NHTSA-ODI opened Preliminary Evaluation PE15-030, to investigate fourteen reports of rollaways in 2014 and 2015 Jeep Grand Cherokee vehicles.[46]   In November 2015, FCA responded to 10 pages of detailed questions from NHTSA, but that response has not been made publically available on the agency's website.[47]

176. On February 3, 2016, NHTSA released an update regarding Preliminary Evaluation PE15-030 and announced that an Engineering Analysis had

---

[44] Exhibit B (NHTSA-ODI Resume 2).

[45] Exhibit U, Brent Snavely, *NHTSA expands probe into FCA gear shifters*, DETROIT FREE PRESS (Feb. 9, 2016), http://www.freep.com/story/money/cars/chrysler/2016/02/08/nhtsa-expands-investigation-into-fca-gear-shifters/80019028/ ("February 2016 Detroit Free Press Article").

[46] *See* Exhibit A (NHTSA-ODI Resume 1).

[47] Exhibit V, Christopher Jensen, *Anton Yelchin's Death Highlights a Known Issue With Jeeps*, THE NEW YORK TIMES (June 21, 2016), http://www.nytimes.com/2016/06/22/business/anton-yelchins-death-highlights-a-known-issue-with-jeeps.html?_r=0 ("2016 New York Times Article").

been opened regarding rollaway incidents involving the Class Vehicles.[48]

Initially, NHTSA reported 121 accidents and 30 injuries as a result of the

Defective Shifter.[49]

177.   NHTSA described the defect as follows:

> The MY 2014-2015 Grand Cherokee vehicles are equipped with Monostable electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift system operates electronically and the gear requested by the driver is transmitted from the shifter via the CAN Bus to the Transmission Control Module which makes the requested shift. The Monostable gearshift does not move into a detent but springs back to a centered/neutral position after the driver selects a gear and releases the shifter. A button on the shift knob must be depressed to shift out of Park, shift out of Neutral, and to shift from Drive to Reverse or Park.
>
> The gear selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the EVIC to warn the driver. In addition, the engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.***[50]

---

[48] *See* Exhibit A (NHTSA-ODI Resume 1).

[49] *See id.*

[50] *Id.* (emphasis added).

178.   In February 2016, NHTSA confirmed that the Defective Shifter is poorly designed, stating that its testing "*indicates that operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection*."[51]

179.   Through ODI's investigation, NHTSA "identified 306 incidents of vehicle rollaway following intended shifts to Park in the 2014-2015 Grand Cherokee."[52]   The ODI's analysis of these incidents determined that the incidents resulted in 117 alleged crashes and caused the following injuries:

> Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg).  Other injuries include reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs.[53]

180.   NHTSA also confirmed that, in addition to model-year 2014 to 2015 Jeep Grand Cherokees, model-year 2012 to 2014 Chrysler 300 and Dodge Charger vehicles with 3.6L engines are equipped with the Defective Shifter.[54]

181.   On April 22, 2016, FCA submitted a Defect Information Report, informing NHTSA that "[t]he existing strategies built into these vehicles to deter

---

[51] *Id.* (emphasis added).

[52] *Id.*

[53] *Id.*

[54] *See id.*

drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so."[55]  FCA admitted that "[d]rivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."[56]

182.   NHTSA continued to investigate the Defective Shifter and perform its Engineering Analysis through June 24, 2016.  As a result of this analysis, NHTSA found the Defective Shifter "appears to violate several basic design guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[57]

183.  NHTSA concluded that the "[a]udible chimes" and "visual warning[s]" provided to alert drivers that the vehicle is not in Park when the engine is running and the driver's door is opened are ineffective.[58]  NHTSA stated:

> Based on ODI's interviews with complainants, in some incidents the driver believed they had left the vehicle idling in

---

[55] Exhibit B (NHTSA-ODI Resume 2) (emphasis added).

[56] *Id.* (emphasis added).

[57] *Id.*

[58] *Id.*

Park when they exited, but the vehicle was not in Park.  In other incidents the drivers believed they had turned the engine Off after shifting to Park, but failed to recognize that the engine did not shutoff and the vehicle was not in Park.  The engine noise at idle is not obvious to many drivers who may not recognize that the engine continues to run after attempted shutoff.[59]

184.   Lastly, NHTSA identified one fatal crash potentially related to one of

the Class Vehicles, a 2015 Jeep Grand Cherokee, stating:

In addition to the crashes and injuries documented in this closing resume, ODI is aware of a fatal incident involving a recalled 2015 Jeep Grand Cherokee that occurred over the weekend of June 18-19, 2016 in Studio City, California that may be related to the alleged defect.  The incident is being investigated by the Los Angeles Police Department and FCA.[60]

**H.   Despite NHTSA's Findings and FCA's Voluntary Recall, FCA Blames Drivers and Fails to Provide a Remedy within a Reasonable Time**

185.   Although FCA has long known about the Defective Shifter, the

Company failed to provide a remedy or replace the Defective Shifter within a

reasonable time, and did not inform Plaintiffs and members of the Classes that a

purported remedy was available until after the highly-publicized death of Mr.

Yelchin in June 2016.  Rather, the first recall notice letter sent to Plaintiffs and

members of the Classes in May 2016 informed them that they would be notified

---

[59] *Id.*

[60] *Id.*

once FCA developed a remedy for the Defective Shifter.  Even after the June 2016 recall was issued, FCA did not have an immediate fix for all of the affected vehicles, and thousands of Class Vehicles have yet to be effectively repaired.

### 1.   The Class Vehicles Are Recalled

186.   On April 22, 2016, FCA announced a voluntary recall of more than 1.1 million Class Vehicles worldwide, including an estimated 811,586 Class Vehicles sold or leased in the United States.  In connection with the recall, FCA issued a press release, stating that "[a]n investigation by FCA US and the National Highway Traffic Safety Administration found some drivers have exited their vehicles without first selecting 'PARK.'"[61]  The Recall Press Release categorized such behavior as a "safety risk" in light of the failure of the Defective Shifter's warning chimes and alert messages inability to deter "some drivers from exiting their vehicles without selecting 'PARK.'"[62]

187.   Thus, FCA announced that it "will enhance the warnings and transmission-shift strategy" on Class Vehicles.[63]  Specifically, "enhancements will combine warnings with a transmission-shift strategy to automatically prevent a vehicle from moving, under certain circumstances, even if the driver fails to select

---

[61] Exhibit C (Recall Press Release).

[62] *Id.*

[63] *Id.*

'PARK.'"[64]   The Recall Press Release failed to include a timeline for the "enhancements," vaguely stating that "[a]ffected customers will be notified when service becomes available."[65]

188.   At the time of FCA's Recall Press Release, NHTSA stated that its "investigation of the shifter in these vehicles showed it is clearly a safety issue that has led to hundreds of crashes and dozens of injuries."[66]

189.   On or around May 14, 2016, FCA sent Class Vehicle owners and lessees a recall letter, informing them of the Defective Shifter and associated safety risks, including the potential for dangerous rollaways.[67]   The Recall Letter was bare on specifics as to FCA's planned remedy and when lessees and owners of Class Vehicles could expect their vehicles to be repaired.  Specifically, the Recall Letter stated that "a permanent remedy is . . . currently under development" and "FCA is working to finalize a remedy by the 4th quarter of 2016."[68]  Furthermore,

---

[64] *Id.*

[65] *Id.*

[66] Exhibit W, David Shepardson, *Fiat Chrysler recalls 1.1 million cars, SUVs for rollaway issue*, REUTERS (Apr. 22, 2016), http://www.reuters.com/article/us-fiatchrysler-recall-idUSKCN0XJ2I0 ("April 2016 Reuters Article").

[67] *See* Exhibit D (May 2016 FCA Recall Letter).

[68] *Id.*

the Recall Letter informed owners and lessees that FCA would contact them again by mail "**with a follow-up recall notice, when the remedy is available**."[69]

190. Notably, FCA limited the scope of its recall to address only the risk of rollaway incidents when a driver exits a vehicle, and did not expand the recall to address the general safety issue posed by the Defective Shifter in that a driver cannot rely on the Defective Shifter to effectively switch to the desired gear and/or the driver does not know which gear the Defective Shifter is in.

## 2. FCA Failed to Provide a Remedy Within a Reasonable Time

191. According to NHTSA, "FCA's recall remedy involves the development of revised control logic to provide 'Auto Park' shift strategies."[70] Specifically, NHTSA detailed three scenarios in which the Defective Shifter leads to accidents or injuries and the countermeasures proposed by FCA to remedy each issue related to the defect:

- **Scenario 1**: "Driver believes they put the vehicle in Park and attempts to shutoff the vehicle using the ignition On/Off button, and then exits the vehicle without realizing that the vehicle is not in Park and the engine

---

[69] *Id.* (emphasis in original).

[70] Exhibit B (NHTSA-ODI Resume 2).

continues to run."[71]  In response to Scenario 1, FCA developed the following countermeasure: "Automatically shift to Park and shut the engine off when the vehicle speed is 1.2 mph or less and the ignition On/Off button is pressed."[72]

- **Scenario 2**:  "Driver believes the vehicle is in Park, intentionally leaves the vehicle running and attempts to exit the vehicle."[73]  In response to Scenario 2, FCA developed the following countermeasure: "Automatically shift to Park if the transmission is not in Park, the vehicle speed is 1.2 mph or less, the driver's seat belt is unbuckled, the driver's door is ajar and the brake pedal is not depressed."[74]

- **Scenario 3**: "Driver attempts to shift into Park when the vehicle is moving, but the vehicle speed is too high to engage Park.  The vehicle may default to Neutral in this situation.  The EVIC displays a message 'Vehicle Speed is too high to shift.'"[75]  In response to Scenario 3, FCA developed the

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

following countermeasure: "Automatically shift to Park if vehicle speed drops to 1.2 mph or less within 5 seconds of the attempted shift to Park."[76]

192.   However, it was not until June 24, 2016, that FCA issued a follow-up recall notice to owners and lessees of certain models of Jeep Grand Cherokees explaining that the Company had developed a purported remedy for the Defective Shifter.[77]   According to FCA, the remedy would involve taking the vehicle to an FCA dealer, who would "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle."[78]   The letter also stated that the dealer would provide additional information and guidance regarding the new feature, stating:

> You will receive an "Auto Park" addendum card explaining the vehicle's new "Auto Park" feature.  After your vehicle receives the software update, please review the addendum card with all of the drivers of your vehicle and then store the addendum card in the owner's manual for future reference.  Your dealer will also review/demonstrate this new "Auto Park" feature and answer any questions or concerns.[79]

---

[76] *Id.*

[77] *See* Exhibit H (June 2016 FCA Second Recall Notice).

[78] *See id.*

[79] *See id.*

### 3.   FCA Wrongly Blamed Drivers for Rollaway Incidents While it Delayed its Response

193.   Despite NHTSA's findings that the Defective Shifter contained a defect, violates basic design guidelines, and does not adequately inform drivers of the Class Vehicles' gear positions, from first receiving customer complaints and accident reports in 2014 throughout much of 2016, FCA continued to maintain that the accidents associated with the Defective Shifter were the fault of drivers.  In its Recall Press Release, FCA dismissed allegations of a defect, stating "[t]he vehicles involved in these events were inspected and no evidence of equipment failure was found."[80]   The automaker explained its decision to recall the vehicles was "to reduce the effect of potential driver error by enhancing warnings and transmission shift strategy" and "address customer-satisfaction issues."[81]

194.   FCA further concealed the design defect in its press release by blaming drivers of Class Vehicles for the incidents.  The Company emphasized, "**unless due care is taken**, drivers may draw erroneous conclusions about the status of their vehicles.  The vehicles also deliver warning chimes and alert messages if their driver-side doors are opened while their engines are still running and 'PARK' is not engaged.  However, investigation suggested these measures

---

[80] Exhibit C (Recall Press Release).

[81] *Id.*

103

may be insufficient to deter some drivers from exiting their vehicles without selecting 'PARK.'"[82]

195.   The manufacturer of the Defective Shifter, ZF, maintained that it is not responsible for the defect, instead placing responsibility squarely on FCA for its integration of the ZF shifter into its cars without a safety override, stating:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, **which was integrated into the vehicle architecture by [FCA]**.[83]

196.   Consumer safety and advocacy groups noted FCA's continued refusal to accept responsibility for the Defective Shifter and continued attempts to blame Class Vehicle drivers for the safety risk associated with the Defective Shifter. Safety Research & Strategies, a consumer watchdog group, said Defendant has placed blame on drivers, and "[w]hat FCA doesn't acknowledge is their design

---

[82] *Id.*

[83] Exhibit X, David Tracy, *Fiat Chrysler Recalls 1.1 Million Cars Because People Can't Figure Out the Shifters (Update),* Jalopnik (Apr. 22, 2016, 4:25 p.m.), http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 ("2016 Jalopnik Article").

defect that changes the way a traditional shift lever works and provides inadequate feedback to drivers."[84]

197.   FCA's foot-dragging with respect to notifying its customers of the dangerous Defective Shifter, and taking steps to correct it, is unfortunately business as usual for FCA.  As reported by *The New York Times* on June 21, 2016, Center for Auto Safety Executive Director Clarence Ditlow believes FCA's investigation and recall have taken too long, noting "[t]here was no sense of urgency on Chrysler's part or N.H.T.S.A.'s part given the potential for death or injury."[85]

198.   This is not the first time Defendant has been criticized for dragging its feet with regard to vehicle safety recalls.  NHTSA has "publicly chastised [FCA], which acknowledged delaying recalls in almost two dozen cases going back to 2013 and affecting millions of vehicles."[86]  NHTSA head, Mark Rosekind, had voiced the agency's "concerns about slow completion rates, slow or inadequate notifications to consumer, faulty remedies, improper actions by dealers any

---

[84] Exhibit Y, Brent Snavely, *Jeep recall in spotlight after actor Anton Yelchin's death*, DETROIT FREE PRESS (June 20, 2016), http://www.freep.com/story/money/cars/chrysler/2016/06/20/jeep-recall-spotlight-after-actor-anton-yelchins-death/86140930/ ("June 2016 Detroit Free Press Article").

[85] Exhibit V (2016 New York Times Article).

[86] *Id.*

more"[87] related to 20 separate recalls that affected 10 million vehicles. Mr. Rosekind further stated that FCA's conduct at that time "represent[ed] a significant failure to meet a manufacturer's safety responsibilities."[88] In response, FCA promised to speed up its recalls and agreed to pay penalties of as much as $105 million. As described by FCA, "[i]n 2015, FCA US continued to focus efforts on refining recall processes and procedures and entered into a consent order with the National Highway Traffic Safety Administration (NHTSA) to undertake specific actions to improve its recall execution."[89] Mr. Ditlow stated that the consent order was "totally aimed at making Chrysler do a better job on recalls in the future."[90]

199. But this case evidences the fact that little has changed. FCA is still putting profits ahead of safety. Defendant has known of the safety risks associated with the Defective Shifter since shortly after the Class Vehicles entered the market and at least since August 2015 when NHTSA opened its investigation. As framed by *The New York Times*, "[t]he question is why, nearly a year later, Fiat Chrysler

---

[87] Exhibit Z, Brett Snavely, *NHTSA Questions FCA recall response rate in 20 recalls,* DETROIT FREE PRESS (May 18, 2015), http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-pubic-hearing/27531875/ ("May 2015 Detroit Free Press Article").

[88] *Id.*

[89] Exhibit L (2015 Sustainability Report).

[90] Exhibit W (2016 New York Times Article).

has still not come up with a fix for the problem, which has now been linked to hundreds of accidents, dozens of injuries and now—potentially—a well-publicized death."[91]

200.   Indeed, on December 16, 2016, NHTSA announced a related investigation into rollaways associated with additional FCA vehicles, including model year 2013-2016 Dodge Ram 1500s and model year 2014-2016 Dodge Durangos with an electronically shifted transmission and electronic rotary control for driver gear selections.[92]   NHTSA's ODI described the issue as identical to the issue with the Class Vehicles, stating that "[c]ustomers report incidents of vehicle roll-way after the operator allegedly shifted the transmission to Park and exited the vehicle."[93]   NHTSA estimates that 1,000,000 additional vehicles are affected by the most recent investigation.[94]

201.   ODI summarized the most recent FCA investigation, PE 16-014, as follows:

> The Office of Defects Investigation (ODI) has identified 43 complaints alleging vehicle roll-away from a parked position in model year (MY) 2013-2016 Ram 1500 and MY 2014-2016 Dodge Durango. These subject vehicles

---

[91] *Id.*

[92] *See* Exhibit AA (NHTSA-ODI Resume 3).

[93] *Id*.

[94] *See id.*

are equipped with an electronically shifted transmission and electronic rotary control for driver gear selections. The reports alleged that the unintended motion occurred after the driver moved the transmission gear selector to Park and exited the vehicle. Nine injuries have been alleged in eight reports, 25 crashes are alleged. Thirty-four of the reports alleged that the vehicle was moving while the shifter indicated that it was in the park position. Many of the incidents alleged the engine was running, however it was noted as off in a few cases.[95]

I.   **FCA Finally Provides a Purported Remedy for Certain Class Vehicles: One that is Ineffective and Diminishes the Functionality of the Class Vehicles.**

202.   After its prolonged and unreasonable delay, FCA responded to the Defective Shifter maelstrom by providing a purported remedy that: (1) is ineffective and/or causes rollaways of Class Vehicles; (2) leads to other mechanical failures in the Class Vehicles; and/or (3) diminishes the functionality of the Class Vehicles.

**1.   FCA's Purported Remedy Is Ineffective**

203.   Numerous Class members have reported that they never received a recall notice from FCA, and have yet to be contacted by the Company or offered the purported remedy for the Defective Shifter in their Class Vehicles.

204.   Moreover, many of those who have had their Class Vehicle repaired by FCA report that the repair was ineffective such that the vehicles continue to

---

[95] *Id.*

experience rollaway incidents (or experienced a rollaway for the first time after the repair) or incidents where their vehicle is not in the intended gear.

205. On information and belief, dealerships have reported that the first recall remedy was ineffective, many of the Class Vehicles have had to be fixed more than once, and even FCA's own dealers are unsure whether the second recall remedy will effectively fix the Defective Shifter, thus requiring Plaintiffs and members of the Classes to devote even more time to remedying this defect.

206. FCA already has admitted that at least 13,000 Class Vehicles in the United States have not been properly fixed even though they were recalled and repaired by the Company.[96] According to a November 16, 2016 *Associated Press* article: "The new software was supposed to make the cars and SUVs automatically shift into park when the driver's door is opened while the engine is running. But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[97]

207. FCA spokesman Eric Mayne stated: "The software didn't work in a small number of vehicles with certain engine, transmission and two- or four-wheel-drive combinations . . . In most cases we initiated the installation of that software without the customer having to show up with the recall notice in hand. It just

---

[96] *See* Exhibit I (November 2016 Associated Press Article).

[97] *Id.*

wasn't the right software for their particular vehicles."[98]   Thus, certain Class members have experienced dangerous rollaway incidents after their Class vehicles were repaired, have incurred out-of-pocket costs associated with damage to property and personal injuries, and have incurred insurance deductible and increased premium expenses.  In addition, these Class members will have to take additional time off from work and/or their daily activities to take their Class Vehicles to a dealership for additional repairs.

208.  FCA sent certain Class members a notice of need for additional repairs, informing them of the need to take their Class Vehicle to the dealership to be fixed for a second time, thus causing additional time to be spent attempting to remedy the defect.[99]   The notice of need for additional repairs states:

> Our records indicate that the recall repairs were attempted on your vehicle at a FCA US dealer.   Further investigation by FCA US has determined, however, that **your vehicle <u>did not</u> receive the complete and proper recall repair.   Your vehicle's software requires additional updating**. . . . **Until the complete recall repair is performed on your vehicle, your vehicle may roll away striking and injuring you, your passengers, or bystanders, if the vehicle's engine is left running, the parking brake is not engaged and the vehicle is not in the "PARK" position before exiting the vehicle**."[100]

---

[98] *Id.*

[99] *See* Exhibit J ("Notice of Need For Additional Repairs").

**[100] *Id.* (emphasis in original).**

## 2. FCA's Purported Remedy Has Led to Other Mechanical Failures in Class Vehicles

209.  Class members also report that FCA's purported remedy led to other mechanical failures in their Class Vehicles.  These mechanical failures occurred shortly after the software update was performed on the Class Vehicles.

210.  Below is a sample of complaints lodged with NHTSA as a result of FCA's purported remedy:

**NHTSA Complaints Related to the Ineffective Remedy**

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 07/05/2016
**Date of Incident:** 07/03/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10882724
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. AFTER THE VEHICLE WAS BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), THE GEAR SHIFTER FAILED TO SHIFT FROM THE PARK POSITION WHEN ATTEMPTING TO REVERSE. THE FAILURE RECURRED NUMEROUS TIMES AND IN VARIOUS POSITIONS. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 28,000.
**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 07/25/2016
**Date of Incident:** 06/30/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10888330
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT HAD NOT EXPERIENCED A FAILURE PRIOR TO BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT INDICATED THAT THE REMEDY DID NOT PROVIDE A REPAIR SOLUTION. THE GEAR SELECTOR RANDOMLY CHANGED GEARS MORE THAN ONCE WITHOUT WARNING. THE FIRST TIME THE FAILURE OCCURRED WHILE REVERSING THE VEHICLE AND

THE GEAR RANDOMLY SHIFTED INTO PARK AND WAS UNABLE TO SHIFT MOMENTARILY. THE DEALER WAS NOTIFIED AND WAS TO SEND A TOW TRUCK, BUT IT DID NOT ARRIVE IN A REASONABLE TIME FRAME. THE CONTACT WAS ABLE TO MANEUVER THE GEAR SHIFT FROM PARK TO DRIVE AND TOOK THE VEHICLE TO THE DEALER. THE DEALER WAS UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE FAILURE RECURRED. THE CONTACT WAS IN THE PROCESS OF MAKING A LEFT TURN WHILE IN DRIVE WHEN THE GEAR SELECTOR CHANGED INTO PARK. THE VEHICLE WAS UNABLE TO BE DRIVEN AND WAS TOWED TO A DEALER. THE CONTACT WAS WAITING ON A RESPONSE FROM THE MANUFACTURER TO SEE IF THEY COULD SEND A TECHNICIAN TO DIAGNOSE THE VEHICLE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS NOT AVAILABLE.

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/08/2016
**Date of Incident:** 08/06/2016
**Component(s):** UNKNOWN OR OTHER
**NHTSA ID Number:** 10893897
JEEP WENT IN FOR SERVICE TO CORRECT THE RECALLED TRANSMISSION ELECTRONIC SHIFT LEVER ON SATURDAY, AUG. 6TH AT 12:30PM. PICKED UP CAR FROM FARRISH JEEP AT 5PM SAME DAY. AT 8PM ON THE SAME DAY, THE CAR WOULD NOT GO OUT OF PARK, THOUGH THE SHIFT LEVER WAS IN DRIVE WHILE IN MY DRIVEWAY. THE DASHBOARD DISPLAYED PARK, WHILE SHIFTER WAS IN DRIVE. EXACT THING HAPPENED WITH 2010 JEEP WRANGLER IN MAY, 2015 AND FARRISH CLAIMED TO FIX IT 3 TIMES IN 36 HOURS. IT HAD TO BE TOWED 3 TIMES BY THE DEALER, BECAUSE THE CAR ROLLED AWAY FROM MY TEENAGE DRIVER THE SAME DAY WE GOT IT BACK FROM FARRISH(IN A NEIGHBORHOOD) AFTER THEY CLAIMED TO HAVE FIXED IT. THIS HAPPENED 3 TIMES IN 36 HOURS.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/08/2016
**Date of Incident:** 07/05/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10893928
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT HAD NOT EXPERIENCED A FAILURE PRIOR TO THE VEHICLE BEING

REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT STATED THAT THE VEHICLE INDEPENDENTLY SHIFTED INTO NEUTRAL FROM PARK SEVERAL TIMES WITHOUT WARNING. THE DEALER WAS NOTIFIED OF THE FAILURE AND PROVIDED NO SOLUTION. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS NOT AVAILABLE. UPDATED 10/04/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/12/2016
**Date of Incident:** 08/07/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895432
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. WHILE THE VEHICLE WAS IN NEUTRAL AT A CAR WASH, THE CONTACT RELEASED THE BRAKE PEDAL AND OPENED THE DOOR. INDEPENDENTLY, THE GEAR SHIFTER SHIFTED FROM NEUTRAL TO PARK. THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 29,000

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/14/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN , UNKNOWN OR OTHER
**NHTSA ID Number:** 10895811
MY JEEP WAS SERVICED TWICE FOR THE RECENT SHIFTER PROBLEM THAT CHRYSLER IDENTIFIES AS DRIVER INATTENTION OR CONFUSION. THE SOFTWARE PATCH THAT IS INTENDED TO "AUTO PARK" THE VEHICLE, HAS FAILED ON TWO OCCASIONS. THE ENGINE IS STARTED, I APPLY THE BRAKE AND PLACE THE SHIFTER INTO REVERSE OR A FORWARD GEAR. I THE DESIRED GEAR IS ILLUMINATED AND I EASE OF THE BRAKE, HOWEVER, WHEN APPLY GAS THE ENGINE SIMPLY RACES AS IF THE TRANSMISSION IS STILL IN PARK OR NEUTRAL. JEEPS ATTEMPT TO FIX A PROBLEM HAS NOW LED TO ANOTHER PROBLEM. THIS VEHICLE IS UNRELIABLE AND A DEATH MACHINE. I HAVE NO CONFIDENCE IN IT'S OPERATION AND I CAN'T IN GOOD CONSCIENCE SELL THIS VEHICLE TO ANYONE. JEEP CORPORATE SHOULD BE IN JAIL.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/15/2016
**Date of Incident:** 08/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895959
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE VEHICLE WAS STILL EXPERIENCING THE SAME FAILURE. THE CONTACT STATED THAT THE VEHICLE SLIPPED OUT OF PARK SEVERAL TIMES AFTER BEING REPAIRED. THE CONTACT NOTIFIED THE DEALER, BUT HAD NOT RECEIVED AN ALTERNATIVE REPAIR SOLUTION. THE FAILURE MILEAGE WAS 10,000. UPDATED 10/04/16*LJ

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/19/2016
**Date of Incident:** 06/13/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10897115
TL* THE CONTACT OWNS A 2015 JEEP GRAND CHEROKEE. THE CONTACT HAD NOT EXPERIENCED ANY FAILURES BEFORE THE DEALER COMPLETED A SOFTWARE UPDATE PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). WHILE THE VEHICLE WAS PARKED, THE GEAR SHIFTED OUT OF POSITION. THE VEHICLE LUNGED FORWARD AT A HIGH RATE OF SPEED AND CRASHED INTO A WOODEN STRUCTURE. THERE WERE NO INJURIES AND A POLICE REPORT WAS NOT FILED. THE CONTACT WAS ABLE TO RE-ENTER THE VEHICLE TO ENSURE THE VEHICLE WAS PLACED IN PARK. THE DEALER WAS UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE VEHICLE WAS NOT REPAIRED, BUT THE STRUCTURAL DAMAGES WERE TO BE ADDRESSED BY THE INSURANCE COMPANY. THE VIN WAS NOT INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT WAS UNABLE TO DETERMINE WHEN THE FAILURE WOULD RECUR. THE MANUFACTURER PROVIDED NO SOLUTION. THE VIN WAS INVALID. THE FAILURE MILEAGE WAS NOT AVAILABLE. UPDATED 11/17/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/16/2016

**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898220
I DRIVE THE 2014 GR CHEROKEE WITH THE ELECTRONIC GEAR
SHIFTER THAT HAS BEEN RECALLED FOR THE SHIFTER NOT
ENGAGING ALL OF THE WAY INTO PARK. I HAD THE RECALL 'FIX'
DONE A COUPLE OF MONTHS AGO, BUT THEN FOUND OUT FROM THE
DEALER THAT THE EMERGENCY BRAKE ONLY ENGAGES IF YOU
ATTEMPT TO OPEN ONE OF THE DOORS. ABOUT A WEEK AGO, AFTER
PARALLEL PARKING ON A BUSY CITY STREET, I PUT THE CAR IN
PARK AND REMAINED IN THE CAR FOR ABOUT ANOTHER MINUTE
WHILE FISHING QUARTERS OUT OF MY CUPHOLDER (FOR THE
PARKING METER). I ALL OF A SUDDEN FELT LIKE SOMETHING HIT MY
CAR, LOOKED UP ONLY TO FIND MY CAR HAD ROLLED BACKWARD
INTO THE PARKED CAR BEHIND ME. I HAVE A HUGE BIKE RACK ON
THE BACK OF MY JEEP THAT BLOCKS THE REVERSE CAMERA, SO THE
AUDIBLE SECURITY ALERT IS ALWAYS ON WHEN THE CAR IS IN
REVERSE - THIS ALERT DID NOT COME ON WHILE THE CAR WAS
ROLLING BACKWARD, THEREFORE, THE CAR WAS NOT IN REVERSE,
BUT RATHER NOT IN PARK ALL OF THE WAY. THANKFULLY THERE
WERE NO PEDESTRIANS BEHIND MY CAR, NOR ANY DAMAGE TO
EITHER VEHICLE, HOWEVER, IF A PERSON WOULD HAVE HAD THEIR
BACK TO ME, I WOULD HAVE CRUSHED THEM BETWEEN THE TWO
CARS. MY CAR HAS NOW BEEN AT THE DEALERSHIP FOR 6 DAYS
(SECOND TIME FOR SAME ISSUE) AND I'M DEALING WITH CUSTOMER
SERVICE DEPARTMENTS WITHIN CHRYSLER/JEEP TO RECTIFY THIS
ISSUE SOMEHOW. I WANT EITHER A NEW GEAR SHIFTER THAT IS NOT
ELECTRONIC, OR TO GET OUT OF THIS VEHICLE. THIS GEAR SHIFTER
IS AN ENORMOUS SAFETY HAZARD. I FEEL LIKE I'M GETTING THE
RUN-AROUND, TO SAY THE LEAST, ABOUT A MAJOR RECALL THAT IS
THE AUTO MAKERS FAULT, NOT THE CONSUMER. FOR THE RECORD, I
HAVE BEEN DRIVING APPROXIMATELY 30 YEARS AND TYPICALLY
AVERAGE 20-30K MILES/YEAR. I AM CONSULTING A LAWYER AT THIS
POINT.

**2015 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/25/2016
**Date of Incident:** 08/18/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898445

NHTSA ID NUMBER: 10894308 THIS SAME ISSUE HAPPENED TO OUR 2015 GRAND CHEROKEE AFTER THE SOFTWARE SAFETY RECALL OF THE TRANSMISSION CONTROL LEVER. PROCEEDING IN DRIVE ON A HIGHWAY, THE LEVER WAS GENTLY BRUSHED - NOT HIT HARD - AND THE TRANSMISSION WENT INTO NEUTRAL. THE THUMB BUTTON WAS NOT DEPRESSED. THIS IS A SIGNIFICANT SAFETY ISSUE, AND WE DID NOT EXPERIENCE IT PRIOR TO THE SOFTWARE UPDATE. IT HAS NOW BEEN REPLICATED SEVERAL TIMES, AND A VIDEO CAN BE PROVIDED IF NECESSARY.

**2013 Chrysler 300**
**Date Complaint Filed:** 09/08/2016
**Date of Incident:** 08/25/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10904633
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE FAILED TO SHIFT OUT OF PARK. THE VEHICLE WAS SERVICED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE FAILURE OCCURRED ON THE SAME DAY SHORTLY AFTER THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/04/2016
**Date of Incident:** 10/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10913784
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER ATTEMPTING TO PLACE THE VEHICLE IN PARK AND EXIT, THE CONTACT DISCOVERED THAT THE GEAR SHIFT FAILED TO MOVE INTO THE PARK POSITION AND THE ACCESSORY WARNING INDICATOR ILLUMINATED. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE VEHICLE WAS DIAGNOSED A SECOND TIME AND THE TECHNICIAN STATED THAT THE RECEIVING CODE FOR THE TRANSMISSION WAS NOT UPDATED TO THE COMPUTER. THE VEHICLE WAS NOT REPAIRED DUE TO THE PART BEING ON BACK ORDER. THE CONTACT MENTIONED THAT THE

ACCESSORY INDICATOR REMAINED ILLUMINATED AFTER THE RECALL REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 57,000.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/13/2016
**Date of Incident:** 10/05/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10915745
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER THE VEHICLE WAS REFUELED, IT WAS UNABLE TO BE STARTED. THE VEHICLE WAS TOWED TO THE DEALER WHERE IT WAS DETERMINED THAT THE VEHICLE WAS NOT IN THE PARK POSITION. THE VEHICLE WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE VEHICLE WAS REPAIRED PER THE RECALL; HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 80,000.

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 10/19/2016
**Date of Incident:** 04/23/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10917281
TL* THE CONTACT OWNS A 2014 JEEP GRAND CHEROKEE. THE CONTACT STATED THAT WHILE REVERSING FROM A PARKING SPACE AND THEN PLACING THE GEAR SHIFTER INTO THE DRIVE POSITION, THE GEAR SHIFTER MOVED TO THE PARK POSITION INDEPENDENTLY. THE FAILURE OCCURRED MULTIPLE TIMES. THE CONTACT STATED THAT THE VIN WAS INCLUDED IN NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN) AND WAS REPAIRED HOWEVER, THE FAILURE RECURRED. THE MANUFACTURER WAS NOT NOTIFIED ABOUT THE FAILURE. THE APPROXIMATE MILEAGE WAS 36,000. THE VIN WAS NOT AVAILABLE.

## NHTSA Complaints Related to Mechanical Failures

**2012 Dodge Charger**
**Date Complaint Filed:** 08/23/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN

**NHTSA ID Number:** 10897869
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. THE CONTACT STATED THAT THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS REMEDIED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). ATER LEAVING THE DEALER, THE CHECK ENGINE AND TRANSMISSION WARNING INDICATORS ILLUMINATED. THE VEHICLE COULD NOT BE DRIVEN OVER 20 MPH. THE VEHICLE WAS TAKEN BACK TO THE DEALER, BUT THE DIAGNOSIS WAS UNKNOWN. THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE FAILURE MILEAGE WAS APPROXIMATELY 30,000.

**2013 Chrysler 300**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/17/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898152
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT INDICATED THAT THERE HAD BEEN NO FAILURES UNTIL THE VEHICLE WAS TAKEN TO THE DEALER TO BE REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). SHORTLY AFTER LEAVING THE DEALER, THE ACCELERATOR PEDAL WAS APPLIED AND DID NOT RESPOND MORE THAN ONCE. THE CONTACT HAD TO APPLY FORCE TO THE ACCELERATOR PEDAL WHILE DRIVING 40 MPH. WHEN DRIVING OVER A RAILROAD TRACK, THE CONTACT HAD TO APPLY FORCE TO THE ACCELERATOR PEDAL TO GET THE VEHICLE TO CROSS THE TRACKS. THE TRANSMISSION WARNING INDICATOR FLASHED. IN ADDITION, THE CONTACT WAS ABLE TO COAST THE VEHICLE OVER TO THE SIDE OF THE ROAD. THE VEHICLE WAS UNABLE TO BE DRIVEN DUE TO THE FAILURE. THE VEHICLE WAS TOWED TO THE DEALER, BUT THEY DID NOT HAVE A REPAIR SOLUTION OR PARTS AVAILABLE. THE MANUFACTURER WAS CONTACTED MORE THAN TEN TIMES BY THE CONTACT AND WAS STILL WAITING ON A REPAIR REMEDY TO DETERMINE IF THE VEHICLE WOULD BE REPAIRED. THE VIN WAS NOT AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 18,000. UPDATED 10/06/16*LJ

**2013 Dodge Charger**
**Date Complaint Filed:** 09/20/2016
**Date of Incident:** 08/12/2016
**Component(s):** POWER TRAIN

**NHTSA ID Number:** 10908275

TL* THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT RECEIVED A RECALL NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT TOOK THE VEHICLE TO THE DEALER. WHEN THE DEALER TRIED TO REPLACE THE PART, THE TRANSMISSION CONTROL MODULE CRASHED AND THE ENGINE STALLED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 17,000.

**2012 Dodge Charger**
**Date Complaint Filed:** 10/03/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10911109

TL* THE CONTACT OWNS A 2012 DODGE CHARGER. AFTER THE VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), THE CONTACT BEGAN TO EXPERIENCE A FAILURE. THE CONTACT STATED THAT THE SHIFTER FAILED TO LOCK INTO THE DESIRED POSITION. THE CONTACT HEARD A LOUD CLONKING NOISE COMING FROM THE TRANSMISSION. THE DEALER DIAGNOSED THAT THE REPAIR CAUSED THE TRANSMISSION TO FAIL. THE CONTACT WAS UNSURE OF THE DETAILS OF THE REPAIR. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2013 Chrysler 300**
**Date Complaint Filed:** 11/18/2016
**Date of Incident:** 07/18/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10926948

TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT HAD NOT EXPERIENCED ANY FAILURES PRIOR TO BEING REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). SHORTLY AFTER THE DEALER'S REPAIR, THE VEHICLE DRASTICALLY REDUCED SPEED WITHOUT WARNING. THE TRANSMISSION GEARS WOULD NOT REMAIN IN THE GEAR THAT WAS SELECTED. THE VEHICLE WAS TAKEN BACK TO THE DEALER, BUT THE FAILURE COULD NOT BE DUPLICATED. THE DEALER INDICATED THAT MORE THAN ONE TECHNICIAN MAY NEED TO DO FURTHER DIAGNOSTIC TESTING. THE

MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS NOT AVAILABLE.

### 3. FCA's Purported Remedy Diminishes the Functionality of the Class Vehicles

211.   Moreover, when effective, the remedy diminishes the functionality of the Class Vehicles.  When a driver of a Class Vehicle opens the driver-side door but the car is not in Park, the software fix abruptly places the vehicle in Park even if the driver is not exiting the vehicle, thereby jerking the driver and the vehicle into the Park position.

212.   In addition, many Class members purchased or leased their Jeep Grand Cherokees in order to tow cargo.  In fact, FCA advertises the Jeep Grand Cherokee as having ***Best-in-Class Maximum Towing Capacity***, stating: "Grand Cherokee can tow a Best-in-Class maximum towing capacity of up to 7,400 pounds."[101]  This functionality has been diminished by FCA's purported remedy which prevents Class Vehicle owners and lessees from opening the door to visibly check their tow cargo while driving in reverse.  When Class Vehicle drivers attempt this standard practice used while towing cargo, their repaired Class Vehicles abruptly jump into Park, thereby destroying the vehicles' towing feature touted by FCA.

---

[101] Exhibit BB, *Jeep, Trail Rated Tough*, http://www.jeep.com/en/2016/grand-cherokee/capability/ (last visited Dec. 16, 2016) ("Jeep Trail Rated Screenshot").

### 4.     Plaintiffs and Class Members Were Harmed by the Recall While Defendant Benefited

213.   Plaintiffs and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they, inter alia: (1) did not receive the benefit of the bargain of the purchase or lease of the Class Vehicles which were sold and leased as safe and reliable vehicles at premium prices even though they contained a known but concealed defect; (2) were forced to take time off from work and/or their daily activities in order to have the repair implemented (in some cases more than once); (3) own or lease a repaired vehicle which suffers from continued rollaways or other mechanical failures; (4) own or lease a repaired vehicle with diminished functionality due to the remedy instituted by FCA; and/or (5) own a vehicle that has substantially diminished in value and is diminishing in value at an increased

214.   Defendant benefited and was unjustly enriched as a result of the recall, which forced hundreds of thousands of customers to visit its dealerships nationwide—without the need for FCA to spend millions of dollars on advertising and marketing to drive customers to its dealerships.   As explained by an automotive industry consultant in a recent *Los Angeles Times* article: "Recalls are

definitely good for business. Smart dealers actively market recalls by calling up customers."[102]

215.   An article in *Digital Dealer* provided dealers with the following advice regarding recalls: "Typically, you must be spending a lot of time, money and effort on bringing more traffic to your lot. But with recalls so abundant, you surely get more people without moving a finger – people come to get their cars fixed."[103]   According to the article, "a Chrysler estimate during one of its recalls showed that 15 percent of their new car purchases came thanks to the service department," and "GM managed to sell 6,600 (in one week) during the ignition switch recall."[104]   Indeed, one Dallas-based dealer reported that, during the Ford recall, he "had the largest profit month of [his] career as a dealership owner."[105]

### J.   FCA's Delayed and Inadequate Response to the Defective Shifter Deprived Class Members of the Benefit of their Bargain and Has Led to a Decrease in Value of the Class Vehicles

216.   Plaintiffs and Class members purchased or leased Class Vehicles based upon a reasonable assumption and based on Defendant's warranties that the

---

[102] Exhibit CC, Jerry Hirsch, *GM recalls are windfall for dealers; The automaker is paying them to fix problems on up to 6 million vehicles,* L.A. TIMES, Apr. 24, 2014, at B1 ("2014 L.A. Times Article").

[103] Exhibit DD, *How Auto Dealers Can Boost Profits Amid the Recalls,* DIGITAL DEALER (Aug. 15, 2014), http://www.digitaldealer.com/how-auto-dealers-can-boost-profits-amid-the-recalls/ ("2014 Digital Dealer Article").

[104] *Id.*

[105] *Id.*

vehicles were safe and free of defects.  However, the Class Vehicles delivered by Defendant were not those for which Plaintiffs and Class members bargained. Rather, the Class Vehicles suffered from a common defect—the Defective Shifter. Had Plaintiffs and Class members known of the defect, they would have either (1) paid substantially less for the vehicles; (2) required an immediate remedy that restored the vehicles to the conditions bargained for; or (3) not purchased or leased the Class Vehicles.

217.   As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm.  This economic harm can be quantified as: (1) the economic value of an effective remedy that restores vehicles to their expected conditions (or the economic harm from the lack of that remedy); (2) the discount that Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (3) the diminished value experienced by the Class Vehicles upon disclosure of the Defective Shifter.

218.   Class members who leased vehicles were similarly harmed because their lease payments were based on an inflated value of the Class Vehicles.

219.   A successful repair of the Class Vehicles would not fully compensate Plaintiffs and Class members.  Through its concealment of the Defective Shifter, FCA deprived Plaintiffs and Class members of the value of a fully functional

vehicle for at least some portion of ownership.  Furthermore, Plaintiffs and Class members must monitor the status of their Class Vehicles' defects and incur time and expense in order to execute repairs.  Furthermore, prior to an effective repair, FCA has appropriated economic welfare from Plaintiffs and Class members by avoiding or delaying the expense necessary to remedy the Defective Shifter while forcing Plaintiffs and Class members to subsidize them by unknowingly assuming the safety risk associated with driving the Class Vehicles containing the Defective Shifter.

220.   Plaintiffs and Class members paid premiums to purchase the Class Vehicles as a result of the brand, reliability, value, and safety representations made by FCA. A car purchased or leased with the reasonable expectation that it is safe and reliable as advertised is worth more than a car known to be subject to the risk of dangerous rollaway incidents.  Class members were harmed from the day they drove their Class Vehicle off the lot because they did not get what they paid for—a car that was well-designed and safe to operate.

221.  As a direct result of FCA's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Plaintiffs and Class members paid a premium for the Class Vehicles which were advertised as safe and reliable, and received Class Vehicles that contained a known but concealed defect.  Defendant was unjustly

enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the cars they received in return.

222.   In addition, following the death of actor Anton Yelchin who was crushed by his rollaway 2015 Jeep Grand Cherokee, there has been widespread disclosure of the design defect of the Defective Shifter in the Class Vehicles. This press has caused a sharp decrease in the value of the Class Vehicles and may have made them essentially unsalable. Each Class member therefore suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicle.

223.   The Jeep Grand Cherokee presents a marked example of the diminished value of Class Vehicles.   Prior to widespread knowledge of the dangerous shifter defect, these vehicles held their value *better* than other vehicles in the same class.   But after the market became aware of the defect, the depreciation rate of 2014-15 Jeep Grand Cherokee vehicles increased dramatically, as shown in the table below:

**Average Monthly Depreciation
Middle Sport/Utility Segment**

| 2014 Model Year | Pre-Period 8/2014-5/2016 | Post-Period 6/2016-10/2016 |
|---|---|---|
| Jeep Grand Cherokee | -1.10% | -1.60% |

| | | |
|---|---|---|
| **Rest of Class** | **-1.24%** | **-1.29%** |

| **2015 Model Year** | **Pre-Period**<br>**9/2015-5/2016** | **Post-Period**<br>**6/2016-10/2016** |
|---|---|---|
| **Jeep Grand Cherokee** | **-1.03%** | **-1.59%** |
| **Rest of Class** | **-1.11%** | **-1.04%** |

224.   What the above table shows is that prior to market knowledge of the shifter defect, Jeep Grand Cherokee vehicles had monthly depreciation rates that were lower than other vehicles in the same class, thus these cars held their value better than competitive cars.   But after the shifter defect became known, the monthly depreciation rates rocketed up for Jeep Grand Cherokees while staying flat, or decreasing for competitors.   The effect of the 0.5% increase in monthly depreciation for the Grand Cherokee is substantial.   For example, on a $40,000 vehicle, the increase means the car depreciates about *$200 more per month*, thus at least $2,400 more in just a single year of ownership.

225.   The loss in value is particularly acute and affects Class members because they do not want to own unsafe cars that might roll away and crush them or members of their family.   Safety, reliability, and quality of design are at the core of FCA's marketing efforts and a driving factor in purchase decisions. Class members want to sell their Class Vehicles but they cannot without incurring

126

substantial losses.  In addition, Class members—unlike FCA—are concerned about selling their Class Vehicles to another driver who may experience a dangerous rollaway incident.

226.  Moreover, many Class members purchased their vehicles with financing in the form of car loans or leases. The drop in value of the Class Vehicles has caused the financing to be underwater, meaning that Class members will have to pay money over and above whatever they can sell their car for.

227.  In addition, many Class members purchased expensive extended warranties for their Class Vehicles, intending to own the vehicles for many years beyond the initial warranty. However, as a result of the Defective Shifter, Class members no longer want to own the Class Vehicles and when they sell them, in addition to losses from the cars being worth much less as a result of the defect, they will lose the value of the extended warranties that they purchased.

228.  As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that the Defective Shifter is unsafe and defectively designed, owners and/or lessees of the Class Vehicles have suffered losses in money and/or property.  Had Plaintiffs and Class members known of the defect at the time they purchased or leased their Class Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

## V.     TOLLING OF THE STATUE OF LIMITATIONS AND ESTOPPEL

### A.     Discovery Rule Tolling

229.   Class members had no way of knowing about FCA's Defective Shifters in their Class Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers.  This is the quintessential case for tolling.

230.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein and misrepresenting the company's true position with respect to the safety qualities of its vehicles.

231.   Within the period of any applicable statutes of limitation, Plaintiffs and the other Class members could not have discovered through the exercise of reasonable diligence that FCA was concealing the Defective Shifter.

232.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

### B.     Estoppel

233.   FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Shifter in the vehicles at issue.

234.    FCA knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Shifter in the vehicles at issue.

235.    Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

## VI.    CLASS ALLEGATIONS

236.    Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Nationwide Class**
> All persons or entities who purchased or leased a 2012-14 Dodge Charger, 2012-14 Chrysler 300, or 2014-15 Jeep Grand Cherokee
>
> **Arizona Subclass**
> All members of the Nationwide Class who are residents of Arizona or purchased their Class Vehicle in Arizona.
>
> **California Subclass**
> All members of the Nationwide Class who are residents of California or purchased their Class Vehicle in California.
>
> **Colorado Subclass**
> All members of the Nationwide Class who are residents of Colorado or purchased their Class Vehicle in Colorado.
>
> **Florida Subclass**
> All members of the Nationwide Class who are residents of Florida or purchased their Class Vehicle in Florida.
>
> **Georgia Subclass**
> All members of the Nationwide Class who are residents of Georgia or purchased their Class Vehicle in Georgia.

**Illinois Subclass**

All members of the Nationwide Class who are residents of Illinois or purchased their Class Vehicle in Illinois.

**Iowa Subclass**

All members of the Nationwide Class who are residents of Iowa or purchased their Class Vehicle in Iowa.

**Louisiana Subclass**

All members of the Nationwide Class who are residents of Louisiana or purchased their Class Vehicle in Louisiana.

**Maryland Subclass**

All members of the Nationwide Class who are residents of Maryland or purchased their Class Vehicle in Maryland.

**Massachusetts Subclass**

All members of the Nationwide Class who are residents of Massachusetts or purchased their Class Vehicle in Massachusetts.

**Michigan Subclass**

All members of the Nationwide Class who are residents of Michigan or purchased their Class Vehicle in Michigan.

**Minnesota Subclass**

All members of the Nationwide Class who are residents of Minnesota or purchased their Class Vehicle in Minnesota.

**Missouri Subclass**

All members of the Nationwide Class who are residents of Missouri or purchased their Class Vehicle in Missouri.

**Nevada Subclass**

All members of the Nationwide Class who are residents of Nevada or purchased their Class Vehicle in Nevada.

**New Jersey Subclass**

All members of the Nationwide Class who are residents of New Jersey or purchased their Class Vehicle in New Jersey.

## New York Subclass

All members of the Nationwide Class who are residents of New York or purchased their Class Vehicle in New York.

## North Carolina Subclass

All members of the Nationwide Class who are residents of North Carolina or purchased their Class Vehicle in North Carolina.

## Ohio Subclass

All members of the Nationwide Class who are residents of Ohio or purchased their Class Vehicle in Ohio.

## Oklahoma Subclass

All members of the Nationwide Class who are residents of Oklahoma or purchased their Class Vehicle in Oklahoma.

## Oregon Subclass

All members of the Nationwide Class who are residents of Oregon or purchased their Class Vehicle in Oregon.

## Pennsylvania Subclass

All members of the Nationwide Class who are residents of Pennsylvania or purchased their Class Vehicle in Pennsylvania.

## Texas Subclass

All members of the Nationwide Class who are residents of Texas or purchased their Class Vehicle in Texas.

## Utah Subclass

All members of the Nationwide Class who are residents of Utah or purchased their Class Vehicle in Utah.

## Washington Subclass

All members of the Nationwide Class who are residents of Washington or purchased their Class Vehicle in Washington.

**Wisconsin Subclass**
All members of the Nationwide Class who are residents of Wisconsin or purchased their Class Vehicle in Wisconsin.

**Wyoming Subclass**
All members of the Nationwide Class who are residents of Wyoming or purchased their Class Vehicle in Wyoming.

237. Excluded from the Class are individuals who have personal injury claims resulting from the defectively designed Defective Shifters in their Class Vehicles.  Also excluded from the Class are FCA, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates, FCA dealers, Class counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case, all persons who make a timely election to be excluded from the Class, governmental entities, and the judge to whom this case is assigned and his/her immediate family.

238. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

239. This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

240.  <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  There are over 800,000 Class Vehicles that have been sold in the United States.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

241.  <u>Commonality and Predominance</u>.  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

> a.  Whether FCA engaged in the conduct alleged herein;
>
> b.  Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;
>
> c.  Whether the Defective Shifter system in the Class Vehicles contains a safety defect;
>
> d.  Whether FCA knew about the defect in the Defective Shifter and, if so, how long FCA has known of it;
>
> e.  Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with a Defective Shifter;
>
> f.  Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

133

    g.    Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

    h.    Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

    i.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

242. <u>Typicality</u>.  Federal Rule of Civil Procedure 23(a)(3):  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.

243. <u>Adequacy</u>.  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

244.  <u>Declaratory and Injunctive Relief</u>.  Federal Rule of Civil Procedure 23(b)(2):  FCA has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

245.  <u>Superiority</u>.  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of

this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. VIOLATIONS ALLEGED

### A. Claims Brought on Behalf of the Nationwide Class

### NATIONWIDE CLASS COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *ET SEQ.*)

246. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

247. This claim is brought on behalf of the Nationwide Class.

248. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

249.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

250.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

251.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

252.   FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

253.   FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles are equipped with a defective Defective Shifter that puts vehicle occupants' safety in jeopardy.   The Class Vehicles share a common design defect in that the Defective Shifter is defectively designed and unsafe, contrary to FCA's representations about its vehicles.   The Class Vehicles share a common design defect which can allow the car to roll away from its parked position.

254.   Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either FCA or its agents (*e.g.*, dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiffs

and each of the other Nationwide Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

255.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, FCA has already attempted to do so through an ineffective recall campaign.  However, the recall has failed to cure the defect.

256.   At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

257.    Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

258.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

259.    Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

### B.    Claims Brought on Behalf of the Arizona Subclass

### ARIZONA COUNT II

### VIOLATION OF CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. § 44-1521, ET SEQ.)

260.    Plaintiffs Jeffrey Guy, Casey E. Perkins, and Wisam Yacoub ("Plaintiffs," for purposes of all Arizona Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

261.    Plaintiffs bring this Count on behalf of the Arizona Subclass.

262.  FCA, Plaintiffs, and the Arizona Subclass are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), ARIZ. REV. STAT. § 44-1521(6).

263.  The Class Vehicles are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

264.  The Arizona CFA proscribes "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." ARIZ. REV. STAT. § 44-1522(A).

265.  In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

266.  FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

267.  FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

268.  By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Arizona CFA.

269.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

270.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Arizona Subclass.

271.   FCA knew or should have known that its conduct violated the Arizona CFA.

272.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

273.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or
>
> c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

274.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

275.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Arizona Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

276.   Plaintiffs and the Arizona Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Arizona CFA.

277.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Arizona CFA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

278.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

279.   The recalls and modifications instituted by FCA have not been adequate.

280.   As a direct and proximate result of FCA's violations of the Arizona CFA, Plaintiffs and the Arizona Subclass have suffered injury-in-fact and/or actual damage.

281.   Plaintiffs and the Arizona Subclass seek monetary relief against FCA in an amount to be determined at trial.  Plaintiffs and the Arizona Subclass also seek punitive damages because FCA engaged in aggravated and outrageous conduct with an evil mind.

282.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## ARIZONA COUNT III

### FRAUDULENT CONCEALMENT
### (BASED ON ARIZONA LAW)

283.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

284.   Plaintiffs bring this Count on behalf of the Arizona Subclass.

285.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

286.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

287.   FCA knew at the time it actively concealed this information that this information was material.

288.   The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

289.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

290.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased

the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

291.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

292.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

293.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.   Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## ARIZONA COUNT IV

## VIOLATION OF EXPRESS WARRANTY
### (ARIZ. REV. STAT. § 47-2313, *ET SEQ.*)

294.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

295.   Plaintiffs bring this Count on behalf of themselves and the Arizona Subclass.

296.   FCA is and was at all relevant times a merchant with respect to motor vehicles under ARIZ. REV. STAT. § 47-2104(A).

297.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

298.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

299.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

300.   Plaintiffs and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

301.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

302.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

303.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

304.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

305.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class

members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

306. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

307. Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in ARIZ. REV. STAT. § 47-2711, the revocation of acceptance of the goods, and the return to Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under ARIZ. REV. STAT. §§ 47-2711 and 47-2608.

308. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant complaint, within a reasonable amount of time after the defect was discovered.

309.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## ARIZONA COUNT V

## UNJUST ENRICHMENT
## (BASED ON ARIZONA LAW)

310.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

311.   Plaintiffs bring this Count on behalf of themselves and the Arizona Subclass.

312.   FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

313.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

314.   Thus, all Arizona Subclass members conferred a benefit on FCA.

315.   It is inequitable for FCA to retain these benefits.

316.   Plaintiffs and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

317.   FCA knowingly accepted the benefits of its unjust conduct.

318.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## C.     Claims Brought on Behalf of the California Subclass

## CALIFORNIA COUNT VI

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200, ET SEQ.)

319.   Plaintiffs David Goldsmith and Michael Vincent Nathan Jr. ("Plaintiffs," for purposes of all California Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

320.   Plaintiffs bring this Count on behalf of the California Subclass.

321.   California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

322.   FCA's conduct, as described herein, was and is in violation of the UCL.  FCA's conduct violates the UCL in at least the following ways:

    a.    By knowingly and intentionally concealing from Plaintiffs and the other Class members that the Class Vehicles suffer from a design defect while obtaining money from Plaintiffs and the Class;

    b.    By marketing the Class Vehicles as possessing functional and defect-free transmission systems;

    c.    By refusing or otherwise failing to repair and/or replace defective transmission systems in Class Vehicles;

d.     By violating federal laws, including the Motor Vehicle Safety Act and NHTSA regulations, by failing to recall and repair vehicles that contain a safety defect; and

e.     By violating other California laws, including California laws governing false advertising and consumer protection.

323.   FCA's misrepresentations and omissions alleged herein caused Plaintiffs and the other Class members to make their purchases or leases of their Class Vehicles.  Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective Defective Shifters.

324.   Accordingly, Plaintiffs and the other Class members have suffered injury in fact, including lost money or property, as a result of FCA's misrepresentations and omissions.

325.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

326.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by FCA under CAL. BUS. & PROF. CODE § 17200.

327.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful, and/or deceptive practices; to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 & 3345; and for such other relief set forth below.

<h2 style="text-align:center">CALIFORNIA COUNT VII</h2>

<h2 style="text-align:center">VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE § 1750, ET SEQ.)</h2>

328.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

329.   Plaintiffs bring this Count on behalf of the California Subclass.

330.   California's Consumers Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

331.   The Class Vehicles are "goods" as defined in CAL. CIV. CODE §§ 1751(a).

332.   Plaintiffs and the other Class members are "consumers" as defined in CAL. CIV. CODE § 1761(d), and Plaintiffs, the other Class members, and FCA are "persons" as defined in CAL. CIV. CODE § 1761(c).

333.   As alleged above, FCA made numerous representations concerning the benefits, efficiency, performance, and safety features of the Class Vehicles that were misleading.

334.   In purchasing or leasing the Class Vehicles, Plaintiffs and the other Class members were deceived by FCA's failure to disclose that the Class Vehicles were equipped with defective Defective Shifters.

335.   FCA's conduct, as described herein, was and is in violation of the CLRA.   FCA's conduct violates at least the following enumerated CLRA provisions:

  a.  CAL. CIV. CODE § 1770(a)(2): Misrepresenting the approval or certification of goods;

  b.  CAL. CIV. CODE § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

  c.  CAL. CIV. CODE § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

  d.  CAL. CIV. CODE § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

  e.  CAL. CIV. CODE § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

336.   Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from FCA's material omissions and misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

337.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

338.   FCA knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the Defective Shifter, and that the Class Vehicles were not suitable for their intended use.

339.   The facts concealed and omitted by FCA to Plaintiffs and the other Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.   Had Plaintiffs and the other Class members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would not have paid the prices they paid in fact.

340.   In accordance with Civil Code § 1780 (a), Plaintiffs and the other Class members seek injunctive and equitable relief for FCA's violations of the

CLRA, including an injunction to enjoin FCA from continuing its deceptive advertising and sales practices.

341.   Plaintiffs have provided FCA with notice of its violations of the CLRA pursuant to CAL. CIV. CODE § 1782(a).  The notice was transmitted to FCA on July 8, 2016.

342.   Plaintiffs and the other Class members' injuries were proximately caused by FCA's fraudulent and deceptive business practices.

343.   Therefore, Plaintiffs and the other Class members are entitled to equitable and monetary relief under the CLRA.

**CALIFORNIA COUNT VIII**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE § 17500, ET SEQ.)**

344.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

345.   Plaintiffs bring this Count on behalf of the California Subclass.

346.   CAL. BUS. & PROF. CODE § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet,

155

any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

347.   FCA caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

348.   FCA has violated CAL. BUS. & PROF. CODE § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of Class Vehicles, as set forth in this Complaint, were material and likely to deceive a reasonable consumer.

349.   Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of FCA's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of FCA with respect to the safety, performance, and reliability of the Class Vehicles. FCA's representations turned out not to be true because the Class Vehicles are distributed with defectively designed Defective Shifters, rendering essential vehicle functions inoperative.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as

156

much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

350.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

351.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business.  FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

352.  Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing their unfair, unlawful, and/or deceptive practices, to restore to Plaintiffs and the other Class members any money FCA acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## CALIFORNIA COUNT IX

### FRAUDULENT CONCEALMENT
### (BASED ON CALIFORNIA LAW)

353.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

354.  Plaintiffs bring this Count on behalf of the California Subclass.

355.  As set forth above, FCA concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of the Class Vehicles.

356.  FCA had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed the Class Vehicles as safe and proclaimed that safety is one of FCA's highest corporate priorities.  Once FCA made representations to the public about safety, quality, functionality, and reliability, FCA was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

357.  In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA which has superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members.  These omitted

facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

358.    Whether or not the Class Vehicles' Defective Shifter worked; whether the Defective Shifter reliably shifted into park when the driver intended to idle the vehicle, whether the Defective Shifter provided sufficient tactile feedback to drivers intending to place their vehicle in park; and whether the Defective Shifter, in fact, could and should have been equipped with a safety override, such as an auto-park feature, in order to mitigate risk to consumers, are material safety concerns.  FCA possessed exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

359.    FCA actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the other Class members to purchase or lease Class Vehicles at a higher price for the Class Vehicles which did not match the Class Vehicles' true value.

360.    FCA still has not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class members.

361.    Plaintiffs and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.   Plaintiffs' and the other Class members'

actions were justified.  FCA was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

362.  As a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage.

363.  FCA's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights and well-being to enrich FCA.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## CALIFORNIA COUNT X

### VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))

364.  Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

365.  Plaintiffs bring this Count on behalf of the California Subclass.

366.  Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

367.  The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

368. FCA is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

369. Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by FCA.

370. FCA made express warranties to Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

371. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly, for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

372. As set forth above in detail, the Class Vehicles are inherently defective in that the Defective Shifter is monostable, yet does not have a safety override that automatically puts the car in "Park" if the driver's door is opened and the driver attempts to exit the vehicle, a defect that was and continues to be covered by FCA's express warranties, and this defect substantially impairs the use,

value, and safety of the defective Shifter Vehicles to reasonable consumers like Plaintiffs and the other Class members.

373.   Plaintiffs Goldsmith, Nathan Jr., and other Class members delivered their Class Vehicles to FCA or its authorized repair facility for repair of the defect and/or notified FCA in writing of the need for repair the defect because they reasonably could not deliver the Class Vehicles to FCA or its authorized repair facility due to fear of the Defective Shifter defect.

374.   FCA and its authorized repair facilities failed and continue to fail to repair the Class Vehicles to match FCA's written warranties after a reasonable number of opportunities to do so.

375.   Plaintiffs and the other Class members gave FCA or its authorized repair facilities at least two opportunities to fix the defect unless only one repair attempt was possible because the vehicle was later destroyed or because FCA or its authorized repair facility refused to attempt the repair.

376.   FCA did not promptly replace or buy back the Class Vehicles of Plaintiffs and the other Class members.

377.   As a result of FCA's breach of its express warranties, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of

FCA's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

378.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

379.   Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

## CALIFORNIA COUNT XI

### VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1791.1 & 1792)

380.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

381.   Plaintiffs bring this Count on behalf of the California Subclass.

382.   Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

383.   The Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

384.   FCA is a "manufacturer" of the Class Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

385.   FCA impliedly warranted to Plaintiffs and the other Class members that its Class Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

386.   CAL. CIV. CODE § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1)   Pass without objection in the trade under the contract description.
>
> (2)   Are fit for the ordinary purposes for which such goods are used.
>
> (3)   Are adequately contained, packaged, and labeled.
>
> (4)   Conform to the promises or affirmations of fact made on the container or label.

387.   The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' Defective Shifter. Specifically, the Defective Shifter is monostable, yet does not have a safety override that automatically puts the car in "Park" if the driver's door is opened and the driver attempts to exit the vehicle. In addition, the Defective Shifter was not adequately designed, manufactured, and tested.

388.   Because of the defects in the Class Vehicles' Defective Shifter, they are not in merchantable condition and thus not fit for ordinary purposes.

389.   The Class Vehicles are not adequately labeled because the labeling fails to disclose the defects in the Class Vehicles' Defective Shifter.

390.   FCA breached the implied warranty of merchantability by manufacturing and selling the Class Vehicles containing the defectively designed Defective Shifter.  Furthermore, these defects have caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused the Class Vehicles to depreciate in value.

391.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose defective condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of the diminished value of FCA's products, the products' malfunctioning, and the non-use of their Class Vehicles.

392.   Pursuant to CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

393.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

D.     **Claims Brought on Behalf of the Colorado Subclass**

## COLORADO COUNT XII

### VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
(COLO. REV. STAT. §§ 6-1-101, *ET SEQ.*)

394.   Plaintiff Debra Felker ("Plaintiff," for purposes of all Colorado Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

395.   Plaintiff brings this Count on behalf of the Colorado Subclass.

396.   Colorado's Consumer Protection Act (the "CCPA") prohibits a person from engaging in a "deceptive trade practice," which includes knowingly making "a false representation as to the source, sponsorship, approval, or certification of goods," or "a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods." Colo. Rev. Stat. § 6-1-105(1)(b), (e).

397.   FCA is a "person" within the meaning of Colo. Rev. Stat. § 6-1-102(6).

398.   In the course of FCA's business, it failed to disclose, and actively concealed, the dangerous risk of faulty and defective Defective Shifters in Class Vehicles as described above. Accordingly, FCA engaged in conduct likely to deceive.

399.   FCA's actions as set forth above occurred in the conduct of trade or commerce.

166

400.   FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

401.   Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's omissions.

## COLORADO COUNT XIII

## STRICT PRODUCT LIABILITY
## (BASED ON COLORADO LAW)

402.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

403.   Plaintiff brings this Count on behalf of the Colorado Subclass.

404.   Colorado law recognizes an action for product defects that complements Colorado's Product Liability Statute, Colo. Rev. Stat. Title 13, Article 21, Part 4.

405.   FCA is a "manufacturer" and "seller" of the Class Vehicles within the meaning of Colo. Rev. Stat. § 13-21-401(1).

406.   FCA manufactured and sold the Class Vehicles in a defective condition and in a condition that was unreasonably dangerous to drivers, other motorists, pedestrians, and others or to their property, including persons who may

167

reasonably be expected to use, consume, or be affected by them, in at least the following respects: (i) the Class Vehicles were defectively designed, assembled, fabricated, produced, and constructed in that they contain faulty and defective Defective Shifters which can allow the car to roll away from its parked position; and (ii) the Class Vehicles were not accompanied by adequate warnings about their defective nature.

407.   The Class Vehicles were defective and unreasonably dangerous at the time they were sold by FCA and were intended to and did reach Plaintiff and the other Class Members in substantially the same condition as they were in when they were manufactured, sold, and left the control of FCA.

408.   Plaintiff and the other Class members are persons who were reasonably expected to use, consume, or be affected by the Class Vehicles.

409.   As a direct and proximate result of the defective and unreasonably dangerous conditions of the Class Vehicles, Plaintiff and the other Class members have suffered damages.

## COLORDO COUNT XIV

## FRAUDULENT CONCEALMENT
## (BASED ON COLORADO LAW)

410.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

411.   Plaintiff brings this Count on behalf of the Colorado Subclass.

168

412.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

413.   FCA further omitted from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

414.   FCA knew at the time it actively concealed this information that this information was material.

415.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

416.   FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that the Defective Shifter can allow the car to roll away from its parked position, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

417.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased

169

the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

418.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. FCA knew or recklessly disregarded that its representations were false because it knew that people had experienced roll-away incidents. FCA intentionally made the false statements in order to sell Class Vehicles.

419.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

420.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

421.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COLORADO COUNT XV

## BREACH OF EXPRESS WARRANTY
## (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)

422.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

423.   Plaintiff brings this Count on behalf of the Colorado Subclass.

424.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a "seller" of motor vehicles under Colo. Rev. Stat. § 4-2-103(1)(d).

425.   With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Ariz. Rev. Stat. § 47-2a103(A)(16).

426.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2.5-103(1)(p).

427.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

428.  As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

429.  FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

430.  Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

431.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

432.  Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

433.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

434. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

435. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

436. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

437. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

438.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COLORADO COUNT XVI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-212)

439.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

440.   Plaintiff brings this Count on behalf of the Colorado Subclass.

441.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3); and is a "seller" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(d).

442.   With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

443.   The Class Vehicles are and were at all relevant times "goods" within the meaning Colo. Rev. Stat. § 4-2-105(1) and 4-2.5-103(1)(h).

444.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are

inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

445.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

446.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COLORADO COUNT XVII**

**UNJUST ENRICHMENT**
**(BASED ON COLORADO LAW)**

447.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

448.   Plaintiff brings this Count on behalf of the Colorado Subclass.

449.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

450.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

451. Thus, all Colorado Subclass members conferred a benefit on FCA.

452. It is inequitable for FCA to retain these benefits.

453. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

454. FCA knowingly accepted the benefits of its unjust conduct.

455. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**E.      Claims Brought on Behalf of the Florida Subclass**

**FLORIDA COUNT XVIII**

**VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*)**

456. Plaintiff Justine Andollo ("Plaintiff," for purposes of all Florida Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

457. Plaintiff brings this Count on behalf of the Florida Subclass.

458. Plaintiff and Class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

459. FCA engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

460.   The   FUDTPA   prohibits   "[u]nfair   methods   of   competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.204(1).

461.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

462.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

463.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

464.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the FUDTPA.

465.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

466.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Florida Subclass.

467.   FCA knew or should have known that its conduct violated the FUDTPA.

468.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

469.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

470.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

471.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Florida Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

472.   Plaintiff and the Florida Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the FUDTPA.

473.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the FUDTPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

474.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

475.   As a direct and proximate result of FCA's violations of the FUDTPA, Plaintiffs and the Florida Subclass have suffered injury-in-fact and/or actual damage.

476.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

180

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

477.   Plaintiff and the Florida Subclass are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1).

478.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

## FLORIDA COUNT XIX

### FRAUDULENT CONCEALMENT
### (BASED ON FLORIDA LAW)

479.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

480.   Plaintiff brings this Count on behalf of the Florida Subclass.

481.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

181

482.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

483.   FCA knew at the time it actively concealed this information that this information was material.

484.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

485.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

486.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

487.  Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

488.  As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

489.  FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## FLORIDA COUNT XX

## BREACH OF EXPRESS WARRANTY
### (FLA. STAT. § 672.313)

490.  Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

491.  Plaintiff brings this Count on behalf of the Florida Subclass.

492.  FCA is and was at all relevant times a merchant with respect to motor vehicles.

493.  In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for

a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

494.  As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

495.  FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

496.  Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

497.  FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

498.  Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

499.  Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

500.  Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

501.  Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

502.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to

185

FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

503.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

504.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## FLORIDA COUNT XXI

## UNJUST ENRICHMENT
## (BASED ON FLORIDA LAW)

505.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

506.   Plaintiff brings this Count on behalf of the Florida Subclass.

507.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

508.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

509.   Thus, all Florida Subclass members conferred a benefit on FCA.

510.   It is inequitable for FCA to retain these benefits.

511.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

512.   FCA knowingly accepted the benefits of its unjust conduct.

513.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**F.    Claims Brought on Behalf of the Georgia Subclass**

**GEORGIA COUNT XXII**

**VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390, ET SEQ.)**

514.   Plaintiff Erica Willis ("Plaintiff," for purposes of all Georgia Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

515.   Plaintiff brings this Count on behalf of the Georgia Subclass.

516.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have

187

sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

517.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

518.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

519.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

520.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Georgia FBPA.

521.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

522.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Georgia Subclass.

523.   FCA knew or should have known that its conduct violated the Georgia FBPA.

524.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

525. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

526. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

527. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Georgia Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

528.   Plaintiff and the Georgia Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Georgia FBPA.

529.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Georgia FBPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

530.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

531.   As a direct and proximate result of FCA's violations of the Georgia FBPA, Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

532.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

533.   Plaintiff and the Georgia Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code. Ann § 10-1-399(a).

534.   Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code. Ann § 10-1-399.

535.   On July 8, 2016, certain Plaintiffs sent a letter complying with Ga. Code. Ann § 10-1-399(b). Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiff and the Georgia Class are entitled.

## GEORGIA COUNT XXIII

## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (GA. CODE ANN. § 10-1-370, *ET SEQ.*)

536.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

537.   Plaintiff brings this Count on behalf of the Georgia Subclass.

538.   FCA, Plaintiff, and the Georgia Subclass are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann § 10-1-371(5).

539.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann § 10-1-372(a).

540.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

541.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

542.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

543.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Georgia UDTPA.

544.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

545.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Georgia Subclass.

546.   FCA knew or should have known that its conduct violated the Georgia UDTPA.

547. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

548. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

      a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

      b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

      c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

549. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

550.  FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Georgia Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

551.  Plaintiff and the Georgia Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Georgia UDTPA.

552.  FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Georgia UDTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

553.  FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

554.   As a direct and proximate result of FCA's violations of the Georgia UDTPA, Plaintiffs and the Georgia Subclass have suffered injury-in-fact and/or actual damage.

555.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

556.   Plaintiffs seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code. Ann § 10-1-373.

### GEORGIA COUNT XXIV

### FRAUD BY CONCEALMENT
### (BASED ON GEORGIA LAW)

557.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

558.   This claim is brought on behalf of the Georgia Subclass.

559.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied

Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

560.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

561.   FCA knew at the time it actively concealed this information that this information was material.

562.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

563.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

564.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

565.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

566.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

567.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## GEORGIA COUNT XXV

## BREACH OF EXPRESS WARRANTY
## (GA. CODE ANN. § 11-2-313)

568.   Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

569.   Plaintiff brings this Count on behalf of the Georgia Subclass.

570.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

571.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for

a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

572.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

573.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

574.   Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

575.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

576.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

577.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

578.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

579.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

580.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to

FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

581.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

582.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## GEORGIA COUNT XXVI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (GA. CODE ANN. § 11-2-314)

583.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

584.   Plaintiff brings this Count on behalf of the Georgia Subclass.

585.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

586.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the

ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

587. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

588. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## GEORGIA COUNT XXVII

## UNJUST ENRICHMENT
## (BASED ON GEORGIA LAW)

589. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

590. Plaintiff brings this Count on behalf of the Georgia Subclass.

591. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

592. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

593.    Thus, all Georgia Subclass members conferred a benefit on FCA.

594.    It is inequitable for FCA to retain these benefits.

595.    Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

596.    FCA knowingly accepted the benefits of its unjust conduct.

597.    As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**G.    Claims Brought on Behalf of the Illinois Subclass**

**ILLINOIS COUNT XXVIII**

**VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ*. AND 720 ILCS 295/1A)**

598.    Plaintiffs Kean McDonald and Lindsey Wells ("Plaintiffs," for purposes of all Illinois Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

599.    Plaintiffs bring this Count on behalf of the Illinois Subclass.

600.    Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

601.    Plaintiffs and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

602.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby."  815 ILCS 505/2.

603.   FCA participated in misleading, false, or deceptive practices that violated the Illinois CFA.  By failing to disclose and actively concealing that the Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Illinois CFA.

604.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of

any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

605.  FCA has known that the Defective Shifter was defectively designed and was not safe for at least two years, but concealed all of that information.

606.  FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

607.  By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in unfair and deceptive business practices in violation of the Illinois CFA.

608.  In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

609.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

610.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Illinois Subclass.

611.   FCA knew or should have known that its conduct violated the Illinois CFA.

612.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

613.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

207

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

614.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

615.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Illinois Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

616.   Plaintiffs and the Illinois Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Illinois CFA.

208

617.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Illinois CFA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

618.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

619.   As a direct and proximate result of FCA's violations of the Illinois CFA, Plaintiffs and the Illinois Subclass have suffered injury-in-fact and/or actual damage.

620.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

621.  Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Subclass seek monetary relief against FCA in the amount of actual damages, as well as

punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

622.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the 815 ILCS 505/1 *et seq.*

## ILLINOIS COUNT XXIX

## FRAUD BY CONCEALMENT
## (BASED ON ILLINOIS LAW)

623.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

624.   This claim is brought on behalf of the Illinois Subclass.

625.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

626.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

627.   FCA knew at the time it actively concealed this information that this information was material.

628. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

629. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiffs and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

630. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

631. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

632. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

633.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.  Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## ILLINOIS COUNT XXX

## VIOLATION OF IMPLIED WARRANTY OF MERCHANTABILITY
### (800 ILL. COMP STAT. 5/2-314 AND 5/2A-212)

634.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

635.   Plaintiffs bring this Count on behalf of the Illinois Subclass.

636.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

637.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-103(1)(p).

638.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter system was not adequately

designed, manufactured, and tested and does not include a safety override to prevent roll-away incidents.

639.  FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

640.  As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

### ILLINOIS COUNT XXXI

### UNJUST ENRICHMENT
### (BASED ON ILLINOIS LAW)

641.  Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

642.  Plaintiffs bring this Count on behalf of the Illinois Subclass.

643.  FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

644.  FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

645.   Thus, all Illinois Subclass members conferred a benefit on FCA.

646.   It is inequitable for FCA to retain these benefits.

647.   Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

648.   FCA knowingly accepted the benefits of its unjust conduct.

649.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## H.   Claims Brought on Behalf of the Iowa Subclass

## IOWA COUNT XXXII

## VIOLATIONS OF THE PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
## (IOWA CODE § 714H.1, *ET SEQ.*)

650.   Plaintiff Pamela Havnen ("Plaintiff," for purposes of all Iowa Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

651.   Plaintiff brings this Count on behalf of the Iowa Subclass.

652.   Defendant is a "person" under Iowa Code § 714H.2(7).

653.   Plaintiff and the Iowa Subclass are "consumers" as that term is defined by Iowa Code § 714H.2(3), who purchased or leased one or more Class Vehicles.

654.   The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know

is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale or lease of consumer merchandise." Iowa Code § 714H.3.

655.   FCA participated in misleading, false, or deceptive practices that violated the Iowa CFA. By failing to disclose and actively concealing that the Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Iowa CFA.

656.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

657.  FCA has known that the Defective Shifter was defectively designed and was not safe for at least two years, but concealed all of that information.

658.  FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

659.  By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in unfair and deceptive business practices in violation of the Iowa CFA.

660.  In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

661.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA

brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

662. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Iowa Subclass.

663. FCA knew or should have known that its conduct violated the Iowa CFA.

664. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

665. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

666.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

667.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Iowa Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

668.   Plaintiff and the Iowa Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Iowa CFA.

669.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Iowa CFA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a

result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

670.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

671.   As a direct and proximate result of FCA's violations of the Iowa CFA, Plaintiff and the Iowa Subclass have suffered injury-in-fact and/or actual damage.

672.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

673.   Pursuant to Iowa Code § 714H.5, Plaintiff and the Iowa Subclass seek an order enjoining FCA's unfair and/or deceptive acts or practices; actual damages; in addition to an award of actual damages, statutory damages up to three times the amount of actual damages awarded as a result of FCA's willful and wanton disregard for the rights and safety of others; attorneys' fees; and such other equitable relief as the Court deems necessary to protect the public from further violations of the Iowa CFA.

# IOWA COUNT XXXIII

## FRAUDULENT CONCEALMENT
### (BASED ON IOWA LAW)

674. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

675. This claim is brought on behalf of the Iowa Subclass.

676. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

677. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

678. FCA knew at the time it actively concealed this information that this information was material.

679. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

680. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

681.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

682.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

683.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

684.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## IOWA COUNT XXXIV

## BREACH OF EXPRESS WARRANTY
## (IOWA CODE § 554.2313 AND 554.13210)

685.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

686.   Plaintiff brings this Count on behalf of the Iowa Subclass.

687.   FCA is and was at all relevant times a merchant with respect to motor vehicles under Iowa Code § 554.2104.

688.   With respect to leases, FCA is and was at all relevant times a "lessors" of motor vehicles under Iowa Code § 554.13103(1)(p).

689.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

690.   FCA's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a defective Defective Shifter from FCA.

222

691. FCA breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

692. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

693. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

694. Also, as alleged in more detail herein, at the time that FCA warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to FCA's Limited Warranty and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

695. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

696. Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, as set forth in Iowa Code § 554.2608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other Class members of the purchase price of all Class Vehicles currently owned and for such other incidental and consequential damages as allowed under Iowa Code §§ 554.2711 and 554.2608.

697. FCA was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the other Class members before or within a reasonable amount of time after FCA issued the recall and the allegations of Class Vehicle defects became public.

698.   As a direct and proximate result of FCA's breach of express warranty,
Plaintiff and the other Class members have been damaged in an amount to be
determined at trial.

## IOWA COUNT XXXV

## UNJUST ENRICHMENT
## (BASED ON IOWA LAW)

699.   Plaintiff incorporates by reference all allegations of the preceding
paragraphs as though fully set forth herein.

700.   Plaintiff brings this Count on behalf of the Iowa Subclass.

701.   FCA has received and retained a benefit from Plaintiff and inequity
has resulted.

702.   FCA has benefitted from selling and leasing defective cars whose
value was artificially inflated by FCA's concealment of the defective Defective
Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been
forced to pay other costs.

703.   Thus, all Iowa Subclass members conferred a benefit on FCA.

704.   It is inequitable for FCA to retain these benefits.

705.   Plaintiff and the Class were not aware of the true facts about the Class
Vehicles, and did not benefit from FCA's conduct.

706.   FCA knowingly accepted the benefits of its unjust conduct.

707.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## I.   Claims Brought on Behalf of the Louisiana Subclass

### LOUISIANA COUNT XXXVI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524)

708.   Plaintiff Dustin Stewart ("Plaintiff," for purposes of all Louisiana Subclass Counts) incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

709.   Plaintiff brings this Count on behalf of the Louisiana Subclass.

710.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

711.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

712.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely

226

monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

713. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**J.    Claims Brought on Behalf of the Maryland Subclass**

**MARYLAND COUNT XXXVII**

**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE COM. LAW § 13-101, ET SEQ.)**

714. Plaintiff Charles Frank Schultz ("Plaintiff," for purposes of all Maryland Subclass Counts) incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

715. Plaintiff bring this Count on behalf of the Maryland Subclass.

716. FCA, Plaintiff, and the Maryland Subclass are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

717. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good. MD. COM. LAW CODE § 13-303. FCA participated in misleading, false, or deceptive acts that violated the Maryland CPA.

718. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and

otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

719.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

720.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

721.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Maryland CPA.

722.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

723.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Maryland Subclass.

724.   FCA knew or should have known that its conduct violated the Maryland CPA.

725.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

726.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

229

      c.     Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

727. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

728. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Maryland Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

729. Plaintiff and the Maryland Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Maryland CPA.

730.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Maryland CPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

731.   FCA's violations present a continuing risk to Plaintiff as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

732.   As a direct and proximate result of FCA's violations of the Maryland CPA, Plaintiff and the Maryland Subclass have suffered injury-in-fact and/or actual damage.

733. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

734. Pursuant to MD. CODE COM. LAW § 13-408, Plaintiff and the Maryland Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## MARYLAND COUNT XXXVIII

## FRAUDULENT CONCEALMENT
## (BASED ON MARYLAND LAW)

735.   Plaintiff incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

736.   This claim is brought on behalf of the Maryland Subclass.

737.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

738.   FCA further affirmatively concealed from Plaintiffs in advertisin and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

739.   FCA knew at the time it actively concealed this information that this information was material.

740.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

741.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

742.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

743.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

744.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

745.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## MARYLAND COUNT XXXIX

## BREACH OF EXPRESS WARRANTY
### (MD. CODE COM. LAW §2-313)

746.   Plaintiff incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

747.   Plaintiff bring this Count on behalf of the Maryland Subclass.

748.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year reduced, its powertrain warranty to five years or 60,000 miles).

749.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

750.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

751.   Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff

234

and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

752.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

753.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

754.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

755.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

756.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently

concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

757. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

758. Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for a return to Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

759. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

760. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## MARYLAND COUNT XL

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MD. CODE COM. LAW § 2-314)

761. Plaintiff incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

762. Plaintiff bring this Count on behalf of the Maryland Subclass.

763. FCA is and was at all relevant times a merchant with respect to motor vehicles.

764. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

765. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

766.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## MARYLAND COUNT XLI

### UNJUST ENRICHMENT
### (BASED ON MARYLAND LAW)

767.   Plaintiff incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

768.   Plaintiff bring this Count on behalf of the Maryland Subclass

769.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

770.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

771.   Thus, all Maryland Subclass members conferred a benefit on FCA.

772.   It is inequitable for FCA to retain these benefits.

773.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

774.   FCA knowingly accepted the benefits of its unjust conduct.

775.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## K.   Claims Brought on Behalf of the Massachusetts Subclass

### MASSACHUSETTS COUNT XLII

### DECEPTIVE ACTS OR PRACTICES PROHIBITED BY MASSACHUSETTS LAW
### (MASS. GEN. LAWS CH. 93A, §1, *ET SEQ.*)

776.   Plaintiffs Bernadine Hartt, Scott Michael Youngstrom Jr. and Todd Machtley ("Plaintiffs," for purposes of all Massachusetts Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

777.   Plaintiffs bring this Count on behalf of the Massachusetts Subclass.

778.   Defendant is a "person" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

779.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."   Mass. Gen. Laws ch. 93A, § 2.  FCA participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

780.   FCA participated in misleading, false, or deceptive practices that violated the Massachusetts Act.  By failing to disclose and actively concealing that the Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety

and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Massachusetts Act.

781.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

782.   FCA has known that the Defective Shifter was defectively designed and was not safe for at least two years, but concealed all of that information.

783.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

784.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in unfair and deceptive business practices in violation of the Massachusetts Act.

785.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

786.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

787.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Massachusetts Subclass.

788.   FCA knew or should have known that its conduct violated the Massachusetts Act.

789.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

790.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

791.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

792.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Massachusetts Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

793.   Plaintiffs and the Massachusetts Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.   Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Massachusetts Act.

794.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Massachusetts Act.   All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

795.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

796.   As a direct and proximate result of FCA's violations of the Massachusetts Act, Plaintiff and the Massachusetts Subclass have suffered injury-in-fact and/or actual damage.

797.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

243

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

798.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Massachusetts Subclass seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Subclass member.  Because FCA's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Subclass member, up to three times actual damages, but no less than two times actual damages.

799.   Plaintiffs also seek an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees costs, and any other just and proper relief available under the Massachusetts Act.

800.   On July 8, 2016, certain Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3).  Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Subclass are entitled.

801.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## MASSACHUSETTS COUNT XLIII

## UNJUST ENRICHMENT
### (BASED ON MASSACHUSETTS LAW)

802.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

803.   Plaintiffs bring this Count on behalf of the Massachusetts Subclass.

804.   FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

805.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

806.   Thus, all Massachusetts Subclass members conferred a benefit on FCA.

807.   It is inequitable for FCA to retain these benefits.

808.   Plaintiffs and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

809.   FCA knowingly accepted the benefits of its unjust conduct.

810.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**L.    Claims Brought on Behalf of the Michigan Subclass**

**MICHIGAN COUNT XLIV**

**VIOLATIONS OF THE MICHIGAN CONSUMER PROTECTION ACT
(MICH. COMP. LAWS § 445.903, *ET SEQ.*)**

811.   Plaintiff Melvin Scott ("Plaintiff," for purposes of all Michigan Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

812.   Plaintiff brings this Count on behalf of the Michigan Subclass.

813.   Plaintiff and Class members are "persons" within the meaning of MICH. COMP. LAWS § 445.902(1)(d).

814.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce  . . . ."  MICH. COMP. LAWS § 445.903(1).  FCA engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:   "(c) Representing that goods or services have … characteristics . . . that they do not have  . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which

tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1). By failing to disclose and actively concealing that the Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices prohibited by the Michigan CPA.

815. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein was unsafe, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

816. FCA knew it had installed a defectively designed Defective Shifter, and knew that the Defective Shifter was not safe, as advertised, and had no

override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

817.  FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

818.  By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Michigan CPA.

819.  In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

820.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class

members, about the true performance of the Class Vehicles, the quality of the FCA

brand, the devaluing of safety and performance at FCA, and the true value of the

Class Vehicles.

821.   FCA intentionally and knowingly misrepresented material facts

regarding the Class Vehicles with an intent to mislead Plaintiff and the Michigan

Subclass.

822.   FCA knew or should have known that its conduct violated the

Michigan CPA.

823.   As alleged above, FCA made material statements about the safety and

utility of the Class Vehicles and the FCA brand that were either false or

misleading.

824.   FCA owed Plaintiff a duty to disclose the true safety, performance,

and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because FCA:

   a.   Possessed exclusive knowledge that it valued profits and cost-
        cutting over safety and performance, and that it was
        manufacturing, selling, and distributing vehicles throughout the
        United States that included a defectively designed Defective
        Shifter and did not perform as advertised;

   b.   Intentionally concealed the foregoing from Plaintiff and the
        Class; and/or

   c.   Made incomplete representations about the safety and
        performance of the Class Vehicles generally, and the defective
        Defective Shifter in particular, while purposefully withholding

material facts from Plaintiffs and the Class that contradicted these representations.

825.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

826.  FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Michigan Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

827.  Plaintiff and the Michigan Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Michigan CPA.

828.  FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Michigan CPA.  All owners of the Class

Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

829.   FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

830.   As a direct and proximate result of FCA's violations of the Michigan CPA, Plaintiff and the Michigan Subclass have suffered injury-in-fact and/or actual damage.

831.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

832.   Plaintiff seeks injunctive relief to enjoin FCA from continuing its unfair and deceptive acts; monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Subclass member;

reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

833. Plaintiff also seeks punitive damages against FCA because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. FCA intentionally and willfully misrepresented the safety and reliability of the Class Vehicles, concealed material facts that only they knew, and repeatedly promised Plaintiffs and Michigan Subclass Members that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles. FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## MICHIGAN COUNT XLV

## FRAUDULENT CONCEALMENT
## (BASED ON MICHIGAN LAW)

834. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

835. Plaintiff brings this Count on behalf of the Michigan Subclass.

836. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

837.   FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

838.   FCA knew at the time it actively concealed this information that this information was material.

839.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

840.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

841.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

842. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

843. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

844. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## MICHIGAN COUNT XLVI

### BREACH OF EXPRESS WARRANTY
### (MICH. COMP. LAWS ANN.440.2313 AND 440.2860)

845. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

846. Plaintiff brings this Count on behalf of the Michigan Subclass.

847. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS ANN. 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

848. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under MICH. COMP. LAWS ANN. 440.2803(1)(p), and 440.2860.

849. The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS ANN. 440.2105(1) and 440.2803(1)(h).

850. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year reduced, its powertrain warranty to five years or 60,000 miles).

851. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

852. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

853. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform

Plaintiff and Class members that the Class Vehicles were defectively designed, and
failed to fix the defectively designed Defective Shifter free of charge.

854.   FCA breached the express warranty promising to repair and correct a
manufacturing defect or materials or workmanship of any part supplied by FCA.
FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class
Vehicles' materials and workmanship defects.

855.   Affording FCA a reasonable opportunity to cure its breach of written
warranties would be unnecessary and futile here.

856.   Furthermore, the limited warranty promising to repair and/or correct a
manufacturing defect fails in its essential purpose because the contractual remedy
is insufficient to make Plaintiff and Class members whole, and because FCA has
failed and/or has refused to adequately provide the promised remedies within a
reasonable time.

857.   Accordingly, recovery by Plaintiff and the other Class members is not
limited to the limited warranty promising to repair and/or correct a manufacturing
defect, and Plaintiff, individually and on behalf of the other Class members, seeks
all remedies as allowed by law.

858.   Also, as alleged in more detail herein, at the time FCA warranted and
sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's
warranties and were inherently defective and FCA wrongfully and fraudulently

concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

859.  Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

860.  Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for a return to Plaintiff and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

861.  FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

862. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## MICHIGAN COUNT XLVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS § 440.314)

863. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

864. Plaintiff brings this Count on behalf of the Michigan Subclass.

865. FCA was a merchant with respect to motor vehicles within the meaning of MICH. COMP. LAWS § 440.2314(1).

866. Under MICH. COMP. LAWS § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff purchased or leased the Class Vehicles.

867. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

258

868.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

869.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## MICHIGAN COUNT XLVIII

### UNJUST ENRICHMENT
### (BASED ON MICHIGAN LAW)

870.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

871.   Plaintiff brings this Count on behalf of the Michigan Subclass.

872.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

873.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

874.   Thus, all Michigan Subclass members conferred a benefit on FCA.

875.   It is inequitable for FCA to retain these benefits.

876.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

877.   FCA knowingly accepted the benefits of its unjust conduct.

878.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### M.   Claims Brought on Behalf of the Minnesota Subclass

### MINNESOTA COUNT XLIX

### VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
### (MINN. STAT. § 325F.68, *ET SEQ.*)

879.   Plaintiff Corinn Berken ("Plaintiff," for purposes of all Minnesota Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

880.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

881.   The Affected Vehicles constitute "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

882.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." MINN. STAT. § 325F.69(1).

883.   FCA's actions as set forth herein occurred in the conduct of trade or commerce.

884.   In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

885.   FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

886.   FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

887.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable,

and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota CFA.

888.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

889.  FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Minnesota Subclass.

890.  FCA knew or should have known that its conduct violated the Minnesota CFA.

891.  As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

892.  FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

        a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

893.  Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

894.  FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Minnesota Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

895.  Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Minnesota CFA.

896.   FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Minnesota CFA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

897.   FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

898.   As a direct and proximate result of FCA's violations of the Minnesota CFA, Plaintiffs and the Minnesota Subclass have suffered injury-in-fact and/or actual damage.

899.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

900.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

901.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## MINNESOTA COUNT L

### VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48, *ET SEQ.*)

902.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

903.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

904.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9)

advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

905. FCA's actions as set forth herein occurred in the conduct of trade or commerce.

906. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

907. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

908. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

909.   By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Minnesota CFA.

910.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

911.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Minnesota Subclass.

912.   FCA knew or should have known that its conduct violated the Minnesota DTPA.

913.   As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

914.   FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

      a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

      b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

      c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

915.   Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

916.   FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Minnesota Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

917. Plaintiff and the Minnesota Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Minnesota DTPA.

918. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Minnesota DTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

919. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

920. As a direct and proximate result of FCA's violations of the Minnesota DTPA, Plaintiffs and the Minnesota Subclass have suffered injury-in-fact and/or actual damage

921. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

922.   Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

923.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) give the clear and convincing evidence that FCA's acts show deliberate disregard for the rights or safety of others.

## MINNESOTA COUNT LI

## FRAUDULENT CONCEALMENT
### (BASED ON MINNESOTA LAW)

924.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

925.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

926.   FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

927.   FCA further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

928.   FCA knew at the time it actively concealed this information that this information was material.

929.   The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

930.   FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

931.   The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

932.   Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

933.   As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

934.   FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## MINNESOTA CLAIM LII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MINN. STAT. § 336.2-314)

935.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

936.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

937.   FCA was a merchant with respect to motor vehicles within the meaning of Minn. Stat. § 336.2-104(1).

938.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Minn. Stat § 336.2A-103(1)(p) and § 336.2A-210.

939.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and 336.2A-103(1)(h).

940.   Under Minn. Stat. § 336.2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Affected Vehicles. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

941.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

942.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## MINNESOTA COUNT LIII

### BREACH OF EXPRESS WARRANTY
### (MINN. STAT. § 336.2-313, AND § 336.2A-210)

943.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

944.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

945.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-313(1)

946.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Minn. Stat § 336.2A-103(1)(p) and § 336.2A-210.

947.   The Affected Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105 and Minn. Stat § 336.2A-103(1)(h)

948.   FCA is and was at all relevant times a merchant with respect to motor vehicles.

949.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter

274

assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

950.   As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

951.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

952.   Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

953.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

954.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

955.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy

is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

956.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

957.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

958.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

959.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

960.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**MINNESOTA COUNT LIV**

**UNJUST ENRICHMENT**
**(BASED ON MINNESOTA LAW)**

961.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

962.   Plaintiff brings this Count on behalf of the Minnesota Subclass.

963.   FCA has received and retained a benefit from Plaintiff and inequity has resulted.

964.   FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

965.   Thus, all Minnesota Subclass members conferred a benefit on FCA.

966.   It is inequitable for FCA to retain these benefits.

967.   Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

968.   FCA knowingly accepted the benefits of its unjust conduct.

969.   As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### N.   Claims Brought on Behalf of the Missouri Subclass

### MISSOURI COUNT LV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (MO. REV. STAT. § 400.2-314)

970.   Plaintiff Taylor Brooks ("Plaintiff," for purposes of all Missouri Subclass Counts) incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

971.   Plaintiff brings this Count on behalf of the Missouri Subclass.

972.   FCA was a merchant with respect to motor vehicles within the meaning of MO. REV. STAT. § 400.2-314(1).

973.   Under MO. REV. STAT. § 400.2-314, a warranty that the Affected Vehicles were in merchantable condition was implied by law in the transactions when Plaintiffs purchased or leased their Affected Vehicles. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class

Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

974.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

975.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## MISSOURI COUNT LVI

## BREACH OF EXPRESS WARRANTY
### (MO. STAT. § 400.2-313, AND § 400.2A-210)

976.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

977.   Plaintiff brings this Count on behalf of the Missouri Class.

978.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-313.

979.   With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Stat. § 400.2A-103(1)(p) and § 400.2A-210.

980. The Affected Vehicles are and were at all relevant times "goods" within the meaning of Mo. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

981. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

982. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

983. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

984. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

985.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

986.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

987.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

988.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

989.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class

281

members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

990.   Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

991.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

992.   As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## MISSOURI COUNT LVII

## UNJUST ENRICHMENT
## (BASED ON MISSOURI LAW)

993.   Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

994.   Plaintiff brings this Count on behalf of the Missouri Subclass.

995. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

996. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

997. Thus, all Missouri Subclass members conferred a benefit on FCA.

998. It is inequitable for FCA to retain these benefits.

999. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1000. FCA knowingly accepted the benefits of its unjust conduct.

1001. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

O.    **Claims Brought on Behalf of the Nevada Subclass**

**NEVADA COUNT LVIII**

**VIOLATIONS OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903, *ET SEQ*.)**

1002. Plaintiff Eliam M. Marrero Bernal ("Plaintiff," for purposes of all Nevada Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1003. Plaintiff brings this Count on behalf of the Nevada Subclass.

1004. The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT. § 598.0903, *et seq.*, prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1005. FCA engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Class Vehicles has been supplied in

284

accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

1006. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1007. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1008. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

1009. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1010. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Nevada DTPA.

1011. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1012. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1013. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Nevada Subclass.

1014. FCA knew or should have known that its conduct violated the Nevada DTPA.

1015. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1016. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

1017. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the

stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1018. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Nevada Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1019. Plaintiff and the Nevada Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Nevada DTPA.

1020. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Nevada DTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1021. FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1022. As a direct and proximate result of FCA's violations of the Nevada DTPA, Plaintiff and the Nevada Subclass have suffered injury-in-fact and/or actual damage.

1023. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1024. Accordingly, Plaintiff and the Nevada Subclass seek their actual damages, punitive damages, an order enjoining FCA's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act.  NEV. REV. STAT. § 41.600.

## NEVADA COUNT LIX

## FRAUDULENT CONCEALMENT
## (BASED ON NEVADA LAW)

1025. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1026. Plaintiff brings this Count on behalf of the Nevada Subclass.

1027. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1028. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1029. FCA knew at the time it actively concealed this information that this information was material.

1030. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1031. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1032. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1033. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1034. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1035. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages

## NEVADA COUNT LX

### BREACH OF EXPRESS WARRANTY
### (NEV. REV. STAT. § 104.2313 AND 104A.2210)

1036. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1037. Plaintiff brings this Count on behalf of the Nevada Subclass.

291

1038. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. § 104.2104(1) and a "seller" of motor vehicles under § 104.2313(1).

1039. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p), and § 104A.2210.

1040. The Affected Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. § 104.2105(1) and Nev. Rev. Stat. § 104A.2103(1)(h).

1041. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1042. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1043. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1044. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1045. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1046. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1047. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1048. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing

293

defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1049. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1050. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1051. Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and the return to Plaintiff and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

1052. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1053. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## NEVADA COUNT LXI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (NEV. REV. STAT. § 104.2314)

1054. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1055. Plaintiff brings this Count on behalf of the Nevada Subclass.

1056. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1057. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely

monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1058. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## NEVADA COUNT LXII

### UNJUST ENRICHMENT
### (BASED ON NEVADA LAW)

1059. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1060. Plaintiff brings this Count on behalf of the Nevada Subclass.

1061. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1062. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1063. Thus, all Nevada Subclass members conferred a benefit on FCA.

1064. It is inequitable for FCA to retain these benefits.

1065. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1066. FCA knowingly accepted the benefits of its unjust conduct.

1067. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

P.     **Claims Brought on Behalf of the New Jersey Subclass**

**NEW JERSEY COUNT LXIII**

**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)**

1068. Plaintiff Clare Colrick ("Plaintiff," for purposes of all New Jersey Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1069. Plaintiff brings this Count on behalf of herself and the New Jersey Subclass.

1070. FCA, Plaintiff, and the New Jersey Subclass Members are "person[s]" under the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1(d).

1071. FCA's engaged in "sales" of "merchandise" within the meaning of N.J. Stat § 56:8-1(c), (e). FCA's actions as set forth herein occurred in the conduct of trade or commerce.

1072. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq*. ("New Jersey CFA"), prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The conduct FCA as set forth herein constitutes unfair or deceptive acts or practices.

1073. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1074. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

1075. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1076. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that

valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the New Jersey CFA.

1077. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1078. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the New Jersey Subclass.

1079. FCA knew or should have known that its conduct violated the New Jersey CFA.

1080. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1081. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the

United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.  Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.  Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1082. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1083. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the New Jersey Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1084. Plaintiff and the New Jersey Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either

300

would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the New Jersey CFA.

1085. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the New Jersey CFA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1086. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1087. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1088. As a direct and proximate result of FCA's violations of the New Jersey CFA, Plaintiffs and the New Jersey Subclass have suffered injury-in-fact and/or actual damage.

1089. Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1090. Defendant had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the New Jersey CFA in the course of its business.

1091. Defendant's violations present a continuing risk to the Plaintiffs as well as the general public.  Defendant's unlawful acts and practices complained herein affect the public interest.

1092. As a result of the foregoing wrongful conduct of FCA, Plaintiffs and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to, actual and statutory damages, treble damages, and order enjoining FCA's deceptive and unfair conduct, costs and reasonable attorneys' fees under N.J. Stat. § 56:8-19, and all other just and appropriate relief.

## NEW JERSEY COUNT LXIV

## FRAUDULENT CONCEALMENT
## (BASED ON NEW JERSEY LAW)

1093. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1094. Plaintiff brings this Count on behalf of the New Jersey Subclass.

1095. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1096. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1097. FCA knew at the time it actively concealed this information that this information was material.

1098. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1099. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material

representations that the Class Vehicles they were purchasing were safe and free from defects.

1100. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1101. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1102. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1103. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages,

## NEW JERSEY COUNT LXV

### BREACH OF EXPRESS WARRANTY
### (N.J. STAT. ANN. § 12A:2-313 AND 12A:2A-210)

1104. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1105. Plaintiff brings this Count on behalf of the New Jersey Subclass.

1106. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104  and a "seller" of motor vehicles under § 12A:2-313.

1107. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under NJ. Stat. Ann. § 12A:2A-103(1)(p), and § 12A:2A-210.

1108. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann. § 12A:2-104(1) and § 12A:2A-103(1)(h).

1109. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class

Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1110. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1111. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1112. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1113. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1114. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1115. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has

failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1116. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1117. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1118. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1119. Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, and for the return to Plaintiffs and the other Class members of the purchase price of all Class Vehicles currently owned, and for such other incidental and consequential damages as allowed.

1120. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1121. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**NEW JERSEY COUNT LXVI**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.J. STAT. ANN. § 12-A:2-314)**

1122. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1123. Plaintiff brings this Count on behalf of the New Jersey Subclass.

1124. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1125. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at

all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1126. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1127. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**NEW JERSEY COUNT LXVII**

**UNJUST ENRICHMENT**
**(BASED ON NEW JERSEY LAW)**

1128. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1129. Plaintiff brings this Count on behalf of the New Jersey Subclass.

1130. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1131. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1132. Thus, all New Jersey Subclass members conferred a benefit on FCA.

1133. It is inequitable for FCA to retain these benefits.

1134. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1135. FCA knowingly accepted the benefits of its unjust conduct.

1136. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**Q.    Claims Brought on Behalf of the New York Subclass**

**NEW YORK COUNT LXVIII**

**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW § 349)**

1137. Plaintiffs John Lynd and Janella Mack("Plaintiffs," for purposes of all New York Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1138. Plaintiffs bring this Count on behalf of the New York Subclass.

1139. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

1140. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk of the faulty and defective Defective Shifters

310

in Class Vehicles as described above.   Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

1141. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1142. Because FCA's deception takes place in the context of automobile safety, its deception affects the public interest.   Further, FCA's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

1143. FCA's conduct proximately caused injuries to Plaintiffs and the other Class members.

1144. Plaintiffs and the other Class members were injured as a result of FCA's conduct in that Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Defective Vehicles have suffered a diminution in value.   These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

## NEW YORK COUNT LXIX

## VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### (N.Y. GEN. BUS. LAW § 350)

1145. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1146. Plaintiffs bring this Count on behalf of the New York Subclass.

1147. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"   False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity…."  N.Y. Gen. Bus. Law § 350-a.

1148. FCA caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

1149. FCA has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the dangerous risk of the faulty and defective Defective Shifter in Class Vehicles as described above, were material and likely to deceive a reasonable consumer.

1150. Plaintiffs and the other Class members have suffered injury, including the loss of money or property, as a result of FCA's false advertising.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the representations and/or omissions of FCA with respect to the safety, quality, functionality, and reliability of the Class Vehicles.  FCA's representations turned out to be untrue because the Class Vehicles are inherently defective in that the Defective Shifter is monostable, yet does not have a safety override that automatically puts the car in "park" if the driver's door is opened and the foot brake's released.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

1151. Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

1152. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1153. Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful and/or deceptive practices. Plaintiffs and the other Class members are also entitled to recover their actual damages or $500, whichever is greater.  Because FCA acted willfully or knowingly, Plaintiffs and the other Class members are entitled to recover three times actual damages, up to $10,000.

**NEW YORK COUNT LXX**

**BREACH OF EXPRESS WARRANTY**
**(N.Y. U.C.C. § 2-313)**

1154. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1155. Plaintiffs bring this Count on behalf of the New York Subclass.

1156. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1157. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class

Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1158. FCA's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with a defective Z Shifter from FCA.

1159. FCA breached the express warranty to repair and adjust to correct defects in materials and workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1160. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1161. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

1162. Also, as alleged in more detail herein, at the time that FCA warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to

FCA's Limited Warranty and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1163. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

1164. Finally, due to FCA's breach of warranty as set forth herein, Plaintiffs and the other Class members assert as an additional and/or alternative remedy, as set forth in N.Y. U.C.C. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Class Vehicles currently owned for such other incidental and consequential damages as allowed under N.Y. U.C.C. §§ 2-711 and 2-608.

1165. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint.

1166. As a direct and proximate result of FCA's breach of express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## NEW YORK COUNT LXXI

## FRAUDULENT CONCEALMENT
## (BASED ON NEW YORK LAW)

1167. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1168. Plaintiffs bring this Count on behalf of the New York Subclass.

1169. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1170. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had a design defect which can allow the car to roll away from its parked position, and would not perform and operate properly when driven in normal usage.

1171. FCA knew at the time it actively concealed this information that this information was material.

1172. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1173. FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that that the Class Vehicles had a design defect which can allow the car to roll away from its parked position, because Plaintiffs and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1174. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1175. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

1176. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

1177. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1178. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## NEW YORK COUNT LXXII

### UNJUST ENRICHMENT
### (BASED ON NEW YORK LAW)

1179. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1180. Plaintiffs bring this Count on behalf of the New York Subclass.

1181. FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

1182. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1183. Thus, all New York Subclass members conferred a benefit on FCA.

1184. It is inequitable for FCA to retain these benefits.

1185. Plaintiffs and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1186. FCA knowingly accepted the benefits of its unjust conduct.

1187. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### R.   Claims Brought on Behalf of the North Carolina Subclass

### NORTH CAROLINA COUNT LXXIII

### VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (N.C. GEN. STAT. §§ 75-1.1, *ET SEQ.*)

1188. Plaintiff Jacob Gunnells ("Plaintiff," for purposes of all North Carolina Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1189. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1190. North Carolina's Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The NCUDTPA provides a private

right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA. N.C. GEN. STAT. § 75-16.

1191. FCA's acts and practices complained of herein were performed in the course of FCA's trade or business and thus occurred in or affected "commerce," as defined in N.C. GEN. STAT. § 75-1.1(b).

1192. In the course of its business, FCA willfully failed to disclose and actively concealed that the defective Defective Shifter discussed herein was unsafe and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, FCA engaged in unfair and deceptive trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

1193. FCA's conduct proximately caused injuries to Plaintiff and the other Class members.

1194. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the

321

stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1195. FCA acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

1196. Plaintiff and the other Class members were injured as a result of FCA's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

1197. Plaintiff, individually and on behalf of the other Class members, seek treble damages pursuant to N.C. GEN. STAT. § 75-16, and an award of attorneys' fees pursuant to N.C. GEN. STAT. § 75-16.1.

## NORTH CAROLINA COUNT LXXIV

## FRAUDULENT CONCEALMENT
## (BASED ON NORTH CAROLINA LAW)

1198. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1199. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1200. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied

Plaintiff and the other Class members information that is highly relevant to their
purchasing decision.

1201. FCA further affirmatively concealed from Plaintiff in advertising and
other forms of communication, including standard and uniform material provided
with each car, that the Class Vehicles it was selling had a design defect which can
allow the car to roll away from its parked position, and would not perform and
operate properly when driven in normal usage.

1202. FCA knew at the time it actively concealed this information that this
information was material.

1203. The Class Vehicles purchased or leased by Plaintiff and the other
Class members were, in fact, defective, unsafe, and unreliable because the Class
Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1204. FCA had a duty to disclose that these Class Vehicles were defective,
unsafe, and unreliable in that that the Class Vehicles had a design defect which can
allow the car to roll away from its parked position, because Plaintiff and the other
Class members relied on FCA's material representations that the Class Vehicles
they were purchasing were safe and free from defects.

1205. The aforementioned concealment was material because if it had been
disclosed Plaintiff and the other Class members would not have bought or leased

the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1206. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

1207. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

1208. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1209. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## NORTH CAROLINA COUNT LXXV

### BREACH OF EXPRESS WARRANTY
### (N.C. GEN. STAT. § 25-2-313 AND § 25-2A-210)

1210. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1211. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1212. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. GEN. STAT. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-313(1).

1213. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under N.C. GEN. STAT. § 25-2A-103(1)(p) and § 25-2A-210.

1214. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. GEN. STAT. § 25-2-105(1) and N.C. GEN. STAT. § 25-2A-103(1)(h).

1215. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class

Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1216. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1217. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1218. Plaintiff and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1219. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1220. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1221. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class members whole and because FCA has

failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1222. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1223. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1224. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1225. Finally, due to FCA's breach of warranty as set forth herein, Plaintiff and the other Class members assert as an additional and/or alternative remedy, revocation of acceptance of the goods, the return to Plaintiff and the other Class members of the purchase price of all Class Vehicles currently owned, and such other incidental and consequential damages as allowed.

1226. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1227. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## NORTH CAROLINA COUNT LXXVI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT. § 25-2-314)

1228. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1229. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1230. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1231. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at

all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1232. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1233. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## NORTH CAROLINA COUNT LXXVII

### UNJUST ENRICHMENT
### (BASED ON NORTH CAROLINA LAW)

1234. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1235. Plaintiff brings this Count on behalf of the North Carolina Subclass.

1236. FCA has received and retained a benefit from Plaintiffs and inequity has resulted.

1237. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1238. Thus, all North Carolina Subclass members conferred a benefit on FCA.

1239. It is inequitable for FCA to retain these benefits.

1240. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1241. FCA knowingly accepted the benefits of its unjust conduct.

1242. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### S.    Claims Brought on Behalf of the Ohio Subclass

### OHIO COUNT LXXVIII

### VIOLATIONS OF THE CONSUMER SALES PRACTICES ACT
### (OHIO REV. CODE § 1345.01, *ET SEQ.*)

1243. Plaintiffs Danielle and Joby Hackett ("Plaintiffs," for purposes of all Ohio Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1244. Plaintiffs bring this Count on behalf of the Ohio Subclass.

1245. Plaintiffs and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, OHIO REV. CODE § 1345.01 ("OCSPA").  FCA is a "supplier" as defined by the OCSPA.  Plaintiffs' and the

other Ohio Subclass members' purchases or leases of the Class Vehicles were "consumer transactions" as defined by the OCSPA.

1246. By willfully failing to disclose and actively concealing the defective Defective Shifter, FCA engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Class Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

1247. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1248. FCA knew it had installed a defective Defective Shifter and knew that the Defective Shifter did not operate safely, as advertised.  FCA knew this for at least two years, but concealed all of that information.

1249. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1250. By failing to disclose that the defective Defective Shifter did not operate safely and did not include a safety override to prevent roll-away incidents, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the OCSPA.

1251. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicle with Defective Shifter, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1252. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Ohio Subclass.

1253. FCA knew or should have known that its conduct violated the OCSPA.

1254. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1255. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.  Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;
>
> b.  Intentionally concealed the foregoing from Plaintiffs and the Class; and/or
>
> c.  Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1256. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of the Class Vehicle with Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1257. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of FCA in

this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Organization, Inc*. (OPIF #10002347);

g.   *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc*. (OPIF #10001586);

h.   *State ex rel. William J. Brown v. Harold Lyons, et al*. (OPIF #10000304);

i.   *Brinkman v. Mazda Motor of America, Inc*. (OPIF #10001427);

j.   *Khouri v. Don Lewis* (OPIF #100001995);

k.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

334

m.    *Brown v. Spears* (OPIF #10000403).

1258. As a result of its violations of the OCSPA, as detailed above, FCA caused actual damage to Plaintiffs and, if not stopped, will continue to harm Plaintiffs.  Plaintiffs currently own or lease, or within the class period have owned or leased, a Class Vehicle that is defective.  Defects associated with the Defective Shifter have caused the value of the Class Vehicles to decrease.

1259. Plaintiffs and the Class sustained damages as a result of FCA's unlawful acts and are therefore entitled to damages and other relief as provided under the OCSPA.

1260. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1261. Plaintiffs also seek court costs and attorneys' fees as a result of FCA's violations of the OCSPA, as provided in OHIO REV. CODE § 1345.09.

## OHIO COUNT LXXIX

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

1262. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1263. Plaintiffs bring this Count on behalf of the Ohio Subclass.

1264. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1265. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had a design defect which can allow the car to roll away from its parked position, and would not perform and operate properly when driven in normal usage.

1266. FCA knew at the time it actively concealed this information that this information was material.

1267. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1268. FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that that the Class Vehicles had a design defect which can allow the car to roll away from its parked position, because Plaintiffs and the other

Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1269. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1270. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

1271. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

1272. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1273. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

### OHIO COUNT LXXX

### BREACH OF EXPRESS WARRANTY
### (OHIO REV. CODE § 1302.26, *ET SEQ.*) (U.C.C. § 2-313)

1274. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1275. Plaintiffs bring this Count on behalf of the Ohio Subclass.

1276. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1277. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1278. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

1279. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

1280. Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

1281. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1282. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1283. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1284. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

1285. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1286. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

1287. FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1288. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## OHIO COUNT LXXXI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OHIO REV. CODE § 1302.27)(U.C.C. § 2-314))

1289. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1290. Plaintiffs bring this Count on behalf of the Ohio Subclass.

1291. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1292. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter system was not adequately designed, manufactured, and tested and does not include a safety override to prevent roll-away incidents.

1293. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely

341

monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1294. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## OHIO COUNT LXXXII

### UNJUST ENRICHMENT
### (BASED ON OHIO LAW)

1295. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1296. Plaintiffs bring this Count on behalf of the Ohio Subclass.

1297. FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

1298. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1299. Thus, all Ohio Subclass members conferred a benefit on FCA.

1300. It is inequitable for FCA to retain these benefits.

1301. Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1302. FCA knowingly accepted the benefits of its unjust conduct.

1303. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### T.  Claims Brought on Behalf of the Oklahoma Subclass

### OKLAHOMA COUNT LXXXIII

### VIOLATIONS OF OKLAHOMA CONSUMER PROTECTION ACT (OKLA. STAT. TIT. 15 § 751, *ET SEQ.*)

1304. Plaintiff Carol Clark ("Plaintiff," for purposes of all Oklahoma Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1305. Plaintiff brings this Count on behalf of the Oklahoma Subclass.

1306. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 15 § 753.

343

1307. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1308. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1309. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1310. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that

valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Oklahoma CPA.

1311. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1312. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Oklahoma Subclass.

1313. FCA knew or should have known that its conduct violated the Oklahoma CPA.

1314. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1315. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the

United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1316. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1317. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Oklahoma Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1318. Plaintiff and the Oklahoma Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

346

material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Oklahoma CPA.

1319. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oklahoma CPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1320. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1321. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Oklahoma Class members, about safety and reliability of the Deceptive Shifter Vehicles, the quality of the FCA brand, the devaluing of integrity at FCA, and the true value of the Class Vehicles.

1322. Plaintiff and Oklahoma Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Oklahoma Class members who purchased or leased the Class Vehicles would not

347

have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated—would have paid significantly less for them. Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

1323. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1324. Defendants had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oklahoma CPA in the course of its business.

1325. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1326. Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiffs and the Oklahoma Class seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

## OKLAHOMA COUNT LXXXIV

## FRAUDULENT CONCEALMENT
### (BASED ON OKLAHOMA LAW)

1327. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1328. Plaintiff brings this Count on behalf of the Oklahoma Subclass.

1329. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1330. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1331. FCA knew at the time it actively concealed this information that this information was material.

1332. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1333. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance

at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1334. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1335. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1336. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1337. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## OKLAHOMA COUNT LXXXV

## BREACH OF EXPRESS WARRANTY
## (OKLA. STAT. TIT. 12A §§ 2-313 AND 2A-210)

1338. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1339. Plaintiff brings this Count on behalf of the Oklahoma Subclass.

1340. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. Tit. 12A §§ 2-104(1) and 2-1103(3), and "sellers" of motor vehicles under § 2A-103(1)(t).

1341. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. Tit. 12A § 2A-103(1)(p).

1342. The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. Tit. 12A §§ 2-105(1), and 2A-103(1)(h).

1343. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1344. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1345. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1346. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1347. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1348. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1349. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1350. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing

defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1351. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1352. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1353. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1354. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## OKLAHOMA COUNT LXXXVI

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (OKLA. STAT. TIT. 12A §§ 2-314 AND 2A-212)

1355. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1356. Plaintiff brings this Count on behalf of the Oklahoma Subclass.

1357. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1358. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1359. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1360. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## OKLAHOMA COUNT LXXXVII

### UNJUST ENRICHMENT
### (BASED ON OKLAHOMA LAW)

1361. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1362. Plaintiff brings this Count on behalf of the Oklahoma Subclass.

1363. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1364. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1365. Thus, all Oklahoma Subclass members conferred a benefit on FCA.

1366. It is inequitable for FCA to retain these benefits.

1367. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1368. FCA knowingly accepted the benefits of its unjust conduct.

1369. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**U.    Claims Brought on Behalf of the Oregon Subclass**

**OREGON COUNT LXXXVIII**

**VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(OR. REV. STAT. §§ 646.605, *ET SEQ*.)**

1370. Plaintiff Todd Fisher ("Plaintiff," for purposes of all Oregon Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1371. Plaintiff brings this Count on behalf of the Oregon Subclass.

1372. FCA is a person within the meaning of OR. REV. STAT. § 646.605(4)

1373. The Class Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of OR. REV. STAT. § 646.605(6).

1374. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in

356

any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1).

1375. FCA engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other unfair or deceptive acts.

1376. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Affected Vehicles.

1377. FCA's actions as set forth above occurred in the conduct of trade or commerce.

1378. FCA knew it had installed a defectively designed Defective Shifter and knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1379. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1380. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Oregon UTPA.

1381. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above.  FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1382. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1383. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Oregon Subclass.

1384. FCA knew or should have known that its conduct violated the Oregon UTPA.

1385. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1386. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

      a. Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

      b. Intentionally concealed the foregoing from Plaintiff and the Class; and/or

      c. Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

1387. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1388. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Oregon Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1389. Plaintiff and the Oregon Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Oregon UTPA.

1390. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Oregon UTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1391. FCA's violations present a continuing risk to Plaintiff as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1392. As a direct and proximate result of FCA's violations of the Oregon UTPA, Plaintiff and the Oregon Subclass have suffered injury-in-fact and/or actual damage.

1393. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1394. Plaintiff and the Oregon Subclass are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1).  Plaintiff and the Oregon Subclass are also entitled to punitive damages because FCA engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

### OREGON COUNT LXXXIX

### FRAUDULENT CONCEALMENT
### (BASED ON OREGON LAW)

1395. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1396. Plaintiff brings this Count on behalf of the Oregon Subclass.

1397. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1398. FCA further affirmatively concealed from Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had a design defect which can allow the car to roll away from its parked position, and would not perform and operate properly when driven in normal usage.

1399. FCA knew at the time it actively concealed this information that this information was material.

1400. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1401. FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that that the Class Vehicles had a design defect which can allow the car to roll away from its parked position, because Plaintiff and the other

Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1402. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1403. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

1404. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

1405. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1406. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## OREGON COUNT XC

### BREACH OF EXPRESS WARRANTY
### (OR. REV. STAT. §§ 72.3130 AND § 72A.2100)

1407. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1408. Plaintiff brings this Count on behalf of the Oregon Subclass.

1409. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under OR. REV. STAT. § 72A.1030(1)(p) and § 72A.2100.

1410. The Class Vehicles are and were at all relevant times "goods" within the meaning of OR. REV. STAT. § 72.1050(1) and OR. REV. STAT. § 72A.1030(1)(h).

1411. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter

assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1412. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

1413. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

1414. Plaintiffs and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

1415. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1416. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1417. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy

is insufficient to make Plaintiff and the other Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1418. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1419. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1420. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1421. FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1422. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## OREGON COUNT XCI

## UNJUST ENRICHMENT
## (BASED ON OREGON LAW)

1423. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1424. Plaintiff brings this Count on behalf of the Oregon Subclass.

1425. FCA has received and retained a benefit from Plaintiff and the Class and inequity has resulted.

1426. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1427. Thus, all Oregon Subclass members conferred a benefit on FCA.

1428. It is inequitable for FCA to retain these benefits.

1429. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1430. FCA knowingly accepted the benefits of its unjust conduct.

1431. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## V.    Claims Brought on Behalf of the Pennsylvania Class

### PENNSYLVANIA COUNT XCII

### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1, *ET SEQ.*)

1432. Plaintiffs Timothy Weber, Bruce Vosburgh, and John and Mary Metzger ("Plaintiffs," for purposes of all Pennsylvania Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1433. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

1434. Plaintiffs purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

1435. All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

1436. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, ….

Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. § 201-2(4).

1437. FCA engaged in unlawful trade practices including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

1438. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1439. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override

system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1440. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1441. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Pennsylvania CPL.

1442. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. FCA compounded the deception by repeatedly asserting that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1443. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class

members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1444. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Pennsylvania Subclass.

1445. FCA knew or should have known that its conduct violated the Pennsylvania CPL.

1446. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1447. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

  a. Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

  b. Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

  c. Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding

material facts from Plaintiffs and the Class that contradicted these representations.

1448. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1449. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Pennsylvania Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1450. Plaintiffs and the Pennsylvania Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Pennsylvania CPL.

1451. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Pennsylvania CPL. All owners of the Class

Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1452. FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1453. As a direct and proximate result of FCA's violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Subclass have suffered injury-in-fact and/or actual damage.

1454. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1455. FCA is liable to Plaintiffs and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a).  Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that FCA's conduct was malicious,

wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## PENNSYLVANIA COUNT XCIII

### FRAUDULENT CONCEALMENT
### (BASED ON PENNSYLVANIA LAW)

1456. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1457. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

1458. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1459. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had a design defect which can allow the car to roll away from its parked position, and would not perform and operate properly when driven in normal usage.

1460. FCA knew at the time it actively concealed this information that this information was material.

1461. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1462. FCA had a duty to disclose that these Class Vehicles were defective, unsafe, and unreliable in that that the Class Vehicles had a design defect which can allow the car to roll away from its parked position, because Plaintiffs and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1463. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1464. The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.  FCA knew or recklessly disregarded that its representations were false because it knew that the Defective Shifter installed in the Class Vehicles is defective and exposes drivers, occupants and members of the public to safety risks. FCA intentionally made the false statements in order to sell Class Vehicles.

1465. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifter – in purchasing or leasing FCA's Class Vehicles.

1466. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1467. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## PENNSYLVANIA COUNT XCIV

### BREACH OF EXPRESS WARRANTY
### (13 PA. CONS. STAT. ANN. § 2313)

1468. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1469. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

1470. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 PA. CONS. STAT. ANN. § 2104 and a "seller" of motor vehicles under 13 PA. CONS. STAT. ANN. § 2313.

1471. With respect to leases, FCA is and was at all relevant times a "lessor" with respect to motor vehicles under 13 PA. CONS. STAT. ANN. § 2A103 and 2A210.

1472. The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 PA. CONS. STAT. ANN. § 2105 and § 2A103.

1473. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1474. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

1475. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

1476. Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform

377

Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

1477. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1478. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1479. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1480. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

1481. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently

concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1482. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

1483. FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1484. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## PENNSYLVANIA COUNT XCV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (13 PA. CONS. STAT. ANN. § 2314)

1485. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1486. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

1487. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1488. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1489. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1490. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## PENNSYLVANIA COUNT XCVI

### UNJUST ENRICHMENT
### (BASED ON PENNSYLVANIA LAW)

1491. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1492. Plaintiffs bring this Count on behalf of the Pennsylvania Subclass.

1493. FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

1494. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1495. Thus, all Pennsylvania Subclass members conferred a benefit on FCA.

1496. It is inequitable for FCA to retain these benefits.

1497. Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1498. FCA knowingly accepted the benefits of its unjust conduct.

1499. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### W.    Claims Brought on Behalf of the Texas Subclass

### TEXAS COUNT XCVII

### VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT
#### (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

1500. Plaintiffs Robert F. Hyatt IV, Cameron Phelps, Cris-Ann Craig, Kelli Foreman, Krystal Dial, Ashley Gillipsie, and Jay Waggoner ("Plaintiffs," for

purposes of all Texas Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1501. Plaintiffs bring this Count on behalf of the Texas Subclass.

1502. Plaintiffs and the Texas Subclass are individuals, partnerships or corporations with assets of less than $25 million (or are controller by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

1503. FCA is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

1504. FCA's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tex. Bus. & Com. Code § 17.46(A).

1505. The Texas Deceptive Trade Practices Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

382

1506. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1507. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems.  FCA knew this for at least two years, but concealed all of that information.

1508. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1509. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that

valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Texas DTPA.

1510. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1511. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Texas Subclass.

1512. FCA knew or should have known that its conduct violated the Texas DTPA.

1513. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1514. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the

United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.  Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.  Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1515. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1516. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Texas Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1517. Plaintiffs and the Texas Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have

paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Texas DTPA.

1518. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1519. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1520. As a direct and proximate result of FCA's violations of the Texas DTPA, Plaintiffs and the Texas Subclass have suffered injury-in-fact and/or actual damage.

1521. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1522. Pursuant to TEX. BUS. & COM. CODE § 17.50, Plaintiffs and the Texas Subclass seek monetary relief against FCA measured as actual damages in an amount to be determined at trial, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

1523. On July 8, 2016, certain Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE § 17.505(a).   Because FCA failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Subclass are entitled.

## TEXAS COUNT XCVIII

## FRAUDULENT CONCEALMENT
## (BASED ON TEXAS LAW)

1524. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1525. Plaintiffs bring this Count on behalf of the Texas Subclass.

1526. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1527. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided

with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1528. FCA knew at the time it actively concealed this information that this information was material.

1529. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1530. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1531. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1532. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1533. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1534. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## TEXAS COUNT XCIX

### BREACH OF EXPRESS WARRANTY
### (TEX. BUS. & COM. CODE § 2.313)

1535. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1536. Plaintiffs bring this Count on behalf of the Texas Subclass.

1537. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under TEX. BUS. & COM. CODE § 2.104(a) and a "seller" of motor vehicles under § 2.313(a).

1538. The Class Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 2.105(a) and § 2.313.

1539. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for

a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1540. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

1541. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

1542. Plaintiffs and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

1543. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1544. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1545. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1546. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

1547. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1548. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to

FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

1549. FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1550. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## TEXAS COUNT C

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

1551. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1552. Plaintiffs bring this Count on behalf of the Texas Subclass.

1553. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1554. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.  These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the

ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1555. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1556. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## TEXAS COUNT CI

### UNJUST ENRICHMENT
### (BASED ON TEXAS LAW)

1557. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

1558. Plaintiffs bring this Count on behalf of the Texas Subclass.

1559. FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

1560. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective

Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1561. Thus, all Texas Subclass members conferred a benefit on FCA.

1562. It is inequitable for FCA to retain these benefits.

1563. Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1564. FCA knowingly accepted the benefits of its unjust conduct.

1565. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## X.    Claims Brought on Behalf of the Utah Subclass

### UTAH COUNT CII

### VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT
(UTAH CODE ANN. § 13-11-1, *ET SEQ.*)

1566. Plaintiff Trevor Marble ("Plaintiff," for purposes of all Utah Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1567. Plaintiff brings this Count on behalf of the Utah Subclass.

1568. The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under UTAH CODE ANN. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction

has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." UTAH CODE ANN. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. UTAH CODE ANN. § 13-11-5.

1569. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1570. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1571. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that

did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1572. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Utah CSPA.

1573. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1574. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Utah Subclass.

1575. FCA knew or should have known that its conduct violated the Utah CSPA.

1576. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1577. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

    a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

    b.    Intentionally concealed the foregoing from Plaintiff and the Class; and/or

    c.    Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1578. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1579. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Utah Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1580. Plaintiff and the Utah Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Utah CSPA.

1581. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Utah CSPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1582. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1583. As a direct and proximate result of FCA's violations of the Utah CSPA, Plaintiffs and the Utah Subclass have suffered injury-in-fact and/or actual damage.

1584. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1585. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs and the Utah Class seek monetary relief against FCA measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff and each Utah Class member, reasonable attorneys' fees, and any other just and proper relief available under the Utah CSPA.

**UTAH COUNT CIII**

**FRAUDULENT CONCEALMENT**
**(BASED ON UTAH LAW)**

1586. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1587. Plaintiff brings this Count on behalf of the Utah Subclass.

1588. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1589. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided

399

with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1590. FCA knew at the time it actively concealed this information that this information was material.

1591. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1592. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1593. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1594. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1595. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1596. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## UTAH COUNT CIV

### BREACH OF EXPRESS WARRANTY
### (UTAH CODE §§ 70A-2-313 AND 70A-2A-210)

1597. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1598. Plaintiffs bring this Count on behalf of the Utah Subclass.

1599. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1600. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter

assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1601. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1602. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1603. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1604. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1605. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1606. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy

is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1607. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1608. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1609. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1610. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1611. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## UTAH COUNT CV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(UTAH CODE §§ 70A-2-314 AND 70A-2A-212)

1612. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1613. Plaintiff brings this Count on behalf of the Utah Subclass.

1614. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1615. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1616. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1617. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## UTAH COUNT CVI

## UNJUST ENRICHMENT
## (BASED ON UTAH LAW)

1618. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1619. Plaintiff brings this claim on behalf of the Utah Subclass.

1620. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1621. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1622. Thus, all Utah Subclass members conferred a benefit on FCA.

1623. It is inequitable for FCA to retain these benefits.

1624. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1625. FCA knowingly accepted the benefits of its unjust conduct.

1626. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### Y.    Claims Brought on Behalf of the Washington Subclass

### WASHINGTON COUNT CVII

### VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ.*)

1627. Plaintiffs Karen Stedman and Cameron Webster ("Plaintiffs," for purposes of all Washington Subclass Counts) incorporate by reference all preceding allegations as though fully set forth herein.

1628. Plaintiffs bring this Count on behalf of the Washington Subclass.

1629. FCA, Plaintiff, and the Washington Subclass members are each a "person" under WASH. REV. CODE ANN. § 19.86.010(1) ("Washington CPA").

1630. FCA engaged in "trade" or "commerce" under WASH. REV. CODE ANN. § 19.86.010(2).

1631. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein was unsafe, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive

acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1632. FCA knew it had installed a defectively designed Defective Shifter and knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1633. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1634. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Washington CPA.

1635. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the many safety issues and serious defects discussed above. FCA compounded the deception by repeatedly asserting

407

that FCA branded vehicles were safe, reliable, of high quality, and by claiming to be of a reputable manufacturer that valued safety and stood behind its vehicles once they are on the road.

1636. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1637. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Washington Subclass.

1638. FCA knew or should have known that its conduct violated the Washington CPA.

1639. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1640. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

      a.    Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was

manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1641. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1642. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiffs and the Washington Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedying them.

1643. Plaintiffs and the Washington Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose

material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Washington CPA.

1644. FCA's actions constituted a generalized course of deception that impacts the public interest because Plaintiffs and the Washington Subclass were injured in exactly the same way as millions of others purchasing and/or leasing FCA vehicles, and the failure to follow the practices pertaining to motor vehicle warranties in WASH. REV. CODE ANN. § 19.118 is recognized by statute as matters vitally affecting the public interest.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business and has the potential for repetition.

1645. As a direct and proximate result of FCA's violations of the Washington CPA, Plaintiffs and the Washington Subclass have suffered injury-in-fact and/or actual damage.

1646. FCA's actions as set forth above induced Plaintiffs and the Washington Subclass members to purchase their Class Vehicles from FCA and/or pay a higher price for their Class Vehicles than they otherwise would have.

1647. Plaintiffs and the Washington Subclass were injured as a result of FCA's conduct.  Due to FCA's deceptive or unfair conduct, Plaintiffs and the

Washington Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Their vehicles have also suffered a diminution in value.

1648. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1649. Pursuant to WASH. REV. CODE ANN. § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs and the Washington Subclass members seek injunctive relief.

1650. As a direct and proximate result of FCA's breach of contract, Plaintiffs and the Washington Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, attorneys' fees, costs, treble damages, and other damages allowed by law.

## WASHINGTON COUNT CVIII

### FRAUDULENT CONCEALMENT
### (BASED ON WASHINGTON LAW)

1651. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

411

1652. Plaintiffs bring this Count on behalf of the Washington Subclass.

1653. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their purchasing decision.

1654. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1655. FCA knew at the time it actively concealed this information that this information was material.

1656. The Class Vehicles purchased or leased by Plaintiffs and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1657. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1658. The aforementioned concealment was material because if it had been disclosed Plaintiffs and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1659. Plaintiffs and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1660. As a result of their reliance, Plaintiffs and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1661. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## WASHINGTON COUNT CIX

### BREACH OF EXPRESS WARRANTY
### (WASH. REV. CODE § 62A.2-313)

1662. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1663. Plaintiffs bring this Count on behalf of the Washington Subclass.

413

1664. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under WASH. REV. CODE § 62A.2-104(1) and a "seller" of motor vehicles under §§ 62A.2-103(1)(d) and 62A.2-313.

1665. The Class Vehicles are and were at all relevant times "goods" within the meaning of WASH. REV. CODE §§ 62A.2-105(1) and 62A.2-313.

1666. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1667. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of its Class Vehicles.

1668. FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Class Vehicles equipped with the defective Defective Shifter system from FCA.

1669. Plaintiffs and the Class members experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform

414

Plaintiffs and Class members that the Class Vehicles were defectively designed, and failed to fix the defective Defective Shifter free of charge.

1670. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1671. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1672. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1673. Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

1674. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently

concealed material facts regarding its Class Vehicles.  Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1675. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.   Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

1676. FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1677. As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## WASHINGTON COUNT CX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (WASH. REV. CODE § 62A.2-314)

1678. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1679. Plaintiffs bring this Count on behalf of the Washington Subclass.

1680. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1681. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1682. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1683. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## WASHINGTON COUNT CXI

### UNJUST ENRICHMENT
### (BASED ON WASHINGTON LAW)

1684. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

1685. Plaintiffs bring this Count on behalf of the Washington Subclass.

1686. FCA has received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

1687. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiffs and the Class have overpaid for the cars and been forced to pay other costs.

1688. Thus, all Washington Subclass members conferred a benefit on FCA.

1689. It is inequitable for FCA to retain these benefits.

1690. Plaintiffs were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1691. FCA knowingly accepted the benefits of its unjust conduct.

1692. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## Z.     Claims Brought on Behalf of the Wisconsin Subclass

### WISCONSIN COUNT CXII

### VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 110.18)

1693. Plaintiff Marc Hughes ("Plaintiff," for purposes of all Wisconsin Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1694. This claim is brought only on behalf of the Wisconsin Subclass.

1695. FCA is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

1696. Plaintiff and Wisconsin Subclass Members are members of "the public" within the meaning of WIS. STAT. § 100.18(1). Plaintiff and Wisconsin Subclass Members purchased or leased one or more Affected Vehicles.

1697. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1).

1698. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1699. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such

override systems.  FCA knew this for at least two years, but concealed all of that information.

1700. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1701. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Wisconsin DTPA.

1702. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1703. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Wisconsin Subclass.

1704. FCA knew or should have known that its conduct violated the Wisconsin DTPA.

1705. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1706. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a.     Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b.     Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c.     Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1707. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the

421

stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1708. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Wisconsin Subclass.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1709. Plaintiff and the Wisconsin Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Wisconsin DTPA.

1710. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Wisconsin DTPA.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1711. FCA's violations present a continuing risk to Plaintiffs as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

1712. As a direct and proximate result of FCA's violations of the Wisconsin DTPA, Plaintiffs and the Wisconsin Subclass have suffered injury-in-fact and/or actual damage.

1713. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1714. Plaintiff and the Wisconsin Subclass are entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2).  Because FCA's conduct was committed knowingly and/or intentionally, Plaintiff and the Wisconsin Subclass are entitled to treble damages.

1715. Plaintiff and the Wisconsin Subclass also seek court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## WISCONSIN COUNT CXIII

## FRAUD BY CONCEALMENT
## (BASED ON WISCONSIN LAW)

1716. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1717. This claim is brought on behalf of the Wisonsin Subclass.

1718. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1719. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1720. FCA knew at the time it actively concealed this information that this information was material.

1721. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1722. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material

representations that the Class Vehicles they were purchasing were safe and free from defects.

1723. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1724. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1725. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1726. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members.  Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## WISCONSIN COUNT CXIV

## BREACH OF EXPRESS WARRANTY
### (WIS. STAT. § 402.313)

1727. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1728. This claim is brought on behalf of members of the Wisconsin Class.

1729. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wisconsin Statutes §§ 402.104(3) and a "seller" of motor vehicles under 402.313.

1730. The Affected Vehicles are and were at all relevant times "goods" within the meaning of Wisconsin Statutes §§ 402.105(1)(c) and 402.313.

1731. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1732. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1733. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1734. Plaintiff and the Class members experienced defects within the warranty period.   Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1735. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1736. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1737. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1738. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing

defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1739. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles.  Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1740. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1741. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1742. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## WISCONSIN COUNT CXV

## UNJUST ENRICHMENT
## (BASED ON WISCONSIN LAW)

1743. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1744. This claim is brought on behalf of members of the Wisconsin Class who purchased the Affected Vehicles

1745. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1746. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1747. Thus, all Wisconsin Subclass members conferred a benefit on FCA.

1748. It is inequitable for FCA to retain these benefits.

1749. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1750. FCA knowingly accepted the benefits of its unjust conduct.

1751. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

### AA. Claims Brought on Behalf of the Wyoming Subclass
### WYOMING COUNT CXVI
### VIOLATIONS OF THE WYOMING CONSUMER PROTECTION ACT (WYO. STAT. §§ 40-12-101, *ET SEQ.*)

1752. Plaintiff Ann Magnuson ("Plaintiff," for purposes of all Wyoming Subclass Counts) incorporates by reference all preceding allegations as though fully set forth herein.

1753. This claim is brought only on behalf of the Wyoming Subclass.

1754. Plaintiff, the Wyoming Subclass and FCA are "persons" within the meaning of Wyo. Stat. § 40-12-102(a)(i).

1755. The Class Vehicles are "merchandise" pursuant to Wyo. Stat. § 40-12-102(a)(vi).

1756. Each sale or lease of a Class Vehicle to a Plaintiff or Wyoming Subclass member was a "consumer transaction" as defined by Wyo. Stat. § 40-12-102(a)(ii). These consumer transactions occurred "in the course of [FCA's] business" under Wyo. Stat. § 40-12-105(a). Plaintiff and Wyoming Subclass members purchased or leased one or more Class Vehicle.

1757. The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits lists unlawful deceptive trade practices, including when a seller: "(i) Represents

that merchandise has a source, origin, sponsorship, approval, accessories, or uses it does not have;" "(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;" "(x) Advertises merchandise with intent not to sell it as advertised;" "(xv) Engages in unfair or deceptive acts or practices." Wyo. Stat. §§ 40-12-105(a).

1758. In the course of its business, FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

1759. FCA knew it had installed a defectively designed Defective Shifter, knew that the Defective Shifter was not safe, as advertised, and had no override system to prevent roll-away incidents, even though its competitors used such override systems. FCA knew this for at least two years, but concealed all of that information.

1760. FCA was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that

did not perform as advertised and jeopardized the safety of the vehicle's occupants. FCA concealed this information as well.

1761. By failing to disclose that the defectively designed Defective Shifter was not safe and had no safety override, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, FCA engaged in deceptive business practices in violation of the Wyoming CPA.

1762. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the FCA brand, the devaluing of safety and performance at FCA, and the true value of the Class Vehicles.

1763. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Wyoming Subclass.

1764. FCA knew or should have known that its conduct violated the Wyoming CPA.

1765. As alleged above, FCA made material statements about the safety and utility of the Class Vehicles and the FCA brand that were either false or misleading.

1766. FCA owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because FCA:

> a. Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a defectively designed Defective Shifter and did not perform as advertised;
>
> b. Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c. Made incomplete representations about the safety and performance of the Class Vehicles generally, and the defective Defective Shifter in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

1767. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1768. FCA's fraudulent use of the defectively designed Defective Shifter and the true performance of the Class Vehicles were material to Plaintiff and the Wyoming Subclass. A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth more than an otherwise comparable vehicle

made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

1769. Plaintiff and the Wyoming Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose material information. Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for FCA's violations of the Wyoming CPA.

1770. FCA had an ongoing duty to all FCA customers to refrain from unfair and deceptive practices under the Wyoming CPA. All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of FCA's deceptive and unfair acts and practices made in the course of FCA's business.

1771. FCA's violations present a continuing risk to Plaintiffs as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

1772. As a direct and proximate result of FCA's violations of the Wyoming CPA, Plaintiffs and the Wyoming Subclass have suffered injury-in-fact and/or actual damage.

1773. Because FCA fraudulently concealed the defectively designed Defective Shifter and the true performance of cars equipped with the Defective

Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by FCA's conduct, they are now worth significantly less than they otherwise would be.

1774. Pursuant to Wyo. Stat. § 40-12-108(a), Plaintiff and the Wyoming Subclass seek damages as determined at trial, and any other just and proper relief available under the Wyoming CPA, including but not limited to court costs and reasonable attorneys' fees as provided in Wyo. Stat. § 40-12-108(b).

1775. On July 8, 2016, certain Plaintiffs sent a letter complying with Wyo. Stat. § 40-12-109. Because FCA failed to offer to cure, or failed to complete a remedy of its deceptive trade acts and practices within the required time period, see Wyo. Stat. § 40-12-102(a)(ix), Plaintiffs seek all damages and relief available under the Wyoming CPA.

## WYOMING COUNT CXVII

## FRAUDULENT CONCEALMENT
## (BASED ON WYOMING LAW)

1776. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1777. This claim is brought on behalf of the Wyoming Subclass.

1778. FCA intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing decision.

1779. FCA further affirmatively concealed from Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling were new, had no significant defects, and would perform and operate properly when driven in normal usage.

1780. FCA knew at the time it actively concealed this information that this information was material.

1781. The Class Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable because the Class Vehicles contained faulty and defective Defective Shifters, as alleged herein.

1782. FCA owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at FCA, because Plaintiff and the other Class members relied on FCA's material representations that the Class Vehicles they were purchasing were safe and free from defects.

1783. The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased

436

the Class Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

1784. Plaintiff and the other Class members relied on FCA's reputation – along with FCA's failure to disclose the faulty and defective nature of the Defective Shifters – in purchasing or leasing FCA's Class Vehicles.

1785. As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

1786. FCA's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members. Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## WYOMING COUNT CXVIII

## BREACH OF EXPRESS WARRANTY
### (WYO. STAT. § 34.1-2-313)

1787. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1788. This claim is brought on behalf of members of the Wyoming Subclass.

1789. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Wyo. Stat. §§ 34.1-2-104(a) and 34.1-2.A-103(a)(xx), and "sellers" of motor vehicles under § 34.1-2-103(a)(iv).

1790. With respect to leases, FCA is and was at all relevant times "lessors" of motor vehicles under Wyo. Stat. § 34.1-2.A-103(a)(xvi).

1791. The Affected Vehicles are and were at all relevant times "goods" within the meaning of Wyo. Stat. §§ 34.1-2-105(a) and 34.1-2.A-103(a)(viii).

1792. In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Class Vehicles (FCA has, since the 2016 model year, reduced its powertrain warranty to five years or 60,000 miles).

1793. As a manufacturer of light-duty vehicles, FCA was required to provide these warranties to purchasers of the Class Vehicles.

1794. FCA's warranties formed the basis of the bargain that was reached when Plaintiff and other Class members purchased or leased their Class Vehicles equipped with the defectively designed Defective Shifter.

1795. Plaintiff and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Class members that the Class Vehicles were defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

1796. FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

1797. Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

1798. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and Class members whole and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

1799. Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

1800. Also, as alleged in more detail herein, at the time FCA warranted and sold the Class Vehicles, it knew that the Class Vehicles did not conform to FCA's warranties and were inherently defective, and FCA wrongfully and fraudulently concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

1801. Moreover, many of the injuries flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein. Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

1802. FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

1803. As a direct and proximate result of FCA's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## WYOMING COUNT CXIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (WYO. STAT. §§ 34.1-2-314 AND 34.1-2.A-212)

1804. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

1805. Plaintiff brings this Count on behalf of the Wyoming Subclass.

1806. FCA is and was at all relevant times a merchant with respect to motor vehicles.

1807. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Shifter was not adequately designed, manufactured, and tested.

1808. FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

1809. As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

## WYOMING COUNT CXX

## UNJUST ENRICHMENT
## (BASED ON WYOMING LAW)

1810. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

1811. Plaintiff brings this Count on behalf of the Wyoming Subclass.

1812. FCA has received and retained a benefit from Plaintiff and inequity has resulted.

1813. FCA has benefitted from selling and leasing defective cars whose value was artificially inflated by FCA's concealment of the defective Defective Shifter at a profit, and Plaintiff and the Class have overpaid for the cars and been forced to pay other costs.

1814. Thus, all Wyoming Subclass members conferred a benefit on FCA.

1815. It is inequitable for FCA to retain these benefits.

1816. Plaintiff and the Class were not aware of the true facts about the Class Vehicles, and did not benefit from FCA's conduct.

1817. FCA knowingly accepted the benefits of its unjust conduct.

1818. As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A.    Certification of the proposed Class, including appointment of Plaintiffs' Counsel as Class Counsel;

B.    An order temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Appropriate injunctive relief;

D.    Equitable relief in the form of buyback of the Class Vehicles;

E.    Costs, restitution, damages, including statutory and punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as may be appropriate.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: December 8, 2017                 Respectfully submitted,


                                        */s/ E. Powell Miller*
                                        E. Powell Miller (P39487)
                                        Sharon S. Almonrode (P33938)
                                        Dennis A. Lienhardt (P81118)
                                        **THE MILLER LAW FIRM, P.C.**
                                        Miller Building,
                                        950 West University Drive, Suite 300
                                        Rochester, MI  48307
                                        Telephone: (248) 841-2200
                                        Facsimile: (248) 652-2852
                                        epm@millerlawpc.com
                                        ssa@millerlawpc.com
                                        dal@millerlawpc.com

                                        ***Plaintiffs' Lead Counsel and Chair of
                                        Plaintiffs' Steering Committee***

                                        **KESSLER TOPAZ
                                        MELTZER & CHECK, LLP**
                                        Joseph H. Meltzer
                                        Peter A. Muhic
                                        Melissa Troutner
                                        Tyler S. Graden
                                        280 King of Prussia Road
                                        Radnor, PA  19087
                                        Telephone: (610) 667-7706
                                        Facsimile: (610) 667-7056
                                        jmeltzer@ktmc.com
                                        pmuhic@ktmc.com
                                        mtroutner@ktmc.com
                                        tgraden@ktmc.com

                                        **HAGENS, BERMAN, SOBOL,
                                        SHAPIRO, LLP**
                                        Steve W. Berman
                                        Thomas E. Loeser
                                        1918 Eighth Avenue, Suite 3300

Seattle, WA  98101
Telephone: 206-623-7292
steve@hbsslaw.com
toml@hbsslaw.com

Christopher R. Pitoun
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
christopherp@hbsslaw.com

**GUSTAFSON GULEK PLLC**
Daniel E. Gustafson
Jason S. Kilene
David A. Goodwin
Raina C. Borrelli
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: 612-333-8844
dgustafson@gustafsongluek.com
jkilene@gustafsongluek..com
dgoodwin@gustafsongluek.com
rborrelli@gustafsongluek.com

**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone: 612-339-6900
rkshelquist@loclaw.com
rapeterson@locklaw.com

**GREG COLEMAN LAW PC**
Gregory F. Coleman
Lisa A. White
Mark E. Silvey

445

Adam E. Edwards
800 South Gay Street, Suite 1100
Knoxville, TN  37929
Telephone: 865-247-0080
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
mark@gregcolemanlaw.com
adam@gregcolemanlaw.com

*Plaintiffs' Steering Committee*

**MANTESE HONIGMAN PC**
David Honigman
Douglas Toering
Gerard V. Mantese
James A. Buster
1361 East Big Beaver Road
Troy, MI  48083
Telephone: 248-457-9200
dhonigman@manteselaw.com
dtoering@manteselaw.com
gmantese@manteselaw.com
jbuster@manteselaw.com

*Plaintiffs' Liaison Counsel*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**IN RE: FCA US LLC MONOSTABLE**      Case Number 16-md-02744
**ELECTRONIC GEARSHIFT**      Honorable David M. Lawson
**LITIGATION**      Magistrate Judge David R. Grand

      MDL No. 2744

**This Document Relates to: ALL ACTIONS**
_____ /

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017 I electronically filed the foregoing

document using the Court's electronic filing system, which will notify all counsel

of record authorized to receive such filings.

              */s/ E. Powell Miller*_____
              E. Powell Miller (P39487)
              **THE MILLER LAW FIRM, P.C.**
              Miller Building,
              950 West University Drive, Suite 300
              Rochester, MI  48307
              Telephone: (248) 841-2200
              Facsimile: (248) 652-2852
              epm@miller.law

              ***Plaintiffs' Lead Counsel and Chair of***
              ***Plaintiffs' Steering Commitee***