# Exhibit 2

REDACTED VERSION OF DOCUMENT TO BE SEALED

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4      IN RE: FCA US LLC

5      MONOSTABLE ELECTRONIC

6      GEARSHIFT LITIGATION        Case No. 16-md-02744

7            MDL No. 2744

8      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

9

10                  VIDEO DEPOSITION OF

11                   DAVID CADES, Ph.D.

12

13

14                  January 25, 2019

15                     9:12 a.m.

16

17          10 South Wacker Drive, Suite 2300

18                  Chicago, Illinois

19        Deanna Amore - CRR, RPR, CSR - 084-003999

20

21

22

23             VERITEXT LEGAL SOLUTIONS

               MID-ATLANTIC REGION

24          1801 Market Street - Suite 1800

            Philadelphia, Pennsylvania 19103

25

Page 2

1                    APPEARANCES OF COUNSEL
2
    On Behalf of the Plaintiffs:
3
                GREG COLEMAN LAW
4               MS. RACHEL SOFFIN
                MR. ADAM A. EDWARDS
5               800 S. Gay Street
                Suite 1100
6               Knoxville, Tennessee 37929
                (865) 86-8541
7               rachel@gregcolemanlaw.com
                adam@gregcolemanlaw.com
8                    - and -
                KESSLER TOPAZ MELTZER CHECK
9               MR. PETER A. MUHIC
                280 King of Prussia Road
10              Radnor, Pennsylvania 19087
                (610) 822-0256
11              pmuhic@ktmc.com
12   On Behalf of the Defendant, FC US LLC:
13              DYKEMA GOSSETT
                MR. FRED J. FRESARD
14              39577 Woodward Avenue
                Suite 300
15              Bloomfield Hills, Michigan  48304
                (248) 203-0593
16              ffresard@dykema.com
17
18
19                    *    *    *    *    *
20
21
22
23
24
25

Page 3

1                    I N D E X

2    WITNESS                        EXAMINATION

3    DAVID CADES, Ph.D.

4       EXAMINATION BY MS. SOFFIN              6

5                     EXHIBITS

6     NUMBER           DESCRIPTION        PAGE

7     Exhibit 93      Report of Douglas Young,    7

8                     Ph.D. and David Cades,

9                     Ph.D.

10    Exhibit 94      FCA Transmission            82

11                    Electronic Shift Lever

12                    Important Safety Recall

13                    S27/NHTSA 16V-240;

14                    MCPS012178

15    Exhibit 95      FCA Transmission            82

16                    Electronic Shift Lever

17                    Important Safety Recall

18                    S27/NHTSA 16V-240;

19                    MCPS012177

20    Exhibit 96      Thumb Drive of Expert      102

21                    File

22    (Exhibit 96 was retained by counsel for

23    plaintiff.)

24

25

Page 4

1      THE VIDEOGRAPHER:  Good morning.  We are going

2    on the record at 9:12 a.m. on January 25, 2019.

3            Please note that the microphones are

4    sensitive and may pick up whispering, private

5    conversations, and cellular interference.

6            Please turn off all cell phones or place

7    them away from the microphones as they can

8    interfere with the deposition audio.

9            Audio and video recording will continue to

10   take place unless all parties agree to go off the

11   record.

12           This is Media Unit 1 of the video-recorded

13   deposition of David Cades, Ph.D., In Re FC USA

14   Monostable Gearshift Litigation, filed in the

15   United States District Court, Eastern District of

16   Michigan, Southern Division, Case No. 16-md-02744.

17           This deposition is being held at

18   Dykema Gossett, located at 10 South Wacker Drive,

19   Suite 2300, Chicago, Illinois 60606.

20           My name is Michael Prager from the firm

21   Veritext Legal Solutions, and I'm the videographer.

22           The court reporter is Deanna Amore from

23   the firm Veritext Legal Solutions.

24           I am not authorized to administer an oath.

25   I am not related to any party in this action, nor

Page 5

1   am I financially interested in the outcome.

2           Counsel and all present in the room will

3   now state their appearances and affiliations for

4   the record.  If there are any objections to

5   proceeding, please state them at the time of your

6   appearance beginning with the noticing attorney.

7       MS. SOFFIN:  Rachel Soffin from Greg Coleman

8   Law on behalf of the plaintiffs.

9       MR. MUHIC:  Peter Muhic, Kessler Topaz Meltzer

10  Check, for the plaintiff.

11      MR. EDWARDS:  Adam Edwards, Greg Coleman Law,

12  also for the plaintiffs.

13      MR. FRESARD:  Rick Fresard for FC USA, LLC.

14      THE VIDEOGRAPHER:  Will the court reporter

15  please swear in the witness.

16                          (Whereupon, the witness was

17                            duly sworn.)

18      THE VIDEOGRAPHER:  Thank you.  You may proceed.

19      MS. SOFFIN:  Good morning.  Can you please

20  state your name.

21      THE WITNESS:  Sure.

22      My name is David Cades, last name is spelled

23  C-a-d-e-s.

24                  DAVID CADES, PH.D.,

25  called as a witness herein, having been first duly

Page 6

1    sworn, was examined and testified as follows:

2                         EXAMINATION

3    BY MS. SOFFIN:

4         Q.   Mr. Cades, I understand you've been

5    deposed before so I won't bore you with all the

6    ground rules.  I'll just give you my two favorites.

7              If I ask a question and you don't

8    understand it, please let me know; I will rephrase

9    it.  Otherwise, I'm going to assume you understand

10   what I'm asking you.

11             Also, if you need to take a break at any

12   time, that's perfectly fine, but if I have a

13   question pending, I ask that you answer it before.

14   Okay?

15        A.   Sure.

16        Q.   And if I'm talking too fast, everyone in

17   the room is free to let me know.

18             I understand that we are taking your

19   deposition today on a report that you prepared on

20   November 16, 2018, with Douglas Young; is that

21   right?

22        A.   My understanding is the deposition relates

23   to the entirety of the case.  I did produce a

24   report in this case with Dr. Young.

25        Q.   We've premarked that report as Exhibit 93.

Page 7

1    Do you have that in front of you?

2                        (Whereupon, Exhibit 93 was

3                        marked for identification.)

4        THE WITNESS:  It appears to be a complete copy

5    of the report, yes.

6    BY MS. SOFFIN:

7        Q.   It's my understanding we are taking your

8    deposition instead of Mr. Young's.  Is there any

9    aspect of this report that you have in front of you

10   or analysis that you won't be able to discuss and

11   that you will need to defer to Dr. Young for?

12       A.   No, ma'am.

13       Q.   Other than Dr. Young, did anyone else work

14   on this report with you?

15       A.   There was a team of people who worked on

16   the entirety of this project at both my and

17   Dr. Young's direction.

18       Q.   Are these people employed at Exponent?

19       A.   Yes, ma'am.

20       Q.   What are their names?

21       A.   The primary folks who assisted with this,

22   Dr. Rachel Jonas.

23       Q.   What does she do at Exponent?

24       A.   I believe she's a scientist in the human

25   factors practice.

Page 8

1    Q.   What role did she play in this report or
2    study?
3    A.   Both she and Dr. Christian Hoyos, who is
4    also a scientist in the human factors practice,
5    were primarily responsible for coordinating the
6    efforts for the specific gearshift behavior study,
7    as well as the North Carolina analysis and review
8    of the material.
9    Q.   I imagine a lot went into coordinating
10   efforts for the gearshift study.  Can you be more
11   specific about what they did?
12   A.   They were responsible for ensuring the
13   participants showed up.  They were responsible for
14   making sure our experimenters were following the
15   proper protocol.  They were responsible for
16   managing all the files and all the other logistical
17   aspects of the gearshift behavior study.
18   Q.   Who else?
19   A.   Dr. Jacqueline Zimmerman,
20   Dr. Patrick Cullen.
21   Q.   What did Jacqueline do?
22   We'll go one at a team unless they teamed
23   up again.
24   A.   If it's easier, I'll list the group of
25   people and describe their similar activities.

Page 9

1              So Jacqueline Zimmerman, Patrick Cullen

2      and Dr. Natalie Motta-Mena, as well as

3      Dr. Danielle King and that group, they were the

4      primary experimenters who actually were in the

5      vehicle with the participants.

6          Q.    Were either you or Dr. Young in the

7      vehicles as well with the participants?

8          A.    My recollection -- I don't recall

9      specifically for Dr. Young.  I believe he was, but

10     both Dr. Young and I were present during the pilot

11     testing as well as during some of the experimental

12     testing and did ride in vehicles with participants.

13         Q.    Is there another group?

14         A.    Dr. Genevieve Nauhaus.

15         Q.    Can you spell her last name?

16         A.    N-a-u-h-a-u-s.

17             Dr. Robyn Brinkerhoff, Dr. Christy

18     Cloninger.

19         Q.    How do you spell her last name?

20         A.    C-l-o-n-i-n-g-e-r.

21             And I think -- that's all I can remember

22     as I sit here right now.

23         Q.    What did that group of people do?

24         A.    They assisted with materials review and

25     with drafting sections of the report.

1     Q.    What materials review?

2     A.    The client-supplied materials supplied in

3   the case, as well as scientific and technical

4   literature.

5     Q.    When you say "scientific and technical

6   literature," do you mean they did the research or

7   they analyzed the research?

8     A.    So specifically the literature cited in

9   the report, that group assisted with the review of

10   that literature to assist Dr. Young and I in the

11   analysis of the data and information provided.

12     Q.    And were you at the helm of all of these

13   efforts, the coordinated efforts for the gearshift

14   behavior, ensuring people showed, materials

15   reviewed, finding and analyzing the scientific

16   literature?

17     A.    I'd agree that's a fair characterization.

18     Q.    Is there any knowledge that any of these

19   individuals listed that you don't personally have?

20     A.    No, ma'am.

21     Q.    Have you ever been retained by FCA before?

22     A.    Yes, ma'am.

23     Q.    When?

24     A.    I have been retained by parties on behalf

25   of FCA numerous times, probably about six or seven

Page 11

1    times within the past -- well, 2019 now, so two and

2    a half years.

3         Q.   In what capacity?

4         A.   In the -- as a consulting expert in

5    support of investigations.

6         Q.   Was that in a litigation context?

7         A.   To the best of my knowledge, all of the

8    matters are in litigation.

9         Q.   Can you name the litigation for me?

10        A.   To the extent that I know I've been

11   disclosed, the one case is Mezo v FCA.

12        Q.   What is that case about?

13        A.   That is an individual products liability

14   case with respect to the monostable gearshift.

15        Q.   In what car?

16        A.   That was the 2013 Chrysler 300.

17        Q.   Where is that case pending?

18        A.   California.

19        Q.   State court?

20        A.   That is my understanding.

21        Q.   M-e-z-o?

22        A.   Yes, I believe so.

23        Q.   Is that the only one that you've been

24   disclosed in, the only litigation?

25        A.   That is the only case that I'm aware that

Page 12

1    I've been disclosed.

2        Q.   Do you know -- you work for Exponent right

3    now; is that right?

4        A.   Yes, ma'am.

5        Q.   Do you know whether Exponent has been

6    retained by FCA before?

7        A.   I don't know that Exponent has been

8    directly retained by FCA before.

9        Q.   Or anyone on behalf of FCA?

10       A.   I am aware that FCA has been retained by

11   folks on behalf of FCA.

12       Q.   In what capacity?

13       A.   My understanding is both with respect to

14   litigation and nonlitigation issues.

15       Q.   Do you have any information about the

16   litigation issues that Exponent has been retained

17   for by or on behalf of FCA?

18       A.   No, not specifically.

19       Q.   Do you know what types of litigation?

20       A.   Beyond automotive product liability, class

21   action, at that level, I don't have any further

22   understanding.

23       Q.   Do you know how many times?

24       A.   No, ma'am.

25       Q.   Do you know whether there is any -- aside

1   from the litigation that we're here for today, do

2   you know whether there is any litigation, any

3   active litigation going on right now that Exponent

4   is doing work for for FCA where it's been

5   disclosed?

6         A.   Not that I know has been disclosed.

7         Q.   How about any litigation in the past

8   10 years, let's say, where Exponent has been

9   retained by or on behalf of FCA where it's been

10  disclosed, not that's necessarily active?

11        A.   I'm not specifically aware in which cases

12  folks were disclosed or not.

13        Q.   Who would know that at Exponent?

14        A.   I would say the people who have been

15  disclosed individually would definitely know that.

16        Q.   Is there any kind of management at

17  Exponent that keeps track of this information?

18        A.   Beyond the individual consultants who are

19  disclosed, I don't know that we -- I'm not familiar

20  with any centralized database that has that

21  information.

22        Q.   What is your hourly rate in this case?

23        A.   I don't have an hourly rate.

24        Q.   Do you have a rate?  Are you charging

25  anything for your work in this case?

Page 14

1    A.   I am not charging anything in this case.

2    Q.   Is Exponent charging anything in this case

3    on your behalf for your work?

4    A.   Exponent is charging an hourly rate for my

5    work in this case.

6    Q.   What is that rate?

7    A.   $350 an hour for all work performed in

8    2019.

9    Q.   2019?

10   A.   Yes.

11   Q.   What about 2018?

12   A.   2018, I believe it was -- Exponent charged

13   $315 an hour for my work.

14   Q.   Do you know how much time you spent on

15   this case so far?

16   A.   I don't know.

17   Q.   Do you have an estimate?

18   A.   Hundreds of hours.

19   Q.   And those are your personal hours?  We are

20   not counting for all the other scientists who were

21   involved?

22   A.   That's correct.

23   Q.   Did you prepare a written report in the

24   Mezo cause we were just discussing?

25   A.   The Mezo case, yes, ma'am.

1    Q.   Is that public record?  Is that under a
2    confidentiality order?
3    A.   I'm not aware of any particular
4    confidentiality order, but I would defer to
5    counsel.
6    Q.   What was the context of your opinion in
7    that case?  Can you give me some background on it?
8    A.   Sure.
9         I offered opinions with respect to the
10   design and implementation of the shifter, the risk
11   of rollaway or safety critical events with respect
12   to the monostable shifter, as well as individual
13   factors with respect to the injured party in that
14   matter with respect to use of the shifter.
15   Q.   What was the injury in that case?
16   A.   The allegations were injuries associated
17   with a fall in a driveway.
18   Q.   A fall as a result of what?
19   A.   The allegations were that the fall was
20   involved -- or occurred as the Chrysler 300 in that
21   case was rolling down Mr. Lavin's driveway.
22   Q.   Was Mezo a bystander?
23   A.   I believe Mezo is the married name of
24   Mr. Lavin's daughter, of one of his daughters.
25   Q.   What are her alleged injuries, the

1    details?

2         A.    She has no alleged injures.

3         Q.    Do you know the causes of action in that

4    case?  What the claims are?

5         A.    The claims are related to the defects

6    associated with the monostable shifter.

7         Q.    So it's not a personal injury action?

8         A.    I mean, my understanding is it is, but

9    I think you're asking legal -- specific legal

10   questions that I don't know the terms.

11        Q.    It's the daughter that was injured?  Is

12   the claim being brought on behalf of the daughter?

13            Maybe I don't understand.

14        A.    No.

15            Mr. Lavin, who was the driver and the

16   injured party, is now deceased.

17        Q.    As a result of this alleged incident?

18        A.    Not in my opinion.

19        Q.    Is that the allegation?

20        A.    That is my understanding of the

21   allegation.

22        Q.    What was your opinion in that case?  What

23   kind of opinions did you render in that case?

24        A.    Beyond what I've already stated?

25        Q.    Your conclusion.  Maybe that's a better

Page 17

1    way to phrase it.

2         A.   My conclusion was that in that case the

3    gearshifter, as designed and implemented, was safe.

4    The risk of rollaway and the risk of inadvertent

5    vehicle movement is a rare event and is not overly

6    represented in the 2013 Chrysler 300 as compared to

7    other vehicles.  The incident is consistent with

8    driver error and is similar to age-related effects

9    of human behavior.

10        Q.   Is that case ongoing?

11        A.   Yes, ma'am.

12        Q.   Have you been deposed yet in the case?

13        A.   Yes, ma'am.

14        Q.   Do you know whether your deposition was

15   marked confidential?

16        A.   I am not aware one way or the other.

17        Q.   Who is the deceased person?

18        A.   Mr. Lavin.  I believe it's Lavin.

19        Q.   Also the same person?  Who was driving the

20   car?

21        A.   Mr. Lavin.

22        Q.   And he's deceased?

23        A.   Yes, ma'am.

24        Q.   Go to your CV in your report.  I think it

25   starts at page -- it's Appendix B.

```
 1              We can start at your academic credentials.
 2      I think it's a couple pages over.
 3              It looks like you have a Ph.D., in
 4      psychology from George Mason University that you
 5      earned in 2011; is that right?
 6          A.    Yes, ma'am.
 7          Q.    And you have a master's degree in
 8      psychology also from George Mason University a few
 9      years earlier in 2007?
10          A.    That is correct.
11          Q.    And before that you got a bachelor's of
12      science in human factors from Tufts University in
13      2003; is that right?
14          A.    Yes, ma'am.
15          Q.    Is your undergraduate degree in human
16      factors engineering or engineering psychology,
17      assuming there is a difference?
18          A.    The program was split between the
19      psychology department and the mechanical
20      engineering department.  The program was called
21      human factors and engineering psychology.  So
22      I would characterize all of the things you just
23      said as part of the degree.
24          Q.    It's all the same?
25          A.    Yes, ma'am, as far as at Tufts University.
```

Page 19

1    Q.    What is human factors?

2    A.    Human factors is the study of the

3    capabilities and limitations of people as they

4    interact with their environment, things in their

5    environment, and people in their environment.

6    Q.    What types of things in their environment?

7    A.    Anything.  It could be anything from a

8    chair to a computer to a phone to a pen or a

9    pencil.

10   Q.    Is it things and people or things or

11   people?

12   A.    I would say "and."

13   Q.    Do you have a degree in engineering?

14         And I'll get more detailed, mechanical,

15   design, automotive, civil, structural, material

16   science, electrical, any of that?

17   A.    No, ma'am, I do not.

18   Q.    Do you have any training in those fields?

19   A.    I did take some courses in engineering,

20   both through my undergraduate and graduate work.

21   Q.    So you have a couple courses in college in

22   the early 2000s?  Is that about it?

23   A.    As well as in grad school, yes.

24   Q.    Do you hold any licenses or certificates

25   in engineering?

Page 20

1       A.    No, ma'am, I do not.

2       Q.    You're not an engineer?

3       A.    No.

4       Q.    Do you have a degree in economics?

5       A.    No, ma'am.

6       Q.    Do you have any training in economics?

7       A.    No, I do not.

8       Q.    Any education in economics?

9       A.    Not beyond high school social studies.

10      Q.    Do you hold any licenses or certificates

11  in economics?

12      A.    I do not.

13      Q.    Have you written any publications on

14  economics?

15      A.    Not specifically on economics, no.

16      Q.    Have you performed any research or studies

17  in the field of economics?

18      A.    To the extent that usability work in

19  publications and research are done in the usability

20  field do touch on marketing and economic impact,

21  I have but not specifically with the focus on

22  economics.

23      Q.    What studies are those?  Do you know the

24  names?  Can you point to them?

25      A.    So if you look at page 7 of my CV, the

Page 21

1    last two articles mentioned there, the

2    Mintz, et al., talked about economics with respect

3    to salaries that folks graduating from human

4    factors programs were getting.  I'd say that's

5    economic related.

6          And then the article just above that, the

7    Barrow, et al., and there is a couple other

8    publications with respect to that project.  That

9    looked at marketing and usability of in-vehicle

10   display.

11        Q.   What is Barrow's background?

12        A.   I believe she has her Ph.D. now.

13   I believe at the time we were both in the human

14   factors and applied cognition program as students

15   at George Mason University.

16        Q.   How about Kidd?

17        A.   Dr. Kidd has his Ph.D. in human factors

18   and applied cognition from the psychology

19   department at George Mason University.

20        Q.   And Nelson?

21        A.   Nelson has the same degree.

22        Q.   Roberts?

23        A.   Not sure if Roberts got his Ph.D. yet.  So

24   he was a student in the same program at the time.

25        Q.   Your college buddies?

Page 22

1       A.    We were colleagues in a doctoral program
2    at George Mason University.
3       Q.    You talked about -- I asked you before to
4    define human factors, and you said it's an
5    evaluation of things and people and how they
6    interact with their environment, is that --
7       A.    It's the study of the capabilities and
8    limitations of people as they interact with things
9    in their environment and other people.
10      Q.    And that relates to the design of systems
11   that are safe?
12      A.    I would more broadly say it relates to the
13   design of systems, in general, would be certainly
14   an application of human factors.
15      Q.    What else does it involve beyond the
16   design of systems?
17      A.    Any interaction between people and
18   anything in characterizing, understanding, studying
19   and making suggestions for improvements to those
20   interactions.
21      Q.    Is it how people interact with things?
22   with objects?
23      A.    That is absolutely a subset of human
24   factors.
25      Q.    What are other subsets of it?

Page 23

1          A.    Human factors has folks who are working in

2     understanding aviation operator behavior, driver

3     behavior, cognitive modeling, basic visual

4     attention, memory, aging, any number of human

5     characteristics.

6          Q.    Going to your professional profile, it

7     says "Dr. Cades specializes in human factors

8     investigations of vehicle and aircraft operator

9     behavior, including perception-response time,

10    visual perception, nighttime visibility, and

11    distractions and has investigated the effects of

12    advanced driver assistance systems in highly

13    automated vehicles on driver behavior.  He also has

14    expertise in the evaluation and development of

15    warnings and instructions for a wide range of

16    consumer and industrial products.  He utilizes his

17    background in human factors and usability testing

18    to support his work in these areas."

19          Is that a fair summary of your personal

20    expertise in human factors?

21          A.    Yes, ma'am, it is.

22          Q.    Does it extend beyond this first

23    paragraph?

24          A.    I would say that first paragraph is a nice

25    overview, and certainly, there are specific work --

1   there is specific work I've done and activities

2   I've undertaken that go beyond that scope as well.

3        Q.    What is that?  What specific activities

4   and what work goes beyond the scope?

5        A.    So specifically I've done work looking at

6   the communication of warnings and safety

7   information for consumer products beyond just the

8   development of warnings and instructions.

9             I've also performed specific research in

10  all of these topic areas as well that I don't know

11  that are characterized completely by that first

12  paragraph.

13       Q.    But would fall somewhere within the ambit

14  of those descriptions?  Is that --

15       A.    I think that's fair.

16       Q.    Do you have a degree in finance?

17       A.    No, ma'am.

18       Q.    Do you have any training or education in

19  that field?

20       A.    Not beyond managing my personal finances.

21       Q.    I won't ask your credit score.

22             Do you hold any licenses or certificates

23  in the area of finance?

24       A.    I do not.

25       Q.    Have you written any publications in

Page 25

1    finance?

2        A.    No, ma'am.

3        Q.    Have you conducted any research or studies

4    in finance?

5        A.    Again, not beyond that one paper that

6    touches on the salaries of graduating graduate

7    students in human factors.

8        Q.    Do you have a degree in mathematics?

9        A.    I do not.

10       Q.    Do you have any degree or education in

11   mathematics?

12       A.    Not beyond the many mathematics and

13   statistics courses I took through the course of my

14   education.

15       Q.    Do you hold any licenses or certificates

16   in the area of mathematics?

17       A.    I do not.

18       Q.    Have you written any publications in the

19   area of mathematics?

20       A.    I would not characterize any of my

21   publications in the area of mathematics.

22       Q.    How about research or studies, have any of

23   those been in the area of mathematics?

24       A.    I would not characterize them as being in

25   the area of mathematics.

Page 26

1    Q.   Do you have a degree in communications?

2    A.   I do not.

3    Q.   Do you have any training or education in

4    communications?

5    A.   Not beyond the scope of communications

6    with respect to human factors and the transmission

7    of safety and instructional information to users.

8    Q.   Do you hold any licenses or certificates

9    in the area of communications?

10   A.   I do not.

11   Q.   And beyond what you just described, have

12   you written any publications or performed any

13   research or studies in the area of communications?

14   A.   Not beyond the aspects that relate to

15   human factors and the transmission of instructional

16   and safety information.

17   Q.   Are you familiar with the field of social

18   psychology?

19   A.   Yes, ma'am.

20   Q.   Do you have a degree in social psychology?

21   A.   I do not.

22   Q.   Do you have any training or education in

23   the field of social psychology?

24   A.   I have taken a course or two in social

25   psychology.

1    Q.    In college?

2    A.    College, and I believe grad school as

3    well.

4    Q.    What is social psychology?

5    A.    Again, not being a social psychologist, my

6    understanding is it has more to do with

7    interpersonal interactions and kind of leading more

8    into kind of industrial, organizational would be

9    the closest it would get to my field, but it really

10   has to do with interpersonal interactions.

11   Q.    So would that be people interacting with

12   people?

13   A.    It would be people interacting with people

14   with a slightly different spin than how I would

15   characterize the human factors study of people

16   interacting with people.

17   Q.    How would you characterize the human

18   factors study of people interacting with people?

19   A.    With respect to human factors, again, we

20   are concentrating, as human factors practitioners,

21   on the capabilities and limitations of people,

22   people's abilities as they are interacting with

23   other people, things and/or the environment, as

24   opposed to social psychology, I would characterize

25   more along the lines of the conversational,

1  emotional interaction, less about the cognitive

2  interaction.

3      Q.    How would you describe or define cognitive

4  interaction in that context?

5      A.    So cognition has to do with the way our

6  brain works and processes information and allows us

7  to act on the world.  To the extent that those acts

8  involve our interactions with other people and how

9  we think about that, as opposed to how we feel

10  about that, would be cognition.

11      Q.    Do you hold any licenses or certificates

12  in the field of social psychology?

13      A.    I do not.

14      Q.    Have you written any publications in the

15  field of social psychology?

16      A.    Not beyond the extent to which it overlaps

17  with human factors, as we just discussed.

18      Q.    Can you point to publications that you

19  have that might overlap?

20      A.    Not specifically, no.

21      Q.    Have you conducted any research or studies

22  in the field of social psychology?

23      A.    Not specifically, no.

24      Q.    Do you have a degree in marketing?

25      A.    I do not.

Page 29

1        Q.    Do you have a degree in advertising?

2        A.    I do not.

3        Q.    Do you hold -- do you have any training in

4    marketing or advertising?

5        A.    With respect to the way that

6    advertisements present information to people as

7    well as marketing overlapping with usability and

8    user experience, I would say I do have training in

9    that area.

10       Q.    Can you be more specific?  What kind of

11   training?

12       A.    So through the course of my career, I've

13   held multiple positions at both usability and user

14   experience firms.  In doing that work -- and also

15   I've done some user experience work since joining

16   Exponent as well.  In doing that work, aspects of

17   the human interaction that we look at also involve

18   things like enjoyment and how a consumer would be

19   more prone to positively interact with a various

20   product or device or website, and so it gets into

21   areas that are similar to my understanding of

22   marketing.

23       Q.    So there might be some minor overlap of

24   your work with marketing or advertising?

25       A.    I would say there might be some overlap.

Page 30

1    I don't know that I'd qualify it.

2        Q.   Do you -- have you written any

3    publications in the areas of marketing or

4    advertising?

5        A.   Not beyond publications or things I've

6    written with respect to usability.

7        Q.   How would you define that?

8        A.   So usability or user experience has to do

9    with specifically how people interact with

10   products.  The product can be anything, again, from

11   a chair to a pencil to a car to a website.

12       Q.   So people's interaction with the actual

13   product, the physical product?

14       A.   Yes, ma'am.

15       Q.   Are you affiliated with any marketing

16   organizations?

17       A.   No, ma'am.

18       Q.   Have you done any research or studies on

19   competition in the consumer marketplace?

20       A.   Not specifically, no.

21       Q.   Have you done any research in supply and

22   demand in the consumer marketplace?

23       A.   Not specifically.

24       Q.   Are there any publications on your CV that

25   you have authored that are not listed in your

Page 31

1    report?

2         A.    Sorry.

3         Q.    That's okay.

4         A.    Not to my knowledge.

5         Q.    Have you written any publications on

6    consumer purchase behavior?

7         A.    I do have publications that touch on

8    aspects of consumer purchase behavior.

9         Q.    Which ones?

10        A.    So if you look at the publication list on

11   page 3, the first paper, Hoyos, et al.

12        Q.    I'm slow.  Give me a minute.

13              Okay.  What about consumer purchase

14   behavior was addressed in this publication?

15        A.    That paper looked at aspects of advanced

16   driver technology and whether or not various

17   consumers would be interested in purchasing it,

18   whether they wanted those technologies and their

19   general perceptions of the technologies.

20        Q.    And Dr. Lester -- or sorry -- Hoyos, what

21   is Hoyos's background?

22        A.    Dr. Hoyos has a Ph.D. in psychology,

23   I believe.

24        Q.    And Lester?

25        A.    Dr. Lester has a Ph.D. in psychology.

Page 32

1        Q.    Crump?

2        A.    I believe Dr. Crump has a Ph.D. in

3    neuroscience, but I don't specifically recall.

4        Q.    By the way, we haven't made -- I don't

5    know whether we've made a specific request for all

6    these publications that you have listed, but do you

7    have access to them?

8        A.    I would imagine I would have access to

9    most of them.

10       Q.    Since you wrote them.

11       A.    I would hope I could find them.

12       Q.    Okay.  At some point we would appreciate a

13   copy of these.

14             What other publications have touched on

15   consumer purchase behavior?

16       A.    I believe the fourth publication, Cades,

17   et al., that ends at page 269, the last part of

18   that citation.

19       Q.    What specifically?

20       A.    That would be similar issues with the

21   Hoyos paper.

22       Q.    Anything else?

23       A.    I don't believe so.

24       Q.    Have you written or been involved with any

25   publications on automobile gearshift behavior or

Page 33

1    interaction?

2        A.    Not specifically, no.

3        Q.    How about generally?

4        A.    In a number of the papers that I've

5    published with respect to driver technology, they

6    were the results of driving studies in which part

7    of those driving studies necessarily had

8    participants interacting with shifters and shift

9    technology.

10            I also performed research projects that

11   looked at shifting behavior or interactions with

12   the shifter as part of closed course driving

13   studies for other projects at Exponent.

14       Q.    You've done those research and projects

15   under the gearshift behavior you just described

16   while you were employed at Exponent?

17       A.    Yes, ma'am.

18       Q.    Was that related to litigation?

19       A.    None of the work I just described was

20   related to litigation.

21       Q.    Would that be consulting work?

22       A.    One of the projects was consulting.  The

23   others were research.

24       Q.    Was that on behalf of automobile

25   companies?

1      A.    The one consulting project was on behalf

2   of a private company, not an automobile company.

3   The other projects were research that we performed

4   on our own.

5      Q.    Why would Exponent just perform research

6   on its own?

7      A.    So as part of being a scientist in the

8   field of human factors, one thing that I like to

9   do, and that other folks in the human factors

10  practice and across Exponent like to do, is find

11  new information.  And as new technologies are

12  coming out, as a human factors practitioner,

13  I certainly wanted to get an understanding of how

14  these new technologies affect the driver

15  interaction with the vehicle.  In order to gain

16  that information, one way to do it is to conduct

17  studies.

18     Q.    And so it's done by and on behalf of

19  Exponent, this research that you're talking about,

20  that was unrelated to litigation or consulting?

21     A.    I'd say that's a fair characterization.

22     Q.    What did that involve, the research?  What

23  was the purpose?

24     A.    To examine the driver interaction with

25  various vehicle technologies.

                                                        Page 35

1       Q.    And did that include gear shifting?

2       A.    I don't know that gear shifting -- I don't

3    believe that gear shifting was a specific focus of

4    those studies.  However, with respect to the way

5    that the various advanced driver assistance

6    technologies function, gear shifting is a part of

7    that interaction.

8       Q.    And was this research concluded, or is it

9    ongoing?

10      A.    I would characterize it as ongoing.

11      Q.    Let's go to your litigation experience

12   starting with depositions.

13      A.    I'm sorry.  You are referring to my

14   testimony list?

15      Q.    Yes.  I'm trying to figure out page

16   numbers here, but I'm not doing a very good job

17   guiding you, but I think we are on the right page.

18      A.    I'm with you.

19      Q.    Good.

20            Going to your listed depositions, in which

21   cases were you hired on behalf of the plaintiff and

22   which defendant?

23            You are welcome to put a P and D, if you

24   want, whatever works for you.

25      A.    So you are at the first one reading

Page 36

1      "Charlene Henry"?

2          Q.    Uh-huh.

3          A.    No. 1 would be defendant; No. 2 would be

4      defendant; 3, defendant; 4, defendant;

5      5, defendant; 6, plaintiff; 7, defendant;

6      8, defendant; 9, defendant; 10, plaintiff;

7      11, plaintiff; 12, defendant; 13 -- all of the rest

8      would be defendant, 13 through 16.

9          Q.    While we are at it, let's go through

10     trials.  Same thing.

11         A.    1, defendant; 2, plaintiff; 3 and 4,

12     defendant.

13         Q.    And the arbitrations?

14         A.    Both are defendant.

15         Q.    For the depositions, did any of these

16     cases involve allegations relating to gearshifts or

17     in any way involving gearshifts?

18         A.    Not beyond the extent that a number of

19     them are motor vehicle cases and at least one of

20     them involved the vehicle transitioning from going

21     forward to backwards.

22         Q.    Which one?

23         A.    That would be -- I believe that would be

24     Deposition No. 3.

25         Q.    Imber?

Page 37

1        A.   Yes, ma'am.

2        Q.   Which -- what numbers, since we are going

3    to numbers, of these cases involve automobiles?

4        A.   Under depositions, No. 2, 3, 4, 5, 7, 9,

5    and then 10 through 15 but not 16.

6        Q.   What did No. 1 involve?

7        A.   Under --

8        Q.   Depos.

9        A.   That involved an alleged trip and fall.

10       Q.   No. 6?

11       A.   No. 6 was a misstep and fall.

12       Q.   8?

13       A.   8 was a railway incident.

14       Q.   CSX.

15            And then 10 -- No. 16?

16       A.   Aviation.

17       Q.   No. 10 and 11 involved automobiles; is

18   that right?

19       A.   Yes, ma'am.

20       Q.   And you were hired on behalf of the

21   plaintiffs in those cases?

22       A.   Exponent was retained on behalf of the

23   plaintiffs.

24       Q.   Exponent.

25            If you're able to discuss it and it's not

Page 38

```
 1    subject to a confidentiality agreement, what was
 2    the basis of your opinion in that case?  No. 10.
 3         A.   My recollection is that No. 10 involved a
 4    left turn and had to do with visibility and
 5    sight line issues as well as driver response.
 6         Q.   11?
 7         A.   No. 11 involved a tree that had fallen
 8    across the road and involved issues with respect to
 9    visibility and low light human visual ability.
10         Q.   And trials, which one of these involved
11    automobiles?
12         A.   No. 1, No. 3, and that's it.
13         Q.   How about the arbitrations?
14         A.   No. 2 involved automobiles or I should
15    clarify, involved at least an automobile.
16         Q.   Let's turn to the documents reviewed in
17    preparing your report.  I think it's on page 7,
18    going all the way through 13; is that right?
19         A.   Yes, ma'am.
20         Q.   Is this list exhaustive?
21         A.   No, ma'am.
22         Q.   What's missing?
23         A.   There are materials that I've received
24    since the issuance of my report.
25         Q.   What are those materials?
```

Page 39

1      A.    Since the issuance of the report, I've

2   received the report of Robert Kuhn; the report of

3   Rene Befurt; as well as depositions with exhibits

4   of Jennifer Baker, Justine Hastings, Robert Kuhn,

5   and Kuhn is K-u-h-n; the deposition and exhibits of

6   Craig Rosenberg; deposition and exhibits of

7   Bruce Strombomb; deposition and exhibits of

8   Stephen with p-h, Williams; as well as the

9   plaintiff's notice of my deposition.

10     Q.    Does your receipt or review of that

11  information alter any of the opinions in your

12  report?

13     A.    No, ma'am.

14     Q.    Are there any opinions in your report that

15  you would like to change as we sit here today?

16     A.    There are no opinions that I would change.

17  However, I have gotten some additional data that

18  I've used to update the North Carolina analysis.

19     Q.    We'll get there.

20           Looks like this includes -- the list of

21  materials that you reviewed includes the

22  plaintiff's deposition transcript; is that right?

23     A.    In that batch it looks like we received 32

24  of the transcripts, and then I believe we received

25  an additional, on page 11, looks like 10 more.  One

Page 40

1    of them might have been a repeat.

2         Q.   Did you personally review any of these

3    deposition transcripts?

4         A.   I did not review those deposition

5    transcripts in their entirety.  I reviewed relevant

6    sections of those depositions.

7         Q.   Who determined the relevant sections for

8    you to review?

9         A.   I did.

10        Q.   How did you do that without reading the

11   whole transcript?

12        A.   Deposition summaries for all of the

13   depositions that we received, less the deposition

14   of Robert Kuhn, were prepared by my staff at my

15   direction.

16        Q.   So someone on your staff reviewed each

17   deposition transcript line by line and then

18   summarized it for you?

19        A.   Various people on my staff reviewed all of

20   the depositions in their entirety, less the

21   deposition of Robert Kuhn, and prepared summaries

22   that I used to guide me to the relevant sections.

23        Q.   And who was that?

24        A.   A collection of the team of people that we

25   talked about earlier.

Page 41

1        Q.    The document reviewers that we talked

2   about?

3        A.    Yes, ma'am.

4        Q.    Who did -- you're excluding Kuhn from

5   this.  Who -- have you reviewed his transcript?

6        A.    I have, a rough draft of his transcript.

7        Q.    And you did that personally?

8        A.    Yes, ma'am.

9        Q.    When did you review it?

10       A.    Yesterday.

11       Q.    What is your understanding of the

12  allegations in this case?

13       A.    Plaintiffs allege that the FCA vehicles

14  noted in the class, which would be the

15  2012 to 2014 Chrysler 300, the 2012 to 2014

16  Dodge Charger, as well as the 2014 to 2015

17  Jeep Grand Cherokee, those vehicles in those makes

18  and model years that were equipped with the

19  monostable gearshifter, plaintiffs allege that the

20  gearshift was defectively designed.

21       Q.    Have you had any contact with anyone at

22  FCA in connection with your work in this case?

23       A.    No, ma'am.

24       Q.    When I ask these questions about you in

25  context, I am also asking about whether anyone on

1    your team, including all of the people you listed

2    before, Dr. Young, did anyone have any connection

3    with anyone at FCA in connection with this case?

4         A.   Not to my knowledge.

5         Q.   Were there any documents you wanted to

6    review as part of your assessment in this case that

7    you were prevented from seeing, or did you get

8    everything you need?

9         A.   In answer to your first question, there

10   were no documents that I wanted to review that

11   I was not able to.

12            In answer to your second question, to the

13   best of my knowledge, I've reviewed information

14   sufficient for my analysis.  To the extent that

15   additional information becomes available and

16   additional documents are produced and provided to

17   me, I can review those.

18        Q.   What is the science of purchase decision?

19   Page 36.

20        A.   When an individual is engaging in the

21   purchase of a product, there are numerous

22   heterogenous individual factors that are considered

23   by any individual in making that purchase.  There

24   is research, the science of purchase decision, that

25   has been done looking at various aspects of

Page 43

1  consumer behavior as it relates to purchasing

2  products and specifically automobiles.

3      Q.   Have you performed any of this research?

4      A.   Not beyond what we have discussed earlier

5  with respect to the research and publications

6  I have looking at individual's desires with respect

7  to purchasing vehicles with advanced vehicle

8  technology.

9      Q.   Just those two studies that you pointed to

10  in your list?

11      A.   I believe so, yes.

12      Q.   Are you offering an opinion in this case

13  on economic damages or monetary value?

14      A.   The analysis that I've performed with

15  respect to purchase decision shows that it is

16  unlikely and that the various individuals among the

17  named plaintiffs, as well as the broader putative

18  class, would not be similarly affected by the

19  inclusion of the monostable shifter, a presentation

20  of any type of disclosure or recall notice as well

21  as the implementation of the recall remedy.

22      Q.   Does that mean you're offering an opinion

23  on economic damages?

24      A.   Not to a specific number, but to the

25  presence and type of any specific damage, I would

Page 44

1    say yes.

2        Q.    Are you offering any opinions on the

3    engineering or design of the gearshift?

4        A.    Yes.

5        Q.    In what capacity?

6        A.    Looking at the design and implementation

7    of the monostable shifter -- is it okay if I refer

8    to them as the "class vehicles"?

9        Q.    Yes.

10       A.    The design and implementation of

11   monostable shifter in the class vehicles from a

12   human factors perspective.

13       Q.    Have you ever designed a gearshift?

14       A.    I have not.

15       Q.    What kind of car do you drive?

16       A.    I currently drive a Land Rover Discovery

17   Sport.

18       Q.    What kind of gearshift does that have?

19       A.    An electronic rotary shifter.

20       Q.    Do you like it?

21       A.    I have no particular opinion on it.  It

22   allows me to shift from one gear to the next.

23       Q.    Going back to the science of purchase

24   decisions, are there subsets within the science

25   like food?  Automobiles?  Vacations?

Page 45

1      A.   That is certainly one way to look at

2   topics covered with respect to purchase decision,

3   and there certainly are going to be differences

4   when you're looking at different types of products.

5   So that is certainly one way to look at different

6   areas of purchase decision behavior.

7      Q.   Do you have any -- I'm using this phrase

8   because you've used it.  Science of purchase

9   decisions, is that its own field of study?

10      A.   My understanding, it certainly could be

11   descriptive of a field of inquiry.

12      Q.   What education do you have in the science

13   of consumer purchase decisions?

14      A.   In looking at the researchers who

15   published papers, they come from a wide variety of

16   backgrounds, including economics, marketing, human

17   factors, other areas of psychology, and I'm sure

18   more areas as well.

19      Q.   Would you consider yourself an expert in

20   consumer purchasing behavior?

21      A.   With respect to the individual factors and

22   to human factors as they related to purchase

23   decision, yes.

24      Q.   What does that mean?  I don't understand

25   what that means, "with respect to the human factors

1    as they relate to purchase decisions"?

2         A.    So my expertise lies in the application of

3    human factors principles in terms of purchase

4    decisions, in terms of understanding the individual

5    factors, the cognitive aspects and how various

6    information is presented and used by individuals

7    engaged in a purchase decision.

8         Q.    A point of purchase decision.

9              Let's go to this.  I'm looking at your

10   professional profile, and it says you "specialize

11   in human factors investigations of vehicle and

12   aircraft operating behavior."  Does that have

13   anything to do with consumer purchasing behavior?

14        A.    I would certainly say that the way in

15   which people operate a vehicle, whether it be an

16   aircraft or a motor vehicle, will influence their

17   purchase decision.

18        Q.    You said that some of the authors of the

19   articles you cited within your study have human

20   factors backgrounds.  Was that your testimony?

21        A.    I believe what I testified to was that

22   people who publish in this area will have

23   backgrounds, including human factors.

24        Q.    What education did you have relating to

25   consumer purchasing behavior?

1     A.    I'm sorry.  Could you repeat the question?

2     Q.    What education do you have relating to

3  consumer purchase behavior?

4     A.    Specifically from an education

5  perspective, I took courses with respect to

6  usability, user center design and using that

7  information to evaluate individuals' and consumers'

8  interactions with and desires for products.

9     Q.    And that's the same thing as purchase

10  behavior?

11     A.    It is certainly related to the activities

12  that individuals go through in purchasing a

13  product.  And, additionally, my background and

14  education in human cognition and human attention

15  and the way in which folks think about and interact

16  with the environment, absolutely plays into and is

17  part of the process that individuals go through

18  when they are purchasing a product.

19     Q.    So you've taken a few college courses on

20  this topic?

21     A.    In answering your question with respect to

22  my education, my formal education in this area,

23  I believe I've answered your question.

24     Q.    Is that -- is my summary, right, though?

25  You've taken a few courses throughout your

Page 48

1   bachelor, master's and Ph.D.?  Is that a summary of

2   your education?

3       A.   With respect to my actual education and

4   teaching in that area and what I've been taught,

5   yes.

6       Q.   Have you conducted any studies or research

7   on consumer decision-making at the point of

8   purchase?

9       A.   Not specifically, no.

10      Q.   How about generally?

11      A.   Generally, I've conducted research looking

12  at consumers' and individuals' thoughts and

13  interactions and asking questions about what they

14  would purchase and when, to the extent that those

15  questions relate to their thought processes that

16  they would have at a point of purchase.  I would

17  characterize that as related to human behavior at

18  the point of purchase.

19      Q.   Is this listed in your report anywhere,

20  this research?

21      A.   In my CV, yes.

22      Q.   Which one?  Which particular research or

23  study are you referring to?

24      A.   So, again, specifically, it would be the

25  Hoyos, et al., paper, the first one listed in the

Page 49

1   publication list; as well as the Cades, et al.,

2   paper, that would be the fourth one down.

3        Q.   Just these two?  That's the extent of your

4   research?

5        A.   That is the extent of my publications that

6   cover that topic.

7        Q.   Is that the extent of your research that

8   covers that topic?

9        A.   No, ma'am.

10       Q.   What research have you done that covers

11   this topic?

12       A.   There is ongoing research with respect to

13   those projects that those publications relate to.

14       Q.   Can you give me details about that ongoing

15   research?

16       A.   We are collecting and have collected more

17   data that we have not analyzed yet.

18       Q.   About what?

19       A.   About consumers' thoughts, feelings and

20   interactions and individuals' thoughts feelings and

21   interactions with respect to advanced vehicle

22   technology.

23       Q.   Okay.  So relating to these two

24   publications, it's ongoing research?  Is that what

25   you're saying?

Page 50

1      A.    Yes, ma'am.

2      Q.    Anything broader than that --

3      A.    No, ma'am.

4      Q.    -- or it all just comes back to these two

5  publications?

6      A.    Those two publications are related to the

7  ongoing project I'm talking about.

8      Q.    So the research that you've conducted with

9  respect to consumer purchase behavior is either

10  included in just these two articles or the ongoing

11  research related to these two articles?

12      A.    That would cover the research, the

13  specific research projects -- projects that I'm

14  working in that area.

15      Q.    What I'm asking you is is your research

16  and publications in the area of consumer purchase

17  behavior limited to just these two articles and the

18  ongoing related research?

19      A.    No, ma'am.

20      Q.    What more do you have?

21      A.    The previous work that I've done in the

22  usability field certainly involves understanding

23  consumers' desires and consumers' interactions with

24  products with respect to looking at the design of

25  those products and systems, such that folks would

Page 51

 1    be more -- would like them better and would be more

 2    likely to use them, and if they were for purchase,

 3    purchase them.

 4         Q.   What work is this?  You said "previous

 5    work."  Can you give me more detail?

 6         A.   So if you look at page 2 of my CV, listed

 7    under "Prior Experience," specifically, my work at

 8    the company User Centric; American Institute For

 9    Research; Electronic, Ink; as well as Verizon

10    Laboratories; as well as various projects I worked

11    on through the course of my education at

12    George Mason University and Tufts University

13    covered these areas.

14         Q.   What did you do at User Experience or

15    User Centric --

16         A.   User Centric --

17         Q.   -- in this capacity?

18         A.   Sorry.

19         Q.   Sorry.  My fault.

20         A.   User Centric was a usability or user

21    experience firm, and they were hired on the project

22    I worked on behalf of their clients to analyze,

23    understand, and improve the customer experience for

24    these clients' products.

25         Q.   How long did you work there?

Page 52

1      A.   I did contract work for them for nine to
2    ten months, I believe.
3      Q.   What did this work involve?
4      A.   Evaluating usability and user experience
5    of their clients' products.
6      Q.   What were those products?
7      A.   The one I remember was a website and
8    mobile portal for a banking institution.
9      Q.   Were you there when the project concluded?
10     A.   I do not believe I was.
11     Q.   And the work you did there about website
12   and mobile portals involved consumer purchase
13   behavior?
14     A.   It involved consumers, but in this case
15   characterized them as client and customer
16   interaction with the bank's products.  So to the
17   extent there were products that users were
18   purchasing from the bank, yes.
19     Q.   What products?
20     A.   I don't specifically recall.
21     Q.   And then Electronic Ink, what is that
22   company?
23     A.   Electronic Ink is a user experience
24   usability firm.
25     Q.   And this was almost 18 years ago?

Page 53

1      A.   Yes, it was.

2      Q.   How long were you there?

3      A.   Three months full-time and continued

4  working with them for another three or four months.

5      Q.   You were an intern?

6      A.   Yes, ma'am.

7      Q.   What were your responsibilities?

8      A.   To assist in the design and implementation

9  of various usability and user experience projects.

10     Q.   Of what products?

11     A.   I honestly don't recall the products that

12  we worked on.

13     Q.   And how about Verizon Laboratories, also

14  approximately 18 years ago?

15     A.   At Verizon Laboratories I was part of the

16  user experience, usability team looking at the

17  interactions of users with their various, at the

18  time, various yellow pages-type products.

19     Q.   What did that have to do with consumer

20  purchase behavior?

21     A.   It had to do with designing the products

22  that Verizon Laboratories was putting out to

23  increase traffic and also increase ratings of

24  consumers using their products.

25     Q.   Do you have any other research experience

Page 54

1    with consumer purchase behavior other than what we

2    discussed?

3        A.    Through the course of my undergraduate and

4    graduate work, I was involved in numerous

5    usability, user-centered design projects that

6    involved assessing systems and projects with

7    respect to the user experience, usability with the

8    ultimate goal of improving that, such that people

9    would be more apt to use it and enjoy that

10   experience of using it more.

11       Q.    Okay.  I just want to make sure

12   I understand.  So your background in consumer

13   purchase behavior includes these two articles that

14   you've published with ongoing research, your

15   internships 18 to 19 years ago that we just

16   discussed, and the 9 to 10 months that you spent at

17   User Centric and some of the college courses that

18   we discussed and the work that you did in college?

19   Is that about it?  Am I missing anything?

20       A.    I believe you didn't characterize the

21   knowledge and understanding of human cognition and

22   attention and interaction with information that

23   absolutely applies to the science of purchase

24   decision.

25       Q.    And you have that background from what?

Page 55

1        A.    From my nearly, at this point, over

2    20 years of experience, education, working in

3    fields related to human factors -- in the field of

4    human factors and fields related to usability and

5    user experience.

6        Q.    What specifically, though, over that

7    period of time, other than the details of what we

8    just discussed, involves consumer purchase

9    behavior?

10        A.    I think we fairly characterized the

11    detailed projects.  What I think has not been

12    accurately characterized is my entirety of my

13    background and career and understanding of human

14    factors and human cognition and the principles of

15    human factors and human cognition as they relate

16    and apply to purchase decisions.

17        Q.    And is that just generally applicable to

18    human factors, the science of human factors, what

19    you've just described?  Would all human factors

20    experts have that background?

21        A.    I certainly can't think of all human

22    factors experts, but I certainly do have that

23    background.

24        Q.    Because of your human factors work?

25        A.    Because of my knowledge, training, and

Page 56

1    experience in the human factors field.

2        Q.   It just seems broad.  I am trying to get

3    down to the details.  I mean, other than what we've

4    just discussed, the publications, the college

5    courses, the few internships that you had, you're

6    broadly saying your work as a human factors expert

7    makes you an expert in consumer purchasing

8    behavior?  Is that what you're saying?

9        A.   In the human factors aspects, as I've laid

10   out with respect to purchase decision and science

11   analysis, yes.

12       Q.   And that's something general to the human

13   factors field?

14       A.   I have certainly acquired those skills and

15   knowledge through my work in the human factors

16   field.  I would consider those topics of human

17   cognition and interaction with information and how

18   that relates to the use of and decision to engage

19   in using or not using products as part of human

20   factors.  I certainly can't say for any other

21   individual in this field that they would have

22   similar or the same expertise.

23       Q.   Other than what we've discussed, have you

24   conducted any research on consumer vehicle purchase

25   behavior?

Page 57

1     A.    Not beyond what we've discussed.

2     Q.    Have you offered opinions about consumer

3  purchase behavior in any other cases?

4     A.    No, ma'am.

5     Q.    Have you offered opinions on consumer

6  purchase behavior in any other capacity?

7  Consulting?  Anything else?

8     A.    Yes, I have.

9     Q.    Can you give me the details of that?

10     A.    With respect to all of the various

11  projects that we have just been discussing for the

12  past 10 or so minutes, in those projects that

13  looked at the design and implementation of various

14  products, certainly, topics related to what would

15  or would not make folks more or less likely to

16  engage in the use and, if necessary, the purchase

17  of those products were discussed.

18     Q.    Have you conducted any research on price

19  negotiations at the point of purchase?

20     A.    Not specifically, no.

21     Q.    Do you have any training or education in

22  price negotiations at the point of purchase?

23     A.    Price negotiation was certainly a topic

24  covered through the course of my education with

25  respect to the individual characteristics and

Page 58

1    cognitive strategies employed.

2         Q.   And when you say "education," which

3    program?  Undergrad?  Master's?  Ph.D.?

4         A.   Those topics were certainly covered

5    through the course of that, and I think more

6    broadly, as I continued to educate myself through

7    reading various research articles and scientific

8    publications since then.

9         Q.   You've cited to several studies in the

10   science of purchase decisions area starting at

11   page 36 and going through the top of page 42 of

12   your report.  It looks like you cited Sanbonmatsu,

13   S-a-n-b-o-n-m-a-t-s-u; and Fazio; Bettman; Abramson

14   and Desai; a few others.  Does that sound right?

15        A.   Pronunciation aside -- don't know that

16   I could do a better job -- but those are some

17   articles that I have cited to.

18        Q.   And let's assume the authors of these

19   studies have degrees in economics, social

20   psychology, and marketing, things you don't have

21   degrees in; right?

22        A.   I do not have degrees in those fields.

23        Q.   And let's assume they've either had those

24   degrees or taught college courses in those areas,

25   and you've not done that either; right?

Page 59

1     A.   No, I have not.

2     Q.   And other than the few articles that we've

3   discussed, you've not published articles in

4   economics, social psychology, or marketing; right?

5     A.   With the caveat that I don't agree with

6   the characterization of the first part of that

7   question, I have not published articles in those

8   areas.

9     Q.   Have you published any articles in social

10   psychology?

11     A.   Not specifically, no.

12     Q.   Marketing?

13     A.   Not beyond the aspects of the articles

14   that I've published that we discussed already.

15     Q.   Economics?

16     A.   Same answer.

17     Q.   Okay.  So if these individuals have done

18   all of that, would you agree they have a different

19   background than you do?

20     A.   I wouldn't agree that their background is

21   different than mine.

22     MS. SOFFIN:  Do you want to take a break, by

23   the way?

24     MR. FRESARD:  This is as good a time as any.

25     THE VIDEOGRAPHER:  We are going off the record.

Page 60

```
 1        This is the end of Media Unit No. 1.  The time
 2     is 10:37 a.m.
 3                     (A short break was taken.)
 4        THE VIDEOGRAPHER:  We are back on the record.
 5        This is the beginning of Media Unit 2.  The
 6     time is 10:56 a.m.
 7        Please proceed.
 8     BY MS. SOFFIN:
 9        Q.   Did you conduct a study in this case about
10     whether people value safety in their decision to
11     purchase a vehicle?
12        A.   That was not specifically an aspect of the
13     study we performed.
14        Q.   Have you ever performed any studies about
15     whether people value safety in their decision to
16     purchase vehicles?
17        A.   No, I have not.
18             Sorry.  Actually, I would have to go back
19     and look.  I believe in the publications, the two
20     publications that we've been speaking of, there
21     were questions with respect to consumers' attitudes
22     toward safety with respect to the vehicle they were
23     considering.
24        Q.   Was that just the advanced vehicle --
25     what's the phrase, advanced vehicle --
```

Page 61

1      A.   There is a couple phrases, Advanced Driver

2   Assistance Systems, as well as Highly Automated

3   Vehicles.

4      Q.   Would that involve studying safety in

5   general or safety with respect to those advanced

6   vehicle systems?

7      A.   My recollection is that it was both.  I'd

8   have to go back and check specifically to answer

9   that question directly.

10      Q.   Would that be noted in those publications?

11      A.   Yes, ma'am, I do believe it would.

12      Q.   Have you ever been qualified in court to

13   testify as an expert in the field of consumer

14   purchase behavior?

15      A.   No, I have not.

16      Q.   Do you have any experience about whether

17   conjoint analysis is a reliable tool for measuring

18   consumer preferences for various attributes in

19   motor vehicles?

20      A.   I don't have any specific opinions about

21   conjoint analysis.

22      Q.   On page 36 you say "Scientific

23   research" -- I'll give you a minute -- on page 36

24   you say "Scientific research demonstrates that

25   consumers tend to be highly heterogenous in terms

Page 62

1    of the product features they prioritize when making

2    a purchase decision."

3            Have you conducted any of the scientific

4    research?

5        A.    I have not conducted the scientific

6    research that is cited there.

7        Q.    Have you conducted any scientific research

8    in this regard, that consumers tend to be highly

9    heterogenous in terms of the product features they

10   prioritize when making a purchase decision?

11       A.    Yes, ma'am.

12       Q.    And is that the two articles we talked

13   about?  The two publications?

14       A.    These topics were covered in a lot of the

15   project work that I've done through the course of

16   my career.  As far as what's been published, it

17   would be the two papers we talked about.

18       Q.    What project work?  Do you have any

19   details on that?

20       A.    In all the usability and user work that

21   I've done throughout my career, through graduate

22   school, internship, the jobs we have spoken about

23   and at Exponent, in assessing how individuals

24   interact and think about products, aspects of those

25   projects absolutely get into the various product

Page 63

1     features that individuals are interested in.

2          Q.    And does that also include whether they

3     would actually purchase it, or is it just what they

4     like about the product, about its use, its

5     usability?

6          A.    In the totality of the work I've done,

7     there have been times where the project has asked

8     whether or not a person would purchase some product

9     or system, and other times that question has not

10    been asked.

11         Q.    Does it involve what they would pay for it

12    too?

13         A.    I don't recall specifically.  My

14    recollection is that the price point of various

15    products was something that we assessed in the

16    course of the usability and user experience work

17    that I've been a part of.

18         Q.    What work was that?  What products did it

19    involve?

20         A.    It certainly involved interactions with

21    the various websites that we talked about earlier

22    and any products that might be available there.

23         Q.    At the bank?

24         A.    Banking institution was one example

25    I could recall specifically.  There was also work

Page 64

1   I've done with respect to the design and

2   interactions of humans with physical products.

3   I am trying to recall specifically.  I think there

4   was an ice cream scoop I worked on at one point.

5        Q.    Anything else?

6        A.    There were many others.  I don't

7   specifically recall what they were.

8        Q.    So the totality of your work that has to

9   do with aspects of consumer purchase behavior that

10   you can remember deals with your internship

11   relating to banking products and an ice cream

12   scoop?

13        A.    I don't agree with that characterization.

14        Q.    I said that you can recall.

15        A.    I can recall generally that I've worked on

16   numerous products at numerous positions.  The

17   internship was not with a banking institution, and

18   through the course of all of that, as well as my --

19   you know, the entirety of my career, covered these

20   types of aspects before.

21        Q.    So what other products, though, besides

22   the banking products and the ice cream scoop, can

23   you recall doing research on consumer purchase

24   behavior?

25        A.    In addition to the advanced driver

Page 65

1    technologies we've discussed, there was a project

2    that I worked on looking at the design and

3    implementation of a vehicle information system with

4    respect to inclement weather.

5         Q.    When was this?

6         A.    That was while I was at

7    George Mason University.

8         Q.    Did you publish an article on that?

9         A.    Yes.

10        Q.    Do you have access to that, or can you get

11   access to that?

12        A.    As I stated before, I would assume

13   I could.

14        Q.    Okay.  Any other products?  We've got the

15   advanced driver technology, the ice cream scoop,

16   and the bank products.  Anything else that you can

17   remember?

18        A.    None that I can specifically recall.

19        THE VIDEOGRAPHER:  Slide your mic up a little

20   bit.

21        THE WITNESS:  I apologize.

22   BY MS. SOFFIN:

23        Q.    On pages 26 through 31 of your report --

24        A.    You said 26?

25        Q.    Yes, through 31, the tables on page 27 and

Page 66

1    28 appears to include instructions and warnings

2    related to the monostable gearshift in the class

3    vehicles in the owner's manual; is that right?

4        A.   The information in Table 1 on pages 27 and

5    28 contain excerpts from a 2015 Jeep Grand Cherokee

6    owner's manual, and the information contained in

7    the table covers the gearshift in vehicle

8    securement generally.

9        Q.   And you say that these, what you call,

10   instructions and warnings are nearly identical

11   across all class vehicles; is that right?

12       A.   They are -- they are similar and nearly

13   identical across the class vehicles.

14       Q.   Was this all of the relevant instructions

15   and warnings in the owner's manual relating to the

16   gearshift in the class vehicles that you found?  Is

17   there anything missing from here that might be

18   relevant?

19       A.   Not that I'm aware of.

20       Q.   And these all span from 424 to 557 of the

21   owner's manual and in various locations between

22   those pages; is that right?

23       A.   I'm sorry.  The top number, you said, was

24   557?

25       Q.   Yes.

1      A.    That is correct.

2      Q.    And is the information on page 28 -- it

3   might also span to page 29, is that a summary of

4   all instructions and warnings related to the

5   gearshift in the class of vehicle user guides?

6      A.    I don't believe the figure depicted on

7   page 29 is exhaustive of the information.  It is

8   representative of the information.

9      Q.    And then page 30 has a tip card, which you

10  describe as another source of information available

11  to drivers about the monostable gearshift; is that

12  right?

13     A.    As well as the display of relevant

14  information in the vehicle with respect to the

15  gearshift.  That is correct.

16     Q.    What does that mean, the actual gearshift?

17  What display?

18     A.    What's been referred to as the EVIC or the

19  dash, as well as the indicator lights on top of the

20  gearshift.

21     Q.    Is that all of the information provided

22  relating to the class vehicles' gearshift at the

23  time of purchase of a new vehicle?

24     A.    No, I don't believe that is the entirety

25  of the information presented at the time of

Page 68

1    purchase for a new vehicle.

2                    (Court reporter clarification.)

3    BY MS. SOFFIN:

4        Q.   In written form?  The User Guide, the

5    manual, the tip card, is there anything else

6    provided to consumers regarding the gearshift at

7    the point of purchase in written material?

8        A.   Not to the best of my understanding.

9        Q.   On page 32 it appears you provide a brief

10   summary of all this information that we just

11   discussed -- is that right? -- just that paragraph

12   under "Summary"?

13       A.   That's a fair characterization of that

14   summary.

15       Q.   Do you have an opinion on the

16   effectiveness of these warnings and instructions in

17   the owner's manual, the user's guide and the tip

18   cards?

19       A.   With respect to the information provided

20   within these written materials, as well as

21   information provided in the vehicle, that

22   information was sufficient for an alert and

23   attentive operator to understand the state of the

24   vehicle as well as ensure its securement.

25       Q.   What does "alert and attentive operator"

Page 69

1    mean?

2        A.    It would be an operator who is engaged in

3    paying attention to the task they are attempting to

4    accomplish.

5        Q.    How is that determined?

6        A.    Generally, that's determined on an

7    individual basis by assessing the specific actions

8    of any given individual based on information

9    available about the behavior of that individual at

10   the time of the action to be assessed.

11       Q.    Is there any studies or research, that you

12   are aware of, of what type of person would be

13   considered alert and attentive?

14       A.    Yes.

15       Q.    Have you performed any of those studies?

16       A.    Yes.

17       Q.    What type of person, if you can describe

18   it in that way?

19       A.    In research related to human behavior, if

20   you examine the behavior of a group of people, the

21   alert and attentive, you'll get a distribution of

22   data.  As is normal in any quantitative assessment

23   of human behavior, folks are necessarily

24   heterogenous.  In looking at that distribution and

25   having an understanding of the experimental

Page 70

```
 1    controls allows the assessment of what would be
 2    expected from typical or alert and attentive
 3    behavior in the absence of distractions or
 4    additional non-task-related activities.
 5         Q.   Is there any research that you have
 6    performed about the alertness and attentiveness of
 7    people with respect to these particular items,
 8    user's guide, owner's manual, tip cards?
 9         A.   I'm sorry.  Could you repeat the question?
10         Q.   Yeah.
11              My understanding is you said the
12    information, the User Guide, the tip card, the
13    owner's manual would be sufficient instructions and
14    warnings for an alert and attentive operator.  Is
15    there any research or studies that you're familiar
16    with with respect to those particular items, user's
17    guides, manuals, tip cards?
18         MR. FRESARD:  Object to the form.
19         THE WITNESS:  Yes.
20    BY MS. SOFFIN:
21         Q.   What is it?
22              It might be on page 43.  I see here you
23    say "Scientific" -- right under disclosure
24    location, second paragraph, "Scientific evidence
25    indicates that even if the allegations in this case
```

Page 71

1    were true, it's unlikely all consumers considering

2    purchase or lease of these vehicles would have

3    noticed and read information offered by FC US

4    regarding the alleged defect.  Furthermore, the

5    inclusion of information in an environment

6    (e.g., in manuals or product documentation) does

7    not necessarily result in a processing of that

8    information."

9            So before you testified that information

10   in product manuals, User Guide, tip cards would be

11   effective for an alert and attentive person, but

12   here it appears you're saying that inclusion of

13   that information in those types of documents

14   doesn't necessarily mean someone is going to

15   process it; is that right?

16       MR. FRESARD:  Objection to form.

17       THE WITNESS:  I would agree with that

18   characterization.

19   BY MS. SOFFIN:

20       Q.   So the processing of the information in

21   the manual, the production documentation and tip

22   cards would be limited to alert and attentive

23   people?

24       A.   I wouldn't say "limited to," however, the

25   information available in those sources was

Page 72

1    sufficient for a person who is alert and attentive

2    with respect to the processing of information.  To

3    lead to compliance, there are other aspects of

4    human behavior that are necessary to get to

5    compliance.

6        Q.   If someone was not alert or attentive, is

7    it less likely they would have processed that

8    information?

9        A.   To the extent that whatever decrements are

10   present in making that individual less alert and

11   attentive and to the extent that those decrements

12   either prevent, inhibit or discourage their ability

13   or desire to look at that information, acquire that

14   information, read that information, understand that

15   information, and comply with that information,

16   I would agree.

17       Q.   I just want to make sure I understand your

18   opinion.  It's your opinion that the instructions

19   and warnings in the User Guide, the user's manual

20   and the tip card were effective for people who were

21   alert and attentive?

22       A.   I agree with that.

23       Q.   And is it for people who were alert and

24   attentive only?

25       A.   Not necessarily.

Page 73

1       Q.   Is it more likely than not that it would

2   have been effective for that group of people?

3       A.   I can't answer that question generally.

4       Q.   Do you have an opinion about whether FCA

5   could have taken any action, whether in the owner's

6   manual, tip card, user's guide or otherwise, that

7   could have made these warnings and instructions

8   more effective?

9       A.   With anything, any product, any warnings,

10  any guide, there is always an opportunity to

11  revive, to add to, to enhance.  However, as I've

12  stated, as presented, the information was

13  sufficient for users to -- and assuming alert and

14  attentive users, to notice, read, understand, and

15  follow.  Therefore, the addition of any other

16  information would be unlikely to alter behavior

17  generally.  However, to specifically answer your

18  question would require an analysis of an individual

19  experience and behavior.

20      Q.   Are you saying the effectiveness of

21  instructions and warnings always requires an

22  analysis of a single individual's behavior?

23      A.   I think you're talking about two different

24  types of analyses.  The first is, generally

25  speaking, in reviewing available information, is

Page 74

1   that information sufficient for an alert and

2   attentive user to access it and follow it?  That's

3   one analysis.

4          As far as understanding if any individual

5   would be compelled by that information or would

6   notice, read, understand, and follow that

7   information, an analysis of that individual would

8   be required.

9      Q.   Are all warnings created equal?  Are some

10  better than others?

11     A.   All warnings are not created equal.

12     Q.   Are some warnings more effective than

13  others?

14     A.   Certainly.

15     Q.   Is there some sort of hierarchy or some

16  sort of standard that indicates what the most

17  effective type of warning is to the least?

18     A.   I'm not aware of any single document that

19  contains that type of information.

20     Q.   How about pictograms?  Are they considered

21  effective for warnings?

22     A.   I've certainly seen examples of pictograms

23  being used as effective warnings.

24     Q.   Did you do any -- perform any studies in

25  this case about the effectiveness of these specific

Page 75

```
 1      instructions or warnings, as you call them, in the
 2      owner's manual, User Guide and tip card that we
 3      talked about?
 4          A.   Beyond -- I performed an assessment of the
 5      named and deposed plaintiffs' use of that
 6      information.
 7          Q.   Anything beyond that?
 8          A.   I leveraged the scientific literature
 9      available with respect to the use of such
10      information.
11          Q.   Have you spoken with any of the plaintiffs
12      in this case?
13          A.   No, ma'am, I have not.
14          Q.   So you have not performed a study, a
15      scientific study of the effectiveness generally of
16      the warnings and instructions, as you call them, in
17      the owner's manual, user's guide, and tip card
18      beyond reviewing the plaintiffs' deposition
19      testimony?
20          A.   And applying the scientific literature
21      with respect to those materials.
22          Q.   Is that correct?
23          A.   With my caveat, I agree with that
24      characterization.
25          Q.   And there is nothing you think FCA could
```

1    have done better to alert people or in their

2    warnings and instructions to people about the

3    gearshift in the owner's manual, User Guide, and

4    tip cards?

5         MR. FRESARD:  Objection to form.

6         THE WITNESS:  I have not seen any evidence

7    through the course of my review or analysis that

8    would suggest that any additional or alternative

9    information would have affected the outcomes of

10   these incidents.

11   BY MS. SOFFIN:

12        Q.   And that's based on your review of the

13   plaintiff's deposition testimony and, as you call

14   it, application to the scientific literature?

15        A.   As well as my broader review of production

16   material supplied in this case and totality of the

17   work I've done in this case.

18        Q.   So the warnings and instructions between

19   pages 424 and 557 in the owner's manual; on

20   pages 163, 171 and 208 and 53 of the User Guide;

21   and the tip card, all of that information was

22   sufficient for what you call a population of alert

23   and attentive people to process regarding the

24   vehicle?

25        A.   I agree with that.

1      Q.   Page 42 of your report, in this first

2  paragraph, it appears you're talking about a study

3  or research regarding consumer predictions about

4  their compliance with warnings versus -- or I guess

5  versus their ultimate compliance with that warning;

6  is that right?

7      A.   I would say more generally with

8  safety-related information, but, yes, that is

9  correct.

10      Q.   And in the next paragraph, you say

11  "Similar evidence exists with respect to purchase

12  decisions or behavior having a financial impact";

13  is that right?

14      A.   You read that correctly.

15      Q.   And then within that paragraph, it appears

16  that you cite a 2008 study from Fogel and Thornton

17  about product rebates; is that right?

18      A.   Consumer behavior with respect to rebates

19  was an aspect of that study.

20      Q.   What else was an aspect of that study?

21      A.   More broadly that study looked at consumer

22  perception with respect to various types of sales

23  and promotions.

24      Q.   And you chose here, though, to cite the

25  rebate aspect to make your point, the rebate aspect

Page 78

1     of that study?

2          A.    That is what's reflected in that sentence.

3          Q.    So in the first paragraph, you're talking

4     about consumer compliance with safety warnings, and

5     then in the next paragraph, you make a leap to

6     discussing "similar evidence exists with respect to

7     purchase decisions having a financial impact" and

8     you relate that to a study or results regarding a

9     product rebate; is that right?

10         A.    I don't agree with that characterization.

11         Q.    Okay.  How would you characterize it?

12         A.    In the first paragraph I'm discussing

13    consumer behavior, both their own and their

14    prediction of their own, as well as their

15    prediction of others in the presence of various

16    types of safety-related information, and from there

17    the next paragraph discusses the relationship

18    between that type of behavior transitioning to

19    specific experience of consumers and their

20    compliance with or behavior with respect to

21    activities that would take place later with respect

22    to rebates and redemptions.

23         Q.    "Later" meaning following the point of

24    purchase?

25         A.    That is correct.

1    Q.   Do you know whether results of research

2    are the same for whether consumers would

3    participate in a rebate following the point of

4    purchase as it would be for the discount at the

5    point of purchase?

6    A.   My understanding is that a discount

7    provided at the point of purchase would be more

8    likely to be used, especially if it was

9    automatically applied, than would a rebate that

10   required the consumer to follow up later.

11   Q.   So it's more likely that people would

12   participate in a discount at the point of purchase

13   than they would be to submit a rebate following the

14   point of purchase?  Is that your understanding?

15   A.   Again, depending on the specific aspects

16   of that discount.  But in that incomplete

17   hypothetical, I agree with your statement.

18   Q.   Do you know whether this study found that

19   people would prefer a price cut at the point of

20   purchase or something like a buy one, get one free

21   versus a rebate?

22   A.   That is my understanding of this study.

23   Q.   So the extent of your opinion here, you're

24   relating people's compliance with safety warnings

25   to people's acceptance of a discount or some sort

Page 80

```
 1    of -- having some sort of financial impact with
 2    their purchase relates to an after-purchase rebate?
 3         A.   I'm sorry.  Can you repeat that, please?
 4         Q.   I could do a better job.
 5              Actually, strike that question.
 6              Are you aware of any studies or research
 7    about the number of people that would accept a
 8    point of purchase discount or participate in a
 9    point of purchase discount?
10         A.   My understanding of this Fogel and
11    Thornton study is that they did look at price cuts
12    as well as, you correctly mentioned, buy one, get
13    one free promotions.
14         Q.   But beyond that study, are you aware?
15         A.   I'm not specifically aware of any papers.
16         Q.   Let's go to page 45.
17         A.   Excuse me?
18         Q.   Page 45.
19         A.   Thank you.
20         Q.   Under the paragraph labeled "Purchase Or
21    Lease Agreement," I think it's about the second and
22    a half sentence up, it appears that you're saying
23    presenting specific warnings or disclosure at the
24    point of purchase or lease would be inappropriate
25    and ineffective; is that right?
```

Page 81

1        A.    You read that correctly.

2        Q.    What's inappropriate about it?

3        A.    From a human factors perspective, the

4    research shows that human attention is goal

5    directed and in line with an individual's

6    specific -- very specific goals at that moment.

7    When a consumer gets to a point or a vehicle

8    purchaser gets to the point of purchase or lease

9    agreement, cognitively, they are at a point of

10   having committed to the purchase already and are in

11   a mindset of looking for that type of information.

12   Therefore, presenting information with respect to

13   warnings or disclosures at that time, after an

14   individual is committed to the purchase, would be

15   not appropriate with respect to the science of

16   effectiveness of warning -- safety information or

17   disclosure -- excuse me -- disclosure presentation

18   and would be more likely to be ineffective.

19       Q.    At the point of purchase, like when

20   they're sitting down with the salesperson?  Is that

21   what we're talking about?

22       A.    Correct.  So specifically speaking about

23   including this type of information, specific

24   warnings, or disclosures on the purchase or lease

25   agreement documentation -- on or in.

Page 82

1      Q.   On or in.

2           So, like, an attachment or something like

3      that, it would be inappropriate and ineffective?

4      A.   Based on from a human factors scientific

5      perspective, it would be.

6      Q.   Inappropriate and ineffective are

7      interchangeable here the way you are using them?

8      A.   I would agree with that.

9      Q.   One moment while I gather.

10     MS. SOFFIN:  We can mark these as the next two

11     exhibits.

12                        (Whereupon, Exhibit 94 was

13                         marked for identification.)

14                        (Whereupon, Exhibit 95 was

15                         marked for identification.)

16     BY MS. SOFFIN:

17     Q.   Are you familiar with these documents that

18     I've just put in front of you?

19     A.   Yes, ma'am.

20     Q.   What are they?

21     A.   Exhibit 94 is the interim notification

22     letter for the S27 recall, and Exhibit 95 is the

23     notice with respect to that recall that the

24     software remedy was ready.

25     Q.   Based on your opinion that presenting the

Page 83

1    specific warnings and disclosures at the point of
2    purchase or lease agreement would be inappropriate
3    and ineffective, do you also agree that presenting
4    information within these documents at the point of
5    purchase would have been inappropriate or
6    ineffective?
7         A.   So to be clear, when you're saying "point
8    of purchase" and relating to the information
9    discussed on page 45 of my report, I'm speaking
10   about that last point of going over the purchase
11   and lease agreement.  To the extent that point of
12   purchase, as you're using it, involved the broader
13   experience of being at the location where a vehicle
14   is purchased, I don't agree with that.
15        Q.   Tell me the difference between what you
16   just said, those experiences.
17        A.   So, again, as a consumer purchasing, in
18   this case, a vehicle or preparing to lease a
19   vehicle, there are multiple stages of information
20   gathering and processing that are discussed
21   throughout my report.  The section of the report
22   that we're discussing right now, on page 45, has to
23   do with behavior expectation and interaction with
24   respect to information provided in the actual
25   purchase and/or lease agreement paperwork.  At that

Page 84

1   point time, it is not in line with a consumer's

2   goals to be assessing specific warnings, safety

3   information or other vehicle attributes less they

4   relate to the specific purchase and/or lease

5   information.

6       Q.   So by the time they are reviewing the

7   purchase or lease agreement and have already made

8   the decision to buy it but have not yet bought it,

9   that's what we're talking about in this paragraph?

10      A.   I agree with that.

11      Q.   Okay.  And are you saying that at that

12  point, if the consumer was presented with

13  disclosures in the S27 documents that I've handed

14  you, it would be inappropriate or ineffective?

15      A.   To present this type of information such

16  as what is contained in the S27 document at that

17  specific moment would be inappropriate from a human

18  factors scientific perspective and likely

19  ineffective with respect to conveying the

20  information.

21      Q.   Meaning people wouldn't have paid

22  attention?

23      A.   Information like the information presented

24  in these S27 documents is not in line with a

25  consumer's cognitive goals at that point in time

Page 85

1    and, therefore, would be less likely to be noticed,

2    read, understood.

3        Q.   If it was included within the purchase or

4    lease agreement?

5        A.   That is correct.

6        Q.   What if they had to sign it?

7        A.   I'm not specifically aware of research

8    looking at the effectiveness of a signature.

9    However, research on general compliance with safety

10   information does suggest that interaction with the

11   information, physical interaction with the

12   information does lead to increased compliance

13   rates.

14       Q.   And a signature would be a physical

15   interaction?

16       A.   I would agree with that.

17       Q.   But what you're saying is if this was

18   presented to consumers at the time they were

19   reviewing their purchase and lease documents and

20   about to make a purchase, your understanding of

21   human factors is people would have gone ahead and

22   purchased it anyway?

23       A.   My understanding is that it would be

24   likely to be ineffective in conveying the

25   information with respect to how it would have

Page 86

1    affected an individual's decision ultimately to

2    purchase.  What I would expect, based on the

3    totality of the work I've done and the research

4    I've reviewed, is you would see an extraordinarily

5    heterogenous response with various individuals

6    reacting very differently to this information.

7         Q.   But in any event, it would have been

8    inappropriate and ineffective to provide this

9    information?

10        A.   I don't believe I have a different way to

11   answer that question.

12        Q.   Well, you say "Specific warnings or

13   disclosures at the point of purchase" -- I think we

14   are talking about the gearshift here, right? --

15   I mean, "would be inappropriate and ineffective"?

16   I'm giving you a specific example of a warning of

17   specific warnings and disclosures.  You have a

18   broad opinion here.  You are not able to give me a

19   broad opinion here about the specific ones I am

20   putting in front you, that these specific ones

21   would be inappropriate and ineffective?  Yes or no?

22        A.   I believe I've answered that.  I can

23   certainly do it again --

24        Q.   Can you do it with a yes or no?

25             I heard you before.  I'm curious if you

Page 87

1    can do it with a yes or no.

2         A.   A yes or no would not be appropriate for

3    that type of question.

4         MS. SOFFIN:  Can we take a quick break?

5         MR. FRESARD:  Sure.

6         THE VIDEOGRAPHER:  We are going off the record.

7    The time is 11:49 a.m.

8                   (A short break was taken.)

9         THE VIDEOGRAPHER:  We are back on the record.

10   The time is 12:04 p.m.

11   Please proceed.

12   BY MS. SOFFIN:

13        Q.   Let's go to page 50.

14        A.   You said 50?

15        Q.   50, five zero.  I'm mumbling.  I'm sorry.

16             Under "Driver Gearshift Behaviors," you

17   say "Several scientific studies have shown that

18   shifting into Park is a highly automated behavior

19   in which drivers use rapid ballistic movements,"

20   and you go on and you have several other opinions.

21             It looks like in this section, "Driver

22   Gearshift Behavior," "Driver Gearshift Errors,"

23   going through page 51, you are relying upon studies

24   conducted by Harley -- is that the study you were

25   referring to, by the way, in 304, the Harley study?

Page 88

1    Sorry.   Footnote 304.

2         A.    In Footnote 304 is referring to the four

3    studies listed.

4         Q.    And were these all studies that included

5    subjects?  People?  Do you know?

6         A.    Harley and Heckman are different analyses

7    of the same participants but all -- so these four

8    references represent three sets of experiments.

9         Q.    So Harley and Heckman involved experiments

10   with people, with subjects; is that right?

11        A.    Yes, ma'am.

12        Q.    How about McCarthy and Shinar?

13        A.    Yes, both McCarthy and Shinar used human

14   subjects.

15        Q.    I know I am going to do this one --

16   Dingus, same thing, do you know whether they

17   included -- what's a good way of phrasing this?  --

18   studies of human subjects?

19        A.    I understand the way you're asking it.

20              Dingus and Klauer both were analyses of

21   human subject data.

22        Q.    Of -- meaning they actually studied

23   people, or was it data?  Like, did they actually

24   perform --

25        A.    People created the data for their

Page 89

1    participants.

2         Q.    Okay.   Do you know the number of subjects

3    in any of these studies that you've cited in these

4    sections?

5         A.    Not off the top of my head.

6         Q.    Was that something you considered when you

7    were citing them in your report?

8         A.    Any time I evaluate information,

9    specifically experimental studies, the number of

10   subjects absolutely plays a role in my

11   understanding of the work that was done.

12        Q.    Are you familiar with the terms

13   "within-subjects design" and "between-subjects

14   design"?

15        A.    Yes.

16        Q.    Do you know whether these studies were

17   within or between subjects or whether that varied?

18        A.    The Harley and Heckman references

19   represent two experiments.   I believe each

20   experiment was employed within-subjects design.

21        Q.    What is "within-subjects design"?

22             You can give me a high-level definition.

23        A.    "Within-subjects design," in terms of in

24   behavioral sciences, is when the subjects in your

25   experiment all perform every condition.   So if, for

Page 90

```
1    instance, you had a drug trial, which would not
2    lend itself well to within-subjects design, but you
3    would have the same participants perform within and
4    without the drug, if that was your variable of
5    choice.
6         Q.   And Harley and Heckman were within.  Were
7    any of the other studies that you cite in 50 and 51
8    that involved test subjects, what were they?
9         A.   I believe McCarthy employed a
10   within-subjects design, and for Dingus and Klauer,
11   the type of experiment they did does not lend
12   itself to that type of characterization.
13            And Klauer is K-l-a-u-e-r.
14        Q.   For the Harley study, do you know the
15   methods they used -- do you know whether they were
16   evaluating errors in that study?
17        A.   Yes, they were.
18        Q.   Do you know the method they used to
19   determine the error?
20        A.   I do.
21        Q.   What was that?
22        A.   Harley, et al., had participants over the
23   course of two different experiments using two
24   different vehicles perform a series of driving
25   maneuvers that involved gear shifting.  Vehicles
```

Page 91

1    were both instrumented, and I believe video data

2    were also collected and used to determine whether

3    or not drivers were making successful gearshift

4    maneuvers.

5         Q.   Do you know -- do you know whether those

6    studies involved note-takers?

7         A.   Those studies involved experimenters.

8    I would not use the description note-takers.

9         Q.   Did those experimenters take notes?

10        A.   I was not part of those experiments.

11   I would certainly imagine, given my experience,

12   some form of notes are taken with respect to the

13   experiments.  A lot of times those notes are more

14   "Make sure to check this data, the camera battery

15   ran out" and things of that nature.

16        Q.   But do you know details of that with

17   respect to Harley or Heckman or any of the studies

18   cited in this section?

19        A.   Not specifically, no.

20        Q.   Do you know any of the criteria they used

21   for determining errors?

22        A.   In Harley and Heckman, the criteria was

23   achieving Park.  They were evaluating shifts to

24   Park.

25        Q.   Do you know the details of that

Page 92

1    evaluation?  What the codes were for the errors?

2        A.   They coded two error types, failure to

3    shift error and mis-shift errors.

4        Q.   And do you know what kind of methods or

5    criteria they employed to come to that -- the

6    conclusion about those errors?

7        A.   I'm sorry.  Could you repeat that?

8        Q.   How did they determine if something was a

9    failure to shift or a mis-shift?

10       A.   Failure to shift errors occurred when the

11   driver, the participant did not make contact with

12   the shift lever prior to exiting the vehicle.  So

13   they exited the vehicle while it was still in gear.

14           Mis-shift errors occurred when the driver

15   moved the gearshift lever into a gear other than

16   Park and then exited the vehicle while it was still

17   in gear.

18       Q.   Is it correct to say that if you cited a

19   study within your report, you believe it's reliable

20   and was performed properly?

21       A.   If a -- for the studies and the literature

22   and technical documentation cited in my report,

23   I evaluate each and every one of those.  And any

24   study and experiment could certainly be evaluated

25   with respect to areas of strength and weakness, and

1    the conclusions that I draw from those studies are

2    based on my assessment of each individual study.

3         Q.    Okay.  That was a really long answer.

4              If you're relying upon a study in your

5    report to form your opinion, is it correct to say

6    that you believe that report is reliable?  The

7    study was done properly?

8         A.    For any of the studies that I've cited,

9    the conclusions that I've reached and that I've

10   drawn from those studies, I would certainly

11   evaluate as reliable.  I don't know specifically

12   for any given study that I have evaluated whether

13   or not the entirety of the study is without

14   weakness.

15        Q.    So it's possible there are studies within

16   your report that you've relied upon that may have

17   unreliable components to them?

18        A.    I don't know that -- I don't think I would

19   say "unreliable."  There would certainly be studies

20   that I've cited and studies that, you know, anyone

21   has published that have aspects of the study that

22   would be subject to potential criticism or

23   investigation.

24        Q.    Do you have any specific criticism of the

25   studies that you relied on in your report?

1     A.    I can't answer that question broadly.

2     Q.    Can you answer it specifically?

3     A.    Yes, I can.

4     Q.    What problems do you have with the studies

5     that you've relied upon in your report to assist in

6     forming your conclusions?

7     A.    Which studies?

8     Q.    Well, I don't know which ones you have

9     problems with.  You said, "Yes, you have problems

10    with them."  What comes to mind?

11    A.    That's not what I said.

12    Q.    Okay.  What did you say?

13    A.    I said that for any study, the information

14    that I relied on for the bases and support for my

15    analysis and opinions, I would characterize as

16    reliable.  With respect to the entirety of any

17    study, I have not assessed, for any of the

18    individual studies, whether or not I would consider

19    the entirety of the work to be without weakness.

20    Q.    How about any aspect of it?  Have you

21    assessed whether any aspect of these studies have

22    weakness?

23          MR. FRESARD:  Object to the form.

24          THE WITNESS:  I don't think I can answer that

25    differently than I previously did.

Page 95

1    BY MS. SOFFIN:

2        Q.    Do you have objective criteria to

3    determine whether a particular study is reliable?

4        A.    No, ma'am.

5        Q.    I was trying to understand your testimony.

6    So it seems it me what you're saying is the parts

7    of the study that you chose to rely upon in forming

8    your opinion are, according to you, reliable; is

9    that right?

10       A.    I agree with that characterization.

11       Q.    But it's possible, and you can't testify

12   today, that there were aspects of these studies

13   that may not be reliable?

14       A.    I also agree with that characterization.

15       Q.    You just don't know one way or another?

16       A.    For any given study, the authors of these

17   studies often will point out, themselves, various

18   limitations to the study.

19       Q.    Yet they come to a conclusion?

20       A.    Many do.

21       Q.    It seems like the ones you've cited have

22   conclusions?  Yes?

23       A.    I'm sorry.  I didn't understand if that

24   was a question.

25       Q.    The studies you're relying on have

Page 96

1    conclusions; right?

2         A.    I would agree with that.

3         Q.    And you are relying on those conclusions?

4         A.    I am relying on the information contained

5    in those reports as I've represented them in my

6    report to support the bases for my analyses and my

7    opinions.

8         Q.    Okay.  So for Harley, for example, on

9    page 50, you say "These results suggest" -- it's

10   the last sentence under "Driver Gearshifting

11   Errors" -- "These results suggest that when

12   shifting into park, drivers rely on the kinesthetic

13   feedback" -- did I pronounce that right?

14        A.    Yes, you did.

15        Q.    -- "drivers rely on kinesthetic feedback

16   received when the gearshift lever reaches the

17   mechanical stop at the end of the lever's travel to

18   determine the end of movement task."

19              Was that the conclusion of the

20   experimenters in this case, or was that the

21   conclusion you reached based on evaluating certain

22   components of the study?

23        A.    That is a conclusion that I reached based

24   on my analysis of the information provided above.

25        Q.    And the analysis of information provided

Page 97

1    was based on testing of the subjects?

2        A.   My analysis of the information was based

3    on the information provided by the authors who, in

4    turn, for the studies that I mentioned involved

5    human subjects, based their analysis on the data

6    they collected from humans.

7        Q.   Okay.  So your analysis was based on their

8    test results?

9        A.   As well as their analysis of their test

10   results.

11       Q.   So, yes?  Both?

12       A.   Yes, both.

13       Q.   So you are relying on both their test

14   results and their analysis of the test results in

15   coming up with your opinions set here in your

16   report; is that --

17       A.   I -- sorry -- I'm relying on their test

18   results, their analysis of their test results and

19   then my analysis of all of that information.

20       Q.   Yet you don't know whether there are

21   aspects of these reports that you might find

22   unreliable?

23       A.   As I sit here today, I don't know of any

24   aspect of those specific experiments that I find

25   unreliable or are subject to weakness.  However, as

Page 98

1     I've mentioned, with any study, there are certainly
2     aspects with respect to limitations that would need
3     to be discussed.
4          Q.   Do you agree with the conclusions in all
5     of the studies that you've cited in your report
6     that involve testing of human subjects, the
7     conclusions made by the authors of those reports?
8          A.   I can't answer that question the way
9     you've asked it.
10         Q.   What's wrong with my question?
11              In each report or each study that you've
12    cited that involves testing of human subjects, did
13    the experimenters and authors of those reports come
14    up with conclusions?  Isn't that the point of a
15    study?  Come up with a conclusion?
16         A.   That is certainly a goal of an empirical
17    investigation.
18         Q.   Did each one of these studies involve a
19    conclusion?
20         A.   In order to thoroughly and properly answer
21    that question, I would go through each and every
22    study I cited to confirm that they, indeed, did
23    reach a conclusion.  There were certainly sources
24    of information I cited, websites, as well as
25    standards, that offered guidance or provide

Page 99

1    information that I might not, in reviewing,

2    consider to be a conclusion.

3        Q.   What would be another word for

4    "conclusion"?  A result?

5        A.   There are certainly times when those could

6    be used interchangeably.

7        Q.   As we sit here today, are you aware of any

8    conclusions or results in these reports or studies

9    and research that you have relied upon, for

10   example, Harley, Heckman, McCarthy, that you

11   disagree with or find unreliable?

12       A.   Not specifically, as I recall right now.

13       Q.   As you were going through these reports,

14   research, studies, was there anything at the

15   time -- Harley, Heckman, McCarthy, for example --

16   that you found unreliable about these studies?

17       A.   Not specifically, as I recall.

18       Q.   You wouldn't make it a point to cite

19   articles or research or studies in your reports

20   that were unreliable; right?

21       A.   I would certainly not cite to and rely on

22   specific information that I understood to be

23   unreliable.

24       Q.   What type of gearshifts were involved in

25   the Harley study?

Page 100

```
 1          Are you pulling up the studies on your
 2     computer now when I'm asking questions?  Is that
 3     what you're doing?
 4          A.   Yes, I am.
 5          Q.   When you have an opportunity or at your
 6     earliest opportunity, can you provide a copy of all
 7     of your publications and studies that you've
 8     referenced in your report to your attorneys?
 9          MS. SOFFIN:  And when you have an opportunity,
10     can you provide them to me?
11          MR. FRESARD:  I'm handing you a thumb drive.
12          MS. SOFFIN:  You are so ready.
13          MR. FRESARD:  I'm not sure what's on there or
14     not.
15     BY MS. SOFFIN:
16          Q.   Is this thumb drive you've just handed me
17     exhaustive of all the publications you authored
18     yourself and all the studies you relied upon and
19     cited in your report?
20          A.   No.
21          Q.   What's missing?
22          A.   That thumb drive contains the entirety of
23     my file in this case.  It does not contain all of
24     the publications that I've authored.
25          Q.   Whatever is missing, at your earliest
```

Page 101

1    convenience, can you provide it to your attorney

2    for evaluation and provision to us?

3         A.   If requested, yes.

4         Q.   I'm requesting it.

5         MR. FRESARD:  What are you specifically

6    requesting?

7         MS. SOFFIN:  Any publications that are

8    missing -- that were missing from here.

9    BY MS. SOFFIN:

10        Q.   Some of your own publications are not on

11   here; correct?

12        A.   That is correct.

13        Q.   Some are and some are not on here?

14        A.   I'm not sure if any of my publications are

15   on there.

16        Q.   Okay.  So I'll just say, at your earliest

17   convenience, can you please gather a copy of all

18   the publications that you've referenced in your

19   report and provide them to your attorney.

20        MS. SOFFIN:  And then when you have an

21   opportunity, we'd like a copy of those

22   publications.

23        MR. FRESARD:  I think the thumb drive includes

24   all of the publications except the ones the witness

25   authored.  Is that correct, Doctor?

Page 102

```
 1        THE WITNESS:  Yes.
 2        MR. FRESARD:  So you want the articles that he
 3   has written?
 4        MS. SOFFIN:  Yes.
 5        Let's mark this as an exhibit too.
 6                        (Whereupon, Exhibit 96 was
 7                         marked for identification.)
 8   BY MS. SOFFIN:
 9        Q.   Does this include the deposition summaries
10   provided by your research assistants?
11             I am going to call them that, if that's
12   accurate.
13        A.   That should provide -- that should include
14   the entirety of the work product in my file,
15   including deposition -- the deposition summaries
16   prepared by the scientists working at my direction.
17        Q.   I think I might have had an open question
18   about what kind of gearshift Harley evaluated in
19   that 2008 study.  Do you know?
20        A.   That is my recollection, that that
21   question was open.
22        Q.   Okay.  You didn't answer it, though;
23   right?
24        A.   I did not answer it.
25        Q.   I am getting hungry, I think.
```

Page 103

1           What type?

2      A.    There were two vehicles across two

3  experiments.  One had a column-mounted shifter, and

4  the other had a floor-mounted shifter.

5      Q.    Did any of them involve monostable?

6      A.    No, ma'am.

7      Q.    How about Heckman?  That was the same --

8  was that the same two cars?

9      A.    Yes, ma'am.

10     Q.    And same gearshifts?

11     A.    Yes.

12     Q.    How about McCarthy and Shinar?  Both of

13  them involved test subjects?

14     A.    Yes, ma'am, they did.

15     Q.    I could actually make this easier.

16          Did any of the studies that you cite

17  involve monostable shifters?

18     A.    I don't believe so, no.

19     Q.    Did you bring anything else with you

20  besides that thumb drive today, any documents that

21  you relied upon in preparing your report or for

22  your deposition?

23     A.    I brought hard copies of information

24  contained on the thumb drive but nothing that is

25  not also on the thumb drive.

Page 104

```
 1       MS. SOFFIN:  I think we are actually at a
 2   logical stopping point.
 3       THE VIDEOGRAPHER:  We are going off the record.
 4       This is the end of Media Unit No. 2.  The time
 5   is 12:33 p.m.
 6                   (A lunch break was taken.)
 7       THE VIDEOGRAPHER:  We are back on the record.
 8       This is the beginning of Media Unit No. 3.  The
 9   time is 1:20 p.m.  Please proceed.
10   BY MS. SOFFIN:
11       Q.   You testified earlier none of the studies
12   in your report involve monostable; is that right?
13       A.   I believe what I testified to is, to the
14   best of my recollection, the scientific studies
15   I cite in my report did not evaluate monostable
16   shifters.
17       Q.   You said it in a fancier way than I did.
18           Are you aware of any studies or research
19   involving monostable gearshifters?
20       A.   Yes.
21       Q.   Which ones?
22       A.   The research and studies I was referring
23   to are those that have been produced in the course
24   of this case, ███████████████████████, as well
25   as the DFSS project, and the mountain of other
```

                                          Page 105

1    research that FCA undertook with respect to

2    electronic shifters and the monostable shifter.

3         Q.    ████████████████████████████████

4    ██████████████████████████████████████████

5    ████████████████████████

6         A.    ████████████████████████████████,

7    and then there were other clinics that FCA

8    undertook with respect to the development of the

9    e-shifter and monostable shifter.

10        Q.    These other clinics that FCA undertook

11   that you are referring to, did they hire third

12   parties?  Did FCA hire third parties?

13        A.    It is my understanding for some they did,

14   and some they did not.

15        Q.    For the ones they did, do you know what

16   company they hired?

17        A.    ████████████████████████

18        Q.    So the others, they performed in-house?

19        A.    That is my understanding.

20        Q.    Do you know who at FCA performed those

21   studies?

22              What document are you looking at?

23        A.    This is entitled "2012 LDLX Electronic

24   Shifter IBDP786."

25        Q.    ████████████████████████████████

Page 106

```
 1              I just can't see.
 2        A.    It is not.
 3              So this PowerPoint presentation describes
 4     work associated, I believe, with the DFSS project
 5     and has team leads listed as Jennifer Baker and
 6     Dave Reddy (phonetic).
 7        Q.    What does DFSS stand for?
 8        A.    I believe it's Design For Six Sigma.
 9        Q.    What date is that?  2012?
10        A.    This says 2012.  I do not see a further
11     specified date.
12        Q.    And that's one -- do you have a Bates
13     number?
14        A.    Mike, Charlie, Papa, Sierra 096143
15     through -- oh, it's all Bates numbered with the
16     same Bates number.
17        Q.    So that is one of the -- is "in-house
18     studies" a proper term -- a proper term to use?
19        A.    I'm comfortable with that
20     characterization.
21        Q.    So that's one of the in-house studies FCA
22     did relating to the monostable gearshift; is that
23     right?
24        A.    That is consistent with my understanding.
25        Q.    Are you aware of any other in-house
```

Page 107

1    studies that FCA performed?

2            If you don't mind, whenever you are

3    looking at your computer, can you tell me what it

4    is you're looking at?

5        A.    Sure.

6            So right now I'm looking at a timeline

7    document that I prepared.

8        Q.    Was that on the jump drive that you

9    provided me?

10       A.    Yes, ma'am.

11       Q.    Okay.  Thank you.

12       A.    So there was testing done -- usability and

13   acceptance testing done in the early part of 2010.

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ██████████████████

17       Q.    Right.

18            That were done in-house?

19       A.    My understanding is what I'm about to go

20   through are in-house testing.  Competitive

21   assessment testing was done toward the end of 2010,

22   maybe early 2011, continued into the middle of

23   2011.

24       Q.    Mr. Cades, while you're going through that

25   can you look at that 2012 DFSS document that you

Page 108

1   just referenced?  Do you have another copy?

2           Thank you so much.  I appreciate that.  Is

3   that a hardcopy of the information on the jump

4   drive, as my colleague called it, that notebook you

5   have right there?

6       A.   This notebook specifically is a subset of

7   client-supplied material that has been produced in

8   the case.  I don't believe the client-supplied

9   materials are on the thumb drive.  They are just

10  the other production materials in the case.

11      MS. SOFFIN:  Counsel, do you know whether all

12  of those documents have been produced in discovery

13  in the litigation?

14      MR. FRESARD:  Yeah, they have to be.  If he has

15  them, they would be part of the document

16  production.

17  BY MS. SOFFIN:

18      Q.   Please list.

19      A.   I've listed the additional testing I'm

20  aware of.  I know in reviewing the testimony of the

21  FCA employees deposed in this case, there has been

22  reference to the general continued testing and

23  evaluation, but those are the specific instances

24  I'm aware of.

25      Q.   And is it correct that you have not spoken

Page 109

1    with anyone at FCA about this testing?

2         A.    That is correct.

3         Q.    In the broader universe outside of what

4    FCA has done in-house that we just discussed, and

5    we'll get into in a little bit, are you aware of

6    any studies or research involving monostable

7    gearshifts?

8         A.    Not beyond the testing that was performed

9    by me and by Dr. Rosenberg in this case.

10        Q.    If you could talk me through some of the

11   aspects of the use and operation of the monostable

12   gearshifters in the class vehicle, can you tell me

13   what a driver needs to do in the class vehicles to

14   shift from Park to Drive?

15        A.    So to shift from Park to Drive with the

16   monostable shifter, the vehicle has to be on -- to

17   clarify, are you talking about before or after the

18   S27 software?

19        Q.    We'll do both.  Before?

20        A.    So before -- you said to shift from Park

21   to Drive?

22        Q.    Yes.

23        A.    The vehicle must be on.  The brake must be

24   depressed.  The driver or shifter's hand has to be

25   on the shifter.  The trigger is pulled, and the

Page 110

1    shifter is pulled in a rearward direction until

2    Drive is reached.

3       Q.   And how about after the S27 -- what did

4    you call it?  Disclosure?

5       A.   The software.

6       Q.   The software.

7       A.   The only difference would be that the

8    conditions for Auto Park to engage, door open,

9    seatbelt off, foot off the brake cannot be violated

10   during that process.

11      Q.   How about what a driver needs to do in a

12   class vehicle to shift from Drive to Neutral before

13   the S27 software update?

14      A.   To shift from Drive to Neutral, it can be

15   accomplished by foot on the brake, hand on the

16   shifter, pull the trigger, push forward until

17   Neutral is achieved.

18           I don't specifically recall if the shifter

19   can be pushed into Neutral without brake

20   application.  I believe it can.  It cannot be taken

21   out of Neutral without brake application.

22      Q.   How about after the S27 software?

23      A.   Similar to my answer before, as long as

24   the condition with respect to the application of

25   Auto Park are not violated, it would be the same.

1      Q.    Is that going to be our answer for all

2   shifting maneuvers?

3      A.    Yes, it will.

4      Q.    So how about from Neutral to Park?

5      A.    Again, brake depressed, hand on the

6   shifter, trigger pulled, push forward until Park is

7   reached.

8      Q.    And Park to Reverse?

9      A.    Foot on the brake -- sorry.  For all of

10  the shifting, vehicle on, foot on the brake, hand

11  on shifter, trigger pulled from Park to Reverse and

12  the shifter is pulled rearward until Reverse is

13  reached.

14     Q.    And Neutral to Reverse?

15     A.    As I stated before, I believe that can

16  be -- sorry.  You said from Neutral to Reverse?

17     Q.    Neutral to Reverse, yeah, take me in that

18  motion.

19     A.    Brake -- car on, brake applied, hand on

20  the shifter, trigger pulled, Neutral to Reverse,

21  push forward from Neutral until Reverse is reached.

22     Q.    Reverse to Park?

23     A.    Reverse to Park would be vehicle on, foot

24  on the brake, hand on the shifter, pull the

25  trigger, push forward from Reverse to reach Park

Page 112

1    until Park is engaged.

2         Q.   Is there anything else that has to be

3    done?  How is Park engaged?

4         A.   With respect to the human interaction of

5    the shifter, Park is engaged by doing all the

6    prerequisites I mentioned and pushing the shifter

7    forward.

8         Q.   Can you go to page 29 of your report,

9    please.  This was the User Guide.

10             I don't see anything about shifting from

11   Reverse to Park.  Am I missing it?

12        A.   I agree I do not see that specific motion

13   described on page 29 of my report.

14        Q.   Which is the User Guide?

15        A.   Which is an excerpt from the 2015 Jeep

16   Grand Cherokee User Guide.

17        Q.   That's similar across class vehicles?

18        A.   Yes, it is.

19        Q.   Page 59 of your report under "Different

20   Rates of Error Types," within that paragraph you

21   say "Shifts to Park are arguably the most

22   safety-critical shifts given that they involve

23   securing the vehicle."

24             What is this opinion based upon?

25        A.   In terms of thinking about how shifting

Page 113

1    behavior relates to safety and the circumstances

2    under which someone would be shifting, as well as a

3    description of incidents involving inadvertent

4    vehicle movement across the world of those

5    incidents, when a person is attempting to shift to

6    Park or wanting to shift to Park, the goal is to

7    make the vehicle secure so that it will not move.

8    That is the time in which people will attempt to

9    generally get out of their vehicle or take their

10   feet and hands off the controls with the

11   anticipation that the vehicle will not move.  Were

12   the vehicle to move when that is the user's goal,

13   it would be a situation that would afford the

14   opportunity for a safety critical event.

15        Q.   You say the "most safety critical," but is

16   all shifting safety critical?

17        A.   I believe -- I don't believe -- actually,

18   read this:  "It is arguably the most safety

19   critical."  I would certainly agree that all shifts

20   and being able to accomplish them, have a potential

21   to impact safety.

22        Q.   Are they safety critical?

23        A.   They have the potential to be.

24        Q.   Safety critical?  They have the potential

25   to be safety critical?  I was just finishing the

Page 114

1    sentence.  Is that correct?

2        A.    Yes.

3        Q.    62, your study, you performed a "Gearshift

4    Behavior Study" as part of your work in this case;

5    is that right?

6        A.    That is correct.

7        Q.    And that is addressed on pages 63 through

8    79 of your report; is that right?

9        A.    No.

10       Q.    Okay.  What page?

11       A.    62 through 80.

12       Q.    Okay.  Thank you.

13       A.    With additional discussion in other places

14   in the report as well.

15       Q.    Is it correct that all of the study

16   participants were recruited by 9:00 a.m. Services

17   and Craigslist?

18       A.    To clarify, Exponent, we used the services

19   of 9:00 a.m. Services, as well as Craigslist.

20       Q.    Do you know how many participants came

21   from each source?

22       A.    I do not.

23       Q.    Do you have the Craigslist ad?

24       A.    I do not.

25       Q.    Does Exponent have it?

Page 115

1        A.    I believe so.

2        Q.    Is that something you can get access to

3    and provide to your attorney?

4        A.    I can.

5        MS. SOFFIN:  We'll make a request for that as

6    well, please.

7    BY MS. SOFFIN:

8        Q.    Do you have access to the information that

9    9:00 a.m. Services used to recruit participants?

10       A.    I do not.

11       Q.    Is that something you can get access to?

12       A.    I could certainly request it from them.

13       Q.    Please do.

14       MS. SOFFIN:  Same request from defense counsel.

15   BY MS. SOFFIN:

16       Q.    Were all of the participants in your study

17   unknown to you, Dr. Young, and anyone else who

18   assisted you with the study?

19       A.    Yes, they were.

20       Q.    Did each participant sign a consent form?

21       A.    Yes, they did.

22       Q.    Have you provided a copy of that consent

23   form to your counsel in this case?

24       A.    I do not believe I have.

25       Q.    Can you -- do you have access to it?

Page 116

1        A.    I do.

2        Q.    Can you please do so?

3        MS. SOFFIN:  We'll make a request for that as

4    well.

5        THE WITNESS:  I can.

6    BY MS. SOFFIN:

7        Q.    Do you know whether, as part of your

8    gearshift testing, and before or after, whether

9    participants were asked their occupation?

10       A.    I don't recall specifically if that

11   information was collected.

12       Q.    So it could have been?  You just don't

13   know?

14       A.    It may have been asked through the course

15   of the recruiting.  I'm not familiar with

16   everything that 9:00 a.m. asked, and I don't recall

17   all of the information that they filled out -- that

18   participants filled out when they arrived.

19       Q.    Would the same be true for whether they

20   have medical conditions?

21       A.    My understanding is that certain aspects

22   of medical conditions, as they relate to people's

23   ability to legally drive and operate a vehicle

24   without assistive devices, was used to identify

25   participants eligible to participate in this study.

Page 117

1        Q.    And were they asked their activities the

2    day before the testing?

3        A.    Not to the best of my knowledge.

4        Q.    How about in the hours before?

5        A.    Not to the best of my knowledge.

6        Q.    We talked before about within-subjects

7    designs and between-subjects designs.  And I recall

8    you describing within-subjects, but I'm not sure

9    whether we got to between.  Can you describe a

10   between-subjects design for me?

11       A.    Sure.

12             A between-subjects design involves an

13   experiment, and talking from the social sciences,

14   where experimental conditions are not crossed

15   across people.  So different groups of participants

16   will be in different conditions, but they will not

17   all perform in all of the conditions.

18       Q.    Your subject was a between subjects --

19   your study was a between-subjects design; is that

20   right?

21       A.    With respect to the independent variable

22   of vehicle type, it was between subjects.

23       Q.    Was it within subjects in any capacity?

24       A.    I would characterize this was a mixed

25   design.

Page 118

1      Q.   Tell me -- go back a step.  What aspects

2  were between design and what aspects were within?

3      A.   So as I've mentioned, the assignment of

4  individual participants to vehicles was between

5  subjects.  The various tasks performed by each was

6  within subjects, and the use of the vehicles across

7  the two different halves of the test track was also

8  a within-subjects design.

9      Q.   It appears that each subject was

10 prescreened to make sure they had a valid driver's

11 license and regularly drove the vehicles listed on

12 Table 2, page 63; is that right?

13     A.   You read that correctly.

14     Q.   And then how did you define "regularly"?

15 Was that once per week?

16     A.   That is what it states.

17     Q.   So did each person currently own the

18 vehicle that they test drove?

19     A.   I believe that the participants had the

20 correct vehicle owned in their greater family.

21 I don't know specifically who the -- what name was

22 on the title for any different vehicle.

23     Q.   So current ownership or access to this

24 type of vehicle?

25     A.   I would agree with that.

Page 119

1      Q.   So, for example, the 12 people who drove

2   the 2009 BMW 350i had current access to that

3   vehicle -- access to that vehicle at the time that

4   they were involved in this study?

5      A.   That is my understanding, yes.

6      Q.   And they had driven that BMW at least once

7   a week?

8      A.   That is the screening criteria that we

9   use.

10     Q.   Once a week for how long?

11     A.   I believe the criteria were they were

12  currently driving it once a week.

13     Q.   So it could have been two weeks?  Four

14  weeks?  Six months?

15     A.   I do not specifically recall the time

16  ownership requirement.

17     Q.   Do you have that data somewhere?

18     A.   I don't recall.

19     Q.   Could you look for it and see if you have

20  it?

21     A.   I can.

22     Q.   Did you have any kind of mileage

23  requirement, mileage-per-year requirement that

24  someone drove each vehicle, or was it just driving

25  once a week?

Page 120

1      A.    The requirement was regularly driving the
2   vehicle once a week.
3      Q.    Over an unspecified time period?
4      A.    Again, I don't recall specifically.
5      Q.    So making sure I'm reading Table 2 right,
6   this is a part of your in-between subjects
7   design -- correct me if I'm wrong on that --
8   12 people drove the BMW, 5 males, 7 females;
9   12 people drove the Chrysler, the 2013 Chrysler
10  300, 9 male, 3 female.  Am I right so far?
11     A.    You read that correctly so far with one
12  correction that it's called a between-subjects
13  design.
14     Q.    Thank you.
15           12 people drove the 2015 Ford Explorer,
16  three male, nine female; 12 people drove the 2015
17  Jeep Grand Cherokee, six male, six female;
18  12 people drove the 2013 Volvo, 4 male, 8 female;
19  is that right?
20     A.    You read that all correctly.
21     Q.    And these were all different people;
22  correct?
23     A.    Correct.  That table represents
24  60 different individuals.
25     Q.    Do you know whether any participant had

Page 121

1    familiarity with more than one of these vehicles or

2    regularly drove more than one of these vehicles?

3         A.   I don't know.

4         Q.   Is that data you collected?

5         A.   We did collect data with respect to other

6    vehicles they drove.

7         Q.   And so the study did not include drivers

8    who were unfamiliar with the vehicle that they

9    drove?

10        A.   That is correct.

11        Q.   The whole session, it appears from your

12   report, lasted 30 to 40 minutes; is that right?

13        A.   That is consistent with my memory.

14        Q.   What tasks were included in each full

15   session?

16        A.   Upon arrival participants reviewed and

17   signed the consent form; went over the general

18   rules of the track, just to drive as they would

19   normally.  They were given an opportunity to

20   position themselves in the vehicle, adjust the

21   seats, adjust the mirror, ask any questions about

22   the vehicle.  And then, as far as the experimental

23   tasks, they left the parking bay area and performed

24   a series of tasks, including static shifting,

25   parallel parking, slope task, mailbox task, a

Page 122

1    turning task, as well as returning the vehicle to

2    the parking bay.  They then filled out a survey.

3        Q.   And were there two people -- I'm going to

4    say on your team -- are you comfortable with that

5    term? -- of Exponent?

6        A.   That sounds good.

7        Q.   Were there two people in each car for that

8    test from Exponent?

9        A.   Yes, that is correct.

10       Q.   Were there times when there was more than

11   two people?

12       A.   Yes.

13       Q.   And is this documented somewhere?  Who was

14   in each car?

15       A.   The two experimenters assigned to each

16   vehicle and each participant is documented.  There

17   were times where either myself or Dr. Young might

18   have been present.  I do not believe those specific

19   times are documented.

20       Q.   Why were there two experimenters?  What

21   was each person doing?

22       A.   The experimenter in the back seat was

23   responsible for running all of the data collection

24   equipment and addressing any technical needs that

25   came up.  The experimenter in the front seat was

Page 123

1     primarily responsible for giving the participant

2     instructions on what tasks to do.

3          Q.   Were these instructions written down

4     anywhere?

5          A.   I believe there is a protocol -- well,

6     there is a protocol that we have for conducting

7     experiments.

8          Q.   If it's not already been produced, if you

9     could provide that to your attorney, we'll make a

10    request for that as well.

11         And the same protocol was used for each

12    participant?  For each subject?

13         A.   Yes, it was.

14         Q.   When you were doing prescreening of --

15    I'm going to go back a little bit -- of the

16    subjects, did you evaluate anything, like,

17    intelligence, emotional quotient, any other

18    personality constructs?

19         A.   We did not collect any data with respect

20    to cognitive motor variables.

21         Q.   Including whether one was tired?  Bored?

22    Happy?  Rushed?  Anything like that?

23         A.   We did not ask questions with respect to

24    that information.

25         Q.   So you don't know, for example, whether

Page 124

1    any of the 12 participants who test drove the BMW

2    were out partying the night before or any of the

3    12 participants that drove the Chrysler 300 were

4    not; correct?

5         A.    That would be correct.

6         Q.    You don't know whether any of the

7    12 participants who test drove the BMW might have

8    worked a 12-hour shift the day before or whether

9    any of the 12 participants that drove the

10   Chrysler 300 did; is that correct?

11        A.    That is correct.  I do not.

12        Q.    So how, without this type of information,

13   can you account for the individual differences

14   between the subjects?

15        A.    The entire purpose of including a group of

16   subjects is necessarily to account for those

17   individual differences.  Any time that an

18   experiment is run and data are collected, as a

19   social scientist, a human factors practitioner, you

20   expect there would be variability among

21   participants.  There is one thing that you can

22   count on, is that individuals perform differently,

23   react differently to information and are inherently

24   heterogenous.

25             So by collecting data from multiple people

Page 125

1    and then comparing those data, you're able to, as a

2    scientist, to determine if there is sources of

3    variance associated with the individual as opposed

4    to with the experimental manipulations.

5         Q.   And so is a short way of saying that that

6    you're taking measures to account for these

7    individual differences?

8         A.   I don't think that captures the spirit or

9    the content of what I just said.

10        Q.   Do you take measures to account for

11   individual differences, or did you, with this

12   study?

13        A.   The process of measuring any variable

14   across multiple individuals allows for the

15   accounting of sources of variability with respect

16   to individual differences.

17        Q.   Can you say that in a simpler way?

18             I did not understand what you just said.

19        A.   People perform differently based on their

20   individual characteristics.  For example, we know

21   that there are effects of age, there are effects of

22   experience, there are effects of any number of

23   individual variables.  To the extent that there are

24   specific variables, such as experience, that we are

25   interested in assessing, as scientists, we control

Page 126

1    for those variables.  With respect to all of the

2    other variables, the countless other variables, in

3    order to understand the influence of those

4    variables on your data, one way to do that is to

5    collect data from multiple people and look at the

6    variability within the data set.

7         Q.   What data did you collect here to look at

8    the variability?

9         A.   Specifically, we recorded video.  There

10   are four videos, video cameras in each vehicle to

11   record the information out the windshield, the

12   information on the dashboard, the driver's head and

13   eye position, as well as video data of the

14   gearshift.  The gearshifts were further

15   instrumented to record their displacement, as well

16   as the timing and force that was associated with

17   their movement.  Additionally, survey data were

18   collected.

19        Q.   What survey data?

20        A.   For a subset of the participants --

21        Q.   What page are you on?

22        A.   78.

23             "A subset of the participants,

24   specifically those who drove the 2013 Chrysler 300

25   and 2015 Jeep Cherokee, were asked additional

Page 127

```
 1    questions related to the recall and disclosure to
 2    investigate how and whether it would affect their
 3    purchasing decision."
 4         Q.   Are you talking about the disclosure on
 5    page 70 that goes to 71?
 6         A.   Yes, I am.
 7         Q.   What was the purpose of asking them or
 8    providing this survey to them?
 9         A.   In terms of understanding the allegations
10    in this case and investigating the allegations in
11    this case with respect to the allegation that
12    additional information with respect to the
13    monostable gearshift and disclosure would have
14    altered or affected, uniformly, the named
15    plaintiffs' and putative class members' or
16    potential putative class members' decisions, this
17    information was used to see if and how this group
18    of people would react to that type of information.
19         Q.   And you administered that survey only for
20    the Chrysler 300 and Jeep Grand Cherokee subjects?
21         A.   That part of the survey was only
22    administered to the 24 subjects who drove the
23    Chrysler 300 and Jeep Grand Cherokee.
24         Q.   Have you ever performed a within-subjects
25    design that was not mixed in any of your studies?
```

Page 128

1      A.    Yes.

2      Q.    What were the circumstances?

3      A.    There were any number of studies that

4  I performed through the course of my career that

5  I exposed the entirety of my subject pool to all of

6  the conditions.

7      Q.    Have you performed other between-subjects

8  designs or any between-subject designs that were

9  not mixed?

10     A.    Through the course of my career, I've

11 utilized between subjects, within subjects, as well

12 as mixed designs where appropriate for

13 investigating the area of inquiry I was interested

14 in.

15     Q.    And is that -- have you performed between,

16 within and mixed -- let me rephrase that.

17          For studies that you have performed or

18 been involved with that address automobiles, have

19 they been between, within, and mixed?  Have you

20 done one or more of each with your automobile

21 studies, or have they all been between?  All mixed?

22     A.    My recollection is that I have conducted

23 studies involving automobiles and driver behavior

24 utilizing all three of the experimental design

25 aspects that you mentioned.

Page 129

1     Q.    Was that while you were working with

2  Exponent?

3     A.    I have done research both while at

4  Exponent and prior to joining Exponent.

5     Q.    Did any of them involve gearshifts?

6     A.    Yes.

7     Q.    Can you give me some details about that

8  and start with your first gearshift study?  When

9  was that?

10     A.    I wouldn't characterize any of them as

11  gearshift studies.

12     Q.    Okay.  Studies on automobiles that involve

13  gearshifts?

14     A.    I can fairly say that any study that I've

15  done on either -- using a vehicle that people are

16  driving or in a driving simulator necessarily

17  involved a gearshift.

18     Q.    Was it focused on the gearshift?

19     A.    No, ma'am.

20     Q.    On page 64 you say "Each vehicle was

21  instrumented with strain gauges and strain" --

22  please pronounce that for me.

23     A.    Potentiometers.

24     Q.    -- "potentiometers."

25           Then the next sentence, you say "The

Page 130

 1    strain gauges were mounted to each gearshift lever

 2    in a full bridge configuration."

 3          What is a full bridge configuration?

 4    A.    When devices, such as the strain gauge and

 5    strain potentiometers, are used for measurement,

 6    there are various configurations, and the full

 7    bridge configuration, from my understanding, is a

 8    more robust configuration that reduces noise and

 9    variability at the point of data collection.

10    Q.    Did someone at Exponent do the

11    configuration?

12    A.    One of our vehicle technicians was

13    responsible for the instrumentation.

14    Q.    Not an Exponent employee?

15    A.    Yes, ma'am.

16    Q.    On page 65 you say -- you're discussing

17    the national instrument SCXI-1000 acquisition

18    system.  What is that?

19    A.    It is a data collection system that

20    allowed us to acquire the necessary data to

21    determine the timing, force, and displacement of

22    the gearshift.

23    Q.    Is this instrument -- was it specifically

24    designed for that type of data collection, the

25    timing, force and displacement of the gearshift?

Page 131

1       A.   My understanding is that the acquisition

2  system allows for these type of data to be

3  collected, and what the technicians were able to do

4  was utilize that acquisition system with custom

5  designed implementation to get the specific data we

6  were interested in off the vehicles.

7       Q.   Custom designed by who?

8       A.   Exponent.

9       Q.   What did that involve?

10      A.   It involved the vehicle technicians

11  working with the tools they had available, as well

12  as the vehicles, to instrument them with the strain

13  gauges and strain pops.

14      Q.   Is the work that they did with the custom

15  design and the instrumentation documented anywhere?

16  Is there a protocol that they followed?

17      A.   I don't believe there is any particular

18  protocol they followed.

19      Q.   Do you have any detail of the custom

20  design beyond what you testified to already, what

21  they did?

22      A.   Not beyond what I testified to and what's

23  in the report.

24      Q.   And then it says "NI-SCXI acquisition

25  system was running National Instruments VI-based

Page 132

1    VersaDAQ software."  What is that?

2         A.   My understanding is that's the software

3    that allows the interface with the vehicle's CANbus

4    and other signals to get the data out in a usable

5    form.

6         Q.   And would that be raw data that you later

7    interpret?

8         A.   Yes, that would.

9         Q.   Do you have that raw data anywhere?

10        A.   Yes, I do.

11        Q.   Is that something that you can provide to

12   your attorneys, please, if you haven't done that

13   already?

14        MS. SOFFIN:  We'll make a request for that raw

15   data.

16   BY MS. SOFFIN:

17        Q.   Who interpreted this data?

18        A.   Ultimately, I did.

19        Q.   Who was in between the collection of the

20   data from this instrument to you?  What happened?

21        A.   When the data comes off these systems and

22   software and hardware, it's in a form; and working

23   with my technician, we are able to decipher and

24   decode what the information means in a way that

25   allows me to perform the analyses that were

Page 133

1   performed for this experiment.

2        Q.   Is there any software that you had to

3   enter this data into to help you interpret it, or

4   was it all manual interpretation?

5        A.   I believe Microsoft Excel was used.

6        Q.   Anything else?

7        A.   Notepad.

8        Q.   So "Both force" -- the next sentence,

9   "Both force and displacement were calibrated at the

10  level of the driver's hand/wrist using applicable

11  NIST standards."

12            Did the technicians also do this

13  calibration?

14       A.   Yes, they did.

15       Q.   Do you know whether they recalibrated

16  before each test?

17       A.   The calibration was with respect to the

18  instrumentation, not the individual.  So the

19  driver's hand/wrist refers to the area, physical

20  area of the vehicle where the calibration was

21  performed.

22       Q.   But were they calibrating -- were they

23  calibrating the software?

24       A.   My understanding, it was calibration of

25  the entire suite of instrumentation.

Page 134

1      Q.   And do you know whether it was

2   recalibrated before each driver's test?

3      A.   I do not believe that was done, nor do

4   I believe that it's necessary.

5      Q.   Going to page 68 under "Turning Task,"

6   within that first paragraph in that section, it

7   says "Participants were not limited to a

8   three-point-turn and can go forward and in reverse

9   if they desired."

10          Did some participants perform more

11   maneuvers than others?

12      A.   There was certainly variability in the way

13   that maneuver was performed by participants in

14   terms of the number of specific forward and back

15   movements they made.

16      Q.   Is that documented anywhere?

17      A.   That is certainly captured in both the

18   video data as well as the raw data.

19      Q.   When you say raw "data," what are you

20   referring to?

21      A.   The data that you had referred to just

22   briefly.

23      Q.   Was there someone taking notes as well in

24   the vehicle?

25      A.   Again, with respect to notes taken in the

Page 135

1    vehicle, those were with respect to the camera
2    stopped working or the battery died or other issues
3    with respect to that.  As far as the data that were
4    collected for these in the analysis, the entirety
5    of those data were done through a combination of
6    the videos, the vehicle instrumentation as well as
7    the surveys.
8         MS. SOFFIN:  We'll make a request for all of
9    those videos, the raw data related to the vehicle
10   instrumentation, the survey results that you just
11   discussed.
12        Fred, I'm sorry.  I didn't clarify that.  I was
13   directing that question to you, please.  I can put
14   all of this in writing after.  I think there is a
15   lot.  I'll clean it up.  I just want to put it on
16   the record, make sure there is access to it and so
17   it can get to you and, ultimately, get to us.
18   BY MS. SOFFIN:
19        Q.   Also, any notes taken, do you have access
20   to that?  Notes taken in the vehicle?
21        A.   To the extent they still exist, we would
22   still have them.
23        Q.   Were any discarded?  Notes?
24        A.   No.
25        Q.   Page 70.  Table 3 says "Parentheses are

Page 136

1    indicative of shifts that were potentially variable

2    across participants."

3              What does a variable mean in this context?

4         A.   So that is not a noun in that context --

5    or is it?  Well, grammar aside, it's not a

6    variable.  It's --

7         Q.   I have a finance degree from Florida

8    State.  Grammar is not my specialty.

9         A.   It is -- what that means is that the

10   parentheticals specifically were not constrained to

11   what's listed there.  That was the general pattern

12   of the maneuver that we anticipated, however

13   participants were free to, as we discussed with the

14   turning task just previously, at their comfort, use

15   greater or fewer shifts in maneuvers to get to the

16   position they were supposed to.

17        Q.   And that would be shown in the raw data

18   and the video that we've talked about?

19        A.   Yes, ma'am.

20        Q.   Do you know whether any particular group

21   of test subjects had more shifting tasks than other

22   group?

23        A.   I'm sorry.  Could you rephrase that,

24   please, or re-ask it?

25        Q.   Do you know whether any particular group

Page 137

```
 1    of test subjects had more shifting tasks than
 2    others?
 3         A.    All of the participants had the same
 4    shifting tasks.
 5         Q.    Page 71, Table 4, addresses gearshift
 6    behavior and the shifting behaviors listed are
 7    corrected mis-shift, uncorrected mis-shift, forget
 8    to shift to Park, late to shift to Park, time to
 9    shift, and force to shift; is that right?
10         A.    You read that correctly.
11         Q.    How did you come up with those
12    classifications?
13         A.    In looking at the previous literature, the
14    ██████████████████    the various other work performed
15    by FCA and other available information with respect
16    to shifting behavior, we determined what would be
17    an accurate way to characterize, classify, and
18    operationalize shifting behavior into discrete and
19    meaningful categories.
20         Q.    And is each shifting behavior fully and
21    properly defined in this next column?  Is there
22    anything you'd like to add to that or retract?
23         A.    I'm comfortable with it as it is.
24         Q.    And you evaluated gearshift behavior using
25    instrumentation that enabled you to detect the gear
```

Page 138

1    selected; isn't that right?

2         A.    That was one of the aspects of the

3    behavior that we were able to measure.

4         Q.    Through the instrumentation?

5         A.    Yes, ma'am.

6         Q.    And is that the same for the force used?

7         A.    Force time and gear selection were all

8    recorded through the instrumentation.  Specific

9    gear selected would also be able to be either

10   verified or coded from the video data.

11        Q.    And was this at a revolution of one

12   millisecond?

13        A.    I don't specifically recall.  It may be

14   mentioned in the report.

15        Q.    Okay.  So before we talked about was there

16   a calibration, calibrating the instrumentation.

17   Was timing criteria a part of that calibration,

18   like, was it entered in the software or anything

19   like that?

20        A.    I'm not sure I understand your question.

21        Q.    When you were evaluating gearshift

22   behavior, was there timing criteria?

23        A.    Time was measured and analyzed.

24        Q.    In what way?

25        A.    The time for participants to get to and

Page 139

1    from various gears was quantified.

2        Q.   And did you use that timing in determining

3    whether something was a corrected mis-shift,

4    uncorrected mis-shift?

5        A.   No, we did not.

6        Q.   How did you determine whether a mis-shift

7    was corrected?

8        A.   The gearshift was corrected for the tasks

9    where -- so -- sorry.  For the tasks in which there

10   were specific, discrete points that the

11   participants had to be in -- so we knew exactly

12   what gear they needed to be in at a given time.  We

13   were able to determine if they were able to get

14   into that gear initially, and then if they

15   proceeded to move onto the next task without

16   correcting, that would be an uncorrected mis-shift.

17   To the extent they initially did not get into the

18   correct gear and self-corrected, that would be

19   considered a corrected mis-shift.

20       Q.   What criteria did you use to make that

21   determination?

22       A.   Binary ones.

23       Q.   What does that mean?

24       A.   They either corrected or they didn't.

25       Q.   How did you determine if they corrected

Page 140

1    it?

2        A.   Through a combination of looking at the

3    vehicle instrumentation data and the videos.

4        Q.   Was there any objective criteria?

5        A.   Not beyond the specific objective criteria

6    I just mentioned.

7        Q.   I'm still confused here.  Okay.

8             So if someone corrected a mis-shift, you

9    determined that by looking at the instrumentation

10   and the videos; is that right?

11       A.   That information was available through the

12   instrumentation and the videos.  We primarily

13   utilized the instrumentation data and would rely on

14   the videos, if necessary.  But as I sit here,

15   I don't believe we needed to use the video.  It was

16   all captured in the instrumentation.

17       Q.   What part of the instrumentation data --

18   and I haven't seen it, so, please, help me out

19   because I can't visualize it.

20            What part of the instrumentation data

21   would allow you to determine whether something was

22   a mis-shift or a corrected mis-shift, uncorrected?

23   Was there objective criteria?

24       A.   Yes.

25       Q.   Okay.  What was that?

Page 141

1      A.   The instrumentation data indicates the

2  specific gear the participant is in, as well as the

3  time and force associated with movement between

4  gears.  Because we only evaluated corrected and

5  uncorrected mis-shifts for tasks in which we knew

6  exactly what gear they had to be in at any given

7  time, by comparing the raw data to the gear we knew

8  they had to be in, we were able to tell whether or

9  not they initially got to the correct gear and

10 thus, made a correct movement, got to the incorrect

11 gear and then corrected, which would be a corrected

12 mis-shift, or got to the incorrect gear and moved

13 on without correcting.

14     Q.   And you were doing that by looking at the

15 time and force data?

16     A.   As well as the codes from the raw data

17 that indicate the specific gear that the vehicle

18 was in.

19     Q.   Was there objective criteria for this,

20 meaning two seconds here, whatever amount of force

21 and this code?  I mean, was it categorized in any

22 way?

23     A.   So what you've just described is actually

24 subjective criteria.  The objective criteria is

25 everything I just mentioned.  As Dr. Rosenberg did,

1    I did not use any subjective criteria.

2        Q.    I guess I'm still a little bit confused.

3    If you are using timing data, force data, and the

4    codes we just discussed to determine whether

5    something is a mis-shift, corrected mis-shift, how

6    are you doing that?  Are you combing through data

7    yourself and figuring it out?  Is all of this

8    filtering into a computer and shooting out

9    mis-shift?  Corrected mis-shift?  How is that

10   happening?

11       A.    I think I see where you might be getting

12   confused.

13           The instrumentation outputted timing and

14   force data with respect to the movement of the

15   gearshift.  Additionally, the instrumentation also

16   outputted what gear the person was in -- the

17   participant was in at any given time.  The

18   objective criteria used to determine correct shift,

19   corrected mis-shift, or uncorrected mis-shift were

20   the specific indication of what gear they were in.

21   The time and the force was used for a separate

22   analysis of time and force.

23           So, for instance, for the static shifting

24   task, as well as the sloped task, we knew ahead of

25   time --

Page 143

1        Q.   Let me just pause one second.  Take me

2    there.  What page was it on again?  Got it.

3             Go ahead.  Let's go through this one task

4    at a time, otherwise my brain is going to explode.

5             Give me -- let's do --

6        A.   I would suggest the slope task is a little

7    more straightforward.

8        Q.   Okay.

9        A.   So for the slope task, participants would

10   pull up to a set of cones.  They would put the

11   vehicle in Park.  They would then put the vehicle

12   in Drive, proceed forward up a slope to another set

13   of cones, put the vehicle in Park, then put the

14   vehicle in Reverse and come back down to the

15   initial set of cones and put the vehicle in Park.

16            That was a finite, discrete, known set of

17   movements.  So when looking at the data that was

18   output from the instrumentation, we could look at

19   the order of the gears that a participant was in.

20   If the order of the gears the participant was in

21   differed from the pattern that I just discussed,

22   then we knew some type of mis-shift had occurred.

23            Specifically, if we then saw a different

24   gear followed by the correct gear, that was labeled

25   as a corrected mis-shift.  For example, if you look

Page 144

1    at the beginning of the slope, so Row 9, it says

2    Park to Drive for the first two.  If someone,

3    instead, went Park to Reverse, and then stayed in

4    Reverse, that would be an uncorrected mis-shift.

5    However --

6         Q.   Stayed in Reverse for how long?

7         A.   Stayed in Reverse until the next Park

8    task.  So if they skipped that Drive there, then

9    that would be an uncorrected mis-shift.

10        Q.   So they could go from -- so if they went

11   from Park to Reverse to Park --

12        A.   Correct.

13        Q.   -- that would be an uncorrected mis-shift?

14        A.   Correct.

15        Q.   But if they went from Park to Reverse back

16   to Drive before Park, that would be a corrected

17   mis-shift?

18        A.   Correct.

19        Q.   Okay.  And the timing has nothing to do

20   with that?  Whether they were in -- let's say they

21   went from Park to Reverse for a number of seconds

22   and then went to Drive, would that be a corrected

23   mis-shift regardless of how long they were in

24   Reverse because they got to Drive before Park?

25        A.   Correct.

Page 145

1          Q.    Okay.  So timing has nothing to do with
2     whether it was a corrected mis-shift or an
3     uncorrected mis-shift?  It's more of the sequence?
4          A.    I believe that's a fair characterization.
5          Q.    So what role did timing play in your
6     assessment, if at all?
7                Let's stay on the slope because I think
8     I understand it now.
9                You're collecting timing data for a reason
10     while they are doing this slope task.  Why?
11          A.    The additional allegations to those that
12     we have discussed have to do with the alleged
13     difficulty and non-intuitiveness of the monostable
14     shifter, and some of the ways of assessing those
15     claims have to do with timing and whether it takes
16     different amounts of time to perform different
17     tasks with different shifters.  So that is why the
18     timing data were collected.
19          Q.    Was there any kind of criteria that you
20     used with that timing assessment?
21          A.    Not in the way that I understand you to be
22     asking.
23          Q.    In any way?
24          A.    The timing data, again, were used to look
25     at how long it took for various types of shifts.

Page 146

1    Timing data were not used as any kind of criteria

2    to characterize a person's behavior other than how

3    long it took to get from one gear to the other.  So

4    the timing was not used as any kind of inclusionary

5    or exclusionary criteria.

6        Q.   Okay.  So tell me -- and pardon me -- tell

7    me one more time, maybe in simpler words, what the

8    timing was used for.

9        A.   The simplest way that I can possibly

10   describe it is that the timing data were used to

11   evaluate how long it took participants to perform

12   various shifting maneuvers.

13       Q.   And do you have that documented anywhere,

14   or is it just a part of the raw data from the

15   instrumentation?

16       A.   A summary of the timing data is included

17   in the report, and the raw data that we've been

18   talking about does have the timing data in it.

19       Q.   Where is that summary in your report?

20       A.   A discussion of the timing data begins on

21   page 76 and continues on to page 77.

22       Q.   So you compared time to shift into Park

23   from each of the three gears, Drive, Neutral and

24   Reverse, across all vehicles excluding BMW.  What

25   did you do with that data?

1        You said "An analysis of variance showed
2    there was a significant effect of shift," and you
3    go to Figure 14.  So here I can see you're
4    evaluating the time to shift to Park from each of
5    the gears to drive to Park, Neutral to Park,
6    Reverse to Park.  Is that how you're doing that?
7        A.   That is what those data describe for the
8    four vehicles, less the BMW.
9        Q.   Why not the BMW?
10       A.   The BMW utilizes a push button Park, and
11   the comparison would not be apples to apples.
12       Q.   Go back to page 71.
13           It looks like your definition of corrected
14   mis-shift includes overshoots; is that right?
15       A.   Yes, that is correct.
16       Q.   What else did it include?  Shifting into
17   the incorrect gear and then rectify to enter the
18   intended gear -- did it include anything beyond
19   these three items listed?
20       A.   It's not three items listed.  So overshoot
21   is an example of the description.  The description
22   stand on its own.
23       Q.   So is there a definition of what an
24   overshoot is then?
25       A.   An overshoot is an example of a shift into

Page 148

1    an incorrect gear and then the rectifying of said

2    overshoot would be the correction of the mis-shift.

3         Q.    Does it also include undershoots?

4         A.    That is certainly a possible way in which

5    someone could shift into the incorrect gear and

6    then rectify.

7         Q.    Did uncorrected mis-shoots include

8    overshoots?

9         A.    Again, potentially that category of data

10   certainly would include overshoots that were

11   uncorrected.

12        Q.    And undershoots as well?

13        A.    Any shifts into a gear that was not the

14   intended gear and goes uncorrected would fit into

15   that category.

16        Q.    Which includes undershoots and overshoots?

17        A.    The only danger, and the reason why we

18   don't specifically discuss undershoots, is based on

19   the methodologies that I've seen employed by anyone

20   who has done any research in this case.  The

21   valuation of an undershoot is entirely subjective.

22   It is difficult, if not impossible, to a reasonable

23   degree of certainty, given the methodologies that

24   I've seen for any experimenter to know for sure

25   that an undershoot was not intentional.

Page 149

1      Q.    Did you find any overshoot errors in your
2    study?
3      A.    My recollection is that there were a
4    combination of what has been referred to in other
5    work in this case in some of the clinics, as well
6    as Dr. Rosenberg's usability tests, on overshoots
7    and undershoots.
8      Q.    Okay.  So you did find overshoots in your
9    studies?
10     A.    That is my recollection.
11     Q.    And you did not measure undershoots?
12     A.    Again, to the extent there was a shift
13    into a gear other than the intended gear and then
14    corrected, it would be a corrected mis-shift.
15    I don't believe -- we did not include undershoots
16    in that.
17     Q.    Did you measure wrong direction shifting
18    in this study?
19     A.    That would be also characterized in the
20    mis-shift.
21     Q.    Corrected or uncorrected?
22     A.    If you move the shifter in the wrong
23    direction, the way that we would characterize that
24    in our study would be contingent on the outcome,
25    not the initial movement.

Page 150

1    Q.   What does that mean, outcome, not -- let's
2    go back to the slopes design.
3    A.   So in the slope task, if you are in
4    Reverse, and you go -- and -- the goal is to get to
5    Park.  If you shift towards Neutral, then that
6    would be a wrong direction, and that would be
7    captured as a corrected mis-shift.
8    Q.   So you didn't isolate wrong direction, but
9    it's included within the mis-shift?
10   A.   The data were not further broken down
11   beyond what's described in Table 4.
12   Q.   In looking at the description of your
13   gearshift study, it looks like you break down the
14   shifting behaviors in this little column
15   "Narrative" for each, but I don't see one for
16   uncorrected mis-shifts.
17        So, for example, you talk about corrected
18   mis-shifts on pages 72 and 73, and then page 74
19   goes from forget -- goes from corrected mis-shifts
20   to forget-to-shift-to-Park errors.  But I don't see
21   anything, a narrative about the uncorrected
22   mis-shift findings.  Is that accurate?
23   A.   No.
24   Q.   Okay.  Where are they?
25   A.   If you look at page 72, the last sentence

Page 151

1    of the paragraph, just above the figure reads "Note

2    that we did not observe any uncorrected mis-shifts

3    in any of the vehicles."

4         MR. FRESARD:  Any time you're ready for a

5    break.

6         MS. SOFFIN:  Okay.  That's fine.  We can take a

7    break.

8         THE VIDEOGRAPHER:  We are going off the record.

9         This is the end of Media Unit No. 3.  The time

10   is 2:40 p.m.

11                    (A short break was taken.)

12        THE VIDEOGRAPHER:  We are back on the record.

13        This is the beginning of Media Unit No. 4.  The

14   time is 2:58 p.m.

15        Please proceed.

16   BY MS. SOFFIN:

17        Q.   Are you familiar with the safety hierarchy

18   or is it the hierarchy of safety controls?

19        A.   I am familiar with a term that's been

20   referred to as safety hierarchy before.

21        Q.   Is that -- what's your knowledge of that?

22   Your understanding of that?

23        A.   It is a hierarchy that looks at ways to

24   address and mitigate hazards with respect to the

25   design of products and systems.

Page 152

1        Q.    Is that something you rely upon in your

2    work of human factors?

3        A.    I have certainly utilized that information

4    in the course of my analyses through the years.

5        Q.    Is that something that's generally

6    accepted within the human factors field?

7        A.    It is accepted as a set of terms and a

8    principle that exists for sure.

9        Q.    What are those terms and principles?

10            You can give me a high level description.

11       A.    Sure.

12            My understanding of the safety hierarchy

13   is that when assessing a, again, product or system

14   with respect to hazards, the persons or people

15   creating said product or systems attempt to design

16   out the hazard.  If that is not possible, for any

17   number of reasons, the next solution is to guard

18   against the potential hazard, and the next level

19   would be to warn about the hazard.  And I have also

20   seen versions of this where an additional component

21   of providing training and information to users of

22   the product is incorporated.

23       Q.    So at the top of that hierarchy of safety

24   controls is eliminating the defect, which is

25   essentially reducing the risk of hazard to zero; is

Page 153

1    that right?

2         A.    No, that is not correct.

3         Q.    How would you describe it?

4         A.    The presence of a hazard is not

5    necessarily a defect.

6         Q.    Is at the top of the hierarchy eliminating

7    a hazard or eliminating a defect?

8         A.    The first level of hierarchy is designing

9    out the hazard or potential for hazard.

10        Q.    What does that mean?

11        A.    So if, in evaluating the design of a

12   product or system hazards or other threats,

13   potential threats to safety are determined, and

14   this hierarchy is being applied, the goal would be

15   to look at ways to implement some sort of design,

16   either new design, design change, or design

17   addition to remove the hazard or at least remove

18   the opportunity for a user to interact with the

19   hazard.  That's also the guarding.

20        Q.    Does that apply to gearshifts?

21        A.    The principles of the safety hierarchy are

22   certainly able to be applied to any system or

23   product.

24        Q.    And that includes gearshifts?

25        A.    As a gearshift is a system and/or product,

Page 154

1    it certainly can be utilized in the design of the
2    gearshift.
3        Q.    So at the top of this hierarchy would be,
4    in relation to gearshifts, designing out a hazard
5    or potential hazard involving a gearshift?
6        A.    That's fair.
7        Q.    And that's the best thing to do to avoid
8    the hazard from causing problems.  Is that a
9    simpler way of putting it?  Designing it out?
10       A.    I don't agree with that characterization.
11       Q.    What's the purpose of designing out a
12   hazard?
13       A.    The purpose of designing out a hazard is
14   to remove or minimize the opportunity or risk of an
15   individual or user or users to encounter said
16   hazard.
17       Q.    And that applies to gearshifts?
18       A.    Again, the idea of this hierarchy can
19   certainly be applied to the design and
20   implementation of a gearshift.
21       Q.    And is designing out a hazard in the way
22   you've described it something that manufacturers of
23   products should take the opportunity to do before
24   distributing it in a consumer marketplace?
25       A.    I certainly believe that manufacturers, in

Page 155

1    designing their products, should assess the

2    products and system for potential hazards and think

3    about how to address them, and that is consistent

4    with what I've seen that FCA has done in this

5    matter.

6         Q.   Not just think about but actually do it,

7    actually address it -- right? -- remove or minimize

8    the opportunity for risk of hazard if they have the

9    opportunity to do that?

10        A.   It is inappropriate to take this one

11   principle from this hierarchy and apply it so

12   broadly in a bubble to any type of even simple

13   system or product, let alone a complicated and

14   nuanced product, such as a motor vehicle.

15        Q.   So are you saying it's inappropriate for

16   an auto manufacturer, such as FCA, to take an

17   opportunity to remove a known hazard that could

18   minimize the opportunity for risk before

19   distributing it into the consumer marketplace?

20        A.   That's entirely inconsistent with what

21   I just said.

22        Q.   Okay.  It sounded like that's what you

23   said.  So let me ask again.  Would it be

24   appropriate for a car manufacturer to take the

25   opportunity to design out a hazard to remove or

Page 156

1    minimize the opportunity for risk of injury prior

2    to distributing a car into the consumer

3    marketplace?

4         A.   To the extent a hazard is able to be

5    designed out, while maintaining every other aspect

6    of the system or the product, it is certainly an

7    option for any manufacturer to consider designing

8    out the hazard.

9         Q.   And that includes gearshifts?

10        A.   Yes, ma'am.

11        Q.   Page 70.  Now, we discussed this briefly

12   before.  This is a survey that you administered to

13   the participants in your test who drove the

14   Chrysler 300 and the 2015 Jeep Grand Cherokee; is

15   that right?

16        A.   I'm sorry.  What what is a survey?

17        Q.   On page 70 where it says "Consider the

18   following disclosure."

19        A.   That is -- from 70 to 71, the text in

20   italics represents a question that was asked as

21   part of a survey to participants who drove the

22   Chrysler 300 and Jeep Grand Cherokee in a behavior

23   study.

24        Q.   So it's part of a broader survey?

25        A.   Yes, ma'am.

Page 157

1      Q.    Was that survey provided or described in

2   the report?

3      A.    I believe it is described in the report.

4   I don't believe it was provided.

5      Q.    And was that the description we talked

6   about earlier?

7      A.    I do believe we discussed it earlier.

8      Q.    So this is one component of a broader

9   survey that you're going to provide to your

10  attorney for me -- right? -- with the questions and

11  the answers?

12     A.    I can do that.

13     Q.    But you only chose to include this

14  particular disclosure within your report?

15     A.    With respect to the analyses that we

16  performed, this question was the only relevant

17  question for this analysis.

18     Q.    Do you mean for your entire analysis in

19  your report or just -- actually, I don't see a

20  conclusion related to just this disclosure.  So

21  I am not sure what you're talking about, why this

22  was relevant to just this analysis.  What do you

23  mean "this analysis"?

24     A.    So the section of the report that we're

25  looking at right now -- so on page 62 begins the

Page 158

1    top -- the section of the report that talks about
2    the entirety of the gearshift behavior study.  The
3    second subheading under it is "Methods," which has
4    a number of different subheadings included therein.
5           The methods go down through page 65, which
6    is "Procedure," where a description of the specific
7    methodology employed during the course the test is
8    described.  As part of that description, continues
9    onto page 70, the question, in the italics that are
10   printed there, is a description of the specific
11   question as part of the survey that was given.
12          So as far as a conclusion statement that
13   you were looking for would not be present in this
14   section of the report.
15       Q.   But later in the report, you describe a
16   conclusion about the survey as a whole?
17          Point me to that part again.  That's
18   page 78.
19       A.   78 discusses the relevant results from the
20   survey.
21       Q.   The entire survey, not just this
22   disclosure on page 70 and 71?
23       A.   The analysis described on page 78
24   discusses the aspects of data from the survey that
25   were relevant to the analyses I performed.

Page 159

1    Q.   So you -- let me make sure.  You conducted

2    a survey and then isolated aspects of that survey

3    that were relevant to the analysis you performed?

4        A.   We conducted a survey to collect a variety

5    of information and then utilized the necessary

6    information from the survey to answer specific

7    questions, research questions, or hypothesis that

8    were proposed.

9        Q.   So you used some of the information from

10   the survey, but not all of it, to reach your

11   hypothesis?

12       A.   Correct.  Similar to how various aspects

13   of the instrumented data that were collected were

14   used for different analyses through the course of

15   the study.

16       Q.   All right.  I'm looking forward to seeing

17   that survey, but this disclosure was part of it on

18   pages 70 and 71, as part of the survey?

19       A.   Yes, ma'am, it was, for the participants

20   who drove the Jeep Grand Cherokee and the

21   Chrysler 300.

22       Q.   And did this disclosure play any role in

23   your conclusion about the survey results on

24   page 78?

25       A.   Yes, it did.

Page 160

1    Q.   It says "When asked if they still would

2    have purchased or leased the vehicles, if given the

3    S27 disclosure language at the time of purchase,

4    10 of 12 Jeep drivers answered yes and 8 of 12

5    Chrysler drivers answered yes."

6          Is that paragraph referencing something

7    other than this disclosure on page 70 and 71?

8          Because it seems to me that this

9    8 out of 12 and this 10 out of 12 is talking about

10   the results from one specific disclosure, or was it

11   broken out into multiple questions?

12   A.   The disclosure that this analysis

13   references is the disclosure that's written in

14   italics on page, I believe you said, 70 and 71.

15   Q.   Okay.  So on page 78 where it starts "When

16   asked if they still would have purchased or leased

17   the vehicles if given the S27 disclosure," and then

18   goes down to the Figure 15 survey results in the

19   box, that area is talking specifically and only

20   about the disclosure on pages 70 and 71; is that

21   right?

22   A.   That is correct.

23   Q.   But above you discuss a broader survey

24   that you are going to get to me, including the

25   questions and the results?

Page 161

1          A.   That is correct.

2          Q.   Okay.

3          A.   Well, sorry.   The paragraph above does

4    discuss the broader results of the survey.   I can

5    provide that to counsel.

6          Q.   Okay.   Good.   We are on the same page.

7               But this part, the "when as if" to the box

8    is just talking about the page 70 disclosure?

9          A.   That is my understanding.

10         Q.   Okay.   It says -- who wrote this

11   disclosure on page 70 and 71?

12         A.   As far as who specifically typed it, it

13   was one of the team members.   As far as who

14   cognitively authored it, it would be a combination

15   of myself and Dr. Young.

16         Q.   So you and Dr. Young came up with the

17   words to use in this disclosure?

18         A.   That is my recollection.

19         Q.   Anybody else?

20         A.   Not that I can recall.

21         Q.   Did anybody play any role, other than you

22   and Dr. Young, in determining the language to use

23   in this disclosure?

24         A.   Certainly, any work product that is

25   generated at Exponent will have multiple eyes on it

Page 162

1     from any number of the team who worked on the

2     project.  To the extent that anyone has thoughts or

3     suggestions or comments, we absolutely will discuss

4     them and consider them.  The ultimate decision for

5     what is implemented would lie with Dr. Young and

6     myself.

7          Q.   Did anyone, other than people employed by

8     Exponent, play any role in determining what

9     language to use in this disclosure?

10         A.   I think at some point the general methods

11    were discussed with my client.  However, the work

12    itself and the ideas for the work and the direction

13    of the work was at the direction of Dr. Young and

14    myself.

15         Q.   And it says -- it appears you described

16    this as language similar to the S27 disclosure; is

17    that right?

18         A.   That is how it's described.

19         Q.   But you didn't actually provide these 24

20    people?

21         A.   That is correct.

22         Q.   You didn't actually provide these

23    24 people with the S27 recall disclosure?

24         A.   Correct.  We did not give them the --

25    either of the forms marked as Exhibit 94 or 95.

Page 163

1     Q.   The first sentence of this disclosure says

2     "Your vehicle is equipped with a state-of-the-art

3     fuel-efficient, eight-speed transmission."

4          What does "state-of-the-art" mean?

5     A.   My understanding is it means it's new and

6     of the -- from a technology standpoint, new and

7     technologically advanced with respect to the

8     marketplace.

9     Q.   Why did you decide to use this term?

10    A.   It's an accurate description of the

11    transmission.

12    Q.   Do you know whether consumers have a

13    positive or negative response to this phrase,

14    "state of the art"?

15    A.   I have not specifically investigated that.

16    Q.   Did you know whether they do?

17    A.   I don't have another answer.

18    Q.   Is the word "state of the art" anywhere in

19    the S27 or the term "state of the art" anywhere in

20    the S27 disclosure?  Can you point me to it?

21    MR. FRESARD:  Object to the form of the

22    question.

23    THE WITNESS:  That term is not contained in

24    Exhibit 94 or 95.

25    BY MS. SOFFIN:

Page 164

1      Q.   You also describe the vehicles as

2  fuel-efficient, eight-speed transmission.  Why did

3  you include that in this disclosure on page 74?

4      A.   It's a correct description of the type of

5  transmission that is in the vehicle.

6      Q.   So you put it in there because it was,

7  according to you, true?

8      A.   It is an accurate description of the

9  transmission.

10     Q.   And the S27 disclosure, it appears FCA

11 says -- when it's describing the problem, it says

12 "The problem is your vehicle may roll away,

13 striking or injuring your passengers or bystanders

14 if the vehicle engine is running, the parking brake

15 is not engaged and the transmission is not in the

16 Park position before exiting the vehicle."

17          Do you see that?

18     A.   You read that correctly.

19     Q.   According to FCA, that's a true statement;

20 right?  An accurate description of the problem?

21     MR. FRESARD:  Object to the form of the

22 question.

23     THE WITNESS:  Again, I would agree that's

24 what's stated on this paper, and my understanding

25 is that was authored by FCA.

Page 165

1    BY MS. SOFFIN:

2        Q.   And even though that's an accurate

3    description of the problem, you did not include

4    that in your disclosure to consumers?

5        MR. FRESARD:  Objection --

6    BY MS. SOFFIN:

7        Q.   On page 70; is that right?

8        MR. FRESARD:  Objection to the form.

9        THE WITNESS:  That is correct.

10   BY MS. SOFFIN:

11       Q.   The words "roll away" are nowhere in this

12   disclosure that you and Dr. Young crafted; is that

13   right?

14       A.   The specific words together "roll away"

15   are not contained in the italicized text on page 70

16   and 71 in my report.

17       Q.   How about "striking"?

18       A.   The word "striking" does not appear in

19   this section of the report.

20       Q.   How about "injuring"?

21       A.   A version of that word does appear.

22       Q.   Where?

23       A.   On page 71, the last sentence of the

24   middle paragraph of italicized text reads "If the

25   driver does not immediately apply the brakes,

Page 166

1    unintended movement of the vehicle could injure

2    those in or near the vehicle."

3        Q.   You used the word "unintended movement"

4    but not "roll away" or "striking"; is that right?

5        A.   That is correct.

6        Q.   Would you agree that consumers might have

7    a more positive response to the phrase "state of

8    the art" and "fuel efficient" and "roll away

9    striking and injuring you and your passengers and

10   bystanders"?

11       A.   I'm sorry.  I missed something in the

12   middle of your question there.

13       Q.   Would you agree that consumers might have

14   a more positive response to a description of a

15   vehicle as being state of the art and fuel

16   efficient than one that can roll away, strike, and

17   injure you or your passengers and bystanders?

18       A.   It would not surprise me if individuals

19   all responded very differently when presented with

20   any of that information.

21       Q.   Do you think someone might respond more

22   positively if you told them their car might roll

23   away, strike, or injure them or their passengers

24   versus whether you told them that they were about

25   to get a state-of-the-art, fuel-efficient vehicle?

Page 167

1       A.    I agree that is a potential response among
2    many potential responses.
3       Q.    So it is possible that someone might more
4    positively respond to a disclosure that their car
5    could roll away, strike, and injure them or their
6    passengers than the disclosure that their vehicle
7    is state of the art and fuel efficient?
8       A.    It is possible that a person might respond
9    that way.
10      Q.    Would you consider that person rational?
11      A.    I would want to assess much more
12   information about any individual before passing any
13   kind of judgment or opinion about that.
14      Q.    So you are not comfortable opining that a
15   reasonable consumer would respond more positively
16   to the phrase "state of the art" and "fuel
17   efficient" than "roll away, striking and injuring"?
18      A.    I am not broadly comfortable with that
19   opinion.  I've not seen data and specific inquiry
20   to address that question.
21      Q.    And is it because you didn't include the
22   phrases "roll away, striking and injuring you or
23   your passengers or bystanders" in your disclosure
24   to consumers?
25      A.    No, that is not why.

Page 168

1      Q.   That's not.

2           You say in this disclosure "As with all

3      automatic transmissions, it is possible that a

4      driver might shift into a gear other than the

5      intended gear."

6           What other transmissions are you referring

7      to?

8      A.   All automatic transmissions.

9      Q.   And would you characterize that as an

10     error if you're shifting into a gear other than the

11     intended gear?

12     A.   I would want to look at the specific

13     context with respect to an individual incident or

14     individual shift you're referring to, but

15     certainly, it would be possible to -- or

16     I wouldn't, rather, be surprised if someone

17     characterized some type of movement like that as an

18     error.

19     Q.   How would you characterize it then?

20          It's your sentence.

21     A.   It could be a mis-shift.  It could be a

22     wrong direction.  It could be a cognitive slip.

23     There is lots of different words to use to

24     characterize that type of behavior.

25     Q.   Are all of these errors, mis-shifts,

Page 169

1    cognitive mis-shifts?

2         A.   Again, it would depend on the individual

3    circumstances around any incident.

4         Q.   Is this phrase "As with all automatic

5    transmissions, it is possible a driver might shift

6    into a gear other than the intended gear" in an S27

7    disclosure?  This specific phrase?

8         A.   It does not appear so.

9         MS. SOFFIN:  We'll take a break.

10        THE VIDEOGRAPHER:  We are going off the record.

11        The time is 3:28 p.m.

12                       (A short break was taken.)

13        THE VIDEOGRAPHER:  We are back on the record.

14        The time is 3:44 p.m.

15        Please proceed.

16   BY MS. SOFFIN:

17        Q.   Are you aware that FCA has a group that

18   does HMI analysis?

19        A.   I've seen reference to a group at FCA

20   called HMI, human machine interface.

21        Q.   Do you know what that group does at FCA?

22        A.   Not specifically beyond my understanding

23   that they look at issues with respect to HMI.

24        Q.   Does that include human factors?

25        A.   Human machine interface, human computer

Page 170

1    interaction, usability, user experience, and human

2    factors are all related.  Certainly, human factors,

3    I would describe as kind of a broader field with

4    those other fields being captured within human

5    factors.

6        Q.   Did you speak with anyone at FCA's HMI

7    department in connection with this case?

8        A.   No, ma'am, I did not.

9        Q.   ███████████████████████████████

10   ████████████████████████████████████████

11   █████████████████████████████████

12       A.   ███████████████████████████████

13   ██████████████████████████████████

14       Q.   ███████████████████████████████

15   ████████████████████████████████████████

16   ███████████████████████

17       A.   ████████████████████████████████

18   ██████████████████

19       Q.   ██████████████████████████████

20       A.   █████████████████████████████

21   █████████████████████████████████

22       Q.   ██████████████████████████████████

23   ██████████████████████████████████████████

24   ███████████████████████████████████████

25   █████████

Page 171

1    A.   ████████████████████████████

2    ████████████████████████████████

3    Q.   ██████

4    A.   ████████████████████████████

5    ████████████

6    Q.   ████████████████████████████

7    ████████████████████████████████

8    ████████████████████████████

9    A.   ████████████████████████████

10   ████████████████████████████

11   ████

12   Q.   ████████████████████████

13   ████████

14        A.   No, ma'am, I have not.

15        Q.   Would you agree that FCA used the

16   monostable design shifter used by Audi in the A8 in

17   the class vehicles?

18        A.   Based on my review of the materials

19   supplied, I understand FCA used a monostable

20   shifter similar to the shifter in the Audi A8.

21        Q.   Similar in what way?

22        A.   My understanding is that the product, as

23   manufactured by said ZF, was, in the guts of it,

24   nearly identical.  My understanding is there are

25   differences with respect to the look, feel and

Page 172

1    specific movement of the shifter between the Audi

2    vehicle as well as the -- as compared to the class

3    vehicle.

4         Q.   What difference in the movement?  What do

5    you mean by that?

6         A.   The detents were tuned differently for the

7    FCA vehicle.

8         Q.   Have you reviewed a document indicating

9    that the detents were different in the Audi

10   monostable than the one ultimately used in the

11   class vehicles?

12        A.   Again, I know it was discussed in the

13   depositions of the FCA employees who have given

14   testimony in this case, and I believe it is

15   discussed, at least alluded to, in some of the

16   testing and evaluation of the clinics that have

17   been performed.

18        Q.   Do you know whether the change in detents

19   was actually implemented in the gearshift that

20   ultimately made it into the class vehicles or

21   whether it was just discussed by FCA?

22        A.   I have not seen, specifically, a

23   description of -- the description comparing and

24   contrasting the actual implemented shifter with

25   respect to the detents.

1    Q.   Okay.  But your understanding is that the

2   monostable design used in the class vehicles had,

3   I think in your words, the same guts as the

4   monostable used in the Audi A8?

5    A.   Again, I would defer to an automotive

6   engineer or an electrical engineer to describe that

7   further, but that is my understanding of the

8   functioning of the gearshift.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 174



Page 175



Page 176



Page 177



Page 178





Page 180



Page 181



Page 182

1    Q.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

2    A.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

3    ▉▉▉▉▉▉▉▉▉▉

4    Q.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

5    ▉▉▉▉▉▉▉▉▉▉▉▉

6    A.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

7    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

8    ▉

9    Q.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

10   ▉▉▉▉

11        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

12   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

13   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

14   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

15   A.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

16   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

17   ▉▉▉▉▉

18   Q.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

19   ▉▉▉▉▉

20   A.    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

21   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

22   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

23   ▉▉▉▉▉▉▉▉▉▉

24        MS. SOFFIN:  I don't have any more questions.

25        MR. FRESARD:  I don't have any.

Page 183

1          THE VIDEOGRAPHER:  We are off the record.

2          It's 4:15 p.m., and this conclude today's

3     testimony given by David Cades, Ph.D.  The total

4     number of media units used was four and will be

5     retained by Veritext.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 184

C E R T I F I C A T E

1

2

3          I, DEANNA AMORE, a Shorthand Reporter and

4     notary public, within and for the State of

5     Illinois, County of DuPage, do hereby certify:

6          That DAVID CADES, PH.D., the witness whose

7     examination is hereinbefore set forth, was first

8     duly sworn by me and that this transcript of said

9     testimony is a true record of the testimony given

10    by said witness.

11         I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15

16         IN WITNESS WHEREOF, I have hereunto set my

17    hand this 28th day of January 2019.

18

19

20    _____

21    Deanna M. Amore, CRR, RPR, CSR

22

23

24

25

Page 185

1    In Re FCA US Monostable Electronic Gearshift

2    David Cades, Ph.D.

3              INSTRUCTIONS TO THE WITNESS

4         Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the

7    appropriate space on the errata sheet for any

8    corrections that are made.

9         After doing so, please sign the errata

10   sheet and date it.

11        You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14        It is imperative that you return the

15   original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

25   3191249

Page 186

1      In Re FCA US Monostable Electronic Gearshift

2      David Cades, Ph.D.

3                    E R R A T A

4                    - - - - -

5      PAGE    LINE    CHANGE

6      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

7      Reason:_____

8      _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

9      Reason:_____

10     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

11     Reason:_____

12     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13     Reason:_____

14     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

15     Reason:_____

16     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

17     Reason:_____

18     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

19     Reason:_____

20     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

21     Reason:_____

22     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

23     Reason:_____

24     _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

25     3191249

Page 187

1   In Re FCA US Monostable Electronic Gearshift

2   David Cades, Ph.D.

3           ACKNOWLEDGMENT OF DEPONENT

4           I, _____, do

5   hereby certify that I have read the foregoing

6   pages and that the same is a correct

7   transcription of the answers given by

8   me to the questions therein propounded,

9   except for the corrections or changes in form

10  or substance, if any, noted in the attached

11  Errata Sheet.

12

13  _____              _____

14  DATE                     SIGNATURE

15

16

17

18

19

20

21

22

23

24

25  3191249

**0**

**02744**   1:6 4:16
**084-003999**   1:19
**096143**   106:14

**1**

**1**   4:12 36:3,11
  37:6 38:12 60:1
  66:4
**10**   1:17 4:18 13:8
  36:6 37:5,15,17
  38:2,3 39:25
  54:16 57:12 160:4
  160:9
**1000**   130:17
**102**   3:20
**10:37**   60:2
**10:56**   60:6
**11**   36:7 37:17 38:6
  38:7 39:25
**1100**   2:5
**11:49**   87:7
**12**   36:7 119:1
  120:8,9,15,16,18
  124:1,3,7,8,9
  160:4,4,9,9
**12384**   184:19
**12:04**   87:10
**12:33**   104:5
**13**   36:7,8 38:18
**14**   147:3
**15**   37:5 160:18
**16**   1:6 4:16 6:20
  36:8 37:5,15
**163**   76:20
**16v**   3:13,18
**171**   76:20
**18**   52:25 53:14
  54:15
**1800**   1:24

**1801**   1:24
**19**   54:15 174:12,14
  174:15
**19087**   2:10
**19103**   1:24
**198804**   177:8
**198888**   174:17
**1:20**   104:9

**2**

**2**   36:3,11 37:4
  38:14 51:6 60:5
  104:4 118:12
  120:5
**20**   55:2
**2000s**   19:22
**2003**   18:13
**2007**   18:9
**2008**   77:16 102:19
**2009**   119:2
**2010**   107:13,21
  173:15 177:3
**2011**   18:5 107:22
  107:23
**2012**   41:15,15
  105:23 106:9,10
  107:25
**2013**   11:16 17:6
  120:9,18 126:24
**2014**   41:15,15,16
**2015**   41:16 66:5
  112:15 120:15,16
  126:25 156:14
**2018**   6:20 14:11,12
**2019**   1:14 4:2 11:1
  14:8,9 184:17
**203-0593**   2:15
**208**   76:20
**2300**   1:17 4:19
**24**   127:22 162:19
  162:23

**240**   3:13,18
**248**   2:15
**25**   1:14 4:2 182:9
**26**   65:23,24
**269**   32:17
**27**   65:25 66:4
**2744**   1:7
**28**   66:1,5 67:2
**280**   2:9
**28th**   184:17
**29**   67:3,7 112:8,13
**2:40**   151:10
**2:58**   151:14

**3**

**3**   31:11 36:4,11,24
  37:4 38:12 104:8
  120:10 135:25
  151:9
**30**   67:9 121:12
  185:16
**300**   2:14 11:16
  15:20 17:6 41:15
  120:10 124:3,10
  126:24 127:20,23
  156:14,22 159:21
  181:19
**304**   87:25 88:1,2
**31**   65:23,25
**315**   14:13
**3191249**   185:25
  186:25 187:25
**32**   39:23 68:9
**350**   14:7
**350i**   119:2
**36**   42:19 58:11
  61:22,23
**37929**   2:6
**39577**   2:14
**3:28**   169:11
**3:44**   169:14

**4**

**4**   36:4,11 37:4
  120:18 137:5
  150:11 151:13
**40**   121:12
**42**   58:11 77:1
**424**   66:20 76:19
**43**   70:22
**45**   80:16,18 83:9
  83:22
**48304**   2:15
**4:15**   183:2

**5**

**5**   36:5 37:4 120:8
  175:16 176:9
  182:9
**50**   87:13,14,15
  90:7 96:9
**51**   87:23 90:7
**53**   76:20
**557**   66:20,24 76:19
**59**   112:19

**6**

**6**   3:4 36:5 37:10
  37:11 176:9
**60**   120:24
**60606**   4:19
**610**   2:10
**62**   114:3,11 157:25
**63**   114:7 118:12
**64**   129:20
**65**   130:16 158:5
**68**   134:5

**7**

**7**   3:7 20:25 36:5
  37:4 38:17 120:8
  175:25 176:9
**70**   127:5 135:25
  156:11,17,19
  158:9,22 159:18

160:7,14,20 161:8
161:11 165:7,15
**71** 127:5 137:5
147:12 156:19
158:22 159:18
160:7,14,20
161:11 165:16,23
**72** 150:18,25
**73** 150:18
**74** 150:18 164:3
**76** 146:21
**77** 146:21
**78** 126:22 158:18
158:19,23 159:24
160:15
**79** 114:8

**8**

**8** 36:6 37:12,13
120:18 160:4,9
174:15
**80** 114:11
**800** 2:5
**82** 3:10,15
**822-0256** 2:10
**86-8541** 2:6
**865** 2:6
**8804** 175:16
**8s** 174:13

**9**

**9** 36:6 37:4 54:16
120:10 144:1
**93** 3:7 6:25 7:2
**94** 3:10 82:12,21
162:25 163:24
**95** 3:15 82:14,22
162:25 163:24
**96** 3:20,22 102:6
**9:00** 114:16,19
115:9 116:16

**9:12** 1:15 4:2

**a**

**a.m.** 1:15 4:2 60:2
60:6 87:7 114:16
114:19 115:9
116:16
**a7** 175:22
**a8** 171:16,20 173:4
173:16 174:1,9
175:4 176:19
**abilities** 27:22
**ability** 38:9 72:12
116:23
**able** 7:10 37:25
42:11 86:18
113:20 125:1
131:3 132:23
138:3,9 139:13,13
141:8 153:22
156:4 178:18,22
179:10
**abramson** 58:13
**absence** 70:3
**absolutely** 22:23
47:16 54:23 62:25
89:10 162:3
**academic** 18:1
**accept** 80:7
**acceptable** 179:15
**acceptance** 79:25
107:13
**accepted** 152:6,7
**access** 32:7,8
65:10,11 74:2
115:2,8,11,25
118:23 119:2,3
135:16,19
**accomplish** 69:4
113:20
**accomplished**
110:15

**account** 124:13,16
125:6,10
**accounting** 125:15
**accurate** 102:12
137:17 150:22
163:10 164:8,20
165:2 177:9
182:12 185:19
**accurately** 55:12
**achieve** 179:9,10
**achieved** 110:17
**achieving** 91:23
**acknowledgment**
187:3
**acquire** 72:13
130:20
**acquired** 56:14
**acquisition** 130:17
131:1,4,24
**act** 28:7
**action** 4:25 12:21
16:3,7 69:10 73:5
184:12
**actions** 69:7
**active** 13:3,10
**activities** 8:25
24:1,3 47:11 70:4
78:21 117:1
**acts** 28:7
**actual** 30:12 48:3
67:16 83:24
172:24 182:4,5
**ad** 114:23
**adam** 2:4,7 5:11
**add** 73:11 137:22
**addition** 64:25
73:15 153:17
**additional** 39:17
39:25 42:15,16
70:4 76:8 108:19
114:13 126:25

127:12 145:11
152:20
**additionally** 47:13
126:17 142:15
181:12
**address** 128:18
151:24 155:3,7
167:20
**addressed** 31:14
114:7
**addresses** 137:5
175:11
**addressing** 122:24
**adjust** 121:20,21
**adjusted** 182:16
182:21
**administer** 4:24
**administered**
127:19,22 156:12
**advanced** 23:12
31:15 35:5 43:7
49:21 60:24,25
61:1,5 64:25
65:15 163:7
**advertisements**
29:6
**advertising** 29:1,4
29:24 30:4
**affect** 34:14 127:2
**affiliated** 30:15
**affiliations** 5:3
**afford** 113:13
**age** 17:8 125:21
**aging** 23:4
**ago** 52:25 53:14
54:15
**agree** 4:10 10:17
59:5,18,20 64:13
71:17 72:16,22
75:23 76:25 78:10
79:17 82:8 83:3

83:14 84:10 85:16
95:10,14 96:2
98:4 112:12
113:19 118:25
154:10 164:23
166:6,13 167:1
171:1,15 176:2,6
178:4,6,10,17,21
182:15,23
**agreement** 38:1
80:21 81:9,25
83:2,11,25 84:7
85:4
**ahead** 85:21
142:24 143:3
**aircraft** 23:8
46:12,16
**al** 21:2,7 31:11
32:17 48:25 49:1
90:22
**alert** 68:22,25
69:13,21 70:2,14
71:11,22 72:1,6,10
72:21,23 73:13
74:1 76:1,22
**alertness** 70:6
**allegation** 16:19
16:21 127:11
**allegations** 15:16
15:19 36:16 41:12
70:25 127:9,10
145:11
**allege** 41:13,19
**alleged** 15:25 16:2
16:17 37:9 71:4
145:12
**allow** 140:21
176:13 178:7
**allowed** 130:20
**allows** 28:6 44:22
70:1 125:14 131:2

132:3,25
**alluded** 172:15
**alter** 39:11 73:16
**altered** 127:14
**alternative** 76:8
173:13 176:24
178:1
**ambit** 24:13
**american** 51:8
**amore** 1:19 4:22
184:3,21
**amount** 141:20
**amounts** 145:16
**analyses** 73:24
88:6,20 96:6
132:25 152:4
157:15 158:25
159:14 173:10
**analysis** 7:10 8:7
10:11 39:18 42:14
43:14 56:11 61:17
61:21 73:18,22
74:3,7 76:7 94:15
96:24,25 97:2,5,7
97:9,14,18,19
135:4 142:22
147:1 157:17,18
157:22,23 158:23
159:3 160:12
169:18 175:7,13
177:23
**analyze** 51:22
**analyzed** 10:7
49:17 138:23
**analyzing** 10:15
**answer** 6:13 42:9
42:12 59:16 61:8
73:3,17 86:11
93:3 94:1,2,24
98:8,20 102:22,24
110:23 111:1

159:6 163:17
170:21 173:24
175:2 179:19
**answered** 47:23
86:22 160:4,5
**answering** 47:21
**answers** 157:11
187:7
**anticipated** 136:12
**anticipation**
113:11
**anybody** 161:19
161:21
**anyway** 85:22
**apologize** 65:21
**appealing** 174:2
174:22
**appear** 165:18,21
169:8
**appearance** 5:6
**appearances** 2:1
5:3
**appears** 7:4 66:1
68:9 71:12 77:2
77:15 80:22 118:9
121:11 162:15
164:10 173:21
175:22
**appendix** 17:25
**apples** 147:11,11
174:11,11
**applicable** 55:17
133:10
**application** 22:14
46:2 76:14 110:20
110:21,24
**applied** 21:14,18
79:9 111:19
153:14,22 154:19
**applies** 54:23
154:17

**apply** 55:16
153:20 155:11
165:25
**applying** 75:20
**appreciate** 32:12
108:2
**appropriate** 81:15
87:2 128:12
155:24 185:7
**approximately**
53:14
**april** 107:14
**apt** 54:9
**arbitrations** 36:13
38:13
**area** 24:23 25:16
25:19,21,23,25
26:9,13 29:9
46:22 47:22 48:4
50:14,16 58:10
121:23 128:13
133:19,20 160:19
176:8
**areas** 23:18 24:10
29:21 30:3 45:6
45:17,18 51:13
58:24 59:8 92:25
**arguably** 112:21
113:18
**arrival** 121:16
**arrive** 179:17
**arrived** 116:18
**art** 163:2,4,14,18
163:19 166:8,15
166:25 167:7,16
**article** 21:6 65:8
**articles** 21:1 46:19
50:10,11,17 54:13
58:7,17 59:2,3,7,9
59:13 62:12 99:19
102:2

**aside** 12:25 58:15
136:5
**asked** 22:3 63:7,10
98:9 116:9,14,16
117:1 126:25
156:20 160:1,16
175:3
**asking** 6:10 16:9
41:25 48:13 50:15
88:19 100:2 127:7
145:22
**aspect** 7:9 60:12
77:19,20,25,25
94:20,21 97:24
156:5 179:2
**aspects** 8:17 26:14
29:16 31:8,15
42:25 46:5 56:9
59:13 62:24 64:9
64:20 72:3 79:15
93:21 95:12 97:21
98:2 109:11
116:21 118:1,2
128:25 138:2
158:24 159:2,12
**assess** 155:1
167:11
**assessed** 63:15
69:10 94:17,21
178:9
**assessing** 54:6
62:23 69:7 84:2
125:25 145:14
152:13
**assessment** 42:6
69:22 70:1 75:4
93:2 107:21 145:6
145:20
**assigned** 122:15
**assignment** 118:3

**assist** 10:10 53:8
94:5 170:23
**assistance** 23:12
35:5 61:2
**assistants** 102:10
**assisted** 7:21 9:24
10:9 115:18
**assistive** 116:24
**associated** 15:16
16:6 106:4 125:3
126:16 141:3
182:22
**assume** 6:9 58:18
58:23 65:12
**assuming** 18:17
73:13
**assumption**
182:20
**atlantic** 1:23
**attached** 185:13
187:10
**attachment** 82:2
**attempt** 113:8
152:15 182:17
**attempting** 69:3
113:5
**attempts** 182:22
**attention** 23:4
47:14 54:22 69:3
81:4 84:22
**attentive** 68:23,25
69:13,21 70:2,14
71:11,22 72:1,6,11
72:21,24 73:14
74:2 76:23
**attentiveness** 70:6
**attitudes** 60:21
**attorney** 5:6 101:1
101:19 115:3
123:9 157:10
185:16

**attorneys** 100:8
132:12
**attributes** 61:18
84:3
**audi** 171:16,20
172:1,9 173:4,13
173:16 174:1,9,25
175:4,8,14,19,22
176:19 177:12,16
177:24 178:3
182:12,15
**audio** 4:8,9
**auditory** 180:15
180:17 181:5
**authored** 30:25
100:17,24 101:25
161:14 164:25
**authorized** 4:24
**authors** 46:18
58:18 95:16 97:3
98:7,13
**auto** 110:8,25
155:16
**automated** 23:13
61:2 87:18
**automatic** 168:3,8
169:4
**automatically**
79:9
**automobile** 32:25
33:24 34:2 38:15
128:20
**automobiles** 37:3
37:17 38:11,14
43:2 44:25 128:18
128:23 129:12
**automotive** 12:20
19:15 173:5
**available** 42:15
63:22 67:10 69:9
71:25 73:25 75:9

131:11 137:15
140:11 180:5
181:8
**avenue** 2:14
**average** 182:17,21
**aviation** 23:2
37:16
**avoid** 154:7
179:21
**avoiding** 179:12
**aware** 11:25 12:10
13:11 15:3 17:16
66:19 69:12 74:18
80:6,14,15 85:7
99:7 104:18
106:25 107:15
108:20,24 109:5
169:17 171:9
175:6,10,12
176:18

**b**

**b** 17:25 58:13
175:25 176:3,5
177:20 182:13
**bachelor** 48:1
**bachelor's** 18:11
**back** 44:23 50:4
60:4,18 61:8 87:9
104:7 118:1
122:22 123:15
134:14 143:14
144:15 147:12
150:2 151:12
169:13 174:6
182:9
**background** 15:7
21:11 23:17 31:21
47:13 54:12,25
55:13,20,23 59:19
59:20

[backgrounds - button]                                                          Page 5

**backgrounds**
  45:16 46:20,23
**backwards**  36:21
**baker**  39:4 106:5
**ballistic**  87:19
**bank**  52:18 63:23
  65:16
**bank's**  52:16
**banking**  52:8
  63:24 64:11,17,22
**barrow**  21:7
**barrow's**  21:11
**based**  69:8 76:12
  82:4,25 86:2 93:2
  96:21,23 97:1,2,5
  97:7 112:24
  125:19 131:25
  148:18 171:18
  182:2,7
**bases**  94:14 96:6
**basic**  23:3
**basis**  38:2 69:7
**batch**  39:23
**bates**  106:12,15,16
  174:12,14 175:16
**battery**  91:14
  135:2
**bay**  121:23 122:2
**befurt**  39:3
**beginning**  5:6 60:5
  104:8 144:1
  151:13
**begins**  146:20
  157:25
**behalf**  2:2,12 5:8
  10:24 12:9,11,17
  13:9 14:3 16:12
  33:24 34:1,18
  35:21 37:20,22
  51:22

**behavior**  8:6,17
  10:14 17:9 23:2,3
  23:9,13 31:6,8,14
  32:15,25 33:11,15
  43:1 45:6,20
  46:12,13,25 47:3
  47:10 48:17 50:9
  50:17 52:13 53:20
  54:1,13 55:9 56:8
  56:25 57:3,6
  61:14 64:9,24
  69:9,19,20,23 70:3
  72:4 73:16,19,22
  77:12,18 78:13,18
  78:20 83:23 87:18
  87:22 113:1 114:4
  128:23 137:6,16
  137:18,20,24
  138:3,22 146:2
  156:22 158:2
  168:24
**behavioral**  89:24
**behaviors**  87:16
  137:6 150:14
**believe**  7:24 9:9
  11:22 14:12 15:23
  17:18 21:12,13
  27:2 31:23 32:2
  32:16,23 35:3
  36:23 39:24 43:11
  46:21 47:23 52:2
  52:10 54:20 60:19
  61:11 67:6,24
  86:10,22 89:19
  90:9 91:1 92:19
  93:6 103:18
  104:13 106:4,8
  108:8 110:20
  111:15 113:17,17
  115:1,24 118:19
  119:11 122:18

  123:5 131:17
  133:5 134:3,4
  140:15 145:4
  149:15 154:25
  157:3,4,7 160:14
  170:12,14 172:14
  177:18 179:15
**best**  11:7 42:13
  68:8 104:14 117:3
  117:5 154:7
**better**  16:25 51:1
  58:16 74:10 76:1
  80:4 178:16
  182:22
**bettman**  58:13
**beyond**  12:20
  13:18 16:24 20:9
  22:15 23:22 24:2
  24:4,7,20 25:5,12
  26:5,11,14 28:16
  30:5 36:18 43:4
  57:1 59:13 75:4,7
  75:18 80:14
  105:17 109:8
  131:20,22 140:5
  147:18 150:11
  169:22 179:19
  182:7
**bezel**  181:4
**binary**  139:22
**bit**  65:20 109:5
  123:15 142:2
**block**  174:20
**blood**  184:12
**bloomfield**  2:15
**blue**  174:7
**bmw**  119:2,6
  120:8 124:1,7
  146:24 147:8,9,10
**bore**  6:5

**bored**  123:21
**bottom**  174:20
**bought**  84:8
**box**  160:19 161:7
**brain**  28:6 143:4
**brake**  109:23
  110:9,15,19,21
  111:5,9,10,19,19
  111:24 164:14
  181:12
**brakes**  165:25
**break**  6:11 59:22
  60:3 87:4,8 104:6
  150:13 151:5,7,11
  169:9,12
**bridge**  130:2,3,7
**brief**  68:9
**briefly**  134:22
  156:11
**bring**  103:19
**brinkerhoff**  9:17
**broad**  56:2 86:18
  86:19
**broader**  43:17
  50:2 76:15 83:12
  109:3 156:24
  157:8 160:23
  161:4 170:3
**broadly**  22:12
  56:6 58:6 77:21
  94:1 155:12
  167:18
**broken**  150:10
  160:11
**brought**  16:12
  103:23
**bruce**  39:7
**bubble**  155:12
**buddies**  21:25
**button**  147:10
  175:20 181:5,7

**buttons** 177:14
**buy** 79:20 80:12
  84:8
**bystander** 15:22
**bystanders** 164:13
  166:10,17 167:23

**c**

**c** 5:23 9:20 175:25
  177:20 184:1,1
**cades** 1:11 3:3,8
  4:13 5:22,24 6:4
  23:7 32:16 49:1
  107:24 183:3
  184:6 185:2 186:2
  187:2
**calibrated** 133:9
**calibrating** 133:22
  133:23 138:16
**calibration** 133:13
  133:17,20,24
  138:16,17
**california** 11:18
**call** 66:9 75:1,16
  76:13,22 102:11
  110:4
**called** 5:25 18:20
  108:4 120:12
  169:20
**camera** 91:14
  135:1
**cameras** 126:10
**canbus** 132:3
**capabilities** 19:3
  22:7 27:21
**capacity** 11:3
  12:12 44:5 51:17
  57:6 117:23
**captured** 134:17
  140:16 150:7
  170:4

**captures** 125:8
**car** 11:15 17:20
  30:11 44:15
  111:19 122:7,14
  155:24 156:2
  166:22 167:4
  182:13
**card** 67:9 68:5
  70:12 72:20 73:6
  75:2,17 76:21
**cards** 68:18 70:8
  70:17 71:10,22
  76:4
**career** 29:12 55:13
  62:16,21 64:19
  128:4,10
**carefully** 185:5
**carolina** 8:7 39:18
**cars** 103:8
**case** 1:6 4:16 6:23
  6:24 10:3 11:11
  11:12,14,17,25
  13:22,25 14:1,2,5
  14:15,25 15:7,15
  15:21 16:4,22,23
  17:2,10,12 38:2
  41:12,22 42:3,6
  43:12 52:14 60:9
  70:25 74:25 75:12
  76:16,17 83:18
  96:20 100:23
  104:24 108:8,10
  108:21 109:9
  114:4 115:23
  127:10,11 148:20
  149:5 170:7
  172:14
**cases** 13:11 35:21
  36:16,19 37:3,21
  57:3

**categories** 137:19
**categorized**
  141:21
**category** 148:9,15
**cause** 14:24
**causes** 16:3
**causing** 154:8
**caveat** 59:5 75:23
**cell** 4:6
**cellular** 4:5
**center** 47:6
**centered** 54:5
**centralized** 13:20
**centric** 51:8,15,16
  51:20 54:17
**certain** 96:21
  116:21 181:7
  182:1
**certainly** 22:13
  23:25 34:13 45:1
  45:3,5,10 46:14
  47:11 50:22 55:21
  55:22 56:14,20
  57:14,23 58:4
  63:20 74:14,22
  86:23 91:11 92:24
  93:10,19 98:1,16
  98:23 99:5,21
  113:19 115:12
  134:12,17 148:4
  148:10 152:3
  153:22 154:1,19
  154:25 156:6
  161:24 168:15
  170:2 176:10
  178:7,10
**certainty** 148:23
**certificates** 19:24
  20:10 24:22 25:15
  26:8 28:11

**certify** 184:5,11
  187:5
**chair** 19:8 30:11
**change** 39:15,16
  153:16 172:18
  180:12 186:5
**changed** 181:25
  182:1,4
**changes** 181:16
  185:12 187:9
**characteristics**
  23:5 57:25 125:20
**characterization**
  10:17 34:21 59:6
  64:13 68:13 71:18
  75:24 78:10 90:12
  95:10,14 106:20
  145:4 154:10
  171:1 176:2,6
**characterize** 18:22
  25:20,24 27:15,17
  27:24 35:10 48:17
  54:20 78:11 94:15
  117:24 129:10
  137:17 146:2
  149:23 168:9,19
  168:24
**characterized**
  24:11 52:15 55:10
  55:12 149:19
  168:17
**characterizing**
  22:18
**charged** 14:12
**charger** 41:16
  181:19
**charging** 13:24
  14:1,2,4
**charlene** 36:1
**charlie** 106:14

**chart** 175:10
**charts** 175:16
  176:8
**check** 2:8 5:10
  61:8 91:14
**cherokee** 41:17
  66:5 112:16
  120:17 126:25
  127:20,23 156:14
  156:22 159:20
  181:18
**chicago** 1:18 4:19
**chime** 181:6
**choice** 90:5
**chose** 77:24 95:7
  157:13
**christian** 8:3
**christy** 9:17
**chrysler** 11:16
  15:20 17:6 41:15
  120:9,9 124:3,10
  126:24 127:20,23
  156:14,22 159:21
  160:5 181:19
**circumstances**
  113:1 128:2 169:3
**citation** 32:18
**cite** 77:16,24 90:7
  99:18,21 103:16
  104:15
**cited** 10:8 46:19
  58:9,12,17 62:6
  89:3 91:18 92:18
  92:22 93:8,20
  95:21 98:5,12,22
  98:24 100:19
**citing** 89:7
**civil** 19:15
**claim** 16:12
**claims** 16:4,5
  145:15

**clarification** 68:2
**clarify** 38:15
  109:17 114:18
  135:12
**class** 12:20 41:14
  43:18 44:8,11
  66:2,11,13,16 67:5
  67:22 109:12,13
  110:12 112:17
  127:15,16 170:24
  171:8,17 172:2,11
  172:20 173:2,11
  175:8,14 180:20
  180:21 181:17
**classifications**
  137:12
**classify** 137:17
**clean** 135:15
**clear** 83:7
**client** 10:2 52:15
  108:7,8 162:11
**clients** 51:22,24
  52:5
**clinic** 104:24
  173:10,16,25
  177:10
**clinics** 105:6,7,10
  107:16 137:14
  149:5 171:6,11,13
  172:16 175:7,13
  176:18
**cloninger** 9:18
**closed** 33:12
**closest** 27:9
**code** 141:21
**coded** 92:2 138:10
**codes** 92:1 141:16
  142:4
**cognition** 21:14,18
  28:5,10 47:14
  54:21 55:14,15

  56:17
**cognitive** 23:3
  28:1,3 46:5 58:1
  84:25 123:20
  168:22 169:1
**cognitively** 81:9
  161:14
**coleman** 2:3 5:7
  5:11
**colleague** 108:4
**colleagues** 22:1
**collect** 121:5
  123:19 126:5,7
  159:4
**collected** 49:16
  91:2 97:6 116:11
  121:4 124:18
  126:18 131:3
  135:4 145:18
  159:13
**collecting** 49:16
  124:25 145:9
**collection** 40:24
  122:23 130:9,19
  130:24 132:19
**college** 19:21
  21:25 27:1,2
  47:19 54:17,18
  56:4 58:24
**column** 103:3
  137:21 150:14
**combination**
  135:5 140:2 149:4
  161:14
**combing** 142:6
**come** 45:15 92:5
  95:19 98:13,15
  137:11 143:14
**comes** 50:4 94:10
  132:21

**comfort** 136:14
**comfortable**
  106:19 122:4
  137:23 167:14,18
**coming** 34:12
  97:15
**comment** 174:25
**comments** 162:3
**committed** 81:10
  81:14
**communication**
  24:6
**communications**
  26:1,4,5,9,13
**companies** 33:25
**company** 34:2,2
  51:8 52:22 105:16
**compared** 17:6
  146:22 172:2
  174:23 175:24
  177:1,19 181:18
**comparing** 125:1
  141:7 172:23
**comparison**
  147:11 173:19
  175:2 176:13
**compelled** 74:5
**competition** 30:19
**competitive**
  107:20
**complete** 7:4
**completely** 24:11
**compliance** 72:3,5
  77:4,5 78:4,20
  79:24 85:9,12
**complicated**
  155:13
**comply** 72:15
**component** 152:20
  157:8

[components - corrected]                                          Page 8

components 93:17
  96:22
computer 19:8
  100:2 107:3 142:8
  169:25
concentrating
  27:20
concept 175:25,25
  176:3,5 177:20
  182:13
conclude 183:2
concluded 35:8
  52:9
conclusion 16:25
  17:2 92:6 95:19
  96:19,21,23 98:15
  98:19,23 99:2,4
  157:20 158:12,16
  159:23
conclusions 93:1,9
  94:6 95:22 96:1,3
  98:4,7,14 99:8
condition 89:25
  110:24
conditions 110:8
  116:20,22 117:14
  117:16,17 128:6
  181:8
conduct 34:16
  60:9
conducted 25:3
  28:21 48:6,11
  50:8 56:24 57:18
  62:3,5,7 87:24
  105:5 128:22
  159:1,4
conducting 123:6
cones 143:10,13
  143:15
confidential 17:15

confidentiality
  15:2,4 38:1
configuration
  130:2,3,7,8,11
configurations
  130:6
confirm 98:22
confused 140:7
  142:2,12
conjoint 61:17,21
connection 41:22
  42:2,3 170:7
consent 115:20,22
  121:17
consider 45:19
  56:16 94:18 99:2
  156:7,17 162:4
  167:10
considered 42:22
  69:13 74:20 89:6
  139:19
considering 60:23
  71:1
consistent 17:7
  106:24 121:13
  155:3
constrained
  136:10
constructs 123:18
consultants 13:18
consulting 11:4
  33:21,22 34:1,20
  57:7
consumer 23:16
  24:7 29:18 30:19
  30:22 31:6,8,13
  32:15 43:1 45:13
  45:20 46:13,25
  47:3 48:7 50:9,16
  52:12 53:19 54:1
  54:12 55:8 56:7

56:24 57:2,5
  61:13,18 64:9,23
  77:3,18,21 78:4,13
  79:10 81:7 83:17
  84:12 154:24
  155:19 156:2
  167:15
consumer's 84:1
  84:25
consumers 31:17
  47:7 48:12 49:19
  50:23,23 52:14
  53:24 60:21 61:25
  62:8 68:6 71:1
  78:19 79:2 85:18
  163:12 165:4
  166:6,13 167:24
contact 41:21
  92:11
contain 66:5
  100:23
contained 66:6
  84:16 96:4 103:24
  163:23 165:15
contains 74:19
  100:22
content 125:9
context 11:6 15:6
  28:4 41:25 136:3
  136:4 168:13
  179:11
contingent 149:24
continue 4:9
continued 53:3
  58:6 107:22
  108:22
continues 146:21
  158:8
contract 52:1
contrasting
  172:24

control 125:25
controls 70:1
  113:10 151:18
  152:24
convenience 101:1
  101:17
conversational
  27:25
conversations 4:5
conveying 84:19
  85:24
coordinated 10:13
coordinating 8:5,9
copies 103:23
copy 7:4 32:13
  100:6 101:17,21
  108:1 115:22
correct 14:22
  18:10 67:1,15
  75:22 77:9 78:25
  81:22 85:5 92:18
  93:5 101:11,12,25
  108:25 109:2
  114:1,6,15 118:20
  120:7,22,23
  121:10 122:9
  124:4,5,10,11
  139:18 141:9,10
  142:18 143:24
  144:12,14,18,25
  147:15 153:2
  159:12 160:22
  161:1 162:21,24
  164:4 165:9 166:5
  177:15 180:8
  187:6
corrected 137:7
  139:3,7,8,18,19,24
  139:25 140:8,22
  141:4,11,11 142:5
  142:9,19 143:25

[corrected - defendant]                                                                 Page 9

144:16,22 145:2
147:13 149:14,14
149:21 150:7,17
150:19
**correcting**  139:16
141:13
**correction**  120:12
148:2 176:20
**corrections**  185:5
185:8 187:9
**correctly**  77:14
80:12 81:1 118:13
120:11,20 137:10
164:18 177:22
**counsel**  2:1 3:22
5:2 15:5 108:11
115:14,23 161:5
**count**  124:22
**counting**  14:20
**countless**  126:2
**county**  184:5
**couple**  18:2 19:21
21:7 61:1
**course**  25:13
26:24 29:12 33:12
51:11 54:3 57:24
58:5 62:15 63:16
64:18 76:7 90:23
104:23 116:14
128:4,10 152:4
158:7 159:14
**courses**  19:19,21
25:13 47:5,19,25
54:17 56:5 58:24
**court**  1:1 4:15,22
5:14 11:19 61:12
68:2 185:20
**cover**  49:6 50:12
**covered**  45:2
51:13 57:24 58:4
62:14 64:19

**covers**  49:8,10
66:7
**crafted**  165:12
**craig**  39:6
**craigslist**  114:17
114:19,23
**cream**  64:4,11,22
65:15
**created**  74:9,11
88:25
**creating**  152:15
**credentials**  18:1
**credit**  24:21
**criteria**  91:20,22
92:5 95:2 119:8
119:11 138:17,22
139:20 140:4,5,23
141:19,24,24
142:1,18 145:19
146:1,5
**critical**  15:11
112:22 113:14,15
113:16,19,22,24
113:25 179:21
**criticism**  93:22,24
**crossed**  117:14
**crr**  1:19 184:21
**crump**  32:1,2
**csr**  1:19 184:21
**csx**  37:14
**cullen**  8:20 9:1
**curious**  86:25
**current**  118:23
119:2
**currently**  44:16
118:17 119:12
**custom**  131:4,7,14
131:19
**customer**  51:23
52:15

**cut**  79:19
**cuts**  80:11
**cv**  17:24 20:25
30:24 48:21 51:6

**d**

**d**  3:1 5:23 35:23
**damage**  43:25
**damages**  43:13,23
**danger**  148:17
**danielle**  9:3
**dash**  67:19
**dashboard**  126:12
**data**  10:11 39:17
49:17 69:22 88:21
88:23,25 91:1,14
97:5 119:17 121:4
121:5 122:23
123:19 124:18,25
125:1 126:4,5,6,7
126:13,17,19
130:9,19,20,24
131:2,5 132:4,6,9
132:15,17,20,21
133:3 134:18,18
134:19,21 135:3,5
135:9 136:17
138:10 140:3,13
140:17,20 141:1,7
141:15,16 142:3,3
142:6,14 143:17
145:9,18,24 146:1
146:10,14,16,17
146:18,20,25
147:7 148:9
150:10 158:24
159:13 167:19
176:21
**database**  13:20
**date**  106:9,11
185:10 187:14

**dated**  173:15
**daughter**  15:24
16:11,12
**daughters**  15:24
**dave**  106:6
**david**  1:11 3:3,8
4:13 5:22,24
183:3 184:6 185:2
186:2 187:2
**day**  117:2 124:8
184:17
**days**  185:16
**deals**  64:10
**deanna**  1:19 4:22
184:3,21
**deceased**  16:16
17:17,22
**decide**  163:9
**decipher**  132:23
**decision**  42:18,24
43:15 45:2,6,23
46:7,8,17 48:7
54:24 56:10,18
60:10,15 62:2,10
84:8 86:1 127:3
162:4 171:7
**decisions**  44:24
45:9,13 46:1,4
55:16 58:10 77:12
78:7 127:16
**decode**  132:24
**decrements**  72:9
72:11
**deemed**  185:19
**defect**  71:4 152:24
153:5,7
**defectively**  41:20
**defects**  16:5
**defendant**  2:12
35:22 36:3,4,4,4,5
36:5,6,6,7,8,11,12

36:14
**defense**   115:14
**defer**   7:11 15:4
    173:5
**define**   22:4 28:3
    30:7 118:14
    176:14
**defined**   137:21
    175:21 178:9
**definitely**   13:15
**definition**   89:22
    147:13,23
**degree**   18:7,15,23
    19:13 20:4 21:21
    24:16 25:8,10
    26:1,20 28:24
    29:1 136:7 148:23
**degrees**   58:19,21
    58:22,24
**demand**   30:22
**demonstrates**
    61:24
**department**   18:19
    18:20 21:19 170:7
    170:10,15
**depend**   169:2
**depending**   79:15
    180:11,18,23
    181:2,13
**depicted**   67:6
**deponent**   187:3
**depos**   37:8
**deposed**   6:5 17:12
    75:5 108:21
**deposing**   185:15
**deposition**   1:10
    4:8,13,17 6:19,22
    7:8 17:14 36:24
    39:5,6,7,9,22 40:3
    40:4,12,13,17,21
    75:18 76:13 102:9

102:15,15 103:22
    170:18 185:4,13
    185:17,18
**depositions**   35:12
    35:20 36:15 37:4
    39:3 40:6,13,20
    172:13
**depressed**   109:24
    111:5
**desai**   58:14
**describe**   8:25 28:3
    67:10 69:17 117:9
    146:10 147:7
    153:3 158:15
    164:1 170:3 173:6
    182:6
**described**   26:11
    33:15,19 55:19
    112:13 141:23
    150:11 154:22
    157:1,3 158:8,23
    162:15,18 177:10
    181:24
**describes**   106:3
**describing**   117:8
    164:11
**description**   3:6
    91:8 113:3 147:21
    147:21 150:12
    152:10 157:5
    158:6,8,10 163:10
    164:4,8,20 165:3
    166:14 172:23,23
    175:5 177:9
**descriptions**   24:14
**descriptive**   45:11
**design**   15:10 19:15
    22:10,13,16 44:3,6
    44:10 47:6 50:24
    53:8 54:5 57:13
    64:1 65:2 89:13

89:14,20,21,23
    90:2,10 106:8
    117:10,12,19,25
    118:2,8 120:7,13
    127:25 128:24
    131:15,20 150:2
    151:25 152:15
    153:11,15,16,16
    153:16 154:1,19
    155:25 171:16
    173:2
**designed**   17:3
    41:20 44:13
    130:24 131:5,7
    156:5 180:1
**designing**   53:21
    153:8 154:4,9,11
    154:13,21 155:1
    156:7 178:14
**designs**   117:7,7
    128:8,8,12 178:2
**desire**   72:13
**desired**   134:9
    178:23,24 179:3,5
**desires**   43:6 47:8
    50:23
**detail**   51:5 131:19
**detailed**   19:14
    55:11
**details**   16:1 49:14
    55:7 56:3 57:9
    62:19 91:16,25
    129:7
**detect**   137:25
**detent**   181:25
**detents**   172:6,9,18
    172:25 182:4
**determination**
    139:21
**determine**   90:19
    91:2 92:8 95:3

96:18 125:2
    130:21 139:6,13
    139:25 140:21
    142:4,18
**determined**   40:7
    69:5,6 137:16
    140:9 153:13
**determining**   91:21
    139:2 161:22
    162:8
**development**
    23:14 24:8 105:8
**device**   29:20
**devices**   116:24
    130:4
**dfss**   104:25 105:4
    106:4,7 107:25
**died**   135:2
**differed**   143:21
**difference**   18:17
    83:15 110:7 172:4
**differences**   45:3
    124:13,17 125:7
    125:11,16 171:25
    181:21
**different**   27:14
    45:4,5 59:18,21
    73:23 86:10 88:6
    90:23,24 112:19
    117:15,16 118:7
    118:22 120:21,24
    143:23 145:16,16
    145:17 158:4
    159:14 168:23
    172:9 173:18
**differently**   86:6
    94:25 124:22,23
    125:19 166:19
    172:6
**difficult**   148:22
    176:24

**difficulty** 145:13
**dingus** 88:16,20
  90:10
**direct** 176:13
**directed** 81:5
**directing** 135:13
**direction** 7:17
  40:15 102:16
  110:1 149:17,23
  150:6,8 162:12,13
  168:22 180:4
**directly** 12:8 61:9
**disagree** 99:11
**discarded** 135:23
**disclosed** 11:11,24
  12:1 13:5,6,10,12
  13:15,19
**disclosure** 43:20
  70:23 80:23 81:17
  81:17 110:4 127:1
  127:4,13 156:18
  157:14,20 158:22
  159:17,22 160:3,7
  160:10,12,13,17
  160:20 161:8,11
  161:17,23 162:9
  162:16,23 163:1
  163:20 164:3,10
  165:4,12 167:4,6
  167:23 168:2
  169:7
**disclosures** 81:13
  81:24 83:1 84:13
  86:13,17
**discount** 79:4,6,12
  79:16,25 80:8,9
**discourage** 72:12
**discovery** 44:16
  108:12
**discrete** 137:18
  139:10 143:16

**discuss** 7:10 37:25
  148:18 160:23
  161:4 162:3
**discussed** 28:17
  43:4 54:2,16,18
  55:8 56:4,23 57:1
  57:17 59:3,14
  65:1 68:11 83:9
  83:20 98:3 109:4
  135:11 136:13
  142:4 143:21
  145:12 156:11
  157:7 162:11
  170:18 172:12,15
  172:21 176:8,10
  180:13 182:12
**discusses** 78:17
  158:19,24
**discussing** 14:24
  57:11 78:6,12
  83:22 130:16
**discussion** 114:13
  146:20
**displacement**
  126:15 130:21,25
  133:9
**display** 21:10
  67:13,17
**displayed** 181:9
**distractions** 23:11
  70:3
**distributing**
  154:24 155:19
  156:2
**distribution** 69:21
  69:24
**district** 1:1,2 4:15
  4:15
**division** 1:3 4:16
**doctor** 101:25

**doctoral** 22:1
**document** 41:1
  74:18 84:16
  105:22 107:7,25
  108:15 172:8
**documentation**
  71:6,21 81:25
  92:22
**documented**
  122:13,16,19
  131:15 134:16
  146:13
**documents** 38:16
  42:5,10,16 71:13
  82:17 83:4 84:13
  84:24 85:19
  103:20 108:12
**dodge** 41:16
**doing** 13:4 29:14
  29:16 35:16 64:23
  100:3 112:5
  122:21 123:14
  141:14 142:6
  145:10 147:6
  185:9
**door** 110:8 181:6
**douglas** 3:7 6:20
**dr** 6:24 7:11,13,17
  7:22 8:3,19,20 9:2
  9:3,6,9,10,14,17
  9:17 10:10 21:17
  23:7 31:20,22,25
  32:2 42:2 109:9
  115:17 122:17
  141:25 149:6
  161:15,16,22
  162:5,13 165:12
**draft** 41:6
**drafting** 9:25
**draw** 93:1

**drawn** 93:10
**drive** 1:17 3:20
  4:18 44:15,16
  100:11,16,22
  101:23 103:20,24
  103:25 107:8
  108:4,9 109:14,15
  109:21 110:2,12
  110:14 116:23
  121:18 143:12
  144:2,8,16,22,24
  146:23 147:5
**driven** 119:6
**driver** 16:15 17:8
  23:2,12,13 31:16
  33:5 34:14,24
  35:5 38:5 61:1
  64:25 65:15 87:16
  87:21,22 92:11,14
  96:10 109:13,24
  110:11 128:23
  165:25 168:4
  169:5 178:18,21
  179:9,20 180:6,7
  181:14
**driver's** 118:10
  126:12 133:10,19
  134:2
**drivers** 67:11
  87:19 91:3 96:12
  96:15 121:7 160:4
  160:5 179:16
**driveway** 15:17,21
**driving** 17:19 33:6
  33:7,12 90:24
  119:12,24 120:1
  129:16,16
**drove** 118:11,18
  119:1,24 120:8,9
  120:15,16,18
  121:2,6,9 124:1,3

124:7,9 126:24
127:22 156:13,21
159:20
**drug** 90:1,4
**duly** 5:17,25 184:8
**dupage** 184:5
**dykema** 2:13 4:18
**dykema.com** 2:16

**e**

**e** 3:1 5:23 9:20
11:21 90:13 105:9
174:9 184:1,1
186:3
**e.g.** 71:6
**earlier** 18:9 40:25
43:4 63:21 104:11
157:6,7 170:12
175:1
**earliest** 100:6,25
101:16
**early** 19:22 107:13
107:22
**earned** 18:5
**ease** 176:11
178:15
**easier** 8:24 103:15
174:16
**eastern** 1:2 4:15
**economic** 20:20
21:5 43:13,23
**economics** 20:4,6
20:8,11,14,15,17
20:22 21:2 45:16
58:19 59:4,15
**educate** 58:6
**education** 20:8
24:18 25:10,14
26:3,22 45:12
46:24 47:2,4,14,22
47:22 48:2,3
51:11 55:2 57:21

57:24 58:2
**edwards** 2:4 5:11
5:11
**effect** 147:2
**effective** 71:11
72:20 73:2,8
74:12,17,21,23
**effectiveness**
68:16 73:20 74:25
75:15 81:16 85:8
**effects** 17:8 23:11
125:21,21,22
**efficient** 163:3
164:2 166:8,16,25
167:7,17
**efforts** 8:6,10
10:13,13
**eight** 163:3 164:2
**either** 9:6 50:9
58:23,25 72:12
122:17 129:15
138:9 139:24
153:16 162:25
181:6
**electrical** 19:16
173:6
**electronic** 1:5 3:11
3:16 44:19 51:9
52:21,23 105:2,23
185:1 186:1 187:1
**eligible** 116:25
**eliminating**
152:24 153:6,7
**emotional** 28:1
123:17
**empirical** 98:16
**employed** 7:18
33:16 58:1 89:20
90:9 92:5 148:19
158:7 162:7
170:22

**employee** 130:14
**employees** 108:21
172:13
**enabled** 137:25
**encounter** 154:15
**ends** 32:17
**engage** 56:18
57:16 110:8
**engaged** 46:7 69:2
112:1,3,5 164:15
**engaging** 42:20
**engine** 164:14
**engineer** 20:2
173:6,6
**engineering** 18:16
18:16,20,21 19:13
19:19,25 44:3
**enhance** 73:11
**enjoy** 54:9
**enjoyment** 29:18
**ensure** 68:24
**ensuring** 8:12
10:14
**enter** 133:3 147:17
**entered** 138:18
**entire** 124:15
133:25 157:18
158:21
**entirely** 148:21
155:20
**entirety** 6:23 7:16
40:5,20 55:12
64:19 67:24 93:13
94:16,19 100:22
102:14 128:5
135:4 158:2
**entitled** 105:23
**environment** 19:4
19:5,5,6 22:6,9
27:23 47:16 71:5

**equal** 74:9,11
**equipment** 122:24
**equipped** 41:18
163:2
**errata** 185:7,9,12
185:15 187:11
**error** 17:8 90:19
92:2,3 112:20
168:10,18
**errors** 87:22 90:16
91:21 92:1,3,6,10
92:14 96:11 149:1
150:20 168:25
177:25 178:19
**especially** 79:8
**essential** 179:11
**essentially** 152:25
**estimate** 14:17
**et** 21:2,7 31:11
32:17 48:25 49:1
90:22
**evaluate** 47:7 89:8
92:23 93:11
104:15 123:16
146:11
**evaluated** 92:24
93:12 102:18
137:24 141:4
173:18 176:10
**evaluating** 52:4
90:16 91:23 96:21
138:21 147:4
153:11
**evaluation** 22:5
23:14 92:1 101:2
108:23 170:23
172:16
**event** 17:5 86:7
113:14
**events** 15:11

evic  67:18 181:2,9
evidence  70:24
  76:6 77:11 78:6
exactly  139:11
  141:6 171:9
examination  3:2,4
  6:2 184:7
examine  34:24
  69:20
examined  6:1
example  63:24
  86:16 96:8 99:10
  99:15 119:1
  123:25 125:20
  143:25 147:21,25
  150:17 178:19
examples  74:22
excel  133:5
excerpt  112:15
excerpts  66:5
excluding  41:4
  146:24 176:5
  182:13
exclusionary
  146:5
excuse  80:17
  81:17
exercise  178:11,13
exhaustive  38:20
  67:7 100:17
exhibit  3:7,10,15
  3:20,22 6:25 7:2
  82:12,14,21,22
  102:5,6 162:25
  163:24 173:22
exhibits  3:5 39:3,5
  39:6,7 82:11
exist  135:21
exists  77:11 78:6
  152:8

exited  92:13,16
exiting  92:12
  164:16
expect  86:2 124:20
expectation  83:23
expected  70:2
experience  29:8
  29:14,15 30:8
  35:11 51:7,14,21
  51:23 52:4,23
  53:9,16,25 54:7,10
  55:2,5 56:1 61:16
  63:16 73:19 78:19
  83:13 91:11
  125:22,24 170:1
experiences  83:16
experiment  89:20
  89:25 90:11 92:24
  117:13 124:18
  133:1
experimental  9:11
  69:25 89:9 117:14
  121:22 125:4
  128:24
experimenter
  122:22,25 148:24
experimenters
  8:14 9:4 91:7,9
  96:20 98:13
  122:15,20
experiments  88:8
  88:9 89:19 90:23
  91:10,13 97:24
  103:3 123:7
expert  3:20 11:4
  45:19 56:6,7
  61:13
expertise  23:14,20
  46:2 56:22
experts  55:20,22

explode  143:4
explorer  120:15
exponent  7:18,23
  12:2,5,7,16 13:3,8
  13:13,17 14:2,4,12
  29:16 33:13,16
  34:5,10,19 37:22
  37:24 62:23
  114:18,25 122:5,8
  129:2,4,4 130:10
  130:14 131:8
  161:25 162:8
exposed  128:5
extend  23:22
extent  11:10 20:18
  28:7,16 36:18
  42:14 48:14 49:3
  49:5,7 52:17 72:9
  72:11 79:23 83:11
  125:23 135:21
  139:17 149:12
  156:4 162:2 178:8
extraordinarily
  86:4
eye  126:13
eyes  161:25

f

f  184:1
factors  7:25 8:4
  15:13 18:12,16,21
  19:1,2 21:4,14,17
  22:4,14,24 23:1,7
  23:17,20 25:7
  26:6,15 27:15,18
  27:19,20 28:17
  34:8,9,12 42:22
  44:12 45:17,21,22
  45:25 46:3,5,11,20
  46:23 55:3,4,14,15
  55:18,18,19,22,24
  56:1,6,9,13,15,20

81:3 82:4 84:18
  85:21 124:19
  152:2,6 169:24
  170:2,2,5 173:9
  175:6,12
fail  185:18
failure  92:2,9,10
fair  10:17 23:19
  24:15 34:21 68:13
  145:4 154:6
fairly  55:10
  129:14
fall  15:17,18,19
  24:13 37:9,11
fallen  38:7
familiar  13:19
  26:17 70:15 82:17
  89:12 116:15
  151:17,19
familiarity  121:1
family  118:20
fancier  104:17
far  14:15 18:25
  62:16 74:4 120:10
  120:11 121:22
  135:3 158:12
  161:12,13
fast  6:16
fault  51:19
favorites  6:6
fazio  58:13
fc  2:12 4:13 5:13
  71:3
fca  1:4 3:10,15
  10:21,25 11:11
  12:6,8,9,10,11,17
  13:4,9 41:13,22
  42:3 73:4 75:25
  105:1,5,7,10,12,20
  106:21 107:1
  108:21 109:1,4

137:15 155:4,16
164:10,19,25
169:17,19,21
170:22 171:6,10
171:15,19 172:7
172:13,21 185:1
186:1 187:1
**fca's** 170:6,9
**features** 62:1,9
63:1
**feedback** 96:13,15
175:4 181:10
**feel** 28:9 171:25
**feelings** 49:19,20
**feet** 113:10
**female** 120:10,16
120:17,18
**females** 120:8
**fewer** 136:15
**fewest** 182:15
**ffresard** 2:16
**field** 20:17,20
24:19 26:17,23
27:9 28:12,15,22
34:8 45:9,11
50:22 55:3 56:1
56:13,16,21 61:13
152:6 170:3
**fields** 19:18 55:3,4
58:22 170:4
**figure** 35:15 67:6
147:3 151:1
160:18 173:22
**figuring** 142:7
**file** 3:21 100:23
102:14
**filed** 4:14
**files** 8:16
**filled** 116:17,18
122:2

**filtering** 142:8
**finance** 24:16,23
25:1,4 136:7
**finances** 24:20
**financial** 77:12
78:7 80:1
**financially** 5:1
**find** 32:11 34:10
97:21,24 99:11
149:1,8
**finding** 10:15
**findings** 150:22
**fine** 6:12 151:6
**finishing** 113:25
**finite** 143:16
**firm** 4:20,23 51:21
52:24
**firms** 29:14
**first** 5:25 23:22,24
24:11 31:11 35:25
42:9 48:25 59:6
73:24 77:1 78:3
78:12 129:8 134:6
144:2 153:8 163:1
184:7
**fit** 148:14
**five** 87:15
**floor** 103:4
**florida** 136:7
**focus** 20:21 35:3
**focused** 129:18
**fogel** 77:16 80:10
**folks** 7:21 12:11
13:12 21:3 23:1
34:9 47:15 50:25
57:15 69:23
**follow** 73:15 74:2
74:6 79:10
**followed** 131:16
131:18 143:24

**following** 8:14
78:23 79:3,13
156:18
**follows** 6:1
**food** 44:25
**foot** 110:9,15
111:9,10,23
**footnote** 88:1,2
**force** 126:16
130:21,25 133:8,9
137:9 138:6,7
141:3,15,20 142:3
142:14,21,22
**ford** 120:15
**foregoing** 187:5
**forget** 137:7
150:19,20
**forgetting** 180:4
**form** 68:4 70:18
71:16 76:5 91:12
93:5 94:23 115:20
115:23 121:17
132:5,22 163:21
164:21 165:8
179:6 187:9
**formal** 47:22
**forming** 94:6 95:7
**forms** 162:25
**forth** 184:7
**forward** 36:21
110:16 111:6,21
111:25 112:7
134:8,14 143:12
159:16
**found** 66:16 79:18
99:16 174:1
**four** 53:4 88:2,7
119:13 126:10
147:8 174:12,16
183:4

**fourth** 32:16 49:2
**fred** 2:13 135:12
**free** 6:17 79:20
80:13 136:13
**fresard** 2:13 5:13
5:13 59:24 70:18
71:16 76:5 87:5
94:23 100:11,13
101:5,23 102:2
108:14 151:4
163:21 164:21
165:5,8 179:6
182:25
**front** 7:1,9 82:18
86:20 122:25
177:2
**fuel** 163:3 164:2
166:8,15,25 167:7
167:16
**full** 53:3 121:14
130:2,3,6
**fully** 137:20
**fumble** 179:4,16
**fumbling** 178:24
**function** 35:6
**functioning** 173:8
**further** 12:21
106:10 126:14
150:10 173:7,24
181:14 184:11
**furthermore** 71:4

---

**g**

**g** 9:20
**gain** 34:15
**gather** 82:9
101:17
**gathering** 83:20
**gauge** 130:4
**gauges** 129:21
130:1 131:13

gay   2:5
gear   35:1,2,3,6
    44:22 90:25 92:13
    92:15,17 137:25
    138:7,9 139:12,14
    139:18 141:2,6,7,9
    141:11,12,17
    142:16,20 143:24
    143:24 146:3
    147:17,18 148:1,5
    148:13,14 149:13
    149:13 168:4,5,10
    168:11 169:6,6
    178:20,23,25
    179:3,5,18,24
    180:4,9,18,23,25
    181:1,3,12,13
gears   139:1 141:4
    143:19,20 146:23
    147:5 178:1,18,22
    180:11
gearshift   1:6 4:14
    8:6,10,17 10:13
    11:14 32:25 33:15
    41:20 44:3,13,18
    66:2,7,16 67:5,11
    67:15,16,20,22
    68:6 76:3 86:14
    87:16,22,22 91:3
    92:15 96:16
    102:18 106:22
    114:3 116:8
    126:14 127:13
    129:8,11,17,18
    130:1,22,25 137:5
    137:24 138:21
    139:8 142:15
    150:13 153:25
    154:2,5,20 158:2
    170:11,24 172:19
    173:8 175:15

178:5 185:1 186:1
    187:1
gearshifter   17:3
    41:19
gearshifters
    104:19 109:12
gearshifting   96:10
gearshifts   36:16
    36:17 99:24
    103:10 109:7
    126:14 129:5,13
    153:20,24 154:4
    154:17 156:9
    173:14 176:4,24
    179:17
general   22:13
    31:19 56:12 61:5
    85:9 108:22
    121:17 136:11
    162:10 180:1
generally   33:3
    48:10,11 55:17
    64:15 66:8 69:6
    73:3,17,24 75:15
    77:7 113:9 152:5
    176:18 180:13
generated   161:25
genevieve   9:14
george   18:4,8
    21:15,19 22:2
    51:12 65:7
getting   21:4
    102:25 142:11
    179:5
give   6:6 15:7 31:12
    49:14 51:5 57:9
    61:23 86:18 89:22
    129:7 143:5
    152:10 162:24
given   69:8 91:11
    93:12 95:16

112:22 121:19
    139:12 141:6
    142:17 148:23
    158:11 160:2,17
    172:13 175:4
    177:1 178:14
    180:2 183:3 184:9
    187:7
giving   86:16 123:1
go   4:10 8:22 17:24
    24:2 35:11 36:9
    46:9 47:12,17
    60:18 61:8 80:16
    87:13,20 98:21
    107:19 112:8
    118:1 123:15
    134:8 143:3,3
    144:10 147:3,12
    150:2,4 158:5
    182:9
goal   54:8 81:4
    98:16 113:6,12
    150:4 153:14
    179:8
goals   81:6 84:2,25
goes   24:4 127:5
    148:14 150:19,19
    160:18
going   4:1 6:9 13:3
    23:6 35:20 36:20
    37:2 38:18 44:23
    45:3 58:11 59:25
    71:14 83:10 87:6
    87:23 88:15 99:13
    102:11 104:3
    107:24 111:1
    122:3 123:15
    134:5 143:4 151:8
    157:9 160:24
    169:10 181:15

good   4:1 5:19
    35:16,19 59:24
    88:17 122:6 161:6
gossett   2:13 4:18
gotten   39:17
grad   19:23 27:2
graduate   19:20
    25:6 54:4 62:21
graduating   21:3
    25:6
grammar   136:5,8
grand   41:17 66:5
    112:16 120:17
    127:20,23 156:14
    156:22 159:20
    181:18
greater   118:20
    136:15
greg   2:3 5:7,11
gregcolemanlaw...
    2:7,7
ground   6:6
group   8:24 9:3,13
    9:23 10:9 69:20
    73:2 124:15
    127:17 136:20,22
    136:25 169:17,19
    169:21 170:17
groups   117:15
guard   152:17
guarding   153:19
guess   77:4 142:2
guidance   98:25
guide   40:22 68:4
    68:17 70:8,12
    71:10 72:19 73:6
    73:10 75:2,17
    76:3,20 112:9,14
    112:16 171:7
guides   67:5 70:17

**guiding**  35:17
**guts**  171:23 173:3

**h**

**h**  9:16 39:5,8
**half**  11:2 80:22
**halves**  118:7
**hand**  109:24
  110:15 111:5,10
  111:19,24 133:10
  133:19 184:17
**handed**  84:13
  100:16
**handing**  100:11
**hands**  113:10
**happened**  132:20
**happening**  142:10
**happens**  179:23
**happy**  123:22
**haptic**  181:10
**hard**  103:23
**hardcopy**  108:3
**hardware**  132:22
**harley**  87:24,25
  88:6,9 89:18 90:6
  90:14,22 91:17,22
  96:8 99:10,15,25
  102:18
**hastings**  39:4
**hazard**  152:16,18
  152:19,25 153:4,7
  153:9,9,17,19
  154:4,5,8,12,13,16
  154:21 155:8,17
  155:25 156:4,8
**hazards**  151:24
  152:14 153:12
  155:2
**head**  89:5 126:12
**header**  174:7,8
**heard**  86:25

**heckman**  88:6,9
  89:18 90:6 91:17
  91:22 99:10,15
  103:7
**held**  4:17 29:13
**helm**  10:12
**help**  133:3 140:18
**henry**  36:1
**hereinbefore**
  184:7
**hereunto**  184:16
**heterogenous**
  42:22 61:25 62:9
  69:24 86:5 124:24
**hierarchy**  74:15
  151:17,18,20,23
  152:12,23 153:6,8
  153:14,21 154:3
  154:18 155:11
**high**  20:9 89:22
  152:10
**higher**  176:23
  182:21
**highest**  182:16
**highly**  23:12 61:2
  61:25 62:8 87:18
**hills**  2:15
**hire**  105:11,12
**hired**  35:21 37:20
  51:21 105:16
**hmi**  169:18,20,23
  170:6,9,15,17
  175:6
**hold**  19:24 20:10
  24:22 25:15 26:8
  28:11 29:3
**honestly**  53:11
**hope**  32:11
**hour**  14:7,13
  124:8

**hourly**  13:22,23
  14:4
**hours**  14:18,19
  117:4
**house**  105:18
  106:17,21,25
  107:18,20 109:4
**hoyos**  8:3 31:11,20
  31:22 32:21 48:25
**hoyos's**  31:21
**huh**  36:2
**human**  7:24 8:4
  17:9 18:12,15,21
  19:1,2 21:3,13,17
  22:4,14,23 23:1,4
  23:7,17,20 25:7
  26:6,15 27:15,17
  27:19,20 28:17
  29:17 34:8,9,12
  38:9 44:12 45:16
  45:22,25 46:3,11
  46:19,23 47:14,14
  48:17 54:21 55:3
  55:4,13,14,15,15
  55:18,18,19,21,24
  56:1,6,9,12,15,16
  56:19 69:19,23
  72:4 81:3,4 82:4
  84:17 85:21 88:13
  88:18,21 97:5
  98:6,12 112:4
  124:19 152:2,6
  169:20,24,25,25
  170:1,2,4 173:9
  175:6,12
**humans**  64:2 97:6
**hundreds**  14:18
**hungry**  102:25
**hypothesis**  159:7
  159:11

**hypothetical**
  79:17

**i**

**ibdp786**  105:24
**ice**  64:4,11,22
  65:15
**idea**  154:18
**ideas**  162:12
**identical**  66:10,13
  171:24
**identification**  7:3
  82:13,15 102:7
**identified**  174:24
  181:1
**identifier**  180:25
**identify**  116:24
  173:9 177:23
  181:16
**illinois**  1:18 4:19
  184:5
**illuminated**  181:4
**imagine**  8:9 32:8
  91:11
**imber**  36:25
**immediately**
  165:25
**impact**  20:20
  77:12 78:7 80:1
  113:21
**imperative**  185:14
**implement**  153:15
**implementation**
  15:10 43:21 44:6
  44:10 53:8 57:13
  65:3 131:5 154:20
**implemented**  17:3
  162:5 172:19,24
**important**  3:12,17
  178:4,17,21 179:2
**impossible**  148:22

improve  51:23
improved  178:7
improvements
  22:19
improving  54:8
inadvertent  17:4
  113:3
inappropriate
  80:24 81:2 82:3,6
  83:2,5 84:14,17
  86:8,15,21 155:10
  155:15
incident  16:17
  17:7 37:13 168:13
  169:3
incidents  76:10
  113:3,5
inclement  65:4
include  35:1 63:2
  66:1 102:9,13
  121:7 147:16,18
  148:3,7,10 149:15
  157:13 164:3
  165:3 167:21
  169:24 180:25
included  50:10
  85:3 88:4,17
  121:14 146:16
  150:9 158:4
includes  39:20,21
  54:13 101:23
  147:14 148:16
  153:24 156:9
including  23:9
  42:1 45:16 46:23
  81:23 102:15
  104:24 121:24
  123:21 124:15
  160:24
inclusion  43:19
  71:5,12

inclusionary
  146:4
incomplete  79:16
inconsistent
  155:20
incorporated
  152:22
incorrect  141:10
  141:12 147:17
  148:1,5
increase  53:23,23
increased  85:12
increasing  178:6
independent
  117:21 170:19
indicate  141:17
indicates  70:25
  74:16 141:1
indicating  172:8
  181:9
indication  142:20
  180:17,19
indications  180:15
  180:24
indicative  136:1
indicator  67:19
individual  11:13
  13:18 15:12 42:20
  42:22,23 45:21
  46:4 56:21 57:25
  69:7,8,9 72:10
  73:18 74:4,7
  81:14 93:2 94:18
  118:4 124:13,17
  125:3,7,11,16,20
  125:23 133:18
  154:15 167:12
  168:13,14 169:2
  180:2
individual's  43:6
  73:22 81:5 86:1

individually  13:15
  176:12
individuals  10:19
  43:16 46:6 47:7
  47:12,17 48:12
  49:20 59:17 62:23
  63:1 86:5 120:24
  124:22 125:14
  166:18
industrial  23:16
  27:8
ineffective  80:25
  81:18 82:3,6 83:3
  83:6 84:14,19
  85:24 86:8,15,21
influence  46:16
  126:3
inform  180:5
information  10:11
  12:15 13:17,21
  24:7 26:7,16 28:6
  29:6 34:11,16
  39:11 42:13,15
  46:6 47:7 54:22
  56:17 65:3 66:4,6
  67:2,7,8,10,14,21
  67:25 68:10,19,21
  68:22 69:8 70:12
  71:3,5,8,9,13,20
  71:25 72:2,8,13,14
  72:14,15,15 73:12
  73:16,25 74:1,5,7
  74:19 75:6,10
  76:9,21 77:8
  78:16 81:11,12,16
  81:23 83:4,8,19,24
  84:3,5,15,20,23,23
  85:10,11,12,25
  86:6,9 89:8 94:13
  96:4,24,25 97:2,3
  97:19 98:24 99:1

99:22 103:23
  105:4 108:3 115:8
  116:11,17 123:24
  124:12,23 126:11
  126:12 127:12,17
  127:18 132:24
  137:15 140:11
  152:3,21 159:5,6,9
  166:20 167:12
  170:20 171:10
  180:5,8,10,12,13
informative  174:2
  174:21
inherently  124:23
inhibit  72:12
initial  143:15
  149:25
initially  139:14,17
  141:9
injure  166:1,17,23
  167:5
injured  15:13
  16:11,16
injures  16:2
injuries  15:16,25
injuring  164:13
  165:20 166:9
  167:17,22
injury  15:15 16:7
  156:1
ink  51:9 52:21,23
inquiry  45:11
  128:13 167:19
instance  90:1
  142:23 180:3
instances  108:23
institute  51:8
institution  52:8
  63:24 64:17
instructional  26:7
  26:15

**instructions** 23:15
  24:8 66:1,10,14
  67:4 68:16 70:13
  72:18 73:7,21
  75:1,16 76:2,18
  123:2,3 185:3
**instrument** 130:17
  130:23 131:12
  132:20
**instrumentation**
  130:13 131:15
  133:18,25 135:6
  135:10 137:25
  138:4,8,16 140:3,9
  140:12,13,16,17
  140:20 141:1
  142:13,15 143:18
  146:15
**instrumented** 91:1
  126:15 129:21
  159:13
**instruments**
  131:25
**intelligence**
  123:17
**intended** 147:18
  148:14 149:13
  168:5,11 169:6
  179:17
**intending** 179:20
**intentional** 148:25
**interact** 19:4 22:6
  22:8,21 29:19
  30:9 47:15 62:24
  153:18
**interacting** 27:11
  27:13,16,18,22
  33:8
**interaction** 22:17
  28:1,2,4 29:17
  30:12 33:1 34:15

34:24 35:7 52:16
  54:22 56:17 83:23
  85:10,11,15 112:4
  170:1
**interactions** 22:20
  27:7,10 28:8
  33:11 47:8 48:13
  49:20,21 50:23
  53:17 63:20 64:2
**interchangeable**
  82:7
**interchangeably**
  99:6
**interested** 5:1
  31:17 63:1 125:25
  128:13 131:6
  184:13
**interface** 132:3
  169:20,25
**interfere** 4:8
**interference** 4:5
**interim** 82:21
**intern** 53:5
**internship** 62:22
  64:10,17
**internships** 54:15
  56:5
**interpersonal** 27:7
  27:10
**interpret** 132:7
  133:3
**interpretation**
  133:4
**interpreted**
  132:17
**intuitive** 175:9,15
  176:4 178:5,12,15
  178:16
**intuitiveness**
  145:13 175:21,23
  176:12,14,19,21

176:23 177:1
  178:6,8
**investigate** 127:2
**investigated** 23:11
  163:15
**investigating**
  127:10 128:13
**investigation**
  93:23 98:17
**investigations**
  11:5 23:8 46:11
**involve** 22:15 28:8
  29:17 34:22 36:16
  37:3,6 52:3 61:4
  63:11,19 98:6,18
  103:5,17 104:12
  112:22 129:5,12
  131:9
**involved** 14:21
  15:20 32:24 36:20
  37:9,17 38:3,7,8
  38:10,14,15 52:12
  52:14 54:4,6
  63:20 83:12 88:9
  90:8,25 91:6,7
  97:4 99:24 103:13
  119:4 128:18
  129:17 131:10
**involves** 50:22
  55:8 98:12 117:12
**involving** 36:17
  104:19 109:6
  113:3 128:23
  154:5
**isolate** 150:8
**isolated** 159:2
**issuance** 38:24
  39:1
**issue** 170:11
**issues** 12:14,16
  32:20 38:5,8

135:2 169:23
**italicized** 165:15
  165:24
**italics** 156:20
  158:9 160:14
**items** 70:7,16
  147:19,20

**j**

**j** 2:13
**jacqueline** 8:19,21
  9:1
**jaguar** 175:20
  177:13
**january** 1:14 4:2
  184:17
**jeep** 41:17 66:5
  112:15 120:17
  126:25 127:20,23
  156:14,22 159:20
  160:4
**jennifer** 39:4
  106:5
**job** 35:16 58:16
  80:4
**jobs** 62:22
**joining** 29:15
  129:4
**jonas** 7:22
**judgment** 167:13
  182:23
**jump** 107:8 108:3
**justine** 39:4

**k**

**k** 39:5 90:13
**keeps** 13:17
**kessler** 2:8 5:9
**kidd** 21:16,17
**kind** 13:16 16:23
  27:7,8 29:10
  44:15,18 92:4

102:18 119:22
145:19 146:1,4
167:13 170:3
179:13
**kinesthetic**  96:12
96:15
**king**  2:9 9:3
**klauer**  88:20
90:10,13
**knew**  139:11
141:5,7 142:24
143:22
**know**  6:8,17 11:10
12:2,5,7,19,23,25
13:2,6,13,15,19
14:14,16 16:3,10
17:14 20:23 24:10
30:1 32:5 35:2
58:15 64:19 79:1
79:18 88:5,15,16
89:2,16 90:14,15
90:18 91:5,5,16,20
91:25 92:4 93:11
93:18,20 94:8
95:15 97:20,23
102:19 105:6,15
105:20 108:11,20
114:20 116:7,13
118:21 120:25
121:3 123:25
124:6 125:20
133:15 134:1
136:20,25 148:24
163:12,16 169:21
170:9 172:12,18
179:19
**knowledge**  10:18
11:7 31:4 42:4,13
54:21 55:25 56:15
117:3,5 151:21
170:19

**known**  143:16
155:17
**knoxville**  2:6
**kostal**  175:18,25
**ktmc.com**  2:11
**kuhn**  39:2,4,5
40:14,21 41:4

**l**

**l**  9:20 90:13
**labeled**  80:20
143:24
**laboratories**  51:10
53:13,15,22
**laid**  56:9
**land**  44:16
**language**  160:3
161:22 162:9,16
**lasted**  121:12
**late**  137:8
**lavin**  16:15 17:18
17:18,21
**lavin's**  15:21,24
**law**  2:3 5:8,11
**ldlx**  105:23
**lead**  72:3 85:12
**leading**  27:7
**leads**  106:5
**leap**  78:5
**lease**  71:2 80:21
80:24 81:8,24
83:2,11,18,25 84:4
84:7 85:4,19
**leased**  160:2,16
**left**  38:4 121:23
174:20
**legal**  1:23 4:21,23
16:9,9
**legally**  116:23
**lend**  90:2,11
**length**  181:23,23
182:5

**lester**  31:20,24,25
**letter**  82:22
**level**  12:21 89:22
133:10 152:10,18
153:8
**lever**  3:11,16
92:12,15 96:16
130:1
**lever's**  96:17
**leveraged**  75:8
**lextant**  104:24
105:3,6,17,25
107:16 137:14
170:10,15,23
171:2,5,7,10,12
173:16 177:2,3,10
177:11,12 182:10
**lextant's**  175:17
**liability**  11:13
12:20
**license**  118:11
**licenses**  19:24
20:10 24:22 25:15
26:8 28:11
**lie**  162:5
**lies**  46:2
**light**  38:9
**lights**  67:19
**limit**  180:21
**limitations**  19:3
22:8 27:21 95:18
98:2
**limited**  50:17
71:22,24 134:7
**line**  38:5 40:17,17
81:5 84:1,24
174:9 186:5
**lines**  27:25
**list**  8:24 31:10
35:14 38:20 39:20
43:10 49:1 108:18

**listed**  10:19 30:25
32:6 35:20 42:1
48:19,25 51:6
88:3 106:5 108:19
118:11 136:11
137:6 147:19,20
**lit**  180:25
**literally**  174:18
**literature**  10:4,6,8
10:10,16 75:8,20
76:14 92:21
137:13
**litigation**  1:6 4:14
11:6,8,9,24 12:14
12:16,19 13:1,2,3
13:7 33:18,20
34:20 35:11
108:13 170:11
**little**  65:19 109:5
123:15 142:2
143:6 150:14
**llc**  1:4 2:12 5:13
**located**  4:18
**location**  70:24
83:13
**locations**  66:21
**logical**  104:2
**logistical**  8:16
**long**  51:25 53:2
93:3 110:23
119:10 144:6,23
145:25 146:3,11
**look**  20:25 29:17
31:10 45:1,5 51:6
60:19 72:13 80:11
107:25 119:19
126:5,7 143:18,25
145:24 150:25
153:15 168:12
169:23 171:25
174:20

[looked - memory]                                                    Page 20

**looked**  21:9 31:15 33:11 57:13 77:21 170:13
**looking**  24:5 42:25 43:6 44:6 45:4,14 46:9 48:11 50:24 53:16 65:2 69:24 81:11 85:8 105:22 107:3,4,6 137:13 140:2,9 141:14 143:17 150:12 157:25 158:13 159:16 170:16 176:9 177:7
**looks**  18:3 39:20 39:23,25 58:12 87:21 107:14 147:13 150:13 151:23
**lot**  8:9 62:14 91:13 135:15
**lots**  168:23
**low**  38:9 182:20
**lower**  176:19,22
**lowest**  175:23
**lunch**  104:6

**m**

**m**  11:21 58:13 184:21
**ma'am**  7:12,19 10:20,22 12:4,24 14:25 17:11,13,23 18:6,14,25 19:17 20:1,5 23:21 24:17 25:2 26:19 30:14,17 33:17 37:1,19 38:19,21 39:13 41:3,8,23 49:9 50:1,3,19 53:6 57:4 61:11 62:11 75:13 82:19

88:11 95:4 103:6 103:9,14 107:10 129:19 130:15 136:19 138:5 156:10,25 159:19 170:8 171:14
**machine**  169:20 169:25
**mailbox**  121:25
**maintaining**  156:5
**making**  8:14 22:19 42:23 48:7 62:1 62:10 72:10 91:3 120:5 178:18
**male**  120:10,16,17 120:18
**males**  120:8
**management**  13:16
**managing**  8:16 24:20
**maneuver**  134:13 136:12
**maneuvers**  90:25 91:4 111:2 134:11 136:15 146:12
**manipulations**  125:4
**manual**  66:3,6,15 66:21 68:5,17 70:8,13 71:21 72:19 73:6 75:2 75:17 76:3,19 133:4
**manuals**  70:17 71:6,10
**manufactured**  171:23
**manufacturer**  155:16,24 156:7 178:10

**manufacturers**  154:22,25
**mark**  82:10 102:5
**marked**  7:3 17:15 82:13,15 102:7 162:25
**market**  1:24
**marketing**  20:20 21:9 28:24 29:4,7 29:22,24 30:3,15 45:16 58:20 59:4 59:12
**marketplace**  30:19,22 154:24 155:19 156:3 163:8
**marriage**  184:13
**married**  15:23
**mason**  18:4,8 21:15,19 22:2 51:12 65:7
**master's**  18:7 48:1 58:3
**material**  8:8 19:15 68:7 76:16 108:7 182:2
**materials**  9:24 10:1,2,14 38:23,25 39:21 68:20 75:21 108:9,10 171:18 180:14
**mathematics**  25:8 25:11,12,16,19,21 25:23,25
**matter**  15:14 155:5 184:14
**matters**  11:8
**mccarthy**  88:12 88:13 90:9 99:10 99:15 103:12

**manufacturers**  154:22,25

**mcps012177**  3:19
**mcps012178**  3:14
**md**  1:6 4:16
**mdl**  1:7
**mean**  10:6 16:8 43:22 45:24 56:3 67:16 69:1 71:14 86:15 136:3 139:23 141:21 150:1 153:10 157:18,23 163:4 172:5 176:16 178:13
**meaning**  78:23 84:21 88:22 141:20
**meaningful**  137:19
**means**  45:25 132:24 136:9 163:5
**measure**  138:3 149:11,17
**measured**  138:23
**measurement**  130:5
**measures**  125:6,10
**measuring**  61:17 125:13
**mechanical**  18:19 19:14 96:17
**media**  4:12 60:1,5 104:4,8 151:9,13 183:4
**medical**  116:20,22
**meltzer**  2:8 5:9
**members**  127:15 127:16 161:13
**memory**  23:4 121:13

**mena** 9:2
**mentioned** 21:1
80:12 97:4 98:1
112:6 118:3
128:25 138:14
140:6 141:25
**mentioning**
107:15
**mercedes** 175:24
177:19
**messages** 181:8
**method** 90:18
**methodologies**
148:19,23
**methodology**
158:7
**methods** 90:15
92:4 158:3,5
162:10
**metrics** 173:18
176:12
**mezo** 11:11 14:24
14:25 15:22,23
**mic** 65:19
**michael** 4:20
**michigan** 1:2 2:15
4:16
**microphones** 4:3,7
**microsoft** 133:5
**mid** 1:23
**middle** 107:22
165:24 166:12
**mike** 106:14
**mileage** 119:22,23
**millisecond**
138:12
**mind** 94:10 107:2
177:6
**mindset** 81:11
**mine** 59:21

**minimize** 154:14
155:7,18 156:1
**minor** 29:23
**mintz** 21:2
**minute** 31:12
61:23
**minutes** 57:12
121:12
**mirror** 121:21
**mis** 92:3,9,14
137:7,7 139:3,4,6
139:16,19 140:8
140:22,22 141:5
141:12 142:5,5,9,9
142:19,19 143:22
143:25 144:4,9,13
144:17,23 145:2,3
147:14 148:2,7
149:14,20 150:7,9
150:16,18,19,22
151:2 168:21,25
169:1
**missed** 166:11
**missing** 38:22
54:19 66:17
100:21,25 101:8,8
112:11
**misstep** 37:11
**mitigate** 151:24
**mixed** 117:24
127:25 128:9,12
128:16,19,21
**mobile** 52:8,12
**model** 41:18
**modeling** 23:3
**moment** 81:6 82:9
84:17
**monetary** 43:13
**monostable** 1:5
4:14 11:14 15:12
16:6 41:19 43:19

44:7,11 66:2
67:11 103:5,17
104:12,15,19
105:2,9 106:22
109:6,11,16
127:13 145:13
171:8,16,19
172:10 173:2,4,12
173:17 174:2,10
175:14,19,19
177:13,17,24
181:1 185:1 186:1
187:1
**monostables**
175:25
**months** 52:2 53:3
53:4 54:16 119:14
**morning** 4:1 5:19
**motion** 111:18
112:12 181:11
**motor** 36:19 46:16
61:19 123:20
155:14
**motta** 9:2
**mountain** 104:25
**mounted** 103:3,4
130:1
**move** 113:7,11,12
139:15 149:22
181:13
**moved** 92:15
141:12
**movement** 17:5
96:18 113:4
126:17 141:3,10
142:14 149:25
166:1,3 168:17
172:1,4
**movements** 87:19
134:15 143:17

**moving** 181:11
**muhic** 2:9 5:9,9
**multiple** 29:13
83:19 124:25
125:14 126:5
160:11 161:25
**mumbling** 87:15

**n**

**n** 3:1 9:16,20,20
39:5 58:13,13
**naive** 175:17
**name** 4:20 5:20,22
5:22 9:15,19 11:9
15:23 118:21
**named** 43:17 75:5
127:14
**names** 7:20 20:24
**narrative** 150:15
150:21
**natalie** 9:2
**national** 130:17
131:25
**nature** 91:15
**nauhaus** 9:14
**near** 166:2
**nearly** 55:1 66:10
66:12 171:24
**necessarily** 13:10
33:7 69:23 71:7
71:14 72:25
124:16 129:16
153:5
**necessary** 57:16
72:4 130:20 134:4
140:14 159:5
185:5
**need** 6:11 7:11
42:8 98:2
**needed** 139:12
140:15

**needs** 109:13
110:11 122:24
**negative** 163:13
**negotiation** 57:23
**negotiations** 57:19
57:22
**nelson** 21:20,21
**neuroscience** 32:3
**neutral** 110:12,14
110:17,19,21
111:4,14,16,17,20
111:21 146:23
147:5 150:5
**new** 34:11,11,14
67:23 68:1 153:16
163:5,6
**nhtsa** 3:13,18
**ni** 131:24
**nice** 23:24
**night** 124:2
**nighttime** 23:10
**nine** 52:1 120:16
**nist** 133:11
**noise** 130:8
**non** 70:4 145:13
**nonlitigation**
12:14
**normal** 69:22
**normally** 121:19
**north** 8:7 39:18
**notary** 184:4
**note** 4:3 91:6,8
151:1
**notebook** 108:4,6
**noted** 41:14 61:10
173:20 175:5
185:12 187:10
**notepad** 133:7
**notes** 91:9,12,13
134:23,25 135:19
135:20,23

**notice** 39:9 43:20
73:14 74:6 82:23
**noticed** 71:3 85:1
**noticing** 5:6
**notification** 82:21
**noun** 136:4
**november** 6:20
**nuanced** 155:14
**number** 3:6 23:4
33:4 36:18 43:24
66:23 80:7 89:2,9
106:13,16 125:22
128:3 134:14
144:21 152:17
158:4 162:1
173:18 174:15
177:1 183:4
**numbered** 106:15
174:6
**numbers** 35:16
37:2,3 182:20
**numerous** 10:25
42:21 54:4 64:16
64:16

**o**

**o** 9:20 11:21 58:13
**oath** 4:24
**object** 70:18 94:23
163:21 164:21
179:6
**objection** 71:16
76:5 165:5,8
**objections** 5:4
**objective** 95:2
140:4,5,23 141:19
141:24 142:18
**objects** 22:22
**observe** 151:2
**occupation** 116:9
**occurred** 15:20
92:10,14 143:22

**october** 173:15
177:3 182:9
**offered** 15:9 57:2
57:5 71:3 98:25
**offering** 43:12,22
44:2
**oh** 106:15
**okay** 6:14 31:3,13
32:12 44:7 49:23
54:11 59:17 65:14
78:11 84:11 89:2
93:3 94:12 96:8
97:7 101:16
102:22 107:11
114:10,12 129:12
138:15 140:7,25
143:8 144:19
145:1 146:6 149:8
150:24 151:6
155:22 160:15
161:2,6,10 173:1
174:14,23 176:7
**once** 118:15 119:6
119:10,12,25
120:2
**ones** 31:9 86:19,20
94:8 95:21 101:24
104:21 105:15
139:22
**ongoing** 17:10
35:9,10 49:12,14
49:24 50:7,10,18
54:14
**open** 102:17,21
110:8
**opened** 181:6
**operate** 46:15
116:23
**operating** 46:12
**operation** 109:11

**operationalize**
137:18
**operationally**
176:14 178:9
**operator** 23:2,8
68:23,25 69:2
70:14
**opining** 167:14
**opinion** 15:6 16:18
16:22 38:2 43:12
43:22 44:21 68:15
72:18,18 73:4
79:23 82:25 86:18
86:19 93:5 95:8
112:24 167:13,19
**opinions** 15:9
16:23 39:11,14,16
44:2 57:2,5 61:20
87:20 94:15 96:7
97:15
**opportunity** 73:10
100:5,6,9 101:21
113:14 121:19
153:18 154:14,23
155:8,9,17,18,25
156:1 179:12
180:3
**opposed** 27:24
28:9 125:3 173:13
**option** 156:7
178:14
**options** 170:24
**order** 15:2,4 34:15
98:20 126:3
143:19,20
**organizational**
27:8
**organizations**
30:16
**original** 185:15

**outcome**  5:1
  149:24 150:1
  184:14
**outcomes**  76:9
**output**  143:18
**outputted**  142:13
  142:16
**outside**  107:15
  109:3
**overlap**  28:19
  29:23,25
**overlapping**  29:7
**overlaps**  28:16
**overly**  17:5
**overshoot**  147:20
  147:24,25 148:2
  149:1
**overshoots**  147:14
  148:8,10,16 149:6
  149:8
**overview**  23:25
**owned**  118:20
**owner's**  66:3,6,15
  66:21 68:17 70:8
  70:13 73:5 75:2
  75:17 76:3,19
**ownership**  118:23
  119:16

**p**

**p**  35:23 39:8
**p.m.**  87:10 104:5,9
  151:10,14 169:11
  169:14 183:2
**page**  3:6 17:25
  20:25 31:11 32:17
  35:15,17 38:17
  39:25 42:19 51:6
  58:11,11 61:22,23
  65:25 67:2,3,7,9
  68:9 70:22 77:1
  80:16,18 83:9,22

87:13,23 96:9
  112:8,13,19
  114:10 118:12
  126:21 127:5
  129:20 130:16
  134:5 135:25
  137:5 143:2
  146:21,21 147:12
  150:18,25 156:11
  156:17 157:25
  158:5,9,18,22,23
  159:24 160:7,14
  160:15 161:6,8,11
  164:3 165:7,15,23
  174:3,5,18 175:16
  177:10,16 182:9
  186:5
**pages**  18:2 53:18
  65:23 66:4,22
  76:19,20 114:7
  150:18 159:18
  160:20 176:9
  187:6
**paid**  84:21
**papa**  106:14
**paper**  25:5 31:11
  31:15 32:21 48:25
  49:2 164:24
**papers**  33:4 45:15
  62:17 80:15
**paperwork**  83:25
**paragraph**  23:23
  23:24 24:12 68:11
  70:24 77:2,10,15
  78:3,5,12,17 80:20
  84:9 112:20 134:6
  151:1 160:6 161:3
  165:24
**parallel**  121:25
**paraphrased**
  177:15,21

**pardon**  146:6
**parentheses**
  135:25
**parentheticals**
  136:10
**park**  87:18 91:23
  91:24 92:16 96:12
  109:14,15,20
  110:8,25 111:4,6,8
  111:11,22,23,25
  112:1,3,5,11,21
  113:6,6 137:8,8
  143:11,13,15
  144:2,3,7,11,11,15
  144:16,21,24
  146:22 147:4,5,5,6
  147:10 150:5,20
  164:16 178:1
  179:9,10,20,21
  181:10
**parking**  121:23,25
  122:2 164:14
  177:4,11,18
  182:11,14,19
**part**  18:23 32:17
  33:6,12 34:7 35:6
  42:6 47:17 53:15
  56:19 59:6 63:17
  91:10 107:13
  108:15 114:4
  116:7 120:6
  127:21 138:17
  140:17,20 146:14
  156:21,24 158:8
  158:11,17 159:17
  159:18 161:7
  179:25
**participant**  92:11
  115:20 120:25
  122:16 123:1,12
  141:2 142:17

143:19,20 179:9
**participants**  8:13
  9:5,7,12 33:8 88:7
  89:1 90:3,22
  114:16,20 115:9
  115:16 116:9,18
  116:25 117:15
  118:4,19 121:16
  124:1,3,7,9,21
  126:20,23 134:7
  134:10,13 136:2
  136:13 137:3
  138:25 139:11
  143:9 146:11
  156:13,21 159:19
  173:12 174:1
  182:16,21
**participate**  79:3
  79:12 80:8 116:25
**particular**  15:3
  44:21 48:22 70:7
  70:16 95:3 131:17
  136:20,25 157:14
**parties**  4:10 10:24
  105:12,12 184:12
**parts**  95:6
**party**  4:25 15:13
  16:16
**partying**  124:2
**passengers**  164:13
  166:9,17,23 167:6
  167:23
**passing**  167:12
**patrick**  8:20 9:1
**pattern**  136:11
  143:21 180:19,24
**pause**  143:1
**pay**  63:11
**paying**  69:3
**pen**  19:8

**pencil** 19:9 30:11
**pending** 6:13
  11:17
**pennsylvania** 1:24
  2:10
**people** 7:15,18
  8:25 9:23 10:14
  13:14 19:3,5,10,11
  22:5,8,9,17,21
  27:11,12,13,13,15
  27:16,18,18,21,23
  28:8 29:6 30:9
  40:19,24 42:1
  46:15,22 54:8
  60:10,15 69:20
  70:7 71:23 72:20
  72:23 73:2 76:1,2
  76:23 79:11,19
  80:7 84:21 85:21
  88:5,10,23,25
  113:8 117:15
  119:1 120:8,9,15
  120:16,18,21
  122:3,7,11 124:25
  125:19 126:5
  127:18 129:15
  152:14 162:7,20
  162:23 170:9
**people's** 27:22
  30:12 79:24,25
  116:22
**perceived** 176:11
**perception** 23:9
  23:10 77:22
**perceptions** 31:19
**perfectly** 6:12
**perform** 34:5
  74:24 88:24 89:25
  90:3,24 117:17
  124:22 125:19
  132:25 134:10

145:16 146:11
**performance**
  176:11
**performed** 14:7
  20:16 24:9 26:12
  33:10 34:3 43:3
  43:14 60:13,14
  69:15 70:6 75:4
  75:14 92:20
  105:18,20 107:1
  109:8 114:3 118:5
  121:23 127:24
  128:4,7,15,17
  133:1,21 134:13
  137:14 157:16
  158:25 159:3
  171:2,5,7 172:17
  173:10 175:7,13
  175:20 177:3,13
  177:17 182:13,18
**period** 55:7 120:3
**person** 17:17,19
  63:8 69:12,17
  71:11 72:1 113:5
  118:17 122:21
  142:16 167:8,10
**person's** 146:2
**personal** 14:19
  16:7 23:19 24:20
**personality**
  123:18
**personally** 10:19
  40:2 41:7
**persons** 152:14
**perspective** 44:12
  47:5 81:3 82:5
  84:18
**peter** 2:9 5:9
**ph.d.** 1:11 3:3,8,9
  4:13 5:24 18:3
  21:12,17,23 31:22

31:25 32:2 48:1
  58:3 183:3 184:6
  185:2 186:2 187:2
**philadelphia** 1:24
**phone** 19:8
**phones** 4:6
**phonetic** 106:6
**phrase** 17:1 45:7
  60:25 163:13
  166:7 167:16
  169:4,7
**phrases** 61:1
  167:22
**phrasing** 88:17
**physical** 30:13
  64:2 85:11,14
  133:19
**pick** 4:4
**pictograms** 74:20
  74:22
**pilot** 9:10
**place** 4:6,10 78:21
**places** 114:13
**plaintiff** 3:23 5:10
  35:21 36:5,6,7,11
**plaintiff's** 39:9,22
  76:13
**plaintiffs** 2:2 5:8
  5:12 37:21,23
  41:13,19 43:17
  75:5,11,18 127:15
**play** 8:1 145:5
  159:22 161:21
  162:8
**plays** 47:16 89:10
**please** 4:3,6 5:5,15
  5:19 6:8 60:7 80:3
  87:11 101:17
  104:9 108:18
  112:9 115:6,13
  116:2 129:22

132:12 135:13
  136:24 140:18
  151:15 169:15
  185:4,9
**pmuhic** 2:11
**point** 20:24 28:18
  32:12 46:8 48:7
  48:16,18 55:1
  57:19,22 63:14
  64:4 68:7 77:25
  78:23 79:3,5,7,12
  79:14,19 80:8,9,24
  81:7,8,9,19 83:1,4
  83:7,10,11 84:1,12
  84:25 86:13 95:17
  98:14 99:18 104:2
  130:9 134:8
  158:17 162:10
  163:20 174:3
**pointed** 43:9
**pointing** 177:6
**points** 139:10
**pool** 128:5
**poor** 177:17
**poorest** 182:18
**pops** 131:13
**population** 76:22
**portal** 52:8
**portals** 52:12
**position** 121:20
  126:13 136:16
  164:16 174:1,10
  175:18 177:12,17
  181:1
**positions** 29:13
  64:16
**positive** 163:13
  166:7,14 175:3
**positively** 29:19
  166:22 167:4,15

possible  93:15
95:11 148:4
152:16 167:3,8
168:3,15 169:5
possibly  146:9
potential  93:22
113:20,23,24
127:16 152:18
153:9,13 154:5
155:2 167:1,2
181:5
potentially  136:1
148:9
potentiometers
129:23,24 130:5
powerpoint  106:3
practice  7:25 8:4
34:10
practitioner  34:12
124:19
practitioners
27:20
prager  4:20
prediction  78:14
78:15
predictions  77:3
prefer  79:19
preference  173:19
preferences  61:18
preferred  173:12
premarked  6:25
173:22
prepare  14:23
prepared  6:19
40:14,21 102:16
107:7
preparing  38:17
83:18 103:21
prerequisites
112:6

prescreened
118:10
prescreening
123:14
presence  43:25
78:15 153:4
present  5:2 9:10
29:6 72:10 84:15
122:18 158:13
180:15
presentation
43:19 81:17 106:3
173:16
presented  46:6
67:25 73:12 84:12
84:23 85:18
166:19
presenting  80:23
81:12 82:25 83:3
pressed  181:7
prevent  72:12
prevented  42:7
previous  50:21
51:4 137:13
previously  94:25
136:14
price  57:18,22,23
63:14 79:19 80:11
primarily  8:5
123:1 140:12
primary  7:21 9:4
principle  152:8
155:11
principles  46:3
55:14 152:9
153:21
printed  158:10
prior  51:7 92:12
129:4 156:1
prioritize  62:1,10

prius  175:24
177:19
private  4:4 34:2
probably  10:25
problem  164:11
164:12,20 165:3
problems  94:4,9,9
154:8
procedure  158:6
proceed  5:18 60:7
87:11 104:9
143:12 151:15
169:15
proceeded  139:15
proceeding  5:5
process  47:17
71:15 76:23
110:10 125:13
processed  72:7
processes  28:6
48:15
processing  71:7,20
72:2 83:20
produce  6:23
produced  42:16
104:23 108:7,12
123:8
product  12:20
29:20 30:10,13,13
42:21 47:13,18
62:1,9,25 63:4,8
71:6,10 73:9
77:17 78:9 102:14
152:13,15,22
153:12,23,25
155:13,14 156:6
161:24 171:22
178:7,9
production  71:21
76:15 108:10,16
173:11 175:7,13

products  11:13
23:16 24:7 30:10
43:2 45:4 47:8
50:24,25 51:24
52:5,6,16,17,19
53:10,11,18,21,24
56:19 57:14,17
62:24 63:15,18,22
64:2,11,16,21,22
65:14,16 151:25
154:23 155:1,2
professional  23:6
46:10
profile  23:6 46:10
program  18:18,20
21:14,24 22:1
58:3
programs  21:4
project  7:16 21:8
34:1 50:7 51:21
52:9 62:15,18
63:7 65:1 104:25
105:4 106:4 162:2
projects  33:10,13
33:14,22 34:3
49:13 50:13,13
51:10 53:9 54:5,6
55:11 57:11,12
62:25
promotions  77:23
80:13
prone  29:19
pronounce  96:13
129:22
pronunciation
58:15
proper  8:15
106:18,18
properly  92:20
93:7 98:20 137:21
173:23

proposed 159:8
propounded 187:8
protocol 8:15
  123:5,6,11 131:16
  131:18
prototype 177:14
provide 68:9 86:8
  98:25 100:6,10
  101:1,19 102:13
  115:3 123:9
  132:11 157:9
  161:5 162:19,22
  181:14
provided 10:11
  42:16 67:21 68:6
  68:19,21 79:7
  83:24 96:24,25
  97:3 102:10 107:9
  115:22 157:1,4
  180:14
providing 127:8
  152:21
provision 101:2
prussia 2:9
psychologist 27:5
psychology 18:4,8
  18:16,19,21 21:18
  26:18,20,23,25
  27:4,24 28:12,15
  28:22 31:22,25
  45:17 58:20 59:4
  59:10
public 15:1 184:4
publication 31:10
  31:14 32:16 49:1
publications 20:13
  20:19 21:8 24:25
  25:18,21 26:12
  28:14,18 30:3,5,24
  31:5,7 32:6,14,25
  43:5 49:5,13,24

50:5,6,16 56:4
58:8 60:19,20
61:10 62:13 100:7
100:17,24 101:7
101:10,14,18,22
101:24
publish 46:22 65:8
published 33:5
  45:15 54:14 59:3
  59:7,9,14 62:16
  93:21
pull 110:16 111:24
  143:10
pulled 109:25
  110:1 111:6,11,12
  111:20
pulling 100:1
purchase 31:6,8
  31:13 32:15 42:18
  42:21,23,24 43:15
  44:23 45:2,6,8,13
  45:22 46:1,3,7,8
  46:17 47:3,9 48:8
  48:14,16,18 50:9
  50:16 51:2,3
  52:12 53:20 54:1
  54:13,23 55:8,16
  56:10,24 57:3,6,16
  57:19,22 58:10
  60:11,16 61:14
  62:2,10 63:3,8
  64:9,23 67:23
  68:1,7 71:2 77:11
  78:7,24 79:4,5,7
  79:12,14,20 80:2,2
  80:8,9,20,24 81:8
  81:10,14,19,24
  83:2,5,8,10,12,25
  84:4,7 85:3,19,20
  86:2,13 160:3

purchased 83:14
  85:22 160:2,16
purchaser 81:8
purchasing 31:17
  43:1,7 45:20
  46:13,25 47:12,18
  52:18 56:7 83:17
  127:3
purpose 34:23
  124:15 127:7
  154:11,13
push 110:16 111:6
  111:21,25 147:10
  175:20 177:14
pushed 110:19
pushing 112:6
put 35:23 82:18
  135:13,15 143:10
  143:11,13,13,15
  164:6 181:18
putative 43:17
  127:15,16
putting 53:22
  86:20 154:9
  178:19

**q**

qualified 61:12
qualify 30:1
quantified 139:1
quantitative 69:22
question 6:7,13
  42:9,12 47:1,21,23
  59:7 61:9 63:9
  70:9 73:3,18 80:5
  86:11 87:3 94:1
  95:24 98:8,10,21
  102:17,21 135:13
  138:20 156:20
  157:16,17 158:9
  158:11 163:22
  164:22 166:12

167:20 173:24
  175:2,11 176:17
  179:7
questions 16:10
  41:24 48:13,15
  60:21 100:2
  121:21 123:23
  127:1 157:10
  159:7,7 160:11,25
  182:24 187:8
queues 181:3,14
quick 87:4
quotient 123:17

**r**

r 9:20 90:13 184:1
  186:3,3
rachel 2:4,7 5:7
  7:22
radnor 2:10
railway 37:13
ran 91:15
range 23:15
ranking 176:15
rapid 87:19
rare 17:5
rate 13:22,23,24
  14:4,6 176:11,23
rated 176:18
rates 85:13 112:20
ratings 53:23
rational 167:10
raw 132:6,9,14
  134:18,19 135:9
  136:17 141:7,16
  146:14,17
reach 98:23
  111:25 159:10
  179:3
reached 93:9
  96:21,23 110:2
  111:7,13,21

**reaches** 96:16
**react** 124:23
 127:18
**reacting** 86:6
**read** 71:3 72:14
 73:14 74:6 77:14
 81:1 85:2 113:18
 118:13 120:11,20
 137:10 164:18
 177:21 185:4
 187:5
**reading** 35:25
 40:10 58:7 120:5
**reads** 151:1
 165:24
**ready** 82:24
 100:12 151:4
**really** 27:9 93:3
**rearward** 110:1
 111:12
**reason** 145:9
 148:17 179:25
 185:6 186:7,9,11
 186:13,15,17,19
 186:21,23
**reasonable** 148:22
 167:15
**reasons** 152:17
**rebate** 77:25,25
 78:9 79:3,9,13,21
 80:2
**rebates** 77:17,18
 78:22
**recalibrated**
 133:15 134:2
**recall** 3:12,17 9:8
 32:3 43:20,21
 52:20 53:11 63:13
 63:25 64:3,7,14,15
 64:23 65:18 82:22
 82:23 99:12,17

110:18 116:10,16
 117:7 119:15,18
 120:4 127:1
 138:13 161:20
 162:23 173:15
**receipt** 39:10
 185:16
**received** 38:23
 39:2,23,24 40:13
 96:16
**recollection** 9:8
 38:3 61:7 63:14
 102:20 104:14
 128:22 149:3,10
 161:18 170:17
**record** 4:2,11 5:4
 15:1 59:25 60:4
 87:6,9 104:3,7
 126:11,15 135:16
 151:8,12 169:10
 169:13 183:1
 184:9
**recorded** 4:12
 126:9 138:8
**recording** 4:9
**recruit** 115:9
**recruited** 114:16
**recruiting** 116:15
**rectify** 147:17
 148:6 180:7
**rectifying** 148:1
**reddy** 106:6
**redemptions**
 78:22
**reduces** 130:8
**reducing** 152:25
**refer** 44:7
**reference** 108:22
 169:19 173:23
**referenced** 100:8
 101:18 108:1

173:25
**references** 88:8
 89:18 160:13
**referencing** 160:6
 170:20 174:4
**referred** 67:18
 134:21 149:4
 151:20 177:4
**referring** 35:13
 48:23 87:25 88:2
 104:22 105:11
 134:20 168:6,14
**refers** 133:19
**reflected** 78:2
**regard** 62:8
**regarding** 68:6
 71:4 76:23 77:3
 78:8
**regardless** 144:23
 179:4,23
**region** 1:23
**regularly** 118:11
 118:14 120:1
 121:2
**relate** 26:14 46:1
 48:15 49:13 55:15
 78:8 84:4 116:22
**related** 4:25 16:5
 17:8 21:5 33:18
 33:20 45:22 47:11
 48:17 50:6,11,18
 55:3,4 57:14 66:2
 67:4 69:19 70:4
 77:8 78:16 127:1
 135:9 157:20
 170:2 184:11
**relates** 6:22 22:10
 22:12 43:1 56:18
 80:2 113:1
**relating** 36:16
 46:24 47:2 49:23

64:11 66:15 67:22
 79:24 83:8 106:22
**relation** 154:4
 170:24
**relationship** 78:17
**release** 181:13
**relevant** 40:5,7,22
 66:14,18 67:13
 157:16,22 158:19
 158:25 159:3
**reliable** 61:17
 92:19 93:6,11
 94:16 95:3,8,13
**relied** 93:16,25
 94:5,14 99:9
 100:18 103:21
**rely** 95:7 96:12,15
 99:21 140:13
 152:1 171:6
**relying** 87:23 93:4
 95:25 96:3,4
 97:13,17
**remedy** 43:21
 82:24
**remember** 9:21
 52:7 64:10 65:17
**remove** 153:17,17
 154:14 155:7,17
 155:25
**render** 16:23
**rene** 39:3
**repeat** 40:1 47:1
 70:9 80:3 92:7
**rephrase** 6:8
 128:16 136:23
**report** 3:7 6:19,24
 6:25 7:5,9,14 8:1
 9:25 10:9 14:23
 17:24 31:1 38:17
 38:24 39:1,2,2,12
 39:14 48:19 58:12

65:23 77:1 83:9
83:21,21 89:7
92:19,22 93:5,6,16
93:25 94:5 96:6
97:16 98:5,11
100:8,19 101:19
103:21 104:12,15
112:8,13,19 114:8
114:14 121:12
131:23 138:14
146:17,19 157:2,3
157:14,19,24
158:1,14,15
165:16,19 174:9
175:18 182:10
**reporter** 4:22 5:14
68:2 184:3
**reports** 96:5 97:21
98:7,13 99:8,13,19
**represent** 88:8
89:19
**representative**
67:8
**represented** 17:6
96:5
**represents** 120:23
156:20
**request** 32:5 115:5
115:12,14 116:3
123:10 132:14
135:8 170:12
**requested** 101:3
**requesting** 101:4,6
**require** 73:18
**required** 74:8
79:10
**requirement**
119:16,23,23
120:1
**requires** 73:21

**research** 10:6,7
20:16,19 24:9
25:3,22 26:13
28:21 30:18,21
33:10,14,23 34:3,5
34:19,22 35:8
42:24 43:3,5 48:6
48:11,20,22 49:4,7
49:10,12,15,24
50:8,11,12,13,15
50:18 51:9 53:25
54:14 56:24 57:18
58:7 61:23,24
62:4,6,7 64:23
69:11,19 70:5,15
77:3 79:1 80:6
81:4 85:7,9 86:3
99:9,14,19 102:10
104:18,22 105:1,4
109:6 129:3
148:20 159:7
**researchers** 45:14
**respect** 11:14
12:13 15:9,11,13
15:14 21:2,8 26:6
27:19 29:5 30:6
33:5 35:4 38:8
43:5,6,15 45:2,21
45:25 47:5,21
48:3 49:12,21
50:9,24 54:7
56:10 57:10,25
60:21,22 61:5
64:1 65:4 67:14
68:19 70:7,16
72:2 75:9,21
77:11,18,22 78:6
78:20,21 81:12,15
82:23 83:24 84:19
85:25 91:12,17
92:25 94:16 98:2

105:1,8 110:24
112:4 117:21
121:5 123:19,23
125:15 126:1
127:11,12 133:17
134:25 135:1,3
137:15 142:14
151:24 152:14
157:15 163:7
168:13 169:23
170:10 171:25
172:25 175:3,4,21
179:1,1 180:14
181:11
**respond** 166:21
167:4,8,15
**responded** 166:19
**response** 23:9 38:5
86:5 163:13 166:7
166:14 167:1
**responses** 167:2
**responsibilities**
53:7
**responsible** 8:5,12
8:13,15 122:23
123:1 130:13
**rest** 36:7
**result** 15:18 16:17
71:7 99:4
**results** 33:6 78:8
79:1 96:9,11 97:8
97:10,14,14,18,18
99:8 135:10
158:19 159:23
160:10,18,25
161:4 174:10
**retained** 3:22
10:21,24 12:6,8,10
12:16 13:9 37:22
183:5

**retract** 137:22
**return** 185:14
**returning** 122:1
**reverse** 111:8,11
111:12,14,16,17
111:20,21,22,23
111:25 112:11
134:8 143:14
144:3,4,6,7,11,15
144:21,24 146:24
147:6 150:4
**review** 8:7 9:24
10:1,9 39:10 40:2
40:4,8 41:9 42:6
42:10,17 76:7,12
76:15 171:18
**reviewed** 10:15
38:16 39:21 40:5
40:16,19 41:5
42:13 86:4 121:16
172:8 182:2
**reviewers** 41:1
**reviewing** 73:25
75:18 84:6 85:19
99:1 108:20
**revive** 73:11
**revolution** 138:11
**rick** 5:13
**ride** 9:12
**right** 6:21 9:22
12:2,3 13:3 18:5
18:13 35:17 37:18
38:18 39:22 47:24
58:14,21,25 59:4
66:3,11,22 67:12
68:11 70:23 71:15
77:6,13,17 78:9
80:25 83:22 86:14
88:10 95:9 96:1
96:13 99:12,20
102:23 104:12

106:23 107:6,17
108:5 114:5,8
117:20 118:12
120:5,10,19
121:12 137:9
138:1 140:10
147:14 153:1
155:7 156:15
157:10,25 159:16
160:21 162:17
164:20 165:7,13
166:4 174:14
176:1,5 177:5,14
177:20
**risk** 15:10 17:4,4
152:25 154:14
155:8,18 156:1
179:2,12,21
**road** 2:9 38:8
**robert** 39:2,4
40:14,21
**roberts** 21:22,23
**robust** 130:8
**robyn** 9:17
**role** 8:1 89:10
145:5 159:22
161:21 162:8
**roll** 164:12 165:11
165:14 166:4,8,16
166:22 167:5,17
167:22
**rollaway** 15:11
17:4 179:2,13,22
**rolling** 15:21
**room** 5:2 6:17
**rosenberg** 39:6
109:9 141:25
**rosenberg's** 149:6
**rotary** 44:19
**rough** 41:6

**rover** 44:16
**row** 144:1
**rpr** 1:19 184:21
**rules** 6:6 121:18
**run** 124:18
**running** 122:23
131:25 164:14
**rushed** 123:22

**s**

**s** 2:5 5:23 9:16
58:13,13
**s27** 3:13,18 82:22
84:13,16,24
109:18 110:3,13
110:22 160:3,17
162:16,23 163:19
163:20 164:10
169:6
**safe** 17:3 22:11
**safety** 3:12,17
15:11 24:6 26:7
26:16 60:10,15,22
61:4,5 77:8 78:4
78:16 79:24 81:16
84:2 85:9 112:22
113:1,14,15,16,18
113:21,22,24,25
151:17,18,20
152:12,23 153:13
153:21 179:1
**salaries** 21:3 25:6
**sales** 77:22
**salesperson** 81:20
**sanbonmatsu**
58:12
**saw** 143:23
**saying** 49:25 56:6
56:8 71:12 73:20
80:22 83:7 84:11
85:17 95:6 125:5
155:15 174:17

**says** 23:7 46:10
106:10 131:24
134:7 135:25
144:1 156:17
160:1 161:10
162:15 163:1
164:11,11 174:9
176:21 177:11,12
177:16
**school** 19:23 20:9
27:2 62:22
**science** 18:12
19:16 42:18,24
44:23,24 45:8,12
54:23 55:18 56:10
58:10 81:15
**sciences** 89:24
117:13
**scientific** 10:3,5,15
58:7 61:22,24
62:3,5,7 70:23,24
75:8,15,20 76:14
82:4 84:18 87:17
104:14
**scientist** 7:24 8:4
34:7 124:19 125:2
**scientists** 14:20
102:16 125:25
**scoop** 64:4,12,22
65:15
**scope** 24:2,4 26:5
**score** 24:21
**screening** 119:8
**scxi** 130:17 131:24
**seat** 122:22,25
**seatbelt** 110:9
**seats** 121:21
**second** 42:12
70:24 80:21 143:1
158:3

**seconds** 141:20
144:21
**section** 83:21
87:21 91:18 134:6
157:24 158:1,14
165:19
**sections** 9:25 40:6
40:7,22 89:4
**secure** 113:7
**securement** 66:8
68:24
**securing** 112:23
**see** 70:22 86:4
106:1,10 112:10
112:12 119:19
127:17 142:11
147:3 150:15,20
157:19 164:17
173:19 174:19
**seeing** 42:7 159:16
**seen** 74:22 76:6
140:18 148:19,24
152:20 155:4
167:19 169:19
172:22 175:1
176:21,25 181:9
**selected** 138:1,9
**selection** 138:7
**self** 139:18
**sensitive** 4:4
**sentence** 78:2
80:22 96:10 114:1
129:25 133:8
150:25 163:1
165:23 168:20
**separate** 142:21
**sequence** 145:3
**series** 90:24
121:24 177:4,11
177:19 182:11,14
182:19

**services** 114:16,18
  114:19 115:9
**session** 121:11,15
**set** 97:15 126:6
  143:10,12,15,16
  152:7 184:7,16
**sets** 88:8
**seven** 10:25 174:1
  174:10 175:18
**sheet** 185:7,10,12
  185:15 187:11
**shift** 3:11,16 33:8
  44:22 92:3,3,9,9
  92:10,12,14
  109:14,15,20
  110:12,14 113:5,6
  124:13 137:7,7,8,8
  137:9,9 139:3,4,6
  139:16,19 140:8
  140:22,22 141:12
  142:5,5,9,9,18,19
  142:19 143:22,25
  144:4,9,13,17,23
  145:2,3 146:22
  147:2,4,14,25
  148:2,5 149:12,14
  149:20 150:5,7,9
  150:20,22 168:4
  168:14,21 169:5
  174:9 178:2,18,22
  180:5 181:23
**shifter** 15:10,12,14
  16:6 33:12 43:19
  44:7,11,19 103:3,4
  105:2,9,9,24
  109:16,25 110:1
  110:16,18 111:6
  111:11,12,20,24
  112:5,6 145:14
  149:22 171:8,16
  171:20,20 172:1

172:24 173:12
  174:2,21,25 175:5
  175:9 176:19
  177:24 178:3
  181:1,11,17
**shifter's** 109:24
**shifters** 33:8
  103:17 104:16
  105:2 145:17
  173:17 174:24
  175:9 176:10
**shifting** 33:11 35:1
  35:2,3,6 87:18
  90:25 96:12 111:2
  111:10 112:10,25
  113:2,16 121:24
  136:21 137:1,4,6
  137:16,18,20
  142:23 146:12
  147:16 149:17
  150:14 168:10
  177:25 180:3
**shifts** 91:23
  112:21,22 113:19
  136:1,15 141:5
  145:25 148:13
  150:16,18,19
  151:2 168:25
  169:1
**shinar** 88:12,13
  103:12
**shooting** 142:8
**shoots** 148:7
**short** 60:3 87:8
  125:5 151:11
  169:12
**shorthand** 184:3
**showed** 8:13 10:14
  147:1 173:11,25
  175:8,14

**shown** 87:17
  136:17 177:24
**shows** 43:15 81:4
**sierra** 106:14
**sight** 38:5
**sigma** 106:8
**sign** 85:6 115:20
  185:9
**signals** 132:4
**signature** 85:8,14
  184:19 187:14
**signed** 121:17
**significant** 147:2
**significantly**
  177:13
**signing** 185:11
**similar** 8:25 17:8
  29:21 32:20 56:22
  66:12 77:11 78:6
  110:23 112:17
  159:12 162:16
  171:20,21
**similarly** 43:18
**simple** 155:12
**simpler** 125:17
  146:7 154:9
**simplest** 146:9
**simulator** 129:16
**single** 73:22 74:18
**sit** 9:22 39:15
  97:23 99:7 140:14
**sitting** 81:20
**situation** 113:13
  180:7
**six** 10:25 106:8
  119:14 120:17,17
**skills** 56:14
**skipped** 144:8
**slide** 65:19
**slightly** 27:14

**slip** 168:22
**slope** 121:25 143:6
  143:9,12 144:1
  145:7,10 150:3
**sloped** 142:24
**slopes** 150:2
**slow** 31:12
**social** 20:9 26:17
  26:20,23,24 27:4,5
  27:24 28:12,15,22
  58:19 59:4,9
  117:13 124:19
**soffin** 2:4 3:4 5:7,7
  5:19 6:3 7:6 59:22
  60:8 65:22 68:3
  70:20 71:19 76:11
  82:10,16 87:4,12
  95:1 100:9,12,15
  101:7,9,20 102:4,8
  104:1,10 108:11
  108:17 115:5,7,14
  115:15 116:3,6
  132:14,16 135:8
  135:18 151:6,16
  163:25 165:1,6,10
  169:9,16 179:14
  182:24
**software** 82:24
  109:18 110:5,6,13
  110:22 132:1,2,22
  133:2,23 138:18
**solution** 152:17
**solutions** 1:23
  4:21,23
**sorry** 31:2,20
  35:13 47:1 51:18
  51:19 60:18 66:23
  70:9 80:3 87:15
  88:1 92:7 95:23
  97:17 111:9,16
  135:12 136:23

139:9 156:16 161:3 166:11 174:15,16

**sort** 74:15,16 79:25 80:1 153:15

**sound** 58:14

**sounded** 155:22

**sounds** 122:6

**source** 67:10 114:21

**sources** 71:25 98:23 125:2,15

**south** 1:17 4:18

**southern** 1:3 4:16

**space** 185:7

**spacing** 181:24 182:5

**span** 66:20 67:3

**speak** 170:6

**speaking** 60:20 73:25 81:22 83:9 180:13

**specialize** 46:10

**specializes** 23:7

**specialty** 136:8

**specific** 8:6,11 16:9 23:25 24:1,3 24:9 29:10 32:5 35:3 43:24,25 50:13 61:20 69:7 74:25 78:19 79:15 80:23 81:6,6,23 83:1 84:2,4,17 86:12,16,17,19,20 93:24 97:24 99:22 108:23 112:12 122:18 125:24 131:5 134:14 138:8 139:10 140:5 141:2,17 142:20 158:6,10

159:6 160:10 165:14 167:19 168:12 169:7 170:21 172:1 173:19 175:2 180:11,18,23 181:2,23

**specifically** 9:9 10:8 12:18 13:11 20:15,21 24:5 28:20,23 30:9,20 30:23 32:3,19 33:2 43:2 47:4 48:9,24 51:7 52:20 55:6 57:20 59:11 60:12 61:8 63:13,25 64:3,7 65:18 73:17 80:15 81:22 85:7 89:9 91:19 93:11 94:2 99:12,17 101:5 108:6 110:18 116:10 118:21 119:15 120:4 126:9,24 130:23 136:10 138:13 143:23 148:18 160:19 161:12 163:15 169:22 171:9 172:22 175:11 176:14 178:3

**specified** 106:11

**spectrum** 177:18

**speed** 163:3 164:2

**spell** 9:15,19

**spelled** 5:22

**spent** 14:14 54:16

**spin** 27:14

**spirit** 125:8

**split** 18:18

**spoken** 62:22 75:11 108:25 171:12

**sport** 44:17

**staff** 40:14,16,19

**stages** 83:19

**stamped** 174:12 174:14 175:16

**stand** 106:7 147:22

**standard** 74:16

**standards** 98:25 133:11

**standpoint** 163:6

**start** 18:1 129:8 181:5,7

**starting** 35:12 58:10

**starts** 17:25 160:15

**state** 5:3,5,20 11:19 68:23 136:8 163:2,4,14,18,19 166:7,15,25 167:7 167:16 180:6 181:3 184:4 185:6

**stated** 16:24 65:12 73:12 111:15 164:24 175:1

**statement** 79:17 158:12 164:19

**states** 1:1 4:15 118:16

**static** 121:24 142:23

**statistics** 25:13

**stay** 145:7

**stayed** 144:3,6,7

**step** 118:1

**stephen** 39:8 170:13,14

**stop** 96:17 181:5,7

**stopped** 135:2

**stopping** 104:2

**straightforward** 143:7

**strain** 129:21,21 130:1,4,5 131:12 131:13

**strategies** 58:1

**street** 1:24 2:5

**strength** 92:25

**strike** 80:5 166:16 166:23 167:5

**striking** 164:13 165:17,18 166:4,9 167:17,22

**strombomb** 39:7

**structural** 19:15

**student** 21:24

**students** 21:14 25:7

**studied** 88:22

**studies** 20:9,16,23 25:3,22 26:13 28:21 30:18 33:6 33:7,13 34:17 35:4 43:9 48:6 58:9,19 60:14 69:11,15 70:15 74:24 80:6 87:17 87:23 88:3,4,18 89:3,9,16 90:7 91:6,7,17 92:21 93:1,8,10,15,19,20 93:25 94:4,7,18,21 95:12,17,25 97:4 98:5,18 99:8,14,16 99:19 100:1,7,18 103:16 104:11,14

104:18,22 105:3
105:21,25 106:18
106:21 107:1
109:6 127:25
128:3,17,21,23
129:11,12 149:9
171:6
**study** 8:2,6,10,17
19:2 22:7 27:15
27:18 45:9 46:19
48:23 60:9,13
75:14,15 77:2,16
77:19,20,21 78:1,8
79:18,22 80:11,14
87:24,25 90:14,16
92:19,24 93:2,4,7
93:12,13,21 94:13
94:17 95:3,7,16,18
96:22 98:1,11,15
98:22 99:25
102:19 114:3,4,15
115:16,18 116:25
117:19 119:4
121:7 125:12
129:8,14 149:2,18
149:24 150:13
156:23 158:2
159:15 174:4,24
175:17,23 176:1
177:2,3,12,23
**studying** 22:18
61:4
**style** 175:8 177:24
**subheading** 158:3
**subheadings** 158:4
**subject** 38:1 88:21
93:22 97:25
117:18 118:9
123:12 128:5,8
185:11

**subjective** 141:24
142:1 148:21
**subjects** 88:5,10
88:14,18 89:2,10
89:13,13,17,20,21
89:23,24 90:2,8,10
97:1,5 98:6,12
103:13 117:6,7,8
117:10,12,18,19
117:22,23 118:5,6
118:8 120:6,12
123:16 124:14,16
127:20,22,24
128:7,11,11
136:21 137:1
**submit** 79:13
**subset** 22:23 108:6
126:20,23 171:2,4
**subsets** 22:25
44:24
**substance** 187:10
**successful** 91:3
182:16,21
**sufficient** 42:14
68:22 70:13 72:1
73:13 74:1 76:22
**suggest** 76:8 85:10
96:9,11 143:6
**suggestions** 22:19
162:3
**suite** 1:17,24 2:5
2:14 4:19 133:25
**summaries** 40:12
40:21 102:9,15
**summarized** 40:18
**summary** 23:19
47:24 48:1 67:3
68:10,12,14
146:16,19
**supplied** 10:2,2
76:16 108:7,8

171:19
**supply** 30:21
**support** 11:5
23:18 94:14 96:6
**supposed** 136:16
**sure** 5:21 6:15
8:14 15:8 21:23
45:17 54:11 72:17
87:5 91:14 100:13
101:14 107:5
117:8,11 118:10
120:5 135:16
138:20 148:24
152:8,11 157:21
159:1 180:21
**surprise** 166:18
**surprised** 168:16
**survey** 122:2
126:17,19 127:8
127:19,21 135:10
156:12,16,21,24
157:1,9 158:11,16
158:20,21,24
159:2,2,4,6,10,17
159:18,23 160:18
160:23 161:4
**surveys** 135:7
**swear** 5:15
**sworn** 5:17 6:1
184:8
**system** 63:9 65:3
130:18,19 131:2,4
131:25 152:13
153:12,22,25
155:2,13 156:6
**systems** 22:10,13
22:16 23:12 50:25
54:6 61:2,6
132:21 151:25
152:15

**t**

**t** 58:13 184:1,1
186:3
**table** 66:4,7
118:12 120:5,23
135:25 137:5
150:11
**tables** 65:25
**take** 4:10 6:11
19:19 59:22 78:21
87:4 91:9 111:17
113:9 125:10
143:1 151:6
154:23 155:10,16
155:24 169:9
**taken** 26:24 47:19
47:25 60:3 73:5
87:8 91:12 104:6
110:20 134:25
135:19,20 151:11
169:12
**takers** 91:6,8
**takes** 145:15
**talk** 109:10 150:17
**talked** 21:2 22:3
40:25 41:1 62:12
62:17 63:21 75:3
117:6 136:18
138:15 157:5
**talking** 6:16 34:19
50:7 73:23 77:2
78:3 81:21 84:9
86:14 109:17
117:13 127:4
146:18 157:21
160:9,19 161:8
179:12 180:12,19
180:24
**talks** 158:1
**task** 69:3 70:4
96:18 121:25,25

122:1 134:5
136:14 139:15
142:24,24 143:3,6
143:9 144:8
145:10 150:3
**tasks**   118:5 121:14
121:23,24 123:2
136:21 137:1,4
139:8,9 141:5
145:17
**taught**   48:4 58:24
**teaching**   48:4
**team**   7:15 8:22
40:24 42:1 53:16
106:5 122:4
161:13 162:1
**teamed**   8:22
**technical**   10:3,5
92:22 122:24
**technician**   132:23
**technicians**   130:12
131:3,10 133:12
**technologically**
163:7
**technologies**   31:18
31:19 34:11,14,25
35:6 65:1
**technology**   31:16
33:5,9 43:8 49:22
65:15 163:6
**tell**   83:15 107:3
109:12 118:1
141:8 146:6,6
174:19,19
**ten**   52:2
**tend**   61:25 62:8
**tennessee**   2:6
**term**   106:18,18
122:5 151:19
163:9,19,23

**terms**   16:10 46:3,4
61:25 62:9 89:12
89:23 112:25
127:9 134:14
152:7,9 175:23
**test**   90:8 97:8,9,13
97:14,17,18
103:13 118:7,18
122:8 124:1,7
133:16 134:2
136:21 137:1
156:13 158:7
**tested**   176:4
182:14
**testified**   6:1 46:21
71:9 104:11,13
131:20,22
**testify**   61:13 95:11
**testimony**   35:14
46:20 75:19 76:13
95:5 108:20
170:13 172:14
183:3 184:9,9
**testing**   9:11,12
23:17 97:1 98:6
98:12 107:12,13
107:15,20,21
108:19,22 109:1,8
116:8 117:2
172:16
**tests**   149:6
**text**   156:19 165:15
165:24 174:20
**thank**   5:18 80:19
107:11 108:2
114:12 120:14
**thing**   34:8 36:10
47:9 88:16 124:21
154:7
**things**   18:22 19:4
19:6,10,10 22:5,8

22:21 27:23 29:18
30:5 58:20 91:15
**think**   9:21 16:9
17:24 18:2 24:15
28:9 35:17 38:17
47:15 55:10,11,21
58:5 62:24 64:3
73:23 75:25 80:21
86:13 93:18 94:24
101:23 102:17,25
104:1 125:8
135:14 142:11
145:7 155:2,6
162:10 166:21
173:3,21 181:24
**thinking**   112:25
**third**   105:11,12
**thirty**   185:16
**thornton**   77:16
80:11
**thoroughly**   98:20
**thought**   48:15
174:16
**thoughts**   48:12
49:19,20 162:2
**threats**   153:12,13
**three**   53:3,4 88:8
120:16 128:24
134:8 146:23
147:19,20
**thumb**   3:20
100:11,16,22
101:23 103:20,24
103:25 108:9
**time**   5:5 6:12
14:14 21:13,24
23:9 53:3,18 55:7
59:24 60:1,6
67:23,25 69:10
81:13 84:1,6,25
85:18 87:7,10

89:8 99:15 104:4
104:9 113:8 119:3
119:15 120:3
124:17 137:8
138:7,23,25
139:12 141:3,7,15
142:17,21,22,25
143:4 145:16
146:7,22 147:4
151:4,9,14 160:3
169:11,14 180:2
**timeline**   107:6
**times**   10:25 11:1
12:23 63:7,9
91:13 99:5 122:10
122:17,19 174:16
**timing**   126:16
130:21,25 138:17
138:22 139:2
142:3,13 144:19
145:1,5,9,15,18,20
145:24 146:1,4,8
146:10,16,18,20
**tip**   67:9 68:5,17
70:8,12,17 71:10
71:21 72:20 73:6
75:2,17 76:4,21
**tired**   123:21
**title**   118:22
**today**   6:19 13:1
39:15 95:12 97:23
99:7 103:20
**today's**   183:2
**told**   166:22,24
**tool**   61:17
**tools**   131:11
**top**   58:11 66:23
67:19 89:5 152:23
153:6 154:3 158:1
174:9 180:25

**topaz**  2:8 5:9
**topic**  24:10 47:20
  49:6,8,11 57:23
  176:8
**topics**  45:2 56:16
  57:14 58:4 62:14
**total**  183:3
**totality**  63:6 64:8
  76:16 86:3
**touch**  20:20 31:7
**touched**  32:14
**touches**  25:6
**track**  13:17 118:7
  121:18
**traffic**  53:23
**training**  19:18
  20:6 24:18 26:3
  26:22 29:3,8,11
  55:25 57:21
  152:21
**transcript**  39:22
  40:11,17 41:5,6
  184:8 185:17,18
**transcription**
  187:7
**transcripts**  39:24
  40:3,5
**transition**  181:3
**transitioning**
  36:20 78:18
**transmission**  3:10
  3:15 26:6,15
  163:3,11 164:2,5,9
  164:15
**transmissions**
  168:3,6,8 169:5
**travel**  96:17
**tree**  38:7
**trial**  90:1
**trials**  36:10 38:10

**trigger**  109:25
  110:16 111:6,11
  111:20,25
**trip**  37:9
**true**  71:1 116:19
  164:7,19 184:9
**trying**  35:15 56:2
  64:3 95:5 173:22
**tufts**  18:12,25
  51:12
**tuned**  172:6
**turn**  4:6 38:4,16
  97:4 134:8
**turning**  122:1
  134:5 136:14
**two**  6:6 11:1 21:1
  26:24 43:9 49:3
  49:23 50:4,6,10,11
  50:17 54:13 60:19
  62:12,13,17 73:23
  82:10 89:19 90:23
  90:23 92:2 103:2
  103:2,8 118:7
  119:13 122:3,7,11
  122:15,20 141:20
  144:2
**type**  43:20,25
  53:18 69:12,17
  74:17,19 78:18
  81:11,23 84:15
  87:3 90:11,12
  99:24 103:1
  117:22 118:24
  124:12 127:18
  130:24 131:2
  143:22 155:12
  164:4 168:17,24
**typed**  161:12
**types**  12:19 19:6
  45:4 64:20 71:13
  73:24 77:22 78:16

  92:2 112:20
  145:25
**typical**  70:2

                **u**

**u**  9:16,16 39:5
  58:13 90:13
**uh**  36:2
**ultimate**  54:8 77:5
  162:4
**ultimately**  86:1
  132:18 135:17
  172:10,20
**uncorrected**  137:7
  139:4,16 140:22
  141:5 142:19
  144:4,9,13 145:3
  148:7,11,14
  149:21 150:16,21
  151:2
**undergrad**  58:3
**undergraduate**
  18:15 19:20 54:3
**undershoot**
  148:21,25
**undershoots**  148:3
  148:12,16,18
  149:7,11,15
**understand**  6:4,8
  6:9,18 16:13
  45:24 51:23 54:12
  68:23 72:14,17
  73:14 74:6 88:19
  95:5,23 125:18
  126:3 138:20
  145:8,21 171:19
**understanding**
  6:22 7:7 11:20
  12:13,22 16:8,20
  22:18 23:2 27:6
  29:21 34:13 41:11
  45:10 46:4 50:22

  54:21 55:13 68:8
  69:25 70:11 74:4
  79:6,14,22 80:10
  85:20,23 89:11
  105:13,19 106:24
  107:19 116:21
  119:5 127:9 130:7
  131:1 132:2
  133:24 151:22
  152:12 161:9
  163:5 164:24
  169:22 170:22
  171:22,24 173:1,7
  176:17 181:20
  182:3,7
**understood**  85:2
  99:22
**undertaken**  24:2
**undertook**  105:1,8
  105:10
**unfamiliar**  121:8
**uniformly**  127:14
**unintended**  166:1
  166:3
**unit**  4:12 60:1,5
  104:4,8 151:9,13
**united**  1:1 4:15
**units**  183:4
**universe**  109:3
**university**  18:4,8
  18:12,25 21:15,19
  22:2 51:12,12
  65:7
**unknown**  115:17
**unrelated**  34:20
**unreliable**  93:17
  93:19 97:22,25
  99:11,16,20,23
**unspecified**  120:3
**update**  39:18
  110:13

**usa**  4:13 5:13
**usability**  20:18,19
  21:9 23:17 29:7
  29:13 30:6,8 47:6
  50:22 51:20 52:4
  52:24 53:9,16
  54:5,7 55:4 62:20
  63:5,16 107:12
  149:6 170:1,23
  175:17
**usable**  132:4
**use**  15:14 51:2
  54:9 56:18 57:16
  63:4 75:5,9 87:19
  91:8 106:18
  109:11 118:6
  119:9 136:14
  139:2,20 140:15
  142:1 161:17,22
  162:9 163:9
  168:23 171:7
  178:7,15
**useful**  181:3
**user**  29:8,13,15
  30:8 47:6 51:8,14
  51:15,16,20,20
  52:4,23 53:9,16
  54:5,7,17 55:5
  62:20 63:16 67:5
  68:4 70:12 71:10
  72:19 74:2 75:2
  76:3,20 112:9,14
  112:16 153:18
  154:15 170:1
  177:25
**user's**  68:17 70:8
  70:16 72:19 73:6
  75:17 113:12
**users**  26:7 52:17
  53:17 73:13,14
  152:21 154:15

175:17 178:5,12
**utilize**  131:4
**utilized**  128:11
  140:13 152:3
  154:1 159:5
  171:10
**utilizes**  23:16
  147:10
**utilizing**  128:24
  180:8

**v**

**v**  11:11
**vacations**  44:25
**valid**  118:10
**valuation**  148:21
**value**  43:13 60:10
  60:15
**variability**  124:20
  125:15 126:6,8
  130:9 134:12
**variable**  90:4
  117:21 125:13
  136:1,3,6 181:8
**variables**  123:20
  125:23,24 126:1,2
  126:2,4
**variance**  125:3
  147:1
**varied**  89:17
**variety**  45:15
  159:4
**various**  29:19
  31:16 34:25 35:5
  40:19 42:25 43:16
  46:5 51:10 53:9
  53:17,18 57:10,13
  58:7 61:18 62:25
  63:14,21 66:21
  77:22 78:15 86:5
  95:17 118:5 130:6
  137:14 139:1

145:25 146:12
  159:12 170:24
  176:10
**vehicle**  9:5 17:5
  21:9 23:8 34:15
  34:25 36:19,20
  43:7 46:11,15,16
  49:21 56:24 60:11
  60:22,24,25 61:6
  65:3 66:7 67:5,14
  67:23 68:1,21,24
  76:24 81:7 83:13
  83:18,19 84:3
  92:12,13,16
  109:12,16,23
  110:12 111:10,23
  112:23 113:4,7,9
  113:11,12 116:23
  117:22 118:18,20
  118:22,24 119:3,3
  119:24 120:2
  121:8,20,22 122:1
  122:16 126:10
  129:15,20 130:12
  131:10 133:20
  134:24 135:1,6,9
  135:20 140:3
  141:17 143:11,11
  143:13,14,15
  155:14 163:2
  164:5,12,14,16
  166:1,2,15,25
  167:6 171:8 172:2
  172:3,7 173:11
  180:6,16 181:9,12
**vehicle's**  132:3
**vehicles**  9:7,12
  17:7 23:13 41:13
  41:17 43:7 44:8
  44:11 60:16 61:3
  61:19 66:3,11,13

66:16 67:22 71:2
  90:24,25 103:2
  109:13 112:17
  118:4,6,11 121:1,2
  121:6 131:6,12
  146:24 147:8
  151:3 160:2,17
  164:1 170:25
  171:17 172:11,20
  173:2 175:8,14
  177:20 179:25
  180:20,22 181:17
  182:14
**verified**  138:10
**veritext**  1:23 4:21
  4:23 183:5
**verizon**  51:9 53:13
  53:15,22
**versadaq**  132:1
**version**  165:21
  174:5
**versions**  152:20
**versus**  77:4,5
  79:21 166:24
  178:15
**vi**  131:25
**video**  1:10 4:9,12
  91:1 126:9,10,13
  134:18 136:18
  138:10 140:15
**videographer**  4:1
  4:21 5:14,18
  59:25 60:4 65:19
  87:6,9 104:3,7
  151:8,12 169:10
  169:13 183:1
**videos**  126:10
  135:6,9 140:3,10
  140:12,14
**violated**  110:9,25

visibility   23:10
  38:4,9
visual   23:3,10 38:9
  180:15,17,19,24
visualize   140:19
visually   174:21
volvo   120:18

**w**

wacker   1:17 4:18
want   35:24 54:11
  59:22 72:17 102:2
  135:15 167:11
  168:12
wanted   31:18
  34:13 42:5,10
wanting   113:6
warn   152:19
warning   74:17
  77:5 81:16 86:16
warnings   23:15
  24:6,8 66:1,10,15
  67:4 68:16 70:14
  72:19 73:7,9,21
  74:9,11,12,21,23
  75:1,16 76:2,18
  77:4 78:4 79:24
  80:23 81:13,24
  83:1 84:2 86:12
  86:17
way   17:1,16 28:5
  29:5 32:4 34:16
  35:4 36:17 38:18
  45:1,5 46:14
  47:15 59:23 69:18
  82:7 86:10 87:25
  88:17,19 95:15
  98:8 104:17 125:5
  125:17 126:4
  132:24 134:12
  137:17 138:24
  141:22 145:21,23

146:9 148:4
  149:23 154:9,21
  167:9 171:21
  180:1 182:6
  184:13
ways   145:14
  151:23 153:15
we've   6:25 32:5
  56:3,23 57:1 59:2
  60:20 65:1,14
  136:18 146:17
  180:13
weakness   92:25
  93:14 94:19,22
  97:25
weather   65:4
website   29:20
  30:11 52:7,11
websites   63:21
  98:24
week   118:15 119:7
  119:10,12,25
  120:2
weeks   119:13,14
welcome   35:23
went   8:9 121:17
  144:3,10,15,21,22
whereof   184:16
whispering   4:4
wide   23:15 45:15
williams   39:8
  170:13,14
windshield   126:11
witness   3:2 5:15
  5:16,21,25 7:4
  65:21 70:19 71:17
  76:6 94:24 101:24
  102:1 116:5
  163:23 164:23
  165:9 179:8 184:6
  184:10,16 185:3

woodward   2:14
word   99:3 163:18
  165:18,21 166:3
  181:4
words   146:7
  161:17 165:11,14
  168:23 173:3
work   7:13 12:2
  13:4,25 14:3,5,7
  14:13 19:20 20:18
  23:18,25 24:1,4,5
  29:14,15,16,24
  33:19,21 41:22
  50:21 51:4,5,7,25
  52:1,3,11 54:4,18
  55:24 56:6,15
  62:15,18,20 63:6
  63:16,18,25 64:8
  76:17 86:3 89:11
  94:19 102:14
  106:4 114:4
  131:14 137:14
  149:5 152:2
  161:24 162:11,12
  162:13 171:2,4
worked   7:15 51:10
  51:22 53:12 64:4
  64:15 65:2 124:8
  162:1 170:10
working   23:1
  50:14 53:4 55:2
  102:16 129:1
  131:11 132:22
  135:2
works   28:6 35:24
  170:15
world   28:7 113:4
worse   182:22
worst   182:13
worthwhile
  178:11,13

wrist   133:10,19
writing   135:14
written   14:23
  20:13 24:25 25:18
  26:12 28:14 30:2
  30:6 31:5 32:24
  68:4,7,20 102:3
  123:3 160:13
  180:14
wrong   98:10 120:7
  149:17,22 150:6,8
  168:22 178:19
  179:24 180:3,4
wrote   32:10
  161:10

**x**

x   3:1

**y**

yeah   70:10 108:14
  111:17
year   119:23
years   11:2 13:8
  18:9 41:18 52:25
  53:14 54:15 55:2
  152:4
yellow   53:18
yesterday   41:10
young   3:7 6:20,24
  7:11,13 9:6,9,10
  10:10 42:2 115:17
  122:17 161:15,16
  161:22 162:5,13
  165:12
young's   7:8,17

**z**

z   11:21
zero   87:15 152:25
zf   171:23
zimmerman   8:19
  9:1

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.