UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC
MONOSTABLE ELECTRONIC
GEARSHIFT LITIGATION

    MDL No. 2744

This Document Relates to:
PERSONAL INURY TRACK
CASES

---

DEDRA MANEOTIS, *et al.*,

                 Plaintiffs,

      v.

FCA US LLC, a Delaware
Corporation,

               Defendant.

Master File No.16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

## **FIRST AMENDED CONSOLIDATED MASTER COMPLAINT FOR PERSONAL INJURY ACTIONS AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................1

II.    PURPOSE AND FUNCTION OF THIS COMPLAINT ..............................4

III.   JURISDICTION AND VENUE .......................................................6

IV.    PARTIES .............................................................................7

    A.   Personal Injury Plaintiffs.........................................................7

    B.   Defendant .........................................................................8

V.     FACTUAL ALLEGATIONS .........................................................9

    A.   FCA and the ZF Electronic Gear Shifter..............................9

        1.   The National Highway Transportation Safety Administration Has Determined the ZF Shifter Is Poorly Designed ................12

        2.   Reports to NHTSA Recount Horrifying Incidents of Vehicle Rollaway ...............................................................17

        3.   FCA and ZF Maintain That There Is Nothing Wrong with the Defective Shifter Vehicles .......................................19

        4.   FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury. ..........................................21

        5.   FCA Finally Provides a Purported Remedy for Certain Defective Shifter Vehicles: One that is Ineffective and Diminishes the Functionality of the Defective Shifter Vehicles. ...............................................................22

        6.   FCA Knew or Should Have Known of the Serious Defect in the Defective Shifter Vehicles and That the Defect Could Lead to Serious Injury and Death. ..........................................28

    B.   Allegations Relating to the Underlying Actions .................30

1.      Dedra Maneotis ...............................................................30

2.      Jesse Arambula ...............................................................35

3.      Julia Aryeh, the daughter of Gloria Levy ("Ms. Levy")...........37

4.      George Likitsakos ...........................................................40

5.      Michael Mannarino ..........................................................43

6.      Dena Scarso....................................................................44

7.      Kimberly Ann Blythe and Gordon Blythe..............................46

C.      Damages ................................................................................47

VI.     TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL.....49

A.      Equitable Tolling....................................................................49

B.      Estoppel ................................................................................51

VII.    VIOLATIONS ALLEGED........................................................52

A.      Dedra Maneotis ....................................................................52

        COUNT I NEGLIGENCE .......................................................52

        COUNT II NEGLIGENCE PER SE ..........................................55

        COUNT III STRICT PRODUCT LIABILITY................................56

B.      Jesse Arambula.....................................................................59

        COUNT I VIOLATION OF THE MAGNUSON-MOSS
              WARRANTY ACT (15 U.S.C. § 2301 *ET SEQ.*)....................60

        COUNT II VIOLATION OF INDIANA'S DECEPTIVE
              CONSUMER SALES ACT (IC § 24-5 *ET SEQ.*)...................63

        COUNT III BREACH OF IMPLIED WARRANTY OF
              MERCHANTABILITY (IC § 26-1-2-314) .............................67

        COUNT IV BREACH OF CONTRACT UNDER INDIANA LAW.68

COUNT V UNJUST ENRICHMENT ...............................................70

COUNT VI PERSONAL INJURY ..................................................70

C.   Gloria Levy ...........................................................................71

COUNT I NEGLIGENCE ..............................................................72

COUNT II BREACH OF EXPRESS WARRANTY ..........................74

COUNT III BREACH OF IMPLIED WARRANTY AS TO
        MERCHANTABILITY ..............................................77

D.   George Likitsakos ..................................................................78

COUNT I NEGLIGENCE RESULTING IN PERSONAL INJURY .78

COUNT II STRICT LIABILITY: PRODUCT LIABILITY .............83

E.   Michael Mannarino ................................................................88

COUNT I STRICT LIABILITY .....................................................88

COUNT II NEGLIGENT PRODUCT LIABILITY ..........................93

COUNT III NEGLIGENCE (WRONGFUL DEATH AND
         PERSONAL INJURY) .............................................95

F.   Dena Scarso ...........................................................................97

COUNT I NEGLIGENCE RESULTIGN IN PERSONAL INJURY .97

COUNT II NEGLIGENT INFLICTION OF EMOTIONAL
         DISTRESS .............................................................99

COUNT III STRICT LIABILITY: PRODUCT LIABILITY ...........101

G.   Kimberly Ann Blythe and Gordon Blythe .........................103

COUNT I NEGLIGENCE ............................................................103

COUNT II STRICT PRODUCT LIABILITY – DESIGN
         MANUFACTURING AND MARKETING DEFECTS ........105

COUNT III VIOLATION OF THE MAGNUSON-MOSS
WARRANTY ACT (15 U.S.C. § 2301, ET. SEQ.) ...............107

COUNT IV BREACH OF WARRANTY .......................................110

COUNT V TEXAS DECEPTIVE TRADE PRACTICES ACT
("DTPA") VIOLATIONS.......................................................111

COUNT VI LOSS OF CONSORTIUM ..........................................112

REQUEST FOR RELIEF ......................................................................113

DEMAND FOR JURY TRIAL ............................................................113

The Personal Injury Plaintiffs, pursuant to the Court's Pretrial Order No. 18: Report of Discovery and Mediation Progress, Establishment of Separate Case Management Benchmarks for Personal Injury Case, and Extension of Discovery Deadlines for Economic Loss Cases [Dkt. No. 274]("Pretrial Order No. 18"), file this First Amended Master Consolidated Complaint For Personal Injury Actions and Demand for Jury Trial ("First Amended Consolidated Master Complaint"). The cases included in the Personal Injury Track as of the date of the filing of this First Amended Consolidated Master Complaint are listed in the attached Exhibit M. The Personal Injury Plaintiffs, based on personal knowledge and upon information and belief as to all other matters based on an investigation by counsel, allege as follows:

## I.    INTRODUCTION

1.    Car makers must design and manufacturer their cars to be safe to operate. One of the most basic safety features in every car is the gear shifter that causes a stationary car to remain stationary unless and until the driver wants the car to move. The design of a gear shifter must be such that drivers know when a car is safe to exit because it is in the "park" mode, and if a car maker decides to use a monostable shifter that does not change positions, it must include a safety override that automatically puts the car in park or engages the parking brake when the driver gets out of the car.

2.      FCA US LLC ("FCA") broke this basic rule when it designed and manufactured cars with monostable shifters that did not provide a reliable method of determining gear placement and did not include any safety-override to prevent rollaway accidents. In its 2012-14 Dodge Chargers and Chrysler 300s, and 2014-15 Jeep Grand Cherokees ("Defective Shifter Vehicles"), FCA installed gear shifters, designed and manufactured by ZF Friedrichshafen AG ("ZF"). Departing from the long established "PRND" gear selector that provided a distinct position of the shifter for each gear, ZF shifters were electronic and never actually "shifted" into any gear, instead returning to a central location after being engaged (the "ZF Shifter"). The ZF Shifter design is dangerously defective because there is not any tactile or position feedback to the operator as to whether the car has actually been placed into the safe-to-exit "park" gear, nor is there a safety override that automatically puts the car in "park" or applies the parking brake if the driver gets out of the car.

3.      The safety issue is real. As of February 2016, the National Highway Transportation Safety Administration ("NHTSA") and the Office of Defects Investigation ("ODI") (collectively, "NHTSA-ODI") had identified over 300 incidents of vehicle rollaway and/or accidents following intended shifts to Park due to the Defective Shifter, including 121 incidents that resulted in crashes and 30 that involved injuries.  Injuries included fractured pelvises, a ruptured bladder, a

fractured kneecap, broken ribs, broken noses, facial lacerations requiring stitches, sprained knees, severe bruising and trauma to legs.   There were 325 additional complaints regarding Defective Shifter Vehicles drivers' difficulty shifting into Park.

4.      The design defect was avoidable. FCA competitors, including BMW, have for several years used similar electronic gear shifters that return to center after being engaged. But on the BMW, if the car is not in "park," and the driver opens the door and unbuckles the seat belt, the car automatically shifts into "park," preventing roll-away incidents and accidents.

5.      The Audi A8 luxury sedan used the identical ZF Shifter, but Audi did not introduce a single A8 into the market before designing and implementing a safety override that automatically engaged the electronic parking brake if the driver's door was opened and the seatbelt unbuckled. FCA could have provided a similar safety override, but it chose not to.

6.      Though complaints and accident reports have been ongoing since soon after FCA began selling Defective Shifter Vehicles, FCA has only recently initiated a voluntary recall of the over 811,000 Defective Shifter Vehicles in the United States. Initially, FCA only sent a letter to owners describing the design defect of the ZF Shifter, even though it knew a viable fix existed and could solve the problem. After years of blaming roll-away accidents on its customers and

telling them the cars were not defective, the widely publicized death of Anton Yelchin, a popular young actor, and the filing of a class action complaint, caused FCA to finally change its tune and issue a recall to purportedly add an "Autopark" feature to the defective shifter mechanism.

7.     FCA's unreasonable delay in fixing the defect and its warning letter was too little, too late. Nearly a million Defective Shifter Vehicles remain in unsuspecting owners' driveways and garages. As a result of this dangerous defect, the Defective Shifter Vehicles are a hazard to their owners and the public and directly caused injuries to Personal Injury Plaintiffs

8.     Personal Injury Plaintiffs seek damages for FCA's tortious conduct related to the defectively designed gear selector as alleged in this First Amended Consolidated Master Complaint. Specifically, Personal Injury Plaintiffs seek: compensation for rehabilitation, medical bills, pain & suffering, wrongful death, pain and suffering, property damage, overpayment for a defective vehicle, consequential damages, and punitive damages for FCA's knowing disregard for its customers' safety in designing and selling the Defective Shifter Vehicles.

## II.     PURPOSE AND FUNCTION OF THIS COMPLAINT

9.     The purpose of this First Amended Consolidated Master Complaint, as directed by the Court's Order Setting Schedule, is to include all plaintiffs who have made claims of personal injury and whose claims still remain active in the

MDL. This First Amended Consolidated Master Complaint includes a section identifying each Personal Injury Plaintiff, a section containing common factual allegations, a description of the underlying incident involving a Defective Shifter Vehicle for each Personal Injury Plaintiffs, and a compendium of the causes of action that the Personal Injury Plaintiffs have asserted in their respective complaints.

10.     This First Amended Consolidated Master Complaint is intended to be an administrative convenience to the Court and the parties and to be a consolidation for purposes of this MDL proceeding only and for the duration of this MDL proceeding only. It does not constitute a "*Lexecon* waiver" and does not waive the right of the Personal Injury Plaintiffs in the underlying actions to have their cases tried in the District in which they were originally filed. *See* Pretrial Order No. 6 at ¶ I. ("This consolidation does not constitute a determination that the actions should be consolidated for trial, nor does it have the effect of making any entity a party to any action in which he, she or it has not been named, served or added in accordance with the Federal Rules of Civil Procedure.").

11.     This First Amended Consolidated Master Complaint neither waives nor dismisses any claims for relief against Defendant not included in this pleading that are asserted by Personal Injury Plaintiffs in actions that have been or will be made part of this MDL proceeding. Certain claims for certain parties may,

consistent with 28 U.S.C. § 1407 and the case law thereunder, be matters for determination on remand by transferor courts.

12.     This First Amended Consolidated Master Complaint is not intended to alter the choice of law rules that apply to the underlying individual actions, which have been filed in several different states.

13.     In the event that a material number of additional individual actions are filed and transferred to this MDL Proceeding, Plaintiffs' Lead Counsel anticipate that they will propose a procedure to allow additional plaintiffs to "adopt" this First Amended Consolidated Master Complaint or portions of it.

### III.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the underlying Personal Injury Plaintiffs' claims based on diversity of citizenship under 28 U.S.C. § 1332(a)(1), because the state of citizenship of each of the plaintiffs is different from the state of citizenship of each of the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.[1]

15.     Venue is appropriate in this District pursuant to the Transfer Order entered by the Judicial Panel on Multidistrict Litigation on February 2, 2017.  [Dkt.

---

[1] The following action was originally filed in state court and removed to federal court: Notice of Removal, *Sophie Mannarino and Michael Menna, as Co-Administrators for the Estate of Michael J. Mannarino, a.k.a Michael J. Mannarino Jr.  v. FCA US LLC*, No. 1:17-cv-07444-NGG-JO, (E.D.N.Y. Dec. 21, 2017) ECF. No. 1.

No. 43].  Venue lies in this District pursuant to 28 U.S.C. § 1391 because FCA

maintains its principal place of business in this District, because a substantial part

of the events or omissions giving rise to Personal Injury Plaintiffs' claims occurred

in this District, and because Defendant conducts a substantial amount of business

in this District. Accordingly, Defendant has sufficient contacts with this District to

subject Defendant to personal jurisdiction in the District and venue is proper.

## IV.    PARTIES

### A.    Personal Injury Plaintiffs

16.    The following are the Personal Injury Plaintiffs as of the date of the

filing of this First Amended Master Consolidated Complaint.[2]

| Plaintiff(s) | Citizenship | Vehicle |
|---|---|---|
| Dedra Maneotis | Citizen of the State of Colorado residing in Craig, Colorado | 2014 Jeep Grand Cherokee |
| Jesse Arambula | Citizen of the State of Indiana residing in Lake County, Indiana | 2012 Chrysler 300 |
| Julia Aryeh, as Personal Representative of the Estate of Gloria Levy | Formerly a Citizen of the State of New York residing in Bedford, New York | 2015 Jeep Grand Cherokee |

---

[2] On March 14, 2019, *Daniel Guarascio v. FCA US LLC*, Case No. 17-12462, and *Steven and Leslie Jones v. FCA US LLC*, Case 17-12463, both personal injury matters included in this MDL, were both resolved in mediation before Judge Gerald M. Lawson (Ret.). These matters have not been included in this First Amended Master Amended Consolidated Complaint as the parties intend to file stipulations dismissing these matters.

| George P. Likitsakos | Citizen of the State of New York residing in New York, New York | 2015 Jeep Grand Cherokee |
|---|---|---|
| Sophie Mannarino and Michael Menna, as Co-Administrators for the Estate of Michael J. Mannarino, a.k.a. Michael J. Mannarino | Citizen of the State of New York residing in Queens, New York and Nassau County, New York | 2015 Jeep Grand Cherokee |
| Dena Scarso | Citizen of the State of New York residing in Staten Island, New York | 2014 Jeep Grand Cherokee |
| Kimberly Ann Blythe and Gordon Blythe | Citizens of the State of Texas residing in Johnson County, Texas | 2014 Dodge Charger |

**B.**     **Defendant**

17.     Defendant FCA is a Delaware limited liability company with its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan. FCA is a member of the Fiat Chrysler Automobiles N.V. ("Fiat Chrysler") family of companies. Fiat Chrysler is a Dutch corporation with its headquarters in London, England. As of 2015, FCA is the seventh largest automaker in the world by unit production.

18.     FCA designs, engineers, manufactures and sells vehicles under the Chrysler, Jeep, Dodge, Ram, Fiat and Maserati brands in this District and throughout the United States. FCA manufactures, distributes, and sells motor vehicles and parts through its network of authorized motor vehicle dealers. FCA engages in interstate commerce by selling vehicles through its authorized dealers located in every state of the United States, including within this District.

19.     At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold, leased, and warranted the Defective Shifter Vehicles throughout the United States.  Defendant and/or its agents designed, manufactured, and/or installed the Defective Shifter in the Defective Shifter Vehicles.  Defendant and/or its agents also developed and disseminated the owner's manuals and warranty booklets, advertisements and other promotional materials relating to the Defective Shifter Vehicles.

## V.     FACTUAL ALLEGATIONS

### A.     FCA and the ZF Electronic Gear Shifter

20.     The Defective Shifter Vehicles were equipped with the ZF shifter, which is an 8-speed transmission with an electronic gear selector.

21.     On its website announcing a "voluntary recall" of these vehicles, FCA describes the ZF Shifter as follows:

> The vehicles affected by this recall are equipped with electronic shift levers that return to the same position after each manipulation. Gear selection is conveyed to the driver by multiple sets of indicator lights, not gear-selector position, and unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles.[3]

---

[3] *See* Exhibit A, http://media.fcanorthamerica.com/newsrelease.do?id=17455&amp;mid=1 (last viewed on October 17, 2016).

22.     The ZF Shifter does not have positions for each gear setting, *i.e.*, Park, Reverse, Neutral, Drive ("PRND"). Rather, it always rests in the same position after having been pushed up or down from that position. The following is a picture of the ZF Shifter in a Jeep Grand Cherokee:



23.     Importantly, the ZF Shifter does not include a safety override that prevents the driver from getting out of the car when it is not in "park." Other manufacturers, including BMW, use monostable electronic gear shifters like the ZF Shifter, but *the BMW gear shifter has a safety override*. If the BMW is not in "park" and the driver's door is opened while the seatbelt is unbuckled, the car *automatically shifts into "park."* This safety override eliminates the possibility of the roll-away incidents that plague the Defective Shifter Vehicles.

24.     Likewise, the Audi A8 luxury sedan uses the same ZF Shifter that FCA used in the Defective Shifter Vehicles. But Audi did not sell a single A8 equipped with the ZF Shifter until it had developed a safety override that automatically engaged the electronic parking brake on the car if the driver's door is opened while the seatbelt is unbuckled.

25.     It is indisputable that from the time FCA first sold a Defective Shifter Vehicle, it had the ability and technological capability to install a safety override that would have prevented the roll-away incidents that have plagued the Defective Shifter Vehicles and caused hundreds of accidents, dozens of injuries, and at least one death. It simply chose not to do so.

26.     FCA has already recognized that the ZF Shifter has a problem. As noted on its website, "To address customer satisfaction issues, the Company began equipping the Charger and 300 with a new shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was updated in model year 2016."[4]

27.     In FCA's own recall chronology it states that as of April 12, 2016, "FCA has identified approximately 700 field reports potentially related to this issue which includes 212 crashes, 308 claims of property damage and 41 injuries."[5]

---

[4] *See id.*

[5] *See* Exhibit B, FCA US LLC Chronology, Monostable Gear Selector (Submitted on April 22, 2016), available at http://www-

1.      **The National Highway Transportation Safety Administration Has Determined the ZF Shifter Is Poorly Designed**

28.      The National Highway Transportation Safety Administration

("NHTSA") Office of Defects Investigation ("ODI") opened Preliminary

Evaluation PE15-030 on August 20, 2015, to investigate 14 reports of rollaway

2014-15 Jeep Grand Cherokee vehicles.[6]

29.      In early February, 2016, amid continuing reports of roll-away

vehicles, NHTSA upgraded its investigation to an engineering analysis, after

determining the issue is one of design rather than defect.[7]

30.      NHTSA described the defect as follows:

> Monostable electronic ("E-shift") gearshift assemblies
> supplied by ZF Group (ZF).  The E-shift system operates
> electronically and the gear requested by the driver is
> transmitted from the shifter via the CAN Bus to the
> Transmission Control Module which makes the requested
> shift.  The Monostable gearshift does not move into a
> detent but springs back to a centered/neutral position
> after the driver selects a gear and releases the shifter.  A
> button on the shift knob must be depressed to shift out of
> Park, shift out of Neutral, and to shift from Drive to
> Reverse or Park.

---

odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514516/RMISC-16V240-
7112.pdf (last visited Dec. 16, 2016).

[6] *See* Exhibit C, http://www-
odi.nhtsa.dot.gov/owners/SearchResultsByUrlCode.action?referenceSearch.request
Id=48801&referenceSearch.urlCode=RGRCHIUC3ZXFGZZ (last accessed
October 17, 2016).

[7] *See* Exhibit B.

The gear selected is shown on a display in the dash and illuminated letters on the shifter.  If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the EVIC to warn the driver.  In addition, the engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.***[8]

31.     NHTSA testing during PE15-030 indicated that the operation of the monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection.[9]

32.     ODI's analysis of the PE15-030 complaint and field report data identified 306 incidents of vehicle rollaway following intended shifts to "park" in the 2014-2015 Grand Cherokee.[10] These resulted in 117 alleged crashes and caused the following injuries:

Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg). Other injuries include reports of a broken nose, facial

---

[8] *Id.* (emphasis added).

[9] *See* Exhibit B.

[10] *See* Exhibit C.

lacerations requiring stitches, sprained knees, severe
bruising, and trauma to legs.[11]

33.     MY 2012-2014 Chrysler 300 and Dodge Charger vehicles (L-cars)

equipped with 3.6L engines use the same Defective ZF Shifter found in the Jeep

Grand Cherokee.[12] ODI received 8 complaints, including 4 crashes and 2 injuries

on the L-cars.[13]

34.     On April 22, 2016, FCA submitted a Defect Information Report,

informing NHTSA that "[t]he existing strategies built into these vehicles to deter

drivers from exiting the vehicle after failing to put the transmission into PARK

have not stopped some from doing so."[14]  FCA admitted that "[d]rivers erroneously

concluding that their vehicle's transmission is in the PARK position may be struck

by the vehicle and injured if they attempt to get out of the vehicle while the engine

is running and the parking brake is not engaged."[15]

35.     On or around May 14, 2016, FCA sent Class Vehicle owners and

lessees a recall letter, informing them of the Defective Shifter and associated safety

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *See* Exhibit D, Part 573 Safety Recall Report (Submitted on April 22, 2016),
available at http://www-
odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514210/RCLRPT-16V240-
3644.PDF (last visited Jan. 5, 2017).

[15] *Id.*

risks, including the potential for dangerous rollaways.[16] The Recall Letter was bare on specifics as to FCA's planned remedy and when lessees and owners of Class Vehicles could expect their vehicles to be repaired.  Specifically, the Recall Letter stated that "a permanent remedy is . . . currently under development" and "FCA is working to finalize a remedy by the 4th quarter of 2016."[17]   Furthermore, the Recall Letter informed owners and lessees that FCA would contact them again by mail "with a follow-up recall notice, when the remedy is available."[18]

36.    Notably, FCA limited the scope of its recall to address only the risk of rollaway incidents when a driver exits a vehicle, and did not expand the recall to address the general safety issue posed by the Defective Shifter in that a driver cannot rely on the Defective Shifter to effectively switch to the desired gear and/or the driver does not know which gear the Defective Shifter is in.

37.    NHTSA continued to investigate the Defective Shifter and perform its Engineering Analysis through June 24, 2016.  As a result of this analysis, NHTSA found the Defective Shifter "appears to violate several basic design guidelines for vehicle controls, such as: 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to

---

[16] See Exhibit E (May 2016 FCA Recall Letter).

[17] *Id.*

[18] *Id.*

remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform."[19]

38.    NHTSA concluded that the "[a]udible chimes" and "visual warning[s]" provided to alert drivers that the vehicle is not in Park when the engine is running and the driver's door is opened are ineffective.   NHTSA stated:

> Based on ODI's interviews with complainants, in some incidents the driver believed they had left the vehicle idling in Park when they exited, but the vehicle was not in Park.  In other incidents the drivers believed they had turned the engine Off after shifting to Park, but failed to recognize that the engine did not shutoff and the vehicle was not in Park.  The engine noise at idle is not obvious to many drivers who may not recognize that the engine continues to run after attempted shutoff.

39.    Lastly, NHTSA identified one fatal crash potentially related to one of the Defective Shift Vehicles, a 2015 Jeep Grand Cherokee, stating:

> In addition to the crashes and injuries documented in this closing resume, ODI is aware of a fatal incident involving a recalled 2015 Jeep Grand Cherokee that occurred over the weekend of June 18-19, 2016 in Studio City, California that may be related to the alleged defect. The incident is being investigated by the Los Angeles Police Department and FCA.[20]

40.    However, it was not until June 24, 2016, that FCA issued a follow-up recall notice to owners and lessees of certain models of Jeep Grand Cherokees

---

[19] *See* Exhibit F ("NHTSA-ODI Resume 2" announcing the findings of the Engineering Analysis announced in NHTSA-ODI Resume 1).

[20] *Id.*

explaining that the Company had developed a purported remedy for the Defective

Shifter.[21]   According to FCA, the remedy would involve taking the vehicle to an

FCA dealer, who would "install new software to include an 'Auto Park' feature

which eliminates the possibility of the driver inadvertently failing to place the

transmission into 'PARK' prior to exiting the vehicle."[22]   The letter also stated

that the dealer would provide additional information and guidance regarding the

new feature, stating:

> You will receive an "Auto Park" addendum card explaining the
> vehicle's new "Auto Park" feature.  After your vehicle receives
> the software update, please review the addendum card with all
> of the drivers of your vehicle and then store the addendum card
> in the owner's manual for future reference.  Your dealer will
> also review/demonstrate this new "Auto Park" feature and
> answer any questions or concerns.[23]

### 2.   Reports to NHTSA Recount Horrifying Incidents of Vehicle Rollaway

41.   NHTSA has received hundreds of reports of rollaway incidents

involving the Defective Shifter Vehicles, including the reports copied verbatim

below:

> MY WIFE PULLED THE CAR INTO A COMMUNITY
> PARK AND PUT THE JEEP IN PARK AND OPENED
> THE DOOR TO GRAB HER SONS LOST DOG. NEXT
> THING SHE KNOWS THE JEEP IS ROLLING, AND

---

[21] *See* Exhibit G (June 2016 FCA Second Recall Notice).

[22] *See id.*

[23] *See id.*

PROCEEDS TO RUN HER OVER AND CONTINUES
DOWN A SMALL HILL INTO SOME TREES. SHE
WAS TAKEN TO THE HOSPITAL VIA A 911 CALL
AND WE ARE NOW WAITING FOR RESULTS
FROM AN MRI. THIS PROBLEM COULD HAVE
KILLED HER IF SHE DIDN'T GET HER HEAD OUT
OF THE WAY.

ON AUGUST 19, 2014, I STEPPED OUT OF MY
STATIONARY 2014 JEEP GRAND CHEROKEE
OVERLAND BELIEVING I HAD PUT THE VEHICLE
IN PARK ON A GENTLE CITYSTREET SLOPE
WHEN IT SUDDENLY MOVED BACKWARD,
ROLLING OVER MY LEFT LEG AND SEVERELY
DAMAGING MY KNEE, SKIN, ARTERY, AND
QUAD MUSCLES. MY WIFE IMMEDIATELY
CALLED AN AMBULANCE, WHICH
TRANSPORTED ME TO A LOCAL HOSPITAL,
WHERE DOCTORS SURGICALLY ATTACHED AN
"EXTERNAL FIXATOR" IN THREE PLACES,
STABILIZING AND COMPLETELY IMMOBILIZING
MY LEG (FOR THE NEXT FIVE WEEKS). AFTER A
SECOND SURGERY AND OVER A YEAR OF
PAINFUL AND ARDUOUS THERAPY LATER, I
CAN NOW WALK WITH A KNEEBRACE,
HALTINGLY AND WITH A NOTICEABLE LIMP. . .
ALL DUE TO THE JEEP GRAND CHEROKEE'S
TRANSMISSION THAT DOES NOT ACCURATELY
INDICATE WHAT GEAR IT IS IN! UNLESS ONE IS
CONCENTRATING 100+% OF THE TIME ON THE
CONSOLE SHIFTER AND CONSTANTLY
GLANCING AT THE INDICATOR LIGHTS ON THE
VEHICLE DASHBOARD THE DRIVER NEVER
KNOWS WHAT POSITION THE JEEP'S
TRANSMISSION IS IN! THE SHIFTER ON THE
CONSOLE ALWAYS LOOKS EXACTLY THE SAME,
NO MATTER WHAT GEAR HAS SUPPOSEDLY
BEEN SELECTED. WE HAD NO ABSOLUTELY
FOREWARNING OF THE POTENTIAL LIFE
THREATENING PROBLEM INHERENT IN THIS

VEHICLE'S DESIGN, AND I CAN ONLY THANK
GOD THAT I'M STILL ALIVE TODAY. LAST WEEK
WE WERE SURPRISED TO RECEIVE WRITTEN
NOTIFICATION FROM FIAT CHRYSLER
AUTOMOBILES THAT THE COMPANY AND
NHTSA HAD RECALLED 2014 JEEP GRAND
CHEROKEES FOR THE SPECIFIC DEFECT
DESCRIBED IN MY INCIDENT ABOVE! (FINALLY!
VINDICATION!) THE RECALL NUMBER IS SHOW
BELOW, I BELIEVE. FCA VEHICLE RECALL
NUMBER: S27 / NHTSA 16V240

ON FEBRUARY 25TH, I SHIFTED MY CAR INTO
PARK AND WAS GETTING OUT TO LOOK AT
BACK WIPER WHICH SEEMED TO BE STUCK. I
HAD LEFT THE CAR RUNNING. THE CAR TOOK
OFF IN GEAR AND CAUSED ME TO FALL AND
BREAK MY ANKLE IN AN OPEN COMPOUND
FRACTURE THAT REQUIRED HOSPITALIZATION
AND SURGERY. MY JEEP ENDED UP HITTING A
PARKED GARBAGE TRUCK AND SUSTAINED
ABOUT $5000 DAMAGE. WHO KNOWS WHAT MY
MEDICAL BILLS WILL END UP BEING. PLUS MY
ANKLE MAY NEVER BE RIGHT. I WILL INCLUDE
A PHOTO OF MY CAR AND XRAY. IT HAPPENED
ON PRIVATE PROPERTY (TACO BELL PARKING
LOT). A POLICE OFFICER CAME AND PARKED
MY CAR AND CALLED AN AMBULANCE BUT DID
NOT MAKE A REPORT SINCE ON PRIVATE
PROPERTY. WE HAVE NOT HEARD FROM
GARBAGE TRUCK AND DOUBT IT DID
ANYTHING TO IT. THE CAR WAS IN PARK AND
NOT SURE HOW FAST WAS GOING WHEN HIT
THE GARBAGE TRUCK

### 3.   FCA and ZF Maintain That There Is Nothing Wrong with the Defective Shifter Vehicles

42.     While FCA has acknowledged it knows of 41 injuries that may be

related to what it describes as a "confusing" shifter, it has stated: "the vehicles

involved in these events were inspected and no evidence of equipment failure was found."[24]

43.    ZF issued a press release stating:

> ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, which was integrated into the vehicle architecture by the manufacturer. As such, ZF is unaware of any indications that claims could be made against ZF in the context of the current NHTSA investigations of the FCA vehicle models "2014-15 Grand Cherokee; 2012-14 Charger & 300 w/3.6 l engine".[25]

44.    The Defective Shifter Vehicles have been under investigation by NHTSA since August 20, 2015, yet FCA concealed detailed information on the defect by marking as confidential all but two pages from its owner's manual in the presentation it provided to NHTSA in response to its investigation. FCA has purposefully kept consumers and its customers in the dark about the ZF Shifter defect. This shroud of secrecy has unquestionably increased the risk of accidents, injury and death to consumers because it has delayed consumer awareness to take

---

[24] *See* Exhibit H, http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed on March 15, 2019).

[25] *See id.*

extreme care to ensure that the "park" position is engaged before getting out of a Defective Shifter Vehicle.

> **4.      FCA's Delayed and Inadequate Response to the Defectively Designed ZF Shifter Has Led to Hundreds of Accidents, Many Involving Serious Injury.**

45.      FCA's foot-dragging on notifying its customers and drivers of the dangerous ZF Shifter defect and taking steps to correct it is, unfortunately, business as usual for FCA. As reported in the *New York Times* on June 21, 2016, Center for Auto Safety Executive Director Clarence Ditlow said, "There was no sense of urgency on Chrysler's part or NHTSA's part given the potential for death or injury."[26] The *Times* pointed out that NHTSA "had publicly chastised the company, which acknowledged delaying recalls in almost two dozen cases going back to 2013 and affecting millions of vehicles."[27] NHTSA Head Mark Rosekind had said at the time, "[t]his represents a significant failure to meet a manufacturer's safety responsibilities."[28]

---

[26] Christopher Jensen, Exhibit I, *Anton Yelchin's Death Highlights a Known Issue With Jeeps*, THE NEW YORK TIMES, June 21, 2016, http://www.nytimes.com/2016/06/22/business/anton-yelchins-death-highlights-a-known-issue-with-jeeps.html?_r=0.

[27] *Id.*

[28] Exhibit J, http://www.freep.com/story/money/cars/chrysler/2015/05/18/fca-fiat-chrysler-jeep-recalls-nhtsa-pubic-hearing/27531875/ (last visited November 25, 2016).

46.     FCA promised to speed up its recalls and agreed to pay close to $105 million in penalties. But this case evidences the fact that little has changed. FCA's corporate culture is still putting profits ahead of safety and FCA customers and drivers are being maimed, even killed, as a result.

5. **FCA Finally Provides a Purported Remedy for Certain Defective Shifter Vehicles: One that is Ineffective and Diminishes the Functionality of the Defective Shifter Vehicles.**

47.     After its prolonged and unreasonable delay, FCA responded to the Defective Shifter maelstrom by providing a purported remedy that: (1) is ineffective and/or causes roll-aways of Defective Shifter Vehicles; (2) leads to other mechanical failures in the Defective Shifter Vehicles; and/or (3) diminishes the functionality of the Defective Shifter Vehicles.

48.     Moreover, numerous Defective Shifter Vehicle owners have reported that they never received a recall notice from FCA, and have yet to be contacted by the Company or offered the purported remedy for the Defective Shifter in their Defective Shifter Vehicles.

49.     On information and belief, dealerships have reported that the first recall remedy was ineffective, many of the Defective Shifter Vehicles have had to be fixed more than once, and they are unsure whether the second recall remedy will, in fact, effectively fix the ZF Shifter.

50.    FCA already has admitted that at least 13,000 Defective Shifter Vehicles in the United States have not been properly fixed even though they were recalled and repaired by the Company.[29]  According to a November 16, 2016 *Associated Press* article: "The new software was supposed to make the cars and SUVs automatically shift into park when the driver's door is opened while the engine is running.  But Fiat Chrysler says the change didn't properly fix 13,000 vehicles in the U.S. and 16,000 in other countries."[30]

51.    FCA spokesman Eric Mayne stated: "The software didn't work in a small number of vehicles with certain engine, transmission and two- or four-wheel-drive combinations . . . In most cases we initiated the installation of that software without the customer having to show up with the recall notice in hand. It just wasn't the right software for their particular vehicles."[31]  Thus, certain consumers have experienced dangerous rollaway incidents after their Defective Shifter Vehicles were repaired.

52.    FCA sent certain Defective Shifter Vehicle owners a second recall notice, informing them of the need to take their Defective Shifter Vehicle to the dealership for additional repairs.  The second recall notice states:

---

[29] *See* Exhibit K, Tom Krishner, *Software Fix Didn't Work on Some Fiat Chrysler Gearshifts*, ASSOCIATED PRESS, Nov. 16, 2016.

[30] *Id.*

[31] *Id.*

> Our records indicate that the recall repairs were attempted on your vehicle at a FCA US dealer.   Further investigation by FCA US has determined, however, that **your vehicle <u>did not</u> receive the complete and proper recall repair.  Your vehicle's software requires additional updating**. . . . **Until the complete recall repair is performed on your vehicle, your vehicle may roll away striking and injuring you, your passengers, or bystanders, if the vehicle's engine is left running, the parking brake is not engaged and the vehicle is not in the "PARK" position before exiting the vehicle**."[32]

53.     Consumers also report that FCA's purported remedy led to other mechanical failures in their Defective Shifter Vehicles.  These mechanical failures occurred shortly after the software update was performed on the Defective Shifter Vehicles.

54.     Below is a sample of complaints lodged with NHTSA as a results of FCA's purported remedy:

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/14/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN, UNKNOWN OR OTHER
**NHTSA ID Number:** 10895811
MY JEEP WAS SERVICED TWICE FOR THE RECENT SHIFTER PROBLEM THAT CHRYSLER IDENTIFIES AS DRIVER INATTENTION OR CONFUSION. THE SOFTWARE PATCH THAT IS INTENDED TO "AUTO PARK" THE VEHICLE, HAS FAILED ON TWO OCCASIONS. THE ENGINE IS STARTED, I APPLY THE BRAKE AND PLACE THE SHIFTER INTO REVERSE OR A FORWARD GEAR. I THE DESIRED GEAR IS ILLUMINATED AND I EASE OF THE BRAKE, HOWEVER, WHEN APPLY GAS THE ENGINE SIMPLY RACES AS IF THE TRANSMISSION IS STILL IN PARK OR

---

[32] *See* Exhibit L ("Notice of Need For Additional Repairs").

NEUTRAL. JEEPS ATTEMPT TO FIX A PROBLEM HAS NOW LED TO ANOTHER PROBLEM. THIS VEHICLE IS UNRELIABLE AND A DEATH MACHINE. I HAVE NO CONFIDENCE IN IT'S OPERATION AND I CAN'T IN GOOD CONSCIENCE SELL THIS VEHICLE TO ANYONE. JEEP CORPORATE SHOULD BE IN JAIL.

**2014 Chrysler 300**
**Date Complaint Filed:** 08/15/2016
**Date of Incident:** 08/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10895959
TL* THE CONTACT OWNS A 2014 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE WAS PREVIOUSLY REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN); HOWEVER, THE VEHICLE WAS STILL EXPERIENCING THE SAME FAILURE. THE CONTACT STATED THAT THE VEHICLE SLIPPED OUT OF PARK SEVERAL TIMES AFTER BEING REPAIRED. THE CONTACT NOTIFIED THE DEALER, BUT HAD NOT RECEIVED AN ALTERNATIVE REPAIR SOLUTION. THE FAILURE MILEAGE WAS 10,000. UPDATED 10/04/16*LJ

**2014 Jeep Grand Cherokee**
**Date Complaint Filed:** 08/24/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10898220
I DRIVE THE 2014 GR CHEROKEE WITH THE ELECTRONIC GEAR SHIFTER THAT HAS BEEN RECALLED FOR THE SHIFTER NOT ENGAGING ALL OF THE WAY INTO PARK. I HAD THE RECALL 'FIX' DONE A COUPLE OF MONTHS AGO, BUT THEN FOUND OUT FROM THE DEALER THAT THE EMERGENCY BRAKE ONLY ENGAGES IF YOU ATTEMPT TO OPEN ONE OF THE DOORS. ABOUT A WEEK AGO, AFTER PARALLEL PARKING ON A BUSY CITY STREET, I PUT THE CAR IN PARK AND REMAINED IN THE CAR FOR ABOUT ANOTHER MINUTE WHILE FISHING QUARTERS OUT OF MY CUPHOLDER (FOR THE PARKING METER). I ALL OF A SUDDEN FELT LIKE SOMETHING HIT MY CAR, LOOKED UP ONLY TO FIND MY CAR HAD ROLLED BACKWARD INTO THE PARKED CAR BEHIND ME. I HAVE A HUGE BIKE RACK ON THE BACK OF MY JEEP THAT BLOCKS THE REVERSE CAMERA, SO THE AUDIBLE SECURITY ALERT IS ALWAYS ON WHEN THE CAR IS IN REVERSE - THIS ALERT DID NOT COME ON WHILE THE CAR WAS

ROLLING BACKWARD, THEREFORE, THE CAR WAS NOT IN REVERSE, BUT RATHER NOT IN PARK ALL OF THE WAY. THANKFULLY THERE WERE NO PEDESTRIANS BEHIND MY CAR, NOR ANY DAMAGE TO EITHER VEHICLE, HOWEVER, IF A PERSON WOULD HAVE HAD THEIR BACK TO ME, I WOULD HAVE CRUSHED THEM BETWEEN THE TWO CARS. MY CAR HAS NOW BEEN AT THE DEALERSHIP FOR 6 DAYS (SECOND TIME FOR SAME ISSUE) AND I'M DEALING WITH CUSTOMER SERVICE DEPARTMENTS WITHIN CHRYSLER/JEEP TO RECTIFY THIS ISSUE SOMEHOW. I WANT EITHER A NEW GEAR SHIFTER THAT IS NOT ELECTRONIC, OR TO GET OUT OF THIS VEHICLE. THIS GEAR SHIFTER IS AN ENORMOUS SAFETY HAZARD. I FEEL LIKE I'M GETTING THE RUN-AROUND, TO SAY THE LEAST, ABOUT A MAJOR RECALL THAT IS THE AUTO MAKERS FAULT, NOT THE CONSUMER. FOR THE RECORD, I HAVE BEEN DRIVING APPROXIMATELY 30 YEARS AND TYPICALLY AVERAGE 20-30K MILES/YEAR. I AM CONSULTING A LAWYER AT THIS POINT.

**2013 Chrysler 300**
**Date Complaint Filed:** 09/08/2016
**Date of Incident:** 08/25/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10904633
TL* THE CONTACT OWNS A 2013 CHRYSLER 300. THE CONTACT STATED THAT THE VEHICLE FAILED TO SHIFT OUT OF PARK. THE VEHICLE WAS SERVICED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE CONTACT MENTIONED THAT THE FAILURE OCCURRED ON THE SAME DAY SHORTLY AFTER THE RECALL REPAIR. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

**2012 Chrysler 300**
**Date Complaint Filed:** 10/04/2016
**Date of Incident:** 10/01/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10913784
TL* THE CONTACT OWNS A 2012 CHRYSLER 300. AFTER ATTEMPTING TO PLACE THE VEHICLE IN PARK AND EXIT, THE CONTACT DISCOVERED THAT THE GEAR SHIFT FAILED TO MOVE INTO THE PARK POSITION AND THE ACCESSORY WARNING INDICATOR ILLUMINATED. THE CONTACT RECEIVED NOTIFICATION OF NHTSA CAMPAIGN

NUMBER: 16V240000 (POWER TRAIN), BUT THE REMEDY FAILED TO REPAIR THE VEHICLE. THE VEHICLE WAS DIAGNOSED A SECOND TIME AND THE TECHNICIAN STATED THAT THE RECEIVING CODE FOR THE TRANSMISSION WAS NOT UPDATED TO THE COMPUTER. THE VEHICLE WAS NOT REPAIRED DUE TO THE PART BEING ON BACK ORDER. THE CONTACT MENTIONED THAT THE ACCESSORY INDICATOR REMAINED ILLUMINATED AFTER THE RECALL REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 57,000.

**2012 Dodge Charger**
**Date Complaint Filed:** 08/23/2016
**Date of Incident:** 08/16/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10897869
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. THE CONTACT STATED THAT THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS REMEDIED PER NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). ATER LEAVING THE DEALER, THE CHECK ENGINE AND TRANSMISSION WARNING INDICATORS ILLUMINATED. THE VEHICLE COULD NOT BE DRIVEN OVER 20 MPH. THE VEHICLE WAS TAKEN BACK TO THE DEALER, BUT THE DIAGNOSIS WAS UNKNOWN. THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE FAILURE MILEAGE WAS APPROXIMATELY 30,000.

**2013 Dodge Charger**
**Date Complaint Filed:** 09/20/2016
**Date of Incident:** 08/12/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10908275
TL* THE CONTACT OWNS A 2013 DODGE CHARGER. THE CONTACT RECEIVED A RECALL NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 16V240000 (POWER TRAIN). THE CONTACT TOOK THE VEHICLE TO THE DEALER. WHEN THE DEALER TRIED TO REPLACE THE PART, THE TRANSMISSION CONTROL MODULE CRASHED AND THE ENGINE STALLED. THE MANUFACTURER WAS MADE AWARE OF THE ISSUE. THE CONTACT HAD NOT EXPERIENCED A FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 17,000.

**2012 Dodge Charger**

- 27 -

**Date Complaint Filed:** 10/03/2016
**Date of Incident:** 08/11/2016
**Component(s):** POWER TRAIN
**NHTSA ID Number:** 10911109
TL* THE CONTACT OWNS A 2012 DODGE CHARGER. AFTER THE
VEHICLE WAS REPAIRED PER NHTSA CAMPAIGN NUMBER: 16V240000
(POWER TRAIN), THE CONTACT BEGAN TO EXPERIENCE A FAILURE.
THE CONTACT STATED THAT THE SHIFTER FAILED TO LOCK INTO THE
DESIRED POSITION. THE CONTACT HEARD A LOUD CLONKING NOISE
COMING FROM THE TRANSMISSION. THE DEALER DIAGNOSED THAT
THE REPAIR CAUSED THE TRANSMISSION TO FAIL. THE CONTACT WAS
UNSURE OF THE DETAILS OF THE REPAIR. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE
FAILURE. THE FAILURE MILEAGE WAS UNKNOWN.

55.     Moreover, when effective, the remedy diminishes the functionality of

the Defective Shifter Vehicles.  When a driver of a Defective Shifter Vehicle opens

the driver-side door but the car is not in Park, the software fix abruptly places the

vehicle in Park even if the driver is not exiting the vehicle.

**6.      FCA Knew or Should Have Known of the Serious Defect in the
Defective Shifter Vehicles and That the Defect Could Lead to
Serious Injury and Death.**

56.     FCA's knowledge as described in this Complaint is reflected in

internal communications, including memoranda and e-mail and in reports of other

incidents—including those compiled in the NHTSA database, which FCA

regularly reviews—involving FCA's vehicles.

57.     On information and belief, FCA's knowledge as described in this

Complaint is reflected in its compilations and analyses of crash data.

58.     On information and belief, FCA's knowledge as described in this Complaint is reflected in the results of tests conducted by Defendant and others, including but not limited to failure mode and effects analyses (FMEA), human factors simulations, pre-release vehicle evaluation tests, computer simulations, and cost/benefit analyses.

59.     Upon reasonable inspection and testing of the Defective Shifter Vehicles and each of such vehicles' components, Defendant knew or should have known the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, were defective and unreasonably susceptible to failure.

60.     Defendant knew or should have known of the defective design and manufacture of the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, and failed to take reasonable corrective steps in curing the defects.

61.     Defendant had sufficient knowledge, expertise, availability, and resources to inspect the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, for defects before sale.

62.     Defendant failed to properly inspect and confirm the safety of the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, before its entry into the stream of commerce and sale.

63.     Defendant failed to complete a reasonable inspection of the Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, which inspection would have revealed the unreasonably high potential for the failure of the Defective ZF Shifter.

64.     The Defective Shifter Vehicles, including the Personal Injury Plaintiffs' Vehicles, were manufactured without adequate quality control measures and without using appropriate manufacturing procedures.

**B.     Allegations Relating to the Underlying Actions**

65.     The following are the underlying accidents that transpired involving each of the Personal Injury Plaintiffs as of the date of the filing of this First Amended Consolidated Master Complaint.

66.     Each of the following injuries occurred during a rollaway incident that happened during the ordinary use and reasonably foreseeable use of the vehicle at issue.

67.     In each incident, upon information and belief, the Defective Shifter in the Defective Shifter Vehicle at issue was in the same essential condition as it was at the time that it left the vehicle manufacturer's control.

**1.     Dedra Maneotis**

68.     On December 20, 2013, Dedra Maneotis pulled up a hill into her driveway and put her 2014 Grand Cherokee in Park.

69.     As she opened the door and stepped one foot out, the car started to roll backward.

70.     With her left leg out, she tried to hop along with her left foot while holding on to the door and the steering wheel.

71.     But the car door clipped a half-height decorative wall and bent backward, causing Dedra to lose her grip on the door handle. She struggled to stay upright as the car gained speed down the hill.

72.     Dedra grew tired and had to let go of her hold on the vehicle. She fell, and her leg got wrapped up in the front driver-side wheel. The Jeep rolled up onto the half-height decorative wall and over Dedra's leg. It then rolled over, and then spun out on, Dedra's leg causing the injury. While the vehicle moved backward to the street, the leg that remained in the car caused her to flip around in the street, which prevented a dangerous head injury.

73.     Immediately after the incident, Dedra Maneotis reported it to the police. Officer Ryan M. Fritz responded and reported that "due to the electronic shifting system in this vehicle . . . [it] was not in 'Park' like she [Dedra] thought it was." Officer Fritz further reported that the vehicle caused extensive damage and injured Dedra in the lower legs.  Dedra was hospitalized for these injuries.

74.     Dedra's family owns Victory Motors of Craig, Inc.—a Chrysler Dodge Jeep Ram dealership in Craig, Colorado ("Victory Motors"). The day after

the rollaway, Dedra's Jeep Grand Cherokee was brought into the service department at Victory Motors. Per FCA's own protocol, the service manager and mechanic at Victory Motors called FCA's Service Technical Assistance Resource ("STAR") team and advised of the rollaway. The STAR team informed the service manager and mechanic that they had not heard of this issue.

75.     However, at that time, FCA knew of the problems.  According to the National Highway Transportation Safety Administration Office of Defects Investigation ("NHTSA-ODI"), "FCA received negative consumer feedback for the Monostable shifters shortly after the [Defective Shifter] Vehicles entered the market" in the 2012 model year.

76.     Moreover, consumers began filing complaints about rollaways involving the Defective Shifter Vehicles on NHTSA's website well before December 21, 2013.  Federal law requires FCA to monitor defects which can cause safety issues and report them within five days. FCA regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the defective ZF Shifter.

77.     The STAR team gave the service manager and mechanic specific protocols and procedures to test the various systems in Dedra's Jeep Grand Cherokee. None of the protocols and procedures identified an issue or defect and everything checked out to STAR's satisfaction. STAR informed the service

manager and mechanic that the rollaway was the result of driver error, and did not

mention anything about their knowledge of rollaways or the consumer complaints.

78.    In or around May/June 2014, Tony Maneotis, Dedra's son and co-

owner of Victory Motors, attended an annual fleet meeting where FCA dealers met

with FCA's sales representatives, fleet representatives, and service representatives

to learn about the new vehicles in the upcoming model year. Tony told FCA's

employees about his mother's rollaway and asked if they knew about any issues

with Dedra's Jeep Grand Cherokee. No FCA employee purported to know about a

defect, and no mention was made of the known rollaways or consumer complaints

about the shifter issue. Rather, FCA's employees asked if Tony had tested Dedra's

Jeep Grand Cherokee with STAR.

79.    In or around May/June 2015, Tony Maneotis again attended the fleet

meeting. There, Tony learned that the model year 2016 Jeep Grand Cherokees

would come equipped with a different shifter than the ZF Shifter. Again, Tony

raised the issue of his mother's rollaway directly with FCA's employees. Again,

FCA's employees said that they were not aware of a safety issue or defect but that

the shifter change was being made to improve safety.

80.    A year later, in the 2016 fleet meeting, FCA finally informed dealers

that there was a safety issue and defect.  They also advised that a recall was going

to be rolled out to correct the defect in the Defective Shifter Vehicles. Only then

did Tony Maneotis learn that Dedra's Jeep Grand Cherokee contained a defect that could prevent cars from fully engaging into "park" despite a driver's attempt to place the vehicle into "park," and affected vehicles could roll away without warning.

81.     Today, Dedra has nerve damage and is numb from the knee to the toes. Her legs get tight quickly and she cannot walk more than 50 yards without difficulty. Since the crash, she has relied on pain medication for near constant pain – she cannot even sit down without pain. Her knee is permanently damaged and she has scarring on her leg. She has endured several surgeries to try and repair her injuries but her condition continues to decline.

82.     From the time of the crash until now, she has relied on pain medication for near-constant pain—she cannot even sit down without pain.

83.     Because of her injuries, Dedra Maneotis cannot participate fully in her family life. She cannot travel, maintain her home, or play with her grandchildren or great-grandchild as she once did. Together with her pain, this has severely diminished her quality of life.

84.     After Dedra's rollaway incident, Dedra's 2014 Jeep Grand Cherokee was recalled by FCA as a result of defects in the Defective Shifter.

2.      **Jesse Arambula**

85.      On November 29, 2015, between approximately 8:30 P.M. and 9:00 P.M., the Plaintiff was driving eastbound in his vehicle on the Indiana Toll Road in Porter County, Indiana.

86.      The Plaintiff, needing to urinate and with no travel plaza or rest area nearby, pulled onto the shoulder of the Indiana Toll Road near the juncture of Indiana State Road 49. He placed his vehicle in park, opened the door, and exited the vehicle.

87.      At this time, the Plaintiff's vehicle, which he reasonably believed and the vehicle itself indicated was successfully placed in park, began rolling backwards, the still-open door of the vehicle knocking the Plaintiff to the ground. The vehicle kept rolling backwards of its own accord, trapping the Plaintiff, running over his right leg, and continuing to move in reverse.

88.      The Plaintiff suffered severe injuries from this incident, including, but not limited to, a crush injury to his right thigh; extensive necrotic infection, including MRSA, cellulitis, and sepsis of the wound and surrounding skin, requiring IV antibiotics and repeated and extensive debridement; permanent limb disfigurement; and ongoing mobility impairment and injury-related disruption of ordinary work and life activities.

89.     On June 24, 2016, the Plaintiff took his vehicle for inspection to Munster Marathon Auto Repair in Munster, Lake County, Indiana. The service notes from that visit indicate, "Upon inspection, the vehicle failed to go fully into park on a number of occasions. A vehicle safety recall was found concerning this condition. The recall does not currently offer a fix for this condition. Customer was informed of the recall."

90.     The Plaintiff purchased his vehicle because of its reputation for safety and utility, consistent with his exposure to Chrysler's advertising messaging. The Plaintiff believed his Chrysler 300 would be a good value because of its utility and reputation for safety. The Plaintiff still owns his vehicle.

91.     Unknown to the Plaintiff at the time he purchased the vehicle, it was equipped with a defectively designed Defective Shifter. This design defect permits the driver to exit the vehicle while it is not in park, which can allow the vehicle to roll away from its parked position as happened in this incident. The Defendant knew that the Defective Shifter could lead to vehicle roll-away incidents, but did not disclose this defect to the Plaintiff, so the Plaintiff purchased the vehicle in the reasonable, but mistaken, belief that the Chrysler 300 was utile and safe to operate as designed.

92.     This defect in the Chrysler 300 has caused the Plaintiff physical injury, emotional anguish, pain and suffering, medical expenses, future attempted

repairs, loss of warranty value, diminished value, and out-of-pocket losses. The Plaintiff no longer feels safe operating his Defective Shifter Vehicle, but because of this Defective Shifter, he is not able to trade or sell his vehicle absent a substantial financial loss, as the value of his vehicle has substantially declined.

**3.  Julia Aryeh, the daughter of Gloria Levy ("Ms. Levy")**

93.    Gloria Levy was a 75-year-old mother of four (ages 49, 48, 45, and 44) and grandmother of seven (ages 17, 17, 17, 10, 8, 8, 7). Gloria lived in Bedford, New York with her daughter Julia Aryeh, Ms. Aryeh's husband and three children. At the time of Ms. Levy's death, Ms. Levy was a resident of Bedford, New York.

94.    Youthful in spirit, mind, and body, Ms. Levy lived for her family. Regardless of where Ms. Levy was or where they were, she called her children every day. She travelled widely to see her children and grandchildren and was a tender and vibrant presence in their lives until her last day.

95.    Ms. Levy was fit as a fiddle staying active by playing golf, tennis, and squash. She exercised daily and enjoyed walking and jogging and would not hesitate to go down a waterslide. She loved to garden and was an excellent horsewoman.

96.    Ms. Levy was excellent at needlework and made cardigans, scarfs, and hats for her children and grandchildren.  She wove beautiful tapestries as well.

97.     Her whole life, she was involved in community affairs and charity visiting the sick and elderly. She donated generously to those less fortunate than her.

98.     On or around January 23, 2017, Ms. Levy was visiting her sons Maurice and Isaac Levy in Harare, Zimbabwe. She was driving the Levy Jeep Grand Cherokee back to her family's home in Harare, Zimbabwe. She spoke briefly to the guard who was manning the front gate to her family's home before opening the gate and entering the driveway. The gate closed behind her. Within seconds, the guard heard Ms. Levy screaming and the sound of a crash.

99.     The gardener also heard the scream and crash. He ran from his residence in the rear of the property towards the front.

100.    On information and belief, Ms. Levy attempted to place the vehicle in Park. She opened the door and began to exit the vehicle when the Levy Jeep Grand Cherokee unexpectedly and without warning began to roll backward.

101.    On information and belief, the moving vehicle made Ms. Levy lose her balance as she tried to exit the car, trapping her between the door and the vehicle chassis. The driver's side door pinned Ms. Levy to the Levy Jeep Grand Cherokee as she slipped down and forced her torso to get caught between the door and the chassis while dragging her down the hill as the car continued to roll backwards. The out of control Levy Jeep Grand Cherokee then collided with a wall

that ran parallel to the driveway. As the vehicle continued to roll and scraped against the wall, the wall pushed the open door toward the vehicle crushing Ms. Levy between the front driver's door and the chassis. When the wall ended, the door opened enough to release Ms. Levy's body onto the driveway and the car continued to roll backward until it hit a tree.

102.   The gardener arrived just in time to watch Ms. Levy's chest rise and expel a breath. After that, Ms. Levy became entirely unresponsive and stopped breathing. There was no visible bleeding. The gardener called for help, carried Ms. Levy's body into the house, and placed her on her bed.

103.   Ms. Levy's son Maurice arrived minutes later. He arrived to find his mother lying lifelessly on the bed. Her shirt was torn and she had severe bruising across her stomach and left leg. She had scratching across her left leg and her left shoe was missing.

104.   Maurice went to the accident scene in the front of the house where the Levy Jeep Grand Cherokee remained wedged against a tree. He noticed that the vehicle was off and the gear was in neutral. He also noticed that the driver's door was severely damaged from scraping against a wall that ran parallel to the driveway.

105.   Afterward, an autopsy was performed at Parirenyatwa General Hospital in Harare.  It was determined that Ms. Levy suffered a bilateral

hemopneumothorax resulting from fractured ribs and hemoperitoneum resulting from a ruptured liver. The Levy Jeep Grand Cherokee caused each of these mortal injuries by crushing Ms. Levy's body.

106.   The loss has devastated her family. The shock of losing someone as healthy and vibrant as Ms. Levy so prematurely remains difficult.

107.   In April, 2016, FCA notified Defective Shifter Vehicle purchasers in the United States of a recall in the Defective Shifter Vehicles. However, notice of the defect was never provided to Ms. Levy or any other members of her family. Nor was a remedy offered.

### 4.   George Likitsakos

108.   Approximately four months prior to the accident at issue, George had spinal fusion surgery, which had not fully healed.

109.   On or around December 5, 2015, George was the operator of the Likitsakos Jeep Grand Cherokee and the Likitsakos Jeep Grand Cherokee was being used in a reasonably foreseeable manner. George shifted the Defective Shifter to "park" and exited the vehicle while the engine was still running. He closed the door to the Likitsakos Jeep Grand Cherokee behind him as he walked away from the vehicle.

110.   Out of the corner of his eye, he noticed the Likitsakos Jeep Grand Cherokee had begun to roll backwards.  He opened the door, attempted to jump

back into the vehicle, and stop the vehicle by applying the brakes.  However, George was ejected from the Likitsakos Jeep Grand Cherokee and slammed onto the ground, knocking him unconscious and knocking loose multiple screws in his spine. The Likitsakos Jeep Grand Cherokee then ran over and crushed George's left leg, fracturing his foot in multiple places.

111.   After rolling over George, the open door of the Likitsakos Jeep Grand Cherokee struck another individual. The Likitsakos Jeep Grand Cherokee only stopped when the rear of the vehicle struck a barrier.

112.   George was taken to St. Luke's Hospital by an ambulance where he was treated for his severe injuries. At St. Luke's Hospital, George received an x-ray of his foot which revealed multiple bone fractures in his left foot. In the coming days and weeks, the pain in his left foot became increasingly severe and it was learned that George's foot had become infected. George was forced to undergo additional spinal fusion surgery to correct the damage caused by this accident.

113.   In or around November 15, 2016, George visited an orthopedic surgeon who recommended additional corrective surgery of a lateral lumbar decompression and interbody fusion LJ-2 and L2-3 with extension of the posterior instrumentation above his previous L3 to SJ fusion with right pelvic fixation.

114.   In or around January 15, 2016, George visited an orthopedic surgeon who recommended additional corrective surgery of a lateral lumbar decompression

and interbody fusion LJ-2 and L2-3 with extension of the posterior instrumentation above Mr. Likitsakos' previous L3 to SJ fusion with right pelvic fixation, as well as ateral lumbar decompression and interbody fusion Ll-2, L2-3, and LJ-4 followed by posterior removal of hardware and extension of the fusion T10 down the pelvis bilaterally. His orthopedist told him that the only way to correct the issue was through surgery.

115.   In or around April 27, 2017, George underwent the aforementioned surgery recommended by his orthopedic surgeon. While his prognosis is good, his recovery is projected to take several months.

116.   Because of his injuries caused by the Likitsakos Jeep Grand Cherokee rolling over knocking him to ground, crushing his left leg, and knocking loose multiple screws in his spine, George cannot fully participate in his family life. He cannot enjoy activities with his grand-children in places which require walking long distances or through crowds. He has had to curb activities that were a part of his every-day routine before the Likitsakos Jeep Grand Cherokee rolled over his foot.

117.   George's injuries have diminished his quality of life. He is in pain on a daily basis. Because his injuries make it difficult for him to stand or walk for long periods of time, George cannot participate in many of his normal pursuits. Standing on his feet for a prolonged time is now difficult and painful. And as a

result, George has suffered the emotional and psychological distress commonly associated with injuries similar to those he has suffered. In order to maintain his balance and prevent further injury to his leg and back, he must limit how long he stands on his feet, which is both difficult and painful.

118. The Likitsakos Jeep Grand Cherokee was taken to East Hills Chrysler Jeep Dodge RAM in Greenvale, New York for repairs. FCA never sent an investigator to inspect the Likitsakos Jeep Grand Cherokee at East Hills Chrysler Jeep Dodge RAM. The Likitsakos Jeep Grand Cherokee was returned to George without any indication that the vehicle had a serious defect.

119. On or around July 21, 2016, FCA responded to George's inquiry sent to FCA Recall Information Center regarding to inquire as to the safety of the Likitsakos Jeep Grand Cherokee. FCA informed George that the remedy to fix the Likitsakos Jeep Grand Cherokee was not yet available.

120. After getting the Likitsakos Jeep Grand Cherokee repaired, George experienced and continues to experience anxiety when driving the Likitsakos Jeep Grand Cherokee.

### 5.   Michael Mannarino

121. Plaintiff is informed and believes and alleges that, on February 15, 2017, decedent Michael Mannarino parked the Defective Shifter Vehicle and attempted to exit the vehicle. As a result of the defective design and/or

manufacture of the Defective Shifter Vehicle, the Defective Shifter Vehicle did not properly engage and/or maintain the "Park" gear position, causing the unmanned Defective Shifter Vehicle to travel backwards, where it impacted Michael Mannarino. Michael Mannarino was then pinned between the Defective Shifter Vehicle and an unoccupied vehicle cause grievous bodily injuries culminating in his death.

### 6. Dena Scarso

122. On or about February 28, 2017 at approximately 9:45pm, Ms. Scarso was heading to Nucci's Restaurant located within a strip mall at 4842 Arthur Kill Rd. Ms. Scarso entered the strip mall parking lot and pulled into a parking space.

123. Ms. Scarso shifted her Defective Shifter forward to place the vehicle in Park. She then pushed the ignition button to turn the vehicle off. Ms. Scarso then opened the door and exited the vehicle.

124. The open door then knocked Ms. Scarso flat onto her back. The front driver's side tire rolled over Ms. Scarso's legs and feet and came to a stop after rolling several feet. Instantly, Ms. Scarso felt incredible pain in both legs.

125. Laying on the ground, Ms. Scarso could see pedestrians walking their dog and that there was traffic on Arthur Kill Rd., Ms. Scarso feared that the vehicle would resume its seemingly spontaneous roll out of the parking lot and into the

street. Despite the pain, Ms. Scarso got up and attempted to get back into the vehicle to stop it.

126.   Grabbing the steering wheel, she attempted to hoist herself back into the driver's seat. With her legs weakened by the Scarso Jeep Grand Cherokee rolling over her, the vehicle's open door knocked her down a second time; this time she landed on her side.

127.   The tire ran over the middle section of her torso bruising her ribs. Ms. Scarso lay on the ground screaming for help but nobody answered her cries. She watched as the vehicle continued to roll backwards completely out of control for several yards in the path of an arc.

128.   Despite the pain, Ms. Scarso crawled and tried to enter the vehicle a third time. This time, Ms. Scarso could not re-enter the vehicle and fell back down on the ground.

129.   The vehicle began moving forwards until it hit a fence and stopped. Again, Ms. Scarso crawled to the vehicle. This time, she was able to climb into the now stationary Scarso Jeep Grand Cherokee. She tried to back the vehicle up off the fence but the vehicle was unresponsive. She pushed the ignition, placed the vehicle in reverse, and disengaged it from the fence.

130.   She was taken to Staten Island University Hospital (North) for emergency treatment.

131.   In April, 2016, FCA notified Defective Shifter Vehicle purchasers in the United States of a recall in the Defective Shifter Vehicles. However, Ms. Scarso never received notice of the recall.

### 7.   Kimberly Ann Blythe and Gordon Blythe

132.   On or about August 20, 2015, Kimberly Blythe was at her father's house in Alvarado, Johnson County, Texas. There is a gate on the property which must be opened to enter. After Kim Blythe entered her father's property, she exited her vehicle to shut the gate, after putting the car in "park" using the shifter. While Ms. Blythe was shutting the gate, her 2014 Dodge Charger began backing towards her. While she tried to avoid being hit by climbing on the gate, the back driver's side tire ran over the back of her heel and caught her left leg. The Dodge Charger pinned her and Ms. Blythe's left leg was trapped between the tire and the wheel well. Kimberly Blythe called her sister, who was up at their father's house, and her sister called 911.

133.   After freeing her leg, Ms. Blythe returned to the driver's seat of the Dodge Charger and noted that the gear shifter was in the "neutral" position. Ms. Blythe had encountered previous difficulty requiring her to forcefully push the gear shifter into the park position. The 2014 Dodge Charger does not have a traditional transmission, but has an electronic transmission shifter.

134.   As a result of the Dodge Charger's transmission/gear shifter malfunction, Ms. Blythe required medical treatment including, but not limited to ambulance transportation, hospitalization, surgeries on her left ankle and leg requiring internal fixation of her bones with invasive hardware. After her release from 11 days in the hospital, Ms. Blythe required inpatient rehab and physical therapy as a result of the crush injury. Additionally, Ms. Blythe suffered complications related to the required medications. As of the date of the filing of this complaint, Kimberly Blythe continues to undergo treatment from her injuries sustained from the Dodge Charger and her injuries have not completely healed or resolved.

**C.     Damages**

135.   Personal Injury Plaintiffs continue to undergo extensive rehabilitation and medical treatment.

136.   As a result of FCA's Defective Shifter Vehicles which failed to keep Personal Injury Plaintiffs' vehicles in "park" and/or failed to achieve "park" despite Personal Injury Plaintiffs' attempts to place the Defective Shifter Vehicles Personal Injury into "park", Personal Injury Plaintiffs have suffered numerous medical issues, including, but not limited to:

    a.  broken bones;

    b.  skin abrasions;

c.  puncture wounds;

d.  constant pain throughout body;

e.  bruising throughout back and shoulders;

f.  twisted ankle;

g.  scarring;

h.  pain while sitting;

i.  pain while standing

j.  anxiety;

k.  whiplash

l.  difficulty walking;

m. inability to perform basic chores and/or engage family;

n.  severe rash;

o.  nerve damage;

p.  crush wounds;

q.  numbness;

r.  knee damage

s.  tightness in leg;

t.  permanent swelling;

u.  death;

v.  loss of consortium; and

w. pain and suffering to surviving family members

137.   The acts and omissions of FCA were the direct and proximate cause of Personal Injury Plaintiffs' injuries and damages.

138.   Personal Injury Plaintiffs' injuries and damages were the direct result of the Defective Shifter installed in the Personal Injury Plaintiffs' Vehicles, their failure to keep the vehicles in "park," and/or the Personal Injury Plaintiffs' Vehicles' failure to properly indicate that the vehicle was not actually in "park."

139.   As a direct and proximate result of the Personal Injury Plaintiffs' Defective Shifter Vehicles' defect and resulting failure, Personal Injury Plaintiffs suffered—and will continue to suffer—non-economic damages including, but not limited to, pain and suffering, loss of enjoyment of life, inconvenience, emotional stress, and impairment of quality of life.

140.   As a direct and proximate result of the Personal Injury Plaintiffs' Defective Shifter Vehicles' defect(s) and resulting failures, Personal Injury Plaintiffs suffered—and will continue to suffer—temporary and permanent impairment, physical impairment, and disfigurement.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

### A.    Equitable Tolling

141.   FCA was on notice of the risk posed by the Defective Shifter Vehicles well before any of the Personal Injury Plaintiffs were injured.  Shortly after the

Defective Shifter Vehicles entered the market in late 2011, FCA began to receive negative consumer feedback regarding the defective ZF Shifter. Consumers had posted complaints on the NHTSA website regarding the defective ZF Shifter since mid-2013. However, FCA did not share its knowledge of the ZF Shifter's potential risks with consumers like the Personal Injury Plaintiffs, leaving them vulnerable to potentially cataclysmic injury and preventing legal action to redress the sale of a Defective Shifter Vehicle.

142.    The Personal Injury Plaintiffs had no way of knowing about FCA's Defective Shifters in their Defective Shifter Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers. This is the quintessential case for equitable tolling.

143.    Within the period of any applicable statutes of limitation, Personal Injury Plaintiffs could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein and misrepresenting the company's true position with respect to the safety qualities of its vehicles. Personal Injury Plaintiffs reasonably relied upon FCA's knowing and affirmative misrepresentations and/or active concealment of these facts.

144.    Within the period of any applicable statutes of limitation, Personal Injury Plaintiffs could not have discovered through the exercise of reasonable

diligence that FCA was concealing the Defective Shifter. The causes of action alleged herein did not accrue until Personal Injury Plaintiffs discovered that their vehicles had the Defective Shifter. Personal Injury Plaintiffs, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – their vehicles were recalled. Even then, Personal Injury Plaintiffs had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

145.   For these reasons, all applicable statutes of limitation have been equitably tolled by operation of the discovery rule with respect to claims as to all Defective Shifter Vehicles.

**B.    Estoppel**

146.   FCA was under a continuous duty to disclose to Personal Injury Plaintiffs the true character, quality, and nature of the Defective Shifter Vehicles at issue.

147.   FCA knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Defective Shifter Vehicles at issue. Personal Injury Plaintiffs reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.

148.   Based on the foregoing, FCA is estopped from relying on any statutes of limitations in defense of this action.

# VII.   VIOLATIONS ALLEGED

**A.   Dedra Maneotis**

149.   The following causes of action apply to Dedra Maneotis:

## COUNT I
## NEGLIGENCE

150.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

151.   FCA, as a designer, manufacturer, and seller of the Grand Cherokee under C.R.S. § 13-21-401, owed Plaintiff a duty to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to Plaintiff, a person reasonably expected to use the Grand Cherokee by FCA and who did so in a manner which FCA might have reasonably expected.

152.   The Grand Cherokee failed because FCA failed to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm. FCA's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, prepared for distribution, and/or sold the Grand Cherokee.

153.   FCA's negligent acts include but are not limited to:

   a.   negligently designing the Grand Cherokee;

   b.   negligently designing and incorporating, among other components, a defective electronic shifter;

    c.     failing to exercise reasonable care to prevent the Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Grand Cherokee in a foreseeable manner;

    d.     failing to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

    e.     failing to incorporate safer alternative designs and formulations during the design and manufacture of the Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Grand Cherokee without impairing its usefulness;

    f.     failing to adequately inspect and test the Grand Cherokee before sale or distribution; and

    g.     failing to recall and remove the Grand Cherokee from the stream of commerce before it malfunctioned during Plaintiff's use.

154.   Dedra Maneotis was a person who FCA reasonably expected, or should have reasonably expected, to use or be affected by the Grand Cherokee.

155.   FCA knew, or should have known in the exercise of reasonable care, of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

156.   The risk of rollaway was known or knowable to FCA in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

157.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

158.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Grand Cherokee on December 20, 2013, when Dedra Maneotis was attempting to park it and it failed catastrophically.

159.   The risk of serious injury or death resulting from a rollaway incident was not obvious to Plaintiff or to the general public.

160.   FCA had a duty to warn Dedra Maneotis and the general public given the high likelihood of accident and the seriousness of consequences, such as death or serious injury.

161.   A reasonably prudent manufacturer would warn drivers that the monostable shifter fails to shift the vehicle into park and that the vehicle is therefore susceptible to rollaway, which can cause serious injury or death.

162.   FCA was obligated to warn, and should have warned, users of the danger involved in using the vehicle.

163.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm – not apparent to an ordinary user – involved in any intended or reasonably expected use.

164.   FCA failed to provide adequate warnings or instructions that informed an ordinary user of the specific risk of harm – not apparent to an ordinary user – involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

165.   As a direct and proximate result of Defendant's breach of its duties, Dedra Maneotis sustained injuries, damages, and losses that were caused by FCA's negligence while the Grand Cherokee was being used in a manner FCA should reasonably have expected.

## COUNT II
## NEGLIGENCE PER SE

166.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

167.   FCA was negligent *per se*.

168.   Under 49 U.S.C. § 30101, *et seq*., the purpose of which was to reduce traffic accidents and death and injuries from traffic accidents, and 49 C.F.R. § 573.6 promulgated thereunder, FCA was required to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."

169.   This statute was enacted for public safety and designed to protect Plaintiff and other drivers and passengers of vehicles from defective conditions in their vehicles that may cause death or physical injury.

170.   The ignition switch defect in Plaintiff's vehicle was a defect that related to motor vehicle safety because it resulted in a failure of a vehicle to remain stationary when the occupant intended it to do so.  FCA was therefore required to furnish a defect report to the NHTSA.  FCA failed to furnish the required report for years after knowing about the rollaway safety defect and therefore violated the statute and regulations promulgated thereunder.

171.   Plaintiff suffered serious personal injury as a direct and proximate result of FCA's failure to furnish the required defect reports to the NHTSA.

172.   FCA's statutory violation for failing to file the required defect reports was a proximate cause of Plaintiff's injuries. Had the requisite defect reports been furnished to the NHTSA, Plaintiff's vehicle would have been recalled and the defect corrected or, alternatively, Plaintiff would have been on notice of the defective condition in her vehicle and could have avoided driving the vehicle while the defective condition persisted.

## COUNT III
## STRICT PRODUCT LIABILITY

173.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

174.   Defendant is a "manufacturer" and seller under C.R.S. § 13-21-401, as it designed, assembled, fabricated, produced, constructed, and prepared the Grand Cherokee before it was sold. Defendant is a "seller" under the same statute because it was a manufacturer, wholesaler, and distributor engaged in the business of selling a product for resale or use, with actual knowledge of the defects in the Grand Cherokee.

175.   Defendant sold the Grand Cherokee to a business affiliated with Dedra Maneotis.

176.   FCA placed the Grand Cherokee in the stream of commerce and expected it to reach the user or consumer without substantial change in the condition in which it was sold. Indeed, it reached Dedra Maneotis – someone who would reasonably be expected to use, consume, or be affected by the Grand Cherokee – without substantial change in the condition in which it was sold.

177.   The Grand Cherokee was defective, and its defects are outlined throughout this Complaint.  Generally, they comprise the design and provision of a dangerous, defective shifter and, despite knowledge of the defects, the failure to warn consumers about the shifter's defects.

178.   In situations such as Dedra's – where the driver used the vehicle as intended and in a foreseeable and reasonable manner – the vehicle should not fail.

- 57 -

179.   Nevertheless, the Grand Cherokee failed, and it did so because of design defects in the Grand Cherokee existing when it left the manufacturer's control.

180.   Defendant knew or should have known of the defective design of the Grand Cherokee and that, as a result, it was unreasonably dangerous.

181.   While history has shown the ZF Shifter causes serious injury and death to operators, it adds no additional utility beyond that offered by traditional automatic shifters, which were readily available, inexpensive, and devoid of the unsafe aspect of the Defective Shifter.  Had a traditional shifter been used, the risk of injury or death from an inadvertent vehicle rollaway would have been eliminated or rendered insignificant.

182.   But, beyond this, FCA could still have kept its drivers safe from the Defective Shifter by incorporating a safety override (as it did for other cars) that automatically engaged the electronic parking brake when the driver's door was opened and the seatbelt was unbuckled.  This override would cure the unsafe aspect of the Defective Shifter without impairing any purported usefulness or imposing unreasonable costs.   This sensible, cost-effective feature would have prevented Dedra's and many others' injuries and harm.

183.   The Jeep Grand Cherokee and Defective Shifter performed exactly as intended by FCA, and yet the vehicle was unreasonably dangerous. The danger

inherent in the Defective Shifter was not obvious to Dedra Maneotis or the general public, nor could they have avoided danger with additional care in the use of the shifter.

95.     The defects in design and inspection made the Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

96.     Defendant did not warn or alert purchasers or users of the foregoing dangers, despite knowledge of them.

184.   As a direct and proximate result of the defects in the Grand Cherokee's design and manufacture and FCA's failures to warn, Dedra Maneotis has sustained injuries, damages, and loss.

185.   Defendant is strictly liable to Dedra Maneotis for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Grand Cherokee.

**B.     Jesse Arambula**

186.   The following causes of action apply to Jesse Arambula:

## COUNT I
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301 *ET SEQ.*)

187.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

188.    The Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

189.    The Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

190.    The Plaintiff's Defective Shifter Vehicle is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

191.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

192.    The Defendant's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Plaintiff's Defective Shifter Vehicle's implied warranties are covered under 15 U.S.C. § 2301(7).

193.    The Defendant breached these warranties, as described in more detail above. Without limitation, the Plaintiff's Defective Shifter Vehicle is equipped with a Defective Shifter that does nothing of the sort and puts vehicle occupants'

safety in jeopardy. The Plaintiff's Defective Shifter Vehicle shares a common design defect with other Defective Shifter Vehicles, in that the Defective Shifter is defectively designed and unsafe, contrary to the Defendant's representations about its vehicles.

194. The Plaintiff has had sufficient direct dealings with either the Defendant or its agents (*e.g.* dealerships and technical support) to establish privity of contract between himself and the Defendant. Nonetheless, privity is not required here because the Plaintiff is an intended third-party beneficiary of contracts between the Defendant and its dealers, and specifically, of the Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Defective Shifter Vehicles and have no rights under the warranty agreements provided with the Defective Shifter Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

195. Affording the Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. The Defendant, having had over two years to provide a suitable repair and redesign for the Defective Shifters, has done nothing but send a letter to registered owners of Defective Shifter Vehicles and offer a software patch, supposedly installing an "auto park" function to prevent rollaways, that does not adequately address the underlying

defects of the Defective Shifter or the numerous related hazards it causes the consumer.

196.   At the time of sale of the Plaintiff's Defective Shifter Vehicle, the Defendant knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Defective Shifter Vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that the Plaintiff resort to an informal dispute resolution procedure and/or afford the Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

197.   The Plaintiff would suffer economic hardship if he returned his Defective Shifter Vehicle but did not receive the return of all payments made by him. Because the Defendant is refusing to acknowledge any revocation of acceptance and immediately return any payments made, the Plaintiff has not re-accepted his Defective Shifter Vehicle by retaining it.

198.   The amount in controversy of the Plaintiff's claim meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of the claims to be determined in this lawsuit.

199.   The Plaintiff hereby seeks all damages permitted by law, including diminution in value of his Defective Shifter Vehicle, in an amount to be proven at trial.

## COUNT II
## VIOLATION OF INDIANA'S DECEPTIVE CONSUMER SALES ACT
### (IC § 24-5 *ET SEQ.*)

200.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

201.   The Plaintiff is a "consumer" within the meaning of Indiana's Deceptive Consumer Sales Act, IC § 24-5 *et seq.* ("DCSA"). The Defendant is a "supplier" as defined by the DCSA. The Plaintiff's purchase of the Defective Shifter Vehicle was a "consumer transaction" as defined by the DCSA.

202.   The DCSA forbids a supplier to "commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." IC § 24-5-0.5-3(a). It is considered a "deceptive act" under the DCSA for a supplier to represent, orally, in writing, or electronically, "[t]hat such subject of a consumer transaction has…performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have," and "[t]such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that is it not." IC § 24-5-0.5-3(b)(1)-(2).

- 63 -

203.   The DSCA defines an "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." IC § 24-5-0.5-2(a)(8).

204.   By willfully failing to disclose and actively concealing the defective Defective Shifter, the Defendant engaged in incurable deceptive acts prohibited by the DSCA, including (1) representing that the Plaintiff's Deceptive Shifter Vehicle had characteristics, uses, accessories, and benefits which it does not have; (2) representive that the Plaintiff's Defective Shifter Vehicle was of a particular standard, quality, or grade when it is not; (3) advertising the Plaintiff's Defective Shifter Vehicle with the intent not to sell it or other such Defective Shifter Vehicles as advertised; and (4) engaging in unconscionable, abusive acts and practices which were unfair, misleading, false, and deceptive to the Plaintiff.

205.   In the course of its business, the Defendant willfully failed to disclose and actively concealed the Defective Shifter discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive. The Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact, with the intent that the Plaintiff rely on such concealment, suppression, or omission, in connection with the sale of the Plaintiff's Defective Shifter Vehicle.

206.   The Defendant knew it had installed a Defective Shifter and knew that the Defective Shifter did not operate safely, as advertised. The Defendant knew this for at least 2 years, but concealed all of that information.

207.   The Defendant was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States, including the vehicle the Plaintiff purchased, that did not perform as advertised and jeopardized the safety of the vehicle's occupants. The Defendant concealed this information as well.

208.   By failing to disclose that the Defective Shifter did not operate safely and did not include a safety override to prevent rollaway incidents, by marketing its vehicles—including the vehicle the Plaintiff purchased—as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, the FCA engaged in incurable deceptive consumer sales in violation of the Indiana Deceptive Consumer Sales Act.

209.   The Defendant's incurable deceptive acts and practices were likely to and did in fact deceive the Plaintiff, a reasonable consumer, about the true performance of the Defective Shifter Vehicle he purchased with the Defective Shifter, the quality of the Defendant's brand, the Defendant's devaluing of safety and performance, and the true value of the Plaintiff's Defective Shifter Vehicle.

- 65 -

210.   The Defendant intentionally and knowing misrepresented material facts regarding the Defective Shifter Vehicles, with an intent to mislead the Plaintiff.

211.   The Defendant knew or should have known that its conduct violated the Indiana Deceptive Consumer Sales Act.

212.   As alleged above, the Defendant made material statements about the safety and utility of the Defective Shifter Vehicles—including the vehicle the Plaintiff purchased—and the Defendant's brand that were either false or misleading.

213.   The Defendant owed the Plaintiff a duty to disclose the true safety, performance, and reliability of his Defective Shifter Vehicle, and the Defendant's devaluing of safety and performance, because the Defendant (a) possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised; (b) intentionally concealed the foregoing from the Plaintiff; and (c) made incomplete representations of the Defective Shifter Vehicles generally, and the Defective Shifter in particular, while purposefully withholding material facts from the Plaintiff that contradicted these representations.

- 66 -

214.  Because the Defendant fraudulently concealed the Defective Shifter and the true performance of the Defective Shifter Vehicle with Defective Shifter, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Defective Shifter Vehicles has greatly diminished. In light of the stigma attached to those vehicles by the Defendant's conduct, they are now worth significantly less than they otherwise would be.

215.  As a result of its violations of the DCSA as detailed above, the Defendant caused actual damage to the Plaintiff and, if not stopped, will continue to harm the Plaintiff. The Plaintiff currently owns a Defective Shifter Vehicle, and defects associated with the Defective Shifter have caused the value of Defective Shifter Vehicles to decrease.

216.  The Plaintiff thereby sustained damages as a result of the Defendant's unlawful acts, and is therefore entitled to damages and other relief as provided under the DCSA.

217.  The Plaintiff also seeks attorneys' fees as a result of the Defendant's violations of the DCSA, as provided in IC § 24-5-0.5-4(a).

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(IC § 26-1-2-314)**

218.  Plaintiff incorporates and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

219.   The Defendant is and was at all relevant times a merchant with respect to motor vehicles.

220.   A warranty that the Plaintiff's Defective Shifter Vehicle was in merchantable condition is implied by law in the instant transaction. The Plaintiff's Defective Shifter Vehicle, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for which cars are used. Specifically, the Plaintiff's Defective Shifter Vehicle is inherently defective in that the Defective Shifter system was not adequately designed, manufactured, and tested, and does not include a safety override to prevent rollaway incidents.

221.   The Defendant was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like the Defendant routinely monitor—before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

222.   As a direct and proximate result of the Defendant's breach of the warranties of merchantability, the Plaintiff has been damaged in an amount to be proven at trial.

## COUNT IV
## BREACH OF CONTRACT UNDER INDIANA LAW

223.   The Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

224.  The Defendant's misrepresentations and omissions alleged herein, including its failure to disclose a defect in the Defective Shifter, caused the Plaintiff to purchase his Defective Shifter Vehicle. Absent those misrepresentations and omissions, the Plaintiff would not have purchased this Defective Shifter Vehicle at the price he paid, and/or would have purchased a less expensive alternative vehicle that did not contain a Defective Shifter. Accordingly, the Plaintiff overpaid for his Defective Shifter Vehicle and did not receive the benefit of his bargain.

225.  Each and every sale or lease of a Defective Shifter Vehicle by an authorized FCA dealer constitutes a contract between the Defendant and purchaser or lessee. The Defendant breached such a contract with the Plaintiff by selling him a Defective Shifter Vehicle and by misrepresenting and failing to disclose the existence of the defective design, including information known to the Defendant, rendering the Plaintiff's Defective Shifter Vehicle less safe and thus less valuable than a vehicle not equipped with a Defective Shifter.

226.  As a direct and proximate result of the Defendant's breach of contract, the Plaintiff has thereby been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages proven by law.

## COUNT V
## UNJUST ENRICHMENT

227.   The Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

228.   The Defendant has received and retained a benefit from the Plaintiff and inequity has resulted.

229.   The Defendant benefited from selling the Plaintiff a defective car whose value was artificially inflated by their concealment of the Defective Shifter at a profit, and the Plaintiff thus overpaid for his vehicle and was forced to pay other costs.

230.   The Plaintiff thus conferred a benefit on the Defendant which it is inequitable for the Defendant to retain.

231.   The Plaintiff was not aware of the true facts about his Defective Shifter Vehicle, and did not benefit from the Defendant's conduct.

232.   The Defendant knowingly accepted the benefits of its unjust conduct.

233.   As a result of the Defendant's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## COUNT VI
## PERSONAL INJURY

234.   The Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

235.   As described above in "Section IV: Parties" (Paragraphs 11-20) of this Complaint, the Plaintiff was severely injured due to the Defective Shifter in his vehicle failing to place the vehicle in park when the Plaintiff reasonably believed it to be in park, and thereby causing his vehicle to roll backwards and run over his right leg.

236.   The Plaintiff thereby suffered the personal injuries described in Paragraph 88 of this Complaint and all associated costs, including but not limited to medical expenses, lost wages, and costs associated with his pain, suffering, and ongoing mobility impairment and injury-related disruption of ordinary work and life activities.

237.   The Plaintiff's injuries are directly and proximately caused by the failure of the Defective Shifter on his Defective Shifter Vehicle, and would never have occurred had he not been misled by the Defendant's behavior as described above into purchasing and driving a Defective Shifter Vehicle.

238.   As a direct and proximate result of the Defendant's actions, the Plaintiff has thereby been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages proven by law.

**C.    Gloria Levy**

239.   The following causes of action apply to Gloria Levy:

## COUNT I
## NEGLIGENCE

240.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

241.   FCA, as a designer, manufacturer, and seller of the Levy Jeep Grand Cherokee owed Plaintiff and Ms. Levy a duty to exercise reasonable care to prevent the Levy Jeep Grand Cherokee from creating an unreasonable risk of harm to Ms. Levy, a person reasonably expected to use the Levy Jeep Grand Cherokee by FCA and who did so in a manner which FCA might have reasonably expected.

242.   The Levy Jeep Grand Cherokee was defective because FCA failed to exercise reasonable care in order to prevent the Levy Jeep Grand Cherokee from creating an unreasonable risk of harm. FCA's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, and/or sold the Levy Jeep Grand Cherokee.

243.   FCA's negligent acts include but are not limited to:

    a.    negligently designing the Levy Jeep Grand Cherokee;

    b.    negligently designing and incorporating, among other components, a defective electronic shifter;

    c.    failing to exercise reasonable care to prevent the Levy Jeep Grand Cherokee from creating an unreasonable risk of harm to the person or property of one who might reasonably be expected to use the Levy Jeep Grand Cherokee in a foreseeable manner;

d.    manufacturing an unsafe product, the Levy Jeep Grand Cherokee;

e.    failing to warn the consumer of the risk of harm or injury where a reasonably careful person would have done so under the circumstances;

f.    failing to incorporate safer alternative designs and formulations during the design and manufacture of the Levy Jeep Grand Cherokee that were practicable and would have eliminated the unsafe nature of the Levy Jeep Grand Cherokee without impairing its usefulness;

g.    failing to adequately test the Levy Jeep Grand Cherokee before retail sale; and

h.    failing to adequately inspect, during the manufacture and fabrication, the Levy Jeep Grand Cherokee.

244.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, which would have better protected occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

245.   The risk of rollaway was known or knowable to FCA in light of the recognized and prevailing scientific and technical knowledge available at the time of manufacture.

246.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Levy Jeep Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

247.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Levy Jeep Grand Cherokee on January 23, 2017, when Ms. Levy was attempting to exit the Levy Jeep Grand Cherokee and the vehicle failed catastrophically.

248.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific risk of harm and unapparent risk of harm involved in any intended or reasonably expected use.

249.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific and unapparent risk of harm involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

250.   As a direct and proximate result of Defendant's breach of its duties, Ms. Levy sustained life ending injuries, damages, and losses that were caused by FCA's negligence while the Levy Jeep Grand Cherokee was being used in a manner FCA should reasonably have expected.

## COUNT II
## BREACH OF EXPRESS WARRANTY

251.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

252.   FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws Ann. 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

253.   The Levy Jeep Grand Cherokee is and was at all relevant times a "good" within the meaning of Mich. Comp. Laws Ann. 440.2105(1) and 440.2803(1)(h).

254.   In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first.  This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has, since the 2016 model year reduced, its powertrain warranty to five years or 60,000 miles).

255.   FCA's warranties formed the basis of the bargain that was reached when Plaintiff's family purchased the Levy Jeep Grand Cherokee.

256.   Plaintiff experienced defects within the warranty period.  Despite the existence of warranties, FCA failed to inform Plaintiff's family that the Levy Jeep Grand Cherokee was defectively designed, and failed to fix the defectively designed Defective Shifter free of charge.

257.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Levy Jeep Grand Cherokee's materials and workmanship defects.

258.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

259.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff whole, and because FCA has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

260.   Accordingly, recovery by Plaintiff is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiff, seeks all remedies as allowed by law.

261.   Also, as alleged in more detail herein, at the time FCA warranted and sold the Levy Jeep Grand Cherokee, it knew that the Levy Jeep Grand Cherokee did not conform to FCA's warranties and was inherently defective and FCA wrongfully and fraudulently concealed material facts regarding the Levy Jeep Grand Cherokee.  Plaintiff's family was therefore induced to purchase or lease the Levy Jeep Grand Cherokee under false and/or fraudulent pretenses.

262.   Moreover, many of the injuries flowing from the Levy Jeep Grand Cherokee cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein.  Due to FCA's failure and/or continued failure to provide such limited remedy within a reasonable time, any limitation on Plaintiff's remedies would be insufficient to make Plaintiff whole.

263.   FCA was provided notice of these issues by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

264.   As a direct and proximate result of FCA's breach of warranty, Plaintiff, Ms. Levy and Ms. Levy's family and beneficiaries have sustained injuries and damages as described in this complaint.

## COUNT III
## BREACH OF IMPLIED WARRANTY AS TO MERCHANTABILITY

265.   Plaintiff incorporates and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

266.   At all material times, FCA was a merchant with respect to the Levy Jeep Grand Cherokee within the meaning of Mich. Comp. Laws § 440.2314(1).

267.   Under Mich. Comp. Laws § 440.2314, a warranty that the Levy Jeep Grand Cherokee was in merchantable condition was implied by law in the

transactions when Plaintiff and her family purchased the Levy Jeep Grand Cherokee.

268.   The Levy Jeep Grand Cherokee was defectively designed and manufactured, and was distributed and sold without the provision of reasonable instructions or warnings regarding the foreseeable risk of harm posed by the Levy Jeep Grand Cherokee. The Levy Jeep Grand Cherokee, when sold and at all times thereafter, was not in merchantable condition and was not fit for its ordinary purpose.

269.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routine monitor—before or within a reasonable amount of time after the allegations before allegations of the defect became public.

270.   As a direct and proximate result of FCA's breach of warranties of merchantability, Plaintiff, Ms. Levy and Ms. Levy's family and beneficiaries have sustained injuries and damages as described in this complaint.

**D.    George Likitsakos**

271.   The following causes of action apply to George Likitsakos:

**COUNT I**
**NEGLIGENCE RESULTING IN PERSONAL INJURY**

272.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

273.    FCA, as a designer, manufacturer, and seller of the Likitsakos Jeep Grand Cherokee owed Plaintiff a duty to exercise reasonable care to prevent the Likitsakos Jeep Grand Cherokee from creating and unreasonable risk of harm to Plaintiff, who used the Likitsakos Jeep Grand Cherokee in the manner which FCA might have reasonably expected.

274.    FCA, as a designer, manufacturer, and seller of the Grand Cherokee, owed Plaintiff a duty to exercise reasonable care to warn Grand Cherokee purchasers of its unreasonably dangerous and defective condition.

275.    The Likitsakos Jeep Grand Cherokee was defective because FCA failed to exercise reasonable care in order to prevent the Likitsakos Jeep Grand Cherokee from creating an unreasonable risk of harm. FCA's failures occurred when it manufactured, designed, engineered, developed, tested, approved, inspected, repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, and sold the Likitsakos Jeep Grand Cherokee.

276.    FCA negligent acts include but not limited to:

    a.  negligently designing the Likitsakos Jeep Grand Cherokee;

    b.  negligently designing and incorporating, among other components, a defective electronic shifter;

    c.  failing to exercise reasonable care to prevent the Likitsakos Jeep Grand Cherokee from creating an unreasonable risk of

harm to the person or property of one who might reasonably be

expected to use the Likitsakos Jeep Grand Cherokee in a

foreseeable manner;

d.  manufacturing an unsafe product, the Likitsakos Jeep Grand

Cherokee;

e.  failing to take reasonable care to warn the consumer of the risk

of harm or injury where a reasonably careful person would have

done so under the circumstances;

f.  failing to incorporate safer alternative designs and formulations

during the design and manufacture of the Likitsakos Jeep Grand

Cherokee that were practicable and would have eliminated the

unsafe nature of the Likitsakos Jeep Grand Cherokee without

impairing its usefulness;

g.  failing to adequately test the Likitsakos Jeep Grand Cherokee

before retail sale;

h.  inadequately inspecting the vehicle during the manufacture and

fabrication of the Likitsakos Jeep Grand Cherokee; and

i.  failing to recall and remove the Likitsakos Jeep Grand

Cherokee from the stream of commerce before it malfunctioned

during Plaintiff's use.

277.   George is a person who FCA should have reasonably expected to use and be affected by a defect in the Likitsakos Jeep Grand Cherokee.

278.   FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, and that would better protect occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

279.   The risk of roll-away was known or knowable to FCA in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture.

280.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Likitsakos Jeep Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

281.   FCA's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Likitsakos Jeep Grand Cherokee on March 30, 2016, when George Likitsakos was attempting to exit the Likitsakos Jeep Grand Cherokee and the vehicle failed catastrophically.

282.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific risk of harm and unapparent risk of harm involved in any intended or reasonably expected use.

283.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific and unapparent risk of harm involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

284.   As a direct and proximate result of Defendant's breach of the aforementioned duty, George Likitsakos has sustained injuries, damages, and losses that were caused by FCA's negligence while the Likitsakos Jeep Grand Cherokee was being used in a reasonably foreseeable manner.

285.   Because the acts and/or omissions of Defendant were either committed by or authorized, ratified, or otherwise approved in a deliberate, cold, callous, malicious, intentional, and/or unreasonable manner, as fully set forth herein, causing injury and damages to Plaintiff, and were done with a conscious disregard of Plaintiff's rights and safety, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish or set an example of them.

## COUNT II
## STRICT LIABILITY: PRODUCT LIABILITY

286.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

287.   Defendant is a manufacturer, designer, developer, processor, producer, assemblers, builder, tester, inspector, installer, equipper, endorser, exporter, wholesaler, retailer, lessor, renters, seller, modifier, servicer, repairer, provider, and otherwise distributor of the Likitsakos Jeep Grand Cherokee.

288.   Defendant leased the Likitsakos Jeep Grand Cherokee, of which George was listed as the primary driver.

289.   The Likitsakos Jeep Grand Cherokee was expected to reach the user or consumer, including George Likitsakos, without substantial change in the condition in which it was sold.

290.   The Likitsakos Jeep Grand Cherokee was placed in the stream of commerce and reached George Likitsakos without substantial change in the condition in which it was manufactured. George Likitsakos is a person who reasonably would be expected to use or be affected by the Likitsakos Jeep Grand Cherokee.

291.   The Likitsakos Jeep Grand Cherokee was defective. These defects include, but are not limited to, the design and incorporation of a defective shifter.

292.   Under entirely foreseeable and predictable operating conditions, such as those of George Likitsakos's at the time of the Likitsakos Jeep Grand Cherokee's failure, the Likitsakos Jeep Grand Cherokee should not fail.

293.   When the Likitsakos Jeep Grand Cherokee unexpectedly failed, it did so as a result of the design defects that existed within the Likitsakos Jeep Grand Cherokee at the time it was manufactured.

294.   Defendant knew or should have known of the defective design of the Likitsakos Jeep Grand Cherokee and that the Likitsakos Jeep Grand Cherokee was unreasonably dangerous.

295.   Because of the Likitsakos Jeep Grand Cherokee's defects, the Likitsakos Jeep Grand Cherokee was unreasonably dangerous to George Likitsakos, who might be reasonably expected to use or be affected by the Likitsakos Jeep Grand Cherokee.

296.   The Likitsakos Jeep Grand Cherokee was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property that would not ordinarily be expected.

297.   The Likitsakos Jeep Grand Cherokee was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property that is not outweighed by the benefits to be achieved by such design.

298.   Even when the Likitsakos Jeep Grand Cherokee and Defective Shifter perform exactly as intended by FCA, the vehicle is unreasonably dangerous.

299.   The Likitsakos Jeep Grand Cherokee was defective at the time Defendant sold it or when it left Defendant's control.

300.   The defects in design and inspection made the Likitsakos Jeep Grand Cherokee unreasonably dangerous, unfit, and unsafe for its intended use and caused the Likitsakos Jeep Grand Cherokee to fail to perform as an ordinary user would expect when used in its intended and foreseeable manner.

301.   George Likitsakos was a person who would reasonably be expected to use or be affected by the Likitsakos Jeep Grand Cherokee.

302.   The Likitsakos Jeep Grand Cherokee was not assembled properly and reached George Likitsakos in a condition unreasonably susceptible to failure.

303.   As a direct and proximate result of the defect in the Grand Cherokee's design and manufacture, George Likitsakos has sustained injuries, damages, and loss.

304.   Defendant is strictly liable to George Likitsakos for the injuries and damages caused by the above defects and inadequacies in the design and manufacture of the Likitsakos Jeep Grand Cherokee.

305.   In the alternative, Defendant is a "manufacturer" of the Likitsakos Jeep Grand Cherokee under Michigan law because it is the apparent manufacturer of the Likitsakos Jeep Grand Cherokee.

306.   When it placed the Likitsakos Jeep Grand Cherokee into the stream of commerce through advertising, distribution, and sale of the Likitsakos Jeep Grand Cherokee, Defendant conveyed to the public, including George Likitsakos, that it had designed, manufactured, marketed, and sold the Likitsakos Jeep Grand Cherokee as its own.

307.   George Likitsakos reasonably relied upon Defendant's care in designing and manufacturing the Grand Cherokee.

308.   George Likitsakos reasonably relied upon Defendant's assurance to him that the Likitsakos Jeep Grand Cherokee was designed and manufactured without defect.

309.   Defendant placed its private label on the Likitsakos Jeep Grand Cherokee with the intent of its private label carrying some weight of quality assurance.

310.   Defendant placed its private label on the Likitsakos Jeep Grand Cherokee to capitalize upon and preserve Defendant's goodwill with the public, including Plaintiff.

311.   Defendant's placement of the private label was made for Defendant's benefit.

312.   Defendant's placement of the private label left Plaintiff ignorant of who manufactured the Likitsakos Jeep Grand Cherokee.

313.   The Likitsakos Jeep Grand Cherokee entered into the stream of commerce under Defendant's name. Defendant did not place any other name on the Likitsakos Jeep Grand Cherokee indicating that any other person, firm, or entity was the designer or manufacturer of the Grand Cherokee. Defendant's placement of its private label on the Likitsakos Jeep Grand Cherokee is sufficient to impose strict liability upon Defendant.

314.   As a direct and proximate result of Defendant placing its private label on the Likitsakos Jeep Grand Cherokee without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Likitsakos Jeep Grand Cherokee, George Likitsakos has sustained injuries, damages, and loss.

315.   Defendant is strictly liable to George Likitsakos for the injuries and damages caused by Defendant's placement of its private label on the Likitsakos Jeep Grand Cherokee without disclosing if any other persons, firms, or entities were involved in the design or manufacture of the Likitsakos Jeep Grand Cherokee.

316.   Because the acts and/or omissions of Defendant were either committed by or authorized, ratified, or otherwise approved in a deliberate, cold, callous, malicious, intentional, and/or unreasonable manner, as fully set forth herein, causing injury and damages to Plaintiff, and were done with a conscious disregard of Plaintiff's rights and safety, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish or set an example of them.

**E.    Michael Mannarino**

317.   The following causes of action apply to Michael Mannarino:

**COUNT I**
**STRICT LIABILITY**

318.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

319.   Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, Defendants FCA US LLC, ROCKAWAY CHRYSLER DODGE JEEP RAM AND ZF NORTH AMERICA, INC., and JOHN DOES 1-100 and each of them, were manufacturers, designers, developers, processors, producers, assemblers, builders, testers, inspectors, installers, warners, equippers, endorsers, exporters, wholesalers, retailers, renters, sellers, lessors, modifiers, servicers, repairers, providers, and/or distributors of the Subject Vehicle as well as the Subject Gear Selector used in the Subject Vehicle.

320. Plaintiffs are informed and believe and, based upon such information and belief, allege that the Subject Vehicle and the Subject Hear Selector in the Subject Vehicle was defective at the time of its manufacture, design, development, production, assembly, building, testing, inspection, installation, equipping, endorsement, exportation, importation, wholesaling, retailing, selling, renting, leasing, modification, service, repair and entrustment.

321. Plaintiffs are informed and believe and, based upon such information and belief, allege that the Subject Vehicle along with the Subject Gear Selector failed to meet the reasonable expectations of safety for the class of persons of which Decedent and Plaintiff were members.

322. Plaintiffs are informed and believe and, based upon such information and belief, allege that any benefits derived from the design of the Subject Vehicle and/or Subject Gear Selector were substantially outweighed by the risk of harm inherent in said design in that, and not by way of limitation, despite the availability to defendants of safer alternative designs, said defective Subject Vehicle and/or Subject Hear Selector presented a substantial and unreasonable risk of injury and/or death to the users of the Subject Vehicle or those in the vicinity of the Subject Vehicle.

323. Specifically, Plaintiffs are informed and believe and based upon such information and belief, allege that the said Subject Vehicle and Subject Gear

Selector were defective in their design, construction, assembly and manufacture and dangerous to life and limb of the users and occupants thereof, in that, among other things and not by way of limitation, the Subject Vehicle and Subject Gear Selector were so poorly designed and manufactured that they failed to maintain their integrity under normal operating conditions, including the subject incident. The aforementioned defects created a substantial danger which was unknown to Decedent and Plaintiff and to the public in general, and would not be recognized by the original user, and the Defendants and each of them failed to give adequate warning of such danger.

324.   Plaintiffs are informed and believe and, based upon such information and belief, allege that prior to the sale and distribution of said Subject Vehicle, Defendants FCA US LLC, ROCK.AWAY CHRYSLER DODGE JEEP RAM AND ZF NORTH AMERICA, INC., and JOHN DOES 1-100 knew the Subject Vehicle and/or Subject Gear Selector were in a defective condition as previously described. Further, said Defendants, through their officers, directed and managing agents, had prior notice and knowledge of the defects and/or defective design of Subject Vehicle and Subject Gear Selector and that these defects and/or defective design presented a substantial and unreasonable risk of harm to the American motoring public, including decedent MICHAEL MANNARINO and Plaintiffs in that said defects and/or defective design unreasonably subjected vehicle operators

and/or occupants to injury and death as a result of failure in the event of foreseeable motor use and misuse. Defendants' prior notice and knowledge arose from several sources, including but not limited to multiple tests, investigations, and test results available prior to the date of said accident, internal memoranda and correspondence, industry publications, as well as notice of multiple injuries and hundreds of complaints caused by the design of the Subject Vehicle and Subject Gear Selector.

325.   Additionally, Plaintiffs are informed and believe and, based upon such information and belief, allege that Defendants, and each of them, had unfettered ability, after years of extensive in-house, government, and independent testing to minimize the substantial risk of serious bodily harm or death caused by the Subject Vehicle and Subject Gear Selector by redesigning or warning of the potential for serious risk or harm, thereby minimizing or eliminating said potential. But Defendants consciously chose not to take steps to exercise that ability, including but not limited to, providing proper design and manufacturing provisions, and Defendants' failure to take such steps allowed Defendants to save money, avoid loss of sales, and repair and recall costs. Defendants' acts prevented the public from becoming aware that the defects in the Subject Vehicle and Subject Gear Selector were, in reality, unsafe, dangerous, and defective, and/or prevented the public from realizing the extent of danger presented by the defects, thereby causing

the injuries, death, and damages to Decedent and Plaintiffs. In addition, Plaintiffs are informed and believe and thereon allege that the aforementioned malfeasance, nonfeasance, defects, failure to warn, were done with the advanced knowledge, authorization, approval and ratification of officers, directors and/or managing agents of the aforesaid Defendants,

326.    Plaintiffs are informed and believe and, based upon such information and belief, allege that Defendants, and each of them, failed to timely admit that the Subject Vehicle and Subject Gear Selector were defectively designed and/or manufactured, and unreasonably delayed in issuing an effective recall of the Subject Vehicle.

327.    As a further proximate result of the acts of defendants, and each of them, and due to the dangerous conditions as alleged, Plaintiffs have incurred substantial funeral and burial expenses.

328.    As a proximate result of the above-described conduct of Defendants, and each of them, the Plaintiffs have and will, suffer the loss of Decedent's love, companionship, guidance, comfort, society, moral support, financial support and physical assistance, all to their general damages, in a sum to be proven at time of trial.

329.    Defendants FCA US LLC, ROCKAWAY CHRYSLER DODGE JEEP RAM AND ZF NORTH AMERICA, INC, and JOHN DOES 1-100 their acts and/or

omissions were either committed by or authorized, ratified, or otherwise approved in a deliberate, cold, callous, malicious, intentional, and/or unreasonable manner, as fully set forth herein, causing injury and damages to Plaintiffs, and the death of MICHAEL MANNARINO, and were done with a conscious disregard of Plaintiffs' and Decedent's rights and safety, Plaintiffs request the assessment of punitive damages against Defendants in an amount appropriate to punish or set an example of them.

## COUNT II
## NEGLIGENT PRODUCT LIABILITY

330.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

331.   Plaintiffs are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, Defendants, and each of them, had a duty not to unreasonably manufacture, develop, design, process, produce, assemble, build, test, inspect, install, warn, equip, endorse, export, import, wholesale, retail, sell, lease, rent, modify, service, repair, or entrust said Subject Vehicle and Subject Gear Selector.

332.   Plaintiffs are informed and believe and, based upon such information and belief, allege that said Defendants, and each of them, breached their duty to Decedent MICHAEL MANNARINO and plaintiffs, thereby causing injuries, death, and damages as herein described, More specifically, Defendants, and each of them

acted unreasonably in designing, installing, selling, manufacturing, and marketing products which presented a substantial and unreasonable risk of injury or death to vehicle occupants, including Decedent MICHAEL MANNARINO and Plaintiffs, and in failing to warn of such dangers.

333.   Plaintiffs are informed and believe and, based upon such information and belief, allege that, at all relevant times herein mentioned, Defendants, and each of them, breached their duty of ordinary care of skill in that they negligently, wantonly, carelessly, recklessly and/or unlawfully installed, service, tested, inspected, maintained, modified, changed, designed and manufactured and furnished the defective Subject Vehicle and Subject Gear Selector so as to cause, permit and/or allow the same to be in a dangerous, defective, unguarded and unsafe condition, and such acts and/or omissions were a substantial factor contributing to the injuries suffered by Plaintiffs and the death of MICHAEL MANNARINO, as herein alleged.

334.   Plaintiffs are informed and believe and, based upon such information and belief, allege that the negligence of said Defendants, and each of them, was a substantial factor in causing the injuries, death, and damages herein alleged.

335.   As a further proximate result of the acts and omissions of Defendants, and each of them, and due to the dangerous conditions as alleged, Plaintiffs have incurred funeral and burial expenses and will continue to incur other cost related expenses, the total amount of such expenses arc not known to Plaintiffs at this time

and Plaintiffs will move to amend this complaint to state such amount when the same becomes known to them, or on proof thereof.

336.   As a proximate result, of the above-described conduct of Defendants, and each of them, the Plaintiffs have and will, suffer the loss of Decedent MICHAEL MANNARINO's consortium, love, companionship, guidance, comfort, society, solace, moral support, all to their general damages, in a sum to be proven at time of trial.

337.   Because the acts and/or omissions of Defendants FCA US LLC, ROCKAWAY CHRYSLER DODGE JEEP RAM AND ZF NORTH AMERICA, INC., and JOHN DOES 1-100 were either committed by or authorized, ratified, or otherwise approved in a deliberate, cold, callous, malicious, intentional, and/or unreasonable manner, as fully set forth herein, causing injury and damages to Plaintiffs, and the death of MICHAEL MANNARINO, and were done with a conscious disregard of Plaintiffs' and Decedent's rights and safety, Plaintiffs request the assessment of punitive damages against Defendants in an amount appropriate to punish or set an example of them.

## COUNT III
## NEGLIGENCE (WRONGFUL DEATH AND PERSONAL INJURY)

338.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

339.   Plaintiffs are informed and believe, and thereupon allege, that at said time and place, Defendants FCA US LLC, ROCKAWAY CHRYSLER DODGE JEEP RAM, ZF NORTH AMERICA, INC., and JOHN DOES 1-100 inclusive, and each of them negligently, recklessly and carelessly manufactured, designed, developed, processed, produced, assembled, built, tested, inspected, installed, warned, equipped, endorsed, exported, wholesaled, retailed, lessors, rented, sold, modified, serviced, repaired, installed, provided, and/or otherwise. distributed the Subject Vehicle and Subject Gear Selector, which malfunctioned and caused the Subject Vehicle to roll away and strike MICHAEL MANNARINO, resulting in his untimely death.

340.   Defendants, and each of them, knew or should have known that it was likely that a person such as Decedent MICHAEL MANNARINO would use the Subject Vehicle in a reasonably foreseeable manner and would suffer serious injuries and even death because of the defect(s) of the Subject Vehicle and Subject Gear Selector.

341.   As a direct and proximate result of the conduct of Defendants, and each of them, MICHAEL MANNARINO sustained severe injuries which resulted in his untimely death.

342.   As a further proximate result of the acts of defendants, and each of them, and due to the dangerous condition as alleged, Plaintiffs have incurred funeral

and burial expenses and will continue to incur other cost related expenses, the total amount of such expenses arc not known to Plaintiffs at this time and plaintiffs will to amend this complaint to state such amount when the same becomes known to them, or on proof thereof.

343. Because the acts and/or omissions of Defendants FCA US LLC, ROCKAWAY CHRYSLER DODGE JEEP RAM AND ZF NORTH AMERICA, INC,, were either committed by, authorized, ratified, or otherwise approved in a deliberate, cold, callous, malicious, intentional, and/or unreasonable manner, as fully set forth herein, causing injury and damages to Plaintiffs, and the death of MICHAEL MANNARINO, and were done with a conscious disregard of Plaintiffs' and Decedent's rights and safety, Plaintiffs request the assessment of punitive damages against Defendants in an amount appropriate to punish or set an example of them.

**F.    Dena Scarso**

334. The following causes of action apply to Dena Scarso:

**COUNT I**
**NEGLIGENCE RESULTIGN IN PERSONAL INJURY**

344. Plaintiff incorporates and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

345. FCA, as a designer, manufacturer, and seller of the Scarso Jeep Grand Cherokee owed Plaintiff a duty to exercise reasonable care to prevent the Scarso

Jeep Grand Cherokee from creating an unreasonable risk of harm to Ms. Scarso, a

person reasonably expected to use the Scarso Jeep Grand Cherokee by FCA and

who did so in a manner which FCA might have reasonably expected.

346.   The Scarso Jeep Grand Cherokee was defective because FCA failed to

exercise reasonable care in order to prevent the Scarso Jeep Grand Cherokee from

creating an unreasonable risk of harm. FCA's failures occurred when it

manufactured, designed, engineered, developed, tested, approved, inspected,

repaired, labeled, advertised, promoted, marketed, distributed, wholesaled, and/or

sold the Scarso Jeep Grand Cherokee.

FCA's negligent acts include but are not limited to:

a.   Negligently designing the Scarso Jeep Grand Cherokee

b.   negligently designing and incorporating, among other
     components, a defective electronic shifter;

c.   failing to exercise reasonable care to prevent the Scarso
     Jeep Grand Cherokee from creating an unreasonable risk
     of harm to the person or property of one who might
     reasonably be expected to use the Scarso Jeep Grand
     Cherokee in a foreseeable manner;

d.   manufacturing an unsafe product, the Scarso Jeep Grand
     Cherokee;

e.   failing to warn the consumer of the risk of harm or injury
     where a reasonably careful person would have done so
     under the circumstances;

f.   failing to incorporate safer alternative designs and
     formulations during the design and manufacture of the
     Scarso Jeep Grand Cherokee that were practicable and

would have eliminated the unsafe nature of the Scarso
Jeep Grand Cherokee without impairing its usefulness;

g.     failing to adequately test the Scarso Jeep Grand Cherokee
before retail sale or lease; and

h.     failing to adequately inspect, during the manufacture and
fabrication, the Scarso Jeep Grand Cherokee.

347.   FCA knew or should have known in the exercise of reasonable care of

alternative designs that were technologically and economically feasible, which

would have better protected occupants from the negligently designed and

manufactured defects described above, but FCA chose not to incorporate these

alternative designs.

348.   FCA failed to provide adequate warnings or instructions that would

have informed an ordinary user of the specific and unapparent risk of harm

involved in any failure to properly follow instructions when using the product for

its intended and reasonably expected use.

349.   As a direct and proximate result of Defendant's breach of its duties,

Ms. Scarso sustained serious injuries, damages, and losses that were caused by

FCA's negligence while the Scarso Jeep Grand Cherokee was being used in a

manner FCA should reasonably have expected.

## COUNT II
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

350.   Plaintiff incorporates and adopts by reference all facts and allegations

contained in the preceding paragraphs as though specifically pled herein.

351.   FCA knew or should have known in the exercise of reasonable care that (1) the use of the Scarso Jeep Grand Cherokee may be harmful or injurious to the user, and (2) that risk of harm and injury was not obvious to the user.

352.   Defendant's inadequate actions, including its quality-control measures and inappropriate manufacturing practices and procedures, contributed to the failure of the Scarso Jeep Grand Cherokee on February 28, 2017, when Ms. Scarso was attempting to exit the Scarso Jeep Grand Cherokee and the vehicle failed catastrophically.

353.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific risk of harm and unapparent risk of harm involved in any intended or reasonably expected use.

354.   FCA failed to provide adequate warnings or instructions that would have informed an ordinary user of the specific and unapparent risk of harm involved in any failure to properly follow instructions when using the product for its intended and reasonably expected use.

355.   As a direct and proximate result of Defendant's breach of its duties, Ms. Scarso sustained serious injuries, damages, and losses that were caused by FCA's negligence while the Scarso Jeep Grand Cherokee was being used in a manner FCA should reasonably have expected.

356. As a result of Defendant's conduct, Plaintiff suffered severe physical harm.

357. As a lessee of the Scarso Jeep Grand Cherokee, Plaintiff was a foreseeable user of the Scarso Jeep Grand Cherokee.

358. As a result, Plaintiff has suffered physical symptoms including nightmares, anxiety, fear of driving, and depression.

## COUNT III
## STRICT LIABILITY: PRODUCT LIABILITY

359. Plaintiff incorporates and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

360. Defendant is an entity engaged in the business of manufacturing, leasing, and selling vehicles, including the Scarso Jeep Grand Cherokee.

361. Defendant is an entity that designed, assembled, fabricated, produced, constructed, prepared and leased the Scarso Jeep Grand Cherokee.

362. Defendant is a seller who had actual knowledge of a defect in the Scarso Jeep Grand Cherokee.

363. Defendant is a seller of the Scarso Jeep Grand Cherokee as it is an entity and manufacturer engaged in the business of selling or leasing vehicles, including the Scarso Jeep Grand Cherokee, for resale, use, or consumption.

364. Defendant leased the Scarso Jeep Grand Cherokee to Ms. Scarso for her personal use.

365.    The Scarso Jeep Grand Cherokee was placed in the stream of commerce and reached Ms. Scarso without substantial change in the condition in which it was manufactured.

366.    The Scarso Jeep Grand Cherokee was defective. These defects are outlined throughout this Complaint, but include the design and provision of a dangerous, defective shifter.

367.    Under entirely foreseeable and predictable operating conditions, such as those of Ms. Scarso's at the time of the Scarso Jeep Grand Cherokee's failure, the Scarso Jeep Grand Cherokee should not fail.

368.    When the Scarso Jeep Grand Cherokee unexpectedly failed, it did so as a result of the design defects that existed within the Scarso Jeep Grand Cherokee at the time it was manufactured.

369.    Defendant knew or should have known of the defective design of the Scarso Jeep Grand Cherokee and that the Scarso Jeep Grand Cherokee was unreasonably dangerous.

370.    Because of the Scarso Jeep Grand Cherokee's defects, the Scarso Jeep Grand Cherokee was unreasonably dangerous to Ms. Scarso, a person reasonably expected to use or be affected by the Scarso Jeep Grand Cherokee.

371.   The Scarso Jeep Grand Cherokee was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property that would not ordinarily be expected.

372.   The Scarso Jeep Grand Cherokee was unreasonably dangerous because of a defect in its design that created an unreasonable risk of harm to persons or property not outweighed by the benefits to be achieved by such design.

373.   Even when the Scarso Jeep Grand Cherokee and Defective Shifter perform exactly as intended by FCA, the vehicle is unreasonably dangerous.

374.   The Scarso Jeep Grand Cherokee was defective at the time Defendant sold it or when it left Defendant's control.

375.   As a direct and proximate result of the defect in the Scarso Jeep Grand Cherokee's design and manufacture, Ms. Scarso has sustained injuries and damages as described in this complaint.

**G.    Kimberly Ann Blythe and Gordon Blythe**

376.   The following causes of action apply to Kimberly Ann Blythe and Gordon Blythe:

**COUNT I**
**NEGLIGENCE**

377.   Plaintiffs incorporate and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

378.    At all times relevant and material hereto, Defendant was negligent in a manner which was a direct and proximate cause of the injuries suffered by Kimberly Blythe. Defendant committed unreasonable acts of omission and commission, which collectively and severally, constituted negligence. Such negligence was a proximate cause of the incident, and of the Plaintiffs' injuries and damages.

379.    The acts, omissions, and negligent failures of the Defendant which constitute negligence, include, but are not limited to, the following: the negligent design of the vehicle and negligent failure to warn of dangerous propensities, including potential electronic transmission shifter failure, failing to provide a proper transmission/gear shifter that prevents the vehicle from moving while the vehicle is in park, adequately designing a proper transmission/gear shifter and failing to adequately warn Kimberly Blythe of unreasonable dangers and risks of harm.

380.    Each of the above-described acts of negligence and/or negligence per se of Defendant, was a proximate cause of the occurrence in question, the injuries, and the damages suffered by Plaintiffs, for which they seek recovery in an amount in excess of the minimum jurisdictional limits of this Court.FCA knew or should have known in the exercise of reasonable care of alternative designs that were technologically and economically feasible, which would have better protected

occupants from the negligently designed and manufactured defects described above, but FCA chose not to incorporate these alternative designs.

## COUNT II
## STRICT PRODUCT LIABILITY – DESIGN MANUFACTURING AND MARKETING DEFECTS

381.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

382.   The 2014 Dodge Charger in question was originally designed, marketed, manufactured, sold and/or placed into the stream of commerce by Defendant.

383.   At the time of the sale of the vehicle in question, Defendant was in the business of designing, marketing, manufacturing, and selling vehicles such as the 2014 Dodge Charger in question, as well as similar other vehicles.

384.   The subject vehicle that caused the injuries to Kimberly Blythe was defectively designed, manufactured, marketed, assembled, and/or constructed by Defendant and unreasonably dangerous, defective, and otherwise unsafe for its intended purpose at the time it left the control of Defendant and at the time it was sold.

385.   The Defendant failed to design, manufacture, assemble, and/or construct the vehicle and the transmission/gear shifter to adhere to minimum and reasonable standards of safety.

386.   The Defendant failed to design, manufacture, assemble, and/or construct the vehicle and the transmission/gear shifter to where the failure of the vehicle and the transmission/gear shifter would have been prevented.

387.   The Defendant failed to take reasonable steps to make safe the defects and hazards described herein.

388.   The Defendant failed to warn Plaintiffs and other of these defects and safety hazards.

389.   Such defects were a producing and proximate cause of the incident made the basis of this suit, the injuries and damages sustained by Kimberly Blythe.

390.   Aside from normal wear and tear, the subject vehicle was in the same defective condition at the time of the incident as it was when it left the hands of Defendant.

391.   The vehicle was expected to, and in fact did, reach the user or consumer without substantial change in the condition in which it was sold.

392.   Technologically and economically feasible safer alternative designs existed that would have prevented or significantly reduced the risk of injury without substantially impairing the utility of the product. These safer alternative designs were economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge.

393.   Defects were present in the marketing of the vehicle at the time it left possession of Defendant that were a producing cause of the occurrence, injuries and/or Plaintiffs' damages.

394.   The vehicle was expected to, and in fact did, reach the user or consumer without substantial change in the condition in which it was sold.

395.   Defendant failed to give adequate warnings of the dangers that were known or by the application of reasonably developed human skill and foresight, should have been known or failed to give adequate instructions to avoid such dangers, which failure rendered the subject vehicle unreasonably dangerous as market.

396.   Defendant failed to give warnings and instructions in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the user of the subject vehicle.

397.   The above-described defects render the vehicle and transmission/gear shifter in question unreasonably and inherently dangerous.

## COUNT III
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, ET. SEQ.)

398.   Plaintiffs incorporate and adopt by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

399.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

400.   FCA is "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

401.   The defective shifter vehicle, Kimberly Blythe's 2014 Dodge Charger, is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

402.   Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

403.   FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). Kimberly Blythe's 2014 Dodge Charger's implied warranties are covered under Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

404.   FCA breached these warranties. Without limitation Kimberly Blythe's 2014 Dodge Charger is equipped with a defective Defective Shifter that puts the vehicle occupants' safety in jeopardy. Kimberly Blythe's 2014 Dodge Charger shares a common design defect in that the Defective Shifter is defectively designed and unsafe, contrary to FCA's representation about it vehicles.

405.   Kimberly Blythe is an intended third-party beneficiary of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealer was not intended to be the ultimate consumer of the 2014 Dodge Charger and has no rights under the warranty agreements provided with the vehicle; the warranty agreement was designed for and intended to benefit the consumer, Kimberly Blythe.

406.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. FCA has had over a year to provide a suitable repair for the Defective Shifters and FCA has done nothing but send a letter to registered owners of the defective vehicles.

407.   At the time of the sale of Kimberly Blythe's defective vehicle, her 2014 Dodge Charger, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the 2014 Dodge Charger's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.

408.   Kimberly Blythe would suffer additional economic hardship, in addition to her serious personal injuries, if she returned her 2014 Dodge Charger but did not receive the return of all payments made by her.

## COUNT IV
## BREACH OF WARRANTY

409.   Plaintiffs incorporate and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

410.   Plaintiffs allege that Defendant expressly and impliedly warranted to the public generally, and specifically to Kimberly Blythe, that the transmission/gear shifter was of a merchantable quality and was safe and fit for the purposes intended when used under ordinary conditions and in an ordinary manner. Contrary thereto, the transmission/gear shifter was not of merchantable quality or fit for its intended use, thereby rendering the transmission/gear shifter unreasonably dangerous and inherently dangerous.

411.   Plaintiffs would show that Defendant breached the implied warranties in the manner described above and in the improper marketing, failures to warn, and failures to instruct in the safe and proper methods of using the transmission/gear shifter. Defendant's breaches of these warranties and/or the above-mentioned defects render the transmission/gear shifter unreasonably and inherently dangerous, and a direct, proximate, and producing cause of the injuries and damages suffered by Plaintiffs. Defendant's conduct and breaches in these warranties were done knowingly.

## COUNT V
## TEXAS DECEPTIVE TRADE PRACTICES ACT ("DTPA") VIOLATIONS

412. Plaintiffs incorporate and adopts by reference all facts and allegations contained in the preceding paragraphs as though specifically pled herein.

413. Defendant expressly represented and warranted that the vehicle and transmission/gear shifter would be properly designed, manufactured, installed and connected so that the vehicle and transmission/gear shifter would not allow the vehicle to move while in a parked position and would be free of defects, built for Plaintiffs expectations, and fit for the particular purpose of its intended use.

414. Defendant violated DTPA Section 17.50(a)(1) by engaging in acts or practices in the conduct of its trade or commerce as specifically enumerated in, but not limited to, subsection (b) of Section 17.46 of the DTPA. Defendant's violations include, but are not limited to, the following:

> Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services in violation of Section 17.46(b)(2);

> Representing that goods or services have sponsorship, approval, characteristics, uses, and benefits, which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which he does not have in violation of Section 17.46(b)(5);

> Representing that goods or services are of a particular standard, quality or grade when they are of another in violation of Section 17.46(b)(7);

> Advertising goods or services with intent not to sell them as advertised in violation of Section 17.46(b)(9);

Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve in violation of Section 17.46(b)(12);

Knowingly making false or misleading statements of fact concerning the need for parts, replacement or repair services in violation of 17.46(b)(13); and

Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed in violation of 17.46(b)(24).

415.   Defendant violated DTPA Section 17.50(a)(2) by engaging in an unconscionable action or course of action by failing to build the premises free of defects and in a good workmanlike manner.

416.   Defendant violated DTPA Section 17.50(a)(2) by breach of an express warranty that the vehicle and transmission/gear shifter would be installed free of defects and in a good and workmanlike manner, when in fact the vehicle and transmission/gear shifter was not free of defects and was not designed, manufactured, or installed in a good and workmanlike manner.

## COUNT VI
## LOSS OF CONSORTIUM

417.   Plaintiffs, Kimberly and Gordon Blythe, were entitled to the full benefits of any normal husband-wife relationship. As a proximate result of the Defendant's negligent acts and/or omissions, Plaintiffs, Kimberly and Gordon Blythe, have suffered a loss and have been deprived of all those benefits to which

they would normally have been entitled. As a proximate result of the negligence of the Defendant and of the resulting injuries to Kimberly Blythe, Gordon Blythe has been deprived of the services of his wife by reason of her inability to carry on her usual duties as a wife. In reasonable probability, this loss will continue into the future, all to the damage of Gordon Blythe. There has been a substantial impairment of the marital relationship between Plaintiffs Kimberly and Gordon Blythe. Accordingly, Gordon Blythe has suffered, and is entitled by law to recover against Defendant for the serious loss of the affection, solace, comfort, companionship, society, and assistance that he previously received from his spouse in a sum in excess of the minimum jurisdictional limits of this Court.

## REQUEST FOR RELIEF

WEREFORE, Personal Injury Plaintiffs respectfully prays for judgment against Defendant FCA in an amount to be determined by the trier of fact for their losses, damages and harm, economic and noneconomic, for puntive and statutuory damages, and for all costs, attorneys fees, expert witness fees, filing fees, pre- and post-judgment interest, equitable and injunctive relief, and such other further relief as the Court may deem appropriate, just, and proper.

## DEMAND FOR JURY TRIAL

Personal Injury Plaintiffs demand a jury trial for all claims so triable.

Dated: March 15, 2019

Respectfully submitted,
**THE MILLER LAW FIRM, P.C.**

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
William Kalas (P82113)
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

*Plaintiffs' Lead Counsel and*
*Chair of Plaintiffs' Steering Committee*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Peter A. Muhic
Tyler S. Graden
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
pmuhic@ktmc.com
trgaden@ktmc.com

**HAGENS BERMAN SOBOL**
**SHAPIRO LLP**
Steve W. Berman
Sean R. Matt
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Christopher R. Pitoun
301 N. Lake Ave, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
Fax: (213) 330-7152
christopherp@hbsslaw.com

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson
Jason S. Kilene
David A. Goodwin
Raina C. Borrelli
Canadian Pacific Plaza
120 S. Sixth St., Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
dgoodwin@gustafsongluek.com
rborrelli@gustafsongluek.com

**LOCKRIDGE GRINDAL
NAUEN P.L.L.P.**
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Ave., Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981
rkshelquist@locklaw.com
rapeterson@locklaw.com

**GREG COLEMAN LAW PC**
Gregory F. Coleman
Lisa A. White
Mark E. Silvey
Adam E. Edwards
First Tennessee Plaza
800 S. Gay Street, Suite 1100

Knoxville, Tennessee 37929
Tel: (865) 247-0080
Fax: (865) 533-0049
greg@gregcolemanlaw.com
lisa@gregcolemanlaw.com
mark@gregcolemanlaw.com
adam@gregcolemanlaw.com

*Plaintiffs' Steering Committee*

**MANTESE HONIGMAN PC**
David Honigman
Douglas Toering
Gerard V. Mantese
1361 E. Big Beaver Rd.
Troy, MI 48083
Tel: (248) 457-9200
Fax: (248) 457-9201
dhonigman@manteselaw.com
dtoering@manteselaw.com
gmantese@manteselaw.com

*Plaintiffs' Liaison Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on March 15, 2019 I electronically filed the foregoing with the Clerk of the Court using the ECF system which will notify all counsel of record authorized to receive such filings.

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com