UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## OPINION AND ORDER DENYING IN PART MOTIONS
## TO SEAL CERTAIN DOCUMENTS

Several putative class actions — some filed here, and others transferred to this district by

the Panel on Multidistrict Litigation — have been consolidated in a Second Amended Master Class

Action Complaint, alleging that defendant FCA US LLC (Chrysler) manufactured certain vehicles

equipped with defective gear shifter mechanisms.  The plaintiffs, alleging that they overpaid for

their vehicles because the defect had been concealed from them at the time of sale, have moved

for class certification, supporting their motion with affidavits from experts and several exhibits

obtained from the defendant during discovery.  The defendant has filed motions to seal some of

the motion briefs and exhibits (including deposition excerpts) addressing class certification and

motions to exclude expert witnesses, arguing that the materials contain "confidential or sensitive

commercial information relating to FCA US's vehicle development strategies, negotiations with

suppliers, and sales practices," and they "also contain[] confidential information pertaining to" a

nonparty consultant that prepared a product evaluation report.   Although the defendant recognizes

the "strong presumption in favor of openness" for court filings, *Brown & Williamson Tobacco*

*Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983), and that the burden of overcoming that

presumption "is a heavy one," *Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d

299, 305 (6th Cir. 2016), it has explained only in very general — and unconvincing — terms why

it wants the materials sealed, and it has not shown "why those reasons outweigh the public interest in access to those records," *Kondash v. Kia Motors America, Inc.*, --- F. App'x ---, No. 18-3181, 2019 WL 1418168, at *2 (6th Cir. Mar. 28, 2019).  Therefore, the Court will deny the motions to seal, except for a couple discrete items that are irrelevant or reflect an employee's personal information.

## I.

Under the Court's recently-amended local rule, when a party seeks to file motions or exhibits under seal, the motion must include a redacted version of the subject document, and the movant also must file an unredacted version under seal for the purpose of adjudicating the sealing motion only.  E.D. Mich. LR 5.3(b)(2)(A)(v) & (vi).  If other filing deadlines loom and the filing party has not received authority to file a motion brief or exhibit under seal, that party may file the motion papers with redactions pending a ruling on a properly filed sealing motion.  LR 5.3(b)(2)(B).  The defendant has opted for the latter procedure here.  The papers it seeks to seal have been filed in a redacted format, and the unredacted version has been filed under seal as exhibits to its sealing motion.

The rule also requires that the motion contain, "for each proposed sealed exhibit or document, a detailed analysis, with supporting evidence and legal citations, demonstrating that the request to seal satisfies controlling legal authority."  LR 5.3(b)(3)(A)(iv).  As discussed below, the defendant has not satisfied that requirement.

### I.  Documents for Motions to Exclude Experts (ECF No. 298)

Chrysler seeks to file under seal a list of specific redacted portions of the plaintiffs' oppositions to the defendant's motions to exclude the testimony of plaintiffs' experts Justine Hastings and Craig Rosenberg.  It also requests the sealing of a prospective motion by the plaintiffs

to exclude testimony by defendant's expert David Cades. However, as the plaintiffs point out in their response, they have not filed any motion to exclude any testimony by Dr. Cades.

The main object of Chrysler's concern appears to be a report of a focus group study that Chrysler commissioned non-party Lextant Corporation to perform. Lextant asked drivers to use and give their impressions of several alternative automobile shifter designs, including the "monostable" design targeted in this case. *See* Report of Polystable E-Shift Competitive Usability & Acceptance Study dated Aug. 24, 2012, ECF No. 298-5, PageID.10524-10616. Chrysler seeks to seal that report in its entirety. All of the other materials that the defendant wants to seal are merely passages of various expert reports and other filings that cite or discuss the Lextant focus group study, and the defendant does not advance any rationale for sealing those various derivative materials beyond the underlying argument for sealing the Lextant report itself.

According to the executive summary of the report, the goal of the study was "to compare the Polystable E-shifter with 3 other shifters in terms of usability, perceived ease of use, and experience, in order to guide future product decisions." PageID.10527. The principal conclusions of the study were that "familiarity and feedback (visual and tactile) contributed to a more successful user experience," and that positive scores on those dimensions "led the Rotary and Polystable shifters to be the most successful in this study for user experience." PageID.10528. Principal findings included the observations that "[p]articipants are familiar with shifting and don't want to re-learn a behavior that doesn't usually require them to think," that drivers "want to feel confident that they have engaged the intended gear," and that "[p]articipants expect system status (current gear) to be displayed in a timely manner, coordinating with the movement of the shifter, and in an easy to see location." PageID.10529. Those findings were derived from one-on-one interviews with 30 study participants, after they had conducted a series of monitored and recorded

in-car exercises that included parking maneuvers, a three-point turn, and "additional shifting maneuvers." PageID.10534-35. The report included a number of photographs of the in-car shifter mechanisms, head shots of the 30 participants, and other photographs and diagrams of the areas used for the parking and shifting exercises. PageID.10536-39, 10541. The report did not specify how the participants were selected, but they seem to have been members of the driving public who were recruited for the purpose of the study.

Chrysler does not set forth any elaborate or precise analysis of any of the material in the 92-page focus group report. Instead, it states in broad and general terms that the report should be sealed in its entirety "because it contains confidential or sensitive commercial information relating to FCA US's vehicle development strategies, negotiations with suppliers, and sales practices," and "[i]t also contains confidential information pertaining to nonparty Lextant Corp." The defendant contends, without elaboration, that "[t]he study includes commercially sensitive information about the manner in which FCA US evaluates and selects componentry for its vehicles and the reasons for those choices," and that "[i]t would cause substantial competitive harm to FCA US if Plaintiff[s] were permitted to publicly disclose the document or the contents of the document," because "[s]uch information would enable a competitor to gain insight into FCA US's decision-making process without the effort and resources FCA US incurred." The defendant also asserts that "[t]he information . . . contains confidential information pertaining to the methods non-party Lextant Corp. uses to perform analysis and prepare work product for its clients," and that "[a]s a result, disclosure of the Lextant-related materials would give Lextant's own competitors access to its proprietary methods that would otherwise only be available to Lextant's clients."

Parties desiring to file court papers under seal face a formidable task in overcoming the presumption that court filings are open to public inspection. *In re Knoxville News-Sentinel Co.*,

723 F.2d 470, 476 (6th Cir. 1983). "Unlike information merely exchanged between the parties, '[t]he public has a strong interest in obtaining the information contained in the court record.'" *Shane Group*, 825 F.3d at 305 (quoting *Brown & Williamson*, 710 F.2d at 1180). "[T]he public is entitled to assess for itself the merits of judicial decisions," and, thus, "'[t]he public has an interest in ascertaining what evidence and records the District Court [has] relied upon in reaching [its] decisions.'" *Ibid.* (quoting *Brown & Williamson*, 710 F.2d at 1181).

"The courts have long recognized, therefore, a 'strong presumption in favor of openness' as to court records," and the "burden of overcoming that presumption is borne by the party that seeks to seal them." *Shane Group*, 825 F.3d at 305 (citing *Brown*, 710 F.2d at 1179; *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)). "The burden is a heavy one: 'Only the most compelling reasons can justify non-disclosure of judicial records.'" *Ibid.* (quoting *Knoxville News*, 723 F.2d at 476).

The status of the information sought to be shielded from public view as a trade secret is relevant. But trade secret status is neither a necessary nor a sufficient condition for sealing. *Kondash*, 2019 WL 1418168, at *3 ("While the existence of a trade secret will generally satisfy a party's burden of showing a compelling reason for sealing documents, even if a trade secret does not exist, a court may still find a compelling reason exists; further, even if a district court finds that a trade secret exists, it must still determine whether public interest outweighs the moving party's interests in protecting their trade secret.")

Even "[w]here a party can show a compelling reason for sealing, the party must [still] show why those reasons outweigh the public interest in access to those records and that the seal is narrowly tailored to serve that reason." *Id.* at *2. "To do so, the party must 'analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.'" *Ibid.*

(quoting *Shane Group*, 825 F.3d at 305-06).  "The presumption in favor of public access is strong when public safety is implicated"; thus, while it is "well-established that confidentiality provisions, protective orders, and the sealing of cases are appropriate litigation tools in some circumstances[,] the interests of public health and safety will often outweigh any confidentiality interests that might be implicated." *Ibid.* (quotations omitted).  "This is particularly true in class actions, where, because of the interest of a broader public outside of the named parties, the standards for overcoming the presumption of openness 'should be applied . . . with particular strictness.'" *Ibid.* (quoting *Shane Group*, 825 F.3d at 305).

Chrysler has failed to carry the heavy burden of justifying the wholesale sealing of the numerous evidentiary documents that it seeks in this motion, because (1) it has made no effort to analyze or explain with particularly, page by page, or line by line, how the various items of information in the 90-plus-page Lextant focus group study qualify as matters that are protected by any extant statutory or decisional authority that would permit sealing; (2) it has made no showing that any of the material qualifies as "trade secrets," and it does not assert any recognized privilege in the information; and (3) even if some of the information could be regarded as "trade secrets," the public interest in disclosure of it weighs heavily against granting the request for sealing, because the information will be central to the Court's, and the jury's, assessment of the merits of the claims in this case, and the information implicates public safety.

## A. The Defendant Has Not Made the Required Particularized Analysis

To make its case on a motion to seal, the movant must "show why [compelling] reasons outweigh the public interest in access to [the] records [in question] and [demonstrate] that the seal is narrowly tailored to serve that reason." *Kondash*, 2019 WL 1418168, at *2 (quoting *Shane Group*, 825 F.3d at 305-06).  "To do so, the party must 'analyze in detail, document by document,

the propriety of secrecy, providing reasons and legal citations.'" *Ibid.*  The defendant has made

no effort to make the required showing here, and instead offers only bare platitudes and vague

generalities categorizing the Lextant report, *in toto*, as its "confidential business information."

Such vagaries may suffice to warrant the application of a "confidential" label during discovery,

but they do not approach the required level of specificity and the strong particularized showing

that is required to justify wholesale sealing of more than 100 pages of core documents in the

evidentiary record of these proceedings.

Moreover, Chrysler has offered nothing in the way of particularized details to explain "why

the interests in favor of closure [are] compelling." *Shane Group*, 825 F.3d at 307.  The defendant's

vaguely phrased fears of revealing information about their "methods of selecting and testing

products" are inadequate to justify sealing because "proponents of closure bear the burden of

showing that 'disclosure will work a clearly defined and serious injury[.]'" *Ibid.* (quoting *Cendant*,

260 F.3d at 194).  "'In delineating the injury to be prevented, specificity is essential,'" but, just as

in *Shane*, the defendant here "offers only platitudes" in its perfunctory briefing in support of the

motion to seal.  *Ibid.*  Here, Chrysler has not even attempted to explain with particularity what

injury would result from disclosure of the Lextant study results.

B.  The Materials in Question Does Not Qualify as "Trade Secrets"

The defendant has not made a case — or even suggested — that any of the information in

the Lextant study comprises any form of "trade secrets."  Nor has it pointed to any statute or case

law that restricts or prohibits the disclosure of the information in question.  *C.f.*, *Shane Group*, 825

F.3d at 308 (noting that "in *Knoxville News–Sentinel* — a case involving litigation between a bank

and the FDIC — we affirmed the district court's decision to seal bank records containing financial

information about the bank's customers," in part because "[v]arious 'statutory provisions and

regulatory rules' protected the customers' information from disclosure, and the 'order of the district court [was] narrowly tailored to serve that interest.'" (quoting 723 F.2d at 476-77)).  "'In civil litigation, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault),' is typically enough to overcome the presumption of access."  *Id.* at 308 (quoting *Baxter*, 297 F.3d at 546); *Brown*, 710 F.2d at 1180 ("In such cases, a court should not seal records unless public access would reveal legitimate trade secrets, a recognized exception to the right of public access to judicial records").  To qualify for protection as a trade secret, "information must (1) derive economic value from the fact that it is not known to others who could make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 410 (6th Cir. 2006).  Here, the defendants have not "even tried to demonstrate that any of the [information they want to conceal] is comparable to a trade secret."  *Ibid.*

It is evident that nothing in the report of the Lextant study could qualify as a trade secret of either Chrysler or its vendor Lextant.  For one thing, the study does not contain any information relating to internal engineering details of the Monostable shifter design.  The study included photographs of the visible shifter lever within the passenger compartment, but those show nothing more than what any member of the driving public would see when sitting in the vehicles; certainly nothing visible was in any way "secret" after the cars went to market.  Also, the study report indicates that Lextant employed 30 ordinary drivers as the focus group sample; nothing in the record suggests that any effort was made by Chrysler to compel those persons to preserve the confidentiality of anything that they observed or did during the study.  The defendant insists that the study somehow comprises information about "how it selects products," but nothing in the

report discusses any internal decision making by Chrysler.  The report simply is a compilation and analysis of comments made *to* Chrysler's focus group agency by ordinary drivers, indicating how they liked the shifter design (or not).

The report included statistical analyses and visualizations of the results of the focus group vehicle tests and interviews, but the defendant has not cited any authority for the proposition that such conventional mathematical cogitations could be regarded as any sort of trade secret, or even was "proprietary" in the faintest sense.  For one thing, Chrysler has not attempted to procure the sealing of the balance of the reports of the plaintiffs' experts; one of the principal objects of the study by the plaintiffs' expert Craig Rosenberg was to replicate the design of the Lextant study and derive a comparative sample to use in assessing its conclusions.  Report of Craig Rosenberg, ECF No. 299-4, PageID.10401 ("My experimental design was similar to the Lextant Study, allowing for fair comparisons between the two studies. In both my study and the Lextant Study, the Monostable gear shift was associated with high error rates and poor user ratings.").  Chrysler wants to seal the *results* of the Lextant study, but it has not advanced any credible claim that the *methods* used in the study or the report in any way qualify as trade secrets.  Here again, the defendant's presentation fails for want of any attempt to make the required particularized showing identifying the trade secret subject to protection.  It is widely accepted by federal courts that a party seeking trade secret protection "must identify its trade secrets with a reasonable degree of precision and specificity that is particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade."  *Dow Chem. Canada, Inc. v. HRD Corp.,* 909 F. Supp. 2d 340, 346 (D. Del. 2012); *see also Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 258-59 (S.D.N.Y 2014) (collecting cases).  The defendant has made no attempt to do so here.

The defendant asserts in similarly general terms that the report comprises "confidential methods" by which Lextant services its customers.  The Sixth Circuit has recognized that "'the privacy interests of innocent third parties should weigh heavily in a court's balancing equation.'" *Shane Group*, 825 F.3d at 308 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)).  But the cases where the sealing of information has been upheld concerned clearly personal and impertinent details associated with third parties, such as personal identifying information of crime victims or financial records of a bank's customers.  *Shane Group*, 825 F.3d at 308; *Knoxville News-Sentinel*, 723 F.2d at 476-77.  No such compelling third-party privacy interests are implicated by anything in the report at issue here; to the extent that it concerns details of any of the participants, nothing more is revealed than their headshots, and no personally identifying information was included in the report.

C. The Public Interest in Disclosure Outweighs any Private Interest in Secrecy

Finally, even if some of the information could be regarded as some form of trade secrets, the interest in full disclosure of the study results is particularly compelling in this case, which is a prospective class action concerning allegedly dangerous transmission defects affecting more than 800,000 vehicles made by the defendant.  *Kondash*, 2019 WL 1418168, at *2.  (holding that even "[w]here a party can show a compelling reason for sealing, the party must [still] show why those reasons outweigh the public interest in access to those records and that the seal is narrowly tailored to serve that reason").  "The presumption in favor of public access is strong when public safety is implicated"; thus, while it is "well-established that confidentiality provisions, protective orders, and the sealing of cases are appropriate litigation tools in some circumstances[,] the interests of public health and safety will often outweigh any confidentiality interests that might be implicated." *Ibid.* (quotations omitted).

-10-

According to the study report, after the exercises and interviews were completed, Lextant's staff conducted various "quantitative and qualitative analys[es]" to compile the responses of participants and summarize them in a cohesive way.  PageID.10542.  One of the summary methods involved creation of "word clouds" depicting the frequency with which participants used various words to describe the shifter designs, color-coded with green to highlight favorable terms and red to denote unfavorable terms.  The most often used terms in describing the "Polystable" shifter design included "smooth," "easy," "convenient," "intuitive," "comfortable," and "familiar." PageID.10544.  The "Monostable" design drew far less favorable reviews, and participants described it most frequently as "insecure," "awkward," "uncomfortable," "frustrating," and "difficult."  In fact, nearly all of the terms used to describe the monostable design were negative; less frequently used phrases panned it as "dangerous," "annoying," "pain-in-the-ass," and "piece-of-junk."  PageID.10545.  The report also included a breakdown of statistical calculations demonstrating the significance of the frequency of the different qualitative responses used to describe the shifters and the feelings users had about them during the vehicle exercises. PageID.10549-10563.

Notably, the report also included statistical tables recording the frequency of shifting errors of different types during the vehicle exercises.  Errors recorded included undershooting or overshooting the intended gear, failing to activate the trigger on the shifter in order to move into another gear, shifting in the wrong direction to reach the intended gear, thinking that the car was in a different gear than the one actually selected, and thinking that the car was in a gear other than the intended one, followed by shifting out of the correct gear into an incorrect setting. PageID.10588.  One of the principal conclusions of the error analysis was that "Overall, the Rotary had the least number of errors and the Monostable had the most."  PageID.10564.  The report also

-11-

noted that the Monostable design produced the "most variety of errors."  PageID.10588.  The number of errors observed in the vehicle exercises varied dramatically between the different designs, with less than 20 "parking errors" for the conventional or "Gated" shifter and 22 for the Polystable design, but 342 for the Monostable shifter.  The analysis also noted that "the Monotable [shifter's] ratings decreased over time as it did not get easier to user and participants still felt unsure and confused even after using it over the duration of the study."  PageID.10565.  The report also tellingly noted that, while all of the study participants were able to learn to use the other designs within four or fewer attempts, 26 of the 30 participants were unable to learn to use the monostable shifter reliably within four tries.  PageID.10573.  The report also concluded that "Even with time, the Monostable [design] was difficult to use without error."  PageID.10574.

The information in the Lextant study goes to the very heart of the case, and will be crucial to the presentation of the plaintiffs' claims that the gear shift design was defective from the outset due to its confusing and unreliable operative and indicative characteristics, and that Chrysler well knew of those defects during its design and implementation, before class vehicles with the shifter went to market.  The public interest in having a fullsome opportunity to assess the basis of those claims and any dispositive decisions reached by this Court or, ultimately, a jury, could not be more compelling than it is here, and it certainly outweighs the vague private interest in secrecy advanced by the defendant in its motion.

The defendant has not made a convincing attempt to explain in any particularized fashion how its interest in sealing information from the Lextant study outweighs the compelling public interest in full disclosure of these proceedings.  *See Shane Group*, 825 F.3d at 306 ("The parties' asserted bases for sealing off all this information were brief, perfunctory, and patently inadequate.").  The Sixth Circuit sternly has warned the district courts of this circuit, in *Shane* and

-12-

in other cases, that summarily granting motions to seal without articulating specific reasons rooted in the facts and circumstances of the case to show why sealing is necessary is not a procedure that comports with the presumption of full disclosure in the judicial process. *United States v. DeJournett*, 817 F.3d 479, 485 (6th Cir. 2016) ("'The interest [justifying nondisclosure] is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" (quoting *Press-Enterprise*, 464 U.S. at 510)). Thus, the Court is unable to articulate any adequately reasoned finding that any of the information derived from the focus group study at issue here should be protected from public view where the defendant has failed to suggest any substantial basis for such a ruling.

The Court will deny the defendant's motion to seal the 2012 Lextant study and materials relating to it.

II.  Motion to Seal Certain Items in the Class Certification Motion (ECF No. 311)

Chrysler also asks the Court to maintain under seal various exhibits to the plaintiffs' motion for class certification.  Those are:

(1) Exhibit B, which is excerpts of the deposition of Chrysler's witness Stephen Williams, mainly consisting of passages where Williams admits that the Monostable shifter design at issue in this case was essentially the same or "exactly the same part" used in different models under various Chrysler brands (ECF No. 287-2, PageID.8337-8345).

(2) Exhibit C, which is a copy of the same Lextant study discussed above (ECF No. 287-3, PageID.8347-8439).

(3) Exhibit D, which is a report of an October 2010 study by Lextant, conceptually similar to the 2012 focus group study in scope and content, in which various Monostable shifter designs from competitor vehicles were compared with two of Chrysler's (then) concept Monostable designs (ECF No. 287-4, PageID.8442-8535).

(4) Exhibits E and L, which are excerpts of a deposition of Chrysler's witness Jay Tenbrink (ECF No. 287-5, PageID.8537-8545), and an internal Chrysler email sent by him (ECF No. 287-12, PageID.8578), mainly consisting of discussions about his participation in and direct observations of the 2012 Lextant study.

-13-

(5)   Exhibit F, which appears to be PowerPoint slides created by Chrysler staff summarizing the 2010 Lextant study findings and stating several recommendations, notably including "[c]reating more defined, tactile detents for [Park,] Reverse, Neutral, and Drive" gears in the shifter design (ECF No. 287-6, PageID.8547-8550).

(6)   Exhibit G, which appears to be more PowerPoint slides comprising excerpts of the 2010 Lextant study and recommending adoption of a Rotary shifter design already developed for certain Jaguar models to be implemented as a replacement for the Monostable shifter (ECF No. 287-7, PageID.8552-8560).

(7)   Exhibits H and I, which appear to be one page of meeting notes and several PowerPoint slides produced by Chrysler staff concerning the adoption of alternative mechanisms to replace the Monostable shifter, and a timeline for putting the Monostable shifter design into production (ECF No. 287-8, PageID.8562-8563).

(8)   Exhibit J, which is a string of July 2011 internal e-mail correspondence between Chrysler staff discussing issues experienced by one of the correspondents while driving a test vehicle equipped with the Monostable shifter, options for modifying the design, and the "timeline" impact of those options (ECF No. 287-10, PageID.8567-71).

(9)   Exhibit K, which is a two-page excerpt of a deposition of Chrysler's witness Jim Bielinda, evidently offered by the plaintiffs solely to identify the position within Chrysler of another person, Allen Amici (ECF No. 287-11, PageID.8574-75).

(10)   Exhibit N, which is Chrysler internal email correspondence from January 2013 concerning a published article that featured one reporter's impressions from driving a then new or soon to-be-released Charger model equipped with the Monostable shifter design, when various car models were exhibited to members of the press during a test track event aligned with the Detroit Auto Show (ECF No. 287-13, PageID.8580-8584).

(11)   Exhibit S, which is the same report of plaintiff's expert Craig Rosenberg discussed above, where the defendant seeks to maintain under seal the same excerpts citing or discussing the 2012 Lextant focus group study.

As with the previous motion, most of the defendant's requests to seal the specific items listed above stem from its underlying desire to maintain the secrecy of the principal documents with which it is concerned, which are the 2010 and 2012 Lextant studies where ordinary drivers were asked to use several types of shifters and comment about their experiences.  All of the other materials are merely derivative of those studies, except portions of Exhibit B, discussing that the "exact same part" was used in several models of Chrysler cars, Exhibits F and G, which included

-14-

discussions about alternatives to the Monostable design and the timeline for implementing those alternatives, and Exhibits J, N, and L which discussed impressions of Chrysler employees and a published media report including complaints about the shifter design.

Once again, the defendant does not elaborate on its general rationale for seeking to seal these documents. It simply states that the listed exhibits comprise "confidential and sensitive business information of FCA US, including proprietary product development information, and confidential business information of third party Lextant." And the defendant offers only nonspecific arguments in support of its position that revealing "timelines" for product implementation would harm its competitive interests. It also argues that, unlike the case in *Shane Group*, its requests to seal are "tailored" because they only comprise several among the numerous exhibits offered in support of the class motion, whereas in *Shane Group* the sealing order encompassed the entire motion and all of its exhibits.

Exhibits B, C, D, E, F, G, L, and S all comprise discussions of or excerpts from the 2012 Lextant study and a conceptually similar 2010 study. For instance, Exhibit L is an email by Chrysler employee Jay Tenbrink commenting on his direct observations from participating in the 2012 focus group study by Lextant. He wrote:

> The poly-stable shifter is doing very well. With most drivers it is scoring highest. Intuitive, easy to use, traditional (in a good way), confident. The 1.5 second lag to show park in the cluster is definitely a detractor.
>
> The results of the mono-stable shifter are much worse than I expected. It really is a shame that we are putting this thing in cars. Anyone who speaks well of that shifter loses credibility in my book. We should get that thing out of our cars ASAP.

Email dated Aug. 3, 2012, ECF No. 287-12, PageID.8578. The requests to seal the content of those studies, and any materials citing or discussing them, will be denied for all of the same reasons discussed above with respect to the request to seal the 2012 study.

Exhibits J and N comprise discussions about a driving report by a Chrysler employee and a published article by a reporter heavily criticizing the shifter design.  For similar reasons to those noted above, the public interest in disclosure of this information, which is powerfully probative of Chrysler's foreknowledge of the defects in the shifter design, heavily outweighs any interest that Chrysler asserts in concealing those portions of the record.

In Exhibit J, a Chrysler employee wrote an extensive and candid report of his experience driving a Chrysler car with the then-new Monostable shifter design.  That account included the following anecdote:

> Last week I took delivery of my 2012 Fast-Feedback Charger equipped with the 3.6L and 8-speed e-shift trans and was not very impressed with the functionality of the shifter. I was so disappointed that I immediately input my negative comments into the Driver Report Entry System . . . . I didn't realize any issues until I had to shift into reverse when backing into my parking spot. It seemed I couldn't "find" reverse. I kept going from park to neutral, always seeming to go right over reverse. It made me feel like an idiot because someone had to wait for me while I was screwing around with the shifter and trying to get my car out of the isle [sic] and into the parking spot.

Email dated July 26, 2011, ECF No. 287-10, PageID.8570.  The originator of the thread also wrote about his experiences showing the shifter off to several family members:

> Most of them found another issue that made them very uncomfortable and that was putting the vehicle back into park. They all were afraid to take their foot off the brake pedal because they were unsure the vehicle was actually in park (until I told them to look at [the] PRNDL light). I was relieved that they experienced the same issues that I did.  Unfortunately, that also meant that we are about to send a vehicle into production that may not appear to function properly.

*Ibid.*  Finally, he concluded with the following inquiry:

> I know that it may take time to get used to this new configuration but my question is, "why can't the shifter function the same way our current shifters function or even the same way Ford, GM, Toyota, and everyone else's shifters currently function . . . or even those dating back to the invention of the automatic transmission?"

-16-

*Ibid.*  Another correspondent in the exchange, Allen Amici, wrote that he had "[e]xperienced the same myself . . . though not to the degree of the author."  *Id.* at PageID.8569.  In subsequent exchanges, other Chrysler employees responded that the options for modifying the shifter were limited within the timeline available, and that only minor modifications such as increasing the tension of detent springs would be "short lead time" to implement.  *Id.* at PageID.8567.

In Exhibit N, the email exchange opened with a verbatim extract of a published media article about one reporter's impressions of the new Charger.  Among other things, the reporter wrote at length about his experience with the shifter design:

> Since we're talking about shifting. . . . I do have one major complaint about the car, and feel it deserves a clear explanation. In my opinion, the new automatic gear selector mechanism (PRND rocker stick) is terrible. Transmissions these days are totally electronic, and the shift lever on the tunnel of the Charger AWD is just an electronic rocker switch with a few hard-to-detect clicks (detents). It rocks up (forward) and down (backward), one or two faint clicks, always springing back to the same center position. The problem is that it doesn't seem to work in an intuitive manner.  In fact, in several cases it was downright dangerous.
>
> Here's what happend to me several times during my week long experience with the new Charger . . . Sometimes I got Reverse, sometimes Neutral, and sometimes Drive — no matter which I was after.  If I was really concentrating, I could get the exact gear I wanted — but that's my point.  With the usual Chrysler shift lever, I don't have to think to do this because each mode selection (Park, Reverse, Neutral, and Drive) has its own physical location along the throw of the lever.

Email dated Jan. 22, 2013, ECF No. 287-13, PageID.8583.  In the ensuing email thread, Chrysler staff commented on several points of criticism that they felt were unfair, and one correspondent stated the following about the prospects for improving the design:

> The issues he describes with the shifter are all known and well documented. Unfortunately the logic is locked in because the transmission supplier ZF will not let us change it.  There is a small change coming in 2014 that will help the R to D shift, but otherwise this will not be resolved until 2015 when we implement the polystable shifter design.  We could have a discussion with [the reporter] off line, but there isn't much else we can say.

*Id.* at PageID.8582.

Nothing in these discussions concerns any particularized engineering details of the shifter design, and all of the information concerns outward impressions and experiences of using the design. Also, the related statements that the problems with the design were "known and well documented" and that alternatives were identified but would not be implemented for two more model years, is powerfully probative evidence that the defendant well knew about the defects and chose not to withhold the defective design from the market in service to its own economic concerns. Moreover, the verbatim recitation of a published article in which a reporter stated his complaints about the design certainly was not in any sense "confidential" or concealed from anyone.

The defendant has not explained in any coherent fashion why the deposition excerpt in Exhibit K should be sealed, and the plaintiff ostensibly offered it only to establish the position within Chrysler held by one of the correspondents in the email discussions (Allen Amici).

The motion to seal certain exhibits in the plaintiffs' class certification motion will be denied.

### III. Motion to Seal Certain Items in the Response to the Class Certification Motion (ECF No. 326)

In this motion the defendant moves to seal portions of its own brief in opposition to the motion for class certification, and a number of exhibits attached to the brief, because they discuss or cite the 2010 and 2012 Lextant focus group reports. Those are Exhibits 2, 3, 16, 20, 21, 27, and 29 to the defendant's opposing brief. For the same reasons discussed above, the motion will be denied as to those exhibits and sections of the brief.

The defendant also asks the Court to seal certain other exhibits or portions of exhibits that it argues — again, formulaically and with little elaboration — would reveal its "confidential and proprietary business information." Those exhibits are:

-18-

(1) Exhibits 4, 6, and 8, which appear to be (a) meeting notes concerning funding and schedules for various products unrelated to the Monostable shifter or any class vehicle, with a single paragraph relating to the Monostable shifter (ECF No. 327-4, PageID.13692), (b) meeting minutes covering schedules and funding for vehicle projects unrelated to the class vehicles or transmission design, with two portions related to the Monostable shifter design (ECF No. 327-6, PageID.13698), and (c) meeting minutes concerning the decision to abandon alternative designs and move ahead with the Monostable shifter, as well as notes about several other vehicle projects unrelated to the class vehicles. The defendant highlighted portions of those exhibits, apparently to indicate which sections comprise the unrelated financial and other product line details that it is concerned about.

(2) Exhibits 5 and 7, which appear to be slides from two Chrysler internal presentations concerning (a) the prospect of implementing the Rotary shifter design used in several Jaguar models for other Chrysler model lines, including the time and cost anticipated for the changeover (ECF No. 327-5, PageID.13694-96), and (b) the decision to go ahead with the Monostable shifter design, including cost and timing estimates, and, notably, stating the conclusions that "Many shifting errors occurred in [the Lextant] clinic due to overshooting intended gear," and that "Many shifting errors occurred in [the] clinic due to the delay to park and lack of park confirmation," (ECF No. 327-7, PageID.13700-704).

(3) Exhibits 9 and 15, which Chrysler says are presentation slides summarizing the results of customer surveys and user testing clinics that it conducted in response to reports of problems with the Monostable shifter design and complaints about cars using the shifter. (ECF No. 327-9, PageID.13708-710; ECF No. 327-12, PageID.13720-723). Notably, the survey concluded that only around 1/3 of drivers with the Monostable shifter design rated it as "easy to engage all gears," while nearly 90% of customers with conventional shifter designs rated all the gears as "easy to engage" (PageID.13721).

(4) Exhibit 11, which is a Chrysler internal email from which the defendant apparently only wants to redact one personal telephone number (ECF No. 327-10, PageID.13712).

(5) Exhibit 14, which Chrysler states is correspondence to the NHTSA reporting the results of its defect investigation, notably expressing Chrysler's view that, while the Monostable shifter design "operates and feels different than previous designs . . . [w]hen the shifter is used properly, the vehicle will not move inadvertently" (ECF No. 327-11, PageID.13716).

The defendant offers the same formulaic recitations advanced in its other motions, arguing that competitors could gain insights into its "decision making process" if the information in the various exhibits is disclosed.

The defendant highlighted portions of Exhibits 4, 6, and 8 containing information about unrelated products and the financial details of projects related to them. It is undisputed that the

information is irrelevant to any issue in this litigation and unrelated to the class vehicles or the design and implementation of the Monostable shifter.  The information coincidently is found in the same documents that contain material relevant to this litigation.  There is no good reason why the material relating to other products should not be excluded from public consideration.  But it is evident that any interest Chrysler may have in preserving the confidentiality of the unrelated product details adequately can be addressed by redaction.  Where crucial "portions of the [filings] may be amenable to public access without jeopardizing the confidentiality of sensitive information," and "confidential information [is not] so embedded in a [filing] that line-by-line redaction is impossible . . . redaction [is] a reasonable alternative to sealing the entire [document]." *IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013).  The request to seal those documents in their entirety will be denied, but the defendant may submit copies of the exhibits redacted to conceal the information highlighted in the its submissions.

The same can be said for the document containing the employee's personal telephone number: that readily may be redacted from Exhibit 11.

For all of the same reasons discussed above, the Court will deny the request to seal Exhibits 5, 7, 9, and 15, all of which comprise powerfully probative information about Chrysler's knowledge of the Monostable shifter design problems, its cognizance of alternatives to the problematic design, and the reasons that it decided to reject the available alternatives and push ahead with marketing the allegedly defective product, despite the well-documented concerns.

The information in Exhibit 14 is similarly probative of Chrysler's alleged efforts to conceal the defect from safety authorities and consumers in the response to NHTSA's recall investigation.  Moreover, inasmuch as it comprises communications to a government authority, the report certainly was not in any sense "confidential" to Chrysler.  In any event, even if the report was

made in confidence, any present interest Chrysler may have in maintaining its confidentiality is

outweighed by the public's interest in full disclosure of it as an item of evidence in this case.

### IV.  Motion to Seal Exhibits to the Plaintiffs' Reply
### in Support of Their Motion for Class Certification (ECF No. 344)

After the motions discussed above were scheduled for hearing, Chrysler filed a motion to

seal certain documents attached to the plaintiffs' reply in support of their motion for class

certification.  The motion is fully briefed, and the Court sees no need for oral argument.  In that

motion Chrysler again seeks to seal certain excerpts from the 2012 Lextant study, which was

discussed at length above.  It also asks to seal the following exhibits that were not previously

discussed:

> (1)   Exhibit B, which is excerpts from the deposition of Chrysler's witness Stephen
> Williams (ECF No. 345-3, PageID.17063-64), in which Williams discussed (1) the fact
> that the Chrysler public relations department typically would draft questions pertinent to
> vehicle investigations and recalls, with input from other departments if "they missed
> something that was important," and (2) the fact that FCA used the same Monostable shifter
> design that had been employed in certain Audi and Bentley models "without any material
> change," and that the "function of it was exactly the same."

> (2)  Exhibit C, which Chrysler identifies only as an "internal document addressing recalls,"
> consisting of a "General Overview," apparently drafted to summarize Chrysler's position
> on the gear shifter recall, and a series of questions and answers on various topics, e.g., "Do
> you have a remedy?", "Why did you use this shifter in the first place?", and "Are these
> shifters still in production?"  ECF No. 345-4, PageID.17066-67.

> (3)  Exhibit D, which is a screenshot from a Chrysler database showing information related
> to a change in a shifter design, with an indicated implementation date in late 2012.  ECF
> No. 345-5, PageID.17069.

> (4)  Exhibit E, which is an April 2016 email string involving discussion of Chrysler internal
> correspondence and slide presentations related to the decision to implement the Monostable
> shifter and alternatives that were considered.  Significantly, the concluding message in the
> series noted that there was an "investigation [in 2010 about whether] to move quickly to
> the Jaguar [rotary shifter] component as a result of the use studies," but the "proposal did
> not move forward due to licensing rights to the shifter design held by the OEM rather than
> the supplier."   Email dated Apr. 26, 2016, ECF No. 345-6, PageID.17071.   The
> correspondence also included an "Executive Summary" of a Chrysler internal "Bulletin"
> dated November 10, 2010, which stated that, "Based on clinic results, the PoR monostable

shifter has been deemed unacceptable from a customer usability and intuitiveness standpoint, however, the rotary knob concept (Jaguar XF/XJ) scored very well." PageID.17072. The "Bulletin" noted that the rotary shifter concept was "Rejected" in November 2010. *Ibid.* Further along in the 2016 email discussion, the question was posed: "Do you have any knowledge if there were discussions around adding an auto park feature when the monotstable [shifter] was selected," but the only response was, "Take a look at Bulletin 0012334 from November 2010"; the excerpt of that bulletin quoted in the email string does not contain any apparent reference to an auto park feature. PageID.17074-75.

The same observations made above apply to these exhibits. First, Chrysler advances only formulaic arguments that the information is "proprietary" and would reveal its "decision making process" and how the company "evaluates recalls." That may be true for the historic decisions about the shifter design involved in these lawsuits. But it does not necessarily provide a peek into the present corporate mindset for products now in development.

More to the point, how Chrysler decided to use the Monostable shifter design, what alternatives it considered, and why those alternatives were not used, all are matters at the very core of this litigation. The motoring public has a compelling interest in knowing as much as can be known about those critical product development decisions, so that members of the public can determine for themselves whether Chrysler unreasonably implemented a dangerously defective design for selfish or other questionable reasons, despite the availability of safer alternatives.

The public also certainly has a compelling interest in knowing how Chrysler "evaluated" the recall investigation in this case, in order to observe how the parties urge to Court to weigh the claims that, instead of disclosing the known safety defects with the shifter, the company instead elected to conceal its prior knowledge of the problems, and instead blame the reported accidents and injuries entirely on "user error" instead of its defective design. Those concerns outweigh any supposed "proprietary interest" in its "decision-making process," which, again, reveal nothing that appears to be in any way truly proprietary, and, as mentioned at oral argument, which relate to decisions that were made almost a decade ago, about products on which production has long since

ceased.  Chrysler has not identified with any specificity a tangible harm that it would suffer from the disclosures.  Any such harm is outweighed by the public interest in full access to an open record of the proceedings and the evidence used to evaluate the merits of the plaintiffs' motion to certify the cases as class actions.

V.  Additional Motions to Seal (ECF Nos. 335, 336, 348, 360)

The parties have filed several other motions to seal certain brief excerpts and exhibits in motions pending before the magistrate judge.  Within the next week, the parties must evaluate those other motions and withdraw those seeking closure of substantially the same materials discussed in this order.  If any entirely unrelated materials are concerned in the subsequent motions, and if there are credible bases for the sealing requests in light of the Court's present rulings, the moving party may resubmit appropriately winnowed motions addressing only those outstanding and truly meritorious requests for closure.

VI.  Conclusion

Except for a few discrete instances, the defendant has not overcome the "strong presumption in favor of openness" of court records.  *Shane Group*, 825 F.3d at 305 (citing *Brown*, 710 F.2d at 1179; *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)).  Nor has the defendant shown why its generally-described reasons for sealing records "outweigh the public interest in access to those records," *Kondash*, 2019 WL 1418168, at *2, sufficiently to justify the wholesale sealing of certain exhibits.

Accordingly, it is **ORDERED** that the motions to seal certain documents (ECF Nos. 298, 311, 344) are **DENIED**.

It is further **ORDERED** that the motion to seal certain items in the response to the class certification motion (ECF No. 326) is **GRANTED IN PART AND DENIED IN PART**.  Those

parts of Exhibits 4, 6, and 8, which contain meeting notes concerning funding and schedules for various products unrelated to the Monostable shifter or any class vehicle, and meeting minutes covering schedules and funding for vehicle projects unrelated to the class vehicles or transmission design, and meeting minutes concerning several other vehicle projects unrelated to the class vehicles; and that part of Exhibit 11, which includes one personal telephone number of an employee, may be redacted to exclude the irrelevant information and filed in the court record in redacted form, but not under seal.

It is further **ORDERED** that **on or before May 8, 2019**, the parties must file redacted versions of Exhibits 4, 6, 8, and 11 to the defendant's response to the motion for class certification. Copies of those same exhibits that the parties offer in support of other papers must be filed in appropriately redacted form by that same date.

It is further **ORDERED** that **on or before May 8, 2019**, the parties must file unredacted and unsealed copies of all other documents subject to the requests to seal discussed in this order. The filings must include an index of exhibits denoting which previously-redacted or sealed items the new documents replace.

It is further **ORDERED** that **on or before May 8, 2019**, the parties must evaluate all other motions to seal not adjudicated by this order and withdraw those seeking closure of substantially the same materials.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   May 1, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on May 1, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI