```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    IN RE: FCA US LLC MONOSTABLE
      ELECTRONIC GEARSHIFT LITIGATION      Case Number 16-md-02744
 4                                         Honorable David M. Lawson
            MDL No. 2744
 5    _____/

 6                        MOTIONS TO EXCLUDE
                          STATUS CONFERENCE
 7
            BEFORE THE HONORABLE DAVID M. LAWSON
 8               United States District Judge
           Theodore Levin United States Courthouse
 9               231 West Lafayette Boulevard
                      Detroit, Michigan
10                     April 25, 2019
      APPEARANCES:
11
      FOR THE PLAINTIFFS:
12
      LEAD COUNSEL:          E. Powell Miller
13                           The Miller Law Firm, P.C.
                             950 West University Drive, Suite 300
14                           Rochester, Michigan  48307
                             248-841-2200
15                           epm@millerlawpc.com

16    LIAISON COUNSEL:       David M. Honigman
                             Mantese Honigman, PC
17                           1361 East Big Beaver Road
                             Troy, Michigan  48083
18                           248-457-9200
                             dhonigman@manteselaw.com
19
      For Individual         William Kalas
20    Plaintiffs:            The Miller Law Firm, P.C.
                             950 West University Drive, Suite 300
21                           Rochester, Michigan  48307
                             248-841-2200
22                           wk@millerlawpc.com

23

24            To Obtain a Certified Transcript Contact:
              Rene L. Twedt, CSR-2907, CRR, RMR, RDR
25                    www.transcriptorders.com
```

```
 1    APPEARANCES CONTINUED:

 2    For Individual          Christopher R. Pitoun
      Plaintiffs:             Hagens Berman Sobol Shapiro LLP
 3                            301 North Lake Avenue, Suite 920
                             Pasadena, California  91101
 4                            213-330-7150
                             christopherp@hbsslaw.com
 5
      For Individual          Adam A. Edwards
 6    Plaintiffs:             Greg Coleman Law PC
                             First Tennessee Plaza
 7                            800 S. Gay Street, Suite 1100
                             Knoxville, Tennessee  37929
 8                            865-247-0080
                             adam@gregcolemanlaw.com
 9
      FOR DEFENDANTS          James P. Feeney
10    FCA US LLC:             Fred J. Fresard
                             Dykema Gossett, PLLC
11                            39577 Woodward Avenue, Suite 300
                             Bloomfield Hills, Michigan 48304
12                            248-203-0700
                             jfeeney@dykema.com
13                            ffresard@dykema.com
                                 and
14                            Michael Williams
                             Bush Seyferth & Paige, PLLC
15                            3001 West Big Beaver Road
                             Suite 600
16                            Troy, Michigan  48084
                             248-822-7800
17                            williams@bsplaw.com

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2    MATTER                                                        PAGE

3    PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY
     OF BRUCE STROMBOM
4    Argument by Mr. Edwards...................................    6
     Argument by Mr. Fresard...................................   15
5    Further Argument by Mr. Edwards...........................   22
     Motion Taken Under Advisement by the Court................   27
6
     DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
7    OF JUSTINE HASTINGS
     Argument by Mr. Fresard...................................   27
8    Argument by Mr. Pitoun....................................   32
     Further Argument by Mr. Fresard...........................   41
9    Motion Taken Under Advisement by the Court................   43

10   DEFENDANT'S MOTION TO EXCLUDE TESTIMONY
     OF CRAIG ROSENBERG
11   Argument by Mr. Fresard...................................   44
     Argument by Mr. Pitoun....................................   50
12   Further Argument by Mr. Fresard...........................   56
     Motion Taken Under Advisement by the Court................   57
13
     STATUS CONFERENCE
14   REQUEST FOR 60-DAY EXTENSION
     Argument by Mr. Williams..................................   58
15   Argument by Mr. Miller....................................   61
     Ruling by the Court.......................................   61
16

17   CERTIFICATE OF COURT REPORTER.............................   62

18

19

20

21

22

23

24

25

1   Detroit, Michigan

2   April 25, 2019

3   2:06 p.m.

4                               *       *       *

5           THE CLERK:  All rise.  The United States District

6   Court for the Eastern District of Michigan is now in session,

7   the Honorable David M. Lawson presiding.

8           THE COURT:  You may be seated.

9           THE CLERK:  Now calling the case of In Re: FCA US LLC

10  Monostable Electronic Gearshift Litigation, Case Number

11  16-2744.

12          THE COURT:  Good afternoon, counsel.  May I have your

13  appearances for the record, please?

14          MR. MILLER:  Good afternoon, your Honor.  Powell

15  Miller for plaintiffs.

16          MR. PITOUN:  Good afternoon, your Honor.  Christopher

17  Pitoun, also for plaintiffs.

18          MR. EDWARDS:  And Adam Edwards, Greg Coleman Law, for

19  the plaintiffs.

20          THE COURT:  I'm sorry, counsel, again?

21          MR. EDWARDS:  Adam Edwards.

22          THE COURT:  Oh, there it is.  Thank you.

23          MR. FRESARD:  Thank you, your Honor.  Fred Fresard

24  and Jim Feeney for FCA.  And Mr. Williams is here for the

25  product liability plaintiffs status conference.

```
 1              THE COURT:  Oh, all right.  Let's deal with the

 2    motions first.  I have got the plaintiffs' motion to exclude

 3    the testimony of Bruce -- is it Strombom?  Is that how it's

 4    pronounced?

 5              MR. EDWARDS:  Correct.

 6              THE COURT:  Then the defendant's motions to exclude

 7    the testimony of Justine Hastings and Craig Rosenberg.

 8              Who is arguing what?

 9              MR. EDWARDS:  I'm arguing for the plaintiffs, your

10    Honor.

11              THE COURT:  On all the motions?

12              MR. EDWARDS:  On the motion to exclude Strombom.

13              THE COURT:  Okay.

14              MR. PITOUN:  And I'm arguing for plaintiffs --

15              THE COURT:  For the other two?

16              MR. PITOUN:  The other two, your Honor.

17              MR. FRESARD:  I'll be handling all three for the

18    defendant, your Honor.

19              THE COURT:  All right.  And Mr. Feeney is carrying

20    your briefcase today?

21              MR. FRESARD:  He is.

22              MR. FEENEY:  Yes, sir.  It's a heavy load.

23              THE COURT:  They were filed in order, so let's take

24    the plaintiffs' motion first.  And is that Mr. Pitoun that's

25    arguing for the plaintiff on the motion to exclude
```

1   Mr. Strombom?

2           MR. EDWARDS:  That's me, Adam Edwards, your Honor.

3           THE COURT:  Oh, Mr. Edwards.  Pardon me.  I'll get it

4   straight.

5           MR. EDWARDS:  That's fine.

6           THE COURT:  Mr. Strombom's -- Dr. Strombom's opinion

7   is twofold, as I understand it.  One has to do with his

8   criticisms of Dr. Hastings' approach, and the other has to do

9   with his own view, I guess, with respect to damages.  And so I

10  understand that you are basically attacking both of those.

11          MR. EDWARDS:  That is correct, your Honor.

12          May I approach the podium?

13          THE COURT:  You can argue from there or from the

14  lectern here, if you wish, wherever you're more comfortable.

15          MR. EDWARDS:  I would prefer to come forward.

16          THE COURT:  That's fine.  That's fine.

17          MR. EDWARDS:  Your Honor, that is correct.

18          There's essentially two pieces to this.  The first

19  piece is whether Dr. Strombom is sufficiently qualified, has

20  sufficient expertise to be able to make technical criticisms

21  of the conjoint analysis-based damages model that our expert,

22  Ms. Hastings, put together, and I'll talk about that briefly.

23          And then perhaps the larger issue here is whether the

24  Strombom analysis of used vehicle depreciation is a reliable

25  method for determining whether class members were damaged at

1    the original point of sale.  And I would be glad to take those
2    in turn.
3              Dr. Strombom admits and stated specifically in his
4    deposition that he does not consider himself to be an expert
5    in conjoint analysis.  Dr. Strombom admitted also that he has
6    never designed a conjoint analysis survey.  And third, he
7    admitted that he has never fielded a conjoint analysis survey.
8              Now, I understand FCA argues that Dr. Strombom does
9    not, in fact, attack the validity of the conjoint analysis
10   survey or the way in which Dr. Hastings proposed -- proposes
11   to conduct her conjoint analysis, but rather attacks the false
12   assumptions underpinning that survey; in other words, the
13   economic underpinnings.  That's what --
14             THE COURT:  Well, there is no survey; right?  Yet?
15             MR. EDWARDS:  There is a -- there is a survey
16   designed and included, and the survey will be forthcoming,
17   absolutely.
18             So the problem with that statement from FCA, that
19   Dr. Strombom does not, in fact, attack the technical aspect of
20   the proposed conjoint survey, is Dr. Strombom's own testimony.
21             I asked him at his deposition very specifically --
22             THE COURT:  I'm familiar.
23             MR. EDWARDS:  Okay.  Yeah.  I asked him, your Honor,
24   if he had technical criticisms --
25             THE COURT:  Your argument essentially is that he

1    disqualified himself; right?

2            MR. EDWARDS:  Right.  He has asserted various

3    technical criticisms, such as bias within the survey, such

4    as attacking the way that she -- that Dr. Hastings would do

5    pricing.  Those are technical criticisms of a conjoint

6    analysis survey.

7            A survey expert would know that things like bias can

8    be addressed by a survey expert through pretesting the survey,

9    avoiding focalism bias through the wording used, very

10   technical, kind of in-the-weeds things that conjoint survey

11   experts know.

12           Dr. Strombom says, "Well, I don't think she did it

13   right," but he doesn't really have the expertise to get into

14   those -- those weeds, your Honor.

15           He also attacks her survey design regarding the

16   selection of pricing.  He states that Dr. Hastings fails to

17   consider the vehicle pricing is negotiated and that identical

18   vehicles sell for different prices, for example.  That's

19   another one of the technical criticisms.

20           When I asked --

21           THE COURT:  I'm trying to sort of look at this in the

22   big picture.

23           MR. EDWARDS:  Sure.

24           THE COURT:  The opinions that are being discussed

25   here in these motions; attacked, if you will, are all related

1    to the question of class certification, which is a decision

2    by me, not by a jury.

3            And to the extent that Dr. Strombom criticizes

4    Dr. Hastings, I understand that some of those criticisms will

5    be fodder for the motion to exclude Dr. Hastings' opinion

6    because of her methodology, but beyond that, what difference

7    does it make whether he is qualified to level those criticisms

8    or not if I conclude that his criticisms really don't amount

9    to much because he said he doesn't have the experience?

10           What's the import of the motion and why did you have

11   to file it?

12           MR. EDWARDS:  Yeah, I think I would agree with you,

13   your Honor, if solely for the purpose of class certification.

14   If you -- if you don't believe that he has the sufficient

15   expertise to launch any valid criticisms of the conjoint

16   survey at issue, then I would agree with you.  I would,

17   though, have an issue with Dr. Strombom, if we get this far

18   down the road, talking to the jury about various issues

19   related to the conjoint survey design, because he doesn't

20   have the expertise to do that.

21           THE COURT:  Well, we're a few hundred yards away from

22   that, I think.

23           MR. EDWARDS:  That we are.  That we are, your Honor.

24           What Dr. Strombom is very familiar with, your Honor,

25   is analyzing used car depreciation rates, and that's really

1      the other major component of our motion to exclude.  This

2      process involves using -- analyzing used car data, and that

3      usually comes from auction houses or other public sources,

4      looking at that data and determine if the depreciation rate is

5      off kilter with what we would expect it to be in the market,

6      comparing it to other vehicles.

7            The term that he used and that I think is appropriate

8      here is trying to determine if there was excess depreciation

9      of used cars.  The problem with this method is that plaintiffs

10     allege that FCA vehicles were sold with a diminished value at

11     the point of sale due to an undisclosed latent defect.  The

12     amount in which the class members -- the proposed class

13     members overpaid is exactly what the conjoint analysis survey

14     is designed to measure.  It's not what the analysis of used

15     vehicles years later is designed to measure.

16           I asked Dr. Strombom specifically in his deposition:

17           "Was part of your assignment in this case to attempt

18     to calculate classwide damages at the initial point of

19     purchase?"

20           His answer:  "No, I don't -- I don't believe so."

21           The question then becomes, if Dr. Strombom is

22     admitting that he is not calculating damages at the point of

23     sale consistent with plaintiffs' theory of liability and

24     damages in this case, then can any numbers from years later

25     in the used car market be extrapolated to give us meaningful,

1    useful, reliable information about whether there was, in fact,

2    overpayment at the point of sale?  Because that's the real

3    issue.

4          So I asked him, can you point to -- and we cite this

5    in our brief and I know your Honor has read it, but to

6    paraphrase, we asked him, is there any academic literature out

7    there, is there anything that's peer reviewed or generally

8    accepted which would close that gap?  Because what we now

9    have is a chasm between over here, has there been excess

10   depreciation, and over here, did someone overpay for a

11   defective product at the point of sale.  He said none that he

12   knows of.  He doesn't know that that's ever been addressed.

13   That was his response.

14         So the follow-up is, okay, well, if there is not any

15   literature about it, perhaps you have done it.  Perhaps you

16   have gone through this process yourself of trying to cross

17   this chasm in tying these two things together.

18         So I asked him specifically:  "Is looking at used car

19   prices a way that you would utilize to assess damages at the

20   original point of sale for an auto defect case?"

21         Answer:  "You know, I don't think I have ever

22   actually found a diminution in value associated with a defect

23   in used car prices."

24         So he has never had to do that.  Because he has never

25   found diminution in the market, he has never had to transpose

Motion Hearing and Status Conference - April 25, 2019

1    that to make the determination as to whether that has any

2    effect on overpayment at the point of sale.

3         So what we're left with is some numbers about

4    depreciation in the used car market which FCA, according to

5    Dr. Strombom's testimony, will attempt to use to create some

6    implication about whether there has been damage at the point

7    of sale.  But really, there is no bridge between those two

8    things, your Honor.  It doesn't tell us a single thing about

9    whether a person that purchases a car with a latent safety

10   defect overpaid due to the failure to disclose that defect.

11        THE COURT:  In the consolidated complaint, the second

12   amended consolidated master complaint, the plaintiffs have

13   alleged that the vehicles have substantially diminished value

14   and that the value -- and that the diminution is increasing --

15   I'm sorry -- they are diminishing in value at an increasing

16   rate month by month.  And then at paragraphs -- paragraph 24,

17   the allegation is, and I'm quoting, "As a specific example of

18   the increased diminution in value, 2014 and 2015 Jeep Grand

19   Cherokees held their value better than other cars in their

20   class before knowledge of the shifter defect became

21   widespread, but after the defect became known, the monthly

22   depreciation in these cars increased dramatically, causing

23   them to hold value worse than other cars in their class."

24        So I understand that you seek to measure damages or

25   establish a deficit at the point of sale, but you also are

Motion Hearing and Status Conference - April 25, 2019

1    alleging in the complaint depreciation at an excess -- at

2    excess values.  So wouldn't Dr. Strombom's analysis be

3    pertinent to that?

4             MR. EDWARDS:  Two things, your Honor.  Very good

5    points.

6             First of all, from the plaintiffs' position, we're no

7    longer pursuing that as a form of damages.  At this point the

8    only damages the plaintiffs are pursuing are damages at the

9    point of sale.  That damages claim has been abandoned.

10            Second, Dr. Strombom --

11            THE COURT:  Is there something formal in the

12   pleadings that suggests that?

13            MR. EDWARDS:  I'm sorry?

14            THE COURT:  Let me say it again.  Is there something

15   formal in the pleadings that suggests that position?

16            MR. EDWARDS:  Not that I know of, your Honor.

17            THE COURT:  So that's news to me.  Is it news to the

18   defendants?

19            MR. EDWARDS:  I'm not sure if it's news to the

20   defendants.  They are shaking their head yes.

21            But I can represent on behalf of the plaintiffs that

22   all of the damages sought in this case are damages at the

23   point of sale.

24            The second major point, though, your Honor, is it

25   was very clear from his deposition, that's not -- his damages

 1    model looking at used car depreciation is not just in rebuttal

 2    to that assertion that was in the second amended complaint or

 3    the earlier drafts of the complaint.  He wants to use -- FCA

 4    wants to use the used car depreciation numbers that Strombom

 5    found as evidence that there wasn't an overpayment or

 6    diminished value at the point of sale, and that's the chasm

 7    that they simply can't cross.

 8         THE COURT:  And you're saying there is nothing out

 9    there anywhere that supports some interpolation of one to the

10    other; is that what you're saying?

11         MR. EDWARDS:  That's exactly right, your Honor.

12    People can overpay for a defective and unsafe car at the

13    point of sale, and if years later that vehicle still sells

14    consistent with the used car market, that could be due to a

15    number of things.  I mean, FCA still denies that these

16    vehicles are defective, so there has been no admission from

17    FCA.  That could be a reason why the market is not responding

18    in terms of depreciation.  There are many others.

19         But the real issue here is, there is absolutely

20    nothing that Dr. Strombom can point to or nothing in any sort

21    of generally-accepted literature which would indicate that we

22    can look at excess depreciation years later in the used car

23    market and that can weigh in any way on the point of sale

24    damages which are being alleged in this case and were

25    consistent with plaintiffs' theory of liability.

1        And, your Honor, if you -- unless you have any

2   further questions, that's all we have.

3        THE COURT:  No, I don't.

4        MR. EDWARDS:  For these reasons we feel like the

5   opinions of Dr. Strombom will be of no aid to this Court and

6   certainly not to the jury.

7        THE COURT:  Thank you, Mr. Edwards.

8        Mr. Fresard?

9        MR. FRESARD:  Thank you, your Honor.

10       Your Honor, the plaintiffs, I think in their

11  pleadings regarding the conjoint analysis issue, they have

12  sort of created a straw man out of Dr. Strombom, saying he is

13  here to refute Hastings' conjoint analysis and then spent half

14  their brief trying to knock him down, completely ignoring the

15  fact that we have a conjoint analysis expert.

16       THE COURT:  Right.

17       MR. FRESARD:  Rene Befurt.

18       Dr. Strombom's role, from our perspective, is more

19  attacking the underlying economic assumptions that

20  Dr. Hastings made when she proposed a potential conjoint

21  analysis that she has not yet designed or conducted.  What

22  he -- what Dr. Strombom --

23       THE COURT:  Well, she has -- I understand that she

24  has proposed and assembled a methodology, but she hasn't put

25  any flesh on the bones by devising a survey or going into the

1  field.  Am I incorrect or --

2         MR. FRESARD:  The survey has not even been designed.

3  It has to be designed with the choices that are going to be

4  presented, who the participants are going to be, what they are

5  going to be asked, and none of that has been done.

6         And we can talk about that more in the context of the

7  Hastings motion, but that's what we think differentiates her

8  from other conjoint analysis experts who have been allowed to

9  testify, is they have actually said, "Here's the survey I'm

10  going to do.  Here are the questions I'm going to ask.  Here

11  are the options I'm going to give."  She has done none of

12  that.

13         THE COURT:  Well, we'll talk about that in a moment,

14  as you say, but what about Dr. Strombom?

15         MR. FRESARD:  So one of Dr. Strombom's major

16  criticisms of Dr. Hastings is that she says when she does her

17  work, eventually she is going to find the actual transaction

18  data, new car transaction data, and use that data to see what

19  the price was at that point.

20         Mr. Feeney and I were talking about that in

21  preparation for this.  We have both been doing automotive

22  consumer class action work for a long time, and new car sales

23  transaction data is the unattainable holy grail for economics

24  experts.  There is none.  The dealers won't share it.  The

25  OEMs won't share it.  The only data available out there is the

1  NADA Blue Book.

2          THE COURT:  Can't you get them from Secretaries of

3  State?

4          MR. FRESARD:  Not the actual transaction data as to

5  the sales price.

6          THE COURT:  Isn't that on the RD108s?

7          MR. FRESARD:  We have never been able to obtain the

8  actual sales, the --

9          THE COURT:  Price, the sales price?

10         MR. FRESARD:  New car sales price data, no economics

11 expert has ever been able to get it.

12         THE COURT:  You mean in the aggregate?

13         MR. FRESARD:  Pardon me?

14         THE COURT:  You can find it transaction by

15 transaction, though, can't you?

16         MR. FRESARD:  If you do individual inquiries, I

17 suppose, but there is no -- R.L. Polk doesn't.  We've never

18 been able to obtain the new car sales price data.

19         THE COURT:  Oh, all right.

20         MR. FRESARD:  So Dr. Strombom has typically purchased

21 the NADA data, the Blue Book data, and that's what most

22 economics experts have done in the automotive field, both on

23 the plaintiff side and the defense side.  And what that allows

24 them to do -- and this is the analysis that Dr. Strombom did

25 in this case and that he has done in several other cases.  We

1    had him on the stand last January in an automotive consumer

2    class action out in California where he was qualified and

3    testified as to this depreciation analysis.

4           THE COURT:  Which case was that?

5           MR. FRESARD:  That was Daniel versus Ford Motor

6    Company.

7           THE COURT:  Was that the My Ford Touch?

8           MR. FRESARD:  No, no.  It was a rear tire wear --

9    premature rear tire wear class action claim.

10          Dr. Strombom's position is that Hastings says she

11   can compute common classwide damages as to what each of the

12   plaintiffs had on a common classwide basis.  What he is

13   saying is, if that was true that she could do that and the

14   plaintiffs are claiming a material omission, they are claiming

15   that FCA hid some information from the purchasers or did not

16   disclose the defective nature of this shifter at the time of

17   sale.  They also plead in their complaint that the information

18   ultimately became known to the class.  They plead that

19   repeatedly in their complaint.  And there was a recall.  And

20   Dr. Strombom cites to a whole lot of critical articles about

21   the shifter.

22          There is no doubt that at some point the market

23   became knowledgeable about this alleged omission.  If the

24   plaintiffs' claim is true that the plaintiffs all paid too

25   much for their vehicles, and all about the same percentage too

1    much, because that's what Hastings will have to say to get to

2    certification, then the Grand Cherokee and the Challenger and

3    the Chrysler 300 should have all depreciated at the same rate

4    as their competitor vehicles.  Excuse me, they all depreciate

5    at the same rate.

6         What should have happened when that knowledge came

7    out, they should have suddenly -- you should see the chart go

8    down and they should suddenly be depreciating at a much faster

9    rate than their competitor vehicles, because now there is a

10   known defect.  Everybody is saying, "You paid too much for

11   that Grand Cherokee.  When I buy it off of you, I'm not going

12   to pay the premium that you paid for it."  And that's --

13   that's how the analysis is done.

14        And in fact, we did find where Christine Hastings

15   herself did a depreciation analysis in the iPhone case, in

16   the Grace versus Apple case in the Northern District of

17   California.  It's really the only data that's available to go

18   back and look and say, okay, assuming the consumer didn't know

19   this and then assuming the consumer became knowledgeable about

20   this, we should see a dropoff in our product compared to other

21   products, and we don't see that here.

22        And that's really the gist of Dr. Strombom's

23   depreciation analysis, is he's using it as proof that you

24   cannot prove common classwide damages at the point of sale.

25        As far as his criticisms of Dr. Hastings --

Motion Hearing and Status Conference - April 25, 2019

1           THE COURT:  Well, I was with you for a while until

2   you said that last sentence, and that essentially is attaching

3   a depreciation analysis to a question about whether the

4   consumer paid too much when the consumer bought the vehicle to

5   begin with.  So how do you relate depreciation to point of

6   sale questions?

7           MR. FRESARD:  Because the plaintiffs are alleging in

8   this case that there was a material fact omitted at the time

9   of sale.

10           THE COURT:  Right.

11           MR. FRESARD:  And then the market became aware of

12   that fact after the sale.  And had FCA told the class members

13   about that fact at the point of sale, the class members would

14   have insisted on a discount and the cars would have been sold

15   for a cheaper amount.

16           THE COURT:  You mean -- oh, you mean at the time when

17   they were purchased new?

18           MR. FRESARD:  Right.  And so if that is true, then

19   when the market became aware of this alleged defect, the price

20   of the Cherokee compared to its competitors should plummet to

21   reflect that decrease in value, that the vehicles are worth

22   less because they have this defect.

23           THE COURT:  Which is what was alleged in the

24   complaint in that paragraph that I read earlier.

25           MR. FRESARD:  Yes, as far as not only alleged damages

1    for increased depreciation, but they also do allege that the

2    customers didn't get their benefit of the bargain, overpaid.

3    The evidence of that would be is if the market, because the

4    market reflects reality, the market would say all these cars

5    are defective.  They are not worth as much as the Explorer

6    or --

7                 THE COURT:  Well, the conjoint analysis, or any other

8    multi-attribute compositional modeling, would also answer that

9    question; right?

10                MR. FRESARD:  If it is done properly.  If it's

11   modeled properly it could potentially answer that question, I

12   think, but you've got to have the new car transaction data,

13   according to Dr. Hastings in her report and at her deposition,

14   to do that.  And we -- I would like to hear where they plan to

15   get that data from.

16                THE COURT:  Okay.

17                MR. FRESARD:  I don't think you can obtain it.  But

18   that's essentially Dr. Strombom's role, your Honor, is as an

19   economist, not as a conjoint analysis expert, to look at the

20   underpinnings of Dr. Hastings' opinions from on the economic

21   side, not on the conjoint analysis side.  And he has some

22   criticisms of her in that regard, and particularly with regard

23   to her claim that she can establish common classwide damages.

24                THE COURT:  Did you want -- I guess you basically

25   addressed both aspects of the argument, criticism of

1    Dr. Hastings and also his own analysis with respect to

2    depreciation.  Did you want to say anything about separating

3    those things or are you content with your argument?

4         MR. FRESARD:  I would separate them only in the

5    context that to the extent the plaintiffs are attacking

6    Dr. Strombom's qualifications, to discuss how a conjoint

7    analysis is performed, he's offered for that purpose.  That's

8    Dr. Befurt.

9         THE COURT:  Yeah.  Okay.  Thank you.

10         THE COURT:  Mr. Edwards, any follow-up?

11         MR. EDWARDS:  Very briefly, your Honor.

12         When attorneys usually say "very briefly" you've got

13    to watch out, but I actually intend to do it.

14         THE COURT:  I'm very steeled against that phrase

15    these days.

16         MR. EDWARDS:  I'm going to address the pricing data

17    and I'm going to briefly address this theory about how used

18    car depreciation data can be converted to some -- something

19    useful about overpayment at the point of sale.

20         First of all, with pricing data, your Honor, I also

21    do a lot of auto defect cases and work with a lot of conjoint

22    experts and actual, real-world transaction data at the point

23    of sale; in other words, finding out what people -- it is

24    difficult to find.  I don't know if I would agree with

25    impossible, but it is, it is very difficult to find, and

1   sometimes with more -- with some car manufacturers, more

2   difficult than others.

3          The thing about conjoint analysis that makes it

4   special and very useful in this context is, when information

5   like price, actual prices paid in the market is not readily

6   available, it's very easy and very scientifically valid to use

7   a conservative proxy for actual prices paid.  And keep in mind

8   here, your Honor, that a good conjoint survey is probably --

9          THE COURT:  Where does that come from?

10          MR. EDWARDS:  In this case, your Honor?

11          THE COURT:  Well, generally first.

12          MR. EDWARDS:  Sure.  It can -- one could use MSRP as

13   a proxy for actual prices paid.  And the more conservative

14   approach and what is -- what is also, I think --

15          THE COURT:  MSRP would not be a conservative

16   approach, would it?

17          MR. EDWARDS:  Well, keep in mind, your Honor, that

18   when you're designing a conjoint, the price levels don't need

19   to be actual prices paid, but rather, the price level on the

20   low end.  You'll have different attributes or levels within

21   the middle of that price range and then you will have a top.

22   The key thing, what makes a conjoint great is, as long as you

23   have the prices paid within that range, you're going to get a

24   valid and reliable scientific result.

25          THE COURT:  Well, I understand what you're comparing

Motion Hearing and Status Conference - April 25, 2019

1    is relative value to the consumer on a part-by-part basis, and

2    that's the whole point of a conjoint analysis; right?

3         MR. EDWARDS:  Right.

4         THE COURT:  Okay.  And what you would end up is --

5    what you would end up with is a value based upon a percentage,

6    would you not, of the diminution in value at the point of sale

7    based upon the defect you're trying to focus on?

8         MR. EDWARDS:  Correct, your Honor.  You're going to

9    isolate out the defect at issue, and a conjoint analysis

10   expert is going to be able to extrapolate from that data

11   through something called hierarchical base regression, in some

12   cases is going to -- is going to be able to pull out those

13   numbers and make a determination as to what the reduction in

14   willingness to pay is.  Or in a case like this where the

15   supply side is fixed as a matter of history, translate that

16   to reduction in market value.  So, yes, it calculates the

17   overpayment.

18        THE COURT:  And what you're looking for, though, is a

19   price per car or an amount per car that was overpaid; right?

20        MR. EDWARDS:  It can be expressed in a lot of

21   different ways, but typically it's expressed in a percentage

22   reduction in value based on the defect.

23        THE COURT:  Okay.  Go back to that, then.  If it's

24   a percentage reduction in value and you're starting with MSRP,

25   which generally is inflated in terms of actual transactions

1     with a few rare exceptions, don't you end up with a skewed

2     result?

3                 MR. EDWARDS:  I gave MSRP as one example that I have

4     seen in the conjoint.  I think we have gotten a little far

5     afield now, because in this case Dr. Hastings actually used

6     invoice price, which is conservative.

7                 THE COURT:  Oh.

8                 MR. EDWARDS:  And very few people are going to pay

9     less than invoice price.  So Dr. Hastings chose the more

10    conservative route and used invoice as a proxy for the actual

11    prices paid.  So we're erring on the side of being

12    conservative there.

13                THE COURT:  Okay.

14                MR. EDWARDS:  With regard to FCA's position that,

15    look, we can tell -- if the market becomes aware of the

16    alleged defect years later, we should see this drop in resale

17    values and that is somehow indicative that there -- if we

18    don't see this excess depreciation drop, this would be

19    evidence that, in fact, there is no overpayment at the point

20    of sale.

21                Conjoint analysis is very good at looking at, okay,

22    how would the market have reacted if FCA would have disclosed

23    this defect at the point of sale?  Looking at depreciation

24    rates like this can never make an equivalent simulation

25    because sitting here today FCA still denies that there is a

1  defect.  Conjoint analysis forces awareness, just like the

2  awareness would be forced if FCA made the admission that there

3  was a defect at the point of sale, and that's what really

4  matters.

5          Looking at prices paid years later based on, well,

6  I saw this on Good Morning America, or there was some media

7  coverage about this because a star died, that's not the same,

8  your Honor, as FCA coming out and saying, "Here's the

9  problem."

10         Let's not also forget that there was a --

11         THE COURT:  Well, what about the recall?

12         MR. EDWARDS:  You were -- you beat me there.  Let's

13  also not forget that there was an FCA recall in this case.

14         THE COURT:  Isn't that an admission, essentially,

15  that there's a problem?

16         MR. EDWARDS:  Well, the FCA -- the FCA recall

17  addressed one component.  And the implication of that recall,

18  if I'm a used car salesman -- well, not me personally, but

19  I can certainly see a used car salesman indicating to a

20  consumer, if the consumer doesn't believe already that the

21  recall addressed this safety defect, which as you know we

22  allege it did not, so it's really no surprise the market isn't

23  reacting in these depreciation rates because FCA is, first of

24  all, denying this ever was a safety defect, and B, they have a

25  recall to fall back on to say, yeah, this has all been taken

Motion Hearing and Status Conference - April 25, 2019

1    care of, it's nothing for you to worry about.

2           In the end it still doesn't tie to an actual

3    overpayment number at the point of sale the way it would if

4    Chrysler would have come out and said, yes, this is the safety

5    defect at issue.  That's what conjoint is excellent at doing.

6           That's all I have.

7           THE COURT:  Thank you.

8           All right.  I'll take that motion under advisement.

9    I'll get you a written decision in due course.

10          And Mr. Fresard, let's deal with Dr. Hastings,

11   please.

12          MR. FRESARD:  Seems topical.

13          THE COURT:  I guess.

14          MR. FRESARD:  Your Honor, I think to follow up on

15   some of the comments by counsel, we have learned today just

16   now that Dr. Hastings plans to use dealer invoice data as

17   part of her analysis and I don't know whether that data is

18   compiled.  Dealers have different invoice prices based on who

19   the dealer is.  A mega dealer in three states gets a better

20   deal from FCA than the little dealer up north.  Dealer

21   invoices include overhead, heat, lighting, other -- their

22   advertising costs.  I don't know where there is a compilation

23   of dealer invoice data.  I don't -- I have just never heard of

24   it before.

25          And that sort of gets to the point of Dr. Hastings'

1    limitations in this case.  You know, when we took her

2    deposition we were kind of surprised at her absolute lack of

3    knowledge of the auto industry and not knowing what terms like

4    OEM meant.

5            When she was asked about, what is a dealer incentive

6    program, she said it's a program that incentivizes dealers.

7    We all live in an automotive town and --

8            THE COURT:  Well, isn't that true?

9            MR. FRESARD:  It is.  Might be a little more

10   complicated than that, though.

11           Just living in an automotive town we sort of know how

12   sophisticated the whole sales transaction process is.  And

13   according to Dr. Hastings, buying a car is simpler than buying

14   a tube of toothpaste is what she said.  Toothpaste is much

15   more complicated because there's so many of them.

16           And that's one of our underlying problems.  When she

17   is saying, I'm going to go out and I'm going to design a

18   survey to test how much people overpaid for the class vehicles

19   because they did not know of the defect, she is unable to

20   bring to bear any knowledge of the auto industry, things

21   like negotiation or things like whether the dealer's at an

22   end-of-the month quota, whether it's winter or summer, all of

23   these factors that she is not even aware of, and she hasn't

24   proposed how she is going to deal with them in her survey.

25           Most importantly, she said at her deposition she

```
 1      doesn't know how she is going to deal with the recall, and
 2      that's a huge issue.  In the typical consumer case we have got
 3      a claim of a material omission by way of a safety-related
 4      defect, and then some dispute about whether there is, in fact,
 5      a defect that affected the value of the vehicles.
 6           In this case, there was a recall.  There was an
 7      admission that the vehicles needed some additional mitigating
 8      technology to protect drivers if they made a shifting error
 9      when they got out of their car and unbuckled their seat belt
10      to put the car in park.
11           THE COURT:  I thought Mr. Edwards deftly turned on
12      that one, saying it's sort of a two-edged sword because the
13      recall is an acknowledgment there is a problem, but also a
14      claim that it's not a problem anymore.  How do you respond to
15      that?
16           MR. FRESARD:  Well, because it is -- the recall did
17      resolve the problem.  The pleading, I think paragraph 152 of
18      their second amended complaint, is that the shifter is
19      confusing, error prone, and if only -- if only --
20           THE COURT:  Take a minute, if you want.
21           MR. FRESARD:  Paragraph 152 of their complaint:
22      "Safety override features are common in other car companies'
23      vehicles that use a monostable shifter.  And if FCA had
24      employed a safety override it may have prevented the
25      collisions, injuries and death associated with the defective
```

1    shifter.  For example, Mercedes sells vehicles with monostable

2    shifters like those in the class vehicles, but Mercedes

3    vehicles include a safety feature that automatically shifts

4    the gear to park when the engine is running and the driver

5    releases his foot off the brake pedal and the driver's side

6    door is open.  This safety override eliminates the potential

7    for the dangerous vehicle rollaways associated with the

8    defective shifter."

9         So they pled in the complaint that they filed that

10   the defect is a risk of rollaway when the driver gets out, and

11   had customers known about this they would have paid less for

12   it.  Then subsequently there was a recall that imposes the

13   exact remedy that they pled in 152 FCA should have

14   implemented.

15        And Hastings said she doesn't know how she is going

16   to deal with that.  She said, "I don't know how I'm going to

17   deal with the recall."  That was her testimony.  And we still

18   haven't seen how she is going to deal with it.

19        And that's in addition to her sort of lack of

20   knowledge in the auto industry.  It's her lack of any proposed

21   design.  She hasn't designed a survey.  She hasn't told us who

22   she is going to survey.  She hasn't decided whether it's going

23   to be class members or -- or people not in the class, because

24   she said class members already know about the monostable

25   shifter.  So she doesn't know that.

Motion Hearing and Status Conference - April 25, 2019

1      She said she -- at her deposition she was not going

2  to include people who buy used cars.  25 percent of the class

3  members purchased these vehicles used.  So her opinions are

4  not relevant to that 25 percent of the class, and they are not

5  a fit under Daubert as to those 25 percent of the class.

6      Your Honor, we attached a lot of conjoint analyses

7  done by other experts and other decisions.  And plaintiff, in

8  their supplemental briefing, cited to the Scheckner decision,

9  Judge Murphy's decision.  In all of those cases the Court was

10  looking at a conjoint analysis that was designed, and in the

11  vast majority of those cases, conducted, but at least a

12  designed study that said, "I'm going to ask these questions

13  and I'm going to survey this population.  I'm going to control

14  for the variables this way."  None of that has been done in

15  this case.

16      And I don't know why, but the plaintiffs have chosen

17  to, I think, roll the dice a little bit and say -- she says,

18  "I'm going to design a survey.  I will get there at some

19  point."  The problem is that for your Honor to assess their

20  motion for class certification, your Honor needs to know if

21  they are going to be able to prove common classwide damages,

22  and Dr. Hastings just doesn't even give your Honor a survey

23  that the Court could look at and decide whether it's reliable

24  or a fit under Daubert.  We don't even come close to getting

25  there.

1             And because of that, your Honor, we don't think the

2    plaintiffs are going to be able to prove classwide damages and

3    we don't think the Court ought to let Dr. Hastings' report

4    stand.  It doesn't even assist the Court, really, I think, in

5    calculating classwide damages.  And for all those reasons, we

6    would ask that the Court exclude Dr. Hastings in this case.

7    She just hasn't done the work.

8             THE COURT:  Okay.  Thank you.

9             Mr. Pitoun, I think this is yours; right?

10            MR. PITOUN:  Yes, your Honor.

11            A couple points I want to respond to from

12   Mr. Fresard's comments.  One, with regards to the source of

13   the dealer invoice data, the source on that was FCA itself.

14   They gave it to us.  So we're going off data they have

15   provided to us in discovery.  And if that's wrong, I sort of

16   don't know what to do about that.  But they provided to us

17   dealer invoice data and MSRP data for each of the class

18   vehicles, so that's what we're going to be using and that's

19   what we provided to Dr. Hastings.

20            Next point I want to address is Mr. Fresard's

21   comments about her lack of auto industry knowledge.  There is

22   no case law that has been provided by FCA that's essentially

23   stood for the proposition that a conjoint expert needs

24   industry-specific knowledge in order to effectively carry --

25   design and carry out a consumer choice survey and perform the

1    conjoint analysis.  That standard doesn't exist.  It's simply
2    a creation for purposes of their motion.
3           And what we do need to consider is, this is a
4    professor who has a Ph.D. in economics.  She is a
5    well-regarded survey expert.  She has consulted for government
6    agencies, she has testified before the Consumer Financial
7    Protection Bureau, and administered surveys in a range of
8    industries, from energy to anti-trust issues, public policy,
9    Social Security.
10          In her deposition, what she testified was that she --
11   that in order to perform a conjoint analysis and design a
12   survey, what you need to do is you need to give yourself a
13   basic knowledge of the industry that you're trying to survey.
14   And that's exactly what she's done.
15          What was ignored in both FCA's opening and their
16   reply brief is one of her sources was over 180 pages of FCA's
17   own internal documents.  She reviewed that along with the
18   complaint and all the documents that were attached to it to
19   get herself up to speed.  I think that provides her the basic
20   knowledge that she needs.
21          Beyond that, I -- I find it hard to speculate, to say
22   that, you know, only auto conjoint people are qualified to
23   perform auto conjoint surveys.  The principles that she's
24   applying apply across industries, and be it the private sector
25   or public sector, it's basically the same exercise.

1       THE COURT:  Well, the point of her participation in

2  the case at this stage is that she wants to provide an opinion

3  that she will be able to determine classwide damages; correct?

4       MR. PITOUN:  That's correct, your Honor.

5       THE COURT:  And in order to do that, a survey will be

6  required.  She can't really do her work without that; correct?

7       MR. PITOUN:  That's correct, your Honor.

8       THE COURT:  Well, the point of Mr. Fresard's motion

9  is that she hasn't done anything on that yet.

10      MR. PITOUN:  Well, as of October 17, 2018, when the

11  report was submitted, the survey had not yet been designed.

12  It now has been designed and it's been deployed to the field.

13      THE COURT:  When was her deposition taken?

14      MR. PITOUN:  If I recall correctly, that would be in

15  December 2018.

16      THE COURT:  Okay.  And she hadn't done -- designed

17  the survey then either?

18      MR. PITOUN:  At that time it was being designed, but

19  it is now completed and in the field.

20      THE COURT:  Oh.  You say it's in the field?

21      MR. PITOUN:  It is in the field.

22      THE COURT:  People are answering questions?

23      MR. PITOUN:  That's correct, your Honor.  The whole

24  process takes about six months, at minimum, to do properly,

25  because you have to get -- well, as she testified in her

1    survey [sic], the first thing you do is you draft the survey

2    instrument and then you have to focus group the questions

3    to make sure that they are not misleading, they are not

4    confusing, that there is no focalism bias, and that's all been

5    completed now.  And then you deploy the survey and you have to

6    get a statistically significant number of completed responses,

7    analyze that data, and then put it together to determine the

8    change in willingness to pay.

9            I just want to quickly back up to something that you

10   said earlier, I believe, in your comments or questions to

11   Mr. Edwards.  What she is measuring is not the depreciation

12   at the time, at the point of purchase, it's the change in a

13   consumer's willingness to pay based on the disclosure of the

14   defect at the time of sale.

15           THE COURT:  I don't recall saying anything about

16   depreciation at the time of purchase, because that doesn't

17   make any sense.

18           MR. PITOUN:  You're right.  I'm sorry.

19           THE COURT:  Which is not to say that I don't say

20   things that don't make sense, but --

21           MR. PITOUN:  It was the diminution in value at the

22   time of -- at the time of sale.

23           THE COURT:  To the consumer?

24           MR. PITOUN:  To the consumer.

25           THE COURT:  Is that not what she is measuring?

1          MR. PITOUN:  No.  She is measuring the consumer's

2    change in their willingness to pay.  It's slightly different.

3          THE COURT:  Okay.  I guess I would assume that the

4    willingness to pay is pretty much tied directly to the

5    consumer's perception of value.

6          MR. PITOUN:  That's correct, your Honor.  Absolutely.

7          THE COURT:  Well, I got one right, huh?

8          Would you just stand by for one second?  I want to

9    make a note.

10          MR. PITOUN:  Sure.

11      (Pause in the proceedings at 2:51 p.m.)

12          THE COURT:  I'm sorry, counsel, go ahead.

13          MR. PITOUN:  So let me back up a second to the topic

14    of the lack of the completeness of her report.

15          An expert is not required to perform a complete

16    conjoint analysis at the class certification stage.  That's

17    well held in the case law, and the Price case is a prime

18    example where the Court evaluated and rejected the exact same

19    argument that FCA is making here.

20          "At class certification," and I'm going to quote, "a

21    conjoint expert need not identify all features she might

22    test, how she will select the features to test, and how such

23    features will be presented in the survey."  At class

24    certification --

25          THE COURT:  So you're quoting -- are you still

1    quoting?

2           MR. PITOUN:  That's it.  Well, and I was going to --

3    yes.

4           THE COURT:  What's that quote from again, please?

5           MR. PITOUN:  That's from Price v. L'Oreal.

6           THE COURT:  Okay.

7           MR. PITOUN:  Would you like a cite?  I can give you a

8    Westlaw citation.

9           THE COURT:  A Westlaw cite is fine.

10          MR. PITOUN:  I'm sorry?

11          THE COURT:  A Westlaw cite is fine.

12          MR. PITOUN:  2018 WL 3869896 at page 11.

13          THE COURT:  Thank you.

14          MR. PITOUN:  And continuing, "The Court need only

15   decide if the proposal is capable of matching the liabilities

16   case to the damages case."  And that's Price again, same

17   place, citing to Comcast.  "The plaintiffs's burden is only

18   to show that the appropriately designed conjoint analysis can

19   reliably estimate the economic value to consumers of the

20   challenged claims."  Again, Price.

21          Now, nothing in Comcast requires an expert to perform

22   his conjoint analysis at the class certification stage.

23   That's just not the requirement.  And while Daubert applies

24   at class cert --

25          THE COURT:  Well, the way I understand the argument

```
 1     is that the defense would accept that proposition.  The point
 2     is, the expert has to be able to say that it can be done, and
 3     Mr. Fresard said that she hasn't brought the goods because
 4     she has been very speculative about whether a survey could be
 5     designed and that -- and there is nothing upon which we can
 6     rely to reach the conclusion that it can be done.  But you're
 7     telling me that it -- that the survey is finished and it's in
 8     the field.  Has that information been supplemented to the
 9     defendant yet?
10             MR. PITOUN:  Well, no, not directly, but again, the
11     fact that the -- because of the time span required in order
12     for us to complete a conjoint analysis and produce our merits
13     report by May 30, we would have to continue on in the process
14     in order to make that deadline.
15             THE COURT:  So what are you saying, that the defense
16     should assume that you're doing what you are supposed to do?
17             MR. PITOUN:  I would hope so.
18             THE COURT:  All right.
19             MR. PITOUN:  I mean, it wouldn't be prudent for us to
20     go full stop just simply because of how long it takes to
21     properly do this.  So...
22             THE COURT:  All right.
23             MR. PITOUN:  And again, you know, the plaintiffs
24     admit that the Daubert standard applies at class
25     certification.  But again, the standard is different in
```

1   the context of Rule 23, and that's where we are.

2           THE COURT:  Well, the Daubert standard isn't

3   different in the context of Rule 23.  Maybe the application

4   of the standard is, but the standard is the same.

5           MR. PITOUN:  Well, I think you stated it better than

6   I have.  The inquiry is limited to whether expert reports are

7   admissible to establish the requirements of Rule 23.

8           THE COURT:  Right.  In fact, I think there is -- that

9   proposition is unsettled, isn't it, whether Daubert even

10  applies at the class certification stage?

11          MR. PITOUN:  Are you -- well, are you referring to

12  the Sixth Circuit -- to the Seventh Circuit case that was

13  cited by defendants?

14          THE COURT:  Well, no.  The Seventh Circuit case is

15  the one that district judges generally follow if they are

16  going to apply the Daubert standard, as I understand it.  But

17  there is no settled Sixth Circuit law, at least appellate law,

18  that says that it is.

19          Now, there is suggestion by the Supreme Court that it

20  probably ought to be, I think, but that's -- but I didn't know

21  that you wanted to raise that point of law.

22          MR. PITOUN:  I'm proceeding under the assumption that

23  Daubert applies as it relates to Rule 23.

24          THE COURT:  I think that's safe and that's probably

25  what I intend to do.

```
 1            MR. PITOUN:  Okay.  Now, I think the example of an
 2     incomplete survey that's really too bare bones and that
 3     defendants have brought to bear in their -- I believe it was
 4     in their reply brief, was the report by Collin Weir in the
 5     ConAgra case.  And if you look at Dr. Hastings' report
 6     compared to Mr. Weir's report, you're really talking about
 7     two different types of reports.  I mean, Mr. Weir's report
 8     was eight pages.  It had a basic two-page analysis of what
 9     conjoint is and a bit of off-the-cuff math on how he's going
10     to apply that to the case at hand.
11            Dr. Hastings' report is much longer.  And just as an
12     aside, plaintiffs attached that report to their opposition,
13     and I have a copy if the Court would like to see it.  Okay.
14     Dr. Hastings' report was 29 pages.  It provides extensive
15     detail on how conjoint works, the factors that she could very
16     well consider, and.
17     A.   Indeed, as she has designed the survey instrument, many of
18     those possibilities have materialized into what she actually
19     has inserted into the survey.
20            And the survey population has basically been
21     determined to provide a statistically significant sample,
22     the breakdown of how many survey takers are going to be SUV
23     purchasers and potential purchasers.  She is going to be
24     surveying class members and nonclass members who have purchased
25     competitive vehicles during the class period.  All these things
```

Motion Hearing and Status Conference - April 25, 2019

1     have become known.

2           And she expressed -- she expressed complete

3     confidence that she had -- that she could create a conjoint

4     that would be able to measure the damages in this case.  It's

5     right there in her report.  And she expressed it again in her

6     deposition.  I don't think there was any doubt in her voice at

7     any point during the deposition that she could do what she

8     intends to do.

9           THE COURT:  All right.  Anything else?

10          MR. PITOUN:  At this juncture, no.

11          THE COURT:  Thank you.

12          Mr. Fresard, any follow-up on this motion?

13          MR. FRESARD:  Very briefly, your Honor.

14          THE COURT:  There it goes again.

15          MR. FRESARD:  Pretty surprised to hear that there is

16    a survey underway.  The class certification schedule in this

17    case was well known to all the parties.  There were extensions

18    requested and granted by the Court.  There is really no excuse

19    for the plaintiffs not having at least produced the design

20    that she -- of the survey that she is now undertaking.

21          Counsel had said that they had not -- you asked

22    whether it had been provided to the defendants and he said,

23    "Not directly."  We have not indirectly seen anything about

24    the survey either, your Honor.

25          THE COURT:  I was trying to imagine how otherwise it

 1    would be than directly.

 2            MR. FRESARD:  Right.  And again, this just gets back

 3    to the --

 4            THE COURT:  You know, what came to mind is whether

 5    there is a duty to supplement, and there is certainly under

 6    26(a)(1)(A), and probably under 26(a)(1)(B), except that's

 7    a little more complicated with respect to expert reports,

 8    because there is only one report, and I would imagine that you

 9    won't see another one until the survey results are in.  So

10    there's -- there might be nothing out there, but there is

11    some information, and I don't think it was mentioned in the

12    response to the motion either.  But if you want to inquire

13    further by way of some sort of discovery before you have to

14    argue the class cert motion you can certainly do that, and I

15    would expect there would be a prompt response in light of the

16    circumstances.

17            MR. FRESARD:  We will, your Honor, but I think the

18    defendant's position is that the class certification issue has

19    been fully briefed.

20            THE COURT:  Yeah.

21            MR. FRESARD:  And that the Court can rule on the

22    record before it, where the Court does not have a conjoint

23    analysis design proposal from Dr. Hastings to assess.

24            Briefly on the Scheckner decision again that counsel

25    talked about with Mr. Weir's conjoint analysis, that was

 1   the Judge Murphy opinion in their supplemental filing, would

 2   encourage the Court to read that opinion.

 3        Mr. Weir submitted a conjoint analysis where he

 4   actually had numbers and had terms that he was using;

 5   self-cleaning oven versus, I think, partial-cleaning oven or

 6   something like that.  He had done a conjoint analysis and come

 7   up with percentages and numbers for the Court to look at, and

 8   the question, what the defendants were arguing in that, is

 9   that his conjoint analysis ought to be rejected.  Mr. Weir's

10   work is up here compared to Dr. Hastings' work, which at the

11   time of briefing, is down here (indicating).

12        THE COURT:  You mean in terms of the evolutionary

13   stage of the project?

14        MR. FRESARD:  Yes, your Honor, in terms of the Court

15   being able to assess whether it's reliable and relevant to the

16   Court's analysis on trying to assess classwide damages in this

17   case.  Mr. Weir at least gave the Court some ammunition or

18   gave the Court something to look at, and Dr. Hastings just --

19   as we said, just didn't do the work in time.  Now we

20   understand she is doing the work, but didn't do the work in

21   time for plaintiffs to meet their burden going forward on

22   arguing for class certification.

23        THE COURT:  Okay.  This motion is under advisement as

24   well.  And as with the other, I'll get a written decision out

25   as soon as I can.

1          MR. PITOUN:  Excuse me, your Honor.  Can I just
2     address one quick correction?
3          THE COURT:  You want to make a difference in your --
4     withdraw part of your argument?  Is that what you want to do?
5          MR. PITOUN:  No, I don't.  The Weir report that
6     Mr. Fresard cites is actually in the ConAgra case.
7          THE COURT:  I understood you to say that.
8          MR. PITOUN:  Okay.  Okay.
9          THE COURT:  He mentioned that it was in Judge
10    Murphy's case, but that's not the ConAgra case.
11         Mr. Fresard, are you -- are we comparing the same
12    thing here?
13         MR. FRESARD:  No.  There is a Weir report in the
14    Scheckner case, your Honor.
15         THE COURT:  Okay.  And you're telling me that it's a
16    good idea for me to read that case before I decide this one?
17         MR. FRESARD:  Yes.  As far as comparing what Mr. Weir
18    did to what Dr. Hastings didn't do in this case.
19         THE COURT:  Thanks.  I appreciate the tip.
20         Don't sit down because you have your next motion up
21    as well.
22         MR. FRESARD:  I do.
23         THE COURT:  And that's the Rosenberg motion.
24         MR. FRESARD:  Yes, your Honor.
25         This is defendant's motion to exclude the testimony

1   of Craig Rosenberg, who is plaintiffs' human factors expert.

2        Dr. -- excuse me -- Mr. Rosenberg --

3        THE COURT:  Mister, not Doctor, yes.

4        MR. FRESARD:  Yes.

5        He's a human factors expert, no doubt about it.  Very

6   limited experience in the automotive realm.  And I think the

7   Court had referred to the My Ford Touch.  He did testify in

8   the My Ford -- or gave a deposition, I think, in the My Ford

9   Touch class action where essentially he was discussing the --

10       THE COURT:  You know, Mr. Fresard, as I was reading

11  your response -- or your motion in that regard, it called to

12  mind the criticism that was leveled against Alan Mulally when

13  he came to Ford Motor Company, that he really didn't -- he

14  wasn't a car guy.  And his response, I thought, was quite

15  pertinent, that he came from an industry in which there were

16  moving parts in his product at a geometric factor of about 100

17  compared to the industry that he was entering.  But that's

18  just an observation.

19       MR. FRESARD:  And it's a valid observation, your

20  Honor.  The problem is that -- and I would say I would even

21  take that observation a little further and talk about the

22  enormous engineering challenges in the aircraft industry and

23  the amount of scientific rigor that has to be applied because

24  the stakes are so high.  And we're seeing it with Boeing even

25  now.  I mean, almost every product is a bet-the-company type

1   of product.

2          And I think when you look at it, Rosenberg has some

3   background in the aircraft industry and it's kind of stunning

4   that he took such an ad hoc approach in this case to his

5   testing, where he gathered some subjects in an abandoned Sears

6   parking lot, sat in the passenger seat, put a GoPro on them,

7   and took notes about whether or not they were making mistakes

8   when they shifted.

9          Then he told me at his deposition, "Well, I was

10  watching everything going on so much that my notes turned out

11  not being worth anything.  We threw those aside and I relied

12  on my assistant Dr. Keller's review of the video as to whether

13  or not these people had made mistakes when they attempted to

14  shift."

15          THE COURT:  Isn't that basically the same thing that

16  Chrysler's analyst did in the Lextant study?

17          MR. FRESARD:  Chrysler -- the Lextant study, Lextant

18  is a vendor, so it wasn't Chrysler's analyst, but they are a

19  customer preference vendor.

20          THE COURT:  Right.

21          MR. FRESARD:  The Lextant group was not --

22          THE COURT:  A contract analyst is what I meant to say.

23          MR. FRESARD:  Contractors.  They were not assessing

24  any safety features of the vehicle.  They were assessing, what

25  do customers like?  Do they like a joy stick?  Do they like a

1    rotary knob?  Do they want a traditional shifter?  And they

2    are looking at a variety of features, including confusion or

3    error rates, but make -- drawing no conclusions about safety.

4         Moreover, we're not trying to -- the Lextant group

5    is not trying to get qualified to offer expert testimony in

6    any federal court; Dr. Rosenberg is.  And I think a better

7    contrast might be between the work that the defendant's

8    experts did where they -- Exponent Engineering instrumented

9    vehicles with shifters using string pots and strain gauges and

10   actually had objective data as to where people were trying to

11   put the shifter at particular times, and it's scientific.

12        And that's a big problem we have with Dr. Rosenberg,

13   is that it's his opinion when he looks at somebody trying to

14   shift, whether or not -- what they were trying to do with it.

15   And not even his, it's his assistant's opinion as she explains

16   it to him.

17        THE COURT:  Is this a weight or an admissibility

18   issue?  I know what you're going to say the answer is, but why

19   isn't it a weight issue?

20        MR. FRESARD:  Because it is so unreliable.  It is so

21   unscientific that it doesn't meet -- it's never been -- you

22   know, he hasn't published anywhere.  There's no studies

23   published saying that this is a way to scientifically assess

24   error rates in shifters, and it is so subjective it doesn't

25   meet even the basic Daubert requirements of empirical testing.

1    And I think the way to really test that is, can we go out and

2    replicate what Mr. Rosenberg did?

3              THE COURT:  All you need is an abandoned Sears

4    parking lot and a GoPro; right?  So of course you can.

5              MR. FRESARD:  There are probably a few Sears parking

6    lots that we could find.

7              But no, the problem is that, whose opinion are we

8    going to listen to as far as whether or not the operator was

9    intending to shift into a particular gear?  Do we just use

10   his --

11             THE COURT:  Is the video footage available?

12             MR. FRESARD:  It is, if -- but what standard would we

13   apply is the question.  It's got to be empirical, scientific

14   work.  So we've got to be able to look at the video and come

15   to the same conclusions as Dr. Rosenberg by looking at it.

16             The plaintiffs said in their briefing that we can

17   fact check Dr. Rosenberg, but that's not our job.  It's their

18   job.  They have the burden of proof of coming forward with

19   reliable scientific evidence for the Court to use in assessing

20   whether to certify a class in this matter.

21             And the problem is, we could watch that video and

22   disagree with Dr. Rosenberg and say, no, we think there were

23   only nine errors, or we could say, wow, we think there were

24   22 errors.  But I think if you had five different people watch

25   the video, you would probably have five different conclusions

1    as to what types of errors were made and whether or not the

2    person was intending to shift into a particular gear.  And

3    that's the big problem with his study; it's just, we don't

4    have instruments on the shifters.  We don't have data.

5         Another problem we have with his study from a

6    scientific standpoint, and really from an admissibility

7    standpoint, your Honor, is that Dr. Rosenberg compared the

8    monostable shifter in a 2015 Grand Cherokee, which is a class

9    vehicle, to a polystable shifter, which is a new electronic

10   shifter in a 2019 Cherokee.  The vehicles are different.

11        THE COURT:  Well, sure, the vehicles are different.

12   The shifter is the same, though, as what was used in the

13   Lextant study, isn't it?

14        MR. FRESARD:  The polystable shifter is the shifter

15   that was assessed in the 2012 Lextant study, yes, your Honor.

16        THE COURT:  Right.  Okay.

17        MR. FRESARD:  But that shifter was commercially

18   unavailable.  It wasn't even invented at the time that the

19   class vehicles were designed and released with the monostable

20   shifter.  That polystable shifter was developed internally at

21   FCA.  It was invented, it was the first of its kind, and

22   ultimately was rolled out in vehicles after the class vehicles.

23        But he is comparing the monostable shifter against

24   technology that was commercially unavailable to FCA at the

25   time they designed this shifter.  And so we think it's

 1    irrelevant.  It doesn't fit the facts of this case.

 2           So essentially, your Honor, we -- it's the defendant's

 3    position that Mr. Rosenberg just doesn't have enough experience

 4    in the automotive field to give us opinions about appropriate

 5    shifter design from a human factors perspective.  But our

 6    primary criticism is the really subjective nature of his

 7    testing and having an assistant watch video and then using

 8    that, and so we think it's inadmissible at this stage.

 9           THE COURT:  All right, Mr. Fresard.  I understand

10    your argument.  Thank you.

11           MR. FRESARD:  Thank you.

12           THE COURT:  And Mr. Pitoun, are you taking this one

13    as well?

14           MR. PITOUN:  I am, your Honor.

15           THE COURT:  You may proceed.

16           How did Mr. Rosenberg determine that there was a

17    shifting error?

18           MR. PITOUN:  So first what he did was he reviewed the

19    Lextant study and he looked at the eight types of errors that

20    were categorized in that study.  And then what he did was he

21    basically selected five of them, the five that were easiest to

22    identify visually on the GoPro, and those were the five that

23    he tested for.

24           THE COURT:  Well, how did he detect that an error had

25    occurred?

1        MR. PITOUN: So they -- so the types of errors --

2    for example, there was an undershoot error where, say, for

3    example, you're trying to go from drive to park, and the task

4    assigned to you says you go from drive to park and the driver

5    only attains reverse.  The GoPro camera could capture that.

6        There is an overshoot error which the driver is

7    supposed to go from, say, drive to reverse, but the driver

8    goes all the way to park.

9        THE COURT:  So in order to make that determination

10    that there was an error --

11        MR. PITOUN:  Right.

12        THE COURT: -- the tester would have to know, A, what

13    the driver's intention was to begin with, and B, that there is

14    some evidence that the driver did not achieve that result; is

15    that correct?

16        MR. PITOUN:  That's correct, your Honor.

17        THE COURT:  So how do you figure out the first?

18        MR. PITOUN:  The first part -- well, the task is

19    given by the test administrator, either Dr. Rosenberg or

20    Dr. Miller, at the time or immediately before the test subject

21    is supposed to do the test.

22        THE COURT:  So they're saying, "You have to drive

23    over here and put it in park"?

24        MR. PITOUN: Sure.  Or, you know, some of the -- so

25    let's use an example.

1          Some of the tests were done in a stationary setting.

2     So the vehicle was stationary with the foot -- the driver's

3     foot on the brake.  And then the -- you know, Dr. Rosenberg

4     might say, "Okay, the vehicle is in drive" -- or say, "The

5     vehicle is in drive.  Please put the vehicle into park," and

6     they would only achieve reverse.  That would be recorded as

7     an error.

8          THE COURT:  Okay.  All right.

9          MR. PITOUN:  Okay.  And then I apologize.  I forgot

10    the second part of what you mentioned.

11          THE COURT:  Well, I -- you had to know what the

12    driver's intent was and then you had to know the driver failed

13    at achieving that result.

14          MR. PITOUN:  That's correct.

15          THE COURT:  And I think you addressed them both.

16          MR. PITOUN:  Okay.  And as a caveat to that point,

17    you know, Mr. Fresard brings up the point that Dr. Rosenberg

18    initially had handwritten notes which he ultimately ended up

19    not using because he didn't find them to be reliable.  The

20    GoPro camera turned out to be far more reliable.  I mean, it

21    records at 60 frames a second.  And the alternative is to rely

22    on unreliable notes, which seems like it would be kind of a

23    foolhardy thing to do.

24          THE COURT:  Was there audio with the GoPro?

25          MR. PITOUN: To my -- I don't know offhand.

1        THE COURT: The reason I ask is, how would one know

2  what the instruction to the driver was if there was not audio?

3  Or was there some other contemporaneous record made?

4        MR. PITOUN: So there were -- there was, like --

5  Dr. Rosenberg had, like, a check box or, like, a -- I'm

6  sorry -- like, a syllabus that he would go through with the

7  driver. "Okay. Now we're going to do a three-point turn."

8        THE COURT: Are those notes available?

9        MR. PITOUN: Yes.

10       THE COURT: Are those records available?

11       MR. PITOUN: Yes.

12       THE COURT: All right.

13       MR. PITOUN: And with regards to the video, those

14  have been produced to defendants. As I recall, the test

15  instructions have also been produced.

16       We're sort of at a loss as to why defendants haven't

17  gone through the videos and basically sought to dispute the

18  point or sought to dispute Dr. Rosenberg's conclusions.

19  Dr. Rosenberg literally invited them to do that during his

20  deposition.

21       THE COURT: When was that deposition taken?

22       MR. PITOUN: Also in December.

23       THE COURT: December. All right.

24       MR. PITOUN: Well, what's essential to keep in mind

25  is that Dr. Rosenberg essentially replicated the methods that

1    were used in the 2012 Lextant study.  That Lextant study

2    was commissioned by FCA itself, nearly identical shifting

3    tasks and identical shifting sequences, and Dr. Rosenberg

4    identified an error rate that was basically the same as what

5    Lextant did.

6         Dr. Rosenberg concluded an error rate of

7    eleven-to-one versus from the monostable to the polystable.

8    Lextant observed an error rate of ten-to-one from the

9    monostable to the polystable.

10        THE COURT:  So why do you need him?

11        MR. PITOUN:  I'm sorry?

12        THE COURT:  Why do you need him?

13        MR. PITOUN:  Well, we -- it's sort of a symbiotic

14   relationship, if you will, your Honor.  His results continue

15   to show that in a post-recall vehicle, which is what we used

16   for the 2015 Jeep Grand Cherokee, there is still a risk of

17   error that makes this vehicle dangerous on a continuing basis.

18        FCA's asserted that the recall takes care of the

19   problem and we assert that it doesn't.

20        THE COURT:  All right.

21        MR. PITOUN:  One other thing about the way that FCA

22   sought to characterize the Lextant study, it's saying that

23   this is a marketing study, that it was commissioned to examine

24   potential future products.  But at the same time, you still

25   need to have your study carried out in a manner that's

1   scientifically rigorous, that essentially gives results to the

2   commissioning party; in this case, FCA, that they can actually

3   rely on.

4          And so even if it's a marketing study or however they

5   want to characterize it, if it weren't scientifically robust,

6   then I don't think they would ever, you know, commission a

7   Lextant study ever again.  I mean -- or they would have

8   stopped the study midway through and said, "You guys are not

9   going to give us data we can actually use," but it doesn't

10  seem like they have done that.

11         The criticism that, you know, Dr. Rosenberg is using

12  a GoPro camera, their expert, Dr. Cades-Young -- or I'm sorry,

13  I've linked two people together.  Dr. Cades and Dr. Young,

14  they used a GoPro camera.

15         And as it relates to Dr. Rosenberg's lack of industry

16  experience, as you point out, you know, his background in the

17  aerospace sector arguably gives him a more safety-critical

18  background in the realm of human factors.  But as mentioned

19  in our brief, and FCA never really seems to respond to this

20  point, he was working with Dr. Erica Miller, who is a

21  specialist in human factors as it relates to the automotive

22  sector.  She is the one who did the coding, and whenever there

23  were close calls, she brought her questions to Dr. Rosenberg

24  and they conferred.

25         The other --

 1            THE COURT:  I don't -- go ahead.  I was going to tell

 2    you I don't have any additional questions.

 3            Do you have any additional argument?

 4            MR. PITOUN:  I just want to comment really quickly on

 5    the whole point, on their argument on instrumentation.

 6            FCA has made a big point about this, that he didn't

 7    instrument the cars, et cetera.  But if you actually read the

 8    Cades-Young report very carefully, even though they talk about

 9    how much they instrumented the cars, the results of that

10    instrumentation, it hardly shows up in their conclusion.  It

11    doesn't -- it's essentially a measurement with no purpose.

12    That's what we would assert now.

13            THE COURT:  All right.  Thank you.

14            Mr. Fresard, any follow-up?

15            MR. FRESARD:  I won't say the magic words, but I will

16    be brief.

17            I guess as I was listening to counsel's argument,

18    your Honor, I was just thinking about we're arguing here today

19    on the admissibility of the expert testimony on the class

20    certification issues, and what came to mind is the materiality

21    prong of the Court's analysis.  And if we're to understand the

22    plaintiffs, the alleged defect in the shifter is that it leads

23    to a higher rate of error.  I think what I just heard in the

24    argument is that it causes a higher rate of error.  And what's

25    the risk of that error is that you may not achieve park, and

1    if the driver gets out of the car the vehicle could have a

2    rollaway.

3            But there has been a recall that instituted an

4    autopark feature that eliminates that risk.  And the question

5    in my mind is, what is the material omission?  What is the

6    material safety risk that still exists post-recall that

7    Mr. Rosenberg is helping the Court assess?  I'm struggling

8    to find it.

9            That's all I have.

10           THE COURT:  Is that a confession?

11           MR. FRESARD:  It is.

12           THE COURT:  All right.  Well, despite your struggles,

13   Mr. Fresard, I'm still going to take this under advisement,

14   and I will get you a written decision on that in due course

15   as well.

16           Is there anything further for the record today on

17   these motions?

18           MR. MILLER:  No, your Honor, not for plaintiffs.

19           MR. FRESARD:  Not from the defense, your Honor.

20           THE COURT:  All right.  Thank you for your

21   presentations.  I thought these were well briefed and have

22   presented very interesting issues, something beyond the

23   garden-variety case, although we don't really get a lot of

24   garden-variety cases here in federal court.

25           We do have a status conference scheduled today.  I

1    think you had sent me an agenda, but I don't have it with me,

2    so I have no clue what's on it right now.

3              MR. WILLIAMS:  Your Honor, we did send an agenda.  It

4    had a single agenda item on it.

5              THE COURT:  And it's you; right?

6              MR. WILLIAMS:  That's me.

7              THE COURT:  All right.  Go ahead, Mr. Williams.

8              MR. WILLIAMS:  Your Honor, we're asking for a 60-day

9    extension.  We're seeking a 60-day extension of the scheduling

10   order that's entered on the personal injury side of the case.

11   I would note that it's not --

12             THE COURT:  An extension of everything?

13             MR. WILLIAMS:  Of the remaining dates, yes, your

14   Honor.  This is our unopposed request for an extension.

15   Plaintiffs have agreed to 60 days.

16             There is good cause for this for a few reasons, your

17   Honor.

18             THE COURT:  Step back one second.  What is left?  How

19   many of these cases are left?

20             MR. WILLIAMS:  There's seven, your Honor.

21             THE COURT:  Okay.

22             MR. WILLIAMS:  There's good cause for the extension

23   for a few different reasons.  One, the trial team does, in

24   fact, have some competing trial obligations in related

25   monostable cases.  There is a monostable case that's in

1  California that is set to go in the midst of our scheduling
2  order.
3        THE COURT:  In a state court?
4        MR. WILLIAMS:  In a state court, yes, your Honor.  I
5  understand.  But of course, your Honor, as the federal court
6  gives comity and respect for the actions of state courts as
7  well, and I hope we can consider that accordingly.
8        In addition, I would say that there are, frankly,
9  your Honor, slightly more cases than we anticipated being in
10 this track.  I recognize that seven is not an overwhelming
11 number.
12       THE COURT:  Well, no, but you thought you would have
13 more settled by now?
14       MR. WILLIAMS:  We have been hopeful, your Honor, yes.
15 So I think that's --
16       THE COURT:  Are any of those still hanging fire with
17 Judge Rosen?
18       MR. WILLIAMS:  No, your Honor.  There are two cases
19 that actually had never gone before Judge Rosen, and that's
20 the Aryeh case, which is the Zimbabwe case.
21       THE COURT:  I thought that was resolved.
22       MR. WILLIAMS:  Well, and that's what I was about to
23 say.  We're still working on resolving that one.  And the
24 Scarso case, which is a late-filed case that -- a straggler
25 case also has not been in front of Judge Rosen because it was

```
 1    late.  So we're also working to resolve that one as well.
 2            THE COURT:  So is the Zimbabwe case also included in
 3    the seven count?
 4            MR. WILLIAMS:  Yes, your Honor.
 5            THE COURT:  All right.  What do you have left to do?
 6            MR. WILLIAMS:  So we do -- essentially, discovery.
 7    The parties have filed -- they filed a master complaint.  We
 8    filed our answer.  We have exchanged initial disclosures.  But
 9    discovery is now opening, so we have to do everything from
10    start to finish, nuts to bolts, depositions.  There has been
11    no exchange by any party of any form of written discovery
12    because all efforts have been focused on settlement.  So...
13            THE COURT:  Are any of those direct files?
14            MR. WILLIAMS:  The Aryeh case, your Honor, yes.  I
15    don't believe any of the remaining ones are.
16            THE COURT:  So those would all be going back to their
17    home districts anyway, right, when pretrial proceedings --
18            MR. WILLIAMS:  That's correct, your Honor.
19            THE COURT:  -- are finished?
20            MR. WILLIAMS:  That's absolutely right.
21            THE COURT:  Unless there is a --
22            MR. WILLIAMS:  Resolution.
23            THE COURT:  Or a stipulation.
24            MR. WILLIAMS:  Correct.  If we saw a Lexecon
25    waiver -- I haven't seen one yet, but we would do it here, I
```

1    suppose.  I would say FCA hasn't made that decision yet, but I

2    wouldn't -- I guess we will wait and see.

3              But, your Honor, I would also note that even with the

4    60-day extension we would still be completing everything,

5    including all dispositive motions and motions challenging

6    experts within the calendar year.  So that at least provides

7    some small reassurance to the Court that we are at least

8    trying to press.

9              THE COURT:  Thank you.

10             MR. WILLIAMS:  Thank you.

11             THE COURT:  Mr. Miller, do you have a comment on this

12   request?

13             MR. MILLER:  Your Honor, I believe 60 days is

14   reasonable and I think it comes within the professional

15   courtesy contemplated by the civility principles, so we do

16   not oppose the request.

17             THE COURT:  That's such a low blow, citing those

18   civility principles.  It just -- even though they interfere

19   with my case management prerogative?

20             Mr. Williams, I think we can accommodate that.

21             MR. WILLIAMS:  I appreciate that, your Honor.  Thank

22   you.

23             THE COURT:  I'll get an order entered on it.

24             MR. WILLIAMS:  Thank you.

25             THE COURT:  Anything else?

```
 1            MR. MILLER:  No, your Honor.

 2            MR. FRESARD:  Nothing from the defense, your Honor.

 3            THE COURT:  What's the status of your discussions

 4   with Judge Rosen on the economic loss cases?  I thought you

 5   had an initial meeting with him on that.

 6            MR. MILLER:  Your Honor, we have had two formal

 7   mediation sessions.  We have another one scheduled, I believe,

 8   the day after the class certification hearing, so we're

 9   actively engaged in that process.

10            THE COURT:  All right.  Just curious.  All right.

11   Thank you.

12            MR. MILLER:  Thank you, your Honor.

13            THE COURT:  Have a good afternoon.  Court is in

14   recess.

15            THE CLERK:  All rise.  Court is now in recess.

16                 (Proceedings adjourned at 3:26 p.m.)

17                        *        *        *

18

19                 CERTIFICATE OF COURT REPORTER

20

21       I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23   _____        _____
             s/ Rene L. Twedt              May 2, 2019
24   RENE L. TWEDT, CSR-2907, RDR, CRR, CRC      Date
         Federal Official Court Reporter

25
```