UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF BRUCE STROMBOM, AND DENYING DEFENDANT'S MOTIONS TO EXCLUDE TESTIMONY OF JUSTINE HASTINGS AND CRAIG ROSENBERG

The plaintiffs in these putative class actions — consolidated before this Court by the Panel on Multidistrict Litigation — allege that defendant FCA US LLC (Chrysler) manufactured certain vehicles equipped with defective gear shifter mechanisms. The plaintiffs contend that they overpaid for their vehicles because the defect was concealed from them at the time of sale. They have moved for class certification, supporting their motion with affidavits from expert witnesses, and the defendant likewise supports its opposition to the class motion with expert affidavits.

Presently before the Court are the parties' motions to exclude expert testimony from the proceedings to determine whether this matter should be certified as a class action. The plaintiffs have moved to exclude the defendant's damages expert, Bruce Strombom, and the defendants have moved to exclude the plaintiffs' damages expert, Justine Hastings, and their design defect expert, Craig Rosenberg.

I.

A.

These motions invoke Federal Rule of Evidence 702 and cases interpreting that rule. The following general principles govern all three motions.

As a general matter, "expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror." *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016), *cert. denied sub nom. Casillas v. United States*, 137 S. Ct. 1120 (2017), and *cert. denied,* 138 S. Ct. 2701 (2018); *see also* Fed. R. Evid. 702. Such testimony is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

The language added by the 2000 amendment — subparagraphs (b) through (d) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

B.

As an initial matter, the law is unsettled on the extent to which the *Daubert* analysis applies to expert testimony offered at this stage of the proceedings solely to inform the Court's Rule 23

analysis. Here, of course, the Court must determine, among other things, whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Ibid.* (quotations omitted).

Some federal courts "'have held that on a motion for class certification, the evidentiary rules are not strictly applied and courts can consider evidence that may not be admissible at trial.'" *Ganci v. MBF Inspection Servs., Inc.*, 323 F.R.D. 249, 257 (S.D. Ohio 2017) (quoting *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D. Mich. 2001)). Nevertheless, some circuits, including the Sixth, have held that, when considering expert testimony which is offered to inform the Court's Rule 23 analysis, the Court does not abuse its discretion by invoking the familiar *Daubert* framework to evaluate whether the expert's opinion is sufficiently reliable and informative to be considered. *See In re Carpenter Co.*, No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (observing that '[t]he Supreme Court has never decided whether a district court must undertake a *Daubert* analysis at the class-certification stage . . . but . . . the Court has suggested that such an analysis may be required in some circumstances") (citing *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2553-54); *see also Schechner v. Whirlpool Corp.*, No. 16-12409, 2019 WL 978934, at *3 (E.D. Mich. Feb. 28, 2019) ("The Supreme Court has not decided whether a district

court must undertake a *Daubert* analysis at the class-certification stage[,] [but] [t]he Sixth Circuit has held that a district court does not abuse its discretion in applying *Daubert* to critical expert witnesses. [Although the court of appeals has acknowledged the split of authority on this question,] [t]he Sixth Circuit has not directly determined the extent to which a district court must apply *Daubert* during the class certification stage." (collecting cases)).

The parties do not appear seriously to contest whether the *Daubert* analysis applies at this stage of the case, and there are several indicators from appellate courts suggesting that it does. Therefore, the Court will do so here, keeping in mind, however, that the challenged testimony is not being offered to prove the merits of the plaintiffs' claims, but only to establish that the merits of those claims properly can be adjudicated by means of collective litigation.

II.

A.  Plaintiffs' Motion re Bruce Strombom

The defendants will rely on an affidavit by Dr. Bruce Strombom, an economist who professes expertise in the fields of applied microeconomics, industrial organization, and finance. Most of Dr. Strombom's report is devoted to a critique of numerous aspects of the opinions rendered by plaintiffs' experts Justine Hastings and Craig Rosenberg. Report of Bruce Strombom, ECF No. 304-2, PageID.11660-11694. He mainly focuses on Dr. Hastings and the discussion of her conjoint analysis that supported her conclusion that class-wide damages can be calculated using standard econometric methods.

Dr. Strombom stated his principal conclusions as follows: (1) "Dr. Hastings assumes, without basis, that disclosure of the Alleged Defect would have resulted in a uniform impact on prices of Jeep Grand Cherokees and, separately, a uniform impact on prices of Chrysler 300s and Dodge Chargers," but "this assumption of a common impact is inconsistent with how prices are

determined in the real world, namely through individualized negotiations between sellers and buyers"; (2) "[b]ecause automobile prices are negotiated and vary from transaction to transaction, even for identical vehicles, there is nothing that constrains the effect on prices of any disclosure concerning the Alleged Defect to be the same for all Putative Class Members, as Dr. Hastings assumes"; (3) "the evidence indicates many Putative Class Members may have known about the Alleged Defect at the time that they acquired their vehicles," and "[f]or these Putative Class Members, the amount they paid already reflected their awareness of the Alleged Defect, so they would not have been harmed"; (4) "because Dr. Hastings' survey does not measure the impact of only the amount by which the risk of the At-Issue Shifter exceeds that of a conventional shifter, it will not be able to reliably establish impact and measure damages"; and (5) Dr. Hastings's "proposed method of calculating damages does not apply to Putative Class Members who purchased used Class Vehicles, or vehicles that were leased," so her analysis would not provide a valid method for estimating the damages of all class members.  PageID.11655.

In the final section of his report, Dr. Strombom also discussed a statistical regression analysis that he performed which, in his opinion, demonstrated that "the depreciation rate of Class Vehicles did not accelerate in June of 2016 as Plaintiffs claim."  Based on that evidence, he concluded that "the depreciation rate of Class Vehicles is inconsistent with Dr. Hastings' assumption that consumers would value Class Vehicles less in the but-for world" where they were fully aware of the defect prior to making their purchasing decisions.  *Ibid.*

The plaintiffs argue that (1) Dr. Strombom is not qualified to offer any opinion on the validity of Dr. Hastings's proposed conjoint analysis and consumer survey method, because he admits that he has no expertise in conjoint analysis and has never performed such an analysis, (2) his opinion that conjoint analysis is never useful for assessing damages in a consumer class action

is contrary to extensive case law approving the use of the method, (3) his testimony about the use of used car pricing data to assess the plaintiffs' damages is unreliable because Dr. Strombom admitted that analysis of used car sales is not an accepted method for assessing damages originating at the point of sale, based on new car pricing, and (4) the testimony about used car sales data is irrelevant, unhelpful, and merely would confuse the issues, because Dr. Strombom admitted that he did not make any attempt to calculate damages at the point of sale, and he does not know of any way in which used car sales data could be translated to estimate point-of-sale damages.

The defendant insists that it does not offer Dr. Strombom to criticize the validity of Dr. Hastings's conjoint analysis or the "validity of choosing conjoint analysis" as a method for estimating damages in this case. Instead, it intends to offer Dr. Rene Befurt for that purpose. It contends that Dr. Strombom will testify only to "critique[] the faulty factual and economic assumptions underlying Dr. Hastings's opinion." However, the defendant asserts that Dr. Strombom would address such matters as "how damages should be quantified in this matter," the lack of any explanation by Dr. Hastings about "how she would measure or characterize risk in her survey," and his opinion that "any reliable methodology for calculating damages to putative class members would need to explicitly account for the effect of the recall." The defendant also argues that Dr. Strombom is qualified to testify that Dr. Hastings's proposed methods are faulty because they do not account for "the role that negotiation plays" in the pricing of new cars, and because she has not identified any common source of pricing data for new car sales that would cover pricing for the class vehicles. The defendant asserts that Dr. Strombom also will criticize Dr. Hasting's "incorrect assumptions" that all class members valued safety equally, and that no class members knew about the defective shifter before they bought their cars, based on his review of deposition

testimony by the named plaintiffs which revealed that (1) some class members valued other aspects of vehicles more or less than safety features, and (2) 92% of the named plaintiffs testified that they test-drove their vehicles before buying, which gave them an opportunity to use and observe the shifters, thus disclosing to them the allegedly defective design. Finally, the defendant argues that Dr. Strombom's analysis of depreciation in used car sales of benchmark vehicles is relevant to refute Dr. Hastings's assumption that consumers would value the class vehicles less if they knew about the defective shifter, because his analysis showed that there was no significant increase in depreciation after the defect was widely known.

1.

There can be little doubt that Dr. Strombom is qualified generally to opine on the impact of economic factors on consumer purchasing decisions. According to his report, he is a "managing principal" of Analysis Group, Inc., which is an "economic, financial, and strategy consulting firm with ten offices throughout North America, three in Europe, and one in Asia." He received a Ph.D. in economics from the University of California, Irvine, and a B.A. in economics from San Jose State University. He has worked as an economist for 25 years. His experience before joining AGI included stints as a vice president at a "middle market merger and acquisition firm" and a manager in the Financial Advisory Services group of the public accounting firm Price Waterhouse. He has testified as an expert in numerous cases (more than 50 separate matters) on topics "involving economics, statistics and econometrics in numerous federal and state courts and in arbitrations," and has provided testimony "related to class certification, liability, loss causation, and damages." In support of that testimony, he has analyzed such things as "the rates of depreciation in the value of automobiles, the cost of repairing alleged defects in automobiles, and the economic value of excessive automobile maintenance expense caused by alleged product defects." He also has

published numerous articles on topics relating to the influence of price and risk on consumer behavior.

In this case, however, Dr. Strombom admits that he is not an expert in conjoint analysis and never has performed such a task; and he admitted at his deposition that he was not even retained to estimate class-wide damages at the point of sale, but only was asked to evaluate the plaintiffs' claim of damages due to increased depreciation. Bruce Strombom dep., ECF No. 283-1, PageID.6924 ("Q. Was part of your assignment in this case to attempt to calculate classwide damages at the initial point of purchase? A. No, I don't — I don't believe so."). Therefore, all of Dr. Strombom's testimony relating to the propriety of Dr. Hastings's conjoint analysis and the foundations for it must be excluded.

Nothing in Dr. Strombom's report is pertinent to the task presented to Dr. Hastings, where she explicitly *was* asked to calculate point-of-sale damages. Moreover, as to specific criticisms raised by the defendant, such as that Dr. Hastings failed to account for the fact that buyers may have known about the defect when they bought their cars, and failed to account for the effect of a recall, Dr. Strombom admitted that he "did not know" whether conjoint analysis still could be applied if some buyers knew about the defect, and that he was "not the right person to ask" about the impact of the recall, because assessing the impact of the recall was "not a focus of my analysis." PageID.6925, 6928. Finally, Strombom admitted that he is "not an expert" on the topic of conjoint analysis. PageID.6933. ("Q. In fact, you don't hold yourself out as an expert on conjoint survey design, do you? A. I don't consider myself an expert on conjoint [surveys]."). The Sixth Circuit has explained that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994). By his own

admission, Dr. Strombom is both unqualified to give any opinion about the suitability of Dr. Hastings's methods, and he has no foundation from which to give any such opinion, because he admitted that he was not asked to investigate the specific "assumptions" underlying the Hastings survey that the defendant criticizes.

Moreover, the defendant has proffered Dr. Rene Befurt as an expert in conjoint analysis, who has not been challenged by the plaintiffs. Therefore, further testimony by Dr. Strombom on that topic would be cumulative and wasteful of the Court's time, particularly given the limited purpose of the testimony presented here, which is not to prove the amount of damages suffered by the plaintiffs, but only to establish that suitable and widely accepted methods exist by which those damages can be assessed on a class-wide basis. Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time, or needlessly presenting cumulative evidence.").

2.

Dr. Strombom is qualified to render an opinion on another topic, which is the extent to which the plaintiffs were damaged (or not) by increased depreciation of their cars after the defect was revealed, long after the initial sales. In their second amended consolidated class action complaint, the plaintiffs alleged that they "and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they, *inter alia* . . . own a vehicle that has substantially diminished in value and is diminishing in value at an increased rate each month and thus cannot be sold without incurring substantial losses"; and "[a]s a specific example of the increased diminution in value, 2014 and 2015 Jeep Grand Cherokees held their value *better* than other cars in their class before knowledge of the shifter defect became widespread, but after the defect became known, the monthly depreciation of these cars increased drastically, causing them

to hold value *worse* than other cars in their class."  SACMC ¶¶ 23-24, ECF No. 88, PageID.2619-20.  Dr. Strombom conducted an analysis of the prices of class vehicles on the used car market and concluded that no increased depreciation occurred after the June 2016 recall.  That testimony certainly is pertinent to rebut the plaintiffs' claims that they suffered class-wide damages based on increased depreciation of their cars long after the initial sales, and the plaintiffs' have not attacked Dr. Strombom's authority to testify on that topic.

However, Dr. Strombom admitted that he did not know how used car prices could be used to estimate point-of-sale damages, he never has tried to apply used car sales data in that fashion in any case, and he is not aware of any academic literature endorsing the use of used car sales prices to estimate point-of-sale damages in a concealed defect case.  Strombom dep., PageID.6922-23 ("Q. How would you go about using depreciation numbers for used vehicles to calculate classwide damages at the point of sale — original point of sale? A. . . I have never been required to do it, so I haven't, you know, thought of all the possible ways."); PageID.6923 ("Q. Do you believe that analyzing resale value of a vehicle that is sold with a latent safety defect is the most appropriate method to determine diminution in value at the point of sale? A. I don't know that there is a general answer to that question. It — it would depend on the facts of the case."); PageID.6941 ("Q. Can you point me to any generally accepted publications or articles that indicate that measuring excess depreciation of used vehicles is an accurate method for determining diminution in value of new vehicles at the point of sale due to a defect? A. I don't know that that has ever been addressed in — in any sort of academic literature that I'm familiar with.").  Thus, by Dr. Strombom's admission, the work that he did, and was qualified to do, has no bearing on the estimation of point-of-sale damages. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to [the

plaintiffs' articulated] theory [of liability]. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").  "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Ibid.* (citations and quotations omitted).  In this case, the defendant has not put forth any sufficiently reliable expert opinion that estimation of used car resale prices reliably can be applied to estimate point-of-sale damages, or to impeach the calculation of such damages by an otherwise reliable and widely accepted method such as conjoint analysis.

* * * * *

For these reasons stated above, the Court will grant in part the plaintiffs' motion and exclude all testimony by Dr. Strombom that concerns criticisms of Dr. Hastings's conjoint analysis method or any of the assumptions employed by her for the purpose of postulating her survey design.  The Court will allow testimony by Dr. Strombom about whether he found any evidence of increased depreciation of class vehicles on the used car market.

### B.  Defendant's Motion re Justine Hastings

The plaintiffs will offer the affidavit and report of Dr. Justine Hastings, an economist, to support the elements of class certification of their economic loss case.  For the purposes of the present proceedings, Dr. Hastings was asked to determine (1) "whether economic methodologies utilizing common evidence can be used to demonstrate that members of the proposed class have incurred an economic impact as a result of the allegedly defective shifter," and (2) "whether generally accepted economic methodologies can be used reliably to quantify class-wide damages in this case."  Report of Justine Hastings, ECF No. 284-1, PageID.7031.

The defendant argues that Dr. Hastings's opinion must be excluded because (1) she has no experience relating to the automobile industry or vehicle purchasing behavior, (2) her opinion lacks any sufficient basis in fact because she "has not developed even the most basic elements of a proposed conjoint analysis — the population to be surveyed, the sample size, the sample selection method, the number and identity of the attributes to be presented, and the actual questions in the survey are all to be determined at a later date, along with many other elements of the analysis," (3) terms that she proposes to use such as "risk" and "intuitiveness" are vague and Hastings has not put forth any definitions of them that can be evaluated to decide whether survey participants will be able to understand what they are being asked, and (4) a survey cannot account for the "real life" experience that consumers face when visiting a showroom and selecting a vehicle in person, because it would not include the "hands on" experience that consumers have when viewing and driving an automobile that they are considering buying.

The plaintiffs respond that Dr. Hastings has extensive academic training and experience studying consumer behavior. According to her report, she is a professor of Economics and International and Public Affairs at Brown University, and a former professor at Yale University and assistant professor at Dartmouth College. She received a Ph.D. in economics from the University of California at Berkeley in 2001, and a Master of Science degree in agricultural and resource economics, as well as a bachelor's degree in economics, from the University of California at Davis. She also is a research associate at the National Bureau of Economic Research ("NBER"), where she conducts research on industrial organization, public economics, and household finance. Her areas of study have included competition, marketing, firm behavior, regulation, consumer behavior, and policy in public economics, and the application of statistical methods to economics. She has conducted research using various methods such as "randomized controlled trials,

regression discontinuities, instrumental variables, structural estimation of demand and supply, machine learning, and survey data collection and analysis." In particular, she has conducted surveys to study public school choice in U.S. metropolitan areas, choices of pension fund investments in Mexico's privatized pension market, and choices of college and major by students from disadvantaged backgrounds.

After considering the proposed class definition and the allegations stated in the class pleadings, which are familiar to the parties, Dr. Hastings concluded that (1) "it is feasible to implement a high-quality survey to obtain quantitative estimates of what the market values of the Class Vehicles would have been 'but-for' the alleged [concealment of the defective shifter design]," (2) "class-wide damages of Proposed Class Members' caused by the alleged Defective Shifter can be calculated using standard econometric methodologies to estimate what the prices of the Class Vehicles would have been 'but-for' the harmful act and then comparing those 'but-for' prices to the actual prices paid by Proposed Class Members," and (3) her proposed survey design, which would involve "[c]ombining a consumer choice experiment with a discrete choice econometric model is a widely used approach in applied microeconomics, including [her] own peer-reviewed research." PageID.7032-33. Since the defendant filed its motion, it appears that Dr. Hastings in fact completed her survey, which was in the field at the time of oral argument.

The defendant does not seriously contest as a general matter that conjoint analysis is a widely accepted method for estimating point-of-sale damages in consumer class actions alleging that product defects were concealed from buyers. As one district court noted:

> Marketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences. The contribution of an attribute to overall product preference, i.e., the "relative importance" of a particular attribute, is the attribute's "partworth." Partworth

estimates can be used to assess how consumers value the elements of a specific product variable.

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1026 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), 674 F. App'x 654 (9th Cir. 2017) (footnotes omitted). The defendant has not identified any significant way in which Dr. Hastings's proposed analysis deviates from the usual principles by which conjoint analysis surveys are designed.

An expert's opinion must be reliable to be admissible. But an opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert,* 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results. And there is no precise formula by which a court might deem a methodology "acceptable" or "unacceptable." *Daubert* and its progeny have therefore not created a straitjacket, *Gross v. Commissioner of Internal Revenue,* 272 F.3d 333, 339 (6th Cir. 2001), but rather counsel a flexible approach, reconciling the "liberal thrust" of Rule 702 which "relax[es] the traditional barriers to opinion testimony" with the responsibility to "screen[] such evidence" in order to keep unreliable or invalid opinions from the jury, s*ee Daubert,* 509 U.S. at 588-89; s*ee also Jahn v. Equine Serv., PSC,* 233 F.3d 382, 388 (6th Cir. 2000).

The criticism of Dr. Hastings's lack of experience with the automobile industry or vehicle purchasing behavior, therefore, is not fatal to the admissibility of her testimony, where she asserts that she will apply methods of examination which, based on her extensive experience, are accepted in her field. *See Zuzula v. ABB Power T&D Co.*, 267 F. Supp. 2d 703, 714 (E.D. Mich. 2003) ("[The expert] arrived at his conclusions that the DD module in Unit 14 was defective by the application of general electrical and mechanical engineering principles, together with his conclusions which flowed from his investigation of the facts of the accident. He also inspected and tested the operation of the accident unit, particularly the interlocking safety mechanisms. There is

no suggestion that the engineering principles utilized by Professor Fagan in arriving at his conclusions were novel, unique, or not generally accepted by the engineering community.").

It appears that Dr. Hastings has not received the survey results, but that does not matter at this stage of the case. The only purpose for her testimony here is to establish that a reliable method exists by which an appropriately designed and vetted survey could estimate class-wide damages. *ConAgra*, 90 F. Supp. 3d at 947 ("[T]he fact that Weir has not yet conducted a hedonic regression analysis with respect to each of plaintiffs' proposed state classes does not render his methodology unreliable, particularly given that he has identified the information he is attempting to obtain that will permit him to conduct such an analysis; that he has stated the state by state analysis will be conducted in the same manner as his nationwide analysis; and that he has explained why he is not in possession of the information needed to complete the analysis at this time.").

Moreover, such surveys have been approved as a means to estimate overpayment by car buyers in class action cases involving allegedly defective automobile control designs:

> Mr. Boedeker used a survey method called choice-based conjoint analysis to infer how consumers valued the MFT system in four scenarios where they were exposed to varying levels of information about the MFT defect, its safety implications, and Ford's knowledge of and failure to disclose information about the defect. The analysis shows that the more information consumers were provided about the defect, the less valuable the MFT system became to them. Thus, while consumers originally valued MFT at $1,850, that value dropped by $729 when they were told to "[i]magine that your salesperson tells you at the point of purchase that the MFT system has a glitch but that a fix for the glitches will be provided for free in the future when ready"; by $910 when they were presented with statements showing Ford's knowledge of the defect and its severity; and by $839-$1,290 when they learned that the defect also caused distractions raising safety concerns.

*In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 943 (N.D. Cal. 2018) (citations omitted). All of the other criticisms directed at the propriety of the assumptions made by Dr. Hastings when postulating her survey design merely impeach the factual basis of the opinion and not the reliability of her methods. "Because the Court acts merely as a gatekeeper and not a

factfinder, an expert whose methodology is otherwise reliable should not be excluded simply because the facts upon which his or her opinions are predicated are in dispute, unless those factual assumptions are 'indisputably wrong.'" *MyFord Touch*, 291 F. Supp. 3d at 967 (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)).

Finally, Dr. Hastings's testimony is offered at this stage of the case for the limited purpose of assessing whether a common question of fact exists that can be answered in the context of this collective litigation, which questions whether the plaintiffs suffered damages due to overpaying for defective and unsafe cars. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("[T]he district court found that the '*allegations* of price-fixing and market allocation . . . will not vary among class members.' Accordingly, the court found that the 'fact of damages' was a question common to the class even if the amount of damages sustained by each individual class member varied."). Dr. Hastings has supported her testimony with sufficient authority to proffer an opinion that common damages were sustained and can be estimated by reliable and accepted methods. And the defendant "has not demonstrated that exclusion of [Dr. Hastings's] testimony is warranted under *Daubert*," because "[a]ll of [its] objections go to the soundness of certain underlying factual assumptions or to the weight of [her] analysis, questions that are properly for the [fact finder] to consider." *Id.* at 973.

The Court will deny the motion to exclude Dr. Hastings's testimony.

### C. Defendant's Motion re Craig Rosenberg

The plaintiffs plan to offer the opinions of Craig Rosenberg, a human factors expert, apparently to show how the common design flaw in the monostable shifter generally affects consumers. Dr. Rosenberg was employed by the plaintiffs to carry out a driving study that roughly

mirrored the design of the 2012 Lextant focus group study, which compared various models of gear shifters for ease of use and incidence of errors.

For his study, Dr. Rosenberg used two vehicles driven by 31 drivers who were recruited from the driving public. One vehicle was a 2015 Jeep Cherokee equipped with the Monostable gear shifter, and the other was a 2019 Jeep Cherokee equipped with a replacement Polystable gearshift design. PageID.11375. The drivers were accompanied by Rosenberg while driving the vehicles through a series of parking and shifting exercises, and the gear shift mechanism was surveilled by a GoPro camera attached to the dashboard. PageID.11381-83. Rosenberg and an assistant reviewed videos from the cameras to catalog and classify eight types of errors they observed, including "undershoot," "overshoot," "wrong gear" (car was in a different gear than the driver believed), "wrong direction" (driver moved the shifter in the wrong direction to reach the intended gear), and "can't tell in correct gear" (vehicle was in the proper gear, but the driver shifted to another gear). PageID.11389. Rosenberg concluded that the Monostable shifter produced many times more shifting errors in the exercises (416 errors for the Monostable design vs. 18 for the Polystable). PageID.11401. Also, Rosenberg surveyed the participants and asked several questions about their experiences using the shifters, and he found that drivers rated the Monostable design significantly worse on qualities such as "ease of use" and "confidence in reaching intended gear." PageID.11418.

The defendant argues that Dr. Rosenberg's opinion should be excluded because (1) he is unqualified to render any opinion about gear shifter safety since he has no expertise with "automotive engineering" or "vehicle safety"; (2) the methodology used to derive the conclusions was unreliable because it depended on a "subjective" review of the dash cam videos by Dr. Rosenberg and his assistant to classify supposed shifting errors; and (3) the testimony is unhelpful

and irrelevant because the comparison design that Dr. Rosenberg used was from a 2019 vehicle using a shifter that was not commercially available in 2015, and the design of the particular Polystable shifter compared did not even exist when the class vehicles went to market.

The defendant has not presented a convincing argument that Dr. Rosenberg is unqualified to testify about the human factors concerns with the defendant's gear shifter design and their impact on vehicle safety. The defendant's criticism of Rosenberg's lack of experience with "automobile engineering" or "vehicle safety" is not fatal to the admissibility of his testimony, because he is qualified by his extensive general experience in human factors engineering and the design of control systems of various sorts to apply design principles which, based on his extensive experience, are accepted in his field. *Zuzula*, 267 F. Supp. 2d at 714. Dr. Rosenberg represents that he received a Bachelor of Science degree in Industrial Engineering from the University of Washington School of Engineering in 1988, a Master of Science degree in Human Factors in 1990, and a Ph.D. in Human Factors in 1994. His professional experience spans 30 years "work[ing] in the areas of human factors, user interface design, software development, software architecture, systems engineering, and modeling and simulation across a wide variety of application areas, including aerospace, consumer electronics, communications, entertainment, and healthcare." He conducted academic research and experiments on advanced issues in human factors engineering. His professional duties have included "user interface design, systems design, software development, graphics programming, experimental design, [and] hardware and software interfacing." He was a consultant to the Boeing Company for more than 16 years as a senior human factors engineer, and during that time he worked as a user interface designer and software architect on a wide range of projects relating to battlefield command and control systems. He also was the lead system architect for the development of advanced air traffic controller workstations,

and the architect of the "Boeing Human Agent Model," which is "an advanced model for the simulation of human sensory, cognitive, and motor performance as applied to the roles of air traffic controllers, pilots, and UAV operators." He has published more than twenty research papers relating to user interface design, computer graphics, and the design of spatial, stereographic, and auditory displays. Report of Craig Rosenberg dated Oct. 22, 2018, ECF No. 303-2, PageID.11369-11371.

In this case, the principal allegations are that the design of the shifter is confusing and contrary to the way ordinary drivers expect a conventional automobile gear shifter to work, and that the design gives insufficient indications of its status and operation to allow a driver reliably to tell whether the car is in the intended gear. The defendant has not explained how any novel or exotic principles of "automobile design" are required in order for an expert to evaluate the simple interfaces presented and determine if they reliably inform the driver whether the control inputs he or she intended have been received by the car. The district court in the *MyFord Touch* litigation addressed and rejected similar arguments against Rosenberg's qualifications, and the court permitted him to testify about the problems with the in-dash display at issue there:

> Dr. Rosenberg has degrees in engineering and human factors, and extensive work experience in those fields. He was a consultant to the Boeing Company "for over 16 years as a senior human factors engineer, user interface designer, and software architect." Although he has not worked specifically with automobiles, he has designed software and user interfaces in the fields of "missile defense, homeland security, battle command management, networking and communications, air traffic control, location-based services, and Unmanned Aerial Vehicle ('UAV') command and control." He has broad engineering and human factors expertise. His testimony about various technical problems with the MFT falls generally within his engineering expertise. Whether a system would distract a user from the user's primary task also fall[s] within Dr. Rosenberg's expertise in human factors and user interface design.

*In re MyFord Touch Consumer Litig.*, No. 13-03072, 2016 WL 7734558, at *5 (N.D. Cal. Sept. 14, 2016) (citations omitted); *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936,

944 (N.D. Cal. 2018) (further discussing Rosenberg's conclusions, which were not challenged by the defendant at later stages of the proceedings).

Similarly, the defendant has not shown that the method Dr. Rosenberg used to evaluate the shifter design was an unreliable means of addressing the question presently put to the Court, which is whether the Monostable shifter may have inherent design defects that would impact the plaintiffs in a common, class-wide manner, regardless of the individual circumstances in which they use their vehicles. All of the specific criticisms of Dr. Rosenberg's experimental design bear on the weight of his conclusions and not the admissibility of his opinion.

Dr. Rosenberg explained in his report the criteria that he applied to identify and classify shifting errors, and he administered a uniform slate of questions when he asked the participants about their experiences using the alternative shifter designs. His conclusions are not advanced on the basis of mere unsupported speculation; they are founded on the video and statistical data cataloged in (and disclosed with) his report. As the Sixth Circuit has explained, and as discussed above, "[t]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). The plaintiffs have satisfied that standard.

Moreover, the criticism of the particular shifter design used as a comparator is both disingenuous and impertinent to the question at hand, which is whether the plaintiffs have identified a potentially provable design defect with sufficient commonality that it could be found to have injured class members in a uniform manner. Here Dr. Rosenberg has done just that, by comparing the class shifter design with a contrasting design that is substantially similar in operation to one of the alternatives that the defendant itself considered when deciding whether to

market the Monostable shifter. The fact that the particular instance of the Polystable shifter used in the 2019 Jeep Cherokee was not on the market at the time when the class vehicles were sold does not impugn the basic conclusion that Dr. Rosenberg reached — exactly the same as the finding of Chrysler's own 2012 consumer study — which was that the Monostable shifter caused an extreme number of shifting errors compared with the modest number that occurred when drivers used a Polystable design, when both shifters were used by the same drivers, in otherwise substantially identical test vehicles. Whether the specific shifter model that was used in the present comparison was commercially available in 2012 has no bearing on the basic conclusion, which was the same then and now, that the Monostable design has serious design defects that lead to unreliable and unsafe results. Chrysler's own contracted study, and Dr. Rosenberg's, suggest that those deficiencies are sufficiently uniform that almost none of the sampled drivers (only four out of 30 in the 2012 Chrysler study) were able to learn to use the Monostable shifter safely after repeated attempts, but all of those same drivers (30 out of 30) had no difficulties when confronted with a Polystable design.

Dr. Rosenberg's opinion evidence is sufficiently well founded at this stage of the case to be considered on the question whether the shifter may have uniformly defective design features that are amenable to examination through the lens of collective litigation. The defendant's motion to exclude his testimony will be denied.

## II. Conclusion

The defendant has not established the required foundation for Dr. Bruce Strombom's testimony criticizing Dr. Hastings's conjoint analysis and its supporting data. However. Dr. Strombom may offer evidence about his own analysis of used class vehicle prices. There is adequate foundation for the expert opinions of Dr. Justine Hastings and Dr. Craig Rosenberg.

Accordingly, it is **ORDERED** that the plaintiffs' motion to exclude testimony by Bruce Strombom (ECF No. 283) is **GRANTED IN PART AND DENIED IN PART**. Dr. Strombom may not offer opinions criticizing the basis of the opinion of plaintiffs' expert Justine Hastings with respect to her proposed damages model and whether calculation of class-wide damages at the original point of sale would be insufficient. However, Dr. Strombom may testify about his separate analysis of pricing of the class vehicles on the used market, insofar as it is pertinent to the plaintiffs' claims that they suffered damages due to increased depreciation of their cars.

It is further **ORDERED** that the defendant's motions to exclude testimony by Justine Hastings and Craig Rosenberg (ECF No. 284, 285) are **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: May 22, 2019

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on May 22, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI