## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:  FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT
LITIGATION

MDL No. 2744

Case No:  16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## DEFENDANT'S MOTION TO EXCLUDE
## TESTIMONY OF DR. JUSTINE HASTINGS

Defendant FCA US LLC ("FCA US") submits this motion, pursuant to Federal Rule of Evidence 702 and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and requests that the Court exclude the expert reports and testimony of Plaintiffs' proffered expert Justine Hastings, Ph.D., and grant such other relief as is just and proper.  In support of this Motion, FCA US relies upon the law and argument set forth in its Brief in support and exhibits, filed contemporaneously herewith.

In accordance with E.D. Mich. L.R. 7.1(a), on April 27, 2020, counsel for FCA US contacted Plaintiffs' counsel to (i) explain the nature of this Motion and its legal basis, and (ii) request concurrence in the relief sought; however, concurrence was denied.

WHEREFORE, FCA US respectfully requests that this Court enter an order excluding the expert reports and testimony of Plaintiffs' expert Justine Hastings.

Respectfully Submitted,

DYKEMA GOSSETT PLLC

By: */s/ Fred J. Fresard*
James P. Feeney (P13335)
Fred J. Fresard (P43694)
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
jfeeney@dykema.com
ffresard@dykema.com

Dated: April 28, 2020             *Attorneys for Defendant FCA US LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT
LITIGATION

                MDL No. 2744

Case No: 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION**
**TO EXCLUDE TESTIMONY OF DR. JUSTINE HASTINGS**

## <u>ISSUES PRESENTED</u>

Pursuant to Local Rule 7.1(c)(2), the following issues are presented in this motion:

Whether the Court should exclude the testimony of Plaintiff's expert Dr. Justine Hastings,

      1.    Where Dr. Hastings' opinions relate to damages and are not relevant to any issues that have been certified for trial, and will therefore not be helpful to the trier of fact; and

      2.    Where Dr. Hastings' methodology is unreliable because she failed to replicate a real-world purchasing scenario, failed to explain why she chose particular attributes for her survey, omitted key attributes and misleadingly described others, and her analysis generated absurd results?

FCA US answers: Yes

Plaintiffs would answer: No

The Court should answer: Yes

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

Fed. R. Evid. 702

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999)

*Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997)

*United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016)

# TABLE OF CONTENTS

ISSUES PRESENTED.................................................................................. i

CONTROLLING OR MOST APPROPRIATE AUTHORITY .............................. ii

TABLE OF AUTHORITIES .................................. **Error! Bookmark not defined.**

INTRODUCTION ........................................................................................1

DR. HASTINGS AND HER OPINIONS .......................................................1

LEGAL STANDARD FOR ADMISSION OF EXPERT OPINION.......................5

ARGUMENT ..............................................................................................6

    I.     DR. HASTINGS' DAMAGES OPINIONS ARE NOT
          RELEVANT TO THE ISSUES CERTIFIED FOR TRIAL. ...............6

    II.    EVEN IF DR. HASTINGS' OPINIONS WERE RELEVANT,
          HER CONJOINT SURVEY DESIGN IS FUNDAMENTALLY
          FLAWED, RENDERING IT UNRELIABLE. ...................................10

          A.     Dr. Hastings' Survey Did Not Come Close To Replicating a
                 Real-World Purchasing Decision...............................................10

          B.     Dr. Hastings' Conjoint Survey Failed To Accurately
                 Convey The Magnitude of the Safety Risk Associated With
                 The "Possibility Of Gear Shifter Issues" .................................18

          C.     Absurd Willingness To Pay Calculations Demonstrate That
                 Dr. Hastings' Methodology Is Fundamentally Flawed. ...........20

CONCLUSION .........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Beaty v. Ford Motor Co.*,
    2020 U.S. Dist. LEXIS 23670 (W.D. Wash. Feb. 11, 2020)................................9

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
    509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ..................5, 6, 14, 20

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
    2017 U.S. Dist. LEXIS 48792 (N.D. Ill. Mar. 31, 2017) ............................13, 14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................20

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ..........................................................................17, 18

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ...................................5

*Munch v. Sears Roebuck & Co.*,
    2007 U.S. Dist. LEXIS 62897 (N.D. Ill. Aug. 27, 2007) .....................................9

*Oracle Am., Inc. v. Google Inc.*,
    2012 U.S. Dist. LEXIS 33619 (N.D. Cal. Mar. 13, 2012) ..............11, 12, 13, 17

*Smelser v. Norfolk S. Ry.*,
    105 F.3d 299 (6th Cir. 1997) ...............................................................................6

*TV Interactive Data Corp. v. Sony Corp.*,
    929 F. Supp. 2d 1006 (N.D. Cal. 2013)........................................................14, 16

*United States v. Rios*,
    830 F.3d 403 (6th Cir. 2016) ...............................................................................5

RULES

Federal Rule of Evidence 702....................................................................5, 6, 14, 20

## <u>INTRODUCTION</u>

Plaintiffs have indicated that they intend to call their damages expert, Dr. Justine Hastings, to testify at the August 2020 trial. Given that damages are not one of the three issues that have been certified for trial, it is unclear what relevant testimony Plaintiffs believe Dr. Hastings can provide. But even if damages opinions had some relevance to the issues that have been certified, her particular opinions are wholly irrelevant because her conjoint analysis purported to measure only the difference between respondents' willingness to pay for vehicles with an unquantified risk of misshifting and resulting rollaway, and vehicles with no such risk at all. Because there is no vehicle that has no risk of misshifting and resulting rollaway, a comparison of respondents' willingness to pay for such a vehicle has no relevance to the issues to be decided by the jury. Further, as set forth below, Dr. Hastings' methodology suffers from numerous flaws that render her opinions unreliable, including her failure to quantify the alleged risk at issue for survey respondents and her failure to incorporate other elements that she acknowledged were necessary to ensure reliability. For the reasons set forth below, Dr. Hastings' opinions should be excluded in their entirety.

## <u>DR. HASTINGS AND HER OPINIONS</u>

Dr. Hastings is "a damages expert," and her opinions in this case are limited to the issue of damages. Ex. A, Hastings 5/30/19 Report, ¶ 10; Ex. B, Hastings

Rebuttal Report, ¶ 3; *see also* Ex. C, Hastings 12/14/18 Dep. at 87:2-87:8 ("My economic opinion is on damages and whether damages can be reliably estimated and impact can be assessed using well-relied on methodologies in economics, which are common to the class. That is the sole question that I'm responsible for and that I bring my expertise to. I'm not a legal expert."); Ex. D, Hastings 7/17/19 Dep. at 53:6-53:11 ("I am here as an expert economist and my assignment in this case is to offer an opinion on whether or not there exists well relied on economic methodologies for estimating class damages in this case at the time of sale.").

In developing her opinions, Dr. Hastings took it as a "given" that FCA US committed the "harmful act" alleged by Plaintiffs. Ex. C, Hastings 12/14/18 Dep. at 85:5-85:7. In other words, she assumed that Plaintiffs had established all of the elements of their claims except damages. *See* Ex. A, Hastings 5/30/19 Report, ¶ 10; Ex. C, Hastings 12/14/18 Dep. at 86:3-86:8 ("as the damages expert, you take the -- whatever the accusation is from the plaintiffs -- and you say, okay, 'Well, if it happens, we're going to need to calculate damages. Can we do that reliably and in a way that is common to the class.' That's my job.")

To estimate damages in this case, Dr. Hastings constructed and conducted a survey, or "choice-based conjoint analysis," toward the goal of measuring "the reduction in buyers' willingness to pay ("WTP") for the Class Vehicles in the but-for-world in which they were informed about the alleged defects before they

purchased or leased the Class Vehicles." Ex. A, Hastings 5/30/19 Report, ¶ 11. Dr.

Hastings' survey presented participants with sets of "choices" between vehicles

with seven varying "attributes." The attributes were:

- drive type (two-wheel drive or four-wheel drive)

- one of three different "accessory packages"—"Base," which included seven features, "Mid-level," which added six more features, and "Deluxe," which added eight more features;

- a "blind spot detection monitor" option, which vehicles either had or lacked;

- three different "defects," which vehicles either had or lacked— "Airbag issues," "gear shifter issues," and "battery sensor issues"; and

- one of six possible prices—$25,000, $33,000, $41,000, $49,000, $57,000 or $65,000.

*Id*. at ¶ 34, Ex. 1 and n. 31. Dr. Hastings' survey provided respondents with the

following description of "Gear shifter issues":

> Some of the *[pipe SV category]* models that you are considering have
> a defect with its gear shifter, which relates to motor vehicle safety.
> Although the gear shifter has the familiar appearance of a
> conventional shifter, it has an unfamiliar movement that *does not*
> provide the tactile or visual feedback that drivers are accustomed to
> receiving from conventional shifters. Specifically, the shifter is
> spring-loaded and returns to the same center position like a joystick,
> always returning to the center position after the desired gear is
> selected. As a result, the driver must take additional time to verify that
> the desired gear position was achieved by checking the display on the
> shift knob or behind the steering wheel.
>
> In some cases, drivers may unintentionally fail to achieve the
> "PARK" position before exiting the vehicle when the engine is
> running. As a result, the vehicle may roll away, strike and injure the
> driver, passengers, or bystanders, or damage nearby property.

The National Highway Traffic Safety Administration has issued recalls in recent years for vehicles makes and models with this gear shifter in them because of possible vehicle rollaway. Vehicle safety experts believe that further physical ("hardware") changes still need to be made to some makes and models to protect them completely from the issue.

Assume that there are two different types of gear shifter, as described in the table below:

| Gear Shifter: Not known to have defects | Gear Shifter: Known to have defects |
|---|---|
| The gear shifter is smooth, convenient, easy, and intuitive to operate, and it provides expected tactile and visual feedback to the driver so that the driver knows which gear the vehicle is in. | The gear shifter is insecure, awkward, frustrating, and uncomfortable to operate, and it provides unfamiliar tactile and visual feedback to the driver, so that the driver *may not* know which gear the vehicle is in. |

*Whenever a possible issue, like this one, is shown for a vehicle, please assume that it may or may not be covered by the warranty, and that it may or may not be able to be repaired.*

*Id*. at pp. 72-73. Thus, the alleged risks associated with the alleged shifter defect were presented to survey participants in a binary fashion—they were required to choose between vehicles that have a risk that drivers may make shifting errors leading to rollaways—and that had been subject to a recall that did not eliminate the risk—and vehicles that had no such risk. And no information was provided to survey respondents regarding the magnitude of the alleged risk.

Survey participants were presented with 12 sets of three vehicles equipped with different variations of the attributes identified above, and for each set, were

asked "[i]f these three new (2019 model year) vehicles were your only options, which one would you choose?" *Id.* at ¶ 34 and Ex. 1. After making their choice, they were then asked, "[f]rom what you know of the market, if you were really shopping for a [vehicle], would you be willing to buy the vehicle that you chose above?" Possible answers were "Yes," "No," or "I'm not sure." *Id*. at Ex. 1.

Dr. Hastings used the survey responses to estimate "part-worths," or "the intrinsic values that respondents place on attributes," then used those values to estimate the alleged reduction "in buyers' WTP for the Class Vehicles." 5/30/19 Report ¶ 53. She then purported to calculate class-wide damages based on her analysis of alleged WTP reductions, demand elasticity, and supply elasticity. *Id.*

## <u>LEGAL STANDARD FOR ADMISSION OF EXPERT OPINION</u>

As a general matter, "expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror." *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Such testimony is governed by Rule 702 of the Federal Rules of Evidence, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability of the proffered

5

testimony. Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The language added by the amendment to Rule 702—subparagraphs (b) through (c)—restates *Daubert's* insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93. This "fit" requirement is to "ensure that the proposed expert testimony is relevant to the task at hand." *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997).

## ARGUMENT

## I.   DR. HASTINGS' DAMAGES OPINIONS ARE NOT RELEVANT TO THE ISSUES CERTIFIED FOR TRIAL.

As Dr. Hastings has repeatedly explained, she is a "a damages expert," and her assignment in this case was to estimate class-wide damages. Because damages have not been certified for trial, Dr. Hastings' opinions, which all pertain to

damages, will not be helpful to the trier of fact at the upcoming issues trial.[1]

Dr. Hastings has not offered opinions on any of the issues that *have* been certified for trial. In fact, in developing her opinions, she expressly avoided addressing any such issues by assuming that Plaintiffs had already proven all elements of their claims except damages—she took it as a "given" that FCA US committed the "harmful act" alleged in this case. Ex. C, Hastings 12/14/18 Dep. at 85:5-85:7. Her "job" was to estimate damages based on that assumption. *Id*. at 86:3-86:8. Because a determination that FCA US committed a "harmful act" necessarily includes all of the predicate elements—including the issues certified for trial—Dr. Hastings has nothing to offer the jury on any of these issues.

Plaintiffs may try to argue that Dr. Hastings' opinions regarding survey respondents' "willingness to pay" is somehow relevant to the issue of materiality, but they are incorrect. In her conjoint survey, Dr. Hastings purported to compare prices survey participants were willing to pay for (1) a vehicle with a shifter defect that causes an unquantified risk of misshifting and resulting rollaway, and that had been recalled but the recall did not eliminate the risks associated with the defect, and (2) a vehicle with a shifter that has no risk of misshifting and resulting rollaway. Ex. A, Hastings 5/30/19 Report, ¶ 54 and p. 73.

---

[1] Since damages have not been certified for trial, FCA US is not currently raising the flaws in Dr. Hastings' opinions specific to her calculation of damages. FCA US will raise those arguments if and when the issue of damages is set for trial.

But the unrefuted evidence in this case demonstrates that there is no vehicle available that is equipped with a shifter that has no risk of a misshift and resulting rollaway. *See* Kuhn Expert Report at 2 ¶ 4, 12 ¶ 10 (excerpts attached as Ex. E); Cades/Young Expert Report at 62-84 (excerpts attached as Ex. F).[2] Thus, anything Dr. Hastings purported to measure does not pertain to a realistic choice faced by class members, and it therefore has no relevance to the issue of materiality in this case. In other words, it is completely irrelevant to the issue of materiality that will be decided by the jury whether class members would prefer a non-existent vehicle with no risk of a misshift and resulting rollaway, and would pay less for a class vehicle in comparison, because that was not the decision faced by class members.

This failing is especially striking given that Dr. Hastings recognized that the alleged harmful act at issue was selling vehicles equipped with a defective shifter which allegedly "*increas[ed]* the potential for unintended gear selection and therefore *increas[ed]* the risk of damage, injury and mortality." Ex. A, Hastings 5/30/19 Report, ¶ 10. But Dr. Hastings made no attempt to measure anything pertaining to an "increased" potential or risk. The descriptions she provided to survey respondents made no mention of an "increase," and instead, presented potential for unintended gear selection and risk of resulting rollaway as a binary option—present in the vehicle with the allegedly defective shifter and absent in the

---

[2] Complete copies are attached to FCA US's summary judgment motion.

vehicle with the non-defective shifter, in which the driver "knows which gear the vehicle is in." *Id*. at p. 73.

And Dr. Hastings compounded the problem—and the irrelevance of her opinions—by providing respondents with absolutely no information about the magnitude of the alleged risk of misshift and resulting rollaways in the class vehicles. The potential materiality of information about an alleged risk presented by a product cannot be determined without considering information that includes the magnitude of the risk and a comparison of the risk present in other products of the same type. *See Beaty v. Ford Motor Co.*, 2020 U.S. Dist. LEXIS 23670, at *15-16 (W.D. Wash. Feb. 11, 2020); *Munch v. Sears Roebuck & Co.*, 2007 U.S. Dist. LEXIS 62897, at *11-12 (N.D. Ill. Aug. 27, 2007). Since Dr. Hastings' survey provided respondents with no such information, her opinions are wholly irrelevant to the issue of materiality.

Further, Dr. Hastings' survey purported to measure participants' "willingness to pay" for vehicles in which the shifter had been recalled, but the recall did not eliminate the risks presented by the defect. For the reasons explained in FCA US's concurrently-filed summary judgment motion, Plaintiffs' judicial admission precludes them from making this argument. Thus, the decision presented to Dr. Hastings' participants is even further removed from the materiality issue that will be presented to the jury at the upcoming trial.

9

Accordingly, her opinions are not relevant, will not be helpful to the trier of fact, and must be excluded from trial.

## II.   EVEN IF DR. HASTINGS' OPINIONS WERE RELEVANT, HER CONJOINT SURVEY DESIGN IS FUNDAMENTALLY FLAWED, RENDERING IT UNRELIABLE.

### A.   Dr. Hastings' Survey Did Not Come Close To Replicating a Real-World Purchasing Decision.

Dr. Hastings correctly acknowledges that "[a] key objective of the survey is to design and simulate a credible marketplace," making it important for the conjoint survey to "represent the real-world scenario of the vehicle-purchasing decision." Ex. A, Hastings 5/30/19 Report, ¶ 14; *see also* Ex. G, Befurt Rebuttal, ¶ 24, n. 40 (citing academic literature stressing the importance of surveys reflecting realistic marketplace conditions). Yet her survey is light years from a real-world purchasing decision for an automobile. First, as described above, her survey made no attempt to present respondents with a "real-world" decision pertaining to the alleged shifter defect—the attribute the survey was designed to measure. But her failure to replicate real-world conditions goes beyond the description of the shifter, and pervades her entire survey. Critically, the vast majority of consumers insist on test-driving vehicles before purchasing them, unlike other products commonly subjected to conjoint analysis. *See* Ex. G, Befurt Rebuttal, ¶ 27 (citing study finding that five out of six car buyers test drive a vehicle before making a purchase). And Dr. Hastings doesn't seem to dispute that the test-driving

experience is an important aspect of the vehicle purchasing decision. *See* Ex. D, Hastings 7/17/19 Dep. at 64:24-65:5 ("Q: The interaction of the consumer who's considering the purchase with the vehicle itself in a test-drive. Isn't that part and parcel an important part of the purchase decision? A: It could be."). Yet participants in Dr. Hastings' conjoint survey were deprived of the interactive, real-world experience of test driving. In fact, they were not even presented a picture, video, simulation, or other representation of the vehicles or features they were being asked to consider, including operation of a shifter with which many respondents may have been unfamiliar. Instead, participants just saw a handful of features listed on a screen with some descriptions, essentially equating the car buying experience to purchasing a toaster on Amazon.

With the survey already failing to capture the interactive elements associated with the real-world car buying experience, it was even more important for Dr. Hastings' survey to present the attributes that most significantly drive purchase decisions in the real world (referred to in the literature as "salient attributes"). *See* Ex. G, Befurt Rebuttal, ¶¶ 24, 29; Ex. H, Hastings 10/22/18 Report, ¶ 27 (referring to "identification of relevant attributes" as one of the "key steps" in conducting conjoint analysis). *Oracle Am., Inc. v. Google Inc.*, 2012 U.S. Dist. LEXIS 33619, at *31-33 (N.D. Cal. Mar. 13, 2012) (striking conjoint analysis as unreliable due to omission of "important features that would have played an important role in real-

11

world consumers' preferences"). As explained below, she missed the most important attribute of all: brand. Just as problematic, she never bothered to explain how she selected the vehicle attributes presented in the survey.

1.    Why Selecting the Right Vehicle Attributes Is So Important.

Failure to include salient attributes (i.e., the features of a product that are most important to consumers in the real world) distorts survey results in two ways. First, omission of salient attributes increases the likelihood that respondents will implicitly associate those attributes with other features that *were* included in the survey. For example, respondents might assume that a vehicle presented with the blind-spot monitoring feature has other optional safety features typically bundled with blind-spot monitoring that they find highly important to their purchasing decision. If so, that would undermine the essential instruction that respondents must hold constant all features not included in the survey, thereby introducing "unquantifiable noise" into survey results. *See* Ex. G, Befurt Rebuttal, ¶¶ 32, 33; *Oracle*, 2012 U.S. Dist. LEXIS 33619 at *33 ("If the conjoint analysis had been expanded to test more features that were important to smartphone buyers . . ., then the study participants may not have placed implicit attributes on the limited number of features tested."). Second, omission of salient attributes causes respondents to focus on the "feature of interest"—in this case the "possibility of gear shifter issues" feature—more than they would in the real world, thereby

12

exaggerating the value of that feature in survey results. *See* Ex. G, Befurt Rebuttal, ¶¶ 32, 39-40; *Oracle*, 2012 U.S. Dist. LEXIS 33619 at \*33 (concluding that omission of features that are "considered by real-world consumers" meant that respondents were "artificially forced to focus" on the feature of interest); *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 48792, at \*94 (N.D. Ill. Mar. 31, 2017) ("By selecting these four non-price attributes without determining if they play an important role in real-world consumers' preferences, Dr. Pittaoulis's survey potentially elevates the two attributes linked to Plaintiffs' damages claims and inflates respondents' WTP estimate for these attributes.").

        2.    <u>Dr. Hastings Never Explained How She Selected the Attributes.</u>

Inexplicably, Dr. Hastings' report provides no explanation for how she decided which attributes to use in the survey. Dr. Hastings ultimately admitted as much in her deposition. At first she tried vaguely referring to explanations being "kind of scattered throughout the report in different areas." Ex. D, Hastings 7/17/19 Dep. at 40:13-41:6. But after persistent examination singling out particular features, she finally began acknowledging the deficiency. *See id.* at 43:15-24 ("Q: When I say call out and you say call out, I am asking for an explanation, a specific explanation of why you chose that specific attribute. I think I have now heard you say agree, that there is no discussion of that, providing that explanation as it relates

to blind spot monitoring in the second report, is that correct? A: There is not a specific discussion of the decision for blind spot monitoring itself.").

The conjoint literature recognizes various methods for determining the salient attributes of a product category, such as a "primary study among a small sample of consumers using such methods as direct questioning and Kelly's repertory grid method." Ex. G, Befurt Rebuttal, ¶ 31, n. 53 (citing Rao, V., *Applied Conjoint Analysis*, Springer, 2014, pp. 43-44) (listing methods)). In fact, Dr. Hastings herself said in her initial report that the criteria for choosing attributes to present alongside the gear shifter would "need to be determined in further questionnaire development work." Ex. H, Hastings 10/22/18 Report, ¶ 44. This makes Dr. Hastings' failure to document the method used to develop her attribute set all the more striking. In the end, it is simply impossible to verify the extent, if any, her method of selecting the attributes conformed to generally-recognized methods of feature selection. This is a fatal blow to her analysis under *Daubert* and Rule 702. *See In re Fluidmaster*, 2017 U.S. Dist. LEXIS 48792, at *91-95, *94 n.28 (rejecting conjoint analysis as inadmissible, in part because expert's report "does not state why she chose these particular attributes" and plaintiffs had the burden of showing why their expert's "selection of certain attributes makes her methodology sufficiently reliable."); *cf. TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1021, (N.D. Cal. 2013) (holding that conjoint analysis was

admissible where expert's separate study to determine the appropriate attributes constituted a "principled basis" for selecting the attributes).

> 3.   <u>Dr. Hastings' Failure to Include Brand As An Attribute Is a Devastating and Incurable Error.</u>

It is common knowledge that brand is often a highly relevant factor in consumer purchasing decisions. It is therefore not surprising that academic literature routinely stresses the importance of including brand as an attribute in conjoint surveys. *See* Ex. G, Befurt Rebuttal, ¶ 31. The following excerpt from a peer-reviewed article underscores the point:

> "Most practitioners of conjoint are aware that, for realistic market simulations, the major competing products must be used. This means that the product attributes in the study should include not only functional attributes such as screen size, memory etc. *but also the major brands.* This point is articulated well in Orme (2001).
>
> . . . .
>
> Therefore, it is important to design the study to consider the major competing products both in terms of brands and the attributes used in the conjoint design. It is not required that the conjoint study exactly mirror the complete set of products and brands that are in the marketplace *but that the main exemplars of competing brands and product positions must be included*."

*Id*. at ¶ 36 (quoting Allenby, G et al., "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, 2014, pp. 421-456, at p. 433) (emphasis added).

Brand is an especially important attribute in automobile purchasing decisions. Ex. G, Befurt Rebuttal, ¶ 34 (quoting Kelly Blue Book—a source cited

by Dr. Hastings—for the proposition that "[a]utomotive brands are some of the most valuable, most recognizable brands in the world. . . . Not only is it one of the biggest household purchases, but it's also one that evokes strong reactions."). Participants in the focus groups organized by Dr. Hastings made that abundantly clear. *Id*. (quoting various focus group participants who revealed the importance of brand in their perception of vehicle characteristics and possible vehicle defects).

Yet here, Dr. Hastings failed to include brand in her conjoint survey. This omission is all the more striking given *Dr. Hastings said in her first deposition that brand needed to be included in the survey*:

> Q. As you sit here today, are you able to tell me the minimum number of features that you would include in your conjoint analysis?
>
> A. I think there needs to at least be the risks of the shifter and the price.
>
> Q. And the brand?
>
> A. And the brand.
>
> Q. Okay. At least three?
>
> A. Yeah, at least three . . . .

Ex. C, Hastings 12/14/18 Dep. at 193:24-194:7.

Tellingly, Dr. Hastings' sur-rebuttal report barely addresses the substance of Dr. Befurt's criticism regarding brand omission. Instead, Dr. Hastings merely asserts that because survey respondents are supposed to hold constant all attributes outside of those presented, her analysis "does not require information about the

model of the vehicle." Ex. B, Hastings Rebuttal, ¶¶ 30-31. This unexplained U-turn from her previous position (that brand needed to be one of the three minimum attributes presented in her survey) is untethered from the ingrained position among conjoint experts that brand must be an attribute. *See* Ex. G, Befurt Rebuttal, ¶ 31. In fact, it disregards one of the core tenets of conjoint survey design—that the features selected must be salient attributes that drive real-world purchase decisions. *See id.* at ¶¶ 24, 29; *Oracle*, 2012 U.S. Dist. LEXIS 33619, at *31-33 (striking conjoint analysis as unreliable due to omission of "important features that would have played an important role in real-world consumers' preferences"); Ex. H, Hastings 10/22/18 Report, ¶ 27 (referring to "identification of relevant attributes" as one of the "key steps" in conducting conjoint analysis). Under Dr. Hastings' reasoning, it makes no difference what features are presented alongside the gear shifter, because the respondent is supposed to hold anything that is omitted constant. This novel position is unsupported junk science that infects her entire conjoint analysis, rendering the analysis unreliable and inadmissible. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.")

To be clear, Dr. Hastings does not cite any sources that support the exclusion of *brand in particular* from attribute selection. This clarification is necessary

17

because she cites various chapters of a textbook to support the proposition that "consumer choice is determined by the difference between options when all other factors, *such as vehicle brand*, are held equal." Ex. B, Hastings Rebuttal, ¶ 31, n.36 (citing Train 2009) (emphasis added). Yet those chapters say no such things for vehicle brand; Dr. Hastings appears to be citing them merely for the uncontroversial proposition that respondents should hold constant all features not included in the survey—a different question than what particular attributes should be included in the survey.

### B. Dr. Hastings' Conjoint Survey Failed To Accurately Convey The Magnitude of the Safety Risk Associated With The "Possibility Of Gear Shifter Issues"

The conjoint literature makes clear that providing concrete and accurate descriptions of survey attributes is essential to maintaining the reliability of the analysis. Ex. G, Befurt Rebuttal, ¶¶ 64-65 (citing various sources). This is especially true when an attribute incorporates risk concepts (such as risk of injury), given the propensity of respondents to misunderstand risk. *See id*. Therefore, it was imperative for Dr. Hastings' survey to describe the risks associated with the "gear shifter issues" accurately. The survey describes the risk as follows:

> In **some** cases, drivers **may** unintentionally fail to achieve the "PARK" position before exiting the vehicle when the engine is running. As a result, the vehicle **may** roll away, strike and injure the driver, passengers, or bystanders, or damage nearby property.

Ex. A, Hastings 5/30/19 Report, p. 72 (emphasis added).

This description misses the mark by a wide margin. Most significantly, Dr. Hastings does not even attempt to convey the actual magnitude of risk associated with the at-issue monostable gear shifter. In reality, the rate of vehicle rollaway or accidents even potentially associated with the at-issue shifter was calculated by Dr. Befurt to be 0.00037—similar to the chance of being struck by lightning in one's lifetime. Ex. G, Befurt Rebuttal, ¶ 66. Yet for all a survey respondent knew, the risk could have been 25%, 50%, 90%, or anything in between. In fact, one focus group participant noted that a similar description (using identical "same" and "may" language) made it seem "like a 90 percent chance it can roll away"—a perceived risk about 2,400 times greater than the actual risk. *Id*. at ¶ 69 (citing exhibits 1A-1B comparing language used in focus groups to survey language).

Curiously, in Dr. Hastings' first deposition (prior to developing the survey), she recognized the need to quantify risk associated with the at-issue gear shifter. *See* Ex. C, Hastings 12/14/18 Dep. at 206:8-12 (Q: How would you quantify the risk of the monostable shifter? A: I think that's something that we're going to develop with the survey. That is something that is part of the survey development.). And not surprisingly, later in the focus groups, a participant illustrated why expressing magnitude of risk is so important, asking: "what are the chances of these [defects]? That's what I like to go off of. What's the percentage, what's the percent chance that one of these things is going to happen?" Ex. G,

19

Befurt Rebuttal, ¶ 69. Yet her survey instrument and backup materials are devoid of such a calculation.

In one sense, it is mystifying that Dr. Hastings failed to convey the risk magnitude to survey respondents, particularly when the importance of doing so was made clear by participants in her own focus group. But of course there is a highly plausible reason for her omission: communicating that the risk associated of vehicle rollaway or accidents is about the same as getting struck by lightning would surely result in a much smaller class damages figure than letting survey respondents leave the risk level to their imagination. Whatever the reason, her failure to accurately convey the safety risk associated with the "possibility of gear shifter issues" does not pass muster under *Daubert* and Rule 702.

### C. Absurd Willingness To Pay Calculations Demonstrate That Dr. Hastings' Methodology Is Fundamentally Flawed.

Although *Daubert* instructs courts to focus on the expert's "principles and methodology" and "not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, absurd results can implicate the reliability of the methodology and support inadmissibility. *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 508 (S.D.N.Y. 2018) (finding methodology unreliable where it "proceeds from an unreliable first step, as demonstrated by the implausible results it produces when applied to other time periods and data series . . . .").

As illustrated below, Dr. Hastings' methodology leads to absurd results that

demonstrate its unreliability. But just as revealing are her explanations for the absurd results, which defy common sense.

1. <u>Negative WTP Values For The At-Issue Monostable Shifter</u>

Dr. Hastings' survey included six prices levels for vehicles, ranging from $25,000 to $65,000. For each of the six prices, Dr. Hastings calculated how much the presence of the allegedly defective gear shifter lowered the amount consumers would be willing to spend on the vehicle, i.e., the reduction in willingness to pay (WTP). Ex. G, Befurt Rebuttal, ¶¶ 115-116, 116 n. 220. Yet Dr. Hastings' report only shows reduction in WTP for the three highest price vehicles, as shown in the following table from page 26:

TABLE 1
REDUCTION IN WTP BY BODY TYPE

| Simulation | Vehicle without alleged defects | Vehicle with known alleged defects | Simulated market share | Reduction in WTP | Percent reduction in WTP |
|---|---|---|---|---|---|
| SUV 1 | $49,000 | $11,616 | 38.1% | $37,384 | 76.3% |
| SUV 2 | $57,000 | $37,696 | 29.6% | $19,304 | 33.9% |
| SUV 3 | $65,000 | $51,496 | 22.8% | $13,504 | 20.8% |
| Sedan 1 | $49,000 | $32,192 | 41.9% | $16,808 | 34.3% |
| Sedan 2 | $57,000 | $41,680 | 30.0% | $15,320 | 26.9% |
| Sedan 3 | $65,000 | $51,496 | 21.1% | $13,504 | 20.8% |

Seeing the WTP results for the three lower priced vehicles makes it immediately clear why they were not presented: they are so absurd that they undermine the validity of the entire analysis. For example, at the $25,000 price level for sedans, Dr. Hastings' method dictates a negative WTP of negative

$59,640, meaning that consumers would *request* to receive at least $59,640 before leaving the dealership with the at-issue monostable shifter. Ex. G, Befurt Rebuttal, ¶ 117 (showing version of WTP table that includes the results presented by Dr. Hastings and those she omitted). The results are even more irrational for SUVs. For example, at the $25,000 price level for SUVs, Dr. Hastings' method dictates that consumers would *request* to receive at least $73,000 before leaving the dealership with the at-issue monostable shifter.

When asked about her omission of the WTPs for the lower priced vehicles at her deposition (which was before Dr. Befurt issued his rebuttal report), her excuse for omitting them was that "the purpose is to be conservative" (apparently on the theory that the lower WTP values for the three higher priced vehicles showed less sensitivity to the inclusion of the at-issue shifter). Ex. D, Hastings 7/17/19 Dep. at 188:6-13. But after Dr. Befurt's rebuttal report highlighted the absurd results, Dr. Hastings presented a new reason in her sur-rebuttal report, asserting that the WTPs for the lower priced vehicles were properly disregarded because "WTP reductions cannot be accurately estimated when they are based on extrapolations beyond the range of the prices used in the survey." Ex. B, Hastings Rebuttal, ¶ 47. This is a specious proposition on a technical level, but practically speaking, this assertion puts Dr. Hastings in a bind that she can't untangle. That's because in her report, she actually relied on a WTP reduction "based on extrapolations beyond the range

22

of the prices used in the survey." Specifically, for SUV 1 in Table 1 of her report (shown above), the price of the SUV with the WTP reduction is $11,616, which is lower than the lowest price used in her survey: $25,000. She can't have it both ways, either her extrapolation theory is wrong and can't be used to justify the absurd results at the lower price levels, or she violated her own rule.

Dr. Hastings' sur-rebuttal provides an alternative explanation for the negative WTP values that is equally problematic. Specifically, she says that Dr. Befurt failed to consider that survey respondents who selected vehicles at lower price points had relatively low incomes, and academic literature shows that those with relatively low incomes are more risk averse. *Id*. at ¶ 51. Therefore, in her words:

> the fact that WTP values for vehicles with low prices can exceed the price of the vehicle reflects the common sense outcome that individuals with relatively low incomes are not willing to or able to bear the risk of purchasing a defective vehicle.

*Id*. This is an astounding statement that defies the most basic common sense. Nobody, regardless of their income level, would insist on being paid tens of thousands of dollars (specifically, a $75,000 payment in the case of the $25,000 SUV) before accepting a vehicle that could be subsequently disposed of for little to no cost (or in reality, sold on the used car market). Put differently, the negative WTPs for the lower priced vehicles cannot be explained away by claiming that people who tend to buy lower-priced vehicles tend to be more risk averse.

23

2.    Astronomical Values for Four Wheel Drive and Blindspot
Monitoring

Dr. Hastings' method leads to similarly absurd results for the Four Wheel

Drive and Blindspot Monitoring attributes included in her survey. For example,

under her model, "consumers who would like to upgrade from a 2WD to a 4WD

would be willing to pay at least $104,560 to enjoy the benefits of a four wheel

drive." And for Blindspot Monitoring, "consumers who would like to add a blind

spot monitor would be willing to pay $38,864 to enjoy the benefits of a blind spot

monitor." Ex. G, Befurt Rebuttal, ¶¶ 123-125. These values are of course not even

remotely close to the market price for these features in the real world—$2,000 for

Four Wheel Drive, and less than $300 for Blindspot monitoring. *Id.*

As with the absurd WTP values for the at-issue shifter, Dr. Hastings' sur-

rebuttal says these values should be excluded based on her extrapolation theory,

which is addressed above. Alternatively, Dr. Hastings explains the massive gap

between the extremely high WTP values for Four Wheel Drive and Blindspot

Monitoring and the prices of those features in the marketplace by asserting that

"the market prices of adding 4WD and BSMs are relatively low because firms

compete to add these features. As a result, buyers can have WTP values that

substantially exceed the market price of adding these two features." Ex. B,

Hastings Rebuttal, ¶ 55. Put differently, Dr. Hastings believes that consumers

might very well theoretically be willing to pay $104,560 for Four Wheel drive,

24

they just don't need to pay that much because competition among automakers drives the price down to the market price of $2,000. But this does nothing to address the fact that a WTP value of $104,560 is facially absurd by any measure.

## CONCLUSION

For the foregoing reasons, FCA US respectfully requests that this Court enter an order excluding the expert reports and testimony of Plaintiffs' proffered expert Justine Hastings, and for such further relief the Court deems necessary and just.

Dated: April 28, 2020

Respectfully Submitted,

DYKEMA GOSSETT PLLC

By: */s/ Fred J. Fresard*
Fred J. Fresard (P43694)
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
ffresard@dykema.com

*Attorneys for Defendant FCA US LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 28, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

DYKEMA GOSSETT PLLC

By: */s/ Fred J. Fresard*
Fred J. Fresard (P43694)
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0700
ffresard@dykema.com

Dated: April 28, 2020               *Attorneys for Defendant FCA US LLC*

4821-7214-9688.8

1