UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In advance of the common issues trial the defendant has moved for summary judgment. In the motion, the defendant states that it seeks summary judgment on the three questions that the Court certified for trial. However, the motion itself only addresses the first certified question: "Whether the monostable gear shift has a design defect that renders the class vehicles unsuitable for the ordinary use of providing safe transportation." *See* Order Amending Class Def., ECF No. 510, PageID.21609. The defendant contends that the plaintiffs are bound by a "judicial admission" that the class vehicles are not defective following a software modification that the defendant installed, and that they cannot prove the existence of a design defect under the relevant standards applied by the various states, either via a "consumer expectations" or "risk-utility" analysis. It also separately argues that for the plaintiffs bringing claims under Massachusetts law, they must prove a violation of some pertinent government enforced safety regulation to establish the existence of a design defect under Massachusetts law. As the Court ruled earlier, the plaintiffs have not admitted, judicially or otherwise, that the class vehicles are not defective. They also have tendered sufficient evidence to require a trial on the disputed material facts embraced by the certified common issues, and the defendant's understanding of Massachusetts law is incorrect. The motion, therefore, will be denied.

I.

The factual background of the case by now is familiar to the parties and was reviewed at length in the Court's previous rulings on the several rounds of the defendant's dispositive motions. The vehicles targeted by the Second Amended Consolidated Master Complaint (SACMC) are the 2012-2014 Dodge Charger, the 2012-2014 Chrysler 300, and the 2014-2015 Jeep Grand Cherokee, which were manufactured with a monostable gear shifter.  Chrysler's internal communications referred to the class models by certain initials, which are "LX" for the Chrysler 300, "LD" for the Dodge Charger, and "WK" for the Jeep Grand Cherokee.  The defendant sold more than 800,000 vehicles during those model years that used the monostable gear shifter.

The plaintiffs allege that studies conducted in 2010 and 2012 by the defendant's retained market research firm, which were replicated during this litigation by the plaintiffs' human factors expert, suggested that the gear shift design "is defective because it inhibits reliable gear selection and provides insufficient tactile or audible feedback to allow drivers to readily and confidently shift to their intended gear."  They contend that the defendant was aware of the defect before the class vehicles went to market, but it elected to sell them anyway, and without disclosing its knowledge of the shifter problems to prospective buyers.  The class vehicles were the subject of a voluntary recall in mid-2016, which included the deployment of a software modification that adds an "auto park" feature to the transmission system.  But the plaintiffs maintain that the modification did not cure certain issues with the design, and they believe that the class vehicles still are unsafe.

The Court denied the plaintiffs' request to certify a class of individuals because of the variety of issues raised by the SACMC, which presently embraces claims under the law of 23 states on a variety of legal theories including product liability, breaches of express and implied warranties, consumer fraud, misrepresentation, and unjust enrichment.  The plaintiffs could not

establish the predominance of common issues over individual issues in their proposed classes and subclasses as required by Rule of Civil Procedure 23(b)(3).  However, the Court certified a common issues class for trial on three issues that present a common basis for the elements of nearly all the various causes of action.

The defendant has challenged the plaintiffs' theory of liability in several previous motions to dismiss, which, for the most part, the Court has denied.  The present motion reiterates many of the same arguments made earlier, but in the context of the discovery record that has been assembled by the parties.  The defendant insists that the plaintiffs' claims are barred by a judicial admission that the vehicles as later modified are not defective, that there is no evidence of a design defect under the laws of the 21 states for which the issues class was certified, that there is no evidence of an alternative safer design that was available when the vehicles were sold, no evidence that the class vehicles were more dangerous than any other vehicle, and that uncontroverted studies show that the average driver had no trouble with the shifter after about 20 minutes of practice.  The plaintiffs disagree.  The discovery record of necessity therefore must be recounted in detail to address those arguments at this stage of the case.

## A. Shifter Design

Stiven Stefanoski is an engineer in the defendant's "e-shifter" division.  He testified that the gear shifter "plays an important role in vehicle operation," because the transmission is "ultimately responsible for [] safe vehicle operation in terms of [gear selection] after it receives an input from the shifter," and "the shifter is what is used for the operator of a vehicle to send the signal to the transmission as to what gear the vehicle should be placed in."  Stiven Stefanoski dep., ECF No. 619-2, PageID.27918.  Brian Wagoner, another Chrysler engineer, testified that the gear shifter is a "primary operator control" and an "important part of the vehicle," and that it is

"important" to driver and public safety that the transmission systems select the gear that the driver intends and signals through the shifter.  Brian Wagoner dep., ECF No. 619-3, PageID.27922. Wagoner agreed that the design of a shifter should be "usable" and "understandable," and that the shifter should "perform [as] intended."  *Id.* at PageID.27924.

Wagoner testified that during the design of the class vehicles, there was a "strong preference" expressed by the branding (marketing) team that the shifter in the Chrysler 300 and Charger should be a "lever-type design" instead of a rotary pattern, because the rotary design was not a "sport car type shifter."  Wagoner dep. at PageID.27925.  The branding team similarly expressed a "strong preference" for a lever-type shifter in the Jeep Grand Cherokee, because the rotary was not deemed a good "fit" for the Jeep from the perspective of "theme" and "brand."  *Id.* at PageID.27926.  Wagoner attested that if the rotary design had been deemed to "fit" from a branding perspective, then such a design could have been used because FCA "had a rotary shifter available — tooled and available to us from the '13 [Dodge Durango] truck, and we were able to effectively integrate it into [that model]," and "if it had been a vehicle fit it would have been available for the Grand Cherokee."  *Id.* at PageID.27926-27.  Wagoner further testified that there was "no issue with intellectual property . . . with respect to the decision to not use a rotary shifter in the WK [Jeep Grand Cherokee]" class models.  *Id.* at PageID.27926.

The plaintiffs' human factors expert Dr. Craig Rosenberg conducted a driving study that roughly mirrored the design of a 2012 focus group study commissioned by the defendant and performed by its research firm, Lextant, which had compared various models of gear shifters for ease of use and incidences of errors.  Rosenberg used two vehicles, which were driven through a series of scripted exercises by 31 drivers recruited from the driving public.  One vehicle was a 2015 Jeep Cherokee equipped with the monostable gear shifter, and the other was a 2019 Jeep

Cherokee equipped with a successor "polystable" gearshift design.  Expert Report of Craig Rosenberg dated Oct. 22, 2018, ECF No. 619-39, PageID.28655.  The drivers all were fluent in English, ranged in age from 20 to 59, and were experienced motorists who reported driving at least 7,000 miles per year.  *Id.* at PageID.28670-71.  Rosenberg selected participants to ensure that he had a mix of those both with and without previous experience using monostable type shifters.  *Id.* at PageID.28671.  The driving exercises were conducted with one participant at a time in an unoccupied parking lot of a closed retail store, during daylight hours, in clear weather conditions.  *Id.* at PageID.28675-76.  Rosenberg was in the vehicle during the exercises, and he used a GoPro camera to record the driver's activity.  *Id.* at PageID.28676.  The same 2015 Jeep Grand Cherokee with the monostable shifter was used in all exercises, along with a second "control" vehicle, which was a 2019 Grand Cherokee with the polystable lever shifter.  That shifter, although also electronic, appears and functions in most respects more like a traditional non-electronic "gated" shifter.  *Id.* at PageID.28679-681.  Participants performed a series of driving maneuvers and parking exercises first in the class vehicle and then in the control vehicle.  *Id.* at PageID.28682-83.  They were given 10 minutes to practice the exercises in each vehicle before repeating the same maneuvers for data collection.  They then were asked several questions about their impressions of each shifter after the driving exercise was done.  *Id.* at PageID.28683.

Rosenberg and an assistant reviewed video from the cameras to catalog and classify eight types of errors they observed, including "undershoot," "overshoot," "wrong gear" (car was in a different gear than the driver believed), "wrong direction" (driver moved the shifter in the wrong direction to reach the intended gear), and "can't tell in correct gear" (vehicle was in the proper gear, but the driver shifted to another gear).  *Id.* at PageID.28684-86.  Rosenberg concluded that the monostable shifter produced many times more shifting errors in the exercises (416 errors for

the monostable design vs. 38 for the polystable).  *Id.* at PageID.28696.  Rosenberg found that there was no significant difference in error rates among drivers with and without prior experience using a monostable type shifter.  *Id.* at PageID.28702.

After the driving exercise was done, Rosenberg presented participants with a list of 22 words in two columns and asked them to pick which best described each shifter.  "The top five words selected to describe the Monostable shifter were (1) Awkward, (2) More-work, (3) Frustrating, (4) Confusing, and (5) Difficult," and "[t]he top five words selected to describe the Polystable gear shift were (1) Predictable, (2) Easy, (3) Simple, (4) Clear, and (5) Intuitive."  *Id.* at PageID.28715.  Rosenberg also noted that both experienced and inexperienced participants rated the monostable shifter equally poorly in terms of usability, intuitiveness, and demand for excess attention to ensure proper gear selection.  *Id.* at PageID.28717-18.

Rosenberg concluded based on the results of his study that "the Monostable gear shifter has an unintuitive design, is difficult to operate, and provides inadequate tactile and visual feedback."  *Id.* at PageID.28725.  He concluded that "[t]hese flaws associated with the Monostable shifter can lead to safety critical incidents associated with eyes off road time and unintended gear selection that can result in vehicle rollaway events."  *Ibid.*  He also reviewed the results of the August 2012 Lextant study, from which his experimental method was derived, concluding that the results of the Lextant study essentially were the same and confirmed an excessively high rate of shifting errors with the monostable shifter due to its confusing and awkward design.  *Id.* at PageID.28734.  Rosenberg noted two major safety concerns with the design: (1) "unintended gear selection errors can result in vehicle rollaways that can be dangerous to the driver, passengers, and other nearby people and property," and (2) "the increased attention required to shift gears can

reduce attention away from the roadway and result in reduced situational awareness." *Id.* at PageID.28655.

## B. April 2009 Shifter Assessment

In April 2009, Chrysler prepared an extensive presentation headed "2012 LX/LD Electronic Shifter Assessment." Presentation dated April 2009, ECF No. 619-4, PageID.27929-971. The presentation stated that the purpose of the review of the shifter design was to determine a "shifter technology direction" based on "competitive" and "functionality" assessments, principally including a "functional assessment" involving 60 "non-technical employees" over the course of eight days, with each participant taking around 40 minutes to complete the exercise." *Id.* at PageID.27930. The assessment included comparison of five shifter mechanisms, which were described as "gated traditional," "rotary knob," "touch screen," "stable," and "monostable." *Id.* at PageID.27932. It appears to be undisputed that the "monostable" design used in the 2009 trial was not a production configuration and differed in significant respects from the design fielded in the class models. That early prototype scored abysmally in the assessment, much worse than any other design, and was rated as "least favorite by nearly half of the participants. *Id.* at PageID.27932, 940. The "traditional" shifter "was the least controversial," and the "traditional," "rotary knob," and "touch screen" were "selected by a similar number of participants as their favorite shifter for functionality." *Id.* at PageID.27940. The summary of feedback about the monostable design noted the following comments: "held into position while performing driving task (a lot of voices), "could not find park (a lot of voices)," "knob size too small (a lot of voices)," "do not like 'return to center' because you cannot look down at it and know what gear [you're] in," "[y]ou need to look at cluster (a lot of voices)," "terrible," "learned but not intuitive," "want shifter knob to stay in gear," and "don't do it." *Id.* at PageID.27937.

C. June 2010 Shifter Assessment

Chrysler continued to tinker with the monostable shifter concept to improve its usability, and in June 2010 it commissioned Lextant to conduct a second internal assessment of a refined monostable shifter configuration.  Presentation dated June 2010, ECF No. 619-6, PageID.27984-28021.  Again, it appears to be undisputed that the monostable shifter configuration used in this second assessment was not the same as the eventual production version, notably in that it included a "Park" pushbutton on the top of the shift lever, which is not a feature present in the class vehicles. *See id.* at PageID.28015.  The second assessment involved 21 participants who were "internal employees of Chrysler with no knowledge of how the e-shift works."  *Id.* at PageID.27990.  Participants each performed a "series of parking maneuvers" over the course of a 45-minute session in a simulator designed to mimic the anticipated cabin layout.  The summary of test results noted that 17 of 21 participants managed to shift into "drive" correctly on the first try, but only six of 21 correctly achieved "park" on the first attempt, and only three out of 21 correctly shifted into "reverse."  *Id.* at PageID.27994.  The commentary further disclosed that "eight (8) participants successfully completed the maneuver in 2 attempts, 3 completed in 3 attempts, and 4 completed in 4 attempts. Therefore, all 21 participants successfully engaged the vehicle in Park with no hesitation or errors after no more than 4 attempts."  *Id.* at PageID.27995.  "[M]ore than 80% of participants successfully completed the [shift into reverse] in 4 attempts, while all completed after 6 attempts."  *Ibid.*  The report also stated that: "An interesting phenomenon seemed to take place during testing of the E-Shift[,] that is, participants who were successful in completing a maneuver initially may still make mistakes performing that maneuver during subsequent trials," noting that among the two participants who shifted into park successfully on the first try, two of those had

issues shifting into park on subsequent attempts; similar errors were noted with repeated shifts to drive and reverse.  *Id.* at PageID.27996.

### D. October 2010 Shifter Assessment

In October 2010, Lextant conducted another shifter design assessment which included the preliminary (Kostal supplied) monostable lever shifter discussed above, a new lever-type shifter (supplied by ZF) that was used in the Audi A8, and a "rotary polystable" shifter design used by Jaguar.  E-Shift Competitive Assessment dated Oct. 2010, ECF No. 619-14, PageID.28168-28261. The October 2010 study involved 20 participants selected from the general population around Columbus, Ohio, with the only qualification being that they held a valid driver license.  *Id.* at PageID.28178.  Participants ranged in age from 20 to 59 and were equally divided by gender.  *Ibid.* The report noted that "[a]ll efforts were made to control variables that were outside of the test objectives," and "[e]ach vehicle was assigned one moderator and one note-taker for all twenty (20) participants."  *Ibid.*  "Participants were given no instructions regarding the functionality of the vehicle," and were directed to perform a series of "basic driving maneuvers" in a closed parking lot. *Id.* at PageID.28177.  "Participants were given six parking attempts to complete one successful parking series (reverse, drive, park), [and] if they were unable to complete the series in six attempts it was considered a failure."  *Id.* at PageID.28182.  Asked to describe the various shifters in one word, participants most often tagged the Jaguar rotary design as "easy," "smooth," and "convenient"; compared with the Audi A8 monostable design, which was viewed as "confusing," "difficult," "sensitive," and "awkward."  *Id.* at PageID.28189.

The report presented an array of statistical tabulations of operator errors and concluded that the Jaguar rotary shifter was significantly easier to learn and produced far fewer errors, stating: "Consistent with their respected [sic] success rates, the Jaguar and the PPB had few errors and

those errors were consistent across participants.  Conversely, the Kostal 7 Position Monostable and Audi A8 7 Position Monostable had a large number of errors across all participants."  *Id.* at PageID.28194.

Shifting errors and confusion persisted throughout the study, even after continued use of the monostable shifter, and a particular difficulty was caused by the lack of tactile, auditory, and visual feedback provided by the design.  *Id.* at PageID.28203 ("The combination of 1) the lack of physical effort required to move the stick, 2) the lack of distance required to move the stick, and 3) the lack of engine feedback when engaging a gear, all caused participants to question if they had correctly performed an action. This need for additional feedback was even more pronounced when shifting to park."); *ibid.* ("Overshooting reverse on the Kostal 7 Position Monostable and Audi A8 7 Position Monostable persisted throughout testing, participants just didn't feel the first detent into reverse.  Additionally, in the Kostal 7 Position Monostable and Audi A8 7 Position Monostable participants often overshot reverse ending up in park. Participants commented that both the Kostal 7 Position Monostable and Audi A8 7 Position Monostable looked like traditional shifter[s] but are bothered that they had to visually confirm the gear rather than the feel and positioning of the shifter.").  The study reported that during the "learning phase" of the assessment, the Kostal monostable shifter produced 150 errors and the Audi A8 (ZF) design even more with 162, compared with just six observed errors for the Jaguar rotary shifter.  *Id.* at PageID.28194.

### E. Change of Plans

Sometime in mid-2010, Chrysler had decided that the initial (Kostal) monostable shifter design was not viable, and it began considering alternative designs for the class vehicles.  On August 31, 2010, Mark Chernoby, then a senior executive on Chrysler's product committee, stated the following in an email to CEO Sergio Marchionne:

FYI, we have run into trouble with the transmission shifter we were planning to use coupled with the SF 8 speed transmission one year from now in the Chrysler 300 and Dodge Charger.

As you may remember, we were pursuing a "monostable" shifter similar to what is in the BMW 5 series today.

It is clear, after 3 dynamic consumer clinics, that too many people are not able to learn how to use the shifter frequently confusing Reverse, Drive, and unable to park.

As you know, this is not a place to be in our market.

We are rapidly pursuing two options:

1. Rotary knob shifter (Jaguar XF-R) which was very easy for people to understand in clinics.

2. Linear shifter (Audi A8) with a motion very similar to today's shifter. Part comes from ZF.

We will likely need to make decisions prior to the next product committee for the Dodge Charger and Chrysler 300.

We will provide information on usability, cost, and timing implications as soon as they are available.

Email dated Aug. 31, 2010, ECF No. 619-8, PageID.28032. The alternative "linear shifter" design described in this email and previously used in the Audi A8 appears to have been a precursor of the shifter design that the defendant eventually deployed in the class vehicles.

By October 6, 2010, excerpts of the minutes from Chrysler's product committee meetings indicated that the defendant had decided to "discontinue work" on the preliminary monostable design, "[d]evelop a cross product proposal for the rotational knob," and "finalize cost and timing implications and return to [Committee] for program approval." Product Committee Minutes dated Oct. 6, 2010, ECF No. 619-10, PageID.28119. A later memo succinctly stated the rationale for the decision: "Based on clinic results, the PoR monostable shifter has been deemed unacceptable from a customer usability and intuitiveness standpoint, however, the rotary knob concept (Jaguar XF/XJ) scored very well." Memorandum dated Nov. 7, 2010, ECF No. 619-11, PageID.28123. It

appears that more than one rotary type shifter was considered, because minutes from a November 20, 2010 product committee meeting stated that the plan "to implement the rotary shifter supplied by Kostal will be dropped due to the IP issues with Jaguar," but "[b]oth the rotary and Audi A8 type linear shifter solution[s] will be pursued from ZF."  Product Committee Minutes dated Nov. 20, 2010, ECF No. 619-12, PageID.28126.  Further committee materials suggest that the principal sticking points in the negotiation were Jaguar's demand for a licensing fee for the rotary shifter and "possible" reservations about licensing the rotary design for use in the Grand Cherokee, due to perceived competition with Land Rover branded models.  Presentation dated Nov. 20, 2010, ECF No. 619-13, PageID.28134.  Additional slides listed an estimated cost of $132 (apparently per unit) for the Jaguar rotary shifter, vs. $111 for the ZF lever-type monostable unit.  *Id.* at PageID.28135.  Nevertheless, under the heading, "Decisions / Next Steps," the presentation stated: "Implement Jaguar style rotary knob on '12 MY LX & LD."  *Id.* at PageID.28136.

### F. Commitment to Audi A8 (ZF) Monostable Design

By early December 2010, Chrysler, for reasons that are not entirely clear from the record, decided to abandon the option of using a rotary shifter in the class vehicles and commit instead to the Audi A8 (ZF) monostable shifter design.  Presentation dated Dec. 11, 2010, ECF No. 619-15, PageID.28264.  The minutes indicate that the decision to "[u]se [the] existing Audi level design/mechanism" was made "to minimize development time."  The December 2010 minutes do not indicate why negotiations with Jaguar over the rotary design were halted, and they did not identify licensing concerns as a factor motivating the decision to use the ZF lever.  *Id.* at PageID.28264.  The presentation noted that "[m]any shifting errors occurred in clinic due to overshooting intended gear," and "due to the delay to park and lack of park confirmation."  *Id.* at PageID.28274.  Chrysler may have made some attempts to refine the design further by adjustment

of certain detent and spring components, but internal correspondence from February 2011 indicates that in later customer clinics the refined design still produced "an average of 1 overshoot or undershoot error per 7.4 shifts (13.5%)."   Email dated Feb. 2, 2011, ECF No. 619-16, PageID.28286.   Further efforts at "tuning" the shifter apparently were curtailed when designers ran out of time to meet the launch timetable for the class models.   Email dated July 28, 2011, ECF No. 619-18, PageID.28294 ("[T]he detent system has been previously assessed for overshoot vs. undershoot vs. effort to get into park; the best design combination available within program timing was implemented.").

### G. Post-Production Feedback

The email discussion noted above, discussing the infeasibility of further design tuning, was prompted by a report from a Chrysler employee about his experience driving a production model with the monostable shifter during a pre-release phase before the first deliveries to customers.   That candid account included the following anecdote:

> Last week I took delivery of my 2012 Fast-Feedback Charger equipped with the 3.6L and 8-speed e-shift trans and was not very impressed with the functionality of the shifter. I was so disappointed that I immediately input my negative comments into the Driver Report Entry System . . . . I didn't realize any issues until I had to shift into reverse when backing into my parking spot. It seemed I couldn't "find" reverse. I kept going from park to neutral, always seeming to go right over reverse. It made me feel like an idiot because someone had to wait for me while I was screwing around with the shifter and trying to get my car out of the isle [sic] and into the parking spot.

Email dated July 26, 2011, ECF No. 619-18, PageID.28297.   The originator of the thread also wrote about his experiences showing the shifter off to several family members:

> Most of them found another issue that made them very uncomfortable and that was putting the vehicle back into park. They all were afraid to take their foot off the brake pedal because they were unsure the vehicle was actually in park (until I told them to look at [the] PRNDL light). I was relieved that they experienced the same issues that I did. Unfortunately, that also meant that we are about to send a vehicle into production that may not appear to function properly.

*Ibid.* Finally, he concluded with the following inquiry:

> I know that it may take time to get used to this new configuration but my question is, "why can't the shifter function the same way our current shifters function or even the same way Ford, GM, Toyota, and everyone else's shifters currently function . . . or even those dating back to the invention of the automatic transmission?"

*Ibid.* Another correspondent in the exchange, Allen Amici, wrote that he had "[e]xperienced the same myself . . . though not to the degree of the author." *Id.* at PageID.28296.

After the class vehicles went to market, Chrysler conducted a follow-up survey of more than 400 owners of the class vehicles, with results compared to responses from a "control group" of owners of prior model year vehicles with a 5-speed automatic transmission (and apparently a more traditional shifter design). Survey Results Presentation dated Jan. 31, 2012, ECF No. 619-23, PageID.28394-28431. Although the report noted that most owners were "satisfied" or "extremely satisfied" with their vehicles, it also stated that "[r]espondents' experience with engaging the gears is not nearly as easy with the eShifter as it is with the 5-speed transmission gear shifter," and "[r]everse (37%) and drive (39%) rate the lowest for ease to engage," versus results from the "[c]ontrol group [in which the] [v]ast majority (89%+) report engaging all gears is very easy" and "three quarters find it extremely easy." *Id.* at PageID.28397. As late as February 22, 2012, reports of further Chrysler testing of the production design with focus groups noted that it "was missing familiar feedback: Feeling shifting through gears; Mono-stable design does not allow for position of shifter to confirm gear; Could not visualize how far to pull or push shifter to next gear; Could not determine how much force or pressure to use when pulling or pushing." Presentation dated Feb. 22, 2012, ECF No. 619-25, PageID.28438. Another post-production usability study from April 2012 concluded that "Push button or Rotary [shifter design] should be the primary direction, based on ease of use and fewest errors," and "[a] more traditional looking

-14-

shifter, such as the mono-stable, would be a third choice, based on ease of use, and number of errors."  Presentation dated Apr. 28, 2012, ECF No. 619-28, PageID.28457.

### H. August 2012 Shifter Assessment

In August 2012, after the class vehicles went to market, the defendant commissioned Lextant for a third study in which drivers were asked to use and give their impressions of several alternative automobile shifter designs, including the "monostable" design at issue in this case. Report of Polystable E-Shift Competitive Usability & Acceptance Study dated Aug. 24, 2012, ECF No. 298-5, PageID.28504-596.  According to the executive summary of the report, the goal of the study was "to compare the Polystable E-shifter with 3 other shifters in terms of usability, perceived ease of use, and experience, in order to guide future product decisions."  *Id.* at PageID.28507.  The principal conclusions of the study were that "familiarity and feedback (visual and tactile) contributed to a more successful user experience," and that positive scores on those dimensions "led the Rotary and Polystable shifters to be the most successful in this study for user experience." *Id.* at PageID.28508.

Principal findings included the observations that "[p]articipants are familiar with shifting and don't want to re-learn a behavior that doesn't usually require them to think," that drivers "want to feel confident that they have engaged the intended gear," and that "[p]articipants expect system status (current gear) to be displayed in a timely manner, coordinating with the movement of the shifter, and in an easy to see location."  *Id.* at PageID.28509.  Those findings were derived from interviews with 30 participants, after they had conducted a series of monitored and recorded in-car exercises that included parking maneuvers, a three-point turn, and "additional shifting maneuvers." *Id.* at PageID.28514-15.  The report did not specify how the participants were selected, but they appear to have been members of the driving public who were recruited for the purpose of the study.

After the exercises and interviews were completed, Lextant's staff conducted various "quantitative and qualitative analys[es]" to compile the responses of participants and summarize them in a cohesive way. *Id.* at PageID.28522. One of the summary methods involved creation of "word clouds" depicting the frequency with which participants used various words to describe the shifter designs, color-coded with green to highlight favorable terms and red to denote unfavorable terms. The most often used terms in describing the "Polystable" shifter design included "smooth," "easy," "convenient," "intuitive," "comfortable," and "familiar." *Id.* at PageID.28524. The "Monostable" design drew far less favorable reviews, and participants described it most frequently as "insecure," "awkward," "uncomfortable," "frustrating," and "difficult." Nearly all of the terms used to describe the monostable design were negative; less frequently used phrases panned it as "dangerous," "annoying," "pain-in-the-ass," and "piece-of-junk." *Id.* at PageID.28525. The report also included a breakdown of statistical calculations demonstrating the significance of the frequency of the different qualitative responses used to describe the shifters and the feelings users had about them during the vehicle exercises. *Id.* at PageID.28529-548.

The report included several tables recording the frequency of shifting errors of different types during the driving exercises. Errors recorded included undershooting or overshooting the intended gear, failing to activate the trigger on the shifter in order to move into another gear, shifting in the wrong direction to reach the intended gear, thinking that the car was in a different gear than the one actually selected, and thinking that the car was in a gear other than the intended one, followed by shifting out of the correct gear into an incorrect setting. *Id.* at PageID.28562-569.

One of the principal conclusions of the error analysis was that "Overall, the Rotary had the least number of errors and the Monostable had the most." *Id.* at PageID.28544. "The Monostable

had the most errors and the largest variety of errors, while the other shifters had fewer errors." *Id.*

at PageID.28566.  "The Rotary shifter had the least number of total errors in the parking tasks."

*Id.* at PageID.28564.  The number of errors observed in the vehicle exercises varied dramatically

between the different designs, with less than 20 "parking errors" for the conventional or "Gated"

shifter and 22 for the Polystable design, but 342 for the Monostable shifter.  *Id.* at PageID.28544.

The report also noted that "[t]he Monostable's ratings decreased over time as it did not get easier

to use and participants still felt unsure and confused even after using it over the duration of the

study," and "[e]ven with time, the Monostable was difficult to use without error."  *Id.* at

PageID.28545, 28554.  In addition, one type of error conspicuously occurred only with the

monostable shifter: "Can't tell in Correct Gear was only an issue in the Monostable shifter, where

participants got into the correct gear but did not realize it and moved out of the correct gear into

an incorrect one."  *Id.* at PageID.28568.

*I.* Continued Deployment

Despite all of the issues raised with the shifter design before, during, and after the Chrysler

300 and Dodge Charger models went to market, Chrysler proceeded to use an "identical" design,

save for cosmetic details, in the 2014 Jeep Grand Cherokee.  The defendant's expert Robert Kuhn

opined that the shifter design in the Jeep has no commonality with the previously deployed models,

but that position is belied by Chrysler's internal correspondence in which the engineer responsible

for the design affirmed that they were "nearly identical":

> John Zbranchik is the release engineer for WK [Jeep Grand Cherokee], however,
> the eShifter module being used for WK and 2012/13 LX/LD is nearly identical.

> The difference between the WK shifter and the LX shifter (aside from some A-
> surface items i.e. leather, chrome finish) is the length of the lever (~15mm longer
> in WK) and the subsequent increase in length of the shroud. The electronic module
> is common between LX/LD and WK.

Email dated July 5, 2012, ECF No. 619-29, PageID.28499.

-17-

It appears to be undisputed that Chrysler changed to a "polystable lever" gated shifter design for all class models starting with the 2016 model year.

## J. Voluntary Recall

The class models were the subject of a NHTSA defect investigation and voluntary recall in mid-2016.  In a closing report, NHTSA's Office of Defect Investigation (ODI) included the following narrative of the recall and the circumstances that prompted it:

> On April 22, 2016, Fiat Chrysler Automotive US, LLC (FCA) submitted a Defect Information Report (DIR) to NHTSA regarding a defect that could result in unattended vehicle rollaway with the engine running in approximately 811,586 model year (MY) 2012 to 2014 Dodge Charger and Chrysler 300 vehicles and MY 2014 to 2015 Jeep Grand Cherokee vehicles equipped with 8-speed transmissions and a monostable gear selector (NHTSA Recall #16V-240, FCA Recall #S27). According to FCA's DIR, "The existing strategies built into these vehicles to deter drivers from exiting the vehicle after failing to put the transmission into PARK have not stopped some from doing so. Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged."
>
> The vehicles recalled by FCA are equipped with Monostable electronic ("shift-by-wire") gearshift assemblies supplied by ZF Group. The subject Monostable shifter has a single neutral position that it snaps back to when the driver releases the shift knob. Although the Monostable gearshift has the familiar appearance of a conventional console mechanical gearshift assembly, it has an unfamiliar movement that does not provide the tactile or visual feedback that drivers are accustomed to receiving from conventional shifters. Consequently, the driver must take additional time to verify that the desired gear position was achieved by checking the PRNDL display on the shift knob or the Electronic Vehicle Information Center (EVIC) display.
>
> FCA received negative consumer feedback for the Monostable shifters shortly after the subject vehicles entered the market.  Field data indicate that the design resulted in higher error rates during attempted shifts to Park and higher rates of powered rollaway incidents.  The Monostable design appears to violate several basic design guidelines for vehicle controls, such as 1) be consistent; 2) controls and displays should function the way people expect them to function; 3) minimize what the user has to remember; and 4) operations that occur most often or have the greatest impact on driving safety should be the easiest to perform.

NHTSA ODI Closing Resume, ECF No. 619-34, PageID.28634-35.

FCA sent an initial recall notice to owners of the class vehicles in May 2016, which stated the following:

> FCA US has decided that a defect, which relates to motor vehicle safety, exists in certain 2014 and 2015 Jeep Grand Cherokee and 2012 through 2014 model year Chrysler 300 / Dodge Charger vehicles. The problem is: Your vehicle may roll away striking and injuring you, your passengers, or bystanders, if the vehicle's engine is left running, the parking brake is not engaged, and the vehicle is not in the "PARK" position before exiting the vehicle.
>
> Drivers may inadvertently fail to achieve the "PARK" position before exiting the vehicle. The electronic shift lever in your vehicle does not move like a conventional shifter. Your shift lever is spring loaded and returns to the same center position like a joystick, always returning to the center position after the desired gear is selected.
>
> . . .
>
> FCA intends to repair your vehicle free of charge. However, a permanent remedy for this condition is currently under development. FCA is working to finalize a remedy by the 4th quarter of 2016.

First Recall Notice, ECF No. 619-35, PageID.28642. Chrysler internal correspondence indicates that the defendant considered entirely replacing the monostable shifter mechanism in affected Jeep Grand Cherokee models with either a rotary polystable or a polystable lever type shifter (similar or identical to the shifter adopted in 2016 and later models). Email dated Feb. 11, 2016, ECF No. 619-37, PageID.28646-649. However, the "fix" that Chrysler eventually offered to owners was limited to a software patch of the gear shift and transmission controls to "install new software to include an 'Auto Park' feature which eliminates the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle." Second Recall Notice, ECF No. 619-38, PageID.28651.

## K.  Proceedings to Date

Several lawsuits were filed across the country by owners of the class vehicles who were injured when their vehicles rolled away when they exited the vehicle thinking they had

successfully selected the "Park" position of the transmission.  Other vehicle owners who were not injured also filed lawsuits alleging that the defendant had sold them a defective vehicle.  On October 5, 2016, the Judicial Panel on Multidistrict Litigation authorized this multi-district litigation by the issuance of an initial transfer order from.  The proceeding presently consists of 14 consolidated matters involving claims both for purely economic losses and for personal injuries.  The Court established case management benchmarks and allowed a lengthy period of discovery on issues concerning class certification and liability.

The defendant filed four separate motions challenging the Court's subject matter jurisdiction, personal jurisdiction over certain claims, and the adequacy of the pleadings.  Those challenges mostly were rejected in the Court's several prior merits opinions, but some claims and parties were dismissed.  The presently operative pleading, for the purposes of this motion, is the plaintiffs' SACMC for economic loss claims, which was filed on December 8, 2017.  The defendant's fourth motion to dismiss directed at that pleading was resolved by the Court's opinion issued on November 28, 2018.  The SACMC presently embraces claims under the law of 23 states on a variety of legal theories including product liability, breaches of express and implied warranties, consumer fraud, misrepresentation, and unjust enrichment.

The plaintiffs eventually filed a motion for class certification, which was granted in part by the Court in a ruling issued on December 9, 2019.  In that ruling, the Court certified an issue class under Federal Rules of Civil Procedure 23(b)(3) and (c)(4) comprising plaintiffs and absent class members from 20 states.  As later amended by the Court upon the parties' motion, the certified class consists of:

> all persons or entities who have purchased  or  leased  a  class  vehicle,  which means  a  2012-2014  Dodge  Charger,  2012-2014  Chrysler  300,  or  2014-2015 Jeep Grand Cherokee equipped with the monostable shifter, where the vehicle  was purchased  or  leased  in  Arizona,  California,  Colorado,  Florida,  Illinois,  Iowa,

> Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, or Wyoming, but excluding every person who has brought a claim against FCA US, LLC alleging recovery for bodily injuries caused by those vehicles under any legal theory.

Order Granting Mot. to Amend. Class Def., ECF No. 496, PageID.21608-09.  The issue class certification was limited to claims brought by plaintiffs in 21 of the 23 jurisdictions embraced by the SACMC.  The Court denied the request for class certification of any issues or claims pleaded under the laws of Missouri and Wisconsin.  That issue-focused class has been certified for the purpose of trying to a jury the following questions of fact that bear in a common fashion on the claims of all class members:

- Whether the monostable gear shift has a design defect that renders the class vehicles unsuitable for the ordinary use of providing safe transportation.

- Whether the defendant knew about the defect and concealed its knowledge from buyers of the class vehicles.

- Whether information about the defect that was concealed would be material to a reasonable buyer.

*Id.* at PageID.21609.  Merits discovery has closed, but the Court approved the parties' request to defer further discovery pertaining solely to damages pending the completion of the issue trial.  The defendant then timely filed its motion for summary judgment.

II.

As the parties well know, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

-21-

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson.*, 477 U.S. at 250). The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

## A.  Judicial Admission

The defendant first argues that the plaintiffs have "judicially admitted" that the addition of the "auto park" feature via the S27 recall "eliminates" any risk of rollaway accidents, and therefore they cannot establish that the vehicles are defective, a critical element of all the class claims. This is a remarkable argument, since the Court has rejected it *twice* in plain and certain terms. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 996-98 (E.D. Mich. 2017) ("As an initial matter, there are several prominent and demonstrably false major premises that the defendant relies on for most of its challenges to the sufficiency of the pleaded claims for statutory and common law consumer fraud and breaches of warranties. Those must be dispelled. First

among them is the assertion, which the defendant also relied upon throughout its briefing on the Rule 12(b)(1) motion, that the 'only defect' alleged by the plaintiffs is 'the absence of an auto park feature.' . . . . Chrysler's assertion that the SACMC's only allegation of defect is that the vehicles did not include an auto-park feature is a canard that undermines the arguments that flow from it."). The Court's recent opinion on class certification aptly summarized the plaintiffs' *actual* present theory of the case, which has been settled since then:

> The plaintiffs allege that studies conducted in 2010 and 2012 by defendant's retained market research firm, which were replicated during this litigation by the plaintiffs' human factors expert, suggest that the gear shift design "is defective because it inhibits reliable gear selection and provides insufficient tactile or audible feedback to allow drivers to readily and confidently shift to their intended gear." In their earlier pleadings, the plaintiffs suggested that the transmission design also could, in some cases, spontaneously shift out of a selected gear into another, unintended gear. They now concede that they have abandoned any claims based on that second alleged defect, and they represent that they intend to proceed solely on the theory that the gear shift is defective due to its confusing interface design.
>
> . . .
>
> The plaintiffs previously pleaded that their vehicles were subject to excess depreciation on the used market, but at oral argument on the parties' expert motions counsel for the plaintiffs conceded that they have abandoned that damages theory. They now assert that they will proceed solely on the theory that they suffered common economic losses due to overpaying for new vehicles at the point of sale, which they believed were safe and fit for daily transportation, but which they later found were unacceptably difficult and dangerous to drive.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 101-02 (E.D. Mich. 2019).

In its present motion, the defendant once again, despite prior admonishments by this Court, has elected to frame its entire litigation strategy on demonstrably false premises and misrepresentations of the record. The plaintiffs have not admitted that the addition of an auto park feature resolved the alleged defect they have alleged. That modification is basically irrelevant to nature of the defect theory on which they are proceeding.

## B.  Alternative Designs

The defendant correctly identifies two alternate paths to establishing a design defect in a product: the risk-benefit theory (applicable in eleven of the jurisdictions involved in the issue class) and the consumer expectation theory (applicable in the rest of them).  The defendant contends that the plaintiffs cannot recover under the former because the record does not support the existence of a safer alternative design that was commercially available, which is a necessary element.  It says that the plaintiffs cannot prevail under the latter theory because the undisputed evidence establishes that the monostable shifter is not more dangerous than a reasonable car buyer would expect.

### 1.  Risk-Utility Test

The plaintiffs concede for the purposes of this motion that at least eight of the relevant jurisdictions embraced by the class definition have adopted a "risk-utility" standard in product liability cases and require proof that a feasible, practical, and safer alternative design existed when the allegedly defective product went to market.  The rule of decision is exemplified by Michigan's product liability law, and neither side urges any variant outcome premised on state-by-state peculiarities on this point of law.

The Sixth Circuit recognized that the "framework" for analyzing design defect products liability cases was set forth in *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670, 365 N.W.2d 176 (1984).  *Kaminski v. Libman Co.*, 748 F. App'x 1, 4 (6th Cir. 2018).  There, the court held that plaintiffs must "prove that the product itself is actionable — that something is wrong with it that makes it dangerous."  *Prentis*, 421 Mich. at 683, 365 N.W.2d at 181-82.  Explaining further, the court stated that "[w]here the plaintiff argues that the product was defectively designed (rather than defectively manufactured), the factfinder must perform a 'risk-utility test.'"  *Id.* at 691, 365 N.W.2d at 186.  "This test 'invite[s] the trier of fact to consider the alternatives and risks faced by

the manufacturer and to determine whether in light of these the manufacturer exercised reasonable care in making the design choices it made.'" *Id.* at 688, 365 N.W.2d at 184.

"Under this approach, a plaintiff must show that (1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a 'feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users.'" *Croskey v. BMW of N. Am., Inc.*, 532 F.3d 511, 516 (6th Cir. 2008) (quoting Mich. Comp. Laws § 600.2946(2); citing *Gregory v. Cincinnati Inc.*, 450 Mich. 1, 11, 538 N.W.2d 325, 329 (1995)). In the typical case where a plaintiff alleges that a product caused a personal injury, the plaintiff must show: "'(1) that the severity of the injury was foreseeable by the manufacturer; (2) that the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product; (3) that there was a reasonable alternative design available; (4) that the alternative available design was practicable; (5) that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and (6) that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe.'" *Ibid.* (quoting *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 738 (6th Cir. 2000)).

### a. Available Alternative Design

The record suggests that the defendant reviewed several alternative designs during the development of the class vehicles. As an initial matter, the plaintiffs question the defendant's premise that any electronic gear shifter was "necessary" for the design of the class vehicles at all, and they point to prior model year vehicles which used more conventional transmission and "gated" shifter designs that manifested none of the issues presented by the monostable shifter. The premise that an entirely non-electronic shifter design was an available and practical alternative is borne out by the defendant's own post-production studies of the monostable design, at least one

of which featured a "control group" of owners of earlier model year vehicles with a 5-speed automatic transmission and a traditional gated shifter design.  Survey Results Presentation dated Jan. 31, 2012, ECF No. 619-23, PageID.28394-28431.  However, even adopting the questionable premise that the particular 8-speed transmission used in class models was a required component of their designs, and that some "shift by wire" control for that transmission was "necessary" to implementation of that transmission in them, the plaintiffs' still have shown the existence of a practical, available, and safer alternative in the Jaguar rotary type polystable shifter, which Chrysler actually considered and apparently even began to implement for the class models, before it was abandoned late in the design process for reasons that are unclear.

The defendant asserts that "there is no evidence that the polystable e-shifter was feasible or practical for use in class vehicles," and "there is no evidence that it would have been safer." But that position simply ignores abundant evidence in the record to the contrary.

The gear shift assessments that the defendant conducted in April 2009, October 2010, and August 2012 *all* featured rotary polystable shifter designs as comparators.  The October 2010 study apparently featured the *same* Jaguar rotary shifter design that Chrysler was considering and, as of November 2010, apparently was taking steps to implement in two of the three class models. November 2010 committee notes stated that "[b]oth the rotary and Audi A8 type linear shifter solution[s] will be pursued from ZF."  Product Committee Minutes dated Nov. 20, 2010, ECF No. 619-12, PageID.28126.  By that point the need for an alternative shifter was recognized by Chrysler, and the company had contemplated using the rotary design since at least August 2010. Email dated Aug. 31, 2010, ECF No. 619-8, PageID.28032.

Moreover, internal memos indicate that a replacement was sought, and the rotary alternative was considered, principally because the earlier iteration of the monostable shifter was

deemed by Chrysler to be unacceptable due to its confusing design and high rate of shifting errors in customer clinics — issues that later would recur, with even worse results, in evaluations of the ZF monostable design.  Memorandum dated Nov. 7, 2010, ECF No. 619-11, PageID.28123 ("Based on clinic results, the PoR monostable shifter has been deemed unacceptable from a customer usability and intuitiveness standpoint, however, the rotary knob concept (Jaguar XF/XJ) scored very well.").  A fair inference also could be drawn from the November 2010 committee materials that Chrysler then had committed with some level of resolve to adopting the rotary shifter for at least two class models, because the presentation stated, under the heading, "Decisions / Next Steps," an item which read, "Implement Jaguar style rotary knob on '12 MY LX & LD."  *Id.* at PageID.28136.

The defendant contends that "IP issues" prevented the adoption of the rotary design for Jeep models due to perceived competition with Jaguar's own Land Rover branded SUVs.  But that position is belied by the testimony of Chrysler engineer Brian Wagoner, who attested that if the rotary design had been deemed to "fit" from a branding perspective, then the rotary shifter could have been used by Jeep because Chrysler "had a rotary shifter available — tooled and available to us from the '13 [Dodge Durango] truck, and we were able to effectively integrate it into [that model]," "if it had been a vehicle fit it would have been available for the Grand Cherokee," and there were "no issue[s] with intellectual property . . . with respect to the decision to not use a rotary shifter in the WK [Jeep Grand Cherokee]."  Wagoner dep. at PageID.27926.

The jury also reasonably could infer from the December 2010 presentation materials, which did not anywhere mention any "IP issues," that the decision to abandon the rotary design was based merely on the defendant's rush to market and desire to avoid a nominally higher unit cost due to licensing fees, *see* Presentation dated Dec. 11, 2010, ECF No. 619-15, PageID.28264, coupled

with the insistence of Chrysler's branding team that a rotary design was "not sporty." That evidence would allow a conclusion that the defendant selected style over safety, or that safety was compromised for the defendant's economic benefit.

The December 2010 minutes indicate that the decision to "[u]se [the] existing Audi level design/mechanism" was made "to minimize development time." The December 2010 minutes do not indicate why the negotiations with Jaguar over the rotary design were halted, and they did not identify licensing concerns as a factor motivating the decision to use the ZF lever. *Id.* at PageID.28264; *see also* Product Committee Minutes dated Nov. 20, 201 at PageID.28135 (indicating an estimated cost of $132 (apparently per unit) for the Jaguar rotary shifter, vs. $111 for the ZF level-type monostable unit). Other later correspondence between Chrysler and Jaguar also suggests that Jaguar remained willing to reach a licensing deal until Chrysler abruptly abandoned the negotiations for reasons that are not apparent from the record. *See* Letter re: Licensing of Rotary Shifter dated Dec. 10, 2015, ECF No. 619-48, PageID.28864-65.

Some evidence that the defendant prefers to highlight may offer grounds for factual disputes about whether and to what extent Jaguar was willing to license its design for use in the class vehicles. But a fair reading of the entire record, taken in the light most favorable to the plaintiffs, reasonably would support a jury finding that a Jaguar-type rotary shifter was an available and practical alternative design.

### b. Safer Alternative Design

There is abundant evidence in the record to support a jury finding that the Jaguar rotary shifter design was demonstrably and significantly safer and would have avoided the confusing interface issues that plagued the monostable lever design throughout its development and through its deployment to the market.

Also, as an initial point, and contrary to the defendant's position, it is the defendant's human factors study that is inadmissible, not the report by the plaintiff's expert, Craig Rosenberg, which already was approved for consideration during the class certification phase and has not been further challenged here.  As the Court has ruled, most of the opinions by the defendant's expert Robert Kuhn, far from providing "uncontroverted" evidence of the design's safety, instead represent unfounded, unreliable, and inadmissible speculation that merely reiterates in "expert" guise the defendant's litigating position, rather than presenting reliable expert testimony to aid the jury's deliberations on the design.  However, even assuming that Kuhn's opinion could supply some evidence suggesting that the gear shifter is safe, that evidence is contradicted by volumes of other documents and testimony suggesting otherwise.

In study after study, from 2010 through 2012, the defendant's own assessments of the monostable design repeatedly demonstrated that it produced a shockingly higher rate of shifting errors compared with the rotary design.  The August 2012 study, after the vehicles went to market, further confirmed the superiority of the rotary pattern: "Overall, the Rotary had the least number of errors and the Monostable had the most."  Report of Polystable E-Shift Competitive Usability & Acceptance Study dated Aug. 24, 2012, ECF No. 619-30, PageID.28544.  "The Monostable had the most errors and the largest variety of errors, while the other shifters had fewer errors."  *Id.* at PageID.28566.  "The Rotary shifter had the least number of total errors in the parking tasks."  *Id.* at PageID.28564.  Not only did the monostable shifter produce more errors, but the error rate was dramatically higher, with more than ten times the error frequency of the rotary and traditional shifters.  *Id.* at PageID.28544.

The 2012 report also notably concluded that the monostable shifter "*did not get easier to use and participants still felt unsure and confused even after using it over the duration of the*

*study*," and "*[e]ven with time, the Monostable was difficult to use without error*."   *Id.* at PageID.28545, 28554.  And the design conspicuously produced additional types of errors that did not occur at all with the alternatives.  *Id.* at PageID.28568 ("Can't tell if Correct Gear was only an issue in the Monostable shifter, where participants got into the correct gear but did not realize it and moved out of the correct gear into an incorrect one.").  Finally, it is notable that the ZF monostable design that eventually went to production *performed even worse* and *produced more errors* than the preliminary Kostal design, which was abandoned by the defendant after it was deemed "unacceptable" due to its high error rate and usability issues.

The record also suggests that the results of the 2012 study were no surprise to Chrysler, because they indicated well-known problems with the monostable design that had resisted its efforts at refinement and tweaking throughout the development process.  In an October 2010 assessment, it was noted that the ZF monostable design had the same failings as the previously rejected monostable lever supplied by Kostal.  Shifting errors and confusion persisted throughout the study, even after continued use of the monostable shifter, and a particular difficulty was caused by the lack of tactile, auditory, and visual feedback provided by the design. E-Shift Competitive Assessment dated Oct. 2010, ECF No. 619-14, PageID.28203 ("The combination of 1) the lack of physical effort required to move the stick, 2) the lack of distance required to move the stick, and 3) the lack of engine feedback when engaging a gear, all caused participants to question if they had correctly performed an action. This need for additional feedback was even more pronounced when shifting to park."); *ibid.* ("Overshooting reverse on the Kostal 7 Position Monostable and Audi A8 7 Position Monostable persisted throughout testing, participants just didn't feel the first detent into reverse. Additionally, in the Kostal 7 Position Monostable and Audi A8 7 Position Monostable participants often overshot reverse ending up in park. Participants commented that

both the Kostal 7 Position Monostable and Audi A8 7 Position Monostable looked like traditional shifters but are bothered that they had to visually confirm the gear rather than the feel and positioning of the shifter."). The study reported that during the "learning phase" of the assessment, the Kostal monostable shifter produced 150 errors and the Audi A8 (ZF) design even more with 162, compared with just six observed errors for the Jaguar rotary shifter. *Id.* at PageID.28194.

Those same design problems harkened back all the way to a June 2010 evaluation of the early Kostal monostable lever design, when it was reported that six of 21 participants failed to achieve a correct shift into park on the first attempt, and three in 21 failed properly to shift into reverse on the first try. Presentation dated June 2010, ECF No. 619-6, PageID.27994. That early evaluation tellingly noted: "An interesting phenomenon seemed to take place during testing of the E-Shift that is, participants who were successful in completing a maneuver initially may still make mistakes performing that maneuver during subsequent trials," noting that among the two participants who shifted into park successfully on the first try, they both had difficulty shifting into park on subsequent attempts. Similar errors were noted with repeated shifts to drive and reverse. *Id.* at PageID.27996.

Finally, the record discloses that despite Chrysler's repeated attempts to refine and "tune" the awkward and uncertain operation of the monostable lever design, even as late as 2011, well into the production cycle, when the shifter presumably was in its final form, the design still produced an alarming error rate of more than one false shift in every seven attempts, for an error rate of more than 13%. Email dated Feb. 2, 2011, ECF No. 619-16, PageID.28286 (reporting customer clinic results of "an average of 1 overshoot or undershoot error per 7.4 shifts (13.5%)").

All of that evidence amply would support a jury finding that the rotary shifter repeatedly was found to be significantly safer than the monostable lever design, even after multiple iterations

and evaluations of the monostable design by the defendant from April 2009 all the way through post-production in August 2012.  Those results also were confirmed by a similar study by the plaintiffs' human factors expert, which reproduced a shockingly high error rate.  The defendant's studies also repeatedly concluded, contrary to the defendant's position, that familiarity with the shifter *did not* improve the error rate, and drivers still were unable to use it reliably even after multiple attempts at driving exercises.  The plaintiffs' expert also explicitly selected participants who were familiar with competing monostable shifter designs and found that they had the same difficulties with the defendant's design as naïve users who had no prior experience with monostable gear shifters.

Based on that record, a jury reasonably could conclude that the defendant's shifter design was alarmingly unsafe, that it was well known to be so, and that it remained so despite repeated attempts at refinement, even in its final production form.  There is sufficient evidence in the record to satisfy the requirements of the risk-utility test.

### 2.  Consumer Expectations Test

The plaintiffs concede that at least two of the relevant jurisdictions have adopted, at least for product liability claims, the so-called "consumer expectations" analysis espoused by the Restatement (Second) of Torts § 402A, under which they must show that a product's allegedly defective design renders it "dangerous to an extent beyond that which would be contemplated by the ordinary consumer."  The law of Maryland is exemplary on that rule of decision, and neither side has suggested that there are any dispositive peculiarities in the application of the rule among the various states.

"Maryland has adopted the theory of strict liability for product liability, as set forth in the Restatement (Second) of Torts § 402A."  *Mayor & City Council of Baltimore v. Monsanto Co.*,

No. 19-0483, 2020 WL 1529014, at *10 (D. Md. Mar. 31, 2020) (citing *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 458-59 (D. Md. 2019); *Phipps v. Gen. Motors Corp.*, 278 Md. 337, 353, 363 A.2d 955, 963 (1976)).  "Maryland courts apply either the consumer expectation test or the risk-utility test to 'determine whether a product is defective and unreasonably dangerous, for strict liability purposes.'"  *Ibid.* (quoting *Exxon*, 406 F. Supp. 3d at 460; *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 194, 792 A.2d 1145, 1150 (2002)).  "Maryland courts apply the risk-utility test only when the product at issue malfunctions in some way," and where, as here, the plaintiff alleges that a product was "defective and unreasonably dangerous when used in [its] ordinary and intended way . . . the consumer expectation test applies."  *Ibid.* (citing *Exxon*, 406 F. Supp. 3d at 461; *Halliday*, 368 Md. at 200, 792 A.2d at 1153 ("[T]he risk-utility test does not apply to a design defect unless the product malfunctions in some way.")).

"Under the consumer expectation test, a 'defective condition' is a 'condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him,' and an 'unreasonably dangerous product' is one that is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics.'"  *Ibid.* (quoting *Halliday*, 368 Md. at 193-94, 792 A.2d at 1150); *see also* W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 99, at 698 (5th ed. 1984)).

For all of the reasons discussed above, the jury reasonably could find that a shifter design that produces more than 10 times the error rate of contemporary alternatives and older, more traditional designs, and that was observed to provoke mis-shifts once in every seven attempts even in its most refined form, is significantly more dangerous than would be accepted in the contemplation of a reasonable motor vehicle operator.  Moreover, the defendant's insistence that

the shifter is reasonably safe because "experienced" operators with "more than 20 minutes" of familiarization with the shifter have "no issues" ignores the fact that a reasonable auto buyer certainly would have serious concerns when contemplating a vehicle that could not be entrusted to any number of naïve drivers who might drive it, such as friends, family, valets, or parking lot and car wash attendants, none of whom routinely could be expected to devote themselves to a 20-minute "training session" on the peculiarities of the shifter before using it. But even if a reasonable consumer could be expected to anticipate some need for familiarity, there is ample contradictory evidence in the record suggesting that the ability of drivers to select an intended gear consistently and reliably with the design *did not* improve with familiarity or practice.

The record contains sufficient evidence to satisfy the consumer expectation test.

### C. Massachusetts Requirements

The defendant contends that the peculiarities of Massachusetts state law require the plaintiffs to prove that a design violates some government enforced safety regulation in order to show the existence of a product defect. But there is no such established rule of law. Instead, a fair reading of the lone decision on which the defendant pins this argument discloses that it was a narrow holding, inapposite here, which has not been read by Massachusetts courts in subsequent cases for the proposition that the defendant seeks to take from it.

The defendant relies for this argument on *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 888 N.E.2d 879 (2008). In that case, the Massachusetts Supreme Court "conclude[d] [that] the plaintiffs' complaint *[did] not adequately allege that their vehicles fail to comply with FMVSS 206* [and] [t]herefore, [] that the plaintiffs [had] failed to make out a case of violation of G.L. c. 93A, § 9, *under a theory of regulatory noncompliance*.") (emphasis added). *Id.* at 630-32, 888 N.E.2d at 886-87. The court acknowledged the validity of the plaintiffs' economic loss theory, reasoning

-34-

that "the purchase price paid by the plaintiffs for their vehicles would entitle them to receive vehicles that complied with those safety standards," and that "[i]f Ford knowingly sold noncompliant (and therefore potentially unsafe) vehicles . . . the plaintiffs would have paid for more (viz., safety regulation-compliant vehicles) than they received," and that [s]uch an overpayment would represent an economic loss — measurable by the cost to bring the vehicles into compliance — for which the plaintiffs could seek redress under G.L. c. 93A, § 9.13." *Id.* at 6312, 888 N.E.2d at 887.

However, the *Iannachino* court expressly noted that in that case the plaintiffs' sole theory of liability was that they had been sold cars that were warranted to comply with a specific federal motor vehicle safety regulation, when in fact they did not comply. Because that was the sole theory of defect, the court held that failing to plead that the components in question actually failed to comply with the pertinent regulation was fatal to the claims. Thus, the *Iannachino* case, fairly read, certainly stands for the rule that allegations of regulatory non-compliance are *sufficient* to sustain a product defect claim, where the claims explicitly plead non-compliance as a premise. But it did not hold that allegations of regulatory violations are a *necessary* ingredient of every product defect claim, for economic injuries or otherwise.

Later decisions have distinguished *Iannachino* and aptly noted that "[the allegations in *Iannachino* are] unlike the instant case where Plaintiffs' claim is not expressly tied to a particular regulatory violation," and "[m]oreover, Plaintiffs *have identified 'a legally required standard,' the one imposed by the common law: the vehicles should not have contained a defect posing 'an unreasonable safety risk' . . . as judged from a reasonable consumer's perspective*." *Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 962-63 (N.D. Cal. 2018) (emphasis added); *see also Costa v. Nissan North America, Inc.*, No. CV 18-11523, 2019 WL 267463 (D. Mass. Jan. 18, 2019)

("Costa has identified particular promotional statements made by Nissan which, she claims, were deceptive in light of the problems she says resulted from the allegedly defective CVTs — problems she states were known to Nissan before Costa purchased her car.") (collecting cases; denying motion to dismiss claims based on *Iannachino*); *Crane v. Sexy Hair Concepts, LLC*, No. 17-10300, 2017 WL 8728961, at *4 (D. Mass. Oct. 10, 2017) ("Here, plaintiff does not base her claim for relief on the ground that the shampoo was defective because it did not comply with a government standard, or some other subjective or unidentified standard. . . . [S]he alleges that she is entitled to purchase a shampoo whose contents conform to the representations on the bottle, and not to be charged a higher price for a non-conforming product. That is a garden-variety form of misrepresentation that is actionable under Chapter 93A.").

So it is here.  The plaintiffs have alleged that the class vehicles were defective for all the reasons discussed above.  Their claims do not depend on a particular safety standard.  The evidence satisfies the requirements of Massachusetts law.

### III.

The plaintiffs have presented abundant evidence sufficient to allow a jury to find that there was a reasonably available and safer alternative to the monostable shifter design, and that the design is more dangerous than a reasonable consumer would expect.  The defendant's arguments to the contrary ignore significant portions of the factual record assembled here.

Accordingly, it is **ORDERED** that the defendant's motion for judgment (ECF No. 592 is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  March 31, 2022

-36-