UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

DEDRA MANEOTIS,

          Plaintiff,

v.

Case Number 17-10351
Honorable David M. Lawson

FCA US, LLC,

          Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION SUMMARY JUDGMENT

The defendant has moved for summary judgment on its statute of limitations affirmative defense. The motion is fully briefed, and oral argument will not assist in its disposition. The Court, therefore, will decide that motion on the papers submitted. E.D. Mich. LR 7.1(f)(2). The defendant contends that the plaintiff's product liability claims are time barred under Colorado law, which governs this dispute, because it is undisputed that they were filed more than two years after the injury accident, and the record does not support any exception under which the untimely filing may be excused. The plaintiff responds that the record leaves open questions of fact about whether a reasonable person in the plaintiff's position would have been fully informed about the existence of a gear shift design defect and its probable role in causing the injury accident, and, at any rate, there is sufficient evidence in the record to support the application of equitable tolling to forgive the tardy filing of the plaintiff's claims. The Court previously denied the defendant's motion to

dismiss brought on the same grounds.  The discovery in the case has refined the parties' arguments, but the facts that have emerged support the plaintiff's argument and preclude judgment as a matter of law.  The motion will be denied.

I.

The basic facts and procedural history of this personal injury matter were discussed at length in the Court's prior opinion, and most of the circumstances of the accident are neither seriously in dispute nor pertinent to the questions presented by this motion.

Plaintiff Dedra Maneotis was injured in December 2013 when her 2014 Jeep Grand Cherokee rolled over her leg after she exited the vehicle at her home in Craig, Colorado, thinking she had successfully put the vehicle in "Park."  She sued defendant FCA US, LLC, alleging that a design defect in the gear shift mechanism installed in her Jeep led to her injuries.  Maneotis's initial complaint, filed in the District of Colorado, was transferred to this Court by the Joint Panel on Multidistrict Litigation and consolidated with the MDL proceedings.  The MDL plaintiffs collectively filed a consolidated master complaint for personal injury actions, which included the claims brought by Maneotis, a citizen of Colorado.  However, to sharpen the pleadings for the purposes of dispositive motion practice, Maneotis filed her own individual first amended complaint, which contained only her claims.

A.  Current Facts from the Discovery

The following facts unique to this case and relevant to the defendant's statute of limitations defense come from the record developed in discovery.

1. The Accident

The plaintiff's family has owned and run the Victory Motors Chrysler dealership since the mid-1970s.  Dedra Maneotis dep., ECF No. 578-2, PageID.23712.  Ms. Maneotis frequently received loaner vehicles from the dealership to drive, changing cars usually around once a month,

and her sons provided the 2014 Jeep Grand Cherokee as a loaner sometime in late 2013.  *Id.* at PageID.23713.  Before the accident in December 2013, Maneotis could not recall any other incidents where she tried to put the car in park, but it rolled away unexpectedly.  *Id.* at PageID.23714.  The 2013 accident happened when Ms. Maneotis pulled the Jeep into her driveway and tried to put it in park, but when she started to get out, the car began to move.  *Ibid.*  She tried to hang on and get back into the car, but she was unable to regain control, and she lost her grip and was pulled under the front wheel as the Jeep rolled over her.  *Ibid.*

The plaintiff's son, Steven Maneotis, testified that when he gave the Grand Cherokee to his mother to drive, he explained to her that "the design [of the shifter] was different," and that she would "not feel the ratcheting" of the shifter, but just a "rocking motion."  Steven Maneotis dep., ECF No. 578-3, PageID.23722.  Steven testified that he relied entirely on Chrysler and recall notices disseminated by the defendant to learn about any defects with the cars he sold, and neither he nor his service team would rely on "third-party" sites like NHTSA when investigating any complaints about the cars sold or serviced at the dealership.  *Id.* at PageID.23725-26.

The plaintiff's daughter, Irene Kitzman, testified that her mother was given the Grand Cherokee as a loaner in August 2013, and she observed that Ms. Maneotis drove the Grand Cherokee to and from work at the dealership daily.  Irene Kitzman dep., ECF No. 578-4, PageID.23730.  Ms. Kitzman never saw her mother have any problems using the gear shifter in the car, and her mother never mentioned any difficulties using the shifter.  *Ibid.*

The plaintiff's son, Tony Maneotis, testified that his mother told him during the months she drove the Grand Cherokee that she was "very uncomfortable," and "sometimes doesn't feel that it's there [or] can't tell when she's . . . engaging it into [] park."  Tony Maneotis dep., ECF No. 578-5, PageID.23735.  The day after the accident, Tony had the Grand Cherokee taken to the

- 3 -

dealership to be examined by mechanics there.  *Id.* at PageID.23738.  The dealership service manager and a technician inspected the vehicle and called the defendant's STAR team.  *Id.* at PageID.23740-41.  The STAR Team directed the service team through a series of test modes, which revealed no diagnostic trouble codes.  *Id.* at PageID.23742.  The service team asked the STAR representatives to open a case on the accident, but the STAR team refused, stating that a case would not be opened because the accident was caused by "driver error."  *Id.* at PageID.23742-43.

Sometime in 2014, Tony told the defendant's representative Bob Lilly about his mother's accident, and Lilly denied knowing about similar rollaway incidents.  *Id.* at PageID.23744.  Tony mentioned the accident to other representatives of the defendant on other occasions, but they also told him that they had "never heard of" similar problems.  *Id.* at PageID.23746.  In May or June 2015, Tony attended a dealer meeting where the defendant's representatives stated that due to some "incidents" and "problems" with the monostable shifter design, newer models would be using a different shifter.  *Id.* at PageID.23745.  Ms. Maneotis was not involved in any of the discussions with the STAR Team or other FCA representatives.  *Id.* at PageID.23749.  Tony Maneotis did not learn that Chrysler had determined that any safety defect existed in the gear shifter until the recall notice was issued in April 2016.  *Id.* at PageID.23755.  When the family first discussed suing Chrysler, their belief was that the accident had been caused when the transmission "slipped out of park" into another gear, after his mother had correctly placed the vehicle in park. *Id.* at PageID.23754.

The plaintiff's neighbor, Sarah Powers, was nearby when the accident occurred and was present when the plaintiff's husband arrived at the scene.  During a "tirade" about the accident, Mr. Maneotis stated that "[h]e thought it was something had to do with a new fangled whatever

where you don't think it's off and it's off but it's not off . . . something to that effect." Sarah Powers dep., ECF No. 578-6, PageID.23760.

Officer Ryan Fritz responded to the scene of the accident, and at his deposition he testified that Ms. Maneotis "told [him] that she thought it was in park, but it was one of those electric shift levers," and he "guessed" that "when she shut if off it was in either neutral or drive" instead. Ryan Fritz dep., ECF No. 575-7, PageID.23763.

## 2. The Defect

The plaintiff's human factors expert produced a report summarizing the safety concerns with the gear shifter design that were highlighted by a driving study he carried out, which was intended roughly to mirror the design of a 2012 focus group study commissioned by the defendant and performed by its research firm, Lextant. Both studies compared various models of gear shifters for ease of use and incidence of errors. An unabridged version of that report has been docketed and was cited in the parties' briefs on the defendant's motion for summary judgment in the economic loss cases. Expert Report of Craig Rosenberg dated Oct. 22, 2018, ECF No. 619-39. The summary that follows cites that full copy of the report.

Rosenberg's study used two vehicles, which were driven through a series of scripted exercises by 31 drivers recruited from the driving public. One was a 2015 Jeep Cherokee equipped with the monostable gear shifter (the same model and configuration as the plaintiff's accident vehicle), and the other was a 2019 Jeep Cherokee equipped with a successor "polystable lever" gearshift design. The drivers in the study all were fluent in English, ranged in age from 20 to 59, and were experienced motorists who reported driving at least 7,000 miles per year. Expert Report, ECF No. 619-39, PageID.28670-71. Rosenberg selected participants to ensure that he had a mix of those both with and without previous experience using monostable type shifters. *Id.* at PageID.28671. The driving exercises were conducted with one participant at a time in an

unoccupied parking lot of a closed retail store, during daylight hours, in clear weather conditions. *Id.* at PageID.28675-76. Rosenberg was in the vehicle during the exercises, and he used a GoPro camera to record the driver's activity. *Id.* at PageID.28676. The same 2015 Jeep Grand Cherokee with the monostable shifter was used in all exercises, along with a second "control" vehicle, the 2019 Grand Cherokee with the polystable lever shifter. That shifter, although also electronic, appears and functions more like a traditional non-electronic "gated" shifter. *Id.* at PageID.28679-681. Participants performed a series of driving maneuvers and parking exercises first in the class vehicle and then in the control vehicle. *Id.* at PageID.28682-83. They were given 10 minutes to practice the exercises in each vehicle, before repeating the same maneuvers for data collection, and then were asked questions about their impressions of each shifter after the driving exercise was done. *Id.* at PageID.28683.

The data gathered during the study have been discussed in other opinions filed in this MDL proceeding and need not be repeated here. The upshot is Rosenberg's conclusion that "the Monostable gear shifter has an unintuitive design, is difficult to operate, and provides inadequate tactile and visual feedback," and "[t]hese flaws associated with the Monostable shifter can lead to safety critical incidents associated with eyes off road time and unintended gear selection that can result in vehicle rollaway events." *Id.* at PageID.28725.

Rosenberg also reviewed the results of the August 2012 Lextant study, from which his experimental method was derived, concluding that the results of the Lextant study essentially were the same and confirmed an excessively high rate of shifting errors with the monostable shifter, due to its confusing and awkward design. *Id.* at PageID.28734. Rosenberg noted two major safety concerns with the design: (1) "unintended gear selection errors can result in vehicle rollaways that can be dangerous to the driver, passengers, and other nearby people and property, and (2) "the

increased attention required to shift gears can reduce attention away from the roadway and result in reduced situational awareness." *Id.* at PageID.28655. Rosenberg's report also included an extensive discussion of specific human interface elements of the design and various accepted guidelines for control system design which, in his opinion, the gear shifter violated. *Id.* at PageID.28739-28746.

Notably, the August 2012 study, which was conducted after the first class vehicles using the shifter design went to market, confirmed that the monostable shifter produced vastly higher rates of mis-shifts than contemporary alternatives, such as a "rotary polystable" design that Chrysler had considered but abandoned: "Overall, the Rotary had the least number of errors and the Monostable had the most." Report of Polystable E-Shift Competitive Usability & Acceptance Study dated Aug. 24, 2012, ECF No. 619-30, PageID.28544. "The Monostable had the most errors and the largest variety of errors, while the other shifters had fewer errors." *Id.* at PageID.28566. "The Rotary shifter had the least number of total errors in the parking tasks." *Id.* at PageID.28564. Not only did the monostable shifter produce more errors, but the error rate was dramatically higher, with more than ten times the error frequency of the rotary and traditional shifters. *Id.* at PageID.28544. The 2012 report also notably concluded that the monostable shifter "*did not get easier to use and participants still felt unsure and confused even after using it over the duration of the study*," and "*[e]ven with time, the Monostable was difficult to use without error.*" *Id.* at PageID.28545, 28554 (emphasis added). And the design conspicuously produced additional types of errors that did not occur with the alternatives. *Id.* at PageID.28568 ("Can't tell in Correct Gear was only an issue in the Monostable shifter, *where participants got into the correct gear but did not realize it and moved out of the correct gear into an incorrect one*.") (emphasis added).

In a supplemental report, Rosenberg expressed specific conclusions relating to this personal injury action, stating that (1) "the design of the Fiat Chrysler Monostable shifter that was installed in the 2014 Jeep Grand Cherokee that [plaintiff Dedra Maneotis] was driving likely resulted in Ms. Maneotis believing that the vehicle was in park when it was actually in some other gear (such as reverse, neutral, or drive)," and (2) "[w]hen Ms. Maneotis exited the vehicle, and the vehicle was not in park as Ms. Maneotis had intended, the vehicle rolled down the driveway and caused damage to property as well as injury to Ms. Maneotis." Supp. Report dated Nov. 8, 2019, ECF No. 558-3, PageID.22930. Rosenberg based those conclusions on his review of the police report and insurance claim files relating to the plaintiff's rollaway accident, in conjunction with the relevant conclusions expressed in his general report about the safety implications of the monostable gear shifter design.

### B.  Previous Motion

The defendant responded to the plaintiff's amended complaint with a motion to dismiss based on its statute of limitations affirmative defense. The Court denied that motion. In that ruling, the Court resolved the parties' dispute about whether a two-year or three-year limitations period applied to the claims, holding that "[t]he plain terms of the competing statutes in this case establish that the plaintiff's claims are governed by the two-year limitations period for product liability actions under [Colo. Rev. Stat. §  13-80-106(1)], and nothing in their plain language suggests otherwise." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2018 WL 4352702, at *4 (E.D. Mich. Sept. 12, 2018). However, the Court concluded that disposition of the affirmative defense as a matter of law was not appropriate at the pleading stage, because "without a developed record on all the salient points, this question at least remains: Would a reasonable driver in Maneotis's position have deduced on the day of the accident that the rollaway was due to

poor design of the shifter, or would she have assumed that it was due to poor use of that design by her?" *Id.* at *7.

Moreover, the Court observed that Maneotis was in a unique position because her family owned the local Chrysler dealership where her vehicle was purchased, and, as a result, they had access to certain channels of investigation and communication about the suspected malfunction which were not available to most consumers. However, the Court found that, notwithstanding those unique resources, a reasonable fact finder could conclude that Maneotis relied to her detriment on several false representations by the defendant about the cause of the accident, and, if sufficiently proven, that deceptive conduct could warrant the application of equitable tolling to foreclose the limitations defense:

> [T]he plaintiff has alleged sufficient facts to suggest that she could prevail on her claim for equitable tolling of the limitations period, based on repeated, allegedly untrue statements by the defendant's representatives, including its STAR team, that (1) there was no defect in the Jeep or its gear shift; and (2) that Chrysler and its representatives had no knowledge of rollaway incidents or safety problems with the shifter design. Even if the plaintiff had some suspicion that a gear shift defect could have been the cause of the accident, she still could prevail if a fact finder decides that she reasonably relied on the false representations by the defendant and accepted, at her peril, its proffered explanation of "user error," which caused her to forego further attempts to secure her rights by litigation, despite her extraordinarily diligent attempts — particularly compared with those that an average consumer could indulge — to investigate the defect.

*Id.* at *8. The defendant now renews its attack on the timeliness of the complaint, contending that information uncovered during discovery conclusively shows that Maneotis had timely awareness of the gear shifter's alleged problems, and there is no basis for tolling her untimely claims.

The plaintiff's theory of the case has evolved since the Court issued its prior ruling. *First*, plaintiffs' counsel conceded during the class certification proceedings on the economic loss cases that they have abandoned any theory of defect premised on spontaneous shifts by the transmission once placed in an intended gear. That was a theory that the Court found relevant at the pleading

stage in this case, since it could implicate design mistakes embedded within the inner workings or software coding of the electronic transmission and shifter.  In addition to the generalized disclaimer of that liability theory by the plaintiffs' steering committee, Maneotis made admissions during discovery suggesting that she has abandoned any reliance on a spontaneous shifting theory of liability.  Her present theory of the case therefore focuses solely on alleged design defects in the design of the user-facing interface of the shifter, which, according to the plaintiff, gives insufficient tactile and audible feedback to allow drivers reliably to ensure that their cars have been shifted to the intended gear.  *Second*, in her response to this motion, Maneotis states that she has abandoned any reliance on principles of fraudulent concealment to oppose the limitations defense, and she now asserts only equitable tolling as an exception to the time bar.

Thus, the questions presented to the Court by the present motion for summary judgment are (1) whether what Maneotis knew before and shortly after the accident was sufficient to place a reasonable person on notice that she had a colorable claim for product liability based on the type of gear shift design defect on which her case now relies, and (2) whether a jury could find that, despite any knowledge she had, the plaintiff reasonably relied on false statements by the defendant about the gear shift design and its connection with the accident that discouraged her from timely pursuit of her rights

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute.  *Id.* at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'"  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party.  *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The defendant seeks summary judgment on its affirmative defense, for which it has the burden of proof.  The party that bears the burden of proof must present a jury question as to each element of its defense.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).  Failure to prove an essential element of a claim or defense renders all other facts immaterial for summary judgment purposes.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).  It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all

reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *PDV Midwest Ref., LLC v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002)).

This case is before the Court based on diversity jurisdiction, and therefore the Court must "apply the same law that [the] state courts would apply." *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (citing *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The defendant insists, and the plaintiff agrees, that Colorado law applies. That conclusion naturally flows from the general rule that "that the law of the state with the most 'significant relationship' with the occurrence and the parties governs." *BlueMountain Credit Alternatives Master Fund L.P. v. Regal Entertainment Group*, 2020 COA 67, ¶ 11, 465 P.3d 122, 126 (citing *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007)). (An MDL court applies the choice-of-law rules of the transferor forum. *See In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 316 F. Supp. 3d 1021, 1030 (S.D. Ohio 2015) (citing *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

The plaintiff's claims are subject to a two-year statutory limitations period that governs product liability claims under Colorado law, Colo. Rev. Stat. § 13-80-106(1); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2018 WL 4352702, at *4 (E.D. Mich. Sept. 12, 2018), and there is no dispute that the plaintiff did not file her complaint until 30 months after the accident. The plaintiff contends that the lawsuit was timely, though, because the claim did not accrue at the earliest until April 2016 when Chrysler issued a recall of the class vehicles because of the monostable shifter. She also argues that the statute of limitations should be tolled because of the defendant's conduct.

A.  Accrual

Accrual of a cause of action under Colorado's statute of limitations "is subject to the discovery rule, meaning that the cause of action accrues on the date both the injury and its cause are known or should have been known by the exercise of 'reasonable diligence.'" *Schmidt v. DJO, LLC*, No. 09-02683, 2010 WL 3239249, at *4 (D. Colo. Aug. 12, 2010) (quoting Colo. Rev. Stat. § 13-80-108(1)); *see also Murry v. GuideOne Specialty Mutual Insurance Co.*, 194 P.3d 489, 491 (Colo. App. 2008) (stating that "[a] cause of action accrues on the date when 'the injury, loss, damage, or conduct giving rise to the cause of action is discovered or should have been discovered by the exercise of reasonable diligence'").  "The point of accrual is usually a question of fact, but if the undisputed facts clearly show when a plaintiff discovered or should have discovered the damage or conduct, the issue may be decided as a matter of law." *Murry*, 194 P.3d at 491.

The defendant argues that the claim accrued on the accident date because the plaintiff was familiar with the design and functioning of the shifter, since she testified that she frequently drove loaner vehicles from the family dealership that included other class models with the monostable shifter, and her daughter testified that the plaintiff drove the accident vehicle daily to and from work at the dealership.  The defendant also points to the evidence of the plaintiff's husband's "tirade" at the accident scene where he blamed the accident on the new functions in the vehicle.  It also relies on other evidence that suggests that the plaintiff was aware that the accident was caused by "driver error" involving her difficulty operating the shifter.

There is sufficient evidence in the record to support findings that the cause of action did not accrue under the discovery rule until, at the earliest, April 2016 when the voluntary recall was issued.  *First*, the nature of the defect here is not one that an ordinary driver untrained in human factors design principles reasonably could be expected to comprehend, even after becoming

"familiar" with the shifter through repeated use. That is because the nature of the alleged defect in the shifter is that by its operation it *obfuscates* or *omits* information that is necessary to allow a driver reliably to place the vehicle into an intended gear without excessive attention and focus. By definition, the defect is one which an ordinary driver might fail to detect because she does not know what she is missing; in other words, it is what the shifter does not do, rather than what it does, that comprises the defect. Moreover, safe operation might be achieved in many instances, notwithstanding the deficient interface, through the application of excess focus on the gear shifting operation, which, while avoiding mis-shifts, would create additional safety risks due to diversion of the driver's attention from her surroundings and other vehicle controls.

*Second*, the consequences of the difficult interface design do not occur in a tangible, predictable manner every time the gear shift is used. The alleged defect is not one where, for example, each time the car is placed into park and indicates it is in park, the transmission actually selects reverse instead, causing it to lurch backward instead of staying put. Instead, the design defect is one which, according to the defendant's final evaluations late in the production process, provoked mis-shifts only randomly, approximately once in every seven attempts. Thus, a driver could operate the shifter for some time, even on repeated occasions, without having a mishap that might trigger any suspicion that the design was faulty, until a serious accident occurred. And even after such an incident, due to the obscure nature of the design's difficulties, a driver would have had no tangible signal that a mis-shift definitely had occurred and might readily attribute a rollaway to "user error," particularly where the defendant's diagnostic team insisted that user error was the cause and allegedly falsely stated that the defendant was not aware of any similar mishaps.

Certainly, there is evidence in the record demonstrating that the plaintiff was "familiar" with the shifter through having used it, but the jury still easily could find that an ordinary driver

- 14 -

untrained in subtleties of human factors design would not have perceived the full implications of the design problems alleged here; namely, a random but excessively high incidence of shifting errors, which the defendant's studies repeatedly had identified.

*Third*, the plaintiff would have no conceivable way of knowing in December 2013, or at any later time until after this litigation was well underway, that repeated controlled studies of the shifter had identified the excessively high number of shifting errors caused by the design, even among drivers who were "familiar" with the shifter. Any suggestion otherwise is belied by the defendant's insistence, in the course of litigating its sealing motion in the class certification proceeding, that the results of the 2012 study were its private, confidential, and proprietary information that never previously had been disclosed to the public. Until the results of that study were made a matter of record in this case, there apparently never was any information produced by the defendant in any public manner that would have put a reasonable consumer on notice of the studies that objectively had demonstrated the excessive error rate produced by the shifter design.

And there is nothing in the record to suggest that any reasonable driver would have suspected any time before 2016, despite Chrysler's repeated attempts to refine and "tune" the awkward and uncertain operation of the monostable lever design (even as late as 2011, well into the production cycle, when the shifter evidently was in its final form), that the design still produced an alarming error rate of more than one false shift in every seven attempts, for an error rate of more than 13%. Email dated Feb. 2, 2011, ECF No. 619-16, PageID.28286 (reporting customer clinic results of "an average of 1 overshoot or undershoot error per 7.4 shifts (13.5%)"). Thus, the record sufficiently suggests that the plaintiff never had full knowledge of both her injury and the probable role of the gear shifter design defect in causing it until, at the earliest, when the voluntary recall was initiated in 2016, and perhaps not even until much later in this litigation when information

about the error rate studies finally came into the public view.  *See BK Trucking Co. v. Paccar, Inc.*, 89 UCC Rep. Serv. 2d 1294, 2016 WL 3566723, at *5 (D.N.J. June 30, 2016) ("When exactly Plaintiffs should have learned that the alleged problems with the ATS were not just isolated incidents but, instead, a systemic defect, may well have been beyond the one-year mark for bringing suit."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 961-62 (N.D. Cal. 2014) ("[A]single problem with [the MyFord Touch dashboard interface] did not establish that there was a systemic problem with the system.  Second, and even more important, even after successive problems with the MFT system, that does not in and of itself establish that Plaintiffs should therefore have known of Ford's alleged fraud in concealing the extent of the problems with the MFT system.").

The defendant seizes on an overheard comment by the plaintiff's husband at the accident scene suggesting that he blamed some component of the car for the accident.  But that testimony is ambiguous, and a jury reasonably could conclude that the reference by Mr. Maneotis to the "new fangled whatever where you don't think it's off and it's off but it's not off . . . something to that effect," referred to some component other than the gear shifter, such as the push button ignition switch in the vehicle.  Moreover, Tony Maneotis testified that even when his family finally reached some level of resolve to sue Chrysler, their suspicions about the defect focused on the idea that some internal malfunction had caused the transmission to shift out of park into another gear, not on the interface design elements which have become the focus of this litigation, for which substantial proof of the safety implications was not uncovered until well into the course of discovery in this case.  Tony Maneotis dep., ECF No. 578-5, PageID.23754.  Although the accrual determination is based on an objective standard, that is, when a reasonable person knew or should have known of the cause of an injury, *Schmidt*, 2010 WL 3239249, at *4, that testimony provides

additional support for a finding that a reasonable person in the plaintiff's position would not have suspected or fully comprehended the nature of the gear shifter's interface design defect until much later.

### B. Equitable Tolling

There also is evidence in the record that would support equitable tolling of the limitations period.  Under Colorado law, "[t]he elements of equitable tolling are: '(1) the party to be estopped must know the relevant facts; (2) the party to be estopped must intend that his or her conduct be acted on, or act in a manner that the party asserting estoppel believes the party to be estopped has such intent; (3) the party asserting estoppel must be ignorant of the relevant facts; and (4) the party asserting estoppel must rely on the other party's conduct to his or her detriment.'"  *Patterson v. BP Am. Prod. Co.*, 240 P.3d 456, 465 (Colo. 2011) (quoting *Olson v. State Farm Mut. Auto. Ins. Co.*, 174 P.3d 849, 858 (Colo. App. 2007)).

*First*, there is evidence of deliberately false and misleading statements made by the defendant during contact with the STAR Team by two service technicians at the Maneotis family dealership.  At the end of that call, the STAR Team representatives refused to open a ticket and summarily stated that the rollaway was due to "driver error."  That is a remarkable conclusion, since it is undisputed that the STAR Team had no communication with the plaintiff herself, and nothing in the record suggests that the STAR Team reviewed any documents or other information about the incident.  There also is nothing to suggest that the two service technicians who participated in the call had any personal knowledge of the accident on which the STAR Team could have relied in rendering their summary conclusion that the rollaway was caused by "user error."

The jury could make a fair inference from the evidence that the diagnosis of "user error" was nothing more than a scripted response intended to deflect suspicion of a design defect by persons who had experienced rollaway incidents. The inference is strengthened by the fact that the STAR Team also refused to open a case about the incident, from which a jury reasonably could infer that the defendant had undertaken to remain willfully ignorant of serious rollaway incidents, avoiding any acknowledgment or documentation of them, to maintain its aura of deniability and sustain the fiction that it was unaware of any problems. And the misrepresentations were not limited to that initial incident: Tony Maneotis testified that he repeatedly was told by the defendant's representatives that they were unaware of any rollaway incidents with the shifter, despite evidence that possible problems with the design were discussed during several dealer meetings. Tony further attested that he never was informed by Chrysler that there was any identified safety defect with the gear shifter until the 2016 recall notice was issued.

The defendant points out that none of its representatives had any direct contact with the plaintiff herself. But that fact does not insulate the defendant from its statements in this case. It is obvious from the record that Tony Maneotis was investigating the cause of the accident on his mother's behalf, and the information he obtained as her surrogate was part of the family discussion concerning their decision to bring suit.

*Second*, there is evidence in the record from which a jury could infer that the defendant intended its repeated misrepresentations to induce Maneotis not to pursue recovery for her injuries. Tony Maneotis testified that on each occasion when he asked about problems with the gear shifter design, or when information about the class models was discussed at dealer meetings, he was asked by the defendant's representatives "how your mom is." Tony attested that in retrospect he found it odd that each time the subject of the gear shifter was broached the same responses were given

denying any safety issues, but also ostensibly voicing concern for his mother.  Tony Maneotis dep., ECF No. 578-5, PageID.23751-52.  The jury could infer from those incidents that the defendant's representatives were well aware of the potential for litigation from the accident and sought to divine whether any action was imminent.  That, in turn, fairly would support an inference that the defendant's denials of any knowledge of rollaway incidents was intended deliberately to delay that consequence.

*Third*, there is evidence to support a finding that the plaintiff made extraordinarily diligent efforts to investigate the cause of the accident, relying on resources uniquely available to her through the family's dealership relationship with the defendant.  Those efforts were rebuffed by the abrupt insistence of the defendant's STAR Team that the mishap was due solely to "driver error," and that the defendant never had heard of similar incidents.  The plaintiff's son Tony Maneotis also made further inquiries during 2014 and 2015, but each time was told that the defendant had no knowledge of either a defect or similar injuries caused by class vehicles.

Finally, for similar reasons to those discussed above, the jury could conclude that the plaintiff relied to her detriment on the defendant's misrepresentations and accepted at face value the proffered explanation of "user error," particularly when it was bolstered by the defendant's repeated insistence that it had "no knowledge" of any similar accidents, and that as a result she decided not to pursue timely litigation to recover for her injuries.  As the Court noted in its prior opinion, federal courts have applied equitable tolling in similar circumstances where a plaintiff's suspicions of an actionable cause for an injury were quelled by the defendant's false insistence on an alternative, innocent causation.  *Guy v. Mercantile Bank Mortgage Co.*, 711 F. App'x 250, 254 (6th Cir. 2017) (noting that the Fifth Circuit has held that "equitable tolling was appropriate where an employer cited the need for a workforce reduction when he fired an older employee, which was

plausible in light of an industry-wide recession and which caused the employee not to bring an age-discrimination suit within the statute of limitations, when in fact the employer had replaced the employee with a younger person at a lower salary" (citing *Rhodes v. Guiberson Oil Tools Division*, 927 F.2d 876 (5th Cir. 1991)); *see also In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, 96 UCC Rep. Serv. 2d 790, 2018 WL 4188459, at *5 (D.N.J. Aug. 31, 2018) (applying equitable estoppel where defendant engaged in a concerted "deny-and-delay" scheme to stall and avoid warranty claims) (citations omitted).

III.

There are material fact questions raised by the evidence in the record that preclude summary judgment on the defendant's statute of limitations defense.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 559) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 5, 2022