UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

                    MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

DEDRA MANEOTIS,

                    Plaintiff,

v.

FCA US, LLC,

                    Defendant.

Case Number 17-10351
Honorable David M. Lawson

_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SEAL AND GRANTING PLAINTIFF'S MOTION TO AMEND COMPLAINT

Plaintiff Dedra Maneotis seeks leave to file a second amended complaint to add a claim for punitive damages. The defendant opposes the motion, arguing that the amendment would be futile because Michigan law, which does not allow punitive damages, governs this issue, and even under Colorado law, the facts do not support a claim for punitive damages. The defendant also asks the Court to seal an exhibit to the plaintiff's motion, which is a letter sent by automaker Jaguar to the defendant inviting a resumption of negotiations over the licensing of a certain rotary shifter design produced by Jaguar. These motions are fully briefed, and oral argument will not assist in their disposition. The Court, therefore, will decide the motions on the papers submitted. E.D. Mich. LR 7.1(f)(2). The defendant has not established good reasons for sealing the exhibit. The choice of law rules favor application of Colorado law to this issue, and under those rules of decision, the

proposed amendment would not be futile.  The motion to seal will be denied, and the motion to amend the complaint will be granted.

I.

The history of the accident and the proceedings are well-known to the parties.  Plaintiff Dedra Maneotis was injured when her 2014 Jeep Grand Cherokee rolled over her leg after she exited the vehicle, thinking she had successfully put the vehicle in "Park."  She sued defendant FCA US, LLC, alleging that a design defect in the gear shift mechanism installed in her Jeep led to her injuries.  Maneotis's initial complaint, filed in the District of Colorado, was transferred to this Court by the Joint Panel on Multidistrict Litigation and was consolidated with the MDL proceedings.  The MDL plaintiffs collectively filed a consolidated master complaint for personal injury actions, which included the claims brought by Maneotis, a citizen of Colorado.  However, to sharpen the pleadings for the purposes of dispositive motion practice, Maneotis filed her own individual first amended complaint, which contained only her claims.  The Court previously denied the defendant's motion to dismiss the first amended complaint for failure to state any plausible claim for relief.

The plaintiff now has moved to file a second amended complaint to add a claim for punitive damages, based on information uncovered during discovery pertaining to the willfulness of the defendant's conduct.  The basic facts of the case, which are not materially in controversy for the purposes of the present motions, are recited below as alleged in the first amended pleading.

On December 20, 2013, Dedra Maneotis pulled up a hill into her driveway and put her 2014 Grand Cherokee in Park.  As she opened the door and stepped one foot out, the car started to roll backward.  With her left leg out, she tried to hop along with her left foot while holding on to the door and the steering wheel.  However, as she tried to keep up with the car, the car door clipped

a half-height decorative wall and bent backward, causing Dedra to lose her grip on the door handle, and she struggled to stay upright as the car gained speed down the hill.  Maneotis soon grew tired and had to let go of her hold on the vehicle, and, as a result, she fell, and her leg got wrapped up in the front driver-side wheel.  The Jeep then rolled up onto the half-height decorative wall and over her leg, rolled over, and then spun out on her leg, causing serious injuries.  Maneotis reported the accident to the police, and an officer called to the scene reported that "due to the electronic shifting system in this vehicle [it] was not in 'Park' like [Maneotis] thought it was."  Maneotis was hospitalized for her injuries and continues to receive treatment and therapy today.

The amended complaint alleges that the monostable gearshift design is dangerously defective because it provides insufficient tactile and visual feedback to drivers to make them aware whether the car has been shifted to the intended gear.  The plaintiff contends that the defendant was aware of the defective gearshift design, and that information uncovered during discovery even shows that it engaged in negotiations to license an alternative, safer gear shift mechanism from fellow automaker Jaguar, but FCA balked at the price demanded for access to Jaguar's "rotary" shifter design, and, according to the plaintiff, decided instead to put profits before safety and forge ahead with marketing cars using the unsafe monostable design.

In her first amended complaint, Maneotis pleaded claims for negligence (Count I), negligence per se (Count II), and strict product liability (Count III), under various Colorado product liability statutes and common law.  She now seeks to add to her prayer for relief a demand for punitive damages, which she contends was not added earlier due to procedural hurdles under Colorado law that preclude the assertion of a demand for punitive damages in the initial pleading in a civil action.  The defendant does not oppose the request for leave to amend on general terms,

but it does interpose a narrow objection to the pleading of the punitive damages demand, which it contends is barred or insufficiently pleaded as a matter of law.

II.

The defendant asks the Court to seal a single exhibit to the plaintiff's motion to amend, labeled as Exhibit 7, which is a letter sent by the chief patent counsel of Jaguar Land Rover to the chief patent counsel for FCA US, LLC.  The defendant does not argue that the letter contains secret information.  Rather, it contends that the information in the letter is protected by a "settlement privilege" that precludes its publication in the record or consideration in evidence at trial, and the letter is irrelevant to disputed trial issues.

A.

Because no secrecy in the letter is asserted, the relevant contents are set forth here:

As you may be aware, in 2010 Chrysler approached Jaguar Land Rover (JLR) to request a licence to the technology in JLR's rotary transmission selector (RTS). After considerable discussion, JLR's Executive Committee decided that JLR would be willing to license this unique technology to Chrysler, either directly or via its supplier, on appropriate terms.

Unfortunately, Chrysler elected to decline the outline licence terms offered by JLR and broke off negotiations shortly thereafter. JLR therefore assumed that Chrysler had reconsidered its plans to implement RTS.

It has recently come to our attention, however, that Chrysler is nevertheless reproducing the RTS technology in at least four current vehicle models: Chrysler 200, Chrysler 300, Dodge Ram and Dodge Durango.

We would therefore like to offer Chrysler the opportunity to re-open the negotiations for the use of this technology, which JLR remains willing to license to Chrysler on appropriate terms.

In connection with this offer, we draw your attention to the following patents assigned to JLR relating to the RTS technology:

    [list of patent numbers omitted]

- 4 -

Please note that we have carried out detailed testing of the RTS systems in each of the above-mentioned vehicle models and it is the opinion of our US counsel that they read onto most or all of the independent claims of the above patents.

[followed by similar recitation of potential trademark infringements]

Letter dated December 21, 2015, ECF No. 522-2, PageID.21726-27.

B.

Parties desiring to file court papers under seal face a formidable task in overcoming the presumption that court filings are open to public inspection. *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983). "Unlike information merely exchanged between the parties, '[t]he public has a strong interest in obtaining the information contained in the court record.'" *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1180 (6th Cir. 1983)). "[T]he public is entitled to assess for itself the merits of judicial decisions," and, thus, "'[t]he public has an interest in ascertaining what evidence and records the District Court [has] relied upon in reaching [its] decisions.'" *Ibid.* (quoting *Brown*, 710 F.2d at 1181).

There is a "'strong presumption in favor of openness' as to court records," and the "burden of overcoming that presumption is borne by the party that seeks to seal them." *Shane Group*, 825 F.3d at 305 (citing *Brown*, 710 F.2d at 1179; *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)). "The presumption in favor of public access is strong when public safety is implicated"; thus, while it is "well-established that confidentiality provisions, protective orders, and the sealing of cases are appropriate litigation tools in some circumstances[,] the interests of public health and safety will often outweigh any confidentiality interests that might be implicated." *Kondash v. Kia Motors America, Inc.*, 767 F. App'x 635, 637 (6th Cir. 2019). (quotation marks omitted). "This is particularly true in class actions, where, because of the interest of a broader public outside of

the named parties, the standards for overcoming the presumption of openness 'should be applied . . . with particular strictness.'"  *Ibid.* (quoting *Shane Group*, 825 F.3d at 305).

The Sixth Circuit recognized a formal "settlement privilege" in *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 979-81 (6th Cir. 2003), which is derived from Federal Rule of Evidence 408 (which at the time stated, "[e]vidence of conduct or statements made in compromise negotiations is . . . not admissible").  Rule 408 prohibits the admission in evidence at trial of "conduct or a statement made during compromise negotiations about the claim."  Fed. R Evid. 408(a)(2).  The *Goodyear* court extended that rule to protect such information from disclosure during discovery.  332 F.3d at 982.  The court did not address the question of sealing settlement negotiation letters in the court record.

Rule 408 does not address sealing, either.  It is pertinent to this discussion, though, since the defendant contends that the letter is irrelevant because Rule 408 makes it so.  The Court disagrees.

Rule 408, in its current iteration, says that evidence of "furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim," and "conduct or a statement made during compromise negotiations about the claim" is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R Evid. 408(a).  However, such evidence may be admissible "for another purpose, such as proving a witness's bias or prejudice [or] negating a contention of undue delay."  Fed. R. Evid. 408(b).  That is a non-exclusive list.  *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("As the use of the term 'such as' confirms, the list is illustrative, not exhaustive.").

The letter from Jaguar is not a communication that occurred during any settlement negotiations; it is merely an invitation to resume discussion of a licensing deal for Jaguar's shifter design. Nothing in the letter comprises any position by either party as to the prospective negotiations beyond the allusion to potential patent and trademark claims that Jaguar believed it might have against FCA and an invitation to foreclose those claims by renewing business negotiations for licensing of Jaguar's rotary shifter technology. The letter does not even hint at any substance of the supposed "appropriate terms" for the licensure, and it does not communicate any actual offer of terms. Certainly, there is no effort to "compromise" any claim. As the Seventh Circuit has explained, Rule 408 does not bar introduction of communications where a party merely asserts its position in a business dispute, absent the statement of actual terms for resolution of contemplated or actual litigation:

> The policy rationale which excludes an offer of settlement arises from the fact that the law favors settlements of controversies and if an offer of a dollar amount by way of compromise were to be taken as an admission of liability, voluntary efforts at settlement would be chilled. That, however, is not the situation we find in the language used by Sosnovske. Instead, he was in effect stating that the herbicide was sold to you on the basis that it would aid, not substantially destroy, your crop and the company is prepared to stand in back of the basis of the sale. The dollar amount was, of course, left open but that did not make the statements of the company's position with regard to backing up its product an offer of compromise and settlement.

*Perzinski v. Chevron Chem. Co.*, 503 F.2d 654, 658 (7th Cir. 1974); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 909 (2d Cir. 1997) ("Rule 408 bars the admission of statements and conduct made 'in the course of compromise negotiations.' By definition, an unconditional offer may not require the employee to abandon or modify his suit, and no such request was made by defendants. The offer therefore cannot be considered an offer of settlement or compromise.") (citations omitted); *Winchester Packaging, Inc. v. Mobil Chem. Co.*, 14 F.3d 316, 319-20 (7th Cir. 1994) ("To settle a bill is to pay it. But a bill that itemizes what the sender thinks the recipient

owes him and demands — even under threat of legal action — payment is not an offer in settlement or a document in settlement negotiations and hence is not excludable by force of Rule 408.") (collecting cases).

The defendant's vaguely articulated concerns about damaging the confidentiality of its negotiations with Jaguar do not supply any sufficient basis for the requested closure of the Court's records, because nothing in the correspondence at issue memorializes any actual *communications* by Jaguar or FCA in furtherance of any such negotiations.  The letter was merely an invitation to negotiate, and at most a statement of Jaguar's opening position in the negotiations; it does not embody any offer or acceptance of any actual terms to settle a dispute.  *Appel v. Wolf*, No. 18-814, 2019 WL 4534540, at *3 (S.D. Cal. Sept. 19, 2019) ("After review of the challenged email, the Court finds the email was not sent to further settlement negotiations as it is evident that no settlement discussion had commenced between the parties.").

Moreover, it does not appear that the letter would be offered in evidence at trial "to prove or disprove the validity or amount of a disputed claim."  FCA has taken the position in this case that the plaintiff cannot prove a product defect under the risk-utility test because there was no safer alternative design available at the time, including the rotary shifter used by Jaguar.  The defendant contends that "IP issues" prevented the adoption of the rotary design for Jeep models due to perceived competition with Jaguar's own Land Rover branded SUVs.  The letter undercuts that position.  The plaintiff points to the letter to show that FCA historically had considered using an alternative and safer design but elected to go ahead with marketing its own defective shifter instead.  The plaintiff then would invite the jury to conclude that the motive for going ahead with the monostable design instead of licensing the alternative rotary shifter mechanism from Jaguar was simply the defendant's decision to put profits before safety, based on the obvious inference

that negotiations over the rotary shifter were broken off because FCA balked at the price that Jaguar demanded for use of its design, not because of "IP issues."

Evidence of a party's position during settlement negotiations is not excludable when it is offered to prove the intent or motive of the party, or to explain reasons for its conduct unrelated to establishing liability or the extent of damages. Rule 408(b) expressly contemplates admission of settlement communications for those "other purposes," which include proving a party's intent, motive, or reason for delay (e.g., due to the pendency of ongoing settlement negotiations). *Sage Realty Corp. v. Ins. Co. of N. Am.*, 34 F.3d 124, 128 (2d Cir. 1994) ("Sage sought to use the letter for the discrete proposition that INA had access to all documents it needed to compute the electric costs. Because Sage did not proffer the letter to show an offer of compromise or an admission made in compromise negotiations, the letter was not subject to Rule 408."); *Coakley & Williams Const., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 353-54 (4th Cir. 1992) ("[S]ettlement offers are only inadmissible when offered to prove liability or damages. *See* Fed. R. Evid. 408. The district court only considered the offer as evidence of the parties' intent."); *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 860 (N.D. Cal. 2019) ("[T]he Advisory Committee Notes to the 2006 Amendments to Rule 408 make abundantly clear that such evidence is admissible to prove notice, stating that '[t]he amendment does not affect the case law providing that Rule 408 is inapplicable when evidence of the compromise is offered to prove notice.'"); *Mahoney v. Ernst & Young LLP*, 487 F. Supp. 2d 780, 797 (S.D. Tex. 2006) ("Submission of the letter is not precluded by Federal Rule of Evidence 408 because Plaintiff offers the letter as proof that she engaged in a protected activity, not as proof of liability for or validity of her claims.").

The letter could be offered in this case to show the defendant's motive for its decision to go ahead with marketing an unsafe design — as the plaintiff alleges, putting profits over safety and electing to proceed with a cheaper design that it knew was unsafe, after it found the cost of an available safer mechanism too rich for its taste. *ESPN, Inc. v. Office of Commissioner of Baseball*, 76 F. Supp. 2d 383, 412-13 (S.D.N.Y. 1999) ("In light of ESPN's substantial need for the disputed materials and the unlikelihood that introduction of such evidence will frustrate either of the purposes underlying Rule 408, I find that evidence and argument related to Baseball's proposed changes to the 1996 Agreement is admissible for the 'other purpose' of demonstrating Baseball's alleged improper motive."); *California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co.*, 602 F. Supp. 183, 188 (W.D. Mo. 1985) ("[D]efendant contended that plaintiffs delayed selling the sugar for animal feed until after the market price had fallen significantly.  As authorized by Rule 408, the evidence regarding settlement negotiations was admissible to explain why plaintiffs delayed in disposing of the sugar."), *aff'd*, 788 F.2d 1331 (8th Cir. 1986).

To the extent that it has any force here, the "settlement privilege" does not supply any compelling basis for sealing evidence of negotiations between Jaguar and FCA, and the public interest in full disclosure of the basis for the defendant's design decisions mitigates against the closure of the record on its motives for adopting the monostable design.

The defendant has not advanced any sound basis either for exclusion of the letter at issue from the evidentiary record or for allowing its filing under seal.

III.

The plaintiff wants to file a second amended complaint to add a prayer for punitive damages.  The defendant objects, arguing that the amendment would be futile because such a claim

is barred under Michigan law, and if Colorado law is deemed to apply, then the facts stated do not suffice to allege the malicious intent required for an award of punitive damages.

Under Federal Rule of Civil Procedure 15(a), a party may amend a complaint at this stage of the proceedings only after obtaining leave of court. Although the Rule provides that "leave of court shall be freely granted when justice so requires," leave may be denied for several reasons, including the futility of the proposed new claim. *Forman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak & Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997).

### A.

A federal court exercising its diversity jurisdiction applies the choice-of-law rules "of the forum state." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). However, when a case originates in one district and is transferred to another solely for the purpose of consolidation into an MDL proceeding, the choice of law rules of the originating jurisdiction travel with the case and must be followed by the MDL court. *See In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 316 F. Supp. 3d 1021, 1030 (S.D. Ohio 2015).

The Court has determined twice already that Colorado law governs this dispute, including the choice-of-law issues. The defendant agrees with that holding for the liability questions, but it says the damages issues are another matter. One would think that a single state's laws would furnish the rules of decision for an entire case. But under the doctrine of "depecage," the conflict of laws analysis distinctly must treat each specific issue in the case on which there is a true conflict. *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 611 (7th Cir. 1981) ("[T]he concept of 'depecage' [refers to] the process of applying rules of different states on the basis of the precise issue involved.").

- 11 -

In this case the only conflict of laws issue that has been raised concerns the punitive damages claim.  The parties agree that Colorado law governs on all other substantive issues of liability and damages.  But that does not rule out the possibility that the law of another forum could be found to govern on the punitive damages issue alone.  *Id.* at 611 n.13 ("[C]hoice of the applicable law should frequently depend upon the issue involved. The search in these instances is not for the state whose law will be applied to govern all issues in a case; rather it is for the rule of law that can most approximately be applied to govern the particular issue.").

The task proceeds in steps.  First, determine the governing principles for choosing the law to be applied.  Second, decide whether the competing rules present either a "true" or "false" conflict.  Finally, apply the relevant principles and guidance to resolve the conflict.

To determine which state's laws govern, "Colorado has adopted the general rule, as set forth in the restatement (Second) of Conflicts of Law, that the law of the state with the most 'significant relationship' with the occurrence and the parties governs."  *BlueMountain Credit Alternatives Master Fund L.P. v. Regal Ent. Grp.*, 465 P.3d 122, 126 (Colo. Ct. App. 2020) (citing *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509 (Colo. 2007)).  "Once the state having the most significant relationship is identified, the law of that state is then applied to resolve the issue." *Ibid.* (citing *Wood Bros. Homes v. Walker Adjustment Bureau*, 198 Colo. 444, 447-48, 601 P.2d 1369, 1372 (1979)).

"The Restatement (Second) provides two sets of criteria for the measurement of the 'most significant relationship.' The first set of criteria includes general factors such as the needs of the interstate system; relevant policies of the forum and other interested states; protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied." *In re*

*Air Crash Disaster 1979*, 644 F.2d at 611-12.  "The second set of criteria includes the contacts to be taken into account in applying these principles. These contacts are: (1) the place of the injury; (2) the place of misconduct; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered."  *Id.* at 612.  "These contacts are to be evaluated according to their relative importance to the issue involved and according to the purposes sought to be achieved by the relevant rules of the interested states."  *Ibid.*

Having identified the governing principles for choosing the law to be applied, the Court next must decide whether the purported clash of rules is either a "true" or "false" conflict.  "A 'false conflict' exists where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or, (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws."  *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019) (quotations omitted).  "By contrast, a 'true conflict' exists where two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result."  *Ibid.*

Here, it is undisputed that the laws of Michigan and Colorado are diametrically opposed; the former bars any recovery of punitive damages and the latter allows it.  *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 65 (Colo. 2005) ("[Under Colorado law,] [p]unitive damages, and even treble punitive damages, are available in tort and contract actions under some circumstances.") (citing Colo. Rev. Stat. § 13-21-102); *McAuley v. Gen. Motors Corp.*, 457 Mich. 513, 519-20, 578 N.W.2d 282, 285 (1998) ("It is well established that generally only compensatory damages are available in Michigan and that punitive sanctions may not be imposed.").  Thus, there

is a true conflict between the laws of the interested sovereigns, which are Colorado (the place of the injury and the plaintiff's domicile), and Michigan (the place of the alleged misconduct and the defendant's domicile).

Having identified the interested sovereigns and found a true conflict between their substantive laws on the issue of punitive damages, the Court must apply the rules and resolve the conflict.  "In general, [the Court] must attempt to determine which, if any, of the states having some relationship to the parties or to the [accident] has the most significant interest in the application of its own substantive law to the merits," focusing "specific[ally on the] question of punitive damages." *In re Air Crash Disaster 1979*, 644 F.2d at 610-11.  The Restatement (Second) recognizes as a first principle that the law of the place of the injury should govern on the issue of punitive damages, unless some other forum has a more significant interest in that issue.  *In re Aircrash Disaster Near Monroe, Michigan on Jan. 9, 1997*, 20 F. Supp. 2d 1110, 1113 (E.D. Mich. 1998) ("Following the Restatement, the law of the place of injury governs wrongful death actions unless 'some other state has a more significant relationship.'" (quoting Restatement (Second) Conflict of Laws § 175)).

Here, the place of the injury is Colorado, and therefore its law is presumed to govern in an injury case "'unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6.'"  *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 750 F. Supp. 793, 798 (E.D. Mich. 1989) (quoting Restatement (Second) of Conflict of Laws § 175); *see also In re Aircrash Disaster 1997*, 20 F. Supp. 2d 1112.

There are other forum relationships besides the place of the accident that could give rise to an interest in the damages issue, such as the forum where the defendant is incorporated, the forum where it has its principal place of business, the place where the defective design and other pertinent

decisions about the design allegedly were made, and the state of the plaintiff's domicile.  *In re Aircrash Disaster 1997*, 20 F. Supp. 2d at 1111.  All but one of those prospective forums in this case are the same — Michigan.  The parties do not dispute that the state of the plaintiff's domicile alone has a minimally significant interest, if any, in the application of punitive damages law, *if domicile is the only relationship between that forum and the controversy.  See ibid.*; *In re Disaster 1987*, 750 F. Supp. at 804-05 ("With regard to the punitive damages claims against Northwest, the states having legally significant contacts are Michigan (place of injury) and Minnesota (place of alleged misconduct and principal place of business). However, unlike the choice of law analysis that was employed by this Court regarding the issue of products liability, the domicile or residence of the plaintiff is not relevant to an evaluation of the choice of law issues concerning punitive damages because the decision by a state on whether to allow punitive damages focuses solely on corporate regulatory versus corporate protective policies.").

Nevertheless, a sovereign may have more than one relationship with the case.  Here, Colorado is both the state of the plaintiff's domicile and the place of the injury.  Michigan is both the place of the defendant's principal place of business and the place where the allegedly defective design was conceived and implemented.  The interests of each sovereign are weighed separately according to each particular relationship, and place of injury is well recognized under the law as a distinct — and distinctly more significant — relationship compared with mere happenstance of party domicile.  *See In re Air Crash Disaster 1987*, 750 F. Supp. at 798 ("*The particular contacts that are to be taken into account in applying the factors in § 6(2) are (1) the place of the injury*, (2) *the place of misconduct*, (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship between the parties is centered."); *see also id.* at 811 ("Under the Restatement approach, the law of the state where the

- 15 -

injury occurred should apply in a wrongful death action unless another forum has 'a more significant relationship' to the occurrence or to the parties."); *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1445, 1452 (D. Colo. 1988) ("[T]he states having relevant contacts with this litigation are: 1) Colorado — place of injury; 2) Texas — place of the wrongful conduct; 3) Texas — defendant airline's principal place of business and state of incorporation; and 4) Idaho — principal state where the relationship between the parties was centered. *The relative significance of these contacts is considered in light of the policies underlying the remedy of punitive damages*. In personal injury and wrongful death actions, the language of the Restatement of Conflicts suggests that the law of the state of injury should apply unless some other state has a more significant relationship to the litigation.") (emphases added).

Recognizing that principle, the decisions most directly on point consistently have found the forum of injury to have the most significant interest in the punitive damages issue, at least in cases where the occurrence of the accident within the forum was not merely fortuitous (i.e., while merely passing through or flying over the location of a crash).  For example, in *Goettsch v. Ford Motor Co.*, No. 03-01374, 2005 WL 1950195 (D. Colo. Aug. 12, 2005), the district court applying Colorado's choice of law principles, on materially identical facts, concluded that Colorado punitive damages law should apply:

> *The accident occurred in Colorado. The Explorer was licensed, insured and registered in Colorado. Ford markets its vehicles through dealerships in Colorado. Plaintiffs have no connection whatsoever to Michigan.* Moreover, Colorado has a strong interest in seeing that its citizens are fully compensated for their injuries and that they do not become dependent on the state. Punitive damages are generally deemed not compensatory in nature as they are designed to punish a tortfeasor and deter future wrongful conduct by the defendant and others. In Michigan, however, punitive damages are compensatory in nature and are distinct from exemplary damages. *In any event, nearly all of the Restatement factors weigh in favor of applying the law where the accident occurred* and the state of domicile of the parties involved.

Ford argues that Michigan's punitive damages law should apply in this products liability case because the design, assembly and marketing of Ford Explorers generally takes place in Michigan. *However, there is no injustice in requiring Ford, an established international corporation that conducts substantial business in Colorado and knows its vehicles will regularly travel on Colorado highways, to be responsible under Colorado law for punitive damages if proven that injuries of Colorado residents were caused by Ford's tortious conduct justifying such damages.* Also, it would seem at least somewhat incongruous under the Restatement approach for Colorado law to apply to negligence and actual damages issues and Michigan law to apply solely as to punitive damages.

*Id.* at *2-3 (citations omitted; emphasis added).  Applying the same logic, where the forum of the injury bars rather than allows recovery of punitive damage awards, federal courts consistently have found that the law of the place of injury controls notwithstanding that the law in the forum where the misconduct occurred would treat punitive damages differently.  *E.g.*, *In re Aircrash Disaster 1997*, 20 F. Supp. 2d 1112.

The policy objective of a forum in punishing tortfeasors lends additional significance to its interest and can tip the balance toward application of its law, where the analysis otherwise is equivocal between the forums of the injury and the alleged misconduct.  *Salinero v. Johnson & Johnson*, 408 F. Supp. 3d 1354, 1357 (S.D. Fla. 2019) ("Though the state where the injury occurred generally has significant interests, *see* Restatement (Second) of Conflict of Laws § 146, *an important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved*.  If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries. *Id.* cmt. e.'").  Thus, the balance here tips in favor of Colorado having the more significant interest, both as the injury forum, and as the forum with an explicit policy interest in the punishment of tortious conduct.

The Seventh Circuit, in *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 614-15 (7th Cir. 1981), examined with depth and care the question how to resolve the competing policies on punitive damages where the competing laws of several forums expressed clashing corporate protective (barring) and corporate regulatory (allowing) impulses with respect to punitive damages.  The Court there noted that in air crash cases it frequently may happen that the place of injury was merely fortuitous in that an air disaster could occur at any moment during an hours long traverse of numerous territorial jurisdictions.  But even where the relationship to the place of injury was deemed less significant due to geographical happenstance, the court of appeals still concluded that the place of injury should prevail as the tie breaker, because there was no other principled way to declare the interest of one of the competing sovereigns to be "more significant" than the other.

Following the tie breaking principle announced in the *Chicago* air disaster case, other federal courts readily have concluded that the default rule of the place of injury should apply, especially where the place of the accident was not fortuitous.  For example, in *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 750 F. Supp. 793 (E.D. Mich. 1989), the district court explained that application of the law of the place of the injury was both proper and should have come as no surprise to the defendant, finding that "the law of the place of injury is a principled and reasonable way in which to resolve the conflict in this case." *Id.* at 810.  That rule "further[s] the interests of certainty, predictability of result and the prevention of forum shopping." *Ibid.*

Colorado's supreme court has not hesitated to hold that Colorado law applies to other issues distinct from liability and compensatory damages in personal injury cases, particularly because consistent application of all pertinent rules of the injury forum would promote predictability and certainty for potential litigants. *E.g.*, *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 511

(Colo. 2007) ("In order to promote uniformity of outcome, discourage forum shopping, and ensure outcomes in accordance with the policy of the state with the most significant relationship to the occurrence and parties, we agree with the majority of jurisdictions that the choice of law governing the cause of action in a tort case also governs the determination of prejudgment interest."). That same interest in uniformity, predictability, and certainty pervades the Restatement's reasoning and animated the adoption of the tie breaker default rule by the *Chicago* court, which held that in cases of otherwise equivocal conflicting interests, the default rule of the Restatement approach promoted the best and most certain outcome. Following suit, in a recent decision of the MDL court in *Curtin v. Ethicon, Inc.*, No. 20-3172, 2021 WL 825986 (D. Colo. Mar. 4, 2021), the application of Colorado's choice of law rules led the court to conclude that Colorado had the most significant interest in the application of its tort law principles to claims for recovery of personal injury damages in a product liability action. *Id.* at *3 ("Colorado applies the 'most significant relationship' test found in Sections 6 and 145 of the Restatement (Second) of Conflicts of Law in tort actions. As the place of Ms. Curtin's residence and the state where her injuries occurred, Colorado has the most significant relationship to this case.") (citation omitted).

Other federal courts applying the Restatement approach, as adopted by various states, readily have concluded that the forum of injury has a more significant interest in the application of its punitive damages laws than the place where the defendant has its main operations or designed or constructed the allegedly defective product. In *Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236 (D.D.C. 2005), the district court weighed the interests as follows:

> Here, most of the potentially interested states have an insufficient interest to affect the analysis. Kentucky, the place of manufacture, has no interest in the question of punitive damages because the instant claim lies with allegedly poor design, not manufacturing defects. The District of Columbia, home of the Plaintiffs both when the Explorer was purchased and when the accident occurred, is interested in their compensatory recoveries but not punitive damages. Virginia, Mr. Mercado's home

> state both now and when suit was brought, might be thought to have some interest in Mr. Mercado's recovery if a shortfall would render his care a state responsibility; however, no party argues for application of Virginia law and it has no connection to the alleged actions giving rise to the lawsuit. Delaware is the state in which Ford is incorporated, but it has no other connection to any relevant activity. Nebraska is the where the injury occurred, but under the interest analysis applied in the District of Columbia, this fact is of minimal importance in a "fortuitous crash" case absent other connections or interests to tie the issue of punitive damages to that forum.

> Thus, the two states with relevant interests to be considered are Michigan and Maryland. Michigan's interest arises because it is the state where Ford is headquartered and where the Explorer was designed; Michigan law precludes punitive damages in an effort to protect corporations within its borders, draw corporations to transact business in the state, and thereby augment the state's coffers. Maryland, on the other hand, is interested because it is where Ford is alleged to have knowingly put a defective product into commerce. Maryland allows punitive damages in product liability suits to further its interest in deterring such conduct, and to protect its consumers from being harmed by known defects in products sold there.

*Id.* at 239-40 (D.D.C. 2005).  The interest of the injury forum outweighs those of the defendant's home forum especially where the product was sold by the defendant in significant numbers in the injury state and was bought and used exclusively there by the plaintiff.  *Alley v. MTD Prod., Inc.*, No. 17-3, 2017 WL 6547996, at *1 (W.D. Pa. Dec. 20, 2017).

The interest of the injury forum here is particularly weighty because the specific defect alleged, which is said to allow the defendant's cars to rollaway unrestrained by the operator, poses a collective risk to all persons and property anywhere within the path of a runaway vehicle, as opposed to a more constrained defect where the extent of harm may be limited only to the operator of the product.  The interest of Colorado here is not only in punishing manufacturers that happen to sell a defective car to a Colorado citizen, but also in protecting all drivers, pedestrians, and bystanders who may be anywhere in the vicinity of a class vehicle when it goes its own way in the world, uninhibited by a driver's desperate efforts to arrest the excursion.

With one exception, the cases cited by the defendant support the above reasoning and the plaintiff's position.   The defendant, however, misreads them by focusing only on the

uncontroversial principle that the plaintiff's domicile, standing alone, is an insignificant factor in the choice of law analysis, ignoring the significant interests of the injury forum in the balance.  The only cited decision applying Colorado choice of law principles that adopted the defendant's view is *Kelly v. Ford Motor Co.*, 933 F. Supp. 465 (E.D. Pa. 1996).  But that decision has been criticized as poorly reasoned, and it has not been followed.  *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 12-07263, 2015 WL 2417411, at *6 (E.D. Pa. May 20, 2015) ("*Kelly* appears more often distinguished than followed."); *Alley*, No. 17-3, 2017 WL 6547996, at *9-10 ("The Court notes that a strict adherence to *Kelly* would create perverse incentives. If courts sitting in diversity reflexively applied the law of the state where products were produced, manufacturers would be incentivized to forum-shop and re-locate to the state with the shortest statute of repose. This would insulate manufacturers from liability and thus remove some of the incentive for them to produce safe and non-defective products.").

The location of the accident here was not fortuitous; the vehicle was sold, serviced, and used extensively, and so far as the record suggests, exclusively, within the injury forum.  Colorado courts would conclude that under these circumstances, the law of the place of the injury controls and governs the adjudication of this case.  That forum is Colorado, which allows a plaintiff to recover punitive damages in products liability actions.

## B.

The Colorado legislature authorized the recovery of punitive damages "[i]n all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages."  Colo. Rev. Stat. § 13-21-102.  The plaintiff must "prove[]

beyond a reasonable doubt that the injury sustained was attended by circumstances of fraud, malice, or willful and wanton conduct." *Coors*, 112 P.3d at 65. "To establish fraud, the plaintiff must show that the defendant made a false representation of a material fact, knowing that representation to be false; that the person to whom the representation was made was ignorant of the falsity; that the representation was made with the intention that it be acted upon; and, that the reliance resulted in damage to the plaintiff." *Id.* at 66. "In the context of section 13-2-102, 'willful and wanton conduct' means conduct purposefully committed which the actor must have realized was done heedlessly and recklessly without regard to consequences or the rights of the plaintiff." *Ibid.* "Where the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of section 13-21-102 are met." *Ibid.*

FCA argues that the proposed second amended complaint does not plead grounds for punitive damages sufficiently because the facts alleged cannot, as a matter of law, establish the malice that is a required premise for a punitive damage recovery in Colorado. However, in its prior opinions, the Court discussed at length the factual record already documented, which suggests that the defendant (1) knew about the difficulties that drivers had consistently and safely operating its shifter design, well before the class vehicles went to market, (2) withheld its knowledge of the design's problems from the public for years after the sale of the cars, even making efforts to continue to conceal and obfuscate the information from public view well into the years long pendency of this litigation, and (3) continues, to this day, to refuse to acknowledge any contribution of its allegedly defective design to the many reported rollaway mishaps, insisting instead that mere "user error" accounts for the hundreds of accidents and dozens of serious injuries suffered by operators of the class vehicles. The knowing concealment from buyers of material

information about product defects, for the purpose of inducing them to purchase or pay more for the product, is sufficient to prove the required fraudulent conduct under Colorado law. *Coors*, 112 P.3d at 66 ("The trial court specifically identified the following actions as constituting fraud: that as early as October 1997 Security Life was aware of the computer truncation error that had affected the policies; though Security Life had actual knowledge in October 1997 that Coors had been significantly overcharged, Security Life failed to advise Coors of that material fact; Security Life published Coors' 1997 annual statement reflecting expense charges that it knew were inaccurate; and by omission, Security Life induced Coors to pay his December 1997 annual premium.").

Moreover, Colorado courts have found sufficient proof of "willful" misconduct where a defendant acknowledged the risks of its conduct in internal communications but decided anyway to forge ahead with a problematic course of business. *Ibid.* ("In reviewing the record, we find that the Biles memo specifically acknowledged that the proposed course of conduct 'may turn out to be a very bad idea' and potentially viewed as 'bad faith' by a court. Despite recognition of the risk to the rights of the insureds, Security Life adopted the Biles scheme.").

This Court also reviewed at length in its prior opinions the internal correspondence that readily suggests that the defendant was well aware of the risks posed by the class vehicle shifter design, and that it acknowledged the problems and the availability of alternatives during its internal debates about deployment of the shifter into production, but in the end it was motivated by purely fiscal priorities to forge ahead with marketing the problematic design. The letter from Jaguar, discussed earlier in this opinion, lends support to that theory.

The proposed second amended complaint alleges sufficient facts to support a claim for punitive damages.

IV.

The defendant has not provided a plausible reason to seal the exhibit to the plaintiff's motion to amend the complaint.  The choice of law analysis points squarely to the application of Colorado law on the punitive damages issue, and the proposed pleading sufficiently alleges the required malice to warrant recovery of the same.

Accordingly, it is **ORDERED** that the defendant's motion to seal exhibits (ECF No. 521) is **DENIED**.

It is further **ORDERED** that the plaintiff's motion to file a second amended complaint to seek punitive damages (ECF No. 523) is **GRANTED**.  The plaintiff separately must file her second amended complaint by **April 22, 2022**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  April 13, 2022

- 24 -