UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## OPINION AND ORDER ON OMNIBUS MOTIONS *IN LIMINE*

The parties filed omnibus motions *in limine* in advance of the issue class trial.  At the final

pretrial conference held on August 24, 2022, the Court ruled from the bench on some of the issues

raised and reserved ruling on other issues to be decided by this written opinion.  The facts of the

case are familiar to the parties, they are summarized in several previous opinions, and they need

not be repeated here.

I.

The plaintiffs ask the Court to "exclude evidence or argument that the closing of the 2015

NHTSA investigation constitutes proof that the installation of an auto park feature in certain class

vehicles resolved the design defect and safety problems with the gear shifter."  They argue that the

Court recognized in its ruling on the motion for summary judgment that the existence of the auto

park remedy is "basically irrelevant" to the plaintiffs' present theory of the case, which is that the

class vehicles remain unsafe despite the fix.  The plaintiffs contend that any argument that the auto

park feature has fixed the alleged defect would be unfairly prejudicial and would confuse the jury

about the actual issues presented in the case.

The defendant counters with a motion to prevent the plaintiffs from using evidence of the

auto park feature to prove that the class vehicles were defective without auto park.  It also argues

that the plaintiffs should be precluded from introducing any evidence that the auto park feature is

inadequate because the Motor Vehicle Safety Act preempted criticism of the efficacy of motor vehicle recalls by federal courts.

To address this issue fully, it is helpful to recount the plaintiffs' theory of liability as it has evolved throughout this litigation. A couple of benchmarks on the timeline are particularly relevant. First, the pleadings in every one of the transferred matters and again in the consolidated amended economic loss complaint conspicuously discussed the history of the so-called "S27" voluntary recall, which was initiated by the defendant in April 2016. The context of the recall, as alleged in the pleadings, was discussed in the Court's first dispositive ruling on the defendant's 12(b)(1) motion:

> The plaintiffs allege that FCA knew about the defects in the shifter since at least 2011, when the affected vehicles first went to market, but it took no steps to address the defect until it issued a voluntary recall in April 2016. In May 2016, FCA sent affected owners a letter explaining the problems and risks with the shifter design but stated only that it was working on a solution to be released near the end of 2016. The NHTSA report of the voluntary recall stated that FCA had assessed the cause and risks that led to the recall as follows:
>
>> Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged. FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety.
>
> The plaintiffs assert that in the meantime, because there was no remedy immediately available to fix the defect, they were left with the alternatives of either driving a dangerous vehicle, or not driving their cars at all. The recall notice ultimately affected more than 800,000 vehicles in the United States. FCA also later phased out the problematic shifter design starting with the 2016 model year.
>
> . . .
>
> On June 24, 2016, FCA notified owners of certain affected vehicles that they could bring their cars into an FCA dealer for a software update that would add an "auto park" feature, intended to "eliminate[] the possibility of the driver inadvertently failing to place the transmission into 'PARK' prior to exiting the vehicle." However, the plaintiffs contend that the software fix was ineffective, and there have

been numerous reports logged by NHTSA of vehicles having rollaway accidents after the fix was applied.  Some owners have had to return to their dealers for a second purported fix, which also has not fully remedied the defect.  According to published news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000 affected vehicles in the United States, and it has sent a second recall notice to affected owners directing them to return their vehicles to a dealer for further repairs.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at

*2 (E.D. Mich. Apr. 18, 2017).  It is noteworthy here that the voluntary recall was commenced in

April 2016, the first recall notice was issued in May 2016, and the follow-up recall notice advising

owners about the availability of the "auto park" fix was sent on June 24, 2016.  The date of that

follow-up recall notice is *before* the date of filing of all the economic loss cases except one

transferred matter, *Wall v. FCA US, LLC*, No. 16-13681 (C.D. Cal.), which was filed in the

transferor district on June 23, 2016.  As noted above, all of the complaints and the amended

pleadings extensively discussed the existence of the "auto park" remedy at the outset of this

litigation.  The defendant contends that the fix was deployed to more than 97% of the class vehicles

since it was made available.  There has been no evidence put into the record to date to rebut that

position.

Nevertheless, the plaintiffs have maintained since the outset of this litigation that despite

the availability of the "auto park" update, their cars still are not suitable for their ordinary purpose

of providing safe reliable transportation, and the defendant failed to disclose its full knowledge

about the design risks until information in its possession came to light finally through the public

record of these proceedings.  The plaintiffs have advanced several grounds for their claim that the

vehicles have a persistent and unremediated defect.

First, in the earliest iteration of their consolidated pleadings, "the plaintiffs suggested that

the transmission design [] could, in some cases, spontaneously shift out of a selected gear into

another, unintended gear," but they eventually "concede[d] that they have abandoned any claims

based on that [] alleged defect, and they [now] intend to proceed solely on the theory that the gear

shift is defective due to its confusing interface design." *In re FCA US LLC Monostable Elec.

Gearshift Litig.*, 334 F.R.D. 96, 101 (E.D. Mich. 2019).

Second, as noted above, the plaintiffs also alleged that "the software fix was ineffective,

and there have been numerous reports logged by NHTSA of vehicles having rollaway accidents

after the fix was applied," that "[s]ome owners have had to return to their dealers for a second

purported fix, which also has not fully remedied the defect," and that "[a]ccording to published

news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000

affected vehicles in the United States."  It is unclear at this point whether the plaintiffs intend to

elicit any proofs at trial to support those allegations that the "auto park" fix is "ineffective" or that

rollaway accidents still are possible and have occurred despite its deployment.

Third, the plaintiffs also have argued, and the Court has recognized in prior dispositive

rulings, that the existence of an "auto park" feature that deploys only under certain restrictive

conditions does not eliminate all conceivable risks of unintended vehicle movement due to mis-

shifts caused by the allegedly confusing design.  As the Court observed in its opinion denying the

defendant's first 12(b)(6) motion:

> [W]hile persistently fixating on the "auto park" feature, the defendant overlooks
> the fact that the retrofitted feature only would work if *one of the car's doors is
> opened*.  If, as the plaintiffs allege, the gear shifter does not reliably inform drivers
> about what gear the car is in . . . then the design poses a serious risk of unintended
> vehicle movement *any time a driver attempts to select a gear*, not only when a
> driver opens the door and exits the vehicle. This risk is borne out by reports
> enumerated in the FACMC, which were received by NHTSA after the recall
> remedy was issued and installed, showing that it does not eliminate the dangers
> posed by the unreliable shifter.  The defendant's contention that the defect fully
> was cured by installation of the "auto park" remedy does not square with the facts
> plainly described in the FACMC.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1001 (E.D. Mich.

2017).  Presently, this appears to be the leading live claim of defect in the plaintiffs' theory of the

case, and it presumably will form the centerpiece of their presentation at trial.  To reiterate, the plaintiffs' theory of the case, as it presently appears to be framed for trial, is that the gear shift design remains defective to this day, and despite classwide deployment of the "auto park" remedy, because it can lead to unintended vehicle movement any time that a driver tries to select a gear, but unwittingly fails due to the confusing design.

Finally, the plaintiffs initially pleaded several theories for recovery of economic damages, but they eventually abandoned them all except for the claim that they overpaid at the point of sale for cars that they believed were safe to drive, but which were not.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. at 102 ("[The plaintiffs] now assert that they will proceed solely on the theory that they suffered common economic losses due to overpaying for new vehicles at the point of sale, which they believed were safe and fit for daily transportation, but which they later found were unacceptably difficult and dangerous to drive.").

The plaintiffs fixate on the point-of-sale aspect of the case and insist that deployment of the auto park fix years after the class vehicles were introduced to the market — and even after the last class vehicle was sold — has no bearing on whether the cars as sold initially were defective and whether the plaintiffs overpaid for their defective cars.  But there can be no question that evidence that an auto park fix was introduced through the recall is relevant to *dis-prove* the claim that the gear shifter has a defect that renders the class vehicles unsuitable for the ordinary or intended use of providing safe reliable transportation.  The defendant must be allowed to make its case on that point, to avoid a hopelessly skewed presentation to the jury.

As discussed above, even the earliest of the economic loss complaints was filed merely one day before the follow-up recall notice that announced the availability of the auto park fix.  All of the other economic loss cases were filed after that notice was conveyed to the public.  Moreover,

every one of the economic loss actions was filed after the recall process was initiated in April 2016, which advised class vehicles owners of the impending fix.

The plaintiffs chose to commence this litigation nevertheless, and from the outset they conspicuously have acknowledged the promulgation of the auto park fix, and persistently have maintained that the auto park feature does not resolve all of the safety problems with the shifter. They knew the state of the design when they sued and alleged that the design nevertheless remained unsafe despite the defendant's purported fix. They cannot now, having expressly acknowledged that element of the design, seek to entirely exclude any evidence of it from the trial. Doing so would leave the jury woefully misinformed about all aspects of the design that bear directly on the question whether or not the monostable-equipped vehicles can supply reasonably safe transportation.

Essentially the plaintiffs want to argue that the design is unsafe, without allowing the defendant to introduce the most probative evidence that it has to defend against that claim. The Court repeatedly has rejected the defendant's position that the case is "all about," or "only about" the auto park feature. But the converse is not true: neither is the case "not at all about" the existence of the auto park remedy. In every dispositive ruling to date, at every juncture where the claims have been challenged, they have been upheld because the Court observed that the plaintiffs alleged and still maintain that the class vehicles are unsafe *despite the inclusion of auto park*. Certainly, this case never has been *only* about vehicles *with* auto park. Equally, however, it never has been about vehicles *without* that feature, because that feature was a component of the design since the very outset of the case, and it was expressly acknowledged in the pleadings.

Moreover, although not directly relevant to this trial, it has been held in several relevant jurisdictions that plaintiffs' entitlement to "benefit of the bargain" damages is eliminated where it

is shown that an alleged defect fully has been remedied by a recall. *E.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 225 (S.D.N.Y. 2019) ("California law [] recognizes the relevance of post-sale mitigation — such as New GM's recall repairs — to the calculation of a monetary award under any of Plaintiffs' theories. . . . For similar reasons, California courts have also followed the traditional rule that the measure of damages for tortious injury to personal property — such as an automobile — is the lesser of the diminution in value or the reasonable cost of repairs."); *id.* at 230-31 ("In short, based on the available Texas authorities, the Court is persuaded that Texas law measures benefit-of-the-bargain damages in cases like this one according to the lesser of (1) the cost of repair or (2) the difference in fair market value between the car as warranted and as sold. And, *where a defendant has successfully repaired a defective vehicle, Texas's prohibition on duplicative recoveries will not permit a plaintiff to recover anything further as far as the benefit of her bargain is concerned. Such a plaintiff has received all for which she bargained*.") (emphasis added). While the damages determination will not be put to the jury at this stage of the trial, those authorities certainly support the proposition that the proper framework for evaluating the existence of a defect includes considering any post-point-of-sale remedies that may address the alleged problems.

The plaintiffs contend that the S27 fix has been ineffective, or that unintended vehicle movement can occur under circumstances when, by design, the auto park feature would not be triggered. However, the defendant is entitled to defend on the basis that any residual risk of unintended vehicle excursions presented by the design, as it has existed since 2016, mitigates the safety concerns to a level that a reasonable driver would consider acceptably safe. Explaining fully the function of the auto park feature will be integral to that defense.

Nevertheless, read narrowly, there is yet some purchase in the plaintiffs' position that argument suggesting that the closure of the NHTSA recall investigation *per se* establishes that the cars (with the recall fix installed) are entirely safe.  As discussed above, the Court repeatedly has rejected the defendant's position that the fact of the auto park recall is a complete defense to liability in this case.  Other federal courts have rejected similar arguments where plaintiffs contend that a recall failed fully to remedy an alleged defect.  *E.g.*, *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Pracs. & Prod. Liab. Litig.*, 890 F. Supp. 2d 1210, 1222 (C.D. Cal. 2011) ("Plaintiffs have alleged that the class vehicles are inherently defective because of the ABS defect, which delays braking and dangerously increases stopping distance. And while the written warranties may limit the buyer's remedy to repairs and adjustments, Plaintiffs allege that the recall did not cure the defect in the vehicles of Plaintiff Kramer and other similarly-situated class members. These allegations, taken as true, tend to support a finding that the defective class vehicles are unsafe and thus are not fit for their ordinary purpose."); *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 681-82 (E.D. Pa. 2011) ("Plaintiff challenges the adequacy of the Recall, arguing that the proposed solution would not remedy the defect in its entirety, and would not result in an award of money damages. A court-ordered recall may require Defendant to provide a more expansive remedy than the one proposed in the Recall. Moreover, since a court proceeding may result in a remedy such as money damages, Plaintiff's claims are not moot.").  Moreover, any argument that the Court "lacks jurisdiction" to entertain the claims to be tried is foreclosed by the Court's ruling on the defendant's Rule 12(b)(1) motion, which presented the same flawed argument.

The defendant's argument that any "criticism" of the recall is "preempted" by the Motor Vehicle Safety Act echoes the same dead letter argument discussed in previous opinions.  It was resolved long ago at the outset of this case that the course of the recall did not divest this Court of

jurisdiction to entertain a product liability action, and no "safety regulation" promulgated under the MVSA preclude the Court from issuing appropriate relief in this case.  Moreover, it does not appear that the plaintiffs intend to argue that the auto park remedy was inadequate to address the narrowly defined "defect" to which it was directed.  The recall notice explicitly indicated that the defect addressed was intended to address situations where "Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured *if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged*."  This is not an injury case, and the claim is not that the auto park feature failed to mitigate the narrow category of risk to which it directly was addressed according to the recall notice.  The plaintiffs' theory as presently framed is that notwithstanding the elimination of a significant component of total risk posed by the design as first fielded, a significant spectrum of risk remains unmitigated, which a reasonable driver could find unacceptably unsafe.

The plaintiffs' motion to exclude evidence and argument that the closing of the 2015 NHTSA investigation has some preclusive effect on proof of defect, or that it constitutes some official determination that the installation of an auto park feature resolved the design defect with the gear shifter, will be granted in part, but only to the extent of disallowing any argument or testimony to the effect that the closure of the 2015 NHTSA investigation constitutes proof that the gear shift is not defective.  The plaintiffs' generalized request to exclude all other evidence about the existence and effect of the auto park fix will be denied.  The defendant be permitted to make a full presentation of what evidence it may have suggesting that the auto park fix mitigated or eliminated significant safety concerns with the gear shift design.  The defendant's motion to exclude evidence and argument that the auto park feature introduced in the S27 recall was "inadequate" or "ineffective," or that the class vehicles were defective without auto park, will be

denied without prejudice.  The plaintiffs will be permitted to offer evidence regarding the efficacy of the auto park feature in eliminating safety risks and that the class vehicles were defective before the introduction of auto park.  The plaintiffs have not alleged, and will not be allowed to offer evidence on, whether the recall fix was not effective to remedy the direct risk of rollaway accidents when a driver exits the vehicle.  However, this is not a definitive ruling.  The Court may revisit the issue and consider admitting evidence that the auto park fix did not fully mitigate the risk of driver exit rollaway accidents, if a sufficient foundation can be laid and proofs offered to show the same. The Court will entertain any appropriate contemporaneous objection.

## II.

The defendant asks the Court to exclude a 2015 letter sent by the Chief Patent Counsel for Jaguar Land Rover to the Chief Patent Counsel for the defendant in which Jaguar's counsel wrote as follows:

> [I]n 2010 Chrysler [FCA] approached Jaguar Land Rover (JLR) to request a licence to the technology in JLR's rotary transmission selector (RTS). After considerable discussion, JLR's Executive Committee decided that JLR would be willing to licence this unique technology to Chrysler, either directly or via its supplier, on appropriate terms.

The defendant argues that the letter from Jaguar's counsel is inadmissible hearsay for which no exception is available.  It also argues that the admission of pricing proposals stated in the letter (which concerned a proposed deal in 2015) would be unfairly prejudicial to the defendant, since they do not reflect what pricing Jaguar might have extended in terms for a deal five years prior.

The plaintiff responds that (1) statements by Jaguar's counsel in the letter would be non-hearsay because they would be offered only to show that the defendant was aware of the statements that were made, (2) statements in reply correspondence by defendant's counsel are party admissions and therefore also not hearsay, and (3) in any event, the letter is admissible under the residual exception because it has strong guarantees of trustworthiness, comprising statements

made by counsel for both parties to the correspondence, and it is the only evidence available to directly prove that an offer to license Jaguar's shifter was extended in 2010, since the defendant stubbornly has refused to ever produce any other documents relating to the deal.

The plaintiffs are not quite correct that statements by Jaguar's counsel would be offered only to show the defendant's "awareness" of those statements. The assertion by Jaguar's counsel was that it offered a deal to license a rotary shifter in 2010. But that assertion is made in a 2015 letter that was sent in the context of a potential claim by Jaguar that the defendant had infringed its patent in the rotary shifter by using a rotary design without license. The defendant's knowledge of that correspondence in 2015 is not relevant to its awareness of options for different gear shift designs in 2010 through 2014 when class models were designed. Instead, the statement has evidentiary value only if it is accepted for the truth of what is stated — that Jaguar did extend a licensing offer five years prior. The plaintiffs are correct, however, that any statements by the defendant's patent counsel qualify as non-hearsay party admissions under Evidence Rule 801(d)(2).

The plaintiffs have made a good case for admissibility under the seldom invoked residual exception. "The residual hearsay exception is to be used only rarely, in truly exceptional cases." *United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005). It applies to statements "not specifically covered" by another exception, but which possess "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807 Adv. Comm. Note. Rule 807 states that "[u]nder the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement is supported by sufficient guarantees of trustworthiness — after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and;

- 11 -

(2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a); *see also United States v. Wandahsega*, 924 F.3d 868, 881 (6th Cir. 2019).

First, there are substantial guarantees of trustworthiness for statements made in the correspondence, which was exchanged between the chief patent counsels for the companies involved in the negotiation. In similar circumstances, federal courts have admitted statements made in documents prepared by counsel for a party where it was clear that the statements were subject to challenge by opposing counsel for a party with a competing interest. *E.g.*, *Cosmopolitan Shipping Co. v. Cont'l Ins. Co.*, 514 F. Supp. 3d 614, 624 (S.D.N.Y. 2021) ("The cards are [] admissible under the residual exception to the hearsay rule, as are the notations on them linking plaintiffs and vessels. The notations are supported by sufficient guarantees of trustworthiness in that they were made by counsel during the course of litigation, subject to confirmation by opposing counsel (Mr. O'Donovan) whose client's interest (Cosmopolitan's interest as defendant) was to narrow the list to reduce liability, and who successfully identified errors that eliminated certain plaintiffs and their claims against Cosmopolitan. The notations appear to be not only the best evidence, but also the only readily available evidence, of which asbestos plaintiffs sailed on which Cosmopolitan chartered ships and when, and CIC has not suggested otherwise."). FCA's counsel had ample reason to contest the assertion in the context of a dispute where Jaguar alleged that the defendant had used its technology without license. But the statement was not challenged in follow-up correspondence by FCA's counsel.

Moreover, in its recent opinion denying the defendant's motion for summary judgment, the Court highlighted the defendant's internal correspondence and other documents indicating that the defendant actively considered licensing the Jaguar shifter, and even started moving forward with

its implementation in class models, before abruptly abandoning those plans, for reasons that are not apparent from the record. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at *5 (E.D. Mich. Mar. 31, 2022) ("Sometime in mid-2010, Chrysler had decided that the initial (Kostal) monostable shifter design was not viable, and it began considering alternative designs for the class vehicles.  On August 31, 2010, Mark Chernoby, then a senior executive on Chrysler's product committee, stated the following in an email to CEO Sergio Marchionne: . . . We are rapidly pursuing two options: 1. Rotary knob shifter (Jaguar XF-R) which was very easy for people to understand in clinics. 2. Linear shifter (Audi A8) with a motion very similar to today's shifter.  Part comes from ZF. . . .  By October 6, 2010, excerpts of the minutes from Chrysler's product committee meetings indicated that the defendant had decided to 'discontinue work' on the preliminary monostable design, '[d]evelop a cross product proposal for the rotational knob,' and 'finalize cost and timing implications and return to [Committee] for program approval.' . . . .  Further committee materials suggest that the principal sticking points in the negotiation were Jaguar's demand for a licensing fee for the rotary shifter and 'possible' reservations about licensing the rotary design for use in the Grand Cherokee, due to perceived competition with Land Rover branded models . . . .  Nevertheless, under the heading, 'Decisions / Next Steps,' the presentation stated: 'Implement Jaguar style rotary knob on '12 MY LX & LD.'") (cleaned up).  No information ever has been put forth to suggest that the defendant did not actually receive an offer to license the Jaguar shifter design in 2010.

Second, the information in the letter is powerfully and directly probative on the topic of whether Jaguar extended a licensing offer for its shifter in 2010, since other correspondence alluded to a potential deal without confirming that a definite offer to license the technology had been extended.  On the question whether an alternative design was available to the defendant —

which is a crucial element of the defect analysis — the letter is by far the best direct evidence that has come to light in this litigation. The plaintiffs contend that the defendant steadfastly has refused to produce any other documents directly relating to the licensing deal, so it also appears to be the sole item of direct evidence available demonstrating that Jaguar actually did extend a licensing proposal to the defendant.

The request to exclude the letter will be denied.

III.

The omnibus motions *in limine* raised several issues, most of which were addressed in the Court's previously entered order summarizing the bench rulings. *See* ECF No. 823. On the items taken under advisement, those parts of the plaintiffs' omnibus motion will be granted in part and denied in part, and the part of the defendant's motion will be denied.

Accordingly, it is **ORDERED** that the plaintiffs' motion to exclude evidence or argument that the closing of the 2015 NHTSA investigation constitutes proof that the installation of an auto park feature in certain class vehicles resolved the design defect and safety problems with the gear shifter (ECF No. 801) is **GRANTED IN PART AND DENIED IN PART**. The defendant may not present any argument or testimony to the effect that the closure of the 2015 NHTSA investigation constitutes proof that the gear shift is not defective. The motion is **DENIED** in all other respects.

It is further **ORDERED** that the defendant's motion to exclude evidence and argument that the auto park feature introduced in the S27 recall was "inadequate" or "ineffective," or that the class vehicles were defective without auto park, is **DENIED WITHOUT PREJUDICE**. The plaintiffs may offer evidence regarding the efficacy of the auto park feature in eliminating safety risks other than the direct risk of rollaway accident upon a driver's exit from the car, as described

in the S27 recall notice, and evidence and argument that the vehicles were defective before the introduction of auto park.  Evidence that the recall fix was not effective to remedy the direct risk of rollaway accidents when a driver exits the vehicle, will not be permitted.  However, this is not a definitive ruling.  The Court may revisit the issue and consider admitting evidence that the auto park fix did not fully mitigate the risk of driver exit rollaway accidents, if a sufficient foundation can be laid and proofs offered to show the same.  The Court will entertain any appropriate contemporaneous objection.

It is further **ORDERED** that the defendant's motion to exclude a 2015 letter sent by the Chief Patent Counsel for Jaguar Land Rover to the Chief Patent Counsel for the defendant (ECF No. 802) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 2, 2022