UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

SOPHIE MANNARINO, as administrator for
the Estate of MICHAEL J. MANNARINO,
a.k.a. MICHAEL J. MANNARINO, JR.,

Plaintiff,

v.

FCA US, LLC,

Defendant.

Case Number 18-10173
Honorable David M. Lawson

_____/

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION
CHALLENGING TESTIMONY OF JOSHUA WILSON, DENYING
MOTION TO EXCLUDE TESTIMONY OF VIVEK BHISE, GRANTING
MOTION TO EXCLUDE LAY OPINION TESTIMONY, AND
DENYING MOTION FOR SUMMARY JUDGMENT**

Defendant FCA US, LLC (FCA or Chrysler) has filed motions to exclude opinion

testimony by certain witnesses and a motion for summary judgment. Chrysler challenges forensic

video expert Joshua Wilson's qualifications to render an opinion on the contents of video images

from a security camera at the accident scene, and it contends that certain opinion testimony from

investigating police officers is inadmissible. Those motions have merit and will be granted in part.

Chrysler also argues that the opinions of human factors expert Vivek Bhise on specific causation

and the availability of an alternate product design are not supported properly and should be

excluded. Chrysler reasons that without that opinion, it is entitled to summary judgment.

However, Dr. Bhise's opinions are admissible under Evidence Rule 702.  The motion to exclude his testimony and the motion for summary judgment will be denied.

## I.  Background

The factual background of the case, which is familiar to the parties, concerns alleged defects in the defendant's "monostable gearshift" device that was installed in certain models of cars Chrysler manufactured in the 2012-2015 timeframe.  In this personal injury track case, the plaintiff, Sophie Mannarino, seeks damages for the alleged wrongful death of her husband, Michael Mannarino.  The circumstances of the incident that led to Mr. Mannarino's death largely are undisputed for the purposes of this motion, although the parties advance opposing theories about the precise cause of his demise.

Michael Mannarino leased a 2015 Jeep Grand Cherokee that was equipped with the monostable electronic gearshift typical of those in the various class models.  He used the vehicle in his work as a liquor salesman, which included making sales calls on 10 to 12 liquor stores daily.  He had leased and driven the Jeep for over a year before the accident.  Mr. Mannarino also used the Jeep to drive his wife to medical appointments and on other personal errands several times each week.

On February 15, 2017 at around 3:00 p.m., Mr. Mannarino pulled his Jeep into a shopping center parking lot in Brooklyn, New York, where he had a scheduled sales call.  What followed was captured by premises surveillance video.  According to the police reports from investigators of the New York City Police Department who later were called to the scene and then viewed the video, Mr. Mannarino was "seen moving around outside [the] vehicle on the driver[']s side."  Mr. Mannarino then partially reentered the Jeep, and, when he stepped out of the vehicle a second time, it began to roll backwards.  During subsequent apparent efforts to reenter and regain control of the

vehicle, Mannarino stepped on the accelerator pedal, causing the Jeep's speed to increase.  He then lost control fully, and the Jeep then knocked Mannarino to the ground and rolled over him.  The Jeep continued moving in reverse until it struck another nearby vehicle.  A witness who approached the Jeep moments later said that he saw a laptop computer and other items on the driver's seat. Police who responded shortly to the scene reported that the vehicle was found with the engine running and the transmission in reverse.  The officers were able to operate the vehicle and parked it in a nearby parking space while securing the scene.

Mr. Mannarino initially survived the accident.  However, when witnesses, paramedics, and police at the scene spoke to him, he was "incoherent" and kept asking "what happened," and he was not able to explain or answer questions about how the accident occurred.  After he was transported to the hospital, Mannarino still did not recall and seemed confused and unaware of the cause for the accident.  None of the witnesses at the scene were able to describe what Mannarino did (or did not do) before or during the rollaway.  They only recalled hearing the sound of the collision, seeing the Jeep in motion, or seeing it roll over something, but none could offer any illuminating details about Mannarino's interaction with the vehicle.

Mr. Mannarino later died from his injuries.  This lawsuit followed.

This case initially was filed in New York state court, then was removed to the Eastern District of New York, and eventually transferred to this Court and consolidated with the MDL proceeding.  It has been managed here as one of the personal injury track cases.  The parties completed a period of discovery, and the defendant filed its motions timely according to the schedule established for personal injury track cases.

II.  Motion to Exclude Joshua Wilson's Opinions

The plaintiff retained Warren Bond and Joshua Wilson to review surveillance video footage that was recovered by police from a check cashing vendor in the shopping center.  The expert report tendered by the plaintiff was authored jointly and signed by both Joshua Wilson and Warren L. Bond, Sr.  The defendant's motion only challenges the admissibility of Wilson's testimony.  It is unclear from the record whether it is anticipated that Mr. Bond also (or in the alternative) would testify at trial.

A.

Warren Bond's resume attached to the report documents extensive experience providing "forensic photography" services for various state and federal police and regulatory agencies since 1963.  His resume also indicates that Bond testified as an expert in a dozen cases in state and federal court between 2012 and 2020.

Joshua Wilson's recitation of his "education and experience" comprises only about half a page.  Joshua Wilson "Education and Experience", ECF No. 703-6, PageID.31015.  The statement indicates that Wilson completed a two-year "criminal justice degree" program at Harding University from 1997-1999.    In 2016, he received a "Bachelor of Fine Arts Photography/Forensics" degree from the Art Institute of Atlanta.  From 2003 through 2008 he was employed as a uniformed patrol officer and detective by the police departments of Fitzgerald and Savannah, Georgia.  From 2008 to 2009 he was a network systems analyst for Complete Computer Solutions.  He then enlisted in the United States Air Force Reserve and served as a munitions specialist from 2010 through 2018.  He has worked for Warren Bond Photography since 2015 as an "accident scene photographer/videographer."  The statement indicates that Wilson testified in two cases in state court in 2019 on unspecified topics.

The defendant argues that Wilson is not qualified as a "forensic video analyst" to render opinions about what the video and images show.  Chrysler also contends that the opinions are unreliable and lack a sufficient basis because Wilson failed to recognize or account for the possibility that various techniques which he used to enhance and process the video footage could have created significant artifacts in the resulting images.  Finally, Chrysler asserts that the opinions would not be helpful to the jury because the jury can look at video footage and images and determine what they show without expert aid.

At his deposition, Wilson supplied somewhat more expansive detail about his experience. Wilson testified that he is employed as a "crime scene photographer and videographer."  Joshua Wilson dep., ECF No. 314-1, PageID.32319.  Warren Bond Photography has retainer agreements with four different police agencies to analyze video footage supplied by the agencies and to provide crime scene photography and videography services.  *Id.* at 32325.  As part of those services, the agency "processes" videos and photographs and analyzes the same "in conjunction with the investigators."  *Id.* at 32326.  Wilson said that, for example, in three cases in 2017 and 2020 he was asked by police to analyze surveillance video that was of poor quality to determine if anything could be discerned from the footage that would help their investigations.  *Id.* at 32327.  He further testified that he had provided video analysis services in various cases, including in one civil litigation, an estimated 15-20 times within the prior year.  *Id.* at 32330.

Wilson testified that when forming his opinion, he reviewed "just the video . . . the five-minute raw video" that was sent to him for analysis.   Wilson dep. at PageID.32321.  To analyze the video, he used Adobe Premiere Pro, which is software that allows him to import video in various formats, enlarge it, and step through the video frame-by-frame to examine the images

captured by a camera. *Id.* at 32328. Wilson testified that he received education about how to use Premiere Pro during a one-quarter course that he took at the Art Institute of Atlanta. *Id.* at 32334. He further testified that from the combination of his police training and experience as an officer responding to accident scenes, his formal education in the use of photo and video processing tools, and his work experience documenting numerous crime and accident scenes, he had learned by training and experience how to (1) preserve and catalog crime scene photographs and video footage, including maintaining metadata for the same and documenting a chain of custody, (2) "process a crime scene" to ensure that images of significant items and details were captured, and (3) "read a crime scene" to infer from ambiguous or difficult to perceive details what might have occurred. *Id.* at 32337-341. Wilson testified that as a crime scene investigator with the Fitzgerald police department he also was responsible for taking photos and videos of crime scenes and for analyzing the same to discern their evidentiary potential. *Id.* at 32348-349. Wilson conceded, however, that none of his police academy training nor any of his other education included any formal instruction on "video analysis" for forensic purposes. *Id.* at 32349-51.

As noted above, Wilson testified that he reviewed a five-minute "raw" video for analysis in this case, which was received by Warren Bond via plaintiff's law firm. However, Wilson admitted that he did not know whether the footage he received digitally was "untouched" or, as photographers' jargon would describe it, "straight out of camera." Wilson dep. at PageID.32392. He described the resolution as "720," which he said is "at the low end" for digital video resolution. *Id.* at 32393. The video was recorded at a frame rate of 24 frames per second. *Id.* at 32397. Wilson said that to facilitate his examination of the video he zoomed or enlarged the most relevant portion to 300 percent of the original size and also cut out portions in which nothing interesting was seen, leaving around 1 minute and 15 seconds of footage to analyze. *Id.* at 32398-99; *see also* Expert

Report, ECF No. 703-6, PageID.31010.  Wilson's report indicates that a total of 1,799 frames were analyzed, and that the video was reviewed frame-by-frame to determine frames of interest and examine what was depicted in each.  The report itemized a series of frames over a period of around 50 seconds in which the vehicle reportedly is seen coming to a stop, the brake lights go off, the driver side door opens, the driver exits the vehicle, then reenters the vehicle with the door still open, the brake lights come on a second time, then go off for a second time, and then the driver door is seen "swinging wide open," as the vehicle starts to roll in reverse, coming to rest after about three seconds of movement.  Report at PageID.31010.  The report was accompanied by still images extracted from the video, which undisputedly are of extremely poor quality and resolution, due to deficiencies in the source recording.  *Id.* at PageID.31017-037.

B.

Chrysler says that Wilson is not qualified to comment on the video evidence because he admits that he never received any formal instruction in that field.  However, "Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  Fed. R. Evid. 702, advisory committee's note, 2000 amend.  In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702, advisory committee's note, 2000 amend.; *see, e.g.*, *Wood v. Wal-Mart Stores E., LP*, 576 F. App'x. 470, 472 (6th Cir. 2014) (holding that there was "ample reason" to conclude that a non-scientific expert's testimony was reliable and would assist the jury where witness had professional experience dealing with building codes as a commercial architect); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (holding that district court properly admitted testimony from expert regarding experience designing driver's enclosures for transit buses).

Chrysler, however, points out that Wilson's experience is limited to work as a "videographer" and "photographer," not a forensic analyst. That circumstance is not fatal to his testimony here, though. Wilson's resume admittedly is thinner than that of the typical expert seen in federal court, particularly with respect to the record of his testimony as an expert in previous cases, of which he identified only two. However, his testimony establishes that he has a sufficient combination of training and experience to supply some valid testimony in this case. Moreover, that testimony could be helpful to aid the jury in the interpretation of the extremely poor quality video footage captured from the accident scene.

Wilson testified that his background includes: (1) instruction at the police academy in basic principles of crime scene photography and videography, (2) five years of experience as a patrol officer and detective with two police departments, including experience as a crime scene photographer and videographer and related experience analyzing crime scene photographs and videos, (3) formal training during his undergraduate education in the use of the video processing software that was employed in the analysis for this case, and (4) five years of experience as a videographer and photographer documenting and analyzing images from numerous crime and accident scenes during his tenure with Warren Bond Photography from 2015 to the present. Wilson testified that he was employed to analyze crime and accident scene videos by various police and government agencies many times, including 15 to 20 times within the year prior to his engagement in this case. Other federal courts easily have found experts qualified based on similar work experience in forensic video analysis, absent formal instruction in the field. *E.g.*, *Raimey v. City of Niles*, 2022 WL 657489, at *7 (N.D. Ohio Mar. 4, 2022) ("Jason Fries holds a degree in biology from San Diego State University with a focus in chemistry and physics. He has twenty-two years of experience in the 'fields of forensic animation, forensic laser scanning, forensic video

analysis, laser-based photogrammetry, and scientific method[,]' and has been qualified as an expert in these fields, as well as in line of site analysis and human factors involved in Officer-Involved Shooting ('OIS') incidents.").

But those qualification take Wilson only so far.  An expert witness's testimony also must be relevant and reliable.  *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 589 (1993)).  Wilson intends to explain to the jury not only how the video exhibits were assembled, but also how the jury should view them and what they show.  The 2000 Amendments to Rule 702 did "not alter the venerable practice of using expert testimony to educate the factfinder on general principles."  Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.  Rule 702 allows an expert to "testify in the form of an opinion *or otherwise*" (emphasis added), which means that the expert may share his or her special knowledge with the factfinder in areas that might extend beyond the information known to the average person.  *See, e.g.*, *Redmond v. United States*, 194 F. Supp. 3d 606, 615 (E.D. Mich. 2016) (stating that an expert's testimony could be helpful to the jury if the information is "beyond the ken of common knowledge") (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994)).  However, when an expert's testimony does not take the form of an opinion, but rather focuses on "educat[ing] the factfinder on general principles," application of the foundational elements in Rule 702 takes on a different cast.

Wilson is qualified to explain how the videos were assembled and how the still photos were extracted from the raw footage.  Chrysler's criticisms of the particular techniques involved in the processing of the video bear more appropriately on the weight of the evidence, taking into account artifacts that may have been introduced through that process, rather than the admissibility of Wilson's testimony.  Moreover, the defendant's presentation, which highlights the types of

artifacts and defects that may be introduced by the video processing workflow, demonstrates that those concerns fully may be illuminated for the jury by opposing testimony and cross-examination. *United States v. Culver*, No. 07-009, 2007 WL 9697594, at *6–7 (N.D. Ala. May 14, 2007), *report and recommendation adopted as modified*, No. 07-CR-009, 2007 WL 9697656 (N.D. Ala. June 1, 2007), *aff'd*, 598 F.3d 740 (11th Cir. 2010).

But where a videographic expert lacks experience and training that is significantly relevant and helpful to interpreting the *content* of a video, courts have limited the testimony to merely explaining the process used to extract and enhance images, while disallowing any opinion testimony about what the images depict, especially where jurors are equally able to view the images and assess what is depicted. *E.g.*, *Slack v. City of San Antonio, Texas*, No. 18-01117, 2021 WL 1390428, at *4 (W.D. Tex. Apr. 13, 2021) ("A number of courts have addressed expert testimony on video recordings and have concluded that the expert should not be permitted to interpret the video's contents where the expert is no better suited than a lay person to do so. . . . Jurors can interpret the video and audio evidence for themselves.") (citing cases); *A.B. v. County of San Diego*, No. 18-1541, 2020 WL 4430971, at *2 (S.D. Cal. July 31, 2020) (limiting the witness's testimony to "his video editing and synchronization process" after finding that "it is not within [the witness's] expertise and qualifications to narrate for the jury and comment on which events in the video evidence are significant").

In this case, Wilson testified amply about his experience and training collecting and analyzing photographs and videos from numerous crime and accident scenes. However, the gravamen of his "opinions" about the images, beyond explaining the process that was used to produce them from the "raw" video footage, encompasses nothing more than looking at the images and expressing a view about what is shown (vehicle stopped or moving, door open or closed, brake

lights on or off, etc.).  Wilson's testimony offers no clue about how any particular experience that he has as a crime scene investigator was necessary to reach any of his interpretational views about what the video depicts.  *C.f.*, *Achelles v. Vannoy*, No. 20-715, 2021 WL 5889380, at *29 (E.D. La. Sept. 8, 2021), *report and recommendation adopted*, 2021 WL 5882118 (E.D. La. Dec. 13, 2021) (finding the *Daubert* criteria satisfied and allowing expert witness to testify about the make and model of a vehicle shown in a video where "he pointed out specific features of the vehicle depicted which indicated to him that it was a Dodge Avenger").  Here it is apparent from viewing the images that the jury does not need expert assistance to view the (admittedly poor quality) images and determine for themselves on the basis of everyday experience what the images show.  The parties, of course, may argue their preferred interpretations of the images based on other circumstantial evidence, and reasonable inferences therefrom.

Wilson may testify about how the videos were processed and the still images were extracted from it, but he may not offer any opinion testimony concerning what the video depicts in terms of circumstances of the accident or their significance.

### III.  Motion to Exclude Testimony by Vivek Bhise

Dr. Vivek Bhise, a retired professor of industrial and manufacturing systems engineering, will be offered by the plaintiff as her human factors expert witness.  Dr. Bhise has a wealth of experience and training in industry and academia in the areas of vehicle ergonomics, automotive systems engineering, work methods and industrial ergonomics, human factors engineering, risk analysis and optimization, product design and evaluations, safety engineering, and statistics and probability theory.  He also has published books and technical papers on these subjects.

A.

The defendant does not challenge Dr. Bhise's qualifications as a human factors expert in the area of automotive design.  Instead, it argues that his opinions on "specific causation" and the existence of a commercially available alternative design must be excluded.

Dr. Bhise produced a 44-page expert report that included an extensive discussion of human factors design principles, methods for designing safe driver controls for cars, and the specific problems with the gearshift design in the class vehicles.  The defendant does not challenge the admissibility of his testimony on generalized principles of human factors and ergonomics or his application of those principles where he concluded that the monostable gearshift design violates those principles in several aspects of its design.  Moreover, the Court earlier denied the defendant's motion for summary judgment in the economic loss cases, which was premised in part on its position that there was insufficient evidence of a defect in the gearshift design.  In that ruling, the Court found that the plaintiff's expert Craig Rosenberg had produced ample opinion evidence that could support a jury finding that the gearshift design is unreasonably dangerous due to its confusing interface and clumsy operation.  Dr. Bhise relied on Dr. Rosenberg's expert report in reaching his conclusion that a gearshift defect could have caused the rollaway incident in this case. The defendant has advanced no grounds to question the propriety of that conclusion or to revisit it.  It also has not advanced any challenge to the balance of the report aside from the opinions that (1) the gearshift defect did, in fact, cause Mr. Mannarino's accident, and (2) there was a commercially available alternative design that could have prevented his death.

In his report, Dr. Bhise phrased his opinion about the specific cause of the accident in this case as follows:

> Mr. Mannarino's accident was a result of the dangerously defective design of the shifter control and the foreseeable error of placing the gear shift lever into

> REVERSE gear instead of PARK with [the] engine running.  Safety measures, such as providing warning messages in the owner's manual, providing dual shift position indicator displays, providing messages in the driver information display (DID), presenting chimes to alert the driver when the keyless entry feature would not allow the driver to turn off the engine, were not sufficient to prevent the accident.

Expert Report dated June 30, 2020, ECF No. 704-3, PageID.31156.  Dr. Bhise also opined that the accident was a result of the defendant's concurrent failure to incorporate an "auto park" feature into the shifter design before launch of the class models into the market, along with its failure or refusal to implement any of the various alternative designs that were less confusing and error prone.  *Id.* at PageID.31157.  Finally, Dr. Bhise opined that "[a]t all relevant times, there were other automatic transmission shifter control designs that were used in many other existing vehicles and were far safer and did not cause shifter control errors at as high a frequency as the monostable shifter control," including the "gated shifter and electronic rotary shifter controls such as the one investigated by Craig Rosenberg."  *Ibid.*

In support of his opinion about the specific cause of the accident in this case, Dr. Bhise discussed his review of the forensic video analysis produced by Warren Bond (an expert whose opinion has not been challenged by the defendant).  Bond's report on the surveillance video footage of the accident noted several significant occurrences during the time when Mr. Mannarino is seen near or in his car.  Dr. Bhise observed that when Mannarino arrived and initially parked the Jeep, the brake lights were illuminated for approximately 12 seconds after the vehicle stopped, and approximately 10 seconds after the brake lights went off the first time, the driver door opened and Mannarino exited the car.  However, five seconds after exiting the car, Mannarino reentered the vehicle, and approximately seven seconds later the brake lights illuminated a second time.

Dr. Bhise further calculated, based on the video timeline, that the brake lights of the vehicle were visibly on for 7.38 seconds during Mannarino's second entry into the vehicle, and he opined that this time during which the brakes were applied was precipitated by Mannarino's unsuccessful

efforts to place the vehicle in park. Expert Report at PageID.31167. Dr. Bhise noted that the defendant's experts Young and Cades found during their own driving study that a successful shift from reverse into park took, on average, less than two seconds. Dr. Bhise inferred, therefore, that the lengthy time of brake application was caused by Mannarino struggling, but failing, to shift the Jeep from reverse into park. Dr. Bhise also determined that the time between when the brake lights went off the second time and when the driver door "swings wide open" was around two seconds, and around three seconds after that the vehicle is seen rolling rearward. Dr. Bhise noted that the first time Mannarino exited the Jeep, it took around seven seconds for his exit from the vehicle. However, his second "exit" (proximate to which he was thrown to the ground and run over), took only approximately two seconds, which was not enough for a safe and controlled exit from the driver position of the car. *Ibid.* Finally, Dr. Bhise noted that the first responding officer on the scene found the car with the engine running and the gearshift in reverse, with its further motion halted only by the vehicle with which it had collided.

Dr. Bhise then proposed several scenarios of what occurred immediately after the Jeep was parked but before Mannarino's first exit from the vehicle, which could be consistent with the timeline of the video: (1) Mannarino inadvertently shifted from drive to reverse, (2) he inadvertently shifted from drive to neutral, (3) he inadvertently left the car in drive, or (4) he successfully shifted into park. Expert Report at PageID.31168-169. However, Dr. Bhise concluded that the first and last scenarios were not possible because if the car was in reverse then it would have rolled away immediately when Mannarino first exited the vehicle, and if it was in park then the rollaway could not have occurred. Dr. Bhise noted that if the car was in drive, then its forward motion would have been impeded by the parking bollard at the head end of the parking space, so the car could not have rolled away forward, and if it was in neutral then it could have

stayed in place because no drive power was applied. Dr. Bhise ultimately concluded that Mannarino's use of the brake during his reentry into the vehicle, along with the fact that the car did not move immediately after the first exit, showed that during the reentry he was struggling to put the car in park, and that observation, combined with the resting state of the car (engine running, transmission in reverse), meant that during the reentry interval Mannarino must have inadvertently shifted either from drive or neutral into reverse. *Id.* at 31171. Dr. Bhise indicated in his report that it was not possible to determine with certainty which of those two problematic scenarios had led to the rollaway, but he was able to determine with certainty that in either of the possible scenarios which he examined, the mis-shift into reverse was caused by a shifting error induced by the confusing interface and ambiguous indications of the gearshift design. *Ibid.*

B.

Chrysler takes issue with both these conclusions, arguing that they are not supported properly by evidence in the record. As mentioned earlier, a qualified expert witness's opinions must be relevant and reliable. *LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). An expert's opinion is not relevant unless it is based on the actual facts of the case. *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 (6th Cir. 2014) (Keith, J. dissenting) ("The 'relevancy' prong of Rule 702 requires that an expert's theory adequately 'fit' the facts of the case. Expert testimony that does not fit the facts does not relate to an issue in the case and, therefore, is not relevant.") (citing *Daubert*, 509 U.S. at 591). An opinion is "reliable" from an evidentiary standpoint if it is "valid" according to the discipline upon which it is based. *See Daubert*, 509 U.S. at 590. In determining validity, the Court's focus is on principles and methodology, not results.

- 15 -

1.  Causation

Chrysler argues that Bhise's opinion on "specific causation" must be excluded because he (1) failed to inspect the plaintiff's vehicle, (2) merely regurgitated his "general causation" analysis in the guise of a "specific causation" determination, essentially opining that because a shifter defect could have caused the accident it did cause the accident, (3) admitted that he has no "scientific certainty" about specific causation, (4) did not consider Mr. Mannarino's "familiarity with the shifter," and (4) failed to rule out alternative causes.  These arguments must be considered in the context of New York law, since the case was filed initially in that state's courts and then removed to federal court on the basis of diversity jurisdiction.  *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715 (6th Cir. 2018) (recognizing that in a federal case based on diversity jurisdiction, federal courts must "apply the same law that [the] state courts would apply") (citing *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

"Under New York law, claims for negligent design and design-based strict products liability should be analyzed under the same standard in products liability cases."  *MacSwann v. Merck & Co., Inc.*, No. 20-1661, 2022 WL 1415031, at *4 (W.D.N.Y. May 4, 2022) (citing *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 662 N.E.2d 730, 735-36 (N.Y. Ct. App. 1995)) (quotations omitted).  "To state a claim for negligent or strict products liability defective design under New York law, a plaintiff must allege that: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury."  *Ibid.* (citing *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106, 450 N.E.2d 204, 207 (N.Y. Ct. App. 1983)).  Under New York law, "plaintiffs usually need expert support for both general and specific causation in a products liability case."

*Baccaro v. Coloplast Corp.*, No. 19-1088, 2021 WL 3089202, at *11 (N.D.N.Y. July 22, 2021) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002)).  "General causation determines whether a product is capable of causing an injury to a member of the public who encounters it, while specific causation determines whether the product in fact caused the plaintiff's claimed damages." *Ibid.*

As an initial matter, the plaintiff argues that the bifurcated examination of "general" and "specific" causation is a rule of decision that has been applied only in "toxic tort" cases, where a plaintiff's disease could have been caused by numerous other complications or exposures to hazardous substances and conditions.  Some courts have questioned whether the two-pronged approach applies to product liability cases other than those involving toxic exposure or medical conditions with multifarious causation factors.  *See Potter v. United States*, No. 17-4141, 2020 WL 2836440, at *4 n.2 (S.D.N.Y. May 30, 2020) ("The Court ultimately finds it unnecessary to decide whether Plaintiff must prove general and specific causation separately because these inquiries merge in practice in this case.  And, regardless of whether the Court were to require Plaintiff to separately establish general and specific causation, it would reach the same conclusion with respect to the reliability of his experts' testimony on causation.").  However, as the *Potter* case noted, the distinction between analytical frameworks is irrelevant where the Court would reach the same conclusion about the reliability of an expert's testimony regardless of which substantive rule of liability applies.

In its reply brief, Chrysler retreats to the position that the plaintiff in every negligence case must prove "causation," regardless of how that concept is framed.  The dispute is immaterial because Dr. Bhise's opinion on causation is sufficiently supported to be admissible regardless of which framework applies.  For the sake of argument though, the Court will assume that Dr. Bhise

must supply some valid opinion testimony showing both that a gearshift defect "could have caused" the rollaway accident, and that in this instance it "did cause" the accident which resulted in the decedent's fatal injuries.

Chrysler insists that Dr. Bhise proceeded impermissibly from his general conclusion that the gearshift design "could have caused" the injury accident to a specific conclusion that the gearshift design "did cause" the accident in this case.  However, that position is belied by a thorough reading of his report.  *First*, Dr. Bhise observed that the vehicle was found by the first responder on the scene, Officer White, with the engine running and the transmission in reverse. That circumstance is uncontradicted by any other evidence in the record.  From that evidence, it is a reasonable deduction that the car rolled away under its own power, causing it to knock down the decedent and roll over him, resulting in his fatal injuries.  *Second*, Dr. Bhise noted that in the driving study conducted by the defendant's own experts Young and Cades, the time required for a successful (correct and intentional) shift from reverse into park was only around two seconds, but when Mannarino reentered the car, the video showed that he applied the brakes for almost eight seconds.  From that, and the known fact that the interlock mechanism of the transmission required the brake to be applied in order to shift into park, it is a reasonable inference that during the period when the brake was applied Mannarino was attempting to shift into park.  Based on the resting state of the vehicle, it is a reasonable conclusion that he was unsuccessful in doing so, and that despite his efforts the car was in reverse instead of park when Mannarino exited the vehicle the second time.  Finally, Dr. Bhise ruled out the possibilities that the car could have been shifted into park or reverse upon initial arrival at the parking spot, based on his observations that neither scenario could have produced the sequence and direction of vehicle movement captured in the video.

Chrysler's objection that Dr. Bhise's analysis failed to account for Mannarino's "familiarity with the shifter" is groundless in light of the fact that Dr. Bhise explicitly called out in his report Craig Rosenberg's findings that "[t]he number of errors for each task *were also compared between the participants with and without previous Monostable experience*," and "[f]or all three [driving] tasks, *there was no difference in the number of errors that occurred between these two experience level groups*."  Expert Report at PageID.31161 (emphasis added); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at *16 (E.D. Mich. Mar. 31, 2022) ("[E]ven if a reasonable consumer could be expected to anticipate some need for familiarity, *there is ample contradictory evidence in the record suggesting that the ability of drivers to select an intended gear consistently and reliably with the design did not improve with familiarity or practice*.") (emphasis added).

Chrysler also faults Dr. Bhise for not "ruling out" alternative causes such as "driver distraction" that could have caused the accident, but it concedes that Dr. Bhise's conclusion that a mis-shift error was the cause is based on perceptible evidence in the record — namely the display of illuminated brake lights for a conspicuously lengthy span during Mannarino's reentry into the vehicle.  Chrysler has pointed to some evidence that, in its view, suggests that Mannarino failed to shift into park because he was "confirming the address" of his sales call, or "working on his laptop," which was found in the front seat of the car.  However, it has pointed to no specific indications in the circumstantial evidence that make those suppositions irrefutable.  Moreover, the fact that an expert has not conclusively ruled out all other possible causal explanations for a mishap does not render his adequately supported testimony about causation inadmissible.  *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 847 (7th Cir. 2017) ("[T]he mere fact that Smith could not testify about certain facts relating to the accident with absolute certainty does not render his

opinions unreliable or irrelevant. Indeed, it is often the case that experts reach conflicting conclusions based on applying different but nevertheless reliable methodologies to a set of partially known facts. The determination of which opinion (if any) identifies the most probable cause of an injury is typically a question of weight, not reliability.") (citations omitted). The defendant's arguments may be persuasive to a jury weighing the competing opinions to discern the cause of the accident, but they do not justify exclusion of the plaintiff's expert's causation opinion from the trial.

Finally, as the plaintiff correctly points out, it is well recognized by New York courts that "[a] plaintiff with no recollection of an accident can establish negligence wholly through circumstantial evidence and is not required to rule out all plausible variables and factors that could have caused or contributed to the accident, but need only prove that it was more likely or more reasonable that the alleged injury was caused by the defendant's negligence than by some other cause." *Timmins v. Benjamin*, 77 A.D.3d 1254, 1256, 910 N.Y.S.2d 584, 584 (N.Y. Sup. Ct. App. Div. 2010) (citing *Gayle v. City of New York*, 92 N.Y.2d 936, 937, 703 N.E.2d 758, 758 (N.Y. Ct. App. 1998) ("Plaintiffs need not positively exclude every other possible cause of the accident. Rather, the proof must render those other causes sufficiently 'remote' or 'technical' to enable the jury to reach its verdict based not upon speculation, but upon the logical inferences to be drawn from the evidence."); *Schneider v. Kings Highway Hosp. Ctr., Inc.*, 67 N.Y.2d 743, 744, 490 N.E.2d 1221, 1221 (N.Y. Ct. App. 1986) ("To establish a *prima facie* case of negligence based wholly on circumstantial evidence, it is enough that plaintiff shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be reasonably inferred. The law does not require that plaintiff's proof positively exclude every other possible cause of the accident but defendant's negligence.") (cleaned up)).

- 20 -

2. Alternative Design

Chrysler's argument that Dr. Bhise failed to propose a viable and commercially available alternative design is a non-starter. Dr. Bhise cited the expert report of the economic loss plaintiffs' expert Craig Rosenberg, and he specifically called out the "rotary polystable" design developed by Jaguar as one that was not only available but was actually considered and (at least in some models) implemented by the defendant during the development of the class model vehicles. As the Court held in an earlier opinion on the defendant's motion for summary judgment on the economic loss cases, although "[s]ome evidence that the defendant prefers to highlight may offer grounds for factual disputes about whether and to what extent Jaguar was willing to license its design for use in the class vehicles[,] a fair reading of the entire record, taken in the light most favorable to the plaintiffs, reasonably would support a jury finding that a Jaguar-type rotary shifter was an available and practical alternative design." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at *14 (E.D. Mich. Mar. 31, 2022).

\* \* \* \* \*

The defendant has not offered a valid basis to exclude Dr. Bhise's opinions on causation and alternative designs.

IV.  Motion to Exclude Lay Opinion Testimony

Chrysler moves to exclude opinion testimony by the investigating officers about how they believed the accident occurred on the ground that it is undisputed that neither was identified as an expert witness, and no expert reports were produced by either of them. The plaintiff does not suggest that either of the officers are expert witnesses, but she contends that their reports may be admitted under Federal Rule of Evidence 803(8), which recognizes a so-called "public records" exception to the hearsay rule, and they may offer testimony in the form of "lay opinions" under Federal Rule of Evidence 701. The defendant has the better argument here.

- 21 -

*First*, so called "lay opinion testimony" is not admissible unless it is "(1) 'rationally based on the witness's perception,' (2) 'helpful to clearly understanding the witness's testimony or to determining a fact in issue,' and (3) is 'not based on scientific, technical, or other specialized knowledge.'" *United States v. Rahim*, 771 F. App'x 605, 612 (6th Cir. 2019) (quoting Fed. R. Evid. 701). The police officers' conclusions about the cause of the accident do not satisfy these requirements because they are not "rationally based on the witnesses' perceptions" of the accident.

It is undisputed that neither officer witnessed the accident first-hand, and neither has pointed to any "perceptions" of the scene that offered them any clue about what happened inside the plaintiff's vehicle, which led to it being shifted into reverse instead of park, allowing it to roll away out of his control. The conclusion by Detective Horn that the accident was caused by a "gearshift defect" purportedly was based on his analysis of wide-ranging circumstantial information gathered after the occurrence, in the course of an investigation. It is undisputed that the investigation was not even commenced until the day after the accident occurred. Therefore, none of the grounds for that conclusion could have been rooted rationally in Detective Horn's own perception.

As the Sixth Circuit has noted, the 2000 amendments to Rule 701 were intended to foreclose exactly this sort of attempted end run around Rule 702 and the pretrial disclosure requirements of Civil Procedure Rule 26(a)(2)(B). "In 2000, the drafters amended Rule 701 to foreclose lay witness testimony 'based on scientific, technical, or other specialized knowledge' — testimony more properly given by a qualified expert. In amending the Rule, the drafters intended to preclude a party from surreptitiously circumventing 'the reliability requirements set forth in Rule 702 . . . through the simple expedient of proffering an expert in lay witness clothing' and to 'ensure[ ] that a party will not evade the expert witness disclosure requirements set forth in [the

rules of federal procedure] by simply calling an expert witness in the guise of a layperson.'" *United States v. White*, 492 F.3d 380, 400-01 (6th Cir. 2007) (quoting Fed. R. Evid. 701 adv. comm. note). Under the federal evidence rules, statements by investigating officers as to accident causation generally are not admitted unless they are based on some fact perceived by the witness, or the witness is qualified as an expert to reconstruct the accident.   Neither of these conditions are met here, "because [t]he investigating officer's opinion on this matter [is] no more than speculation based on the same facts that the jury [will have] before it." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 890 (10th Cir. 2006); *see also Duhon v. Marceaux*, 33 F. App'x 703, 2002 WL 432383, at *4 (5th Cir. 2002) ("It is undisputed that Officer Gaudet was not qualified to testify as an expert in accident reconstruction and that he did not witness the accident. As a general rule, police officers' lay opinions as to the cause of an automobile accident formed by viewing subsequent evidence at the scene are excluded under Rule 701.") (quotations omitted).

*Second*, the plaintiff's invocation of Federal Rule of Evidence 803(8) does nothing to salvage the police officers' live opinion testimony.  That rule describes one of the exceptions to the hearsay rule, and presumably the plaintiff would cite it when offering the police report into evidence.  And that rule will defeat a hearsay objection if the report can be seen as "[a] record or statement of a public office [that]: (A) . . . sets out . . . (iii) in a civil case . . .  factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.'" *Jones v. Sandusky County*, 652 F. App'x 348, 356 (6th Cir. 2016) (quoting Fed. R. Evid. 803(8)(A)(iii) and (B)).  If the report satisfies Rule 803(8), then "even those portions of the report consisting of conclusions or opinions formed as a result of a factual investigation are admissible under [that rule]." *Ibid.* (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988); *Alexander v. CareSource*, 576 F.3d 551, 563

(6th Cir. 2009)).  However, the report must be "based on a factual investigation and satisf[y] the Rule's trustworthiness requirement."  *Beech Aircraft*, 488 U.S. at 170.  "In this Circuit, '[t]o determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems.'"  *Alexander v. CareSource*, 576 F.3d 551, 563 (6th Cir. 2009) (quoting *Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009)).

Here, the police officers' conclusions that the accident was caused by a gearshift defect are not admissible under the public records exception because the circumstances demonstrate that those conclusions are lacking in any discernible substantial basis developed from their investigations.  Officer White admitted that (1) he never was trained in accident reconstruction, Sheldon White dep., ECF No. 716-3, PageID.33285; (2) he was not able to obtain any useful information at the scene, from either bystanders or the decedent, about how the accident occurred, *id.* at 33287-88; (3) he never examined the interior of the vehicle, *id.* at 33290; (4) he did not take any photos at the accident scene, *id.* at 33291; and (5) he never obtained any information about the manufacturer recall of the vehicle based on the supposed safety defect, *id.* at 33300.  Moreover, Officer White admitted that the "amended" conclusion attributing the accident to a recall defect was inserted into the report by his supervisor, and there has been no suggestion that the supervisor either witnessed the accident or performed any independent investigation into the cause.  *Id.* at 33300-301.

Similarly, Detective Horn admitted that (1) by the time he arrived at the accident scene on the following day, the Jeep had been removed from the scene, and he was not able to take any photos of the vehicle as it was found after the accident, Steven Horn dep., ECF No. 716-1,

- 24 -

PageID.31014; (2) the diagram that he created of the accident scene, including the location and orientation of the vehicles involved, later was found to be incorrect and based on mistaken information that was supplied to him by others, *id.* at 33054-55; (3) he could not recall whether he ever inspected the interior of the vehicle or the gearshift mechanism, *id.* at 33065-66; and, (4) when the vehicle was impounded, the department's Collision Technician Group was unable to access or inspect anything in the interior of the Jeep because the doors were locked and the keys were not available, *id.* at 33113-114.  Finally, Horn further admitted that the only information he obtained about the alleged defect and recall was from his review of a website maintained by the defendant, and he never conducted any other or separate investigation of any accidents involving the class vehicle or the defect alleged in this case.  *Id.* at 33136-137.  Notably, although the information was not included in his investigation report, Horn volunteered at his deposition that he owned the same Jeep model as Mannarino, and that he "inadvertently placed [his] car in a different [gear] selection constantly," although he also stated that he never had experienced a rollaway incident.  *Id.* at 33138.

The numerous deficiencies in the officers' investigations noted above compel a finding that none of the pertinent factors favor a finding of trustworthiness for either "finding" about causation. *First*, the "timeliness" of the investigation does not favor the witnesses, since both arrived at the scene only later, after it had been disturbed, and Detective Horn's investigation was not begun until the following day.  *Second*, both investigators admitted that they had no skill or training in accident reconstruction or defect analysis, or the application of principles of either to mishaps of the type in this case.  It also is undisputed that neither investigator has any experience or training concerning the application of human factors principles to problems with vehicle driver controls. *Third*, no hearing was held in the course of either investigation.  *Fourth*, there are readily apparent

motivational issues since no explanation has been tendered for why Officer White's supervisor decided to "amend" his report to include findings on causation, which White himself had not reached, and there is at least some modest ground for skepticism about Detective Horn's motivation during the investigation based on his admission that he owned the same vehicle as the decedent and "constantly" had problems with mis-shift errors while driving the car.

The marked deficiencies in the factual basis for the supposed determinations of causation suggest grounds to find the officer's opinions untrustworthy. Because there was no substantial basis in any facts gathered through the investigations to support the witnesses' speculations about the cause of the accident, and because they were not privy to any first-hand observations of the incident that reliably could inform any such conclusions, the officers' reported "findings" on that topic must be excluded.

## V. Motion for Summary Judgment

The sole premise of this motion is that because the plaintiff has no admissible expert evidence to offer on the topics of causation and the availability of a commercially reasonable alternative design, she cannot prevail on her claims for product liability and negligent design. The defendant's arguments on that point are without merit for the reasons discussed above. And the defendant has not challenged any other substantive elements of the claims.

## VI. Conclusion

Witness Joshua Wilson's limited qualifications as a forensic video expert in turn limit his ability to render an opinion on what the security video depicts. Dr. Vivek Bhise has identified a sufficient basis in the record to allow him to opine on causation and the existence of a commercially available alternative design. There is no basis to allow the opinions of the investigating police officers about how the accident occurred. And there are fact issues presented

by the record that preclude summary judgment on liability.  Those questions must be answered at trial.

Accordingly, it is **ORDERED** that the defendant's motion to exclude the testimony of Joshua Wilson (ECF No. 703) is **GRANTED IN PART**.  Wilson may testify about how the videos were processed and how the still images were extracted from it, but he may not offer any opinion testimony concerning what the video depicts in terms of circumstances of the accident or their significance.

It is further **ORDERED** that the defendant's motion to exclude the testimony of Dr. Vivek Bhise (ECF No. 704) is **DENIED**.

It is further **ORDERED** that the defendant's motion to exclude the opinion testimony of the two investigating police officers as to how the accident occurred (ECF No. 705) is **GRANTED**.

It is further **ORDERED** that the defendant's motion for summary judgment (ECF No. 702) is **DENIED**.  The case is ready for trial.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 13, 2022