UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: FCA US LLC MONOSTABLE
ELECTRONIC GEARSHIFT LITIGATION

          MDL No. 2744

Case Number 16-md-02744
Honorable David M. Lawson
Magistrate Judge David R. Grand

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR ENTRY OF JUDGMENT AND DENING MOTION TO CERTIFY CLASS

This multidistrict litigation action presently consists of seven lawsuits that were filed in this district and four that were filed in other districts alleging defects in the shifters of certain motor vehicles manufactured by defendant FCA US LLC (commonly referred to as Fiat Chrysler Automobiles, FCA, or Chrysler). The Judicial Panel on Multidistrict Litigation (JPML) ordered these actions to be centralized in the Eastern District of Michigan under 28 U.S.C. § 1407 and assigned the actions to the undersigned. As part of the process of winnowing issues and parties through extensive motion practice, the plaintiffs filed a Second Amended Consolidated Master Complaint (SACMC). The Court identified common issues among all the various claims by the 39 named plaintiffs in 23 states identified in the SACMC and certified them for trial under Civil Rule 23(c)(4), to begin on September 6, 2022. Before trial, defendant Chrysler objected to including the four transferred cases as part of the issues trial, citing venue objections under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), and the Court sustained the objection, excluding those cases, which alleged claims under the laws of four jurisdictions, from the trial. The jury returned verdicts finding that there were "no defects" in any of the subject vehicles under the laws of 18 of the remaining jurisdictions submitted for their consideration. The jury found that a design defect existed under Utah law.

Defendant Chrysler now moves for entry of judgment on all the claims raised in the SACMC, reasoning that the definitions of "defect" in the four jurisdictions excluded from the trial replicate those under the laws of the jurisdictions that the jury considered.  And Chrysler says that even with a defect finding under Utah law, a corresponding jury finding of no concealment precludes the plaintiffs' claims under that state's laws.  The plaintiffs, on the other hand, contend that the jury's verdict is limited in scope, and despite the findings of "no defect," the cases can proceed because the question whether the shifters had "usability flaws" was never decided.  The plaintiffs filed a separate motion to certify a new multi-state class premised on the idea that the class vehicles were equipped with monostable shifters that had those "usability flaws" that were concealed from consumers.  They also say that certain claims by the Utah plaintiffs survive because concealment is not an essential element of those claims.

The Court heard oral argument on the motion on June 28, 2023.  Based on the pleadings and the plaintiffs' arguments throughout the case, the concept of "usability flaws" was never presented as an independent basis for the claims apart from the contention that the shifters had a "safety defect."  The jury's rejection of the plaintiffs' defect theory, therefore, dooms their claims under the laws of all states except Utah.  It also precludes certification of a new class as proposed by the plaintiffs.  The Utah claim for breach of implied warranty and the related federal claim survive, however, because "concealment" is not an element of those claims under Utah or federal law.  The defendant is not entitled to judgment against any of the parties in the four transferred cases because, at the defendant's request, those parties were not part of the trial or the jury's verdict.  Chrysler's motion to enter judgment, therefore, will be granted in part and denied in part.

I.

The factual background of the case is by now familiar to the parties and was reviewed at length in the Court's previous rulings on the defendant's several rounds of dispositive and class certification motions.  *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091 (E.D. Mich. Mar. 31, 2022); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 2019 WL 6696110 (E.D. Mich. 2019), *clarified on denial of reconsideration*, 340 F.R.D. 251, 2022 WL 34675 (E.D. Mich. 2022); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582 (E.D. Mich. 2018); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975 (E.D. Mich. 2017); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 11552971 (E.D. Mich. Apr. 19, 2017); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297 (E.D. Mich. Apr. 18, 2017).  The vehicles targeted by the SACMC are the 2012-2014 Dodge Charger, the 2012-2014 Chrysler 300, and the 2014-2015 Jeep Grand Cherokee that were manufactured with a monostable gear shifter.  Chrysler's internal communication referred to the class models by certain initials, which are "LX" for the Chrysler 300, "LD" for the Dodge Charger, and "WK" for the Jeep Grand Cherokee.  The defendant sold more than 800,000 vehicles during those model years that were equipped with the monostable gear shifter.

The plaintiffs alleged that studies conducted in 2010 and 2012 by the defendant's retained market research firm, which were replicated during this litigation by the plaintiffs' human factors expert, suggested that the gear shift design "is defective because it inhibits reliable gear selection and provides insufficient tactile or audible feedback to allow drivers to readily and confidently shift to their intended gear."  They charged that the defendant was aware of the defect before the class vehicles went to market, but it elected to sell them anyway, and without disclosing its

knowledge of the shifter problems to prospective buyers.  The class vehicles were the subject of a voluntary recall in mid-2016, which included the deployment of a software fix that adds an "auto park" feature to the shifter system.  But the plaintiffs alleged that the fix did not cure certain issues with the design, and they believed that the class vehicles remained unsafe and "defective."

As noted in the Court's prior rulings, the plaintiffs' theory of the case evolved significantly throughout this litigation.  However, a couple of benchmarks on the timeline are particularly relevant.  First, the pleadings in all of the transferred matters and again in the consolidated amended economic loss complaint conspicuously discussed the history of the so-called "S27" voluntary recall that was initiated by the defendant in April 2016.  The recall was discussed in the Court's first dispositive ruling on the defendant's Rule 12(b)(1) motion:

> The plaintiffs allege that FCA knew about the defects in the shifter since at least 2011, when the affected vehicles first went to market, but it took no steps to address the defect until it issued a voluntary recall in April 2016.  In May 2016, FCA sent affected owners a letter explaining the problems and risks with the shifter design, but stated only that it was working on a solution to be released near the end of 2016.  The NHTSA report of the voluntary recall stated that FCA had assessed the cause and risks that led to the recall as follows:
>
>> Drivers erroneously concluding that their vehicle's transmission is in the PARK position may be struck by the vehicle and injured if they attempt to get out of the vehicle while the engine is running and the parking brake is not engaged.  FCA US has therefore determined that the absence of an additional mechanism to mitigate the effects of driver error in failing to shift the monostable gear selector into PARK prior to exiting the vehicle constitutes a defect presenting a risk to motor vehicle safety.
>
> The plaintiffs assert that in the meantime, because there was no remedy immediately available to fix the defect, they were left with the alternatives of either driving a dangerous vehicle, or not driving their cars at all.  The recall notice ultimately affected more than 800,000 vehicles in the United States.  FCA also later phased out the problematic shifter design starting with the 2016 model year.
>
> . . .
>
> On June 24, 2016, FCA notified owners of certain affected vehicles that they could bring their cars into an FCA dealer for a software update that would add an "auto park" feature, intended to "eliminate[] the possibility of the driver inadvertently

failing to place the transmission into 'PARK' prior to exiting the vehicle." However, the plaintiffs contend that the software fix was ineffective, and there have been numerous reports logged by NHTSA of vehicles having rollaway accidents after the fix was applied.  Some owners have had to return to their dealers for a second purported fix, which also has not fully remedied the defect.  According to published news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000 affected vehicles in the United States, and it has sent a second recall notice to affected owners directing them to return their vehicles to a dealer for further repairs.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at

*2 (E.D. Mich. Apr. 18, 2017).  It is noteworthy that the voluntary recall was commenced in April

2016, the first recall notice was issued in May 2016, and the follow-up recall notice advising

owners about the availability of the "auto park" fix was sent on June 24, 2016.  The date of that

follow-up recall notice precedes the date of filing of all the economic loss cases except one

transferred matter, *Goldsmith v. FCA US, LLC*, No. 16-13681 (C.D. Cal.), which was filed in the

transferor district on June 23, 2016.  As noted above, all of the complaints and the amended

pleadings extensively discussed the existence of the "auto park" remedy.  The defendant contends

that the fix was deployed to more than 97% of the class vehicles since it was made available.  There

has been no evidence offered into the record to date to rebut that assertion.

Nevertheless, the plaintiffs have maintained since the outset of the litigation that despite

the availability of the "auto park" update, their cars still were not suitable for their ordinary purpose

of providing safe reliable transportation, and the defendant failed to disclose its full knowledge

about the design risks until information in its possession came to light finally through the public

record of these proceedings.  The plaintiffs advanced several somewhat varying grounds for their

claim that the vehicles have a persistent and unremediated design defect.

First, in the earliest iteration of their consolidated pleadings, "the plaintiffs suggested that

the transmission design [] could, in some cases, spontaneously shift out of a selected gear into

another, unintended gear."  But they eventually "concede[d] that they have abandoned any claims

based on that [] alleged defect, and they [now] intend to proceed solely on the theory that the gear shift is defective due to its confusing interface design." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 101 (E.D. Mich. 2019).

Second, the plaintiffs alleged that "the software fix was ineffective, and there have been numerous reports logged by NHTSA of vehicles having rollaway accidents after the fix was applied," that "[s]ome owners have had to return to their dealers for a second purported fix, which also has not fully remedied the defect," and that "[a]ccording to published news reports, FCA has acknowledged that the fix was ineffective when applied to up to 13,000 affected vehicles in the United States." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 1382297, at *2 (E.D. Mich. Apr. 18, 2017). At trial, the plaintiffs abandoned the allegations of post-recall rollaway accidents and did not present any proof that such incidents occurred despite the "auto park" deployment.

Third, and most persistently, the plaintiffs also argued, and the Court recognized in its prior dispositive rulings, that the existence of an "auto park" feature that deploys only under certain restrictive conditions does not eliminate all conceivable risks of unintended vehicle movement due to mis-shifts caused by the allegedly confusing design. As the Court observed in its opinion denying the defendant's first Rule 12(b)(6) motion:

> [W]hile persistently fixating on the "auto park" feature, the defendant overlooks the fact that the retrofitted feature only would work if *one of the car's doors is opened*. If, as the plaintiffs allege, the gear shifter does not reliably inform drivers about what gear the car is in . . . then the design poses a serious risk of unintended vehicle movement *any time a driver attempts to select a gear*, not only when a driver opens the door and exits the vehicle. This risk is borne out by reports enumerated in the [first amended consolidated master complaint] FACMC, which were received by NHTSA after the recall remedy was issued and installed, showing that it does not eliminate the dangers posed by the unreliable shifter. The defendant's contention that the defect fully was cured by installation of the "auto park" remedy does not square with the facts plainly described in the FACMC.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1001 (E.D. Mich. 2017).  This final iteration of the defect claim was the major theme of the plaintiffs' case at trial, which focused on their contentions that the gear shift design remained defective despite class wide deployment of the "auto park" remedy, because its deficient driver interface could lead to unintended vehicle movement any time that a driver tried to select a gear but unwittingly failed due to the confusing design.

Also of note is that the plaintiffs initially pleaded several theories for recovery of economic damages, but they eventually abandoned them all except for the claim that they overpaid at the point of sale for cars that they believed were safe to drive, but which were not.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. at 102 ("[The plaintiffs] now assert that they will proceed solely on the theory that they suffered common economic losses due to overpaying for new vehicles at the point of sale, which they believed were safe and fit for daily transportation, but which they later found were unacceptably difficult and dangerous to drive.").

The course of the litigation over the last seven years is complex, as many MDL cases tend to be.  The first among the separate suits that were transferred to this district for consolidation was filed in the Central District of California on June 23, 2016.  Three more followed the transfer route, and seven suits were filed in this district.  Together, those 11 cases — all putative class actions — collectively comprise the part of the MDL alleging economic loss to the vehicle purchasers. (Several other cases alleging personal injuries were filed in or transferred to this distract as part of the MDL, but they were addressed on a separate track and were not part of the common-issues class trial.)

On December 9, 2019, after a lengthy discovery period, the Court issued an opinion conditionally certifying a common issues class under Federal Rule of Civil Procedure 23(c)(4).

The SACMC named as plaintiffs 39 individuals from 23 different states asserting several theories of liability based on allegations of defective shifters in the 2012-2014 Dodge Charger, the 2012-2014 Chrysler 300, and the 2014-2015 Jeep Grand Cherokee that the defendant manufactured and sold.  In its order conditionally certifying the common issues class, the Court determined that the plaintiffs had failed to demonstrate that their causes of action set out in the SACMC were amenable to class treatment under Federal Rule of Civil Procedure 23(b)(2) or (3), but that there were several discrete issues apparent from the record that were suitable subjects for class-wide adjudication under Rule 23(c)(4).  Those issues were:

- Whether the monostable gear shift has a design defect that renders the class vehicles unsuitable for the ordinary use of providing safe transportation.

- Whether the defendant knew about the defect and concealed its knowledge from buyers of the class vehicles.

- Whether information about the defect that was concealed would be material to a reasonable buyer.

The Court found that, although the claims under the laws of the several states set out in the SACMC had varying elements, the common factual questions above would "predominate within certain issues," and "class treatment of those issues [would be] the superior method of resolution."  *See Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 413 (6th Cir. 2018).

The defendant subsequently filed a motion to decertify the class in which it argued that the Sixth Circuit's decision in *In re National Prescription Opiate Litigation*, 956 F.3d 838 (6th Cir. 2020), barred the Court from proceeding with an issue trial on the three certified questions, because doing so would invade the trial rights of the defendant in the four cases that were filed in other districts and transferred here.  The defendant further argued that under the principles laid down in *Lexecon*, trying the common questions separately from the entire causes of action for each of the respective states would impair the defendant's rights under the Seventh Amendment, and that the

Court is forbidden from executing an express or implied "self-assignment" of the transferred cases for trial, and it therefore had no authority to try any issues in those matters.

Following the denial of its motion to decertify the issue class, the defendant took a different tack and filed a motion for a suggestion of remand before trial, in which it argued that the four transferred cases, *Goldsmith v. FCA US, LLC*, No. 16-13681 (C.D. Cal.); *Mack v. FCA US, LLC*, No. 16-13678 (E.D.N.Y.); *Lynd v. FCA US, LLC*, No. 16-13913 (N.D.N.Y.); and *Brooks v. FCA US, LLC*, No. 16-13677 (W.D. Mo.), were required to be remanded to the transferor districts upon the completion of the final pretrial conference, since all pretrial proceedings then would be complete.  In that motion, the defendant again cited *Lexecon* and argued that remand should be suggested because retaining the cases in this district when no further pretrial proceedings remained to be conducted would be a waste of time and the parties' resources and could lead to needless confusion in the parties' pretrial preparations.  The Court concluded that the motion for a suggestion of remand was without merit and denied it.

Nevertheless, in order to clarify the scope of the trial, the Court ordered that "the issue class trial shall constitute an adjudication by the jury of the three certified questions as they pertain to the parties and claims involved in the direct-filed MDL cases," and that "[a]fter the conclusion of the issue trial, the Court will entertain appropriate motions on the questions whether and to what extent the results of the issue trial may, by operation of law, be binding on parties and absent class members in *[Goldsmith] v. FCA US, LLC*, No. 16-13681 (C.D. Cal.); *Mack v. FCA US, LLC*, No. 16-13678 (E.D.N.Y.); *Lynd v. FCA US, LLC*, No. 16-13913 (N.D.N.Y.); and *Brooks v. FCA US, LLC*, No. 16-13677 (W.D. Mo.)."  Order Denying Mot. for Suggestion of Remand, ECF No. 808, PageID.35396 (E.D. Mich. July 27, 2022).

The jury trial on the three certified questions commenced on September 6, 2022. The parties remained at odds over the scope of the issues to be tried even after the trial had begun. On September 12, 2022, a week into the trial, the Court issued an opinion addressing the plaintiffs' motion to submit "two additional questions" to the jury, along with a second motion to decertify the class, which the defendant had filed on the eve of trial. The plaintiffs asked the Court to include the following questions in the jury instructions and verdict form:

> Question 1: Did the Class Vehicles have a design defect at the time they left FCA's possession that rendered the Class Vehicles unsuitable for the ordinary purpose of providing safe transportation?
>
> If "yes," proceed to Question 2.
>
> Question 2: Do Class Vehicles that contain AutoPark have a design defect that render the Class Vehicles unsuitable for the ordinary purpose of providing safe transportation?

Opinion, ECF No. 844, PageID.36644. The Court observed that the suggestion of "additional questions" for the jury merely was a belated attempt by the plaintiffs to reconfigure the class to split it into cohorts pre-dating and post-dating the recall initiation, and that doing so would present serious due process problems, since the questions presented to the jury would not be the same as those that were published in the class notice. The Court also noted that the plaintiffs never previously had made any timely attempt to adjust the class definition. The Court concluded:

> The plaintiffs have settled on a theory of liability that the class vehicles sold with monostable shifters were defective when sold, and the post-recall auto park fix did not cure the defect. That is how they have been presenting their proofs at trial. Posing questions to the jury which seek to distinguish between pre- and post-recall vehicles, that is, those with and without the auto park feature, will not address this key liability issue in any helpful way, and it likely will inject confusion into an already complex case.

*Id.* at 36648. The Court accordingly denied the motion to submit additional questions, and it denied the defendant's second motion to decertify the class, finding, contrary to the defendant's

argument, that there were no grounds for a conclusion that class counsel had "abandoned" any class claims or that plaintiffs' counsel was unfit to proceed with the trial.

When arguing over how the jury should be instructed to consider the question of "design defect" as presented in the first certified question, the plaintiffs advocated for a basic, universal definition of the term, while the defendant insisted that the jury must be instructed on the definition of "design defect" as it is defined under the laws of each of the 19 states involved in the direct-filed cases. The Court agreed with the defendant and instructed the jury accordingly. After the two-week trial, the jury returned a verdict on the first certified issue finding no design defect under the laws of 18 states and finding a defect under Utah law. On the second certified issue, the jury found that the defendant did not conceal knowledge of the defect, separately applying two different standards of proof. Per the instructions, the jury did not proceed to answer the third certified issue.

## II.

Defendant Chrysler argues in its motion that it is entitled to a judgment on all of the claims from the 18 jurisdictions where the jury answered "NO" to the first certified question, plus all of the claims in the four transferred cases because the definition of "design defect" in those states — California, New York, and Missouri — parrots the definitions in other states that the jury considered, plus all of the Utah claims because the jury found no concealment, plus the federal Magnuson-Moss Warranty Act claims because none of the state law warranty claims are viable. The plaintiffs respond that the verdict does not support the dismissal of all of the plaintiffs' claims because the jury was not asked to decide whether, prior to April 22, 2016, "the monostable gear shifter had ***usability flaws*** that were central to the Class Vehicles' operation." They reason that because the question of "usability flaws" remains, the statutory warranty and consumer protection claims still have life, and even where those claims include a "concealment" element, the verdict

on the second question only encompassed claims under Utah law.  The plaintiffs insist that the class members in New York and California were excluded from the class issues trial by the Court's order and are unaffected by the verdict.  Finally, the plaintiffs argue that the claim for breach of implied warranty under Utah law survives because the jury answered "yes" to the design defect question and concealment is not an element of that claim.

A.

1.

The defendant moved for judgment as a matter of law on all the claims at trial, which was denied, and now moves again for entry of judgment.  The defendant relies on Federal Rule of Civil Procedure 50(b)(3) as authority for the relief it seeks, but Rule 50 applies only to motions based on the legal insufficiency of the evidence presented at trial, Rule 50(a)(1), or "addresses a jury issue not decided by a verdict," Rule 50(b).  Neither of these circumstances obtains here.  The defendant also relies on Rule 58(d), which simply states that a party may ask the Court "that judgment be set out in a separate document."  The defendant's motion asks for more than that, however.  The jury's verdict resolved certain critical disputed fact issues, and with that resolution it can be said that with those material facts no longer in dispute, the defendant may "show[] that . . . [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The Court agrees that the defendant is entitled to judgment in its favor on all of the warranty claims brought by the plaintiffs and class members from Arizona, Colorado, Florida, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Washington, and Wyoming.  That is so because the jury was instructed on the definitions of "design defect" under the laws of each of those jurisdictions, and in response to the first certified question the jury found, under the laws of all 18 of those states,

that the class vehicles have no defect rendering them unsuitable for the ordinary purpose of providing reasonably safe transportation.

The Court's several prior rulings at the class certification and summary judgment phases have demonstrated, based on exhaustive surveys of the case law in the relevant jurisdictions, that the existence of a safety-related "defect" is a fundamental element for the plaintiffs' express and implied warranty claims in every relevant jurisdiction. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 111-13 (E.D. Mich. 2019) ("The question whether the gear shift has a design defect that renders the class vehicles unsuitable for the ordinary or intended use of providing safe transportation is a typical foundational element for all of the pleaded implied warranty and product liability claims. Typically, the implied warranty cause of action (variously identified under other labels in some jurisdictions) requires the plaintiffs to prove that a product is not 'merchantable,' meaning that it is unsuitable for its ordinary or intended use. . . . Under the laws of all the jurisdictions where implied warranty claims were pleaded, 'merchantability' of an automobile requires a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation.'") (collecting cases). The jury at the common issues trial determined that the class vehicles have no such defect. That factual finding negates all of the plaintiffs' claims for recovery under express and implied warranty theories in the 18 jurisdictions where the jury returned a finding of "no defect" at the issues trial.

In addition, all of the statutory consumer fraud and common law fraudulent concealment claims are premised on "concealment" of material information about the "defect," which is a fundamental element of all of those claims. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. at 114 ("Another common question is whether the defendant knew about the alleged safety defect in the gear shift design and concealed its knowledge from users. Concealment of a

material fact from another party to a transaction is a foundational element of fraudulent concealment in every jurisdiction where that cause was pleaded."). The unavoidable corollary of the finding of "no defect" is that a jury logically could not conclude that knowledge of any such (non-existent) defect was "concealed" from persons who bought the defendant's vehicles. The jury at the common issues trial accordingly was instructed that it should not even consider the second certified question unless it found under the law of at least one jurisdiction that a defect existed in the first instance. Trial Tr. Vol. 9, ECF No. 868, PageID.38354 ("If you find that the class vehicles have a design defect by applying the law of any of the states as I have explained it above, then you should proceed to answer the second question. The second question must be answered if you found that there was a defect by applying the law of any state. *The second question should not answered if you did not find that there was a defect under any state's laws*.") (emphasis added). Consequently, the claims for concealment and consumer fraud are precluded in every state where the jury answered in the first instance that the class vehicles have no design defect.

Of course, the jury *did* answer the question about concealment because it found that there was a design defect in at least one of the jurisdictions. The plaintiffs argue that this finding must be limited to the Utah cases, because that is the only state under whose laws a design defect was found. But neither the jury instructions nor the verdict form limited that finding, and the jury was instructed to answer the question by applying two distinct standards of proof: preponderance of evidence, and clear and convincing evidence. The "no concealment" finding was not confined to Utah cases.

## 2.

On the eve of trial, the plaintiffs attempted by various artifices to procure a belated realignment of the class definition to partition the class into buyers who purchased their cars before

and after the initiation of the S27 voluntary recall, and they now once again attempt to reframe the case in arguing that "certain issues" were "not litigated" during the issues trial, including the question whether the class vehicles had "usability flaws" prior to the recall.  The Court rejected the attempted reconfiguration of the claims before and during the trial, and the grounds for its resolve have not shifted since the verdict was returned:

> By any stretch, the plaintiffs' tardy attempt to redefine the scope of the class on the eve of trial is woefully untimely and procedurally improper.  Class certification was granted in this case in December 2019, more than two years and eight months ago. The plaintiffs previously moved to amend the class definition, but they never raised the issue of the date cutoff.  The scope of the 23(b)(3) claims class that was proposed by the plaintiffs is irrelevant at this point, since the Court denied the motion to certify a 23(b)(3) class, and instead certified a 23(c)(4) common issues class.  Moreover, class notice has gone out to more than 760,000 absent class members without regard to the date of purchase of the class vehicles.  The time for raising any purported issues with the class definition came and went long ago, and the plaintiffs never presented any such concerns to the Court until the final pretrial conference.  Any alteration of the class definition at this late date would be profoundly disruptive and prejudicial.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 4211149, at *2 (E.D. Mich. Sept. 12, 2022).  As the Court noted, "[t]he plaintiffs have settled on a theory of liability that the class vehicles sold with monostable shifters were defective when sold, and the post-recall auto park fix did not cure the defect.  That is how they have been presenting their proofs at trial[,] [and] [p]osing questions to the jury which seek to distinguish between pre-and post-recall vehicles, that is, those with and without the auto park feature, will not address this key liability issue in any helpful way."  *Id.* at *5.

Moreover, as the Court observed in its ruling addressing the parties' pretrial omnibus motions *in limine*, after exhaustively recounting the evolution of the plaintiffs' theory of liability, replicated in part above, this case never has been premised on mere "usability flaws" in the defendant's design, and from the outset it exclusively has been focused on the question whether

-15-

or not the defendant's vehicles were unreasonably unsafe due to the allegedly confusing gear

shifter interface:

> The Court repeatedly has rejected the defendant's position that the case is "all about," or "only about" the auto park feature. But the converse is not true: neither is the case "not at all about" the existence of the auto park remedy. In every dispositive ruling to date, at every juncture where the claims have been challenged, they have been upheld because the Court observed that the plaintiffs alleged and still maintain that the class vehicles are unsafe despite the inclusion of auto park. Certainly, this case never has been *only* about vehicles *with* auto park. Equally, however, it never has been about vehicles *without* that feature, because that feature was a component of the design since the very outset of the case, and it was expressly acknowledged in the pleadings.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-02744, 2022 WL 4011225, at *4

(E.D. Mich. Sept. 2, 2022). It is far too late at this juncture for the case to be rebooted with an

entirely different theory of liability. Based on the theory with which the plaintiffs went to trial,

their warranty and concealment claims fail in every jurisdiction where the issue trial jury answered

"NO" to the first certified question.

During oral argument, the Court asked plaintiffs' counsel to explain the difference between

a "design defect" and a "usability flaw" under the laws of the various jurisdictions with respect to

their warranty claims. He was not able to provide a satisfactory answer. Moreover, the plaintiffs'

new position that the class issues trial did not address the question whether the defendant

"concealed" any "usability flaw" not rising to the level of a "defect" is belied by the pleadings,

which, from the outset, explicitly have framed all of the claims of "deception" and "concealment"

and "consumer fraud" exclusively in terms of "concealment" of the alleged "safety defect."

Nothing in the pleadings, and nothing in the plaintiff's evidence or argumentation up to this point

in the case, ever has suggested that the case was about deception involving anything other than the

allegedly unreasonably unsafe design of the monostable shifter, whether labeled a "design defect,"

"usability flaw," or any other characterization of the design of a product that poses user risks to a

consumer.  The SACMC is replete with descriptions of the alleged "defect" that the plaintiffs specifically allege was concealed.  Nowhere in the pleadings are there any facts pleaded suggesting that anything other than "the defect" was concealed.

First, throughout their pleadings, the plaintiffs define and universally refer to the "Defective Shifter," which they describe as having a "safety defect."  *See* SACMC ¶ 4, ECF No. 182, PageID.5435 ("FCA installed gear shifters in the Class Vehicles that departed from the long established 'PRND' gear selector that provided a distinct position of the shifter for each gear. Unlike traditional automatic transmission shifters, the Class Vehicles are equipped with a monostable electronic gearshift supplied by ZF Friedrichshaffen AG ('ZF'), which returns to a central predetermined position after a driver switches gears (*the 'Defective Shifter'*).";  *id.* ¶ 5, PageID.5435-36 ("*The design of the Defective Shifter is dangerously defective* because of the lack of a physical gear position that would clearly notify drivers regarding which gear their vehicle is in, and the lack of a safety override function that would automatically put the vehicle in Park or engage a parking brake when a driver attempts to exit the vehicle when it is not in Park. *This dangerous defect has resulted in hundreds of accidents and vehicle rollaways* as a result of drivers not knowing which gear their transmission is in and/or exiting their vehicle without the vehicle in Park.") (emphases added above and throughout the following citations).

Second, the pleadings repeatedly reference "the defect" and "the Defective Shifter," never suggesting that anything other than "the defect" was concealed.  *E.g.*, SACMC ¶ 10, PageID.5437-38 ("Although FCA *has known of the Defective Shifter and associated safety risks* since shortly after certain of the Class Vehicles were placed on the market in 2011, *it has failed* to act within a reasonable time *to notify Plaintiffs and members of the Classes (defined below) of the defect* and/or provide a remedy to protect them from the associated safety risks. . . . Additionally, *the recall and*

*purported remedy do not fully compensate Plaintiffs* and members of the Classes for either *the decrease in value of their vehicle since the defect came to light* or for their time dedicated to fixing the defect."); *id.* ¶ 12, PageID.5439 ("FCA has long known of the safety risks associated with *the defect* in the *Defective Shifter*."; *id.* ¶ 14 ("In fact, *the design defect* was avoidable.").

Third, the plaintiffs allege in their pleadings that they were deprived of the benefit of the bargain by overpaying for cars that had "the defect" and which were "unsafe" to operate. SACMC ¶ 23, PageID.5443 ("Plaintiffs and members of the Classes were harmed by the Defective Shifter and recall in a number of ways, in that they . . . did not receive the benefit of the bargain of the purchase or lease of the Class Vehicles *which were sold and leased as safe and reliable vehicles at premium prices* even though *they contained a known but concealed defect*.").

Finally, in the allegations directed to the consumer protection claims, the plaintiffs explicitly pleaded that the claims were premised on concealment of "the defect":

> *Defendant misrepresented the standard, quality or grade of the Class Vehicles* and knowingly, actively, and affirmatively *omitted and/or concealed the existence of the Defective Shifter* to increase profits by selling additional Class Vehicles. *Knowledge and information regarding the Defective Shifter and associated safety risks* were in the exclusive and superior possession of Defendant and its dealers, and *was not provided to Plaintiffs and members of the Classes*, who *could not reasonably discover the defect* through due diligence. Based on pre-production testing, design failure mode analysis, and consumer complaints to dealers and NHTSA, inter alia, *Defendant was aware of the design defect in the Defective Shifter and fraudulently concealed the defect* from Plaintiffs and members of the Classes.

SACMC ¶ 26, PageID.5444-45; *see also id.* ¶ 31, PageID.5447 ("Plaintiff Jeffrey Guy is a resident of Arizona . . . . *He purchased [his class vehicle] because of its reputation for safety and utility*, consistent with *his review of Jeep's advertising messaging regarding safety and reliability*."); *id.* ¶ 32, PageID.5447 ("*Unbeknownst to Plaintiff Guy* at the time of purchase, *his vehicle was equipped with the Defective Shifter*, which fails to adequately alert drivers of the Class Vehicles' gear position, including when drivers exit the vehicle with the engine running. Until Defendant's

recall on April 22, 2016 and subsequent letters sent to Class Vehicle owners and lessees, *Defendant never warned Plaintiff Guy of the Defective Shifter and corresponding safety risk* associated with his vehicle."); *id.* ¶ 265, PageID.5567 ("In the course of its business, *FCA willfully failed to disclose and actively concealed the defectively designed Defective Shifter discussed herein* and otherwise engaged in activities with a tendency or capacity to deceive.") (pleading a claim under Arizona Consumer Fraud Act).

Nothing in the pleadings or throughout the presentation of the plaintiffs' claims suggests that there was any factual premise for the consumer fraud or concealment claims under other causes of action other than concealment of the alleged safety "defect." There is no reference to a "usability flaw" as a creature separate and apart from a design defect. There is no basis in the pleadings or the record for a conclusion that the plaintiffs ever have framed their case as seeking recovery for alleged deception about anything other than the shifter's confusing design, which they persistently have framed as a "safety defect."

Finally, as the Court recognized in several prior rulings, the plaintiffs have not presented any legal authority suggesting that they can prevail on any of their various legal theories where the claims all are premised on the existence of a "defect" that — at least according to the applicable rules of decision in the 18 jurisdictions where "no defect" was found —has been remedied fully by the defendant's voluntary recall. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 4211149, at *3-4 (E.D. Mich. Sept. 12, 2022) (citing *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015); *Hadley v. Chrysler Group, LLC*, 624 F. App'x 374, 378 (6th Cir. 2015); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 4011225, at *4 (E.D. Mich. Sept. 2, 2022). Regardless of the causes of action pleaded, the plaintiffs long ago

abandoned all of their theories of damages other than the claim that they did not receive the full "benefit of the bargain" when they purchased allegedly unsafe vehicles that they thought were safe to drive.  The cases on point hold that is no longer a theory on which they can hope to prevail where the vehicles — according to the jury — presently perform as safely as a reasonable consumer would expect.

The defendant's request for entry of judgment on all of the claims by plaintiffs and absent class members in Arizona, Colorado, Florida, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Washington, and Wyoming will be granted.

B.

The defendant also seeks entry of judgment on the claims of plaintiffs and absent class members from New York and California.  It is undisputed that claims by individual plaintiffs and absent class members from those jurisdictions were asserted exclusively in three of the four cases that were filed in other districts and transferred to this Court for consolidation into the MDL proceedings.  Those matters are *Goldsmith v. FCA US, LLC*, No. 16-13681 (C.D. Cal.); *Mack v. FCA US, LLC*, No. 16-13678 (E.D.N.Y.); and *Lynd v. FCA US, LLC*, No. 16-13913 (N.D.N.Y.). The fourth transferred case, *Brooks v. FCA US, LLC*, No. 16-13677 (W.D. Mo.), involved individual and putative class claims under Missouri law, but those claims were not involved in the issue trial because the plaintiffs abandoned their efforts to secure class certification in that jurisdiction. *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 106, 2019 WL 6696110 (E.D. Mich. 2019) ("The plaintiffs conceded in their reply that the available class representatives for Missouri (Taylor Brooks) and Wisconsin (Marc Hughes) cannot adequately represent absent class members from those states (or any others), because the individual claims

-20-

pleaded by those plaintiffs are inconsistent with the theory of liability now advanced by other plaintiffs in the case. That is because the plaintiffs now have abandoned their claims, which previously were advanced by Brooks and Hughes, that the gear shift mechanism in question has either a manufacturing or design defect that causes class vehicles to spontaneously shift from a selected gear to a different, unintended gear. The plaintiffs have withdrawn Brooks (Missouri) and Hughes (Wisconsin) as potential representatives, and there is no question that classes cannot be certified in those states regarding any claims or issues.").

The defendant's argument for entry of judgment in the transferred matters simply ignores the orders of the Court by which — at the defendant's urging — all claims from those individuals and absent class members involved in the transferred cases expressly were *excluded* from adjudication during the class issues trial. The legal theories of claim or issue preclusion may furnish a portal through which the defendant might bring the jury verdict to the cases that were not part of the trial. But the defendant makes no attempt to demonstrate how New York's or California's issue preclusion rules mandate a finding of no liability for the defendant. Instead, the defendant merely resurrects in contrapositive form the same arguments premised on "Due Process" and "Seventh Amendment" concerns that it previously posed when it argued strenuously that none of the claims from the transferred cases — or any portion of them — could be tried before this Court in the first instance. The defendant now contends that the Court should "construe" the jury's verdict "to answer the 'defect' question for California and New York," because the legal definition of that term under those states' laws maps onto some of the state law definitions that the jury actually considered. The defendant warns that ruling otherwise would "raise major problems under the Due Process Clause of the Fifth Amendment and the Reexamination Clause of the Seventh Amendment."

This is a Janus-like presentation.  The defendant's arguments run headlong into some fundamental concepts that are designed to discourage cynical retrenching that deprives litigants of their day in court.  For one: judicial estoppel.

The doctrine of judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Its purpose is "to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'"  *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)).

The Supreme Court has identified several factors for district courts to consider when applying the doctrine: (1) whether "a party's later position [is] clearly inconsistent with its earlier position;" (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 243 (6th Cir. 2021) (quoting *New Hampshire*, 532 U.S. at 750-51)).  All of those factors weigh against the defendant here.

First, the defendant's earlier position that the claims included in the transferred matters *could not* be tried here manifestly contradicts its present position that those claims necessarily *must have been decided* during the issue trial.  In its pretrial motions to decertify the class and for a suggestion of remand, the defendant argued on the same legal grounds for precisely opposite results, invoking both Due Process and Seventh Amendment language each time.  *In re FCA US*

*LLC Monostable Elec. Gearshift Litig.*, 340 F.R.D. 251, 253 (E.D. Mich. 2022) ("The defendant argues that the Sixth Circuit's decision in *In re National Prescription Opiate Litigation*, 956 F.3d 838 (6th Cir. 2020), requires that the issues class be decertified.  It reasons that proceeding with an issue trial on the three certified questions would invade the trial rights of the defendant in the four transferred cases, citing *Lexecon . . .*, and trying these issues separately from the entire causes of action for each of the respective states may impair the defendant's rights under the Seventh Amendment.").

Second, the defendant persuaded the Court to accept that rationale and to grant substantial relief based on its expressed concerns, which the Court did by excluding from the adjudication in the common issues trial all the claims and parties involved in the transferred cases.  The relief granted was not precisely what the defendant wanted — either decertification or early remand — but the Court's order had the identical substantial effect, which was to preclude the claims involved in the transferred cases from being tried to a jury in this Court.

Third, the defendant — at least before trial — plainly desired (and gained) an advantage in the litigation by limiting the scope of the claims to be litigated at the common issues trial, which was the result for which it repeatedly advocated in its pretrial motions.  For reasons that are apparent from the verdict, the defendant now, perhaps, wishes that it *had* consented to be bound by the result of the common issues trial even in the remote proceedings.  But it resolutely declined to do so before trial.

Another problem: the plaintiffs and absent class members from New York and California have not had their day in court.  As the plaintiffs point out, the absent class members were not adequately represented by individual plaintiffs at the common issues trial because their respective class representatives were excluded from the trial by order of the Court (again, at the defendant's

behest).  As the Supreme Court has explained, "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) *either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty* [and] [i]n the class-action context, these limitations are implemented by the procedural safeguards contained in Federal Rule of Civil Procedure 23." *Taylor v. Sturgell*, 553 U.S. 880, 900-01 (2008) (emphasis added).  In this instance, the Court appointed the named plaintiffs from *each state* to act as class representatives *for their respective jurisdictions*.  *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 117 (E.D. Mich. 2019).  Because the Court excluded claims from the New York and California plaintiffs from the common issues trial, those class representatives could not have participated in the trial, and in fact they did not.  And because the class representatives from each state were appointed solely to represent their respective jurisdictions, none of the other class representatives reasonably could have understood that they were charged with representing New York or California class members.

The defendant's position essentially amounts to an argument for an expansive theory of "virtual representation," which was rejected by the Supreme Court in *Taylor*, where the Court held that "[a]n expansive doctrine of virtual representation [would] recognize, in effect, a common-law kind of class action [and] authorize preclusion based on identity of interests and some kind of relationship between parties and nonparties, shorn of the procedural protections prescribed in [Rule 23]."  *Taylor*, 553 U.S. at 901.  The Court warned that "[t]hese protections, grounded in due process, could be circumvented were we to approve a virtual representation doctrine that allowed courts to create de facto class actions at will."  *Ibid.*  The defendant contends that the verdict in the common issues trial must be "construed" to bind New York and California class members because

the class notice informed them that they "would be bound" by the result of the issue trial. But that notice did not say that the trial of the claims would take place entirely in a single proceeding. It merely indicated that *when the class issues were decided at trial*, the absent class members — along with their class representatives — then would be bound. *See* Joint Form of Notice, ECF No. 530-3, PageID.22152 ("*The Plaintiffs must prove their position on the certified questions at trial. The Court has set the trial date for August 11, 2020 at the Theodore Levin United States Courthouse located at 231 W. Lafayette Blvd., Detroit MI 48226. Please note that the trial date is subject to change.*"); *id.* at 22156 ("If you remain a Class Member, *you and FCA US will be bound by the jury or Court's answers to the questions identified above* and you keep the possibility of getting money or benefits that may be available in the future. But, you may give up any rights you have to sue FCA US separately concerning the same legal claims in this lawsuit. *You will be bound by the outcome of any trial, whether Plaintiffs win or lose.*"); *id.* at 22154 ("The Court and a jury will hear the evidence and arguments presented by both sides and will decide who should prevail on each of these three issues. Subsequent to that determination, *the Court will determine what additional proceedings, if any, are appropriate.*") (emphases added).

As the Court explained in its order denying the defendant's motion for suggestion of remand, the Manual for Complex Litigation contemplates a bellwether trial as an expedient for potentially narrowing issues in advance of remand. "'Prior to recommending remand, the transferee court could conduct a bellwether trial of a centralized action or actions originally filed in the transferee district, the results of which (1) may, *upon the consent of the parties to constituent actions not filed in the transferee district*, be *binding on those parties and actions*, or (2) may otherwise promote settlement in the remaining actions.'" *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 19001834, at *3 (E.D. Mich. July 27, 2022) (quoting

Manual for Complex Litigation, Fourth § 20.132 (2004) (emphasis added)).  The Court "established a procedure that comports fully with the guidance of the Manual, which [was] followed through to trial," whereby "the issue class trial constitute[d] a bellwether trial of sorts, directed to resolving the three certified questions *as they pertain to the parties and claims in the cases originally filed in this district*."  *Ibid.*  The defendant had the opportunity to consent to the resolution of the claims of all parties and class members at a single common issues trial, and it elected not to do so.  It cannot now leverage its insistence for constraining the trial agenda before this Court as a subterfuge to foreclose the convening of trials in the first instance in the transferor districts, to decide the factual questions relating to parties that expressly were excluded from the bellwether verdict here.

Finally, the defendant has not made any developed argument urging the application of either claim or issue preclusion principles to render judgment in its favor against the parties that were excluded from the common issues trial.  Under the circumstances, the principles of collateral estoppel cannot be applied to preclude resolution by trial in the first instance — in the appropriate venues — of the three certified questions, which remain to be decided in the transferred matters. The principles of issue preclusion (a/k/a collateral estoppel) are the same under both New York and California law.  Both require identical proceedings, a final judgment on the merits, and, critically, the person against whom the decision is imposed must have been "a party or in privity with a party at the prior proceeding."  *Lu v. Vivente 1, Inc.*, No. 23-02799, 2023 WL 3958359, at *2 (N.D. Cal. June 12, 2023) (citing *Wabakken v. California Dep't of Corr. & Rehab.*, 801 F.3d 1143, 1148 (9th Cir. 2015)); *Newrez, LLC v. City of Middletown*, 188 N.Y.S.3d 157, 159 (App. Div. 2023) (citing *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490 (N.Y. Ct. App. 1984)).  However, as the Supreme Court has explained, in order for "a prior proceeding [] to

have binding effect on absent parties, [it] would . . . have to be so devised and applied as to insure that those present are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue." *Richards v. Jefferson County*, 517 U.S. 793, 801 (1996).

Here, the difficulty is that the question of the existence of a defect under New York and California law was not "identical to" any issue decided by the jury in the class issue trial, nor was it "clearly raised" in the trial where the jury was not instructed on the law of either jurisdiction. Moreover, the class issues trial — by design — explicitly *foreclosed* the "full and fair consideration of the common issues" as they pertained to claims and parties involved in the transferred cases. The parties argued extensively throughout the trial about the proper form of the jury instructions, and the defendant repeatedly insisted that in order for a sound verdict to be secured, the jury must be instructed on the peculiar rules of decision for determination of a defect using model instructions from every one of the 19 jurisdictions involved in the issue trial. *See* Def's Proposed Jury Instructions, ECF No. 851. However, because the claims of the California and New York parties and class members explicitly were excluded from the trial, the Court did not instruct the jury on the law of either jurisdiction.

Following the trial, the defendant now once again attempts a turnabout and argues — without presenting any developed argument for issue preclusion — that the issues under New York and California law must be deemed to have been decided merely because the rules of decision in those states are substantially similar to those in other states. But the defendant's trial position was that the issues were legally disjunctive and needed to be resolved under distinct rules for every jurisdiction. Its buyer's remorse will not alter that insistence at this stage of the case.

The defendant has failed to present any developed argument for the application of issue preclusion, and the arguments that it has presented are foreclosed by its adoption of a manifestly contrary position during pretrial litigation.  Moreover, any judgment purporting to bind parties and class members in the transferred cases would run afoul of the due process principles enunciated clearly in *Taylor* and would deprive the parties to those cases the full trial to which they unquestionably are entitled, *see* U.S. Const. Am. VII, and which the class notice told them they would enjoy.  The defendant's request to enter judgment on the claims of the parties and class members involved in the four transferred cases will be denied.

C.

The defendant also seeks dismissal of all the claims brought under Utah law.  The plaintiffs concede that the Utah consumer protection violation claims (Count CII), fraudulent concealment claims (Count CIII), breach of express warranty claims (Count CIV), and unjust enrichment claims (Count CVI) must be dismissed.  They contend that they now intend to proceed solely on the Utah claim for breach of implied warranty and the associated count for violation of the federal Magnuson-Moss Warranty Act.  The defendant acknowledges the jury's finding that the class vehicles are "defective" under Utah law, but it attempts to leverage the negative finding on the second question — "no concealment" — as grounds for entry of judgment on the implied warranty claim.  The defendant is not entitled to judgment on the implied warranty claim, however, because "concealment" is not an element of the *prima facie* case under Utah state law.

Under Utah's enactment of the Uniform Commercial Code, a "'warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'"  *Spencer v. Harley-Davidson, Inc.*, No. 16-00427, 2018 WL 3972925, at *7 (D. Utah Aug. 20, 2018) (quoting Utah Code § 70A-2-314).  Under Utah law, "the elements of

strict liability and breach of warranty 'are essentially the same.'" *Straub v. Fisher & Paykel Health Care*, 1999 UT 102, 990 P.2d 384, 389 (Utah 1999) (quoting *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 159 (Utah 1979)).  "Utah applies a three-part test to establish a claim of strict product liability: a plaintiff must show '(1) that the product was unreasonably dangerous due to a defect or defective condition, (2) that the defect existed at the time the product was sold, and (3) that the defective condition was a cause of the plaintiff's injuries.'" *Spencer*, 2018 WL 3972925, at *6 (quoting *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1279 (10th Cir. 2003)).  "A product is 'unreasonably dangerous' if, at the time of sale by the manufacturer, the product 'was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training or experience possessed by that particular buyer, user or consumer.'" *Ibid.* (quoting Utah Code § 78B-6-702; Utah Code Ann. § 78B-6-703(1)).  "To establish a claim for breach of the implied warranty of merchantability, [the plaintiffs] must show that [the defendant], as [a] merchant[], sold a good which did not meet one of the standards of merchantability: (1) passes without objection; (2) is of fair average quality; (3) is fit for ordinary purposes; (4) is of even kind, quality and quantity; (5) is adequately contained, packages and labeled; or (6) conforms to promises on the packaging." *Id.* at *7.

It is undisputed that the defendant is a "merchant" and that it "sold" the class vehicles.  The jury determined that, according to Utah law, the class vehicles have a design defect that has not been rectified by the installation of the auto park fix, and that defect renders the vehicles unreasonably unsafe.  *See* Trial Tr. Vol. 9, ECF No. 868, PageID.38351.  The jury's verdict conclusively resolved the question whether the class vehicles are fit for the ordinary purpose of providing safe, reliable transportation (at least in Utah).  *Winzler v. Toyota Motor Sales USA, Inc.*,

No. 10-00003, 2010 WL 3064364, at *3 (D. Utah Aug. 3, 2010) ("'[T]he implied warranty of merchantability' is simply a guarantee that [the vehicle] will operate in a 'safe condition' and 'substantially free of defects.'" (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989)), *judgment vacated on other grounds*, 681 F.3d 1208 (10th Cir. 2012).  According to the jury, they are not.  The jury's answer the to the defect question, along with the other undisputed facts in the record, are sufficient to make out a *prima facie* case for breach of implied warranty under Utah law.  *Spencer*, 2018 WL 3972925, at *7.

The defendant further argues that "knowledge of the defect" by a consumer is a defense to an implied warranty or product liability claim under Utah law, and the case law on point supports that position.  *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 158 (Utah 1979) ("[T]here are two defenses to strict products liability, namely, (1) misuse of the product by the user or consumer; and (2) knowledge of the defect by the user or consumer, who is aware of the danger and yet unreasonably proceeds to make use of the product, i. e., assumption of risk.").  However, the case presently is before the Court on a "renewed" motion under Federal Rule of Civil Procedure 50(b)(3) (or perhaps Rule 56(a)) for entry of judgment as a matter of law following a jury trial.  The defendant's defense of knowledge of the defect was not presented at trial, and the jury was not instructed on that issue, for the obvious reason that the class common issues trial was not a trial of any causes of action, but instead was a preliminary trial of discrete factual questions addressing certain elements fundamental to the plaintiffs' *prima facie* case.

As explained above, the established existence of a defect along with other undisputed facts suffice to make out the plaintiffs' *prima facie* case on their sole surviving claim for breach of the implied warranty.  The defendant's request for adjudication as a matter of law on its affirmative defense is a matter that is not presently before the Court.  Nor has the defendant pointed to any

evidence in the trial record concerning whether any individual plaintiffs or class members had "knowledge" of the defect, which is a decidedly different inquiry from the only question presented to the jury, which was whether knowledge of the defect was "concealed" by the defendant.

The cases cited by the defendant as backup for its argument are distinguishable and do not establish the proposition that it advances: the defendant posits that "lack of concealment" of a defect by the defendant standing alone mandates the dismissal of a warranty claim alleging unsuitability of a product for its ordinary purpose on the ground that buyers must be deemed as a matter of law to have had full "knowledge" of the defect.  That notion does not find support in Utah law.

The decision in *In re Ford Motor Co. E-350 Van Product Liability Litigation (No. II)*, MDL No. 03-4558, 2012 WL 379944, at *19 (D.N.J. Feb. 6, 2012), did not hold that "lack of concealment" necessarily implies "knowledge" by consumers, and in a footnote the court expressed skepticism toward any such class-wide inference of universal knowledge of a defect. *See id.* at *19 n.15 ("This Court's consideration of the news reports issued between 2000 and 2004 should not be construed as a ruling that every consumer who was aware of such an article had actual knowledge of E-350's handling problems. Rather, this Court merely recognizes that a consumer who had seen such a report may have had actual knowledge of the E-350's handling defects at the time of purchase, depending on, inter alia, the information contained in the article."). Moreover, the decision did not apply Utah law and is not controlling on this Court.

Similarly, in *Upjohn Co. v. Rachelle Laboratories, Inc.*, 661 F.2d 1105 (6th Cir. 1981), the court of appeals considered principles of liability under Michigan not Utah state law.  Moreover, the panel rejected the defendant's argument that "negligence in failing to discover defects is a defense to a breach of warranty."  *Id.* at 1108.  That holding bolsters the view that there is some

daylight between "concealment" of a defect, or lack thereof — or even undisputedly widespread publication of information about a problem — and a demonstration of "knowledge" of that defect on the part of a purchaser.

*Durbano Metals, Inc. v. A&K R.R. Materials*, 574 P.2d 1159 (Utah 1978), is distinguishable because there it was proved that the claimant "orally agreed" to accept goods with a specific defect after having been informed of the problem. *Id.* at 1162 ("Defendant waived the requirement that the materials be only 90-pound materials, however. The waiver occurred when defendant orally agreed to pay for these 110-pound materials at the contract price."). No evidence of any such concession to knowingly accept defective goods has been shown here.

The court in *Henry Heide, Inc. v. WRH Prod. Co.*, 766 F.2d 105 (3d Cir. 1985), applied New Jersey not Utah state law. Moreover, in that case the court of appeals found that there was a material dispute of fact about whether the buyer's inspection procedure should have disclosed the defect in question. *Id.* at 111. That decision also supports the view that whether a buyer had "knowledge" of a defect is a fact-intensive question that is not resolved merely by proof that a defect was "not concealed" by a seller.

Finally, in *Sobiech v. International Staple & Mach. Co.*, 867 F.2d 778 (2d Cir. 1989), the court of appeals rejected the position that mere obviousness of a defect upon examination precludes an implied warranty claim, holding narrowly that a buyer's extensive use of an identical product before making a second purchase of the same item barred any claim that the additional specimen was unfit on the basis of defects that were apparent during extended usage of the first example. *See id.* at 783 ("We do not . . . rest our decision simply on the cases holding that a purchaser cannot recover damages for breach of implied or express warranties that an examination of the goods should have revealed to him. *This case involves extensive use and actual knowledge*

-32-

*of the problems in issue before purchase.* Such use and knowledge precludes any implied warranties as to the performance of that machine or machines of identical design.") (citations omitted).   Once again, that decision endorses the view that determination of a purchaser's "knowledge" of a defect is a fact-intensive inquiry dependent on the circumstances of pre-purchase inspection and usage by the customer.

None of the cases cited by the defendant hold that "absence of concealment" equates to "presence of knowledge" among all buyers as a matter of law.   Close reading of the decisions on point reveals reasoning hewing to the contrary view that "concealment" and "knowledge" are separate concepts, and demonstration of "knowledge" requires a more searching inquiry looking beyond whether a defect was merely "obvious" or even widely known, into circumstances demonstrating that in a particular instance an individual buyer in fact knew about the problem in question.

The question of the Utah plaintiffs' "knowledge" of the defect was not put to the jury; no proofs on that subject were received; and the jury was not instructed on the pertinent rules of decision for that affirmative defense under Utah law.   The verdict on the second certified question therefore does not supply legal ground for judgment as a matter of law on the implied warranty cause of action.   The defendant is not entitled to judgment on the Utah implied warranty and Magnuson-Moss claims, but the Court will grant the motion as to the other counts under Utah law.

## D.

The defendant tacked on to its motion for judgment an argument that "continued class treatment is no longer appropriate" even if all of the claims are not decided finally in its favor. The plaintiffs presented some opposition to that position in their response, but they also have filed several related motions to certify (or re-certify) several additional classes to proceed on claims or

questions that they believe survived the jury verdict.  One such motion seeks to certify a multi-state class that posits claims based on the existence of a "usability flaw" in the class vehicles because of the design of the monostable shifter.  *See* ECF No. 874.  But that motion dies aborning, because, for reasons discussed earlier, any claims in the several enumerated states based on "usability flaws" can no longer amount to viable causes of action in light of the jury's verdict.  That motion, therefore, will be denied.

The plaintiffs also have moved to certify separate classes in New York and California, which were not part of the common issues trial, and in Utah based on the jury's verdict finding the vehicles defective under the law of that state.  The defendant has opposed those motions and filed a separate motion to strike them.  They are set for a hearing; the question whether any further proceedings ought to be undertaken on a class basis under the laws of those states is better addressed in the context of the specific issues presented by the plaintiffs' post-verdict motions for class certification.  Those questions will be addressed in due course.

III.

Based on the jury's verdict in the common issues trial, the defendant FCA US LLC is entitled to judgment dismissing all the claims stated in the Second Amended Consolidated Master Complaint and the complaints in the direct-filed cases on which that consolidated pleading is based under the laws of all the states where the jury found that no design defect existed in the shifters in the class vehicles.  The defendant is not entitled to judgment against any party in the transferred cases under the laws of California, New York, or Missouri, or for any warranty claims against any party under Utah law.  The plaintiffs cannot establish a viable basis to certify a new multi-state class based on alleged usability flaws in the class vehicles.  The Court will adjudicate the plaintiffs' motion to certify classes under California and New York law (ECF. No. 873) and the defendant's

motion to strike that motion (ECF No. 884) before filing suggestions of remand for the transferred cases.

Accordingly, it is **ORDERED** that the defendant's motion for judgment (ECF No. 872) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that judgment in favor of the defendant shall enter on all of the claims by plaintiffs and absent class members raising claims under the laws of Arizona, Colorado, Florida, Illinois, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Texas, Washington, and Wyoming, in the Second Amended Consolidated Master Complaint and the complaints in the direct-filed cases.

It is further **ORDERED** that the defendant's motion for judgment is **DENIED** on the claim based on implied warranty under Utah law, and on the claims of the parties and class members involved in the four transferred cases, *Goldsmith v. FCA US, LLC*, No. 16-13681 (C.D. Cal.); *Mack v. FCA US, LLC*, No. 16-13678 (E.D.N.Y.); *Lynd v. FCA US, LLC*, No. 16-13913 (N.D.N.Y.); and *Brooks v. FCA US, LLC*, No. 16-13677 (W.D. Mo.).

It is further **ORDERED** that the individual and class claims under Utah law of consumer protection violations (Count CII), fraudulent concealment (CIII), breach of express warranty (Count CIV), and unjust enrichment (Count CVI), as pleaded in the Second Amended Consolidated Master Complaint and the complaint in *Felker v. FCA US LLC*, No. 17-10983, are **DISMISSED WITH PREJUDICE**.  The plaintiffs' motion for class certification of the surviving claim of implied warranty violations as pleaded by Utah plaintiff Trevor Marble (ECF No. 875) will be addressed in due course.

It is further **ORDERED** that the plaintiffs' motion to certify a new multi-state class (ECF No. 874) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   August 3, 2023